**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| DON GIBSON, | ) | |
| | ) | |
| LAUREN CRISS, and | ) | |
| | ) | |
| JOHN MEINERS, | ) | |
| | ) | |
| individually and on behalf of | ) | |
| all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| NATIONAL ASSOCIATION OF | ) | |
| REALTORS, | ) | |
| | ) | |
| COMPASS, INC., | ) | |
| | ) | |
| EXP WORLD HOLDINGS, INC., | ) | |
| | ) | |
| REDFIN CORPORATION, | ) | |
| | ) | |
| WEICHERT REALTORS, | ) | |
| | ) | |
| UNITED REAL ESTATE, | ) | |
| | ) | |
| HOWARD HANNA REAL ESTATE | ) | |
| SERVICES, and | ) | |
| | ) | |
| DOUGLAS ELLIMAN, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Don Gibson, Lauren Criss, and John Meiners ("Plaintiffs"), bring this action on

behalf of themselves and on behalf of the Class consisting of all persons who listed properties on

a Multiple Listing Service in the United States ("the MLS") using a listing agent or broker affiliated

with one of the Corporate Defendants named herein and paid a buyer broker commission from October 31, 2019, until the present ("the Class Period").

Defendants are the National Association of Realtors ("NAR") and seven of the largest national real estate brokerages and franchisors: Compass, eXp, Redfin, Weichert Realtors, United Real Estate, Howard Hanna Real Estate Services, and Douglas Elliman, Inc., each of which has a significant presence in this District and nationwide. Together and along with NAR and other unnamed co-conspirators, Defendants have conspired to require home sellers to pay the broker representing the buyer of their homes in violation of federal antitrust law.

Plaintiffs seek treble damages under federal antitrust law, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees, and demand a trial by jury.

## NATURE OF THE ACTION

1. Plaintiffs, home sellers who listed their homes on Multiple Listing Services in the United States, bring this action against Defendants for agreeing, combining, and conspiring to impose and enforce an anticompetitive restraint that requires home sellers to pay the broker representing the buyer of their homes, and to pay an inflated amount, in violation of federal antitrust law. Indeed, the Antitrust Division of the United States Department of Justice is currently and actively investigating practices in the residential real estate brokerage marketplace, with a focus on compensation paid to brokers among other conduct and practices.

2. Defendants are the National Association of Realtors and seven of the largest national real estate brokerages and franchisors: Compass, eXp, Redfin, Weichert Realtors, United Real Estate, Howard Hanna Real Estate Services, and Douglas Elliman, Inc. (the latter group is the "Corporate Defendants" and collectively with NAR they are referred to as "Defendants").

3. The cornerstone of Defendants' conspiracy is NAR's rule that requires all home

2

sellers to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation ("the Mandatory Offer of Compensation Rule") when listing a property on an MLS. Corporate Defendants—by virtue of compelling and/or encouraging their franchisees, brokers, and agents to belong to NAR and adhere to its rules—adopt, implement, and enforce the Mandatory Offer of Compensation Rule.

4. An MLS is a database of properties listed for sale in a particular geographic region. The vast majority of homes in the United States are sold on an MLS marketplace. In most MLS areas, brokers are required to list all properties on the MLS.

5. Most MLSs are controlled by local NAR associations, and access to such MLSs is conditioned on brokers agreeing to follow all mandatory rules set forth in NAR's Handbook on Multiple Listing Policy.[1] The Mandatory Offer of Compensation Rule is a mandatory rule in NAR's Handbook.

6. Defendants and their co-conspirators collectively possess market power in local markets for real estate broker services through their control of and participation in the local MLS.

7. In most MLSs, NAR conditions a broker's access to and use of NAR's MLSs on a broker's agreement to adhere to and implement terms that restrain competition. Further, each Corporate Defendant mandates and/or encourages that franchisees, brokerages, and individual realtors join and implement NAR's anticompetitive rules, including the Mandatory Offer of Compensation Rule; otherwise these parties would not receive the benefit of Corporate Defendants' branding, brokerage infrastructure, and other support. As some of the leading brokers in the United States, their knowing acts of forming and/or joining and participating in the

---

[1]    *See* National Association of Realtors, Handbook on Multiple Listing Policy 2019, *available at* https://www.nar.realtor/sites/default/files/documents/2019-HMLP.pdf ("NAR Handbook").

conspiracy, by implementing and enforcing its rules and policies, is essential to the conspiracy's success. The unlawful restraints implemented and enforced by the conspirators benefit NAR and the Corporate Defendants, furthering their common goals by permitting brokers to impose supra-competitive charges on home sellers and restrain competition by precluding competition from innovative or lower-priced alternatives.

8. Defendants' conspiracy forces home sellers to pay a cost that, in a competitive market and were it not for Defendants' anticompetitive restraint, would be paid by the buyer.

9. It is well recognized in the industry that steering is used to scare homeowners into inflated or stabilized rates for fear that buyer brokers will not share homes.

10. If NAR's Mandatory Offer of Compensation Rule were not in place, then the cost of buyer broker commissions would be paid by their clients (home buyers). Buyer brokers would thus have to compete with one another by offering a lower commission rate. The Mandatory Offer of Compensation Rule thereby restrains price competition among buyer brokers because the person who actually retains the buyer broker — the home buyer — does not negotiate or pay the commission for his, her, or their broker.

11. Deepening the anticompetitive effects of the Mandatory Offer of Compensation Rule, NAR rules also prohibit buyer brokers from making home purchase offers contingent on the reduction of the buyer broker commission.

12. Real estate brokers handle most residential real estate sales in the United States. In a typical transaction, one broker will represent the seller, and another broker will represent the buyer of a home. Both the buyer broker and seller broker (also known as the listing broker) are paid a percentage of the property's sales price. Currently, total broker compensation in the United States is typically five to six percent of the home sales price, with approximately half of that

4

amount paid to the buyer broker.

13.　　In competitive foreign markets, home buyers pay their brokers, if they choose to use one, and they pay less than half the rate paid to buyer brokers in the United States. These international markets include United Kingdom, Germany, Israel, Australia, and New Zealand. In these markets, which are not affected by any policy like the Mandatory Offer of Compensation Rule, buyer brokers are paid by home buyers, rather than home sellers. According to the Executive Director of the Consumer Federation of America, total commission rates in "a number of developed countries" range "between 1% and 4%" whereas in the United States the average total commission rates continue to remain between 5% and 6%, which is "no lower than it was in 2001" despite significant advances in technology.[2]

14.　　Indeed, a 2015 report, commissioned by NAR to study negative emerging trends in the real estate industry, highlighted concerns that total commissions in the United States are inflated compared to international markets, such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium. According to the report commissioned by NAR, in those countries the average total commissions ranges between 1% and 3%.[3]

15.　　As a representative of a brokerage that operates in both the United States and internationally observed at an FTC/DOJ Joint Public Workshop on the real estate industry, "[i]t's hard to believe it's 2018 and we're in the US and the average commission fee is still between 5%

---

[2]　　FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf.

[3]　　Swanepoel Group, D.A.N.G.E.R Report, at 22 (definitive analysis of negative game changers emerging in real estate) (2015). The report also suggests that total commissions in Germany range between 3% and 6%.

and 6% when we have one of the largest, most developed markets in the [world]. But we still maintain that *elevated* level of commission expense." (emphasis added).[4]

16.    The Mandatory Offer of Compensation Rule explains why commissions in the United States remain artificially and anticompetitively "elevated" beyond where they would be in a market free from Defendants' conspiracy. Indeed, other industry participants recognize that "this seller agent/buyer agent model" is why commission amounts are "very different" in the United States compared to countries like "the UK," as Defendants and their co-conspirators are "dead set on not letting 6% commissions go away" in the United States.[5]

17.    Defendants use their control of the MLSs — and Corporate Defendants use their agreements with their local franchisees and agents, their employee policy and procedures manuals, and leadership roles in NAR and local realtor associations — to require brokers in local residential real estate markets to adhere to NAR's rules, including the Mandatory Offer of Compensation Rule. Doing so helps implement and enforce the conspiracy. Defendants further implement the conspiracy by reviewing NAR's Rules and agreeing to them at yearly meetings, and NAR further advances the conspiracy by re-issuing its Rules (including the Mandatory Offer of Compensation Rule). Further, Defendants participate in and implement the conspiracy by serving on boards and committees that enforce compliance with NAR Rules.

18.    Through these actions, and others alleged in this Complaint, each Corporate Defendant—in conjunction with NAR—has taken actions to further the conspiracy and thereby has agreed to join, participate in, facilitate, and implement the conspiracy.

---

[4]    FTC-DOJ Joint Public Workshop, Segment 2 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf.

[5]    *Id.*

19.     Defendants' conspiracy has kept buyer broker commissions in the 2.5% to 3.0% range for many years despite the diminishing role of buyer brokers. Many home buyers no longer search for prospective homes with the assistance of a broker, but rather independently through online services. Upon information and belief, NAR and Defendants have studied and are aware of this trend and fact. Prospective home buyers increasingly retain a buyer broker after the client has already found the home the client wishes to buy. Despite this diminishing role for buyer brokers, their percentage of commission has remained steady, due to Defendants' conspiracy. And at the same time, because housing prices have significantly increased during the last several years (far outpacing inflation) and because commissions are calculated as a percentage of the home's sale price, the actual dollar amounts have substantially risen as well.

20.     Defendants' success in maintaining (and in inflation-adjusted dollars increasing) the same artificially and anticompetitively inflated commission rates despite these technological and social changes starkly contrasts with results in other industries. For example, the introduction of the Internet and innovative or discount service providers have provided enormous financial benefits to consumers of numerous goods and services in various sectors, such as travel booking, insurance, banking, and stock brokering, as well as retailing and bookselling. Despite transaction costs dramatically decreasing in a myriad other sectors and industries, real estate commission rates have persisted and remained steady in a range of 5% to 6%.

21.     The disconnect between buyer broker costs and commissions illustrates the effect of Defendants' conspiracy. Whether a home purchased by their client costs $250,000 or $2,500,000, the buyer broker's costs are roughly similar. But the sum received by the buyer broker as a commission is *significantly* greater for the more costly property. Why? Many if not most of the services that buyer brokers provide do not vary based on the sale price, so in a rational,

7

competitive market the percentage fee should decrease as the home price increases. Instead, due to Defendants' conspiracy and anticompetitive practices such as the Mandatory Offer of Compensation Rule, the commission overcharges imposed on home sellers bear little relation to the quantity or quality of the services or value allegedly provided by the brokers who are paid the commissions. This structure results from a lack of competition and makes no economic sense, except for the buyer broker.

22.     Moreover, another pernicious effect in the marketplace that results from and is amplified by Defendants' anticompetitive conspiracy is the practice of "steering." That is, given the requirement for seller brokers to make a blanket, unilateral offer of commission to buyer brokers, buyer brokers face strong incentives to "steer" their buyer clients toward homes where the buyer broker would receive a greater commission percentage. Indeed, economic studies have documented and confirmed the prevalence and significance of steering and further "suggest[ed] that this could limit price competition."[6]

23.     Given that buyer brokers will not show homes to their clients where the seller broker is offering a lower buyer broker commission (or will show such homes later), seller brokers face pressure in convincing home sellers to make their unilateral blanket offers to provide high commissions to buyer brokers. In sum, the conspiracy has multiple illogical, harmful, irrational, and anticompetitive effects, including that it: (a) requires sellers to pay overcharges for services provided by buyer brokers to the buyer, who is the seller's adversary in the transaction; (b) raises, fixes, and stabilizes buyer broker compensation at levels that would not exist in a competitive

---

[6]     *See* FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf.

marketplace; and (c) encourages and facilitates steering and other actions that impede innovation and entry by new and lower-cost real estate brokerage service providers.

24. Defendants' conspiracy has inflated and stabilized buyer broker commissions, which, in turn, have inflated the total commissions paid by home sellers such as Plaintiffs and Class members. Plaintiffs and Class members have each incurred, on average, thousands of dollars in overcharges and damages as a result of Defendants' conspiracy.

25. For example, a class member who sells a house for $400,000 would have paid roughly $10,000 to $12,000 in additional commissions to the buyer's broker due to the conspiracy.

26. In a competitive market not affected by Defendants' anticompetitive restraint, the seller would pay nothing to the buyer broker, who would be paid instead by the buyer (their client), and the total commission paid by the seller would be set at a level to compensate only the seller broker. And even assuming *arguendo* that in a competitive market the seller would pay any part of the buyer broker's commission (an assumption that defies commonsense), the commission would be far less than the 2.5% to 3.0% that is currently and typically paid to buyer brokers.

27. Moreover, in the absence of the Mandatory Offer of Compensation Rule, seller brokers would face additional competitive pressures. That is, instead of following long-time practice of setting total commissions at or near 6% and assigning roughly half of that amount to themselves and roughly the other half to the buyer broker commission (and selecting that amount at a level to remain in the good graces of buyer brokers), seller brokers would set a commission to pay themselves alone and would engage in more vigorous competition with one another to lower their rates and/or provide additional services to justify their newly transparent rates.

28. Plaintiffs, on behalf of themselves and the Class, sue for Defendants' violations of the federal antitrust laws as alleged herein, and seek treble damages, injunctive relief, and the costs

of this lawsuit, including reasonable attorneys' fees.

29.     Plaintiffs bring this lawsuit as a class action on behalf of home sellers who paid a buyer broker commission in the last four years in connection with the sale of residential real estate listed on an MLS in the United States using a listing agent or broker affiliated with one of the Corporate Defendants named herein.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 15 U.S.C. § 4 and under 28 U.S.C. §§ 1331, 1337.

31.     This Court has personal jurisdiction over Defendants, each of which has been properly served. Defendants have: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

32.     Each Defendant has received revenue attributable to business transacted in Missouri and in this District from the brokerage operations of their respective subsidiaries, franchisees, affiliates, and/or transaction counterparts that transact business in Missouri and in this District.

33.     For NAR, it collects substantial revenues and fees from its nationwide membership—including substantial numbers of members located and transacting business in

Missouri, including in this District—as public estimates suggest that NAR makes more than $200 million in revenue every year, with most of that coming from member dues, including from members located in Missouri. Accordingly, during the Class Period, NAR has collected millions of dollars, if not tens of millions of dollars, in membership fees and revenues attributable to real estate brokerages, brokers, and/or realtors operating in this District.

34. In addition, NAR conducts and transacts substantial business in this District through its involvement in drafting, reviewing, and publishing regularly updated editions of the "Interpretations of the Code of Ethics," with its 31st Edition published in 2019. NAR's Interpretations of the Code of Ethics reflects that NAR, through its Professional Standards Committee, interacts and conducts business with arbitration Hearing Panels and Boards of Directors of local real estate associations (including local associations operating in this District) to review and articulate purported policies and principles that have been applied in specific disputes involving realtors and that are also forward-looking "official statements of [NAR's] policy and are not merely advisory," thereby governing arbitration of disputes among realtors occurring in this District.

35. NAR requires each of the Corporate Defendants, as well as other co-conspirators operating in this District, to comply with NAR policies, including its Handbook on Multiple Listing Policy and Code of Ethics. Among the policies that NAR requires the Corporate Defendants and other co-conspirators to follow in this District is the Mandatory Offer of Compensation Rule. Upon information and belief, NAR actively monitors and polices the Corporate Defendants and other co-conspirators operating in this District to ensure full compliance with its Rules and Policies, including the Mandatory Offer of Compensation Rule. Failure to comply with the Mandatory Offer of Compensation Rule will result in removal of the entity or

11

individual from NAR membership and, in turn, expulsion from MLSs.

36. NAR also engages in substantial lobbying activities directed at various government entities and political candidates, at the local, state, and federal levels. Indeed, NAR is the country's largest lobbying presence in Washington, D.C. and most state legislatures. Upon information and belief, NAR has transacted such lobbying business directed at Missouri and at this District.

37. Venue is proper in this District under 15 U.S.C. § 22 and under 28 U.S.C. §1391(b), (c), and (d). Each Defendant transacted business, was found, had agents and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

38. The Mandatory Offer of Compensation Rule and other anticompetitive NAR rules apply and have been implemented by Defendants and co-conspirators in interstate commerce, including in this District. These rules govern the conduct of local NAR associations, local brokers, and local sales agents across the country. Defendants' conduct alleged herein has inflated buyer broker commissions nationwide, and has injured home sellers in those areas. NAR, through Defendants, its other members, and other co-conspirators, are engaged in interstate commerce, and are engaged in activities affecting interstate commerce, in the United States.

## PARTIES

**Plaintiffs**

39. At the time of his home sale, Plaintiff Don Gibson was a resident and citizen of Missouri; currently he is a resident and citizen of Florida. Gibson sold his home located in Columbia, Missouri in June 2021. Gibson used Weichert Realtors—First Tier as his listing broker to sell the home; Gibson's home was listed on the Columbia Board of Realtors MLS serving the

mid-Missouri area. Upon closing his home sale, Gibson paid $15,750 (3% of the purchase price) to the buyer's broker affiliated with House of Brokers Realty, Inc.

40. Plaintiff Lauren Criss is a resident and citizen of Missouri. She sold her home located in Kansas City, Missouri in September 2023. Criss used Defendant Compass Realty Group as her listing broker to sell the home; Criss's home was listed on the Heartland MLS serving the Kansas City area. Upon closing her home sale, Criss paid $7,380 (3% of the purchase price) to the buyer's broker affiliated with Keller Williams Realty Partners, Inc.

41. At the time of his home sale, Plaintiff John Meiners was a resident and citizen of Missouri; currently he is a resident and citizen of Kansas. Meiners sold his home located in Kansas City, Missouri in August 2023. Meiners used Compass Realty Group as his listing broker to sell the home; Meiners' home was listed on the Heartland MLS serving the Kansas City area. Upon closing his home sale, Meiners paid $15,360 (3% of the purchase price) to the buyer's broker affiliated with Platinum Realty.

42. As set forth in this Complaint, Defendants' unlawful conduct and conspiracy has caused home sellers, including each of the Plaintiffs, to pay a buyer broker commission and has also increased the amount of the buyer broker commission over the amount that would be charged to the buyer in a competitive marketplace absent the Mandatory Offer of Compensation Rule and Defendants' conspiracy.

**Defendants**

43. Defendant National Association of Realtors, a lobbying group that advocates for the interests of real estate brokers, has over 1.5 million individual members from whom it has collected hundreds of millions of dollars in dues and membership fees during the Class Period, including millions of dollars in dues and membership fees from NAR members located in this

13

District. NAR oversees fifty-four state and territorial realtor associations and over 1,200 local realtor associations. NAR is headquartered in Chicago, Illinois.

44. Compass, Inc. is a publicly-traded company incorporated in Delaware with its principal place of business in New York. Compass's stock began trading on the New York Stock Exchange after its initial public offering in April 2021. Through 2022, Compass represented sellers or buyers in more than 700,000 transactions totaling more than $780 billion in gross transaction value; Compass is the largest independent real estate brokerage by gross transaction value. Compass has an office in this District.

45. eXp World Holdings, Inc. is a publicly-traded company incorporated in Delaware with its principal place of business in Bellingham, Washington. eXp offers the bulk of its real estate brokerage services through its subsidiary, eXp Realty, LLC. eXp has brokerages in all 50 states in the United States residential real estate market. For the year ended December 31, 2022, eXp's agent count exceeded 86,000 and the company provided brokerage services for over 511,000 transactions. As used herein, the term "eXp" will refer collectively to eXp World Holdings, Inc. and eXp Realty, LLC. eXp has multiple offices in this District

46. Redfin Corporation is a publicly traded company incorporated in Delaware with its principal place of business in Seattle, Washington. Redfin operates in more than 100 markets (including in this District) and has developed partnerships with over 8,700 agents at other brokerages. Redfin has over 2,400 agents of its own, and in 2022 provided brokerage services for over 80,000 residential real estate transactions. Redfin has multiple agents operating in this District.

47. Weichert Realtors is a nationwide real estate brokerage company with its principal place of business in New Jersey. As of July 2022, Weichert operates through 375 franchise offices

in 43 states and touts itself as "one of the nation's leading providers of real estate and related services."[7] Weichert has a franchise within the Kansas City metropolitan area that provides real estate services in this District and the entire region; the franchise (Weichert Realtors, Welch & Company) has a team of over 115 real estate agents.[8] Weichert also has franchises within this District, including in Columbia, Missouri (First Tier); Blue Springs, Missouri (CJ Properties); Branson, Missouri (The Griffin Company); and Laurie, Missouri (Laurie Realty).

48.     United Real Estate is a nationwide real estate brokerage company with its principal place of business in Dallas, Texas. It is the sixth largest brokerage in the United States with company-owned brokerages in Dallas, Houston, Chicago, Philadelphia, and Washington, D.C. It also operates through franchises and company-owned brands in several markets, including within this District. In 2022, United merged with Platinum Real Estate. Platinum has over 50 agents in the Kansas City area and a presence in Iowa, Kansas, Missouri, Nebraska, and Oklahoma. United, through Platinum, has at least four offices within this District. Today, United has over 20,000 agents across the United States.

49.     Howard Hanna Real Estate Services is a privately held real estate brokerage company with its principal place of business in Pennsylvania. In 2022, Howard Hanna was ranked first as the largest privately held real estate brokerage company in the United States, and ahead of other publicly traded companies such as Redfin and United Real Estate. In 2022 alone, Howard Hanna was engaged in over 113,000 transactions with a sales volume in excess of $36.6 billion.[9] According to Howard Hanna, it is a "powerhouse brand that stretches across the East Coast and

---

[7]     https://www.weichert.com/aboutus/.

[8]     https://www.weicherthomeskc.com/about-us.

[9]     https://www.realtrends.com/500-by-sides/.

into the Midwest . . . " with "15,000 agents across a 13-state footprint."[10]

50.     Douglas Elliman, Inc. is a publicly traded real estate brokerage company incorporated in Delaware with its principal place of business in Florida. Douglas Elliman owns Douglas Elliman Realty LLC, which provides residential real estate brokerage services. Douglas Elliman Realty LLC is the sixth-largest residential brokerage company in the United States. In 2022, Douglas Elliman was engaged in over 26,000 transactions with a sales volume valued at over $42 billion. Douglas Elliman has over 20 offices with approximately 6,900 real estate agents. As used herein, the term "Douglas Elliman" will refer collectively to Douglas Elliman, Inc. and Douglas Elliman Realty LLC.

51.     Each Defendant has a significant presence in the nationwide market.

**Co-Conspirators and Agents**

52.     In addition to the named Defendants, many other local realtor associations and real estate brokers participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, nearly all who own, operate, and participate in MLSs agree to, comply with, and implement the Mandatory Offer of Compensation Rule.

53.     By adopting the Mandatory Offer of Compensation Rule, MLSs, among others, have participated as co-conspirators in the antitrust violations and unfair practices alleged herein and performed acts and made statements in furtherance thereof.

54.     Furthermore, the franchisees and brokers of Defendants agreed to, complied with, and implemented the Mandatory Offer of Compensation Rule and thereby have participated as co-conspirators in the antitrust violations and unfair practices alleged herein and performed acts and

---

[10]     https://blog.howardhanna.com/press/the-hanna-family-of-companies-tops-industry-list-as-1-privately-held-real-estate-brokerage-in-the-u-s/.

made statements in furtherance thereof.

55.     Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as a defendant in this Complaint.

## FACTUAL ALLEGATIONS

**Real Estate Industry Background**

56.     State licensing laws regulate who can represent sellers and buyers in the real estate market. There are two licensee categories: (1) the real estate broker (also known as a "brokerage firm"), and (2) the individual real estate licensee or agent. Brokerage firms license individual real estate realtors or agents and are legally responsible for the actions of their licensed realtors or agents.

57.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction.  That is why real estate brokerage contracts with sellers and buyers are required to be with brokers, not agents, and all payments to individual realtors or agents pass through brokers.

58.     Most brokers and their individual realtors or agents occupy dual roles: that is, a broker may act as a seller broker for some home sales and act as a buyer broker for other home sales.

59.     According to NAR, 86% of sellers sold their home with the assistance of a real estate broker in 2022, and 86% of buyers purchased their home with the assistance of a real estate broker in 2022.

60.     In typical residential real estate transactions, real estate brokers and agents receive compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home sells.

17

61.    A seller broker's compensation is set forth in a listing agreement, a contract between the seller and the seller broker.  The listing agreement includes the terms of the listing and often provides that the seller broker has the exclusive right to market the seller's home. Notably, due to the Mandatory Offer of Compensation Rule, the listing agreement specifies the total commission that a home seller will pay to the seller broker and also specifies the amount earmarked to be paid to the buyer broker.

62.    When a buyer retains a broker, the buyer often enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

63.    If the buyer has a broker, the seller pays the buyer broker a commission. In fact, a standard of conduct in NAR's Code of Ethics long permitted and encouraged buyer brokers to tell their clients that their services are free, which obviously is not a true statement.

64.    The result of these agreements and the Mandatory Offer of Compensation Rule is that buyer brokers—who are supposed to assist their clients in negotiating against the seller—receive their compensation from the total commission paid by the seller, not from the buyer they represent.  Real estate insiders recognize that the Mandatory Offer of Compensation Rule leads to a marketplace where there is "a lot of confusion around how commissions work," where even writers for real estate publications "never get[] a very clear cut answer from the industry or from anyone" on the subject.[11] And other market participants agreed that the practice is "confusing" and that most consumers "just don't understand how commission works."[12]

---

[11]    FTC-DOJ Joint Public Workshop, Segment 1 Tr., June 5, 2018 (link provided *supra*).

[12]    FTC-DOJ Joint Public Workshop, Segment 2 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf.

65.    Absent the Mandatory Offer of Compensation Rule and in a competitive market (after all, a seller has no incentive to compensate a buyer broker for actively negotiating against a seller's interests), a buyer would instead pay his, her, or their broker, and a seller would agree to a pay a commission that would go solely toward the seller's own broker. The seller's total broker commission would thus be approximately half (or less) than the amount that sellers have paid as a total commission to compensate both their selling broker and their adversary's broker, the buying broker.

**Multiple Listing Services (MLSs) and the Mandatory Offer of Compensation Rule**

66.    An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their realtors or agents, if they are in compliance with the rules of the MLS. Many MLSs are owned and operated by local realtor associations that are members of, and governed by, NAR.

67.    As required by NAR rules, seller brokers list their clients' property on an MLS. If a seller broker does not list a client's property on an MLS, most buyer brokers will not show that property to prospective buyers. MLSs also act as the main source of listings for online websites, such as Zillow, through which many prospective home buyers find homes.

68.    The Mandatory Offer of Compensation Rule requires a seller, through the seller's broker, to make a blanket, unilateral and effectively non-negotiable offer of compensation to buyer brokers whenever listing a home on an MLS owned by a local NAR association. If a buyer represented by a broker purchases the home, then the buyer broker receives the offered compensation.

**Anticompetitive NAR Rules**

69.    The Mandatory Offer of Compensation Rule was adopted by NAR in 1996 in its

19

Handbook on Multiple Listing Policy (the "Handbook"). The rule has been in effect ever since.

70. Before the adoption of the Mandatory Offer of Compensation Rule in 1996, NAR played a central role in designing, implementing, and enforcing through the MLS system a similar and also flawed market structure in which *all* brokers involved in residential home sales tended to represent the seller, either as the seller's broker or as the "sub-agent" of the seller's broker.

71. Under this prevailing system of sub-agency, even if a broker was primarily working with buyers, the broker remained legally obligated to represent the interests of sellers.[13] Accordingly, when a transaction closed, the seller would pay a total commission to the seller broker, who would in turn compensate the "sub-agent" broker who had been working with the buyer, albeit while owing legal and fiduciary obligations to the seller.

72. As a result of this confusing and misleading marketplace practice, many homebuyers believed (mistakenly) that the sub-agent broker was working on their behalf. "When this sub agency system, in which brokers working with buyers were legally obligated to pass on information disadvantageous to their clients to sellers, was exposed through press coverage, it collapsed almost overnight."[14]

73. Once brokers working with buyers were no longer serving as "sub-agents" for the seller's broker, the prior practice of the seller paying commission to both brokers involved in the transaction should have disappeared, as no justification remained to warrant it. However, that is around when NAR and its co-conspirators stepped in to implement and enforce an anticompetitive

---

[13]    Further information regarding the system of sub-agency is set forth in the following publication: Stephen Brobeck & Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM. (2006), *available at* https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

[14]    *Id.* at 3, *available at* https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

Case 4:23-cv-00788-FJG    Document 1    Filed 10/31/23    Page 20 of 48

scheme designed to continue and maintain supra-competitive commissions and impede innovation and lower-priced competition by requiring, through the Mandatory Offer of Compensation Rule, that seller brokers make blanket, unilateral offers of compensation to buyer brokers when listing a home on an MLS.

74.     Specifically, in November 1996, NAR adopted the Mandatory Offer of Compensation Rule in its Handbook on Multiple Listing Policy.

75.     The NAR Board of Directors, and committees reporting to it, determine from time to time whether to modify any policies in the Handbook, and the Board has approved certain changes in recent years within the Class Period.  Indeed, one such change (which occurred in late 2019) is the so-called "Clear Cooperation Policy" that requires a property to be listed in an MLS within one business day of any marketing activity occurring regarding the property.

76.     All policies that are retained unchanged, and all modified or revised or new policies, are then set forth in new editions of the Handbook that tend to be issued annually. The Board of Directors of NAR have consistently and repeatedly agreed and chosen to retain the Mandatory Offer of Compensation Rule in the Handbook even in the face of criticism by economists and industry experts that the Mandatory Offer of Compensation Rule is anticompetitive and causes supra-competitive commission rates.

77.     In revising and re-issuing the Handbook, NAR has invited each Defendant and other co-conspirators to participate in the following agreement, combination, and conspiracy: They can participate in the MLS, and gain the benefits provided by NAR and the MLS, but only upon the condition that they agree to adhere to and enforce the anticompetitive restraints set forth in the Handbook. Thus, to the extent any Defendant argues that it was not involved in the initial drafting or adoption of the Mandatory Offer of Compensation Rule, that argument lacks legal significance

because each Defendant has joined the conspiracy and agreed to abide by, implement, and enforce the Mandatory Offer of Compensation Rule.

78. The Handbook states the Mandatory Offer of Compensation Rule as follows:

> In filing a property with the multiple listing service of an association of Realtors, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants.[15]

79. The Handbook further states that "[m]ultiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[16]

80. The Mandatory Offer of Compensation Rule shifts a cost to the seller that would otherwise be paid by the buyer in a competitive market. As *The Wall Street Journal* opined, the result is that home sellers are effectively required to hire a buyer broker if they wish to list their home on an MLS, which requires the services of a seller broker, and that this system is a violation of "the Sherman Anti-Trust Act that keeps buying agents paid though they offer almost no useful services."[17]

81. Moreover, the NAR requirement that the seller broker make a blanket, unilateral offer provides an incentive for seller brokers to cooperate with buyer brokers by offering a high commission for the buyer broker. And, of course, brokers often act as a selling broker in one

---

[15]     NAR Handbook, at 65.

[16]     NAR Handbook, at 35.

[17]     Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734.

transaction but as a buyer broker in another, which further contributes to the competition-restraining effects of the Mandatory Offer of Compensation Rule in that it fosters an environment in which brokers work cooperatively to split a total commission, instead of openly competing to earn the business of both potential home sellers and potential home buyers based solely on the services to be provided to that represented party.[18]

82.     As to the potential possibility that a buyer might seek to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer, NAR has adopted another rule that prevents this. Specifically, NAR's Code of Ethics, Standard Practice 16-16, states:

> REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[19]

In other words, for a buyer broker even to present an offer to a seller that is conditional on the

---

[18]     In addition, the requirement that the offer of compensation be "blanket" means that the Mandatory Offer of Compensation Rule compels home sellers to make this financial offer without regard to the experience or quality of the buyer broker and without regard to the services or value being provided by that buyer broker. The same "blanket" fee must be offered to a brand-new buyer broker with no experience as that offered to a buyer broker with many years of experience. In a competitive and rational market, competitors with more experience and a track record of results tend to command higher prices than new entrants with no experience or track record, but the Mandatory Offer of Compensation Rule blocks this kind of competitive differentiation. Moreover, because the offer is blanket and can be easily compared to the blanket offers that every other seller broker must include and publish (to fellow brokers only) on the MLS, the Mandatory Offer of Compensation Rule by design creates strong incentives for sellers to offer the high, standard commission rates to buyer brokers that the conspiracy has long sought to maintain. Seller brokers know that if they list a home and include a lower blanket offer of compensation to buyer brokers, then due to the practice of "steering" the community of buyer brokers is likely to avoid showing that home to their clients (potential home buyers).

[19]     National Association of Realtors, Code of Ethics and Standard of Practice (Jan. 1, 2019), *available at* https://www.nar.realtor/sites/default/files/documents/2019-COE.pdf.

23

seller reducing the buyer broker commission would expressly violate NAR's ethics rules. There is nothing ethical or economically rational about Standard Practice 16-16, especially when coupled with the Mandatory Offer of Compensation Rule.

83. NAR has published "Case Interpretations" that exacerbate the anticompetitive effects of its ethics rules and provide a mirage of potential negotiation regarding the buyer broker commission. For example, NAR's Case Interpretation #16-15 states that negotiation over the amount of a buyer broker's commission may only occur if it is "completed prior to showing of the property" by the buyer broker to the potential buyer. That is, the buyer broker, if inclined to reduce the amount of buyer broker commission, must request a commission reduction ***before the broker can even show*** the property to his, her, or their client (the potential buyer). Obviously, the NAR Rule and Case Interpretation practically and effectively guarantee that no such negotiations will ever take place.[20]

84. But for the Mandatory Offer of Compensation Rule and other anticompetitive rules and policies of NAR, buyers (not sellers) would pay the commission to their broker, and brokers would have to engage in competition by offering lower commissions to prospective buyers. And, selling brokers would face downward pressure on total commissions and renewed competition to earn business from home sellers, as seller brokers would no longer be calculating their commission rates to include any compensation for the buyer broker.[21]

---

[20]     Even if some negotiation does rarely occur, the Mandatory Offer of Compensation Rule still works to elevate the baseline for any such rare negotiations. Just as an agreement to fix prices (or an agreement to announce uniform price increases) is *per se* unlawful even though the marketplace might reflect some potential negotiation with the conspirators' customers, the Defendants' conspiracy here is unlawful and anticompetitive because it elevates the baseline for any negotiations.

[21]     Even if one assumes for the sake of argument that, in a market free of the Mandatory Offer of Compensation Rule, a seller continues to pay all or a portion of the buyer broker's commission,

**NAR's Oversight and Enforcement of its Anticompetitive Rules**

85.     NAR has experienced success in requiring that its members — which include state and local realtor associations as well as non-member brokers and agents who operate in geographic areas with MLSs operated by local realtor associations — comply with its anticompetitive rules and with other rules set out in the Handbook and NAR's Code of Ethics.

86.     NAR requires that its members which own and operate MLSs comply with the mandatory provisions in the Handbook and the Code of Ethics. The Handbook states that an agreement by an association to establish an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."[22]

87.     Local realtor associations are required by NAR to monitor their MLS and the MLS's participants to ensure that they comply with mandatory provisions from the NAR Handbook. Thus, each local realtor association and MLS, and each participant in those associations and MLSs, agrees to the anticompetitive restraints challenged in this lawsuit, and they all play important roles in implementing and enforcing those restraints.

88.     Failure to strictly comply with the Code of Ethics can lead to expulsion for NAR's individual and associational members.  NAR's Code of Ethics and Arbitration Manual states:

> Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National

---

the commission would be far less than the 2.5% to 3.0% currently charged to home sellers like Plaintiffs and paid to buyer brokers.

[22]     NAR Handbook, at 9.

Association.[23]

89.     If a broker or agent were denied access to a local MLS, then that broker and its agents could not list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

90.     NAR's model rules for local realtor associations also require adherence to NAR's Code of Ethics.

91.     NAR further penalizes and discourages potential noncompliance with its anticompetitive rules by withholding professional liability insurance from any associations operating under any bylaws or rules not approved by NAR.[24] NAR's position and monitoring of potential non-compliance includes conduct to oversee and monitor Realtor associations and MLSs.

92.     NAR reviews the governing documents of its local realtor associations to ensure compliance with NAR rules. NAR requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

93.     Recently NAR purportedly sought to "clarify" its position that home sellers are not required to offer any amount of compensation to buyer's agents. NAR's "clarification" contradicts the under-oath testimony of its executives and dozens of emails from NAR. Andrea V. Brambila, *In 'sudden' reversal, NAR says listing brokers can offer 0%*, Inman (Oct. 6, 2023). But even NAR's "new" interpretation does not assist consumers: "[] NAR is not requiring or encouraging MLSs to change their data fields to permit $0. We are simply advising that doing so would continue to comply with NAR's MLS policy." *Id.* Thus, NAR's newly-announced interpretation does two things: (1) reveals that NAR's longstanding interpretation (reversed just a few weeks ago) violated

---

[23]     National Association of Realtors, Code of Ethics and Arbitration Manual 2019, at 1, *available at* https://www.nar.realtor/sites/default/files/documents/2019-CEAM.pdf.

[24]     NAR Handbook, at 8.

the federal antitrust laws (particularly when considering the amount of NAR enforcement that contradicts its new interpretation), and (2) still does nothing to assist consumers on a going-forward basis.

**Defendants Designed, Joined, and Participated in the Conspiracy**

94.     Corporate Defendants have agreed to adopt, promote, implement, and enforce the Mandatory Offer of Compensation Rule by imposing NAR rules on their affiliated franchisees, brokers, and employees. By participating in an association which prevents members from allowing their associates to compete with one another for commissions, and by agreeing to follow and enforce these anticompetitive rules, Defendants have joined the conspiracy and acted to further its implementation and enforcement.

95.     Corporate Defendants have orchestrated, joined, and participated in the alleged conspiracy in at least three ways: (1) required and/or encouraged their brokers, agents, and franchisees (and the agents or realtors employed by those franchisees) to comply with NAR rules, including the Mandatory Offer of Compensation Rule; (2) supervised NAR's operations, including NAR's adoption, maintenance, and enforcement of the Mandatory Offer of Compensation Rule; and (3) caused their franchisees, subsidiaries, and agents to influence local realtor associations to adopt and enforce NAR's rules, including the Mandatory Offer of Compensation Rule.

96.     First, Defendants implemented the conspiracy by requiring and/or encouraging that their contractors, agents, subsidiaries, and franchisees (and by necessary implication, the subsidiaries' and franchisees' agents and realtors) to comply with NAR's rules, including the Mandatory Offer of Compensation Rule.

97.     These agreements with contractors, agents, subsidiaries, and franchisees require their agents to (a) comply with NAR's Code of Ethics; (b) join and comply with the rules of the

local realtor association; and (c) participate in and comply with the rules of the local MLS, which include the mandatory rules in the NAR Handbook.

98.     For example, Compass admits:

> Aside from federal, state and local regulations, *we are subject to a variety of rules promulgated by trade organizations including the NAR, state and local associations of REALTORS, and [MLSs]*.
>
> Generally, as members of these organizations, *we are subject to their policies, bylaws, codes of ethics, and fees and rules*, which govern our dealings with other members, the public, and clients as well as the manner in which we use and display the organization's brand and services.
>
> We have a dedicated team that works with a variety of stakeholders, including our brokers of record, to help manage and comply with these rules and policies.

Compass 2022 Form 10-K at p. 11.

99.     Like Compass, eXp commits to following NAR's rules and policies. It states:

> We primarily serve the residential real estate industry, which is regulated by federal, international, state, provincial and local authorities as well as private associations or state sponsored association or organizations.
>
> *We are required to comply with* federal, state, provincial and local laws, as well as *private governing bodies' regulations*, which combined results in a highly-regulated industry.

eXp World Holdings, Inc. 2022 Form 10-K (filed February 28, 2023) (emphasis added).

100.    Weichert also commits to NAR's conspiracy:

> In order to be called a REALTOR, your Weichert Sales Associate must earn a state license and complete additional training. REALTORS are also required to comply with a code of ethics and professional standards, above and beyond federal and state regulations.
>
> *All Weichert Sales Associates are members of the National Association of Realtors.*

28

"Selecting a Realtor" available at https://www.weichert.com/guides/buying/find-a-realtor/ (last visited October 14, 2023) (emphasis added). *See also id.* at "Key Takeaways: Your Weichert Sales Associate" ("1. As a REALTOR, every Weichert Sales Associate **must** be a member of the National Association of Realtors and comply with a code of ethics and professional standards.") (emphasis added).

101.   Weichert codifies its mandatory participation in NAR in its Franchise Disclosure Document: "You must be and remain a member in good standing of the National Association of Realtors throughout the Term of this Agreement. Your Franchised Business must comply with the Code of Ethics of the National Association of Realtors at all times." Weichert Franchise Disclosure Document at § 7.05.

102.   Howard Hanna requires its agents to comply with "any real estate transaction standards adopted by the National Association of Realtors®." Howard Hanna Franchise Disclosure Document at § 10.11.

103.   Until earlier this month, Redfin's brokers and agents also were members of NAR and subject to the Mandatory Offer of Compensation Rule. In early October 2023, Redfin announced that it would leave NAR and "require[e] our brokers and agents to leave NAR everywhere we can." *Redfin leaves NAR—and calls on its brokers and agents to follow suit*, Inman (Oct. 2, 2023). This also meant Redfin was resigning from NAR's Board of Directors. *Id.*

104.   According to Redfin's statement, the company had "already been uncomfortable with the NAR's positions on commissions . . ." and it objected to the fact that "NAR still blocks sellers from listing homes that don't pay a commission to the buyer's agent . . ." *Id.* Through its statement, Redfin admits that NAR's policies were anti-consumer, and that Redfin continued to adhere to them even after it grew "uncomfortable." Despite its adherence to the Mandatory Offer

of Compensation Rule and other anti-consumer NAR mandates, Redfin admitted that "[r]emoving these blocks would be easy, and it would make our industry more consumer-friendly and competitive." *Id.*

105. Notably, however, even Redfin cannot cut all ties with NAR because:

> In about half the U.S. . . . we can't quit NAR individually or en masse, because NAR membership is required for agents to access listing databases, lockboxes, and industry-standard contracts.
>
> ***It's impossible to be an agent if you can't see which homes are for sale, or unlock the door to those homes, or even write an offer.***

*Id.* (emphasis added). Redfin calls on NAR to "decouple" membership from local access to these tools, saying "[a]gents shouldn't have to underwrite policies and legal efforts that hurt consumers . . ." *Id.*

106. Redfin's position, though, ignores the fact that it adhered to, implemented, and enforced those same anti-consumer rules for years through its membership in NAR. Simply put, despite its recent change of heart, Redfin has been part of the conspiracy throughout the Class Period and must now account for its historic role in the conspiracy outlined herein.

107. Like the other Corporate Defendants, Douglas Elliman also admits that it "participate[s] in MLS and are a member of the NAR and state real estate associations and, accordingly, are subject to each group's rules, policies, data licenses, and terms of service." Douglas Elliman, Inc. Form 2022 10-K (submitted March 16, 2023).

108. The former CEO of Platinum—a merger partner with United—served on NAR's Board of Directors as of 2019.

109. Second, executives from the Corporate Defendants, have actively participated in the management and operation of NAR. Indeed, senior executives of the Corporate Defendants have served on NAR's governing board of directors. For example, Steve Wagner, United Real

Estate's Executive Vice President of Training, Education, and Development, along with Jason Gesing, Chief Industry Officer at eXP, Kristine Burdick, Howard Hanna's President of Broker Operations, and Donna Kreps, Howard Hanna's President Real Estate Service, have all served as NAR Large Board Representatives. Jim Weichert, CEO/President of Weichert Realtors, along with executives at Howard Hanna, including Gary Scott, Pat Riley, Marsha Rand, and Dennis Cestra, Sr., have all served on NAR's Board of Directors. Both NAR's Handbook and in its Code of Ethics (and thus the Mandatory Offer of Compensation Rule) were drafted, developed, and promulgated by NAR's board of directors or NAR's Professional Standards Committee.

110. Executives from Weichert also served on and participated in NAR-affiliated committees related to MLSs and their governance.

111. Like the other Corporate Defendants, Douglas Elliman executives served on NAR-affiliated boards and committees.

112. Greg Hrabcak, head of Hanna Commercial Real Estate's Central Ohio commercial and property management divisions, currently serves on NAR's Leadership Team as Treasurer.

113. Further, the following representatives from the Corporate Defendants or their franchisees participated in the NAR Multiple Listing Issues and Policies Committee, responsible for reviewing and reissuing the Handbook: Howard W. Hanna, CEO of Howard Hanna; Glenn Kelman, CEO of Redfin; and Howard Hanna's Helen Hanna Casey participated in NAR's Multiple Listing Issues and Policies Committee meetings.

114. Furthermore, Howard Hanna representatives, including its CEO, participated in NAR planning committee meetings, as well as NAR-affiliated advisory boards and its Executive Committee.

115. Third, upon information and belief, executives of franchisees of the Corporate

Defendants have participated in the governance of the local realtor associations that own and operate the Subject MLSs (and participate in the governance of other local realtor associations), and they implemented the conspiracy through those associations. Those executives and local realtor associations required compliance with the NAR rules, including the Mandatory Offer of Compensation Rule, and adopted standard form contracts to implement these NAR rules.

116.    Accordingly, the franchisees and agents of Defendants have joined and furthered the alleged conspiracy through their agreement to implement, comply with, and enforce NAR's rules, including the Mandatory Offer of Compensation Rule.

## EFFECTS OF THE CONSPIRACY

117.    Defendants' conspiracy has had the following anticompetitive effects throughout the United States:

    a.    Home sellers have been forced to pay commissions to buyer broker—who represent their adversaries in negotiations to sell their homes—thereby substantially inflating the cost of selling their homes.

    b.    Home sellers have been compelled to set a high buyer broker commission to induce buyer brokers to show their homes to the buyer brokers' clients.

    c.    Home sellers have paid inflated buyer broker commissions and inflated total commissions.

    d.    The retention of a buyer broker has been severed from the setting of the broker's commission; the home buyer retains the buyer broker, while the home seller's agent actually sets the buyer broker's compensation.

    e.    Price competition among brokers to be retained by home buyers has been restrained, as has price competition among brokers seeking to be retained to

sell homes.

 f. Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer broker commission.

 g. Corporate Defendants and their franchisees have increased their profits substantially by receiving inflated buyer broker commissions and inflated total commissions.

118. There are no pro-competitive effects of Defendants' conspiracy, which is plainly anticompetitive and injurious to competition.

119. To the extent Defendants may seek to argue that the MLS system in some abstract fashion has certain pro-competitive benefits, none of these purported benefits depends in any way upon specifying brokers' respective commission rates. And no purported pro-competitive benefits explains why the Mandatory Offer of Compensation Rule is *mandatory*.

120. Even if any alleged pro-competitive effects exist, they are substantially outweighed by the conspiracy's anticompetitive effects.

121. Substantial economic evidence supports the view that Defendants' conspiracy has resulted in inflated total commissions and inflated buyer broker commissions paid by home sellers, at levels far above what a competitive market would produce.

122. Compared to other countries with competitive markets for residential real estate brokerage services, the commissions in the United States are substantially higher. Economists Natalya Delcoure and Norm Miller compared international real estate commissions with those in

the United States.[25] They concluded:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[26]

123. Delcoure and Miller also found variation within countries. For example, in the UK, they found that "1%-2% is typical" for total broker commissions, but that in "very competitive areas" the total rates ranged between "0.5-0.75%" whereas in lower priced areas the range was "as high as 3.5%."[27] Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[28]

124. In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to the seller broker and buyer broker) in most areas of the United States average between 5% and 6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and 3%. These numbers have remained stable despite both rising home prices (which leads to larger commission amounts) and the decreasing role of the buyer broker in an age when many prospective home buyers have already scoured the market using Zillow or other websites.

125. Other economists have reached similar conclusions. A Professor of Economics from Cornell University has described the Mandatory Offer of Compensation Rule — that is, the

---

[25]     *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).

[26]     *Id.* at 14.

[27]     *Id.* at 17.

[28]     *Id.* at 13.

NAR requirement of having "the seller pay[] for the commission of both the listing [selling] agent and the cooperative [buyer's] agent" — as a "structural hurdle" that has prevented innovation and price competition in the real estate market.[29] This "hurdle" exists only because of Defendants' anticompetitive conspiracy and does not stem from any actual or unique structural aspect of real estate markets.

126. The Mandatory Offer of Compensation Rule encourages and facilitates anticompetitive steering away from brokers who deviate from the "standard" commission practices and rates. The Mandatory Offer of Compensation Rule enables buyer brokers to identify and compare the buyer broker compensation offered by every seller and then steer their clients toward homes offering higher commissions.

127. This practice of steering, confirmed by economic literature, has manifest anticompetitive effects. Steering deters reductions from the "standard" commission and enables brokers to avoid doing business with, or to retaliate against, buyer brokers who try to compete by offering significant discounts.

128. Defendants, and their franchisees and brokers and other co-conspirators, also appear to use software technology to help facilitate steering based on MLS commission information. They have taken further actions to prevent buyers from learning about properties that offer discount buyer broker commissions.

129. CoreLogic is a software technology company that provides software and data services to many MLSs around the country. CoreLogic's software program is called "Matrix."

---

[29] *See* FTC-DOJ Joint Public Workshop, Segment 3 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf

Matrix has features that allow a broker to create and curate a tailored electronic listing of potential properties to send to their buyer clients when those properties match certain criteria applicable to that buyer client's interests. The Matrix software allows the broker, however, to filter listings by the buyer broker commission being offered, which means that the buyer broker can use the Matrix software to ensure that his, her, or their client only receives information about potential homes offering a buyer broker commission in a desired range.

130.     The Antitrust Division of the United States Department of Justice is now conducting an active investigation into anticompetitive practices in the residential real estate brokerage business, including a focus on compensation to brokers and restrictions on their access to listings. The Antitrust Division has recently served Civil Investigative Demands ("CIDs") as part of its investigation into "[p]ractices that may unreasonably restrain competition in the provision of residential real-estate brokerage services."[30]

131.     The CID that the Antitrust Division served on CoreLogic directed it to produce "all documents relating to any MLS member's search of, or ability to search, MLS listings on any of the Company's multiple listing platforms, based on (i) the amount of compensation offered by listing brokers to buyer brokers; or (ii) the type of compensation, such as a flat fee, offered by listing brokers to buyer brokers."[31]

132.     In addition, NAR has enacted certain other rules and policies — which the Corporate Defendants have helped draft and then abided by, agreed to, and implemented — that further exacerbate the anticompetitive effects of steering. For example, requiring that the offered

---

[30]     Civil Investigative Demand to CoreLogic, U.S. Dept. of Justice, No. 29938 (issued April 16, 2019).

[31]     *Id.*

buyer broker commission be specified in only certain ways (such as a percentage of the sale price) makes it easy for realtor participants to see and compare offers.

133.     In furtherance of Defendants' scheme to follow and enforce the Mandatory Offer of Compensation Rule, NAR (at the urging and direction of many of the Corporate Defendants, upon information and belief) passed the Clear Cooperation Policy in November 2019. The Clear Cooperation Policy provides that "[w]ithin one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public." *See* Section 17 Clear Cooperation (Policy Statement 8.0), 2022 Handbook on Multiple Listing Policy.

134.     The Clear Cooperation Policy thus effectively prevents agents and brokers from using any off-MLS avenue to sell properties and avoid the Mandatory Offer of Compensation Rule, as they are forced to submit the property to the MLS (and cause their home seller clients to make the mandatory offer of compensation to a buyer agent) within one business day of trying to market the property.

135.     The economic evidence is plain that the Mandatory Offer of Compensation Rule works to restrain competition in several respects in real estate markets with the result being that home sellers pay far more than they otherwise should.

136.     Defendants' conspiracy and the Mandatory Offer of Compensation Rule was designed to keep real estate commissions at elevated, supra-competitive levels, and Defendants have managed to keep the standard commission at right around 6 percent for many years, despite

significant changes in technology that should have substantially reduced commission charges.

## RELEVANT MARKETS AND DEFENDANTS' MARKET POWER

137. The relevant service market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with access to MLSs. Defendants' control of MLSs allows Defendants to impose the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules on Class members and other market participants. Access to the MLSs is critical for brokers to compete and to assist home buyers and sellers in the areas in which those MLSs operate.

138. The relevant geographic markets for the claims asserted herein is within the United States. Nearly all homes sold in the United States were listed on MLSs by brokers that are subject to the MLS and NAR rules and standards.

139. Defendants, through their co-conspirator franchisees and other conspiring brokers in the areas in which the MLSs operate, collectively provide a significant portion of the residential real estate broker services in these areas.

140. Defendants and their co-conspirators collectively have market power in each relevant market through their membership in and control of the local MLS and their dominant share of the local market.

141. For example, Compass touts that it had 4.6% of the U.S. market share in 2022. But that market power becomes significantly more concentrated in urban areas:

> Of the large cities we serve that have a [MLS], our market share in our top three [cities] by sales volume was approximately **28%** as of December 31, 2022.

Compass, Inc. 2022 Form 10-K (filed March 1, 2023).

142. Similarly, Weichert also has material market power, so much so that it was

38

identified by Realogy Corporation as a significant competitor in public disclosure filings. Realogy Holdings Corp. Form 10-K (filed February 24, 2016) (identifying Weichert as a material competitor).

143. Any buyer brokers in the areas in which MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' effective control of MLSs through their co-conspirators (*i.e.*, NAR, through their local franchisees, other local brokers, and the local realtor associations) means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service.

144. A seller's broker without access to a listing service like an MLS would be unable to reach the large majority of potential buyers, and a broker who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

145. For an alternative listing service to compete effectively with an MLS, the alternative would need to have listings as comprehensive (or at least nearly so) as an MLS. But Brokers and their individual realtors or agents who currently profit from inflated buyer broker commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower total commissions and lower buyer broker commissions and seller broker commissions. Further, many buyers would be reluctant to retain a buyer broker operating on an alternative listing service that required them to pay the buyer broker commission, when other buyer brokers operating on an MLSs are entirely compensated by home sellers. Accordingly, seller brokers on an alternative listing service would struggle to attract buyer brokers and their buyer clients.

146.    Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer brokers. Any listing service attempting to compete with an MLS would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the incumbent MLS. The absence of listing services that compete with MLSs reflects the very substantial barriers to entry.

147.    As an additional impediment to potential competition, NAR advises MLSs to enter into non-compete agreements with third-party websites, such as Zillow, so that those websites do not become competitive rivals to MLSs. NAR's checklist of "critical components" states that the consumer-facing website "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation." The non-compete agreement requires the consumer-facing website to agree not to "use the data in a manner that is similar to a Multiple Listing Service." NAR has thus advised MLSs to take affirmative steps to further the alleged conspiracy by preventing third-party websites from becoming possible competitors.

148.    NAR has also previously taken actions to stifle innovation and competition among real estate brokers, including actions which led to the Antitrust Division of the Department of Justice (DOJ) filing a lawsuit to enjoin a NAR "policy that obstruct[ed] real estate brokers who use innovative Internet-based tools to offer better services and lower costs to consumers." NAR ultimately agreed to a Final Judgment in which it agreed to modify and abandon its challenged policy.[32] The DOJ's lawsuit illustrates that NAR has a history of formulating, adopting, and

---

[32]    *See* https://www.justice.gov/archive/atr/public/press_releases/2005/211008.htm; *see also* https://www.justice.gov/atr/case-document/final-judgment-142.

enforcing anticompetitive policies — like the Mandatory Offer of Compensation Rule challenged in this case — that stifle innovation and restrain competition in violation of federal law. NAR and the real estate industry's history of anticompetitive conduct extends much farther back as well, in that for much of the first half of the 20th Century realtors operated under express agreements to use specified commission percentages in home sale transactions, until the United States Supreme Court declared that scheme an illegal price-fixing arrangement under the federal antitrust laws in *United States v. Nat'l Ass'n of Real Estate Bds., et al.*, 339 U.S. 485 (1950).

## CONTINUOUS ACCRUAL

149.    During the four years preceding the filing of this Complaint, Defendants, through their co-conspirator brokers in the areas in which MLSs operate, repeatedly charged and received buyer broker commissions and total commissions that were inflated as a result of the conspiracy. These inflated commissions during the preceding four years were paid by Plaintiffs and the other Class members in connection with the sale of residential real estate listed on one of the MLSs. Each payment of these inflated commissions by Plaintiffs and the other Class Members during the last four years injured them and gave rise to a new cause of action for that injury.

150.    During the last four years, Defendants and their co-conspirators have maintained, implemented, and enforced the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules nationwide.

## CLASS ACTION ALLEGATIONS

151.    Plaintiffs bring this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of the Class defined as:

> All persons in the United States who, from October 31, 2019, through the present, used a listing broker affiliated with any Corporate Defendant in the sale of a home listed on an MLS, and who paid a commission to the buyer's broker in connection with the sale of the

home.

152.    Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

153.    The Class is readily ascertainable because records of the relevant transactions should exist.

154.    Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class have many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

155.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

156.    Common questions of law and fact exist as to all members of the Class and predominate over any question affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

    a.    Whether Defendants engaged in the alleged conspiracy;

    b.    Whether the conduct of Defendants' and their co-conspirators caused injury to the business or property of Plaintiffs and the other members of the Class;

    c.    Whether the effect of Defendants' conspiracy was to inflate both total

commissions and buyer broker commissions;

d.    Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

e.    Whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

f.    Whether Defendants' conduct is unlawful; and

g.    The appropriate class-wide measures of damages.

157.    Plaintiffs' claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Defendants and the relief sought within the Class is common to each member.

158.    Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Class. Together Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of the Class. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

159.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

160. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## ANTITRUST INJURY

161. Defendants' anticompetitive agreements and conduct have had the following effects, among others:

a. Sellers of residential property have been forced to pay inflated costs to sell their homes through forced payments of commissions to buyer brokers;

b. Home sellers have been forced to set buyer broker commissions to induce buyer brokers to show the sellers' homes to prospective buyers;

c. Price competition has been restrained among brokers seeking to be retained by home buyers, and by brokers seeking to represent home sellers; and

d. Defendants and their franchisees and subsidiaries have inflated their profits

44

by a significant margin by the increased total commissions and increased buyer broker commissions.

162. By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher total commissions than they would have paid in the absence of Defendants' anticompetitive conspiracy, and as a result have suffered damages.

163. There are no pro-competitive effects of Defendants' conspiracy that are not substantially outweighed by the conspiracy's anticompetitive effects.

164. Significant economic evidence supports concluding that Defendants' conspiracy has resulted in Class members paying buyer broker commissions and total commissions that have been inflated to a supra-competitive level.

165. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**COUNT I**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**Against all Defendants**
**(Brought on behalf of Plaintiffs and the Class)**

166. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

167. Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

168. The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make

45

inflated payments to the buyer broker.

169.    In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

   a.    Participated in the creation, maintenance, re-publication, and implementation of the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules;

   b.    Participated in the establishment, maintenance, and implementation of rules by local NAR associations and MLSs that implemented the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules; and

   c.    Requiring franchisees of Defendants and others to implement the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules, which each Defendant does through its franchise agreements, policy manuals, and other contracts with its franchisees, affiliates, subsidiaries, and realtors.

170.    Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer broker commission and an inflated total commission, and it has restrained price competition among buyer brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

171.    Defendants' conspiracy has caused buyer broker commissions and total commissions to be inflated. Plaintiffs and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate. Absent Defendants' conspiracy, Plaintiffs and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

172. Defendants' conspiracy is a *per se* violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

173. In the alternative, Defendants' conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis.

174. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request relief and pray for judgment against Defendants as follows:

a. An Order certifying the Class under the appropriate provisions of Rule 23 of the Federal Rule of Civil Procedure, and appointing Plaintiffs and their counsel to represent the Class;

b. Declarations that the actions of Defendants, as set forth above, are unlawful;

c. A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from (1) requiring that sellers pay the buyer broker, (2) continuing to restrict competition among buyer brokers and seller brokers, and (3) engaging in any conduct determined to be unlawful;

d. Appropriate injunctive and equitable relief;

e. An award to Plaintiffs and the other members of the Class for damages and/or restitution in an amount to be determined at trial;

f. An award of pre- and post-judgment interest to Plaintiffs;

g. An award to Plaintiffs for their costs of suit, including reasonable attorneys'

47

fees and expenses;

h.      An award of such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial of all issues so triable.

Dated: October 31, 2023              Respectfully submitted:

*/s/ Matthew L. Dameron*
_____

| | |
|---|---|
| Matthew L. Dameron | MO # 52093 |
| Eric L. Dirks | MO # 54921 |

**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Tel:     (816) 945-7110
matt@williamsdirks.com
dirks@williamsdirks.com

**BOULWARE LAW LLC**

| | |
|---|---|
| Brandon J.B. Boulware | MO # 54150 |
| Jeremy M. Suhr | MO # 60075 |
| Erin D. Lawrence | MO # 63021 |

1600 Genessee, Suite 416
Kansas City, Missouri 64102
Tel:     (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com
erin@boulware-law.com

**KETCHMARK AND MCCREIGHT P.C.**

| | |
|---|---|
| Michael Ketchmark | MO # 41018 |
| Scott McCreight | MO # 44002 |

11161 Overbrook Rd. Suite 210
Leawood, Kansas 66211
Tel:     (913) 266-4500
mike@ketchmclaw.com
smccreight@ketchmclaw.com

***Attorneys for Plaintiffs and the Class***