# Exhibit 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DON GIBSON, LAUREN CRISS, JOHN MEINERS, and DANIEL UMPA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS, et al.,<br><br>Defendants. | Civil Action No. 4:23-cv-00788-SRB<br><br>[Consolidated with 4:23-cv-00945-SRB] |

**DECLARATION OF ERIC L. DIRKS IN SUPPORT OF
CLASS COUNSEL'S MOTION FOR ATTORNEY'S FEES,
COSTS, EXPENSES AND SERVICE AWARDS**

I, Eric L. Dirks, hereby declare as follows:

1. I am a partner at the law firm of Williams Dirks Dameron LLC in Kansas City, Missouri, and counsel for the Plaintiff and the Class in the *Burnett* and *Gibson* actions (together with *Umpa* and *Moehrl* "the litigation"). I submit this declaration in support of Plaintiffs' Motion for Attorneys' Fees, Expenses and Service Awards for the nine settlements currently pending approval in the *Gibson* case. I make this statement of my own personal knowledge, and if called to testify, would testify competently thereto.

2. The following is a brief description of my professional background. I am a founding partner of the law firm of Williams Dirks Dameron LLC, in Kansas City, Missouri where I focus my practice on complex litigation, including nationwide class actions. Before my involvement in this litigation, I acted as counsel on over four dozen class and collective actions, settled numerous class actions, tried a class action to verdict and through appeal in federal court,

1

and successfully argued the issue of class certification before the Missouri Supreme Court. As the Court is aware, my firm and our co-counsel successfully navigated the *Burnett* case from its infancy to a $1.785 billion jury verdict.

3. I am AV rated with Martindale Hubbell, am routinely selected as a Super Lawyers Top 50 in Kansas City and have been selected to Kansas City's Best of the Bar on multiple occasions. I have publicly spoken on numerous occasions the topic of complex litigation, including class actions.

4. I have spent the majority of my time over the past three-and-a-half years working on the litigation and am intimately familiar with all aspects of the *Gibson* and *Burnett* matters.

5. Based on my experience prosecuting the litigation and our research, the more than $987.1 million in Settlements obtained thus far collectively represent the largest known consumer class recovery in litigation involving the real estate brokerage industry.

6. The Settlements are more than a large financial recovery for the class. The practice change relief set out in the Settlements is a substantial victory for class members and, in my opinion, will ultimately result in cost savings for future home sellers.

7. Based on my experience in handling class action litigation for the past two decades, I can say without a doubt that the Settlements constitute a fair and reasonable–indeed excellent– result for the class.

8. Our firm and co-counsel filed *Burnett* in 2019 and *Gibson* in 2023 and have collectively dedicated more resources to prosecuting the litigation than any other case in our firms' history. Prior to *Moehrl* and *Burnett*, there had never been a public prosecution or private settlement involving the modern Mandatory Offer of Compensation Rule. In other words, the litigation is the first to obtain monetary or injunctive relief with respect to the modern Mandatory

2

Case 4:23-cv-00788-SRB   Document 399-1   Filed 08/20/24   Page 3 of 13

Offer of Compensation Rule. Throughout the litigation, Defendants took the position that their conduct was lawful and that the cases lacked merit.

9. At the time we filed *Gibson*, the *Burnett* and *Moehrl* cases represented the only certified classes of plaintiffs involving the Mandatory Offer of Compensation Rule. Our firm and co-counsel, along with class counsel in *Moehrl* (collectively "Class Counsel" or "co-counsel"), litigated the only cases involving the Mandatory Offer of Compensation Rule until other plaintiffs began filing similar cases once they had the opportunity to observe our successes in the litigation. Prior to and since filing *Gibson*, we undertook significant research into the Settling Defendants, their participation in NAR, their enforcement of the Mandatory Offer of Compensation Rule, and their market share and market presence. We reviewed publicly available information, including SEC filings, company websites, third party websites, YouTube videos, and other sources in order to investigate the connection between these companies and the practices found to be antitrust violations in *Burnett*. As discussed in greater detail below, to achieve this result for the Settlement Class, we, along with our co-counsel, performed a massive amount of work—more than 105,000 hours through July 31, 2024—on a contingent basis, working for more than five years in the litigation. We also spent over $13,147,775.19 in reasonable and necessary expenses through July 31, 2024.

10. After we reached Settlements with Anywhere and RE/MAX, we continued litigating against Keller Williams, HomeServices, and NAR in the *Burnett* matter. We litigated all the way through trial in *Burnett*. We have now reached settlements with all *Burnett* and *Moehrl* defendants.

11. But we did not stop there. We filed the *Gibson* case in 2023 to obtain additional monetary and injunctive relief for the class. We combined our knowledge and experience from

3

*Burnett* and *Moehrl* with additional research to identify additional companies that participated in the same anticompetitive agreement alleged in *Burnett* and *Moehrl*.

12. Based on my two decades of experience prosecuting and serving as class counsel in numerous class actions, I can say that this litigation was the most unique, hotly-contested and fraught with risk that I have experienced. Moreover, the result came after years of litigation beginning with *Burnett* and *Moehrl*, and now including *Gibson* and *Umpa*.

13. All told, the various Defendants in the litigation were represented by no less than thirty well-respected defense firms during the course of the *Burnett* litigation including: Cooley; Quinn Emanuel Urquhart Sullivan; Skadden Arps, Slate, Meagher & Flom; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Jones Day; Gibson Dunn & Crutcher; Crowell & Moring LLP; Vinson & Elkins; Wilmer Cutler Pickering Hale & Dorr LLP; O'Melveny & Meyers LLP; Pillsbury Winthrop Shaw Pittman LLP; DLA Piper LLP; Arent Fox Schiff; Holland & Knight; Faegre Baker Daniels; Morgan Lewis & Bockius; Foley & Lardner; MacGill PC; Barnes & Thornburg; MoloLamken; Polsinelli; Stinson; Shook Hardy and Bacon; Bryan Cave; Wagstaff & Cartmell; Brown & James; Lathrop GPM; Horn Aylward & Bandy; and Armstrong Teasdale.

14. In undertaking such a substantial commitment on behalf of the Settlement Class, we assumed tremendous risk because the claims were complex and expensive to prosecute. We defeated two sets of motions to dismiss, three motions to compel arbitration, five motions for summary judgment, and three efforts to reverse decisions by this court through appeals. We also took and defended over 80 depositions in *Burnett* and over 100 depositions in *Moehrl*. In addition, the litigation involved at least 20 different experts on liability and damages who submitted numerous reports and testified at dozens of depositions. The damages experts for both parties reviewed and analyzed huge data sets including millions of rows of data. Expert testimony

4

addressed a broad array of subject matters.

15. We reviewed a document discovery universe that included more than 5 million pages of documents, identifying hundreds of key documents that were later introduced as deposition and trial exhibits. Both sides also served numerous third-party subpoenas to MLSs, real estate brokerages, and other third parties.

16. Our investment of labor and expenses substantially limited the other work my firm and my co-counsels' firms we were able to take on during the last five years. We were opposed by a much larger defense team with nearly boundless resources. The over 105,000 hours of work we collectively performed through July 31, 2024 reflects this massive undertaking. Given the size and business model of our firms, that was a significant risk for us to take on a purely contingent basis.

17. There were certainly less risky cases we could have devoted those resources to, where liability, damages, or both were more certain, where expert witnesses and other case costs were cheaper, where payment would come faster, and where the claims followed parallel government prosecutions or other private litigation. We nonetheless dedicated our resources to these cases because we believed in the claims and were committed to representing the class.

18. We could have moved on to new cases after the *Burnett* and *Moehrl* cases, but instead we continued to work on behalf of the class to maximize the financial recovery and practice change relief.

19. When we first brought the litigation, we faced considerable risk in establishing the defendants' liability, which required among other things establishing the existence of an agreement, each defendant's participation in that agreement, and the anticompetitive consequences of that agreement for sellers and others.

5

20. Liability was also far from the only risk we faced. Defendants levied every conceivable challenge to class certification, expert testimony, and damages.

21. And the litigation has been unusually expensive to prosecute. This is due, in part, to the nature of litigating antitrust claims. But also that we were required engage experts to handle significant data processing and evaluation due to the large number of transactions involved.

22. Considering the time involved, expenses required, and level of legal complication, this litigation was, by far, the riskiest litigation my firm has ever prosecuted. Each day that the litigation progressed and we invested more time and money, the risk compounded.

23. It was only following a jury trial that most Defendants in the original *Burnett* action seriously entertained settlements at the ranges we have been able to achieve.

24. The present Settlements were not reached until after the benefit of years of litigation in *Burnett* and *Moehrl* and after arms-length and adversarial negotiations with each Settling Defendant, including mediations with most.

25. In determining that the Settlements are in the best interest of the Class, Plaintiffs considered publicly available materials, their knowledge of the evidentiary record based on years of litigating the *Burnett* and *Moehrl* cases, and a forensic accountant who received and used internal financial documents from each Settling Defendants to evaluate their financial position and ability to pay.

26. Each settlement was reached only after Class Counsel considered each settling Defendant's ability to pay, including the impact that continued and expensive antitrust litigation would have on each Defendant's financial position and, therefore, the size and likelihood of any recovery for the Class. In my opinion, the Settlements are fair, reasonable and adequate in light of the Settling Defendants' financial condition.

27.     I also believe the Settlements are in the best interests of the Settlement Class given the risks and delay of further litigation. The Settlement represents the most Settling Defendants could reasonably pay. Moreover, due to the nature of joint and several liability, the Settlements do not constitute a maximum recovery for the class because Settlement Class Members will be eligible to participate in any related existing and future settlements. Thus, the Settlements obtained meaningful relief for the classes with the opportunity for additional recovery. Indeed, as Class Counsel, we continue to strenuously litigate on behalf of the Settlement Class.

28.     My firm's work on this litigation was performed on a wholly-contingent basis pursuant to contingency fee contracts with the Named Plaintiffs. Each of these contracts with Named Plaintiffs called for a contingency fee of 35%—higher than the amount requested from the common fund. My firm has not received any amounts in connection with this litigation, either as fee income, litigation funding, or expense reimbursement outside of any fees awarded by this Court.

29.     The time we have spent on this litigation over the last five years has substantially limited our ability to take on other, potentially profitable work. Because my office is relatively small, any time I spend on this litigation necessarily reduces the time I have available to work on other matters. I have personally declined to work on numerous promising cases due to my commitments in prosecuting this litigation.

30.     My firm kept contemporaneous track of the time spent on the litigation, which includes time in *Burnett* and *Gibson*.

31.     After an exercise of billing judgment, our firm has expended 10,032 hours of work in connection with the litigation through July 31, 2024, and many more since then. Many of our hours in this litigation were not recorded due to the contingent nature of our Plaintiffs' practice.

For example, I rarely record the time I spend on phone calls or on emails, yet over the course of this litigation I have made and received thousands of calls and emails. But we do regularly record contemporaneous daily time records in our computerized database, which occurred in this case and is reported below.

32. My firm's lodestar through July 31, 2024, in the litigation is:

| 33. TIMEKEEPER | POSITION | HOURS | RATE | TOTAL |
| --- | --- | --- | --- | --- |
| Allen, Alexis | Associate | 49.2 | $600 | $29,520.00 |
| Cheung, Katia | Associate | 2,139.6 | $600 | $1,283,760.00 |
| Dameron, Matthew | Partner | 1,283.7 | $1,250 | $1,604,625.00 |
| Dirks, Eric | Partner | 4,036.8 | $1,250 | $5,046,000.00 |
| Flores, Carlos | Paralegal | 62.1 | $300 | $18,630.00 |
| Graham, Katie | Paralegal | 24.9 | $300 | $7,470.00 |
| Mann, Clinton | Associate | 137.4 | $600 | $82,440.00 |
| Stout, Courtney | Associate | 2,204.8 | $600 | $1,322,880.00 |
| Strickland, Brittni | Paralegal | 76.5 | $300 | $22,950.00 |
| Williams, Michael | Partner | 15.5 | $1,250 | $19,375.00 |
| Wren, Jesse | Paralegal | 1.8 | $300 | $540.00 |
| | TOTAL HOURS | 10,032.30 | TOTAL | $9,438,190.00 |

34. These rates are consistent with recent lodestar crosschecks in complex litigation in the Kansas City area. *See, e.g., Rogowski v. State Farm Life Ins. Co.*, No. 22-CV-203, 2023 WL 5125113, at *5 n.8 (W.D. Mo. Apr. 18, 2023) (performing lodestar crosscheck on rates of $1,125 for senior partners, $775-$950 for junior partners, $475-$700 for associates, and $275-$340 for paralegals); *In re T-Mobile Customer Data Security Breach Litigation*, No. 21-MD-3019 (W.D. Mo. June 29, 2023), ECF No. 235 at 37–38 (rejecting need to perform lodestar crosscheck but nonetheless finding the following rates reasonable, senior partners $1,000-$1,275, junior partners $825-$950, and associates $475-$650); Order and Judgment Granting Final Approval of Class Action Settlement, *Jackson County v. Trinity Industries*, No. 1516-CV23684, at 4–5 (Mo. Ct. Cir. Aug. 30, 2022) (approving blended hourly rate of $662 for firms). This Court previously found these rates to be reasonable. *See Burnett v. Nat'l Ass'n of Realtors*, No. 4:19-CV-00332-SRB, 2024

8

WL 2842222, at *17 (W.D. Mo. May 9, 2024) (finding counsels' submitted rates reasonable).

35. Our work in class action litigation has been crosschecked relatively recently by this Court in *Hays v. Nissan N. Am. Inc.*, No. 17-CV-353 (W.D. Mo. Sept. 30, 2022), ECF No. 138 at 3 ($900 - $1,125 for partners, $695 for associates, $340 for paralegals).

36. A court within the Eighth Circuit recently approved a class action fee petition noting the "median standard billing rate for equity partners of $1,463 per hour, as reflected by a nationwide survey of the top 50 law firms nationwide." *PHT Holdings II, LLC v. N. Am. Co. Life and Health Ins.*, No. 18-CV-368, 2023 WL 8522980, at *7 (S.D. Iowa Nov. 30, 2023). The court recognized the overall lodestar crosscheck rates were below this average in finding the lodestar crosscheck to result in a reasonable fee. *Id.* at 7–8. The court also observed that, where, as here, prosecuting the case requires particularized legal specialization, courts may consider a national billing rate. *Id.* at 7; *see also In re Auto Parts Antitrust Litig.*, No. 12-md-2311, 2018 WL 7108072, at *3 (E.D. Mich. Nov. 5, 2018) ("In national markets, partners routinely charge between $1,200 and $1,300 an hour, with top rates at several large law firms exceeding $1,400. In specialties such as antitrust and high-stakes litigation and appeals, for lawyers at the very top of those fields, hourly rates can hit $1,800 or even $1,950." (cleaned up)); *see also Spano v. Boeing Co.*, No. 06-CV-743, 2016 WL 3791123, at *3 (S.D. Ill. Mar. 31, 2016) (using similar rates).

37. The PWC 2024 Billing Rate Survey conducted by PWC reveals that the average rate for top firms continues to rise with AMLAW 50 equity partner rates averaging over $1,500 per hour. *See 2024 Billing Rate & Associate Salary Survey (BRASS) Initial Release*, PWC, https://www.pwc.com/us/en/law-firms/surveys/assets/brass24ir/2024-brass-ir-brochure.pdf.

38. Four of the firms representing Defendants here are in the AMLAW top 10, and nine of the firms representing Defendants are in the AMLAW Top 25. *See Law Firms*, ALM |

LAW.COM, https://www.law.com/law-firms/.

39. This litigation not only required Class Counsel with specialized knowledge of class action antitrust law, it was also the product of national litigation in multiple venues with attorneys from all over the country.

40. The antitrust claims at issue here also involved complicated legal issues and was uniquely expensive to prosecute. *Burnett* went to trial, with *Moehrl* scheduled to be tried by the end of 2024. Finally, this litigation occurred during the recent inflationary conditions which have had an impact on law practices – including the rising cost of retaining staff.

41. Additional time and expenses has been and will be incurred for the work that we will be performing on the litigation and on settlements through the conclusion of the settlements and even after final approval of the settlements.

42. The lodestar summary reflects Williams Dirks Dameron LLC's extensive experience in the field, the complexity of the matters involved in this litigation, and the prevailing rate for providing such services. We further affirm that (1) the rates submitted with this Declaration are based on rate scales, as annually adjusted, submitted and approved by other courts.

43. The firms' combined reported lodestar through July 31, 2024 is **$90,853,364.**[1]

44. Through July 31, 2024, Williams Dirks Dameron has advanced a total of $1,044,029.06 in out-of-pocket expenses (after the exercise of billing judgment) reasonably and necessarily incurred in connection with the prosecution of this matter. These expenses are reflected in the books and records regularly kept and maintained by my firm. It is my opinion that the Settlements would have never been reached without the expenditure of these expenses.

---

[1] This total amount is derived from the updated lodestar declarations of Co-Lead Counsel submitted in connection with this motion as well as the previously-submitted declarations of non-lead counsel. *See Burnett* Doc. 1392-7-11.

Although there were multiple defendants in the litigation, due to the joint and several liability nature of the litigation, all of the time and expenses spent in furtherance of the litigation against one defendant applied to the time and expenses against another defendant.

45. My firm's reasonable expenses in the litigation through July 31, 2024 are as follows:

| ACTIVITY | TOTAL COST |
|---|---:|
| Copy & Print | $7,179.00 |
| Court Fees | $502.00 |
| Depositions | $18,687.95 |
| Document Storage, Production & ESI | $55,528.18 |
| Experts & Consultants | $904,125.12 |
| Mediation | $12,760.60 |
| Postage | $43.38 |
| Process Service | $3,416.05 |
| Records & Transcripts | $176.70 |
| Research | $13,899.95 |
| Travel & Meals | $27,710.13 |
| TOTAL | $1,044,029.06 |

46. This total constitutes $7,753.43 in additional expenses since January 31, 2024 that I reported in connection with the Anywhere, RE/MAX and Keller Williams settlements. Thus, my firm is presently seeking expenses in the amount of $7,753.43.

47. Plaintiffs previously submitted expenses totaling $12,923,266.48 through January 31, 2024. The Court previously awarded payment of these expenses. *Burnett* Doc. 1487.

48. Plaintiffs' total expenses in the litigation through July 31, 2024 is **$13,147,775.19**.[2]

49. These expenses were necessary because the litigation required a multitude of

---

[2] This total amount is derived from the updated declarations of Co-Lead Counsel submitted in connection with this motion as well as the previously-submitted declarations of non-lead counsel. *See Burnett* Doc. 1392-7-11.

11

depositions due to the numerous fact and expert witnesses. Experts were critical because they are typically necessary in antitrust cases. Document storage was required given the large volume of documents produced. Class notice administration was required under Rule 23. Legal research was required given the innumerable legal disputes and briefs. When possible, the *Moehrl*, *Burnett*, *Gibson* and *Umpa* plaintiffs coordinated in order to reduce expenses. For example, we shared document repositories and coordinated numerous depositions to occur on the same day. All of the expenses submitted were reasonable expenses in such a large litigation.

50.     The Class Representatives invested significant time and effort on behalf of the class. Each *Gibson* class representative has worked closely with class counsel at all stages of the litigation and through settlement approval. Each class representative is currently working with counsel to respond to discovery requests and will likely sit for depositions. . All of them were willing to put their names and reputations into the public domain in order to represent not only themselves but the entire class.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 20th Day of August 2024.

_____
Eric L. Dirks