Exhibit 7

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

DON GIBSON, LAUREN CRISS, JOHN MEINERS, and DANIEL UMPA, on behalf of themselves and all others similarly situated,

        Plaintiffs,

  v.

NATIONAL ASSOCIATION OF REALTORS, et al.,

        Defendants.

Civil Action No. 4:23-cv-00788-SRB

[Consolidated with 4:23-cv-00945-SRB]

# DECLARATION OF PROFESSOR ROBERT H. KLONOFF RELATING TO ATTORNEYS' FEES

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   QUALIFICATIONS ........................................................................................... 2

III.  MATERIALS RELIED UPON ...................................................................... 12

IV.   FACTUAL OVERVIEW ................................................................................. 13

    A.   Allegations in the Related Lawsuits ................................................... 13

    B.   Pretrial Activities and Rulings ........................................................... 13

    C.   Trial and Settlements .......................................................................... 14

        1.   Trial Against *NAR*, *Keller Williams*, and *HomeServices* ............. 14

        2.   *Anywhere, et al*. Settlements ................................................... 15

        3.   The *Compass, et al.* Settlements Involved in the Motion for Attorneys' Fees at Issue ........................................................... 15

        4.   *NAR* Settlement ...................................................................... 16

        5.   *HomeServices* Settlement ....................................................... 16

        6.   Recap of Settlements ................................................................ 17

    D.   Class Counsel's Lodestar and Multiplier in the Pending and Prior Settlements ......................................................................................... 18

V.    SUMMARY OF OPINIONS ON ATTORNEYS' FEES ................................ 18

VI.   THE ATTORNEYS' FEES REQUESTED BY CLASS COUNSEL (ONE THIRD OF THE COMMON FUND) ARE REASONABLE ........................................... 21

    A.   This Court Should Use the Percentage-of-the-Fund Method .............. 22

Case 4:23-cv-00788-SRB   Document 399-7   Filed 08/20/24   Page 3 of 102

B. The 1/3 Fee Award Requested Here Is Reasonable, Without Even Taking Into Account the Valuable Injunctive Relief and Cooperation from Defendants in Pursuing Other Defendants ...................................................................... 24

    1. Reasonableness of a Fee Award of 1/3 of the Fund .................................... 24

        a. The 1/3 of the Fund Requested is Reasonable Under the Johnson Factors Based on the Compelling Facts and Circumstances Here .. 25

            i. Time and Labor Required ............................................................... 26

            ii. Novelty and Difficulty of the Questions........................................ 26

            iii. Skill Requisite to Perform the Legal Service Properly ............. 31

            iv. Preclusion of Other Employment Due to Acceptance of the Case ................................................................................................. 38

            v. Customary Fee ................................................................................. 38

            vi. Any Prearranged Fee ..................................................................... 40

            vii. Time Limitations Imposed by the Client or the Circumstances ................................................................................. 40

            viii. Amount Involved and Results Obtained ................................... 41

            ix. Experience, Reputation, and Ability of Attorneys ................... 45

            x. Undesirability of the Case ............................................................. 46

            xi. Nature and Length of Professional Relationship with the Client ................................................................................................ 46

            xii. Awards in Similar Cases .............................................................. 46

C. The Percentage Requested Is Reasonable Notwithstanding the Fact that These are So-Called Mega-Fund Cases .............................................................. 47

D.   With Injunctive Relief Considered, the True Percentage Sought By Class Counsel is Significantly Less than 1/3 of the Benefits ........................... 61

E.   There Is No Need for a Lodestar Cross-Check .................................................... 62

F.   In Any Event, a Lodestar Analysis Supports the Fees Requested ...................... 65

   1.   Calculation of Hours Devoted to Prosecuting Multiple Defendants ......... 66

   2.   The Hours Spent by Class Counsel ............................................................. 69

   3.   The Billing Rates Proposed by Class Counsel ............................................. 70

G.   The Multiplier Is Well Justified Based on the Facts ............................................. 72

H.   The Multiplier Is Well Justified in Comparison with Other Mega-Fund Cases 74

I.   The Requested 1/3 Fee Award is Necessarily Reasonable if the *Compass et al.* Settlements are Viewed in Isolation ........................................................................ 76

VII.   CONCLUSION ............................................................................................................ 77


APPENDIX A: Curriculum Vitae

## I. INTRODUCTION

1. I have been asked by class counsel to opine on their request for 1/3 of the $110.6 million common fund in the *Compass, et al.* settlements as attorneys' fees (*i.e.,* approximately $36.87 million).[1] More generally, I have been asked to opine on the approach this Court should take not only for the $110.6 million settlement funds immediately at issue here but also for other pending settlements in related litigation involving other defendants—the $418 million settlement with the National Association of Realtors (hereafter, the *NAR* settlement), and a $250 million settlement with HomeServices.[2] Class counsel have advised me that they will be seeking 1/3 of the fund for all pending settlements. As discussed below, it is my opinion that an award of 1/3 for the $110.6 million settlement and for the other pending settlements is both reasonable and justified. Although I do not believe that this Court is required to conduct a lodestar cross-check to justify the percentage sought by class counsel, it is my opinion that such a cross-check supports class counsel's request. I discuss below a methodology that in my opinion is well suited to this litigation should this Court choose to conduct a lodestar cross-check.[3]

---

[1] The nine individual settlements that make up this $110.6 million total are discussed in detail *infra,* ¶¶ 18-22.

[2] Certain of the settlements include additional contingent amounts if certain targets are met. In addition, I understand that the *NAR* settlement includes a mechanism for multiple listing services and brokerages to "opt in" to the settlement, including by making additional settlement payments beyond the $418 million to be paid by NAR. I do not consider these contingent amounts, but my analysis in this Declaration (including the reasonableness of a 1/3 fee award and the mechanism for conducting a lodestar cross-check) would be applicable to any such amounts.

[3] In addition to discussing the various pending settlements, my Declaration also references and takes into account the prior $208.5 million settlement with Anywhere Real Estate, RE/MAX, and Keller Williams Realty, Inc. (hereafter, the *Anywhere, et al.* settlements). This Court, in an order dated May 9, 2024, gave final approval to the *Anywhere, et al.* settlements and awarded 1/3

2.    I recognize that my role is limited and that the Court will determine reasonable attorneys' fees and select the appropriate methodology to use in making that award.

## II.    QUALIFICATIONS

3.    As discussed below (¶¶ 9-10), I have qualified as an expert in numerous class action and other aggregate cases and have opined on attorneys' fees issues in many of those cases.  I am currently the Jordan D. Schnitzer Professor of Law at Lewis & Clark Law School and have held that position since June 1, 2014.  This is an endowed, tenured position at the rank of full professor. From July 1, 2007, to May 31, 2014, I served as the Dean of Lewis & Clark Law School, and I was also a full professor at Lewis & Clark during that time.  Immediately prior to assuming the deanship at Lewis & Clark, I served for four years as the Douglas Stripp/Missouri Professor of Law at the University of Missouri-Kansas City School of Law (UMKC).  That appointment was an endowed, tenured position at the rank of full professor.  Before joining the academy in a full-time capacity, I served for more than a dozen years as an attorney with the international law firm of Jones Day, working in the firm's Washington, D.C. office.  I was an equity partner at the firm for most of that time. I continued to work for Jones Day while I was employed at UMKC; my status with the firm during that period changed from partner to of counsel.  I ended my relationship with Jones Day in 2007, when I became Dean of Lewis & Clark Law School.  While working at Jones Day (before joining the UMKC faculty), I also served for many years as an adjunct professor of law at Georgetown University Law Center.  Before joining Jones Day, I served as an Assistant

---

of the common fund. *Burnett v. Nat'l Ass'n of Realtors,* No. 4:19-CV-00332-SRB, 2024 WL 2842222 (W.D. Mo. May 9, 2024).

2

United States Attorney and as an Assistant to the Solicitor General of the United States. Immediately after graduating from law school, I served as a law clerk for Chief Judge John R. Brown of the U.S. Court of Appeals for the Fifth Circuit. I received my law degree from Yale Law School in 1979.

4. In my various academic positions, I have taught (among other subjects) complex litigation, class actions, civil procedure, federal courts, and federal appellate procedure. With respect to my scholarship, I am a co-author of the Wright & Miller treatise, *Federal Practice and Procedure.* I have sole responsibility for the three volumes of the treatise focusing on class actions (including attorneys' fees in class actions). In addition, I co-authored the first casebook devoted specifically to class actions, and I am now the sole author of that book: *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017, with annual supplements). I am also the sole author of the West Nutshell on class actions, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 6th ed. 2021), and the West Nutshell on federal multidistrict litigation, *Federal Multidistrict Litigation in a Nutshell* (West 2020). These texts, which address attorneys' fees issues, are used at a number of law schools and have been cited by many courts and commentators.[4] I have also authored or co-authored numerous scholarly articles on class actions

---

[4] As just a small sample, *see, e.g.*, *Forsythe v. Teva Pharm. Indus. Ltd,* 102 F.4th 152, 156 n.9 (3d Cir. 2024) (*citing* casebook); *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 468 (1st Cir. 2013) (*citing Class Action Nutshell*); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (*citing Class Action Nutshell*); *Adams v. United Services Automobile Ass'n*, No. 2:14-CV-02013, 2016 WL 1465433, at *7 (W.D. Ark. Apr. 14, 2016) (*citing Class Action Nutshell*), *rev'd on other grounds*, 863 F.3d 1069 (8th Cir. 2017); *LaRocque ex rel. Spang v. TRS Recovery Servs., Inc.*, 285 F.R.D. 139, 151 (D. Me. 2012) (*citing Class Action Nutshell*); *Soileau v. Churchill Downs Louisiana Horseracing Co., L.L.C.*, 2021-0022 (La. App. 4 Cir. 12/22/21), 334 So. 3d 901, 940, writ denied, 2022-00243 (La. 4/12/22), 336 So. 3d 83 (*citing* casebook); Samir D. Parikh, *The New Mass Torts Bargain*, 91 FORDHAM L. REV. 447, 476  (2022) (*citing Federal Multidistrict Litigation Nutshell*); Brian T. Fitzpatrick, *Many Minds, Many MDL Judges*, 84 LAW & CONTEMP. PROBS. 107, 108  (2021) (*citing Federal Multidistrict Litigation Nutshell)*.

and other topics.[5] In October 2014, I was elected to membership in the International Association of Procedural Law ("IAPL"), an organization of preeminent civil procedure scholars from around the world. I was selected in a competitive process to present a scholarly article on class actions at the May 2015 Congress of the IAPL, an event held once every four years.

5. In September 2011, Chief Justice John G. Roberts, Jr., appointed me to serve a three-year term as the academic voting member of the Judicial Conference Advisory Committee on Rules of Civil Procedure ("Advisory Committee"). The Advisory Committee considers and recommends amendments to the Federal Rules of Civil Procedure. Only one professor in the United States is selected by the Chief Justice to serve in that role during any three-year term. In May 2014, Chief Justice Roberts reappointed me to serve a second three-year term on the Advisory Committee. I completed that service in May 2017 (The maximum period of service on the Advisory Committee is six years). I also served on the Advisory Committee's Class Action Subcommittee, which took the lead for the full Advisory Committee on proposed amendments to the federal class action rule, Federal Rule of Civil Procedure 23. Those proposed amendments became effective on December 1, 2018.

---

[5] My articles have been frequently cited. For example, my 2013 article, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729 (2013), has been cited well over 350 times by courts and commentators. As just a small sample, *see, e.g.*, *In re Parish*, 81 F.4th 403, 419 (5th Cir. 2023); *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 484 & n.18 (3d Cir. 2018); *In re National Football League Players' Concussion Injury Litig.*, 775 F.3d 570, 576 (3d Cir. 2014); *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014) (Posner, J.); *In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014); *Gordon v. Sig Sauer, Inc.*, No. CV H-19-585, 2019 WL 4572799, at *20 (S.D. Texas, Sept 20, 2019); *Immigration-Remedies-Garland v. Aleman Gonzalez*, 136 Harv. L. Rev. 410, 419 (2022); Helen Hershkoff and Luke Norris, *The Oligarchic Courthouse: Jurisdiction, Corporate Power, and Democratic Decline*, 122 MICH. L. REV. 1, 54 (2023); Christine P. Bartholomew, *Antitrust Class Actions in the Wake of Procedural Reform*, 97 IND. L.J. 1315, 1317 (2022); J. Maria Glover, *Mass Arbitration*, 74 STAN. L. REV. 1283, 1291 (2022).

4

6.    I have been a member of the American Law Institute ("ALI") since 2003, and I serve on the ALI Council, the organization's governing body.  I was an Associate Reporter for the ALI's class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation*.  I was the principal author of Chapter 3, which addresses class action settlements and attorneys' fees.  The ALI project was unanimously approved by the membership of the American Law Institute at its annual meeting in May 2009 and was published by the American Law Institute in May 2010.  It has been frequently cited by courts and commentators.[6]

7.    In addition to my academic work, I have 44 years of experience as a practicing lawyer.  I have had eight oral arguments before the U.S. Supreme Court, and numerous oral arguments in other federal and state appellate courts throughout the country, including oral arguments in eight federal circuits.  As an attorney at Jones Day, I personally handled more than 100 class action cases, mostly (but not entirely) on the defense side.  I have also served as co-counsel in numerous high-profile class actions and MDLs post-Jones Day, including cases in the U.S. Supreme Court and numerous federal circuits.

---

[6] As just a small sample, *see*, *e.g.*, *Smith v. Bayer Corp.*, 564 U.S. 299, 316 (2011) n.11 (2011); *Home Depot USA, Inc. v. Lafarge N. Am.*, 59 F.4th 55, 67, 68 (3d Cir. 2023); *In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1122–23 (9th Cir. 2021) (Bade, J., concurring), *cert. denied.* 143 S. Ct. 107 (2022); In *re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 331 (3d Cir. 2019); *Keepseagle v. Perdue*, 856 F.3d 1039, 1069–70 (D.C. Cir. 2017) (Brown, J., dissenting); *Hill v. State Street Corp.*, 794 F.3d 227, 229 (1st Cir. 2015); *Burns v. SeaWorld Parks & Entm't, Inc.*, No. CV 22-2941, 2024 WL 1621337, at *12 (E.D. Pa Apr. 15, 2024); *In re Splunk Inc. Sec. Litig.*, No. 20-CV-08600-JST, 2024 WL 923777, at *7 n.2 (N.D. Cal. Mar. 4, 2024); *Hawes v. Macy's Inc.*, No. 1:17-CV-754, 2023 WL 8811499, at *14 (S.D. Ohio Dec. 20, 2023); Matthew Shapiro, *Democracy, Civil Litigation, and the Nature of Non-Representative Institutions*, 109 CORNELL L. REV. 113, 168 n.268 (2023); Abbe R. Gluck & Elizabeth Chamblee Burch, *MDL Revolution*, 96 N.Y.U. L. REV. 1, 30 (2021); Elizabeth Chamblee Burch & Margaret S. Williams, *Judicial Adjuncts in Multidistrict Litigation*, 120 COLUM. L. REV. 2129, 2121–22 (2020).

8. I have lectured and taught on class actions and other litigation topics throughout the United States and abroad, including presentations at law schools in Cambodia, Canada, China, Colombia, Croatia, Ecuador, France, Germany, India, Israel, Italy, Japan, the Philippines, Russia, South Africa, South Korea, Taiwan, and Turkey. Over the years, I have frequently appeared as an invited speaker at class action symposia, conferences, and continuing legal education programs.[7]

9. I have testified as an expert in numerous class action cases and in other cases raising civil procedure issues. These include, among many others:

- *In re JUUL Labs, Inc. Marketing, Sales Practices, and Products Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal.) (submitted expert declaration, dated 6/23/23, on attorneys' fees for settlement with JUUL; submitted expert declaration, dated 1/11/24, on attorneys' fees for settlement with Altria);

- *Rogowski v. State Farm Life Insurance Company*, No. 4:22-cv-00203-RK (W.D. Mo.) (submitted expert declaration, dated 2/13/23, in support of class counsel's motion for attorneys' fees, costs, and service awards for class plaintiffs);

- *In re Marjory Stoneman Douglas High School Shooting FTCA Litigation*, No. 01:18-62758-WPD (S.D. Fla.) (*Parkland Shooting*) (submitted expert declaration, dated 2/08/22, on a motion to terminate lead counsel; submitted supplemental expert declaration, dated 10/28/22, on attorneys' fees issues in Federal Tort Claims Act civil litigation);

- *Githieya v. Global Tel Link Corp.*, No. 1:15-cv-00986-AT (N.D. Ga.) (submitted expert declaration, dated 4/01/22, on attorneys' fees issues; submitted expert declaration, dated 7/22/22, on class certification and fairness issues in connection with a proposed class settlement);

---

[7] Examples of those courses and speaking engagements are contained in my attached curriculum vitae (Appendix A).

- *Rosie D. v. Baker,* C.A. No. 01-30199-RGS (D. Mass.) (submitted expert declaration, dated 11/23/21, on attorneys' fees issues);

- *Bahn v. American Honda Motor Co.*, No. 2:19-cv-5984 RGK (C.D. Cal.) (submitted expert declaration, dated 11/22/21, on attorneys' fees issues);

- *In re Broiler Chicken Antitrust Litig.*, No. 1:16-CV-08637 (N.D. Ill.) (submitted expert declaration, dated 9/15/21, on attorneys' fees issues raised by the court);

- *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020) (submitted expert declaration on attorneys' fees, dated 10/29/19; submitted supplemental expert declaration on class settlement terms, dated 12/15/19);

- *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices & Products Liability Litigation*, No. 3:17-md-02777-EMC (N.D. Cal.) (submitted expert declaration on settlement fairness, dated 4/25/19);

- *In re Syngenta AG MIR162 Corn Litigation*, No. 2:14-MD-02591-JWL-JPO (D. Kan.) (submitted expert declaration on attorneys' fees, expenses, and service awards, dated 7/10/18; submitted supplemental declaration on attorneys' fees, dated, 8/17/18);

- *In re Chinese-Manufactured Drywall Litigation*, MDL No. 2047 (E.D. La.) (submitted expert declarations on attorneys' fees issues, dated 5/4/17 and 8/1/18);

- *Jabbari v. Wells Fargo & Co.*, No. 15-cv-02159-VC (N.D. Cal.) (submitted expert declaration on class certification, settlement fairness, attorneys' fees, costs, and incentive payments in unauthorized accounts litigation, dated 1/19/18; submitted supplemental declaration, dated 5/21/18);

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 3.0-liter and Bosch settlements, dated 4/28/17);

7

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration, dated 9/30/16, addressing objections by class members to proposed 2.0-liter settlement);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, Nos. 12-970, 15-4143, 15-4146, and 15-4645 (E.D. La.) (submitted expert declaration on class certification, settlement fairness, and attorneys' fees relating to proposed Halliburton/Transocean class settlement) (dated 8/5/16);

- *Skold v. Intel Corp.*, Case No. 1-05-CV-039231 (Super. Ct. of Cal., Santa Clara Cnty.) (submitted expert declaration, dated 12/30/14, on class settlement approval, attorneys' fees, and incentive payments to class representatives);

- *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB (E.D. Pa.) (submitted expert declaration, dated 11/12/14, on class certification, class notice, and settlement fairness);

- *MBA Surety Agency, Inc. v. AT&T Mobility, LLC*, Case No. 1222-CC09746 (Mo. 22d Dist.) (submitted expert declaration on class certification and settlement fairness, dated 2/13/13; submitted a supplemental expert declaration, dated 2/19/13; and testified in court on 2/20/13);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La.) ("Deepwater Horizon") (submitted expert declarations on class certification, fairness, and attorneys' fees for the economic and property damages settlement (Doc. No. 7104-3) and class certification, fairness, and attorneys' fees for the personal injuries settlement (Doc. No. 7111-4) (both dated 08/13/12), and submitted supplemental expert declarations for both class settlements (Doc. No. 7727-4) (economic), (Doc. No. 7728-2) (medical) (both dated 10/22/12)); and

- *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, MDL No. 2147, Case No. 1:10-cv-02278 (N.D. Ill.) (submitted expert declarations on the fairness of a proposed class action settlement (Doc. No. 163-3) and on attorneys' fees and incentive payments (Doc. 164-1) (both dated 03/08/11) and testified in court on March 10, 2011)).

10. Courts evaluating attorneys' fees and class settlements have relied extensively on my testimony. For example:

- In the *Syngenta MIR 162 Corn* MDL litigation, Judge John Lungstrum cited my two declarations on attorneys' fees issues numerous times in his two opinions.[8] Indeed, Judge Lungstrum credited my opinions on attorneys' fees over the contrary opinions of five law professor experts retained by various objectors.[9]

- In the *Deepwater Horizon* MDL litigation, Judge Carl Barbier cited and quoted my declarations (relating to a proposed settlement with British Petroleum) more than 60 times in his two opinions analyzing class certification and fairness.[10] In a later order in that MDL, Judge Barbier repeatedly cited another declaration of mine—which I filed in connection with a class settlement involving defendants Transocean and Halliburton.[11]

---

[8] *See In re Syngenta AG MIR 162 Corn Litig.,* 357 F. Supp. 3d 1094, 1112 (D. Kan. 2018) (granting final approval of class settlement and awarding total attorneys' fees), *aff'd.*, *Kellogg v. Watts Guerra LLP*, 41 F.4th 1246, 1257 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1022 (2023); *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2018 WL 6839380 (D. Kan. Dec. 31, 2018) (allocating attorneys' fees among common benefit counsel and individually retained private attorneys), *aff'd, Kellogg v. Watts Guerra LLP*, 41 F.4th 1246, 1257 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1022 (2023), and *aff'd, In re Syngenta AG MIR 162 Corn Litig. (Hossley-Embry Grp. II),* No. 21-3110, 2024 WL 3684788 (10th Cir. Aug. 7, 2024).

[9] *In re Syngenta*, 2018 WL 6839380, at *4.

[10] *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 903, 914–16, 918–21, 923–24, 926, 929–33, 938, 941, 947, 953, 955, 960, 962 (E.D. La. 2012) (approving economic and property damages settlement), *aff'd*, 739 F.3d 790 (5th Cir. 2014); *In re Deepwater Horizon*, 295 F.R.D. 112, 133–34, 136, 138–41, 144–45, 147 (E.D. La. 2013) (approving medical benefits settlement).

[11] *See* Order and Reasons, Case No. 2:10-md-02179-CJB-JCW (Doc. No. 22252) (E.D. La. 02/15/17), *available at* https://www.laed.uscourts.gov/sites/default/files/OilSpill/2152017 OrderAndReasons%28HESI% 26TOsettlement%29.pdf (last visited Aug. 15, 2024).

9

- In the *Volkswagen Clean Diesel* MDL litigation, Judge Charles Breyer repeatedly cited and quoted my two declarations in his three opinions—relating to the 2.0-liter VW class settlement, the 3.0-liter VW class settlement, and the class settlement with VW's co-defendant, Bosch.[12]

- In the *AT&T Mobility* MDL litigation, then–District Judge (now Seventh Circuit Judge) Amy St. Eve cited and quoted my declarations more than 20 times in approving a class settlement and awarding attorneys' fees.[13]

- In the *JUUL* MDL, Judge Orrick utilized my proposed methodology for determining the lodestar cross-check.[14] The settlement for which fees were sought was a consumer class settlement involving JUUL, but the work performed by class counsel also related to separate government entity cases and personal injury cases, as well as to a consumer class action against Altria. Judge Orrick noted, in a fee issue of first impression, that "Professor Klonoff's method of roughly calculating a lodestar cross-check [was] helpful," and he adopted that approach over a number of alternatives offered by plaintiffs as the one that "makes the most sense[.]"[15] In a subsequent settlement of a consumer class action involving a different defendant—Altria—Judge Orrick again found my

---

[12] *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prod. Liab. Litig.*, No. 3:15-md-02672-CRB, 2016 WL 6248426, at *18, *19, *20 (N.D. Cal. Oct. 25, 2016), *aff'd sub nom. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 895 F.3d 597 (9th Cir. 2018), and *aff'd sub nom. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 741 F. App'x 367 (9th Cir. 2018); Order Granting Final Approval of the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. No. 3229) (filed 05/17/17), at 34, 35, 38; Order Granting Final Approval of the Bosch Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. No. 3230) (filed 05/17/17), at 18.

[13] *See In re AT&T Mobility Wireless Data Serv. Sales Tax Litig.*, 789 F. Supp. 2d 935, 956–59, 961, 963–65 (N.D. Ill. 2011) (approving class settlement); *In re AT&T Mobility Wireless Data Serv. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 n.3, 1034–35, 1037, 1040, 1042 (N.D. Ill. 2011) (awarding attorneys' fees).

[14] *In re JUUL Labs, Inc. Marketing, Sales Practices, and Products Liab. Litig.,* No. 19-md-02913-WHO, 2023 WL 11820531, at *3 (N.D. Cal. Dec. 18, 2023).

[15] *Id.* at *2, 3 n.5.

methodology "helpful" and once again used it conducting a lodestar cross-check with respect to a settlement of the consumer class against Altria.[16]

- In *In re Broiler Chicken Antitrust Litig.*, Judge Thomas Durkin cited and quoted my declaration numerous times in awarding attorneys' fees of more than $55 million; he specifically stated that he found my declaration (and one other) to be "very helpful[.]"[17]

- In *Zakikhani v. Hyundai Motor Co*., Judge Stanley Blumenfeld, Jr., cited my declaration in approving attorneys' fees to class counsel.[18]

- In *Githieya v. Global Tel Link Corp*., Judge Amy Totenberg cited and quoted my declaration several times in awarding attorneys' fees to class counsel.[19]

- In the *Equifax Data Breach* case, Judge Thomas Thrash considered various expert reports relating to a class settlement and proposed attorneys' fees; he noted that, although he exercised his own independent judgment, he found my declaration to be "particularly helpful."[20]

- In the *Wells Fargo Unauthorized Accounts* litigation, Judge Vince Chhabria cited my declaration in connection with the issue of whether objectors to a class settlement should be ordered to post an appeal bond.[21]

---

[16] *In re JUUL Labs, Inc. Marketing, Sales Practices, and Products Liab. Litig.,* No. 19-md-02913-WHO, 2024 WL 2202009, at *3 (N.D. Cal. May 15, 2024).

[17] No. 16 C 8637, 2021 WL 5578878, at *2 n.4, *3–4 & n.5 (N.D. Ill. Nov. 30, 2021).

[18] *Zakikhani v. Hyundai Motor Co.*, No. 8:20-CV-01584-SB-JDE, 2023 WL 4544774, at *8 (C.D. Cal. May 5, 2023), *reconsideration denied*, No. 8:20-CV-01584-SB-JDE, 2023 WL 4544771 (C.D. Cal. June 14, 2023).

[19] *Githieya v. Global Tel Link Corp.*, No. 1:15-cv-00986-AT (N.D. Ga. Aug. 30, 2022) (Doc. No. 369).

[20] *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020), *aff'd in relevant part*, No. 20-10249, 2021 WL 2250845 (11th Cir. June 3, 2021).

[21] *Jabbari v. Wells Fargo & Co.*, No. 15-CV-02159-VC, 2018 WL 11024841, at *7 (N.D. Cal. June 14, 2018).

- In *Skold v. Intel Corp.*, Judge Peter Kirwan cited my declaration in approving a class settlement and awarding attorneys' fees.[22]

11. For my expert work in the present litigation, I am being compensated at my standard 2024 hourly rate of $1,125.00. Payment for my services is not contingent on the outcome of class counsel's request for attorneys' fees. Nor is it contingent on my taking any particular position on class counsel's request for attorneys' fees.

12. Additional information regarding my qualifications and experience—including a list of my publications—can be found in my curriculum vitae (attached hereto as Appendix A).

## III.  MATERIALS RELIED UPON

13. In addition to reviewing declarations of Steve Berman, Brandon Boulware, Robert Braun, Eric Dirks, Michael Ketchmark, and Marc Seltzer in support of the motion for attorneys' fees currently before the Court, I reviewed numerous motions, briefs, and orders in the *Moehrl*, *Burnett*, and *Gibson* matters.

---

[22] *See Skold v. Intel Corp.*, No. 1-05-CV-039231 (Cal. Super. Ct. Santa Clara County) (Jan. 29, 2015), at 7, *available at* http://lawzilla.com/blog/janet-skold-et-al-vs-intel-corporation/. I should also note that in *Rogowski v. State Farm Life Insurance Company*, No. 4:22-cv-00203-RK (W.D. Mo.) although the court did not cite my declaration, it did award—consistent with my testimony—33⅓ of a mega-fund. *Rogowski v. State Farm Life Ins. Co.*, 2023 WL 5125113, at *5 (W.D. Mo. Apr. 18, 2023).

## IV.  FACTUAL OVERVIEW

14. This Court is thoroughly familiar with the background of the litigation, having presided over the historic jury trial in October 2023, and having considered and ruled upon myriad motions in this litigation.  Thus, I discuss only those facts that are relevant to my opinions.

### A.  Allegations in the Related Lawsuits

15.  These cases involve pathbreaking antitrust claims that go to the core of the real estate MLS commission system.  In brief, the plaintiffs in the various cases allege that the National Association of Realtors (NAR) and various brokerages conspired to artificially inflate commissions by adopting a "cooperative compensation rule" that impeded the ability of sellers to negotiation lower commission rates.  Under that rule, sellers must pay commissions to buyers' agents that find homes for buyers.  Sellers argued that such payments are excessive and violate federal antitrust laws.  The antitrust theories were developed entirely by class counsel, without the benefit of a prior or concurrent government investigation or lawsuit.  And unlike most class actions, these cases have sought not only potentially billions of dollars in monetary damages, but also fundamental changes to the entire real estate industry—changes that will benefit real estate sellers and buyers nationally.

### B.  Pretrial Activities and Rulings

16.  Hard-fought litigation took place for over four years in two related cases: *Burnett v. Nat'l Ass'n of Realtors*, Case No. 4:19-cv-00332-SRD (W.D. Mo.) (*Burnett*), and *Moehrl v. National Association of Realtors*, Case No. 1:19-cv-01610-ARW (N.D. Ill.) (*Moehrl*).  *Moehrl* involved 20 MLSs in 19 states, while *Burnett* covered four MLSs in Missouri.  The allegations in

13

the two cases were essentially the same. In both cases, the parties engaged in extensive fact and expert discovery, and in both cases, class certification was granted over defendants' vigorous opposition. The six plaintiff law firms in the class settlements discussed below were also counsel in *Burnett* and *Moehrl*. In both cases, plaintiffs successfully defended against motions to dismiss, motions for summary judgment, and *Daubert* challenges. In addition, in *Burnett*, plaintiffs successfully defeated defendants' argument that the suit was subject to arbitration (an issue that was also briefed in *Moehrl*). Importantly, the discovery conducted by plaintiffs' counsel in *Burnett* and *Moehrl* focused on the entire industry, not just on the particular MLSs at issue in those two cases.

### C. Trial and Settlements

#### 1. Trial Against *NAR*, *Keller Williams*, and *HomeServices*

17. In October 2023, this Court presided over a trial in *Burnett*—involving a class of approximately a half million Missouri real estate sellers against NAR and various brokerages, including Keller Williams and HomeServices of America. (RE/MAX and Anywhere Real Estate settled before trial). After a two-week trial and less than three hours of deliberations, the jury found that NAR, HomeServices of America, and Keller Williams had engaged in an antitrust conspiracy and awarded $1.78 billion in damages (before trebling). Importantly, unlike the settlements at issue here, which contain historic injunctive relief, the jury's verdict did not require the industry to change its practices, a point emphasized by NAR shortly after the verdict.[23] NAR

---

[23] Debra Kamin, *Home Sellers Win $1.8 Billion After Jury Finds Conspiracy Among Realtors*, THE NEW YORK TIMES (Oct. 31, 2023), https://www.nytimes.com/2023/10/31/realestate/nar-antitrust-lawsuit.html (quoting N.A.R. president, Tracy Kasper, as stating "[t]his verdict does not require a change in our rules").

also stated publicly that it was "confident" it would prevail on appeal.[24] NAR and the other defendants filed extensive post-trial motions, and had the cases not settled, those defendants were prepared to appeal the judgments (assuming they did not get post-trial relief from this Court).

### 2. *Anywhere, et al.* Settlements

18. These nationwide class settlements created a fund of $208.5 million and also obligated the defendants to make important changes in their practices and to cooperate in ongoing litigation against other defendants. The settling defendants were Anywhere Real Estate, Inc., RE/MAX LLC, and Keller Williams Realty, Inc. On May 9, 2024, this Court entered an order granting final approval of the settlement and awarding attorneys' fees of 1/3 of the common fund. *Burnett v. Nat'l Ass'n of Realtors,* No. 4:19-CV-00332-SRB, 2024 WL 2842222 (W.D. Mo. May 9, 2024). The Court utilized the percentage-of-the-fund approach and did not deem it necessary to conduct a lodestar cross-check. *Id.* at *14.

### 3. The *Compass, et al.* Settlements Involved in the Motion for Attorneys' Fees at Issue

19. The nine *Compass, et al.* nationwide class settlements currently before the Court involve the creation of a total non-reversionary fund of $110.6 million. That amount is made up of contributions by nine defendants: Compass ($57.5 million); Real Brokerage ($9.25 million); Realty ONE ($5 million); @properties ($6.5 million); Douglas Elliman ($7.75 million); Redfin Corporation ($9.25 million); Engel & Volkers ($6.9 million); HomeSmart Holdings, Inc. ($4.7

---

[24] *Id. See also Update in Case of Burnett v. NAR et al.*, NATIONAL ASSOCIATION OF REALTORS (Oct. 31, 2023), https://www.nar.realtor/breaking-news/update-in-case-of-burnett-v-nar-et-al (statement from NAR President Tracy Kasper after the verdict that "[NAR] remain[s] optimistic we will ultimately prevail").

million); and United Real Estate ($3.75 million). [Doc. 161 at 8; Doc. 303 at 2]. In addition to the monetary commitments, the settling defendants obligate themselves to make important changes in their practices, detailed in the settlement agreements [Docs. 161-2 through 161-6; 294-1; 303-1] and summarized in the brief in support of preliminary approval. The settling defendants have also agreed to cooperate in the ongoing litigation against the remaining defendants. Most of these settlements were reached only after extensive negotiations overseen by an experienced mediator, Greg Lindstrom, who was involved in prior settlement-related work in this litigation. The motions for preliminary approval were filed on April 29, 2024, July 12, 2024, and July 15, 2024. [Docs. 161, 294, 303]. Preliminary approval was granted on April 30, 2024, July 15, 2024, and July 16, 2024. [Docs. 163, 297, 348], and final approval is pending.

### 4. *NAR* Settlement

20. The *NAR* nationwide class settlement between plaintiffs and NAR creates a non-reversionary fund of at least $418 million plus interest. [*Burnett* Doc. 1458 at 7, 12]. In addition, the NAR agrees to change its business practices going forward [*Burnett* Doc. 1458 at 12-15] and agrees to cooperate with plaintiffs in their claims against the remaining defendants who have not settled. [*Burnett* Doc. 1458 at 15-16]. The motion for preliminary approval was filed on April 19, 2024. [*Burnett* Doc. 1458]. Preliminary approval was granted on April 23, 2024, [*Burnett* Doc. 1460], and final approval is pending.

### 5. *HomeServices* Settlement

21. On August 7, 2024, class counsel reached a settlement with another brokerage, HomeServices, for $250 million, along with injunctive relief and a cooperation agreement. The

motion for preliminary approval was filed on August 7, 2024. [*Burnett* Doc. 1518]. Preliminary

approval was granted on August 18, 2024, [*Burnett* Doc. 1520], and final approval is pending.

### 6. Recap of Settlements

22. To recap, the approved and pending settlements are as follows:[25]

- Anywhere $83.5 million [approved]

- RE/MAX: $55 million [approved]

- Keller Williams: $70 million [approved]

- **Compass: $57.5 million [pending]**

- **Real Brokerage: $9.25 million [pending]**

- **Realty ONE: $5 million [pending]**

- **@properties: $6.5 million [pending]**

- **Douglas Elliman: at least $7.75 million [pending]**

- **Redfin: $9.25 million [pending]**

- **Engel & Volkers: $6.9 million [pending]**

- **HomeSmart: $4.7 million [pending]**

- **United: $3.75 million [pending]**

- NAR: $418 million [pending]

---

[25] The nine settlements currently at issue per the Court's scheduling orders (and defined herein as the *Compass, et al.* settlements) are highlighted in bold.

17

- HomeServices: $250 million [pending]

- **TOTAL FOR ALL ABOVE SETTLEMENTS: $987.1 million**

### D. Class Counsel's Lodestar and Multiplier in the Pending and Prior Settlements

23. As reflected in the declarations of class counsel accompanying their motion for attorneys' fees, the combined lodestar as of July 31, 2024 is $90,853,364. Class counsel have provided the Court with the lodestar for each of the six law firms designated as class counsel, including the billing rates for each timekeeper. (I understand that time for non-lead counsel in *Moehrl* is also included in the lodestar). Assuming total settlements of $987.1 million, total fees sought for all approved and pending settlements are $329.03 million (a figure that includes the $69.5 million in fees previously awarded by this Court). As I explain in detail below, based on a total lodestar of $90,853,364, the multiplier for all approved and pending settlements is approximately 3.62.

## V. SUMMARY OF OPINIONS ON ATTORNEYS' FEES

24. In my opinion, under the percentage-of-the-fund method, which I believe is the preferable method to calculate fees in a common fund case like this one, a 1/3 fee is justified by the so-called *Johnson*[26] factors. This Court approved a 1/3 award in the *Anywhere, et al.* settlement, and there are no circumstances here that would warrant a lower percentage award for the pending settlements. Class counsel devoted more than 105,000 hours to this litigation overall as of July 31, 2024; the legal, factual, expert, and class certification issues were complex and

---

[26] *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1996).

challenging; great skill was required to litigate these cases; the plaintiff firms were hampered in their ability to take on other major matters; individual plaintiffs entered into 1/3 to 35 percent contingent fee agreements; the cases imposed significant time challenges; the results obtained were extraordinary; class counsel are highly regarded; and the fees sought are supported by awards in other cases.

25. In my opinion, the fact that the various settlements, viewed in their entirety, could be characterized as "mega-fund" settlements (settlements totaling more than $100 million) does not suggest that a percentage below 1/3 should be designated. In my opinion, fee percentages should not be reduced as the settlement amounts increase; indeed, the Eighth Circuit has recently rejected any such per se approach,[27] as have numerous other courts that have authorized comparable fees in mega-fund cases. A per se rule reducing fees in mega-fund cases would create a disincentive to class counsel to pursue the best possible relief against all defendants. Finally, based on the extraordinary results achieved by class counsel, I believe that a 1/3 fee award is reasonable for all of the pending settlements.

26. Importantly, the actual percentage sought by class counsel is substantially less than 1/3 when the value of the injunctive relief is factored into the equation. Myriad courts permit injunctive relief to be considered in determining the true value of a settlement. Press coverage reveals that the value of the injunctive relief here is billions of dollars *per year* going forward. Adding to the monetary total fund an exceedingly conservative value of the injunctive relief as $10 billion yields a fee percentage of only 2.99 percent. Moreover, although the precise value

_____

[27] *In re T-Mobile Customer Data Sec. Breach Litig.,* No. 23-2744, 2024 WL 3561874, at *5 (8th Cir. July 29, 2024).

cannot be assessed, the settlements have secured the cooperation of the settling defendants in prosecution of the remaining defendants, adding important pressure on the remaining defendants to fold their tents and settle as well.

27. This Court concluded in the *Anywhere, et al.* settlements, *Burnett v. Nat'l Ass'n of Realtors,* No. 4:19-CV-00332-SRB, 2024 WL 2842222 (W.D. Mo. May 9, 2024), that no lodestar cross-check was necessary. The Eighth Circuit recently confirmed that it does not generally require a lodestar cross-check but noted that such a cross-check may "sometimes [be] warranted to double-check the result of the 'percentage of the fund' method.'"[28] For instance, a cross-check may be warranted "when a megafund case settles quickly given the potential for a windfall."[29] In this litigation, the settlement occurred only after years of hard-fought litigation, including a contested trial. And there are no other red flags suggesting that such a cross-check is necessary. Conducting one would merely bring into the equation all of the disadvantages of the lodestar approach.

28. In any event, out of an abundance of caution, I have done a lodestar cross-check. My lodestar cross-check is calculated based on a total lodestar of $90,853,364 for the litigation as a whole as of July 31, 2024, and based not only on the *Compass, et al.* settlements but also the previously approved *Anywhere, et al.* settlement fund and other recent pending settlements, including *NAR* and *HomeServices.* Based on the total amounts of attorneys' fees sought (including $69.5 million already awarded) of $329.03 million, that works out to a multiplier of 3.62. My methodology of looking at the total settlements and total lodestar is well supported by the case

---

[28] *Id.* at *7 (*quoting Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1157 (8th Cir. 1999)).
[29] *Id.* (citation omitted).

law—including numerous antitrust cases. This methodology recognizes that, in litigation of this type, every hour of work is spent developing a case against all defendants. Any attempt to divide up hours on a defendant-by-defendant basis would be arbitrary and counterfactual.

29. A multiplier of 3.62 is fully justified based on the case law in light of the unique risks and challenges in this litigation. Courts in the Eighth Circuit and elsewhere have approved significantly higher multipliers in mega-fund cases.[30] Finally, if the previously approved *Anywhere et al.* settlements and the *Compass, et al.* settlements are considered in isolation, without taking into account the other pending settlements, the resulting multiplier is an extremely modest 1.17.

## VI. THE ATTORNEYS' FEES REQUESTED BY CLASS COUNSEL (ONE THIRD OF THE COMMON FUND) ARE REASONABLE

30. In the *Compass, et al.* settlements, class counsel are seeking, as attorneys' fees, 1/3 of the $110.6 million settlement fund, *i.e.*, approximately $36.9 million. These settlements are in addition to the $208.5 million settlement fund that has already been approved by this Court (with a fee award of 1/3) in the *Anywhere, et al.* settlements. The *Compass, et al.* settlements are also in addition to the $668 million in settlements currently pending this Court's approval in the *NAR* and *HomeServices* settlements. (Class counsel advised me that they intend to seek a 1/3 fee award in the *NAR* and the *HomeServices* settlements as well).

31. In the remaining sections of this Declaration, I offer my opinions on the reasonableness of the 1/3 fee request in the *Compass, et al.,* settlements and the other pending settlements. In the

---

[30] *See, e.g., id.* at *6 (recognizing that even a 5.3 multiplier was "'high'" but not impermissible) (citation omitted).

final section, I focus solely on the *Compass, et al.* settlements, without factoring in the *NAR* and *HomeServices* settlements.

## A. This Court Should Use the Percentage-of-the-Fund Method

32. As an initial matter, this Court must decide whether to use the percentage-of-the-fund method (the percentage method) or the lodestar method. Just as this Court did in the *Anywhere, et al.* settlements, *Burnett v. Nat'l Ass'n of Realtors,* No. 4:19-CV-00332-SRB, 2024 WL 2842222, at *14 (W.D. Mo. May 9, 2024), it is my opinion that the Court should use the percentage method here, as informed by the so-called *Johnson*[31] factors.

33. Courts in the Eighth Circuit have discretion in common fund cases to choose either the percentage method or the lodestar method.[32] Nonetheless, in the Eighth Circuit and elsewhere, courts strongly prefer to use the percentage method in common fund cases.[33] This preference for

---

[31] *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1996).

[32] *See, e.g.*, *In re T-Mobile Customer Data Sec. Breach Litig.,* No. 23-2744, 2024 WL 3561874, at *4 (8th Cir. July 29, 2024); *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244 (8th Cir. 1996); *In re IBP, Inc. Secs. Litig.*, 328 F. Supp. 2d 1056, 1064 (D.S.D. 2004) (noting that courts have "discretion to use either the lodestar method or the percentage of the benefit method").

[33] *See, e.g.*, *Reddiar v. McDonough,* No. 4:20-CV-00410-SRB, 2023 WL 11748952, at *1 (W.D. Mo. Jan. 5, 2023) ("It is 'recommended that the percentage of the benefit method . . . be employed in common fund situations.'") (*quoting Johnston*, 83 F.3d at 245); *Terry Bishop, DVM v. Delaval Inc.*, No. 5:19-CV-06129-SRB, 2022 WL 18542465, at *1 (W.D. Mo. June 7, 2022) (same); *PHT Holding II LLC v. N. Am. Co. for Life & Health Ins.*, No. 418CV00368SMRHCA, 2023 WL 8522980, at *6 (S.D. Iowa Nov. 30, 2023) (noting that the percentage method is "often 'preferable' to the lodestar method when determining the reasonableness of fees in cases where the fees and the class benefits are derived from a single fund.") (citation omitted); *Tussey v. ABB, Inc.*, No. 06-CV04305-NKL, 2019 WL 3859763, at *2 (W.D. Mo. Aug. 16, 2019) ("in common fund cases, the percentage of the benefit approach is generally recommended") (*citing Johnston*, 83 F.3d at 245–246); *Accord, e.g.*, *Voulgaris v. Array Biopharma, Inc.*, 60 F.4th 1259, 1263 (10th Cir. 2023) (noting that the 10th Circuit has "express[ed] a preference for the percentage-of-the-fund approach" in common-fund cases) (citation omitted); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 (2004) (noting that the "vast majority" of courts apply the percentage method in common fund cases).

22

the percentage method—which I strongly support—stems primarily from the fact that the percentage method "most closely aligns the interests of the lawyers with the class, since the more recovered for the class, the more the attorneys stand to be paid."[34] By contrast, the lodestar method arguably gives class counsel an incentive to work more hours than are necessary and to avoid early settlement.[35] Under the percentage method, class counsel are incentivized to work vigorously because "the more the attorney succeeds in recovering money for the client . . . the higher dollar amount of fees the lawyer earns."[36] Moreover, the lodestar method has been heavily criticized by courts and commentators as "difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result."[37] As the Eighth Circuit has

---

[34] *In re Charter Communications, Inc.*, MDL No. 1506 All Cases, Consolidated Case No. 4:02-CV-1186 CAS, 2005 WL 4045741, at *22 (E.D. Mo. June 30, 2005); *Accord, e.g., Ramah Navajo Chapter v. Jewell*, 167 F. Supp. 3d 1217, 1241 (D.N.M. 2016) (same); *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (noting that the percentage method "provides a powerful incentive for the efficient prosecution and early resolution of litigation"); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269 (D.C. Cir. 1993) ("It matters little to the class how much the attorney spends in time or money to reach a successful result."); *see also* NAT'L ASS'N OF CONSUMER ADVOCATES, STANDARDS AND GUIDELINES FOR LITIGATING AND SETTLING CONSUMER CLASS ACTIONS 27 (3d ed. 2014) (noting that the percentage method "keeps class counsel's financial interest closely aligned with that of the class itself").

[35] *See, e.g., Premachandra v. Mitts*, 727 F.2d 717, 733 (8th Cir. 1984) (courts may reduce fee awards accordingly in order to "[dis]courage overpreparation"); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001) ("[T]he lodestar approach creates [an] incentive to run up the billable hours."); *Swedish Hosp.*, 1 F.3d at 1268–69 ("[U]sing the lodestar approach . . . attorneys are given incentive to spend as many hours as possible, billable to a firm's most expensive attorneys [and] . . . there is a strong incentive against early settlement since attorneys will earn more the longer a litigation lasts."); REPORT OF THE FEDERAL COURTS STUDY COMMITTEE 104 (Fed. Judicial Ctr. Apr. 2, 1990), *available at* https://www.fjc.gov/sites/default/files/2012/Rep FCSC.pdf (noting that the lodestar method gives class counsel "incentives to run up hours unnecessarily").

[36] *See, e.g., In re Xcel Energy, Inc., Secs., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 992 (D. Minn. 2005) (cleaned up).

[37] *Ramah Navajo Chapter v. Babbitt*, 50 F. Supp. 2d 1091, 1108 (D.N.M. 1999). *Accord, e.g., Swedish Hosp.*, 1 F.3d at 1269–70 ("The lodestar method makes considerable demands upon judicial resources since it can be exceptionally difficult for a court to review attorney billing

23

noted, the lodestar calculation "increases the workload of an already-overtaxed judicial system," can be "insufficiently objective," brings about inconsistent results, may be "subject to manipulation," and can lead to "a disincentive for the early settlement of cases."[38]

34. As I discuss below, in my opinion, the 1/3 fee award sought by class counsel is reasonable, particularly when taking into account the *Johnson* factors. (¶¶ 37-78). Moreover, there is no need for the Court to conduct a lodestar cross-check. (¶¶ 99-101). In any case, as I explain, a lodestar cross-check—utilizing a holistic methodology that takes into consideration the total hours spent in the overall litigation, all of the pending settlements (*Compass, et al., NAR et al.,* and *HomeServices*), and all of the settlements previously approved by this Court (the *Anywhere et al.* settlements)—fully supports class counsel's request for 1/3 of the fund. (¶¶ 102-114). The resulting multiplier, 3.62, is well within levels routinely approved by courts.

**B. The 1/3 Fee Award Requested Here Is Reasonable, Without Even Taking Into Account the Valuable Injunctive Relief and Cooperation from Defendants in Pursuing Other Defendants**

**1. Reasonableness of a Fee Award of 1/3 of the Fund**

35. As noted, class counsel seek attorneys' fees of 1/3 of the $110.6 million settlement fund in the *Compass, et al*. settlements and 1/3 in the other pending settlements. This is the same percentage that they sought (and that this Court approved) in the *Anywhere et al.* settlements.

---

information over the life of a complex litigation and make a determination about whether the time devoted to the litigation was necessary or reasonable . . . . A related weakness in the lodestar approach is that it often results in substantial delay in distribution of the common fund to the class."); REPORT OF THE FEDERAL COURTS STUDY COMMITTEE, *supra* note 35 (noting that the lodestar method may "unduly burden judges").

[38] *Johnston*, 83 F.3d at 245 n.8 (citations omitted).

24

36.  In the Eighth Circuit, a "[fee] award in the amount of one-third of the total settlement fund" is "in line with other awards in [that] Circuit."[39]  As this Court noted in awarding 1/3 of the fund in the *Anywhere* settlements, "one-third of the common fund is an appropriate amount for class counsel's fees in complex class actions, including antitrust litigation." *Burnett*, 2024 WL 2842222, at *14; s*ee also id.* (discussing Eighth Circuit cases and Missouri federal district court cases awarding as much as 36 percent "even to large settlements").  As I discuss below, based on the applicable criteria, it is my opinion that the percentage sought by class counsel here is reasonable.

### a. The 1/3 of the Fund Requested is Reasonable Under the Johnson Factors Based on the Compelling Facts and Circumstances Here

37.  In the Eighth Circuit, a district court addressing an attorneys' fee award is required to assess the facts and circumstances by looking at 12 factors.  These so-called *Johnson* factors, originally set forth by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*,[40] are:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee—this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[41]

---

[39] *Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017); *see also id.* (noting that "courts have frequently awarded attorneys' fees ranging up to 36% in class actions").

[40] 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989).

[41] *Barfield v. Sho-Me Power Elec. Cooperative*, No. 2:11-CV-4321NKL, 2015 WL 3460346, at *5 (W.D. Mo. June 1, 2015) (*quoting Allen v. Tobacco Superstore, Inc.*, 475 F.3d 931, 944 n.3 (8th Cir. 2007)).

25

38. Although courts applying the *Johnson* factors have discretion on whether to apply particular factors and how much weight to give each one,[42] it is settled law that in a common fund case, "the *most critical factor* in assessing fees is the degree of success obtained."[43]

39. In my opinion, the *Johnson* factors, taken as a whole, strongly support the reasonableness of the 1/3 fee award requested by class counsel. Although it is possible to group these factors for discussion, for clarity I address each factor separately.

### i. Time and Labor Required

40. This litigation has required a significant investment of time by class counsel. To date, class counsel have devoted more than 105,000 hours to this litigation. Moreover, it is a certainty that numerous additional hours will be necessary to administer this settlement and the other pending settlements and to convince the remaining defendants to settle or conduct additional trials.

### ii. Novelty and Difficulty of the Questions

41. Substantial attorneys' fees are justified when the legal issues are particularly complex.[44] Indeed, courts (including this Court in the *Anywhere, et al.* settlements) have supported

---

[42] *See, e.g.*, *Keil v. McCoy*, 862 F.3d 685, 703 (8th Cir. 2017) (a district court is "not required to discuss all of the factors, since rarely are all of the *Johnson* factors applicable") (cleaned up); *Yarrington v. Solvay Pharmaceuticals, Inc*., 697 F. Supp. 2d 1057, 1062 (D. Minn. 2010) ("not all of the individual factors will apply in every case, affording the Court wide discretion in the weight to assign each factor").

[43] *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 852 (8th Cir. 2002) (emphasis added). *Accord, e.g., In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *4 (D. Kan. July 29, 2016) ("[T]he amount involved and the results obtained . . . may be given greater weight when, as in this case, the trial judge determines that the recovery was highly contingent and that the efforts of counsel were instrumental in realizing recovery on behalf of the class") (cleaned up). *See also Keil*, 862 F.3d at 697 (noting the "substantial and immediate benefits" the settlement conferred on class members); *In re CenturyLink Sales Practices & Sec. Litig*., No. CV 17-2832, 2020 WL 7133805, at *32 (D. Minn. Dec. 4, 2020) (same).

[44] *In re RFC & Rescap Liquidating Trust Action*, 399 F. Supp. 3d 827, 831 (D. Minn. 2019) (noting the complex legal issues involved and many complicated defenses raised by the defendants).

26

1/3 fee awards in antitrust cases, noting that such cases are especially challenging.[45]  Here, the myriad legal and factual issues in this litigation were novel, complex, and contentious.  Some examples of the novel and difficult nature of the issues are discussed below.

42.  **Complex Legal and Factual Issues.**  In the related *Moehrl* and *Burnett* cases, defendants in those actions challenged nearly every aspect of plaintiffs' Sherman Act claims, including: contesting the existence of an agreement between corporate defendants and NAR; contesting the existence of a conspiracy; arguing that plaintiffs failed to allege a properly defined market; arguing that NAR rules do not unreasonably restrain trade because they are inherently pro-competitive; asserting that plaintiffs cannot show they suffered a legally-cognizable injury and thus lack Article III standing; and asserting that NAR's rules were not the cause of plaintiffs' claimed injuries.  Defendants also challenged every aspect of Plaintiffs' Missouri Merchandising Practices Act (MMPA) claims.  Class counsel successfully defeated these challenges at both the motion to dismiss and summary judgment stages.  However, defendants' arguments were not insubstantial, and they loomed on appeal of any contested final judgment.[46]

---

[45] *See, e.g., Burnett v. Nat'l Ass'n of Realtors*, No. 4:19-CV-00332-SRB, 2024 WL 2842222, at *16 (W.D. Mo. May 9, 2024) ("[b]ecause antitrust claims are especially complex, expensive, and difficult to prosecute, courts have recognized that antitrust settlements should result in attorneys' fees equal to one-third of the fund."); *In re Cattle & Beef Antitrust Litig.,* No. 22-3031 (JRT/JFD), 2023 WL 8098644, at *3 (D. Minn. Nov. 21, 2023) (noting that "[a]ntitrust class actions are inherently complex" in justifying one-third fee award); *In re Pork Antitrust Litig.,* No. CV 18-1776 (JRT/JD), 2022 WL 18959155, at *3 (D. Minn. Oct. 19, 2022) (same); *Urethane*, 2016 WL 4060156, at *5 (granting one-third fee award in antitrust case relying heavily on the fact that it "was an extremely difficult and complex case . . . with significant disputed issues arising at [various stages of the litigation]").

[46] *See* Suggestions in Support of the Motion of the National Association of Realtors to Dismiss the Association for Lack of Jurisdiction and to Dismiss the First Amended Complaint for Failure to State a Cause of Action (Doc. No. 77), *Sitzer et al. v. National Association of Realtors et al.,* No. 4:19-cv-00332 (W.D. Mo. Aug. 5, 2019); Suggestions in Support of the Corporate Defendants' Motion to Dismiss (Doc. No. 79), *Sitzer et al.,* No. 4:19-cv-00332 (W.D. Mo. Aug.

43.  **Defendants' Arguments that the Claims Had to Be Arbitrated.**  Plaintiffs' counsel defeated two motions to compel arbitration, as well as several other arbitration-related arguments. Class counsel confronted complex "gateway" arbitrability issues as well as equitable estoppel principles under Missouri law.  Class counsel successfully persuaded the Court that equitable estoppel did not apply and that the Court—rather than an arbitrator—must decide threshold questions of arbitrability.[47]  Moreover, on two occasions class counsel successfully defended the Court's denial of arbitration on appeal to the Eighth Circuit.[48]  Defendants also unsuccessfully attempted to appeal the second Eighth Circuit ruling to the U.S. Supreme Court.[49]

44.  **Complex Expert Issues.** Class counsel defeated four separate motions to exclude testimony from experts who were essential to prosecution of this case.  Defendants twice moved

---

5, 2019); Order (Doc. No. 331), *Sitzer et al.,* No. 4:19-cv-00332 (W.D. Mo. Oct. 16, 2019) (denying Motions to Dismiss); Order (Doc. No. 1019) *Sitzer et al. v. National Association of Realtors et al.*, No. 4:19-cv-00332 (W.D. Mo. Dec. 16, 2022) (denying motions for summary judgment).

[47] *See* The HomeServices Defendants' Suggestions in Support of Their Motion: (1) To Compel Arbitration, (2) To Strike Class Allegations as To Certain Unnamed Plaintiffs, and (3) To Stay Proceedings with Respect to the HomeServices Defendants Pending Arbitration (Doc. No. 218), *Sitzer et al.,* No. 4:19-cv-00332 (W.D. Mo. Feb. 28, 2020); Order (Doc. No. 239), *Sitzer et al. v. National Association of Realtors et al.*, No. 4:19-cv-00332 (W.D. Mo. April 4, 2020) (denying HomeServices' motion in full); The HomeServices Defendants' Suggestions In Support Of Their Motion To Compel Arbitration (Doc. No. 758), *Sitzer et al.*, No. 4:19-cv-00332 (W.D. Mo. May 5, 2022); Defendants Re/Max, LLC, The National Association of Realtors, Realogy Holdings Corp. And Keller Williams Realty, Inc.'s Suggestions in Support of Their Motion to Compel Arbitration Or, In the Alternative, To Stay Proceedings Pending Arbitration (Doc. No. 785), *Sitzer et al.,* No. 4:19-cv-00332 (W.D. Mo. May 27, 2022); Order (Doc. No. 843), *Sitzer et al.*, No. 4:19-cv-00332 (W.D. Mo. July 19, 2022) (denying motions to compel arbitration).

[48] *See Joshua Sitzer, et al. v. National Assoc. of Realtors, et al.*, No. 20-01779 (8th Cir. Apr 14, 2020); *Scott Burnett, et al. v. HomeServices of America, Inc., et al.*, No. 22-02664 (8th Cir. Aug 09, 2022).

[49] Petition For a Writ of Certiorari, *HomeServices of America, Inc., et al., Petitioners vs. Scott Burnett, et al.*, No. 23-840 (U.S. Feb 02, 2024); Denial of Petition for a Writ of Certiorari, *HomeServices of America, Inc., et al., Petitioners vs. Scott Burnett, et al.*, No. 23-840 (U.S. April 15, 2024).

to exclude the testimony of Dr. Craig T. Schulman—once before class certification and once before trial—testimony that provided a benchmark analysis vital to plaintiffs' claims. On both occasions defendants asserted that his testimony did not fit the facts of the case, his methodology was unreliable, his opinions were not relevant, and he had offered impermissible legal interpretations. The Court sided with plaintiffs on each ground for exclusion. Defendants also moved to exclude the testimony of Jeffrey Rothbart, asserting five primary grounds for exclusion. Plaintiffs successfully rebutted each of these arguments. Finally, Defendants levied similar challenges to the testimony of Roger Alford, which was essential in assisting the jury in understanding complex antitrust principles and the residential real estate industry. Once again, class counsel successfully defended the testimony, ensuring that it could be presented at trial.[50] Despite plaintiffs' victories, however, defendants' challenges to plaintiffs' expert testimony remained an issue in any appeal.

45. **Contested Class Certification Issues.** In justifying substantial attorneys' fees, a number of courts have relied on the fact that class counsel litigated difficult class certification issues.[51] Here, defendants mounted vigorous challenges to class certification, including two unsuccessful attempts to appeal class certification to two different Circuits (the Seventh and the

___

[50] *See* Order (Doc. No. 1017), *Sitzer et al.,* No. 4:19-cv-00332 (W.D. Mo. Dec. 16 2022) (denying Motion to Exclude Merits Opinion Testimony of Dr. Craig T. Schulman (Doc. No. 921)); Text entry No. 733, *Sitzer et al.,* No. 4:19-cv-00332 (W.D. Mo. April. 18, 2022) (denying Motion to Exclude Class Certification Opinion Testimony of Dr. Craig T. Schulman (Doc. No. 552)); Order (Doc. No. 1018), *Sitzer et al.,* No. 4:19-cv-00332 (W.D. Mo. Dec. 16, 2022) (denying Motion to Exclude Expert Testimony of Jeffrey Rothbart); Order (Doc. No. 1021), *Sitzer et al.,* No. 4:19-cv-00332 (W.D. Mo. Dec. 20, 2022) (denying Motion to Exclude Expert Testimony of Roger Alford).

[51] *See, e.g.,* *In re CenturyLink*, 2020 WL 7133805, at \*12; *Chieftain Royalty Company v. XTO Energy Inc.*, CIV-11-29-KEW, 2018 WL 2296588, at \*5 (E.D. Okla. 2018); *Kelly v. Phiten USA, Inc.,* 277 F.R.D. 564, 570 (S.D. Iowa 2011); *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 771 (S.D. Texas 2008); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 197 (3d Cir. 2000).

Case 4:23-cv-00788-SRB   Document 399-7   Filed 08/20/24   Page 34 of 102

Eighth).  Among other arguments, defendants contended that class certification was not supported by admissible expert testimony and that plaintiffs' injury and damages theories conflicted with their liability case.[52]  Again, while plaintiffs were successful in the district court and defeated defendants' attempts to appeal under Rule 23(f), class certification remained a disputed issue that defendants would have litigated in any appeal.

46.  **Challenges to the $1.78 Billion Trial Verdict.**  Defendants had multiple grounds for challenging the trial verdict, including numerous challenges to the admissibility of critical evidence; the absence of evidence of a conspiracy by NAR or any of the brokerage defendants; an argument that plaintiffs lacked standing and were uninjured; and numerous other contentions.[53] Although the *NAR et al.* settlements eliminated the need for this Court and the Eighth Circuit to rule on any of these challenges, these were clearly arguments that both this Court and the Eighth Circuit would have had to address had the case not settled.

---

[52] *See* Corrected Petition for Permission to Appeal Class Certification Decision Pursuant to Federal Rule of Civil Procedure 23(f), *Moehrl, et al., v. The National Association of Realtors, et al.*, No. 23-8010 (7th Cir. April 12, 2023); Petition for Permission to Appeal Class Certification Decision Pursuant to Federal Rule of Civil Procedure 23(f), *Burnett, et al. v. The National Association of Realtors, et al.*, No. 22-8009 (8th Cir. April 22, 2022).

[53] *See* Corrected Suggestions in Support of Defendant The National Association of Realtors' Motion for Judgment as a Matter of Law (Doc. No. 1275), *Sitzer et al.*, No. 4:19-cv-00332 (W.D. Mo. Oct. 25, 2023); Suggestions in Support of Defendant Keller Williams Realty Inc.'s Motion for Judgment as a Matter of Law (Doc. No. 1268), *Sitzer et al., No. 4:19-cv-00332* (W.D. Mo. Oct. 25, 2023); The HomeServices Defendants' Motion for Mistrial and for Costs and Fees Under 28 U.S.C. §1927 or, In the Alternative, For Limiting Instruction and to Strike (Doc. No. 1265), *Sitzer et al.*, No. 4:19-cv-00332 (W.D. Mo. Oct. 25, 2023); Suggestions in Support of the HomeServices Defendants' Motion for Judgment as a Matter of Law (Doc. No. 1262), *Sitzer et al.,* No. 4:19-cv-00332 (W.D. Mo. Oct. 23, 2023).

### iii. Skill Requisite to Perform the Legal Service Properly

47. **Difficult Legal Issues.** As noted above, this case involved a number of difficult legal and factual issues (¶¶ 41-46). Great skill was required, and as discussed below (¶ 74), class counsel are highly skilled and experienced in antitrust cases and complex civil litigation generally.

48. **Difficult Trial Issues.** Because relatively few class actions go to trial,[54] courts reviewing attorneys' fee requests justifiably give significant weight, when applicable, to the fact that a contested trial occurred. For example, in its order awarding attorneys' fees in the *Deepwater Horizon Litigation*, the court noted that class counsel "did something that rarely happens in class actions: they actually went to trial."[55] The court emphasized that the "massive two-phase trial effort" weighed in favor of the fees requested by class counsel.[56] Similarly, in *Allapattah*, the district court emphasized that the settlement was reached only after class counsel succeeded at trial, noting that "[c]lass counsel . . . faced a potential catastrophic risk in the event the case was lost at trial."[57] In *Urethane*, the court relied heavily in its fee award on the impressive jury verdict obtained by class counsel.[58] The court emphasized that "the case was not settled pretrial" but

---

[54] *See, e.g.*, *Hughes v. Kore of Ind. Enter., Inc*., 731 F.3d 672, 676 (7th Cir. 2013) (noting that it is "the rare case in which a class action not dismissed pretrial goes to trial rather than being settled"); *Waters v. Int'l Precious Metals Corp*., 190 F.3d 1291, 1299 (11th Cir. 1999) ("Rarely do class action litigations proceed to trial."); Robert H. Klonoff, *Class Actions in the Year 2026: A Prognosis*, 65 EMORY L.J. 1569, 1642 (2016) (indicating that "settlement is still the norm").

[55] *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179-CJB, 2016 WL 6215974, at *18 (E.D. La. Oct. 25, 2016).

[56] *Id.*

[57] *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1203 (S.D. Fla. 2006).

[58] *Urethane*, 2016 WL 4060156, at *4–7.

rather was litigated before a jury, resulting in a verdict of over $400 million—an "incredible success on the merits."[59]

49.   In the present case, a compelling justification for the 1/3 fee award requested by class counsel is that in *Burnett* they conducted a full trial on the merits against NAR and various brokerages and, on October 31, 2023, achieved a classwide award for a Missouri class of real estate sellers of $1.78 billion in damages (before trebling).  I have no doubt that this impressive and historic trial verdict was an essential catalyst for the substantial settlements that followed.

50.   **Absence of Government Litigation.**  In some cases, private counsel are assisted by the existence of parallel government litigation.  Such government litigation—which may involve both criminal actions and civil enforcement—can provide valuable resources and can help uncover underlying wrongdoing.  Thus, some courts have noted the heavy involvement of the government

_____

[59] *Id*. at *4; *accord, e.g.*, *Brady v. Air Line Pilots Ass'n*, 627 F. App'x 142, 144–45 (3d Cir. 2015) (emphasizing that "Class Counsel conducted a five-week liability trial that resulted in a jury verdict in favor of the class" in upholding district court's 30 percent attorneys' fee award); *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1115 (D. Kan. 2018) (noting that "litigation was extensive and exhaustive . . . and included a trial and a plaintiffs' verdict"); *In re Apollo Grp. Inc. Sec. Litig.*, No. 04-cv-02147-PHX-JAT, 2012 WL 1378677, at *7 (D. Ariz. Apr. 20, 2012) (awarding attorneys' fees of 33⅓ percent of $145 million fund based in large part on favorable jury verdict secured by class counsel, and noting: "[S]ecurities class actions rarely proceed to trial . . . [and] there was a great risk that this case would not result in a favorable verdict after trial."); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 768 F. Supp. 912, 931–32 (D.P.R. 1991) (relying on multi-phase trial in setting aside total attorneys' fees of $68 million out of $220 million fund, or 30.9 percent), *rev'd on other grounds*, 56 F.3d 295 (1st Cir. 1995). Indeed, courts give substantial weight in awarding fees to the fact that a case was *close* to going to trial. *See, e.g.*, *Fleisher v. Phoenix Life Ins. Co*., Nos. 11-cv-8405(CM), 14-cv-8714(CM), 2015 WL 10847814, at *12–13 (S.D.N.Y. Sept. 9, 2015) (noting, in awarding 33⅓ percent of cash settlement fund, that "the litigation was hard-fought" and a settlement was reached "on the eve of trial" and after an "all-day mock trial"); *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 99, 104, 106 (E.D. Pa. 2013) (noting that class counsel "had completed significant preparation for trial" in awarding attorneys' fees of 33⅓ percent); *Columbus Drywall & Insulation*, No. 1:04-cv-3066-JEC, 2012 WL 12540344, at *3 (N.D. Ga. Oct. 26, 2012) (emphasizing that "[t]he case settled only within 48 hours of trial" in awarding attorneys' fees of 33⅓ percent).

in setting awards below amounts requested by class counsel. For example, in reducing class counsel's fee request in the *AOL Time Warner Securities Litigation*, the court noted that class counsel "benefited to a degree from work performed by others," including "[p]arallel government investigations."[60] Similarly, in explaining its fee award of only 10 percent in *In re Quantum Health Resources, Inc.*, the court emphasized that "[t]he facts of [the] case weighed heavily in the Class's favor from the start, largely because the material allegations of the complaint were supported by the unequivocal results of public investigations conducted by [California state agencies]."[61]

51. Conversely, courts have also noted (as is true here) the *absence* of government involvement in approving substantial fee requests. For example, in *In re CenturyLink Sales Practices & Securities Litigation*, the court noted that the plaintiffs "faced a risk of losing" because of "the fact that there was no government investigation regarding [the defendant's] statements to its investors" and that, therefore, "[p]roving loss causation would have been a significant hurdle."[62] Similarly, in *In re Gulf Oil/Cities Services Tender Offer Litigation*, the court emphasized that the case was "not [one] where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill. [Class counsel] did all the work on their own."[63] As the court noted in *Urethane*, the fact that "[class]

---

[60] *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02-cv-05575 (SWK), 2006 WL 3057232, at *17 (S.D.N.Y. Oct. 25, 2006).
[61] 962 F. Supp. 1254, 1259 (C.D. Cal. 1997).
[62] No. CV 18-296 (MJD/KMM), 2021 WL 3080960, at *6 (D. Minn. July 21, 2021).
[63] 142 F.R.D. 588, 597 (S.D.N.Y. 1992); *accord, e.g., Syngenta*, 357 F. Supp. 3d at 1112 (noting that the case "did not involve a government investigation or prosecution of the defendant, and thus plaintiffs' counsel were forced to undertake all of the necessary investigation and discovery").

33

[c]ounsel had to build this case on their own, *without the help of a government investigation or prosecution*," weighed in favor of the requested 33⅓ percent fee award.[64]

52. Here, class counsel had no assistance of any kind from insurance regulators, state attorneys general, or any other state or federal officials.

53. **No Public Admission of Liability.** In some instances, class counsel benefit from the fact that the defendant has publicly admitted wrongdoing. Such admissions no doubt make it easier for class counsel to prosecute the claims and negotiate a settlement. For example, in *Quantum Health*, the court emphasized the "significant public admissions by Quantum" in concluding that class counsel did not face "any significant risk" and awarding attorneys' fees of only 10 percent

---

[64] *Urethane*, 2016 WL 4060156, at *4 (emphasis added); a*ccord, e.g.*, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1635648, at *7 (E.D. Pa. Apr. 5, 2018) ("This was not a case where government prosecutions laid the groundwork for private litigation. This case required a pioneering effort by Class Counsel." (citation, internal quotation marks, and brackets omitted)); *Standard Iron Works v. ArcelorMittal*, No. 08-cv-05214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) (noting, in awarding attorneys' fees of 33 percent, that "Class Counsel initiated and developed this case with no assistance from any prior government investigation or prosecution"); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 748–49 (E.D. Pa. 2013) (relying on absence of government investigation); *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *5 (E.D. Pa. Jan. 3, 2008) (similar); *Syngenta,* 357 F. Supp. 3d at 1112 (in awarding 33⅓ percent of $1.5 billion settlement, relying on the fact "that, unlike some other class actions, this case did not involve a government investigation or prosecution of the defendant, and thus plaintiffs' counsel were forced to undertake all of the necessary investigation and discovery").

of the common fund.[65] Similar public admissions of wrongdoing by Volkswagen in the *Clean Diesel* scandal also facilitated a prompt settlement.[66]

54. Here, all of the defendants vigorously contested liability prior to entering into the class settlement; even today (and in the settlement agreements themselves), defendants admit no wrongdoing despite their agreement to pay hundreds of millions of dollars.

55. **No Public Relations Reason to Settle.** In some cases, widespread adverse publicity creates a public relations nightmare for a defendant, thus increasing the need for such a defendant to settle on terms favorable to plaintiffs. Examples include the *Deepwater Horizon Litigation*, where BP faced "a torrent of criticism" in the wake of the oil spill disaster;[67] the *Volkswagen Clean Diesel Litigation*, where Volkswagen's admission of fraud shook consumer confidence and resulted in "something like a tsunami" of bad press;[68] and the *NFL Concussion Litigation*, where commentators noted that "regular updates from a courtroom had the potential to be a [public relations] nightmare for the NFL, especially because of the possibility of unflattering documents

---

[65] 962 F. Supp. at 1259; *see also, e.g.*, *In re Schering-Plough Corp. Enhance Sec. Litig.*, Nos. 08-397 & 08-2177 (DMC) (JAD), 2013 WL 5505744, at *43 (D.N.J. Oct. 1, 2013) (noting that the litigation "was no easy task for [class counsel] because no Defendant ever admitted wrongdoing"). Additionally, even if the defendant has not publicly admitted wrongdoing, courts have focused on the relative ease of establishing liability in awarding fees below those requested by class counsel. For example, the Third Circuit, in rejecting the district court's fee award in *In re Cendant Corp. Litigation*, emphasized that plaintiffs had "a simple case in terms of liability." 264 F.3d 201, 221 (3d Cir. 2001).

[66] Sindhu Sundar, *VW Mea Culpa Paved Path to Lightning-Fast DOJ Settlement*, LAW 360 (Apr. 21, 2016), https://www.law360.com/articles/787693/vw-mea-culpa-paved-path-to-lightning-fast-doj-settlement (The "unusually swift" resolution was "likely the result of VW's admissions" of wrongdoing).

[67] Leon Kaye, *Five Years After Deepwater Horizon, Can BP Repair Its Reputation?*, SUSTAINABLE BRANDS (Feb. 19, 2015), https://sustainablebrands.com/read/marketing-and-comms/five-years-after-deepwater-horizon-can-bp-repair-its-reputation.

[68] Danny Hakim, *VW's Crisis Strategy: Forward, Reverse, U-Turn*, N.Y. TIMES (Feb. 26, 2016), https://www.nytimes.com/2016/02/28/business/international/vws-crisis-strategy-forward-reverse-u-turn.html.

coming to light."[69] Here, there were no similar pressures that compelled the defendants to settle. In fact, plaintiffs were challenging conduct that was well accepted for generations by the real estate industry. The industry was facing no sudden public relations crisis when these cases were brought or settled.

56. **Quality of Opposing Counsel.** An important factor in evaluating a proposed fee award is the "quality and vigor of opposing counsel."[70] This is understandable; class counsel must be especially adept when confronted by skilled defense counsel. For example, in awarding attorneys' fees of 33⅓ percent in *Dartell v. Tibet Pharmaceuticals, Inc.*, the court noted that "[t]he performance and quality of defense counsel . . . favors a finding that [class counsel] prosecuted this case with skill and efficiency."[71] Similarly, in awarding attorneys' fees of 33⅓ percent of the $510 million fund in the *Initial Public Offering Securities Litigation*, the court noted that class counsel "were pitted against . . . prominent national defense firms," and it emphasized what an "impressive feat" a favorable settlement was, achieved "against such formidable opponents."[72] Judge Lungstrum likewise awarded 1/3 of a $1.5 billion settlement, noting that defendants were "represented by experienced and well-funded top-shelf counsel, [who] (quite properly) raised

[69] Dan Diamond, *NFL Pays $765 Million to Settle Concussion Case*, Still Wins, FORBES (Aug. 29, 2013), https://www.forbes.com/sites/dandiamond/2013/08/29/nfl-pays-765-million-to-settle-concussion-case-still-wins/#67a1d1317e62.

[70] *In re Charter Communications, Inc.*, MDL No. 1506 All Cases, Consolidated Case No. 4:02-CV-1186 CAS, 2005 WL 4045741, at *29 (E.D. Mo. June 30, 2005) (*citing In re IBP, Inc. Sec. Litig.*, 328 F. Supp. 2d 1056, 1064 (D.S.D. 2004)).

[71] No. 14-cv-03620, 2017 WL 2815073, at *9–10 (D.N.J. June 29, 2017) (citations and internal quotation marks omitted).

[72] *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 510 (S.D.N.Y. 2009).

every defense and contested every issue throughout,"[73] much like defendants did here. Numerous other courts have articulated similar reasoning.[74]

57. Here, extraordinary skill on the part of class counsel was required because defendants have been represented by at least 30 of the top defense firms in the country, including (among other outstanding firms) Cooley; Gibson, Dunn & Crutcher; Holland & Knight; Jones Day; Morgan, Lewis & Bockius; O'Melveny & Meyers; Paul, Weiss, Rifkind, Wharton & Garrison; Quinn Emanuel Urquhart Sullivan; and Skadden, Arps, Slate, Meagher & Flom.

58. In the face of defendants' formidable attorneys, class counsel had to perform with great skill. They had to master the real estate industry, prepare and defend novel theories of antitrust liability, fend off facial and summary judgment challenges, avoid arbitration, convince the Court to proceed on a classwide basis, and present the complex issues in the case before a federal jury. As discussed below (¶ 74), this is an exceptionally talented group of class counsel. But with at least 30 of the nation's top defense firms litigating on the other side, and defendants seemingly

---

[73] *Syngenta,* 357 F. Supp. 3d at 1112.

[74] *See, e.g.*, *Pollard v. Remington Arms Co.*, 320 F.R.D. 198, 198 (W.D. Mo. 2017) (noting that defense counsel was "experienced and skilled"); *In re CenturyLink*, 2020 WL 7133805 at *34 (noting that the defendant and their counsel "mounted a strong defense" and required class counsel to respond to "a flurry of substantial and complex motions."); *Allapattah*, 454 F. Supp. 2d at 1207 ("Further adding to the difficulty of the case was the quality of Plaintiffs' legal adversaries. Exxon hired some of the most able lawyers and experts in America and spared no expense in doing so."); *Billitteri v. Sec. Am., Inc*., Nos. 3:09-cv-01568-F & 3:10-cv-01833-F, 2011 WL 3585983, at *7 (N.D. Tex. Aug. 4, 2011) ("Because of the extremely effective work of opposing counsel . . . the skill required here . . . certainly justifies the contemplated [fee] award."); *In re OSB Antitrust Litig.*, No. 06-826, 2008 WL 11518423, at *2 (E.D. Pa. Dec. 19, 2008) (noting, in awarding attorneys' fees of 33⅓ percent, that "counsel for Defendants—dozens of extremely distinguished lawyers from across the country—skillfully and vigorously opposed [class counsel]"); *Schwartz v. TXU Corp*., No. 3:02-cv-2243-K, 2005 WL 3148350, at *29–30 (N.D. Tex. Nov. 8, 2005) ("The standing of opposing counsel should be weighed in determining the fee, because such standing reflects the challenge faced by plaintiffs' attorneys. The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation.").

willing to spare no expense to win, many talented plaintiffs' lawyers could have been outgunned here. Class counsel here made this litigation their central focus, in some instances to the near exclusion of all other cases. Indeed, a number of the attorneys at the six plaintiff firms worked on these cases full-time or close to full time for a number of years. *See, e.g.*, Dirks Decl. at ¶ 4; Boulware Decl. at ¶ 7. The district court's observations in *Urethane* are equally applicable here:

> [Class] counsel achieved an incredible result for the class, in a case with an extreme amount of risk at all stages of the litigation, and they obtained that result because they won what is reported to be one of the largest verdicts of its kind in United States history. Counsel had to build this case on their own, without the help of a governmental investigation or prosecution, . . . and they toiled for many years, at great expense to themselves, with a very real risk that they would not recover anything.[75]

### iv. Preclusion of Other Employment Due to Acceptance of the Case

59. As noted (¶ 58), the six law firms representing plaintiffs were hampered in their ability to take on significant other work. Some of the lawyers on the plaintiffs' side worked on little else for years.

### v. Customary Fee

60. In individual contingency-fee contracts, the negotiated attorneys' fees percentage is typically 1/3; indeed, that percentage can go much higher if, as here, the case goes to trial.[76] Here, the class representatives entered individual fee agreements of up to 35 percent contingent fees.

---

[75] *Urethane*, 2016 WL 4060156, at *6.

[76] *See, e.g.*, *Galloway v. Kansas City Landsmen, LLC*, 833 F.3d 969, 973 (8th Cir. 2016) (noting that, in the district court's experience, "33% is in the middle of the range that attorneys performing contingency fee work" typically charge); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) (noting that the "usual range for contingent fees is between 33 and 50 percent"); *Swinton v. Squaretrade, Inc.*, 454 F. Supp. 3d 848, 887 (S.D. Iowa 2020) (recognizing that a one-third contingency fee is "typical"); *Hite v. Vermeer Manufacturing Co.*, 361 F. Supp. 2d 935, 953 (S.D. Iowa 2005) (noting that a one-third contingency is standard in Iowa for contingency cases).

Contingent fee agreements of 1/3 are common, and it is notable that various individual fee agreements here exceeded that percentage.[77]

61. In assessing reasonable fees, numerous courts have cited the actual percentages in individual fee agreements. As the Seventh Circuit has explained:

> When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys. The court must base the award on relevant market rates and the *ex ante* risk of nonpayment. To determine the market for attorney's fees, the court should look to actual fee contracts that were privately negotiated for similar litigation . . . .[78]

Similarly, the court in *Allapattah* noted that, "when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."[79]

62. Here, the fact that numerous individual plaintiffs agreed to a contingency fee of up to 35 percent speaks volumes regarding the difficulty of the litigation and the fairness of a fee request of one third of the common fund.

---

[77] *See, e.g.*, *Montague v. Dixie Nat. Life Ins. Co.*, No. 3:09-00687-JFA, 2011 WL 3626541, at *3 (D. S.C. Aug. 17, 2011) ("A 33% fee award from the common fund in this case is consistent with what is routinely privately negotiated in contingency fee litigation."); *Frederick v. Range Resources-Appalachia*, LLC, No. C.A. 08-288 ERIE, 2011 WL 1045665, at *12 (W.D. Pa. Mar. 17, 2011) ("the contingency fee agreement that the named Plaintiffs and Class Counsel initially entered into at the outset of this litigation called for a contingency fee of 33.5%"); *In re Remeron Direct Purchaser Antitrust Litig.*, No. CIV.03-0085 FSH, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation.").

[78] *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011).

[79] 454 F. Supp. 2d at 1211; *accord, e.g.*, *In re Cont'l Ill.*, 962 F.2d at 572 ("The object in awarding a reasonable attorneys' fee . . . is to simulate the market."); *RJR Nabisco Inc. Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶ 94, 268 (S.D.N.Y. 1992) (noting that "what should govern [fee] awards is . . . what the market pays in similar cases").

### vi. Any Prearranged Fee

63. As noted (¶ 60), individuals entered into private contingency fee contracts of up to 35 percent.

### vii. Time Limitations Imposed by the Client or the Circumstances

64. In awarding fees, a number of courts have emphasized the litigation pressures faced by plaintiffs. For example, in *Johnson*, the court noted that "priority work that delays the lawyer's other legal work is entitled to some premium."[80] In *League of Women Voters of Missouri v. Ashcroft*, the Eighth Circuit noted that the fee request was reasonable under the *Johnson* factors in light of, among other things, "the time-sensitive nature of the claims."[81] And in *Allapattah*, the court cited the "frantic pace" of the litigation in "giv[ing] significant weight to this factor in setting the [fee] percentage."[82]

65. Here, serious time limitations were imposed in this litigation. Discovery was extensive and challenging, and as noted (¶ 58), several of the lawyers involved in this litigation worked on little else for years. Moreover, class counsel faced the pressure of a firm trial date in *Burnett*— with no realistic prospect of a pretrial settlement in sight.

---

[80] *Johnson*, 488 F.2d at 718.

[81] 5 F.4th 937, 941 (8th Cir. 2021); *see also In re CenturyLink*, 2020 WL 7133805, at *34 (noting that class counsel aptly responded to "a flurry of substantial and complex motions," including dispositive motions, filed by defense counsel).

[82] 454 F. Supp. 2d at 1215; *accord, e.g.*, *In re OSB Antitrust Litig.*, 2008 WL 11518423, at *2; *Lucas v. Kmart Corp.*, No. 99-cv-01923, 2006 WL 2729260, at *6 (D. Colo. July 27, 2006).

### viii.  Amount Involved and Results Obtained

66.  As noted above (¶ 38), "the degree of success obtained is the most critical factor in determining the reasonableness of a fee award."[83] For example, in the *Rite Aid Corporation Securities Litigation*, the court emphasized that the $126.6 million settlement was the largest recovery on record against auditors in a securities class action.[84] Here, in addition to the $208.5 million settlement fund approved by this Court in the *Anywhere, et al.* settlements, class counsel successfully negotiated a non-reversionary cash settlement of $110.6 million in the *Compass, et al.* settlements, $418 million in the *NAR* settlement, and $250 million in the *HomeServices* settlement.  These "groundbreaking" settlements may be some of the largest settlements or verdicts ever obtained against the real estate industry.[85] And they are clearly large by any class action standard.[86] Moreover, unlike in most class actions, in which settlements occur before trial, here class counsel achieved a landmark jury verdict that fundamentally altered the path of the litigation.

---

[83] *Vines v. Welspun Pipes Inc.*, 9 F.4th 849, 856 (8th Cir. 2021) (cleaned up).

[84] 362 F. Supp. 2d 587, 90 (E.D. Pa. 2005).

[85] Will Daniel, *The $1.8 billion 'conspiracy' verdict that rocked the real-estate industry has turned into a groundbreaking $418 million settlement*, Fortune (March 15, 2024), https://fortune.com/2024/03/15/nar-settles-lawsuits-real-estate-commissions-threat/; *see also, e.g.*, Mike Winters, *Landmark $418 million settlement could slash homebuying costs by tens of thousands of dollars—here's how it works,* CNBC (Mar. 21, 2024), https://www.cnbc.com/amp/2024/03/21/landmark-settlement-could-slash-homebuying-costs.html (describing settlement as "groundbreaking"); Michael Bloom et al., *What the National Association of Realtors' settlement means for consumers and real estate brokers,* Yahoo Finance (Mar. 15, 2024), https://finance.yahoo.com/news/national-association-realtors-settlement-means-234223890.html (stating that the settlement "is set to usher in the most sweeping reforms the American real estate market has seen in a century").

[86] *See, e.g.*, *In re Apple Inc. Device Performance Litig.*, No. 5:18-MD-02827-EJD, 2023 WL 2090981 at *13 (N.D. Cal. Feb. 17, 2023) ("The $310 million Settlement floor, with a maximum Settlement amount of $500 million, is a substantial result."); *In re Glumetza Antitrust Litig.*, No. C 19-05822 WHA, 2022 WL 327707, at *6 (N.D. Cal. Feb. 3, 2022) ("The combined settlement amount of $453,850,000 constitutes the third-largest absolute dollar recovery for a direct-purchaser class in a generic delay pharmaceutical antitrust action."); *Ferron v. Kraft Heinz*

41

67. Critically, all of the funds (after attorneys' fees, expenses, and any approved service awards) will go to the class. No funds are subject to reversion to the defendants. This is the polar opposite of a case in which class members end up with little value, such as a settlement involving worthless coupons,[87] or one where much or most of the fund is unclaimed and reverts to the defendant.[88]

68. Moreover, as discussed in detail below (¶¶ 96–98), the results also include historic injunctive relief that will result in a sea change in the real estate industry. And class counsel secured the cooperation of the settling defendants in the prosecution of the remaining defendants.

69. In my opinion, the fact that the nationwide settlements here are lower than the $1.78 billion trial verdict in the Missouri class action does not undermine the conclusion that class counsel were highly effective in achieving these settlements. Because of the trial defendants' limitations on their ability to pay, the settlements obtained a significant recovery for the class without tipping the defendants into bankruptcy. As noted (¶ 46), there were numerous risks in upholding that trial verdict on appeal. NAR and the brokerages mounted substantial challenges to the trial verdict; had that verdict been upheld, appeal would have been a certainty. More generally,

---

*Foods Company*, No. 20-CV-62136-RAR, 2021 WL 2940240, at *10 (S.D. Fla. July 13, 2021) (noting that in a case with a total settlement valued at $125 million "the benefits provided to the Class by the Settlement are remarkable"); *Cook v. Rockwell Int'l Corp.*, No. 90-CV-00181-JLK, 2017 WL 5076498, at *2 (D. Colo. Apr. 28, 2017) (noting that the $375 million settlement was an "extraordinary result").

[87] *Compare, e.g.*, *Swinton*, 454 F. Supp. 3d, at 861 (noting that heightened scrutiny is required when a settlement includes coupons as compensation), *with Columbus Drywall & Insulation*, 2012 WL 12540344, at *3 (noting, in awarding attorneys' fees of 33⅓ percent, that "unlike some class settlements, the recovery here consists entirely of cash, rather than coupons or discounts on future purchases from the defendants").

[88] *Compare, e.g.*, *Shanley v. Evereve, Inc.*, 22-CV-0319 (PJS/JFD), at *22 (D. Minn. Nov. 18, 2022) (unclaimed settlement amounts would revert to the defendant).

as noted (¶¶ 41–47), defendants had several plausible legal challenges to the complaint, plaintiffs' experts, and class certification, just to name a few of the areas plaintiffs would have had to litigate on appeal.

70.   Moreover, as discussed below (¶ 96), these settlements do far more than creating a pot of money.  They result in transformative injunctive relief that was not achieved even after the jury trial in this Court.  As NAR pointed out after the October 2023 jury verdict (*see* ¶ 17), that verdict did not adjudicate whether the industry had to change its practices.  According to press coverage, the relief is worth billions of dollars per year. *See* ¶ 26.  And in addition to the injunctive relief, class counsel secured the cooperation of the settling defendants in prosecuting the remaining defendants.

71.   Finally, a settlement must be realistic based on the defendants' solvency.  A settlement that leads to a defendant's bankruptcy is not advantageous to the class.  Here, as in the prior and other pending settlements, class counsel was attentive to seeking the maximum settlements without forcing the defendants into bankruptcy.  Indeed, they consulted with financial experts to determine what each settling defendant could reasonably pay in settlement without becoming insolvent. Dirks Decl. at ¶¶ 27-28.  This Court recognized this point in the *Anywhere, et. al.* settlements.  It noted that the settlements were "supported by the financial condition of the Settling Defendants," and that "[b]efore settling, Plaintiffs used a forensic accountant to confirm each defendant's ability to pay while still maintaining a viable business." *Burnett*, 2024 WL 2842222, at *5.  The Court concluded that "[t]he Settlements each capture a significant portion of the Settling Defendants' available assets while still allowing them to continue operations," whereas "the joint and several liability that would have resulted from a judgment would have been disastrous for any of the

43

defendants." *Id.* The Court cited several cases supporting the notion that a settlement can be fair and reasonable without having ruinous consequences for the defendant. *Id.*[89]

72. A similar issue arose in the *VW Clean Diesel* MDL litigation, in which I served as an expert on the fairness of the class settlement. Various objectors complained that, although the settlement awarded in excess of the Bluebook value of the vehicles, it was deficient because it did not award the full original purchase price of the cars, some of which were many years old with high mileage. In making that argument, the objectors emphasized the egregiousness of Volkswagen's conduct. In urging the Court to reject those objections, I explained that such an award, while desirable in theory given Volkswagen's admitted misconduct, could well bankrupt Volkswagen. As such, the objectors' proposal was not ultimately in the interest of the class. Judge Breyer agreed, reasoning:

> "… Professor Klonoff opines that requiring Volkswagen 'to pay the full purchase [price], regardless of the age of the vehicle, would increase the cost of the settlement multifold. The possibility of bankruptcy under such a scenario cannot be ignored.' (quoting Klonoff Declaration). Bankruptcy would present 'a huge impediment to prompt, efficient, and fair payments to injured claimants.' (quoting Klonoff Declaration). Weighing this possibility against the immediate and guaranteed benefits provided by the Settlement, settlement is clearly favored."[90]

---

[89] Specifically, the Court cited two Eighth Circuit cases: *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 125 (8th Cir. 1975), and *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1153 (8th Cir. 1999), as well as a decision from the Southern District of New York, *Meredith v. SESAC, LLC,* 87 F. Supp.3d 650, 665 (S.D.N.Y. 2015). *See Burnett*, 2024 WL 2842222, at *5.

[90] *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prod. Liab. Litig.*, No. 3:15-md-02672-CRB, 2016 WL 6248426, at *18 (N.D. Cal. Oct. 25, 2016), *aff'd sub nom. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 895 F.3d 597 (9th Cir. 2018), and *aff'd sub nom. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 741 F. App'x 367 (9th Cir. 2018).

44

73.  Other courts have likewise looked at the possibility of bankruptcy in assessing whether the amount of a particular settlement is fair, reasonable, and adequate.  For example, In *In re Genworth Fin. Sec. Litig.*, the district court found a proposed class settlement to be fair where—as is the case here—the amount was reached through consultation with financial experts who determined what the Defendant could reasonably pay without compromising its solvency.[91] As the court explained, a larger jury verdict would "decrease the plaintiffs' likelihood of recovery through bankruptcy proceedings."[92] Similarly, in *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, the district court approved a cash settlement constituting only 35 percent of the total estimate of damages because "there was significant risk that, even if [Plaintiffs] succeeded at trial, the resulting damage award could be wiped out by a bankruptcy filing."[93]

### ix.  Experience, Reputation, and Ability of Attorneys

74.  Class counsel are highly skilled and experienced class action and antitrust attorneys, from some of the most prestigious plaintiff firms in the country. *See Burnett* Docs. 1392-1–1392-6 (declarations of all six firms).  The individual lawyers from these firms included some of the country's most accomplished class action and antitrust plaintiff lawyers.  Team members have

---

[91] In re Genworth Fin. Sec. Litig., 210 F. Supp. 3d 837, 842 (E.D. Va. 2016)

[92] *Id.*

[93] *In re EVCI Career Colleges Holding Corp. Sec. Litig.,* No. 05 CIV 10240 CM, 2007 WL 2230177, at *1 (S.D.N.Y. July 27, 2007); *Accord, e.g., In re Lumber Liquidators Chinese-Mfr. Flooring Prod. Mktg., Sales Prac. and Prod. Liability Litig.,* 952 F.3d 471, 485 (4th Cir. 2020) ("Lumber Liquidators' potential inability to pay litigated judgments in both MDLs weighs in favor of the [district] court's adequacy ruling"); *Lane v. Facebook, Inc.*, 696 F.3d 811, 823-24 (9th Cir. 2012) (affirming settlement in light of the district court's conclusion that additional damages would be "annihilative" to defendant company that was "on the verge of bankruptcy"); *In re AOL Time Warner, Inc.*, No. 02 Civ. 5575(SWK), 2006 WL 903236, at *12 (S.D.N.Y. Apr. 6, 2006) (fact that a greater recovery "would put the defendant at risk of bankruptcy or other severe economic hardship" weighs in favor of settlement).

45

received recognition as the "The Best Lawyers in America," "Super Lawyers," and "Rising Stars." *Id*. Many have held prominent leadership roles in other major class actions and MDL cases.[94]

### x. Undesirability of the Case

75. Any lawyer considering involvement on the plaintiffs' side in this case had to understand that the litigation involved a huge commitment of time and resources, with an outcome that was anything but certain. Class counsel appear to be the first and only lawyers willing to represent the settlement class until after the successful trial verdict in *Burnett*. Only after their successes did other attorneys start to bring similar cases.

### xi. Nature and Length of Professional Relationship with the Client

76. For the vast majority of class members, there was no prior relationship. Courts have generally given little weight to this *Johnson* factor, noting that "[t]he meaning of this factor . . . and its effect on the calculation of a reasonable fee has always been unclear."[95] Here, to the extent that this factor is relevant at all, it is neutral.

### xii. Awards in Similar Cases

77. Fee awards in other cases involving significant challenges confirm the reasonableness of the fees sought here. As I explain in detail below, the percentage requested by class counsel here (1/3) is in line with percentages awarded in numerous other class actions. It also aligns with the fees awarded in other antitrust settlements. And, unlike in most of those cases, the settlements here will yield injunctive relief worth billions of dollars to the class and future real estate sellers;

---

[94] *See*, *e.g.*, Burnett Docs. 1392-4 at ¶ 2; 1392-5 at ¶ 2.
[95] *Bruner v. Spring/United Mgmt. Co*., No. 07-cv-02164-KHV, 2009 WL 2058762, at *9 (D. Kan. July 14, 2009).

in essence, class counsel secured the settling defendants' agreement to transform their industry practices going forward.

78. As the above discussion reflects, analysis of the *Johnson* factors demonstrates the reasonableness of the fees sought here. And that is based just on the monetary fund. As discussed below (¶¶ 96–98), the actual percentage sought by counsel is much lower than 1/3 because the settlements include substantial injunctive relief worth billions of dollars.

### C. The Percentage Requested Is Reasonable Notwithstanding the Fact that These are So-Called Mega-Fund Cases

79. In this section, I explain why, in my opinion, an award of 1/3 is reasonable notwithstanding the fact that these settlements could be characterized as mega-fund settlements, *i.e.*, those above $100 million.[96]

80. As an initial matter, I would note that the Eighth Circuit made clear just last month that "we decline to hold that a court must award a reduced percentage in megafund cases."[97] It noted that "a per se rule requiring a percentage reduction in every megafund case would introduce arbitrary and formulaic rules into an inquiry that needs to be anything but."[98] As a result, any argument that the fee award must be reduced because these are mega-fund settlements is incorrect. Out of an abundance of caution, however, I address herein various empirical studies on mega-fund

---

[96] *See, e.g.*, *Reyes v. Experian Info. Sols., Inc.,* 856 F. App'x 108, 111 (9th Cir. 2021) ("megafund cases are usually those with settlements exceeding $100 million"); *In re Xcel Energy, Inc.*, *Secs., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 998-99 (D. Minn. 2005) (megafund class actions involve settlements over $100 million); *Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*, No. 17-CV-0304-WJM-NRN, 2021 WL 2981970, at *2–3 (D. Colo. July 15, 2021) (discussing "megafund" settlement of over $130 million).

[97] *In re T-Mobile Customer Data Sec. Breach Litig.*, No. 23-2744, 2024 WL 3561874, at *5 (8th Cir. July 29, 2024).

[98] *Id.*

47

settlements and actual awards in other mega-fund cases.  As a result of that analysis, I conclude

that a 1/3 fee award in the present mega-fund context is entirely reasonable.

81.  I am fully aware that empirical studies reveal that a fee of 1/3 is above the average and

median fee awards in class actions, although it is close to the percentage range in the Eighth

Circuit.[99]  I further recognize that, according to empirical studies, fee awards (as a percentage)

tend to decline as the amount of the settlement increases, with the lowest percentage awards

appearing in so-called mega-fund settlements.[100]  But these empirical studies, which focus on

medians and averages, cannot substitute for a careful analysis of the facts and circumstances of

each settlement.

82.  In *Syngenta*, for example, the district court explained that the declining percentage

approach "fails to appreciate the immense risks undertaken by attorneys in prosecuting complex

cases in which there is a great risk of no recovery."[101]  Similarly, in *Urethane*, the district court

---

[99] *See, e.g.*, Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811, 833, 836 (2010), (finding, for 2006–2007 period, average and median of about 25 percent with the awards in the Eighth Circuit having an average of 26.1 percent and a median of 30 percent); Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009–2013*, 92 N.Y.U. L. REV. 937, 947, 951 (2017) (finding average of 27 percent and median of 29 percent for 2009–2013 period with an average of 29 percent and a median of 32 percent in the Eighth Circuit); Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD.. 248, 259, 267 (2010) (finding, in 1993–2008 study, average fees of 24 percent and median fees of 25 percent with average of 25 percent and median of 30 percent in the Eighth Circuit).

[100] *See, e.g.*, Fitzpatrick, *supra* note 99, at 811 (noting that, in the eight cases involving settlements between $250 million and $500 million during 2006–2007, average and median awards were 17.8 percent and 19.5 percent, respectively); Eisenberg, Miller & Germano (2017), *supra* note 99, at 947–48 (describing "scaling effect" where, "as [the] recovery amount increases, the ratio of the size of the attorneys' fee relative to the size of the recovery (*i.e.*, the fee percentage) tends to decrease" and finding that average and median fees for settlements greater than $100 million varied from "a low of 16.6% in 2009 to a high of 25.5% in 2011").

[101] *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1114 (D. Kan. 2018) (*quoting Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212–13 (S.D. Fla. 2006).

48

rejected objectors' reliance on statistical studies in arguing that fee awards should necessarily decrease with the size of the fund. To the contrary, in awarding attorneys' fees of 33⅓ percent in *Urethane*, the court stated:

> This Court appreciates that some courts have awarded lower percentages to avoid granting an excessive windfall to counsel under the unique circumstances of those cases. On the other hand, *the Court agrees with those courts who have noted that such a diminishing scale can fail to provide the proper incentive for counsel* . . . . [I]n the present case, . . . class counsel achieved extraordinary success in a very long litigation. Thus, use of a declining-scale approach is not appropriate here, and the Court will award fees based on the unique circumstances of the case.[102]

83. Likewise, the Third Circuit has noted that the "position [that fees should decrease with the size of the fund] has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply."[103] In the *Rite Aid Securities Litigation*, the Third Circuit made clear that "the declining percentage concept does not trump the fact-intensive [attorneys' fees] analysis."[104] And in *Allapattah*, the court emphasized that a declining percentage reduction is "antithetical to the percentage [method's] purpose of . . . align[ing] the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained."[105]

---

[102] *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *5–6 (D. Kan. July 29, 2016) (emphasis added).

[103] *In re Cendant Corp. Litig.*, 264 F.3d 201, 284 n.55 (3d Cir. 2001).

[104] *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 303 (3d Cir. 2005), *as amended* (Feb. 25, 2005).

[105] 454 F. Supp. 2d at 1213. *Accord, e.g., In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 197 (E.D. Pa. 2000) (similar).

49

84. Other courts have made the same points.[106] Moreover, numerous scholars agree that fee percentages should not necessarily be lower in mega-fund cases.[107] In my opinion, these courts and scholars have correctly articulated the flaws in a declining percentage approach.

85. To be sure, an empirical study conducted in 2010 by Professor Brian Fitzpatrick of Vanderbilt University School of Law showed an inverse relationship between fee percentages and the amounts of settlements.[108] Of the mega-fund settlements surveyed by Professor Fitzpatrick where the fund was between $500 million and $1 billion—like the collective settlements here—both the average and median fee awards were 12.9 percent.[109] For several reasons, I do not believe that this study undercuts the 1/3 fee request here.

86. First, as discussed below (¶¶ 96–98), the true percentage sought here, taking into account the extraordinary injunctive relief secured, is well below 1/3—indeed, under the most conservative assumptions it is below three percent.

87. Second, as Judge Lungstrum noted in *Syngenta*, a rigid approach to mega-fund settlements would lead to incentives that conflict with the percentage approach:

---

[106] *See, e.g.*, *In re Equifax Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1280 (11th Cir. 2021); *In re Auto. Parts Antitrust Litig.*, No. 2:12-cv-00203, 2017 WL 3525415, at *2 (E.D. Mich. July 10, 2017); *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010,* No. 2:10-md-02179-CJB, 2016 WL 6215974 (E.D. La. Oct. 25, 2016).

[107] *See, e.g.*, John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 697 (1986); Declaration of Professor Geoffrey P. Miller at 11, *In re Takata Airbag Prods. Liab. Litig.*, No. 1:15-md-02599-FAM (S.D. Fla.) (Dkt. No. 2318-3) (filed Jan. 24, 2018), *available at* https://www.autoairbagsettlement.com/Content/Documents/Exhibit%20C%20to%20Response%20to%20Objections%20HN.pdf; Declaration of Brian T. Fitzpatrick at 14 n.4, *In re High-Tech Employees Antitrust Litig.*, No. 11-CV-2509-LHK (N.D. Cal.) (filed May 8, 2015), *available at* http://www.hightechemployeelawsuit.com/media/303927/15-5-8__1079__fitzpatrick_decl__motion_for_attorney_fees.pdf.

[108] Fitzpatrick, *supra* note 99.

[109] *Id.* at 839 tbl.11. *See also Ark. Teacher Ret. Sys. v. State St. Corp.*, 25 F.4th 55, 65–66 (1st Cir. 2022) (discussing Professor Fitzpatrick's findings).

[i]t is true that economies of scale may mean that a large percentage would result in an unacceptable windfall in some cases . . . [but] the court does not agree that megafund cases should necessarily be subject to a diminishing scale by which the award percentage falls as the settlement amount grows. As the Court has noted previously, use of such a scale fails to provide the proper incentive for counsel and is fundamentally at odds with the percentage-of-the-fund approach . . . . [110]

88. Third, by definition, the median value is the value in the middle of a data set; of the values used to identify the median, half are necessarily equal to or *greater than* the median. And various values used to calculate an average may be equal to or *greater than* the average.[111] As I discuss above (¶¶ 41–59), the extraordinary level of work and result achieved here in the face of enormous risk warrants a substantial fee percentage—well above the mean and median percentages in the Fitzpatrick study—even though lower percentages might be more appropriate in different factual settings. Relying on averages and medians without focusing on the crucial facts of *this* litigation and settlement would be a flawed approach.

89. Fourth, there are numerous mega-fund cases with percentage-based fee awards equal to or greater than the 1/3 of the fund sought here. As would be expected, those awards are based on a careful analysis of the specific facts and challenges of a given case. For example, in *In re Vitamins Antitrust Litigation*,[112] *Standard Iron Works v. ArcelorMittal*,[113] and *In re Flonase*

---

[110] *In re Syngenta*, 357 F. Supp. 3d at 1114. Judge Lungstrum also noted that in "many [mega-fund] cases, the court did not reject a higher request but rather accepted the low one." *Id.*

[111] Indeed, from 1996 to 2011, the median percentage of attorneys' fees in mega-fund cases valued between $500 and $1,000 million was 17.7%; the median value from 2012–2021 was again 17.7%, *see* Janeen McIntosh & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-year Review*, 19 NERA 27 (2021), https://www.nera.com/content/dam/nera/publications/2022/PUB_2021_Full-Year_Trends_012022.pdf.

[112] No. MISC 99-197(TFH), 2001 WL 34312839, at *11–13 (D.D.C. July 16, 2001).

[113] No. 08-cv-05214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014).

51

*Antitrust Litigation*,[114] the courts awarded, respectively, 34.06 percent, 33 percent, and 33⅓ percent as attorneys' fees because of the complex issues involved, the quality of class counsel's work, and the results obtained.

90.   The mega-fund cases cited in paragraph 89 are just three examples.  In the table below, I have collected 51 mega-fund cases that involved fee awards of 30 percent or greater (30 of which awarded 33 percent or more).  Importantly, 28 of the cases post-date the publication of Professor Fitzpatrick's 2010 study.

**TABLE 1: Fee Awards of 30 Percent or More in Mega-Fund Class Actions**

| Case | Recovery | Fee Award | Trial? |
|------|----------|-----------|--------|
| *Cook v. Rockwell Int'l Corp.*, 2017 WL 5076498 (D. Colo. Apr. 28, 2017) | $375 million | 40 percent | Yes |
| *Lobo Exploration Co. v. BP Am. Prod.*, No. CJ-1997-72 (Oka. Dist. Ct., Beaver Cnty. Dec. 8, 2005) | $150 million | 40 percent | No |
| *Simmons v. Anadarko Petroleum Corp.*, No. CJ-2004-57 (Okla. Dist. Ct., Caddo Cnty., Dec. 23, 2008) | $155 million | 40 percent | No |
| *Lauriello v. Caremark RX LLC*, No. 01-cv-2003-006630.00 (Ala. Cir. Ct., Jefferson Cnty. Aug. 15, 2016). | $310 million | 40 percent | No |

---

[114] 951 F. Supp. 2d 739, 747–49 (E.D. Pa. 2013).

| Case | Recovery | Fee Award | Trial? |
|---|---|---|---|
| *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000) | $185 million | 40 percent | No |
| *In re Capacitors Antitrust Litig.*, No. 3:14-CV-03264-JD, 2023 WL 2396782 (N.D. Cal. Mar. 6, 2023) | $165 million | 40 percent | No[115] |
| *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) | $127 million | 36 percent | No[116] |
| *In re Managed Care Litig. v. Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) | $100 million | 35.5 percent | No |
| *Haddock v. Nationwide Life Ins. Co.*, No. 3:01-cv-01552-SRU (D. Conn. Apr. 9, 2015) (Dkt. No. 601) | $140 million | 35 percent | No |
| *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 million | 34.06 percent | No |
| *In re Syngenta AG MIR 162 Corn Litig.*, 357 F.Supp.3d 1094 (D. Kan. 2018) | $1.5 billion | 33.33 percent | Yes |
| *Hale v. State Farm Mut. Auto Ins. Co.*, 2018 WL 6606079 (S.D. Ill. Dec. 16, 2018) | $250 million | 33.33 percent | Yes |
| *In re Loestrin 24 Fe Antitrust Litig.*, MDL No. 2472 (D.R.I. July 17, 2020) | $120 million | 33.33 percent | No |
| *DeLoach v. Phillip Morris Co.*, No. 1:00-cv-01235, 2003 WL 25683496 (M.D.N.C. Dec. 19, 2003) | $212 million | 33.33 percent | No |

[115] This settlement was one of several throughout the many stages of this litigation. Trial commenced on two occasions but was never completed. Class counsel recovered in total $604,550,000 and was awarded a total of $187,490,000 in attorneys' fees. *In re Capacitors Antitrust Litig.*, 2023 WL 2396782, at *1–2.

[116] A trial was conducted in the parallel government enforcement action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 et seq., but the private class action based on plaintiffs' tort claims was settled prior to trial.

53

| Case | Recovery | Fee Award | Trial? |
|------|----------|-----------|--------|
| *In re Tricor Direct Purchaser Antitrust Litig.*, 1:05-cv-00340-SLR (D. Del. Apr. 23, 2009) (Dkt. No. 543) | $250 million | 33.33 percent | No |
| *In re Neurontin Antitrust Litig.*, No. 2:02-cv-01830 (D.N.J. July 6, 2014) (Dkt. No. 114) | $190 million | 33.33 percent | No |
| *In re Titanium Dioxide Antitrust Litig.*, No. 1:10-cv-00318 (D. Md. Dec. 13, 2013) (Dkt. No. 555) | $163.5 million | 33.33 percent | No |
| *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-01894 (AWT) (D. Conn. Dec. 9, 2014) (Dkt. No. 521) | $297 million | 33.33 percent | No |
| *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan. July 29, 2016) (Dkt. No. 3276) | $835 million | 33.33 percent | Yes |
| *In re Relafen Antitrust Litig.*, No. 01-cv-12239-WGY (D. Mass. Apr. 9, 2004) (Dkt. No. 297) (direct purchaser litigation) | $175 million | 33.33 percent | No |
| *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739 (E.D. Pa. 2013) | $150 million | 33.33 percent | No |
| *City of Greenville v. Syngenta Crop Prot.*, No. 3:10-cv-00188 (S.D. Ill. Oct. 23, 2012) | $105 million | 33.33 percent | No |
| *In re OSB Antitrust Litig.*, No. 06-cv-00826 (D. Pa. Dec. 9, 2008) (Dkt. No. 947) | $120.7 million | 33.33 percent | No |
| *In re Apollo Grp. Inc. Sec. Litig.*, No. 04-cv-02147-PHX-JAT, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012) | $145 million | 33.33 percent | Yes |

| Case | Recovery | Fee Award | Trial? |
|---|---|---|---|
| *Rogowski v. State Farm Life Ins. Co.*, No. 4:22-CV-00203-RK, 2023 WL 5125113, (W.D. Mo. Apr. 18, 2023) | $325 million | 33.33 percent | No[117] |
| *Cabot East Broward 2 LLC v. Cabot*, 2018 WL 5905415 (S.D. Fla. Nov. 9, 2018) | $100 million | 33.33 percent | No |
| *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) | $510 million | 33.33 percent | No |
| *In re Buspirone Antitrust Litig.*, No. 1:01-md-01413-JGK (S.D.N.Y. Apr. Nov. 18, 2003) (Dkt. No. 171) | $220 million | 33.30 percent | No |
| *Standard Iron Works v. ArcelorMittal*, No. 08-cv-05214, 2014 WL 7781572 (N.D. Ill. Oct. 22, 2014) | $164 million | 33 percent | No |
| *Dahl v. Bain Capital Partners, LLC*, No. 1:07-cv-12388 (D. Mass. Feb. 2, 2015) (Dkt. No. 1095) | $590.5 million | 33 percent | No |
| *San Allen, Inc. v. Buehrer*, No. CV-07-644950 (C.P., Cuyahoga Cnty., Ohio Nov. 25, 2014) | $420 million | 32.7 percent | Yes |
| *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL-1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) | $105.7 million | 32.7 percent | No |
| *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1.06 billion | 31.33 percent | Yes |
| *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) | $220 million | 30.9 percent | Yes |

---

[117] A trial was conducted in related litigation, but that case was not part of the settlement.

| Case | Recovery | Fee Award | Trial? |
|---|---|---|---|
| *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2024 WL 3292794 (N.D. Ill. July 3, 2024) | $181 million | 30 percent | No |
| *In re Domestic Drywall Antitrust Litig.*, MDL No. 2437 (E.D. Pa. July 17, 2018) | $190 million | 30 percent | Yes |
| *Peace Officers' Annuity & Benefit Fund v. DaVita Inc.*, Civil Action No. 17-cv-0304-WJM-NRN (D. Colo. July 15, 2021) | $135 million | 30 percent | No |
| *In re Dole Food Co., Inc. Stockholder Litig.*, 2016 WL 541917 (Del. Ch. Feb. 10, 2016) | $113 million | 30 percent | Yes |
| *Weatherford Roofing Co. v. Employers Nat'l Ins. Co.*, No. 91-05637 (116th Tex. Dist. Ct., Dallas Cnty. Dec. 1, 1995) | $140 million | 30 percent | Yes |
| *In re (Bank of America) Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) | $410 million | 30 percent | No |
| *Tennille v. Western Union Co.*, No. 09-cv-00938-JLK-KMT, 2014 WL 5394624 (D. Colo. Oct. 15, 2014) | $180 million | 30 percent | No |
| *In re Linerboard Antitrust Litig.*, No. 98-cv-05055, 2004 WL 1221350 (E.D. Pa. June 2, 2004) | $202.5 million | 30 percent | No |
| *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D. Okla. Jan. 2, 1990) | $185 million | 30 percent | Yes |
| *In re (Chase Bank) Checking Account Overdraft Litig.*, No. 1:09-md-02036 (S.D. Fla. Dec. 19, 2012) (Dkt. No. 3134) | $162 million | 30 percent | No |
| *In re (Citizens Bank) Checking Account Overdraft Litig.*, No. 1:09-md-02036 (S.D. Fla. Mar. 12, 2013) (Dkt. No. 3331) | $137.5 million | 30 percent | No |

| Case | Recovery | Fee Award | Trial? |
|------|----------|-----------|--------|
| *In re Informix Corp. Sec. Litig.*, No. 97-cv-01289-CRB (N.D. Cal. Nov. 23, 1999) (Dkt. No. 471) | $132.2 million | 30 percent | No |
| *Kurzweil v. Philip Morris Co., Inc.*, Nos. 94-civ-2373 (MBM), 94-civ-2546 (BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 million | 30 percent | No |
| *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) | $111 million | 30 percent | No |
| *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632 (N.D. Tex. Apr. 9, 2010), *as modified* (June 14, 2010) | $110 million | 30 percent | No |
| *In re Prison Realty Sec. Litig.*, No. 3:99-cv-00458 (M.D. Tenn. Feb. 9, 2001) (Dkt. No. 108) | $104 million | 30 percent | No |
| *In re Polyurethane Foam Antitrust Litig.*, No. 1:10-MD2196 (N.D. Ohio Feb. 26, 2015) | $147.8 million | 30 percent | No |

91. These cases show that, even in mega-fund cases, there is nothing unprecedented about awards at the 1/3 level requested here. In my view, the settlements here—even as mega-fund settlements—justify an award of 1/3 of the fund, given the difficult factual, legal, and expert issues, contested class certification issues, formidable opposing counsel, the significant risk of no recovery, and the fact that class counsel successfully litigated a case to a jury verdict. Indeed, only 12 of the 51 cases listed in Table 1 involved an actual trial.

92. Moreover, given that mega-fund class actions are less common than those with smaller recoveries, average and median fee percentages for those cases are subject to greater variation.[118] Notably, a number of mega-fund settlements have been securities class actions, where average and median fee awards tend to be lower than the overall averages and medians.[119] Presumably, one reason for lower fees in securities cases is that the crucial issue of class certification—a major source of dispute here (*see* ¶ 45)—is generally less challenging in securities cases.[120] And in many securities settlements, private plaintiffs are helped significantly by parallel government enforcement actions.[121] Moreover, in some mega-fund securities fraud settlements, courts have pointed to the lack of complex legal and factual challenges and the relative ease of achieving

---

[118] *See, e.g.*, *In Re "Deepwater Horizon"*, 2016 WL 6215974, at *16 (noting that with respect to mega-fund cases "there are fewer percentage awards to serve as a benchmark; consequently, there is some variability in the percentages awarded in these cases").

[119] *See* Fitzpatrick, *supra* note 99, at 834.

[120] *See, e.g.*, *In re FedEx Ground Package Sys., Inc. Emp't Practices Litig.*, No. 3:05-MD-527 RLM, 2017 WL 1735541, at *5 (N.D. Ind. Apr. 28, 2017) (noting, in awarding attorneys' fees of 30 percent and distinguishing lower fee awards in comparable securities cases, that "securities cases . . . differ . . . in many ways, not least of which that class certification in securities cases is nearly automatic under today's laws"); *see also* Robert H. Klonoff, *The Decline of Class Actions*, 90 Wash. U. L. Rev. 729, 824 (2013) (noting that because "securities fraud suits . . . tend to involve overarching issues that impact all class members and seek damages that can be easily calculated," they "are commonly certified").

[121] *See, e.g.*, *PaineWebber Ltd. P'ships Litig. v. Geodyne Res., Inc.*, 999 F. Supp. 719, 725 (S.D.N.Y. 1998) ("[W]hile Class Counsel did not necessarily piggyback on the SEC's efforts from the beginning of these actions, their risk in litigating Class Members' claims was substantially reduced by pressure placed on [the defendant] in the SEC Order. Largely for this reason, the Court declines to award Class Counsel the doubling of its lodestar that they seek."); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1336 (S.D. Fla. 2001) (SEC's investigation and investigatory materials were "at least somewhat helpful" to class counsel, and merited a downward adjustment in class counsel's requested fee); *see also* Lisa L. Casey, *Reforming Securities Class Actions from the Bench: Judging Fiduciaries and Fiduciary Judging*, 2003 B.Y.U. L. REV. 1239, 1297 (2003) (noting that "courts reduced fees [in securities class actions] based on their perception that enforcement actions by the SEC assisted plaintiffs' counsel or reduced the risk of loss").

58

settlement in awarding lesser attorneys' fees.[122] In contrast, class counsel did not have the benefit of any of these risk-reducing factors here. From my perspective, the risks here could not have been more daunting. Indeed, it is my understanding that there were few copycat lawsuits (a common phenomenon in class actions) until after the historic jury verdict.

93. In my view, the critical takeaway from the mega-fund case law is that attorneys' fee awards should bear a relationship to the degree of risk involved.[123] Indeed, courts often expressly note the degree of risk assumed by class counsel in approving larger fee awards.[124] As one court noted in awarding attorneys' fees of 33 percent, "[c]ourts recognize that the risk of receiving no recovery is a major factor in awarding attorneys' fees…[T]he riskier the case, the greater the justification for a substantial fee award."[125] Another court explained that "[a]ttorneys' risk is

---

[122] *See, e.g., In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742–43 (3d Cir. 2001) (noting that the "case was neither legally nor factually complex and did not require significant motion practice or discovery by [class counsel], and the entire duration of the case from the filing of the Amended Complaint to the submission of a Settlement Agreement to the District Court was only four months").

[123] *See, e.g.*, Eisenberg & Miller, *supra* note 99, at 27, 38 ("Fees are . . . correlated with risk: the presence of high risk is associated with a higher fee, while low-risk cases generate lower fees . . . . That fees are adjusted for risk is widely accepted in the literature."). In their more recent study, Professors Eisenberg, Miller, and Germano found that "the association between risk and fee percentage continues in the 2009–2013 data." Eisenberg, Miller & Germano (2017), *supra* note 99, at 958

[124] *See, e.g., In re Life Time Fitness Inc., Tel. Consumer Prot. Act Litig.*, 847 F.3d 619, 623 (8th Cir. 2017) (affirming district court's percentage-based fee award because, among other things, the attorneys assumed significant risk in taking on the lawsuit and class counsel devoted significant time to the litigation); *Pollard v. Remington Arms Co.*, 320 F.R.D. 198, 198 (W.D. Mo. 2017) (noting that class counsel "faced great risks in this litigation" and that, in light of favorable verdicts obtained by the defendants elsewhere, "there was a considerable chance Plaintiffs would recover nothing"); *accord, e.g., Larson v. Allina Health Sys.*, No. 17CV03835SRNTNL, 2020 WL 2611633, at *2 (D. Minn. May 22, 2020); *Thorkelson v. Publ'g House of the Evangelical Lutheran Church in Am.*, No. 10 CV 1712 (MJD/JSM), 2013 WL 12149693, at *3 (D. Minn. Apr. 8, 2013); *In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, No. 11-MD-2247 ADM/JJK, 2012 WL 2512750, at *11 (D. Minn. June 29, 2012), *aff'd*, 716 F.3d 1057 (8th Cir. 2013).

[125] *Montague v. Dixie Nat. Life Ins. Co.*, No. 3:09-00687-JFA, 2011 WL 3626541, at *3 (D. S.C. Aug. 17, 2011).

perhaps the foremost factor in determining an appropriate fee award."[126] Indeed, a number of the *Johnson* factors focus specifically on the risks imposed by the litigation, including the difficulty of the issues and the undesirability of the case. *See* ¶ 37 (*quoting Johnson* factors)

94.  An emphasis on risk is especially relevant in mega-fund cases, where class counsel often invest many thousands of attorney hours and millions of dollars in expenses.  For example, in *In re Charter Communications*, the court reasoned that the percentage-based fee award was "particularly reasonable given the risks undertaken . . . and the excellent results achieved [by class counsel]."[127] Similarly, in *Roberts v. Texaco*, the court observed that it is "the skill, ingenuity, effort and *risk* of counsel that, in the final analysis, produces the result."[128] As noted, this case exemplifies the significant risks undertaken by class counsel on behalf of the class to obtain a historic settlement.

95.  Finally, comparing this case to most mega-fund settlements is an apples and oranges analysis.  Unlike most of the cases in Table 1, the actual percentage here is substantially lower than 1/3 because, in addition to creating a pot of money, the instant case also achieves injunctive

---

[126] *Francisco v. Numismatic Guar. Corp. of Am.*, No. 06-61677-CIV, 2008 WL 649124, at *14 (S.D. Fla. Jan. 31, 2008). *Accord, e.g.*, *In re Ocean Power Technologies, Inc.*, No. 3:14-cv-03799, 2016 WL 6778218, at *28 (D.N.J. Nov. 15, 2016) ("Courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees."); *Jenkins v. Trustmark Nat'l Bank*, 300 F.R.D. 291, 309 (S.D. Miss. 2014) (noting that "courts have found that class counsel ought to be compensated . . . for risk of loss or nonpayment assumed by carrying through with the case").

[127] No. 4:02-CV-1186 CAS, 2005 WL 4045741, at *22 (E.D. Mo. June 30, 2005).

[128] *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (emphasis added). *Accord, e.g.*, *In re Tyco Int'l Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 260 (D.N.H. 2007) (noting that the case "involved a greater risk of non-recovery than other multibillion-dollar securities class action settlements" and emphasizing that, "[h]ad [class counsel] lost at summary judgment or fallen short of establishing liability at trial, they would have lost the tens of millions of dollars in expenses and all of the attorney time that they collectively invested in th[e] case").

*relief worth billions of dollars. See ¶* 96. As discussed below, *the true percentage sought is not 1/3;* taking into account an extremely conservative value of the injunctive relief, the amount sought as fees is only 2.99 percent of the total benefit, a modest amount by any measure for such a challenging and hard-fought case.

### D. With Injunctive Relief Considered, the True Percentage Sought by Class Counsel is Significantly Less than 1/3 of the Benefits

96. This case involves not only the creation of a common fund but also the implementation of pathbreaking injunctive relief. Here, press coverage states that the injunctive value of these settlements is worth billions of dollars *per year* going forward.[129] For purposes of this Declaration, I assume an exceedingly low value of the injunctive relief as a total of $10 billion. Adding that value to the $987.1 million of settlement funds results in a true percentage of 2.99, as opposed to 1/3.

97. Numerous courts have made clear that in calculating the true percentage requested, it is proper to take into account the value of injunctive relief.[130] That approach makes perfect sense:

---

[129] *See, e.g.*, Debra Kamin, *4 Ways a Settlement Could Change the Housing Industry*, THE NEW YORK TIMES (Mar. 15, 2024), https://www.nytimes.com/2024/03/15/realestate/nar-realtors-settlement-takeaways.html (quoting estimate by retired executive director of the Consumer Federation of America); Scott Horsley, *If you recently sold your home, you might get part of your realtor fee back,* NPR (Mar. 22, 2024), https://www.npr.org/2024/03/22/1239486107/realtor-fee-commission-homes-for-sale ("Economists at the Federal Reserve Bank of Richmond estimate the changes could save homebuyers $30 billion a year, with most of those savings coming out of the pockets of real estate agents.").

[130] *See, e.g., Henderson v. Emory Univ.,* No. CV 16-2920-CAP, 2020 WL 9848978, at *4 (N.D. Ga. Nov. 4, 2020) (including estimated value of injunctive relief in total settlement fund, making requested fee 23% rather than one-third; *Corker v. Costco Wholesale Corp.,* No. 2:19-CV-00290-RSL, 2021 WL 2790518, at *1 (W.D. Wash. June 25, 2021) (adding value of injunctive relief to common fund, decreasing true percentage from approximately 43% to 11%); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 478 (D.N.J. 2008) (adding value of injunctive relief to common fund, decreasing true percentage requested from 32% to 28%); *Tennille v. W. Union Co.,*

To ignore all of the value secured by class counsel would be to ignore the overall success of the litigation. Here, for example, where the injunctive relief, as valued by plaintiffs' experts, is worth billions of dollars, it would make no sense to turn a blind eye to such relief when assessing the reasonableness of attorneys' fees.

98.  Indeed, even in situations in which the injunctive aspect of a settlement cannot be calculated with precision, numerous courts have looked to the injunctive relief as evidence supporting the percentage-of-the-fund requested. As Chief Judge Beth Phillips in this District has recognized, "[t]he fact that counsel obtained injunctive relief in addition to monetary relief for their clients is . . . a relevant circumstance to consider in determining what percentage of the fund is reasonable as fees."[131]

### E.  There Is No Need for a Lodestar Cross-Check

99.  Class counsel has asked for my view on whether the fees requested by class counsel should be tested using a "lodestar cross-check"—*i.e.*, a procedure that courts sometimes use to

---

No. 09-CV-00938-MSK-KMT, 2013 WL 6920449, at *12 (D. Colo. Dec. 31, 2013), *report and recommendation adopted as modified*, No. 09-CV-00938-JLK-KMT, 2014 WL 5394624 (D. Colo. Oct. 15, 2014) (adding value of injunctive relief to common fund and awarding Class Counsel 35% of total fund); *Sheppard v. Consol. Edison Co. of New York,* No. 94-CV-0403(JG), 2002 WL 2003206, at *7 (E.D.N.Y. Aug. 1, 2002) (including estimated value of injunctive relief in common fund, decreasing true percentage of requested fee from approximately 20% to 13%).

[131] *Jones v. Monsanto Co.*, No. 19-0102-CV-W-BP, 2021 WL 2426126, at *9 (W.D. Mo. May 13, 2021), *aff'd*, 38 F.4th 693 (8th Cir. 2022) (*quoting Staton v. Boeing Co*., 327 F.3d 938, 946 (9th Cir. 2003). *Accord, e.g., Tussey v. ABB, Inc.,* No. 06-CV-04305-NKL, 2019 WL 3859763, at *3 (W.D. Mo. Aug. 16, 2019) (injunctive relief obtained by class counsel supported one-third fee award because "the actual benefit to the Settlement Class is in excess of the monetary benefit received."); *Hooper v. Advance Am.,* No. 08-4045-CV-C-NKL, 2010 WL 11469807, at *3 (W.D. Mo. Nov. 4, 2010) (noting that "counsel has fought for and obtained future injunctive relief" in finding that requested fees were justified); *Phillips v. Caliber Home Loans, Inc.,* No. 19-CV-2711 (WMW/LIB), 2022 WL 832085, at *2 (D. Minn. Mar. 21, 2022) (considering injunctive relief in finding that the results obtained by class counsel supported a one-third fee award).

verify the reasonableness of the fees sought based on sheer percentages.[132] The Eighth Circuit recently stated that while it has not required a lodestar, it has "not held that a crosscheck is always unwarranted" and in fact it may "sometimes [be] warranted to double-check the result of the 'percentage of the fund' method.'"[133] As an example, the Eighth Circuit cites the situation "when a megafund case settles quickly [thereby raising] the potential for a windfall."[134] In this case, the settlement occurred only after years of litigation, including a contested trial. Nor can I think of any other factors here that would require a lodestar cross-check. Indeed, courts have stated that as a general proposition, a cross-check is not required.[135] This Court declined to conduct a lodestar cross-check in *Anywhere, et al*. *See Burnett v. Nat'l Ass'n of Realtors,* No. 4:19-CV-00332-SRB, 2024 WL 2842222, at *17 (W.D. Mo. May 9, 2024) (citing authority within the Eighth Circuit for

---

[132] *See, e.g.*, *In re Xcel Energy, Inc.,* 364 F. Supp. 2d at 999 ("Although not required, the court will exercise its discretion and verify the reasonableness of [an] attorney fee award by cross-checking it against lodestar.") (*citing Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999)); *In re Crocs, Inc. Sec. Litig.*, No. 07-cv-02356-PAB-KLM, 2014 WL 4670886, at *4 n.4 (D. Colo. Sept. 18, 2014) (using lodestar cross-check "only for comparison purposes").

[133] *In re T-Mobile Customer Data Sec. Breach Litig.*, No. 23-2744, 2024 WL 3561874, at *7 (8th Cir. July 29, 2024) (*quoting Petrovic*, 200 F.3d at 1157).

[134] *Id.* (citation omitted).

[135] *See, e.g.*, *In re CenturyLink,* 2020 WL 7133805, at *13 ("When the Court uses the percentage-of-the-benefit method, it is not required to cross-check it against the lodestar method.") (*citing Keil v. Lopez*, 862 F.3d 685, 701 (8th Cir. 2017)); *In re Pork Antitrust Litig.,* No. CV 18-1776 (JRT/JD), 2022 WL 18959155, at *4 (D. Minn. Oct. 19, 2022) (*citing Keil*, 862 F.3d at 701) (noting that a lodestar cross-check is not required); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp. 3d 1217, 1241 (D.N.M. 2016) ("[D]istrict courts need not calculate a lodestar when applying the percentage method.") (*citing Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994)); *Bacchi v. Mass. Mut. Life Ins. Co.*, No. 12-11280-DJC, slip op at 7 (D. Mass. Nov. 8, 2017) (noting that lodestar cross-check is discretionary); *Smith v. Krispy Kreme Doughnut Corp*., No. 1:05CV00187, 2007 WL 119157, at *3 (M.D.N.C. Jan. 10, 2007) (noting that "[i]t is not necessary for the Court to conduct a lodestar analysis"); *Laffitte v. Robert Half Int'l Inc.*, 376 P.3d 672, 688 (Cal. 2016) (noting that courts "retain the discretion to forgo a lodestar cross-check and use other means to evaluate the reasonableness of a requested percentage fee"). This is not a case like *Health Republic Ins. Co. v. United States*, 58 F.4th 1365 (Fed. Cir. 2023), in which the class notice promised class members that a lodestar cross-check would be conducted.

the proposition that "[a] lodestar crosscheck is 'not required'") (citations omitted). I see no basis for a different approach with respect to the pending settlements.

100. Indeed, in my opinion, conducting a lodestar cross-check could be counterproductive. Such a procedure can lead to the very harmful consequences that the percentage method is designed to avoid. As one court has noted, "[t]he lodestar analysis, even when used as a cross check to determine a reasonable percentage award, has the effect of rewarding attorneys for the same undesirable activities that the percentage method was designed to discourage, namely 'incentiviz[ing] [class counsel] to multiply filings and drag along proceedings to increase their lodestar.'"[136]

101. It is not surprising, therefore, that a number of courts in the Eighth Circuit have used the percentage method without reference to a lodestar cross-check.[137] Many other jurisdictions follow a similar approach.[138] Indeed, in awarding attorneys' fees of 30 percent in the $410 million

---

[136] *Jewell*, 167 F. Supp. 3d at 1242 (citation omitted).

[137] *See, e.g.*, *Baldwin v. Nat'l W. Life Ins. Co.*, 2:21-CV-04066-WJE, at *3 (W.D. Mo. June 16, 2022) (calculating and approving attorneys' fees by using the percentage method and without reference to a lodestar or lodestar cross-check); *Massey v. Shelter Life Ins. Co.*, No. 05-4106-CV-NKL, at *2 (W.D. Mo. Oct. 17, 2006) (same).

[138] *See, e.g.*, *Swedish Hosp. v. Shalala*, 1 F.3d 1261, 1266–70 (D.C. Cir. 1993) (lodestar analysis not required); *Fankhouser v. XTO Energy, Inc.,* No. CIV-07-798-L, 2012 WL 4867715, at *3 (W.D. Okla. Oct. 12, 2012) (awarding 36 percent fee without lodestar cross-check); *Hill v. Marathon Oil Co.*, No. 5:08-cv-00037, slip op. at 5–6 (W.D. Okla. Oct. 3, 2012), *available at* https://ecf.okwd.uscourts.gov/doc1/14912670884 (awarding 33⅓ percent fee without lodestar cross-check); *CompSource Okla. v. BNY Mellon, N.A.*, No. CIV 08-469-KEW, 2012 WL 6864701, at *8 (N.D. Okla. Oct. 25, 2012) (awarding 25 percent fee without lodestar cross-check noting that "a majority of circuits recognize that trial courts have the discretion to award fees based solely on a percentage of the fund approach and are not required to conduct a lodestar analysis in common fund class actions."); *Droegemueller v. Petroleum Dev. Corp.,* No. CIV.A.07-CV-2508, 2009 WL 961539, at *4 (D. Colo. Apr. 7, 2009) (awarding 33⅓ percent fee without lodestar cross-check); *Lewis v. Wal-Mart Stores, Inc.,* No. 02-CV-0944 CVE FHM, 2006 WL 3505851, at *2 (N.D. Okla. Dec. 4, 2006) (awarding 33⅓ percent fee without lodestar cross-check); *Millsap v. McDonnell*

*Bank of America Checking Account Overdraft Litigation* settlement without conducting a lodestar cross-check, the court emphasized that "[t]he lodestar approach should not be imposed through the back door via a cross-check."[139] In 2022, in the *Githieya* case, a federal court in Georgia cited my declaration in concluding that a lodestar cross-check was not required.[140]

### F.  In Any Event, a Lodestar Analysis Supports the Fees Requested

102.  In any case, out of an abundance of caution, I have performed a lodestar cross-check. As discussed below, such an analysis, in my opinion, only confirms the reasonableness of the 1/3 fee award sought by class counsel.

103.  The lodestar method involves "multipl[ying] the number of hours worked by the prevailing hourly rate."[141] The court then considers the "less objective" factors of "the contingent nature of success" and the "quality of the attorneys' work."[142] I focus on these issues below.

---

*Douglas Corp.,* No. 94-CV-633-H(M), 2003 WL 21277124, at *9 (N.D. Okla. May 28, 2003) (awarding 25 percent fee without lodestar cross-check).

[139] *In re Bank of Am. Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1362 (S.D. Fla. 2011). Likewise, numerous scholars have argued that courts should not use a lodestar cross-check when applying the percentage method. *See, e.g.*, Declaration of Brian T. Fitzpatrick at 6–7, *In re High-Tech Employees Antitrust Litig.*, No. 11-CV-2509-LHK (N.D. Cal.) (filed May 8, 2015), *available at* http://www.hightechemployeelawsuit.com/media/303927/15-5-8__1079__ fitzpatrick_decl__motion_for_attorney_fees.pdf; Morris Ratner, *Civil Procedure: Class Action Fee and Cost Awards*, THE JUDGE'S BOOK: Vol. 1, Article 9, 30–32 (2017); Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 TUL. L. REV. 1809, 1813– 14 (2000).

[140] *Githieya v. Global Tel Link Corp.*, No. 1:15-cv-00986-AT (N.D. Ga. Aug. 30, 2022) ("The Court finds that a lodestar cross-check is not necessary here for the reasons set forth in the declaration of Professor Robert Klonoff.").

[141] *Vines v. Welspun Pipes Inc.*, 9 F.4th 849, 855 (8th Cir. 2021) (*quoting Childress v. Fox Assocs., LLC*, 932 F.3d 1165, 1172 (8th Cir. 2019); *cf. Skender v. Eden Isle Corp.*, 33 F.4th 515, 521 (8th Cir. 2022) ("the court may exclude hours that were not reasonably expended").

[142] *Anderson v. Travelex Ins. Servs.*, 8:18-CV-362 (D. Neb. Sep. 22, 2021) (*citing Jorstad v. IDS Realty Trust*, 643 F.2d 1305, 1312-13 (8th Cir. 1981); *accord, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 8:10-ml-02151-

65

## 1. Calculation of Hours Devoted to Prosecuting Multiple Defendants

104. As explained above, the settlements all stemmed directly from work performed throughout the litigation in developing evidence and making successful legal arguments. As a result, in my opinion, if a lodestar cross-check is conducted, it is appropriate to calculate the lodestar and lodestar multiplier in a holistic fashion based on the pending settlements and also on the prior *Anywhere, et al.* settlements. As in many antitrust (and other complex) cases, hours accumulated in a difficult multi-defendant case cannot be isolated on a defendant-by-defendant basis. Rather, tasks such as expert development, opposing motions to dismiss, developing arguments for class certification, and even conducting trials in individual cases are tasks that advance the litigation as a whole, against all defendants.

105. Trying to parse the hours that should be allocated to a particular defendant would be entirely guesswork and would involve complicated time-intensive review of all time sheets—a process that would completely undermine the purpose of having a simple cross-check. A cross-check is *not* supposed to be a full lodestar analysis, but rather a simplified approach to provide information that might support or undermine an award based solely on a percentage basis. Courts

---

JVS (FMOx), 2013 WL 12327929, at *34 (C.D. Cal. July 24, 2013) (multiplier awarded based on "all the circumstances of [the] litigation, particularly the risks"); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 680 (N.D. Tex. 2010), *as modified* (June 14, 2010) (noting that a multiplier was "warranted due to the risks entailed in this litigation"); *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1271 (D. Kan. 2006) (finding multiplier resulting from lodestar cross-check "[e]minently reasonable based on the risks associated with counsel taking on this case").

have thus noted that a cross-check "need entail neither mathematical precision nor bean-counting . . . ."[143] Numerous cases, including several within the Eighth Circuit, are in accord.[144]

106. Thus, trying to go through every time entry in an attempt to isolate time to allocate specifically to the *Compass, et al.* settlements currently under consideration would be a futile and enormously time-consuming effort to achieve "mathematical precision." Nor would it be accurate or fair to determine the hours devoted to the *Compass, et al.* settlements by simply relying on hours accumulated by class counsel subsequent to this Court's approval of the *Anywhere, et al.* settlements. Work leading to the *Compass, et al.* settlements has been ongoing since the commencement of this litigation, and in my opinion, it would make no sense to look only at post-*Anywhere, et al.* settlement hours in determining the lodestar applicable to the *Compass, et al.* settlements (or the other pending settlements).

107. This is not the first case to deal with litigation in which multiple defendants have settled over time based on work done by class counsel that has benefited all of the cases. This scenario is especially common in antitrust cases. Every hour accrued identifying and preparing experts, defending the cases against legal challenge, marshaling support for class certification, and

---

[143] *Pierce v. Rosetta Stone, Ltd.*, No. C 11-01283 SBA, 2013 WL 5402120, at *5 (N.D. Cal. Sept. 26, 2013) (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306–307 (3rd Cir. 2005) (footnote omitted)).

[144] *See e.g.*, *PHT Holding II LLC v. N. Am. Co. for Life & Health Ins.*, No. 418CV00368SMRHCA, 2023 WL 8522980, at *7 (S.D. Iowa Nov. 30, 2023) ("When cross-checking a fee request, it is not necessary for a court to use 'mathematical precision' or 'bean counting.'") (citation omitted); *In re NuvaRing Prod. Liab. Litig.*, No. 4:08 MDL 1964 RWS, 2014 WL 7271959, at *4 (E.D. Mo. Dec. 18, 2014) ("The lodestar cross-check need entail neither mathematical precision nor bean counting") (*quoting In re Rite Aid,* 396 F.3d at 306); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.,* 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (same).

67

myriad other tasks necessarily benefit all of the cases, not just the one that happens to be before the Court at a particular moment on the reasonableness of attorneys' fees.

108. As one leading case on this issue has explained, "courts typically base fee awards in subsequent settlements on all work performed in the case," based on the reality—applicable here—that "the total work performed by counsel from inception of the case makes each settlement possible."[145] Under this approach, when calculating fees, "courts typically calculate the lodestar multiplier by dividing (1) all past and requested fee awards by (2) all of counsel's time from inception of the case."[146] Numerous other authorities are in accord.[147] Not surprisingly, as those

---

[145] *In re Capacitors Antitrust Litig.,* No. 3:14-CV-03264-JD, 2018 WL 4790575, at *6 (N.D. Cal. Sept. 21, 2018) (citation omitted).

[146] *Id.*

[147] *See, e.g., Lobatz v. U.S. West Cellular of California,* 222 F.3d 1142, 1149-50 (9th Cir. 2000) (approving the district court's use of "the total hours class counsel spent on the entire litigation" and rejecting an objector's argument that the court should have focused solely on time spent subsequent to an earlier settlement); *Binotti v. Duke Univ.*, No. 1:20-CV-470, 2021 WL 5366877, at *3 (M.D.N.C. Aug. 30, 2021) ("Where a settlement is the result of successive cases or successive settlements within the same case, the proper method of performing a lodestar cross-check is to divide the total lodestar for the entire litigation campaign by the aggregate fees requested, including fees previously awarded."); *In re Automotive Parts Antitrust Litig.*, No. 12-MD-02311, 2020 WL 5653257, at *3 n.5 (E.D. Mich. Sept. 23, 2020) ("In calculating the lodestar for purposes of the cross-check, it would be impractical to compartmentalize and isolate the work that . . . Class Counsel did in any particular case at any particular time because all of their work assisted in achieving all of the settlements and has provided and will continue to provide a significant benefit to all of the . . . classes."); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 3:07-cv-05634-CRB 2019 WL 6327363, at *6 (N.D. Cal. Nov. 26, 2019) ("The Court will consider the lodestar ratio with respect to the cumulative lodestar—for simplicity and consistency, and in recognition of counsel's work as a whole at this stage") (*citing In re Capacitors*, 2018 WL 4790575, at *6); *In re Domestic Drywall Antitrust Litig.*, No. 13-MD-2437, 2018 WL 3439454, at *20 (E.D. Pa. July 17, 2018) (performing cross check with cumulative lodestar where case resulted in successive settlements over multiple years); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-cv-42 (JG) (VVP), 2015 WL 6964973, at *7 (E.D.N.Y. Nov. 10, 2015) (performing cross check using the "total lodestar from inception of the case" and total settlement fund, including prior settlements); *Ferris v. Sprint Commc'ns Co. L.P.*, No. 5:11-CV-00667-H, 2012 WL 12914716, at *3 (E.D.N.C. Dec. 13, 2012) (recognizing that class counsel could not "segregat[e] their fees" for similar settlements and calculating lodestar

authorities (cited in n. 147) reveal, many of the cases articulating this approach are antitrust cases, which frequently involve multiple defendants who settle at different points in the litigation.

109. This holistic approach to calculating fees in the context of successive settlements makes perfect sense as a policy matter. As one court has cogently stated: "[I]f an award of fees for a successive settlement were limited and calculated only on the basis of time and expenses incurred since the preceding settlement, counsel would have little or no incentive to vigorously or efficiently pursue litigation or settlement of claims with non-settling defendants . . . even though the remaining defendants might be equally as culpable or have greater culpability."[148] Moreover, a holistic approach provides a methodology that can be used for all future settlements, thus avoiding the need for the Court and the parties to determine how to calculate the lodestar for each subsequent settlement.

### 2. The Hours Spent by Class Counsel

110. This Court is in the best position to evaluate whether the hours spent by class counsel are reasonable. Class counsel have not asked me to conduct such an inquiry. For purposes of my cross-check, I accept the hours supplied to me by class counsel and assume they are reasonable.

---

crosscheck based on time and expense incurred "in resolution of all the…settlements"); *Payne v. Sprint Commc'ns Co. L.P.*, No. 1:11-CV-3434-CCB, 2012 WL 13006270, at *3 (D. Md. Nov. 30, 2012) (same); *In re Ins. Brokerage Antitrust Litig.,* 282 F.R.D. 92, 124 (D.N.J. 2012) (calculating multiplier for lodestar cross check by dividing the total of four fee awards over time by the litigation's total lodestar).

[148] *In re Southeastern Milk Antitrust Litig.*, No. 2:07-CV 208, 2013 WL2155387, at *7 (E.D. Tenn. May 17, 2013).

69

### 3. The Billing Rates Proposed by Class Counsel

111. I have not been asked by class counsel to conduct a timekeeper-by-timekeeper evaluation of the reasonableness of the billing rates. For purposes of my cross check, I accept the billing rates proposed by class counsel for all timekeepers. I would, however, note three points.

112. First, class counsel demonstrate that the rates they propose are consistent with rates approved by these and similar timekeepers in other matters.[149] The best evidence of the reasonableness of fees is other courts' approval of comparable fees for the same law firms and attorneys.

113. Second, because these are nationwide class actions and involve class counsel and defense firms from around the country, the focus should not be solely on Missouri (or Illinois) rates; rather, where (as here) "local community rates would not be sufficient to attract experienced counsel in a specialized legal field, the appropriate rate may be determined by reference to a national market or a market for a particular legal specialization."[150] Indeed, class attorneys in other high profile class actions have had comparable or higher rates approved.[151]

---

[149] *See*, *e.g.*, Dirks Decl. at ¶¶ 36-40; *see also Burnett* Doc. 1392-5 at ¶ 7.

[150] *S.C. v. Riverview Gardens Sch. Dist.*, No. 18- 4162-CV-C-NKL, at *11 (W.D. Mo. Sep. 3, 2020) (cleaned up); *see also Dinosaur Merch. Bank v. Bancservices Int'l LLC*, No. 1:19 CV 84 ACL, at *8 (E.D. Mo. June 26, 2020) (noting that "in a specialized legal field, the appropriate rate may be determined by reference to a national market or a market for a particular legal specialization") (cleaned up); *Am. Gen. Life Ins. Co. v. Vision*, No. 19-CV-3016-CJW-KEM, at *24 (N.D. Iowa Nov. 19, 2019) (same); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 660 (E.D. La. 2010) ("[T]he attorneys come from states across the country. Thus a more national rate is the appropriate pole star to guide the Court.").

[151] For example, in *Volkswagen Clean Diesel*, class counsel's hourly rates were as high as $1,600 for partners and $790 for associates. *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017); *see also, e.g.*, *In re Remicade Antitrust Litig.*, No. 17-cv-04326, 2023 WL 2530418, at *28 (E.D. Pa. Mar. 15, 2023) (hourly rates up to $1,325 were reasonable when class

114.  Third, the billing rates proposed are quite low in comparison with rates charged by the very law firms that litigated these cases.  It is instructive, in gauging billing rates for class counsel, to look at rates for the firms actually representing the defendants in the litigation.[152] For example, partners at the Quinn Emanuel firm bill as high as $2,030 per hour;[153] associates bill as high as $1,515 per hour;[154] and paralegals bill as high as $550 per hour.[155]

---

counsel had "many years of experience" and were "highly skilled in antitrust and other complex litigations"); *Whiteley v. Zynerba Pharm.*, Civil Action 19-4959, at *27 (E.D. Pa. Sep. 16, 2021) (hourly rates up to $1100 were reasonable and appropriate considering the market, skill level, and experience of the attorneys); *Nitsch v. DreamWorks Animation SKG, Inc.,* No. 14-CV-04062-LHK, 2017 WL 2423161, at *9 (N.D. Cal. June 5, 2017) (approving fee award that included partner billing rates as high as $1,200 per hour).

[152] *See, e.g.*, *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 n.18 (7th Cir. 1982) ("The rates charged by the defendant's attorneys provide a useful guide to rates customarily charged in this type of case." (citation omitted)); *Ruiz v. Estelle*, 553 F. Supp. 567, 589 (S.D. Tex. 1982) ("In an action for which no adequate parallel can be found, the best example of a fee paid for similar work is that paid by opposing counsel in the same action."); *cf. I.W. v. School Dist. of Philadelphia*, No. 14-3141, 2016 WL 147148, at *13 (E.D. Pa. Jan. 13, 2016) ("Evidence of the hours expended by the non-prevailing party on the same task is relevant to the determination of whether the hours requested by the prevailing party are reasonable." (citations omitted)).

[153] *See e.g.*, Summary of First and Final Fee Application of Quinn Emanuel Urquhart & Sullivan, LLP (Doc. No. 1015), Exhibit B, *In re Nordic Aviation Capital Designated Activity Co. et al*, No. 21-33693-KRH (Bankr. E.D. Va. July 13, 2022) (listing partner billing rate of $2,030 per hour); Order Granting First and Final Fee Application of Quinn Emanuel Urquhart & Sullivan, LLP (Doc. No. 1147), *In re Nordic Aviation Capital Designated Activity Co. et al,* No. 21-33693-KRH (Bankr. E.D. Va. Oct. 18, 2022) (approving fee request in full).

[154] *See e.g.*, Summary of Fourth Monthly Fee Statement of Quinn Emanuel Urquhart & Sullivan, LLP (Doc. No. 1247) at 2, *In re Cano Health, Inc.*, No. 1:24-BK-10164 (Bankr. D. Del. July 17, 2024) (listing associate billing rate as $1,515 per hour); Certificate of No Objection Regarding Fourth Monthly Fee Statement Of Quinn Emanuel Urquhart & Sullivan, LLP (Doc. No. 1300), *In re Nordic Aviation Capital Designated Activity Co. et al.*, No. 21-33693-KRH (Bankr. E.D. Va. Aug. 7, 2024) (approving fee request in full).

[155] *See e.g.,* Summary of Fourth Monthly Fee Statement of Quinn Emanuel Urquhart & Sullivan, LLP (Doc. No. 1247) at 2, *In re Cano Health, Inc.*, No. 1:24-BK-10164 (Bankr. D. Del. July 17, 2024) (listing paralegal billing rate of $550 per hour); Certificate of No Objection Regarding Fourth Monthly Fee Statement of Quinn Emanuel Urquhart & Sullivan, LLP (Doc. No. 1300), *In re Nordic Aviation Capital Designated Activity Co. et al.*, No. 21-33693-KRH (Bankr. E.D. Va. Aug. 7, 2024) (approving fee request in full).

### G. The Multiplier Is Well Justified Based on the Facts

115.  Based on the more than 105,000 hours expended thus far, and taking into account the prior *Anywhere, et al.* settlements and all pending settlements, the multiplier would be 3.62.  This calculation is based on the total approved and pending settlements ($987.1 million), a request of one-third of that amount for fees ($329.03 million), and a total lodestar of over $90 million.  In my opinion, a multiplier of 3.62 is very reasonable, especially given the risks, challenges, and protracted nature of these cases.

116.  As a threshold matter, I believe that class counsel are clearly entitled to more than just their hours multiplied by their hourly rates.  When using the lodestar method to calculate fees, courts often apply a multiplier "to compensate for the risk of [the] litigation."[156]  When using the lodestar as a cross-check on a percentage-based fee, the multiplier is simply designed to assess whether there are reasons to question the reasonableness of the resulting fee.  In analyzing the multiplier, the ultimate standard is "reasonableness," and courts often look to those *Johnson* factors that are not already subsumed within the lodestar calculation (excluding, for example, "the time and labor involved," because class counsel's hours and rates are already accounted for by the lodestar).[157]

---

[156] *Been v. O.K. Indus., Inc.*, No. CIV-02-285-RAW, 2011 WL 4478766, at *10 (E.D. Okla. Aug. 16, 2011).

[157] *See, e.g.*, *Keil*, 862 F.3d at 697 ("To determine the reasonableness of a fee award . . ., district courts may consider relevant factors from the twelve factors listed in *Johnson*"); *In re Miniscribe Corp.*, 309 F.3d 1234, 1243 (10th Cir. 2002) (applying "*Johnson* criteria for determining the multiplier . . . to be applied to the lodestar amount"); *Swinton v. Squaretrade, Inc.*, 454 F. Supp. 3d 848, 884 (S.D. Iowa 2020) ("the lodestar amount can be adjusted, up or down, to reflect the individualized characteristics of a given action . . . [and courts] must consider relevant factors from the twelve [*Johnson*] factors") (cleaned up); *Koehler v. Freightquote.com, Inc.*, No. 12-2505-DDC-GLR, 2016 WL 3743098, at *6–9 (D. Kan. July 13, 2016) (approving class

117. In this case, there is no question that class counsel reasonably expected to be awarded more than just their hours multiplied by their hourly rates (assuming that the Court were to apply the lodestar method as the primary method or as a cross-check). As explained in ¶¶ 40–59, class counsel took on litigation that entailed enormous risk and challenges. It would be illogical and unfair to rely solely on standard billing rates, without enhancement, in a situation where there was a serious likelihood that class counsel would recover nothing. Class counsel's designated hourly rates do not reflect that risk.

118. A multiplier of 3.62 is not high here given that this is anything but a routine or average case. This litigation entailed enormous risk, as detailed above (*see* ¶¶ 40–59), and class counsel had to litigate against defendants that were willing to hire the most expensive law firms in the country. A lodestar multiplier "need not fall within any pre-defined range, so long as the court's analysis justifies the award, such as when the multiplier is in line with multipliers used in other cases."[158]

119. Notably, the Eighth Circuit has noted that a multiplier of 5.3 "does not exceed the bounds of reasonableness."[159] Likewise, the Ninth Circuit upheld a multiplier of 6.85 in *Steiner v. American Broadcasting Co., Inc.*, emphasizing that it was "well within the range of multipliers that courts have allowed."[160] Another court has noted that "[c]ourts regularly award lodestar

---

counsel's requested multiplier where "the other *Johnson* factors demonstrate[d] the reasonableness of the fee").

[158] *In re Xcel Energy, Inc., Secs., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 999 (D. Minn. 2005); *accord*, *e.g.*, *T-Mobile,* 2024 WL 3561874, at *5 (recognizing that even a 5.3 multiplier was "'high'" but not per se impermissible) (citation omitted).

[159] *Rawa v. Monsanto Co.*, 934 F.3d 862, 870 (8th Cir. 2019) (citation omitted).

[160] 248 F. App'x 780, 783 (9th Cir. 2007).

multipliers of up to *eight* times the lodestar, and in some cases, even higher multipliers."[161] In *In re Charter Communications Securities Litigation* the court noted, in awarding a multiplier of 5.61, that the multiplier was "fully justified here given the effort required, the hurdles faced and overcome, and the results achieved."[162] In approving a multiplier of 6 in *Cardinal Health*, the district court noted that "the risk of non-recovery [was] the most important factor in the fee determination."[163] Similarly, in *Rite Aid*, the court noted, in approving a 6.96 multiplier, that (like the historic life insurance settlement here) the case involved the largest recovery against an auditor in a Rule 10b-5 securities action.[164] These points apply fully here.

## H. The Multiplier Is Well Justified in Comparison with Other Mega-Fund Cases

120. Multipliers at levels well in excess of the 3.62 multiplier here have been approved in numerous mega-fund cases. Such cases include, among many others, the following (all of which involve multipliers of over 5):

---

[161] *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) (emphasis added); *see also, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6, App. (9th Cir. 2002) (collecting cases applying multipliers ranging as high as 19.6); *In re Credit Default Swaps Antitrust Litig.*, No. 1:13-md-02476, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (multiplier of 6.2); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (multiplier of 6); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589–90 (E.D. Pa. 2005) (multiplier of 6.96); *Stop & Shop Supermarket Co. v. Smith-Kline Beecham Corp.*, No. Civ. A. 03-4578, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (multiplier of 15.6); *In re Buspirone Antitrust Litig.*, No. 1:01-md-01413-JGK, slip op. at 8 (S.D.N.Y. Apr. 18, 2003) (Doc. No. 171) (multiplier of 8.46); *Newman v. Carabiner International, Inc.*, No. 1:99-cv-02271, slip op. at 11 (S.D.N.Y. Oct. 25, 2001) (Doc. No. 31) (multiplier of 7.7); *In re 3COM Corp. Sec. Litig.*, No. C-97-21083, slip op. at 12 (N.D. Cal. Mar. 9, 2001) (multiplier of 6.67); *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327, 335 (Bankr. D. Md. 2000) (multiplier of 19.6); *Perera v. Chiron Corp.*, No. 95-20725-SW (N.D. Cal. 1999) (multiplier of 9.14), *cited in* Elizabeth J. Cabraser, CALIFORNIA CLASS ACTIONS AND COORDINATED PROCEEDINGS § 15.05 (2d ed. 2017).
[162] No. 4:02-cv-01186-CAS, 2005 WL 4045741, at *18 (E.D. Mo. June 30, 2005).
[163] 528 F. Supp. 2d at 766.
[164] 362 F. Supp. 2d at 589–90.

**TABLE 2: Multipliers Over 5.0 in Mega-Fund Class Actions**

| Case | Recovery | Multiplier | Trial? |
|------|----------|------------|--------|
| *Stop & Shop Supermarket Co. v. Smith-Kline Beecham Corp.*, No. 03-cv-04578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) | $100 million | 15.6 | No |
| *Lobo Exploration Co. v. BP Am. Prod.*, No. CJ-1997-72 (Oka. Dist. Ct., Beaver Cnty. Dec. 8, 2005) | $150 million | 8.7 | No |
| *In re Buspirone Antitrust Litig.*, No. 1:01-md-01413-JGK (S.D.N.Y. Apr. 18, 2003) (Dkt. No. 171) | $220 million | 8.46 | No |
| *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. CIV.A. 05-11148PBS, 2009 WL 2408560 (D. Mass. Aug. 3, 2009) | $350 million | 8.3 | No |
| *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587 (E.D. Pa. 2005) | $126.6 million | 6.96 | No |
| *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003), *aff'd*, 404 F.3d 173 (3d Cir. 2005) | $3.18 billion | 6.87 | No |
| *In re 3COM Corp. Sec. Litig.*, No. C-97-21083 (N.D. Cal. Mar. 9, 2001) | $259 million | 6.67 | No |
| *In re Credit Default Swaps Antitrust Litig.*, No. 1:13-md-02476, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) | $1.86 billion | 6.2 | No |
| *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007) | $600 million | 6 | No |
| *Rogowski v. State Farm Life Ins. Co.*, No. 4:22-CV-00203-RK, 2023 WL 5125113, (W.D. Mo. Apr. 18, 2023). | $325 million | 5.75 | No[165] |

---

[165] A trial was conducted in related litigation, but that case was not part of the settlement.

75

| Case | Recovery | Multiplier | Trial? |
|------|----------|------------|--------|
| *In re Charter Commc'ns, Inc. Sec. Litig.*, No. 4:02-cv-01186-CAS, 2005 WL 4045741 (E.D. Mo. June 30, 2005) | $146.2 million | 5.6 | No |
| *Roberts v. Texaco*, 979 F. Supp. 185 (S.D.N.Y. 1997) | $115 million | 5.5 | No |
| *Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-05923 WHA (N.D. Cal. May 21, 2015) | $203 million | 5.5 | Yes |
| *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) | $7.22 billion | 5.21 | No |

121. Here, a multiplier of 3.62 for class counsel for all of the approved and pending settlements is well justified. Class counsel took on a challenging and risky case with extremely complex legal and factual issues; prosecuted it skillfully over the course of several years in multiple jurisdictions without assistance from any government litigation; obtained class certification despite defendants' vigorous opposition; successfully conducted a classwide trial; and obtained historic monetary and injunctive settlements for the class.

## I. The Requested 1/3 Fee Award is Necessarily Reasonable if the *Compass et al.* Settlements are Viewed in Isolation

122. Finally, I have offered my opinion in a holistic fashion, in which I support a 1/3 award when all of the approved and pending settlements are considered. It thus follows *a fortiori* that a 1/3 fee award is warranted if the Court considers just the *Compass, et al.* settlements in isolation (and does not the *NAR* and *HomeServices* settlements). All of my analysis above is fully

76

applicable: the requested award is justified by the *Johnson* factors and is supported by a lodestar cross-check using a holistic approach—but considering only the *Compass, et al.* settlements and the *Anywhere, et al.* settlements. Under that scenario, the settlements would be $110.6 million in *Compass, et al.* and $208.5 million in *Anywhere, et al.* A 1/3 award of that combined amount would be $106.37 million. Using the current lodestar of $90,853,364, the multiplier would be a modest 1.17.

## VII. CONCLUSION

123. In my opinion, the attorneys' fees sought by class counsel are reasonable and should be approved. My conclusion applies not only for the fees sought in the *Compass, et al.* settlements but also in the other settlements pending as of the date of this Declaration (the *NAR* and *HomeServices* settlements).

\* \* \*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on information known to me.

Robert H. Klonoff

August 20, 2024

# Appendix A

## CURRICULUM VITAE

**ROBERT H. KLONOFF**
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, Oregon 97219
Tel: 503-768-6935 (Office)
E-Mail: klonoff@lclark.edu

Date of Birth: March 15, 1955
Place of Birth: Portland, Oregon

## EDUCATION:

J.D., Yale University, 1979

A.B., University of California, Berkeley, 1976, Majored in Political Science/Economics (Highest Honors)

## WORK EXPERIENCE:

### Current Positions:

Jordan D. Schnitzer Professor of Law, Lewis & Clark Law School (since 2014)

Panelist, FedArb (alternative dispute resolution)

### Prior Positions:

Dean of the Law School, Lewis & Clark Law School (2007-2014)

Douglas Stripp/Missouri Endowed Professor of Law, University of Missouri-Kansas City School of Law (2003-2007)

Jones Day, Washington, D.C. (Partner, 1991-July 2003; Of Counsel, 1989-1991, 2003- 2007)

Adjunct Professor of Law, Georgetown University Law Center (class action law and practice) (1999-2003)

Visiting Professor of Law, University of San Diego School of Law (1988-1989)

Assistant to the Solicitor General of the United States (1986-1988)

Assistant United States Attorney (Criminal Division, District of Columbia) (1983-1986)

Associate, Arnold & Porter, Washington, D.C. (1980-1983)

Law Clerk to the Honorable John R. Brown, Chief Judge, United States Court of Appeals for the Fifth Circuit (1979-1980)

Summer Associate, Baker & Botts, Houston, and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (1978)

Summer Associate, Sidley & Austin, Washington, D.C. (1977)

**SPECIAL HONORS AND ACHIEVEMENTS:**

Member, Council of the American Law Institute

Recipient, Lewis & Clark Law School's 2020 Leo Levenson Award for Excellence in Teaching (the law school's most prestigious award)

Recipient, 2018 Albert Nelson Marquis Lifetime Achievement Award in the field of law from *Who's Who in America*

Member, 2011-2017, United States Judicial Conference Advisory Committee on Civil Rules (appointed by Chief Justice John G. Roberts, Jr., in 2011 as the sole voting member from the law school academy; reappointed May 2014 for a second three-year term)

Elected Member, International Association of Procedural Law

Fulbright Specialist Scholar at the University of Hong Kong Faculty of Law (2016)

Recipient, Oregon Consular Corps Award for Individual Achievement in International Outreach, Portland, Oregon (May 2013)

Associate Reporter, American Law Institute's *Principles of the Law of Aggregate Litigation* (class action project; drafts presented at several annual meetings; final version approved by full ALI in May 2009 annual meeting and published in May 2010)

Fellow, American Academy of Appellate Lawyers

Sustaining Life Fellow, American Bar Foundation

Academic Fellow, Pound Institute

Recipient, 2007 Award for Outstanding UMKC Law Professor (based on vote of 3d year class)

2007 UMKC Law School Commencement Speaker (based on vote of 3d year class)

Recipient, 2006 UMKC Law School Elmer Pierson Teaching Award for Most Outstanding Teacher in the Law School (selected by the Dean)

Recipient, 2005 President's Award for Outstanding Service from the UMKC Law School Foundation

Reporter, 2005 National Conference on Appellate Justice (co-sponsored by the Federal Judicial Center, National Center for State Courts, and other organizations)

Co-Recipient, District of Columbia Bar's Frederick B. Abramson Award for Superior Service to the Community (June 1998)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant to the Solicitor General of the United States (1986, 1987)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant United States Attorney (1984, 1985)

The Benjamin N. Cardozo Prize for Best Moot Court Brief for Academic Year 1978-1979, Yale Law School

Semi-Finalist, Moot Court Oral Argument, Yale Law School (Fall, 1978)

Phi Beta Kappa

U.C. Berkeley's Most Outstanding Political Science Student (1976)

The Edward Kraft Award for Outstanding Work as a Freshman Student, U.C. Berkeley (1974)

## **MEMBERSHIPS:**

U.S. Supreme Court Bar

Various Federal Circuit and District Courts

District of Columbia Bar

Missouri State Bar

Oregon State Bar

Multnomah County Bar

American Law Institute

American Bar Association

American Bar Association Committee on Class Actions & Derivative Suits (Section of Litigation)

## PUBLICATIONS:

### Books:

Wright & Miller, *Federal Practice and Procedure* (co-author with sole ongoing responsibility for the three volumes devoted to class actions)

Klonoff, "Objections to Class Action Settlements: Ethical Considerations," chapter in *Class Actions and Other Complex Litigation: Ethics* (Lexis Nexis forthcoming 2025)

Castanias & Klonoff, *Federal Appellate Practice in a Nutshell* (West 3d ed. 2023)

Klonoff, *Introduction to the Study of U.S. Law: Cases and Materials* (West 2d ed. 2021) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 6th ed. 2021)

Klonoff, *Federal Multidistrict Litigation in a Nutshell* (West 2020)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017)

Castanias & Klonoff, *Federal Appellate Practice in a Nutshell* (West 2d ed. 2017)

Klonoff, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017) (with teacher's manual)

Klonoff, *Introduction to the Study of U.S. Law: Cases and Materials* (West 2016) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 4th ed.) (2012)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed.) (2012) (with teacher's manual)

Klonoff (associate reporter), *Principles of the Law of Aggregate Litigation*, American Law Institute Publications (2010) (along with Samuel Issacharoff, reporter, and associate reporters Richard Nagareda and Charles Silver)

Castanias & Klonoff, *Federal Appellate Practice and Procedure in a Nutshell* (Thomson West) (2008)

Klonoff & Colby, *Winning Jury Trials: Trial Tactics and Sponsorship Strategies* (NITA 3d ed.) (2007)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 3d ed.) (2007)

Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (Thomson West 2d ed.) (2006) (with teacher's manual)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 2d ed.) (2004)

Klonoff & Colby, *Winning Jury Trials: Trial Tactics and Sponsorship Strategies* (Lexis Nexis 2d ed.) (2002)

Klonoff & Bilich, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West Group 2000)

Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West Group 1999)

Klonoff & Colby, *Sponsorship Strategy: Evidentiary Tactics for Winning Jury Trials* (Michie Co. 1990)

## Articles and Book Chapters:

Klonoff, *Federal Rule of Civil Procedure 23(f): Reflections After a Quarter Century,* 75 Syracuse L. Rev. __ (forthcoming 2025)

Klonoff, *COVID-19 Aggregate Litigation: The Search for the Upstream Wrongdoer,* 91 Fordham L. Rev. 385 (2022)

Klonoff, *3M's Bankruptcy Maneuver Raises Issues for Justice System* (Law 360, Aug. 11, 2022)

*Francis McGovern: The Consummate Facilitator, Teacher, and Scholar*, 84 Law & Contemporary Problems 1 (2021) (co-author)

Klonoff, *International Handbook on Class Actions,* chapter on the Future of U.S. Aggregate Litigation, Cambridge University Press (2021)

Klonoff, *The Judicial Panel on Multidistrict Litigation: The Virtues of Unfettered Discretion*, 89 UMKC L. Rev. 1003 (2021)

Klonoff, *Class Action Objectors: The Good, the Bad, and the Ugly*, 89 Fordham L. Rev. 475 (2020)

Klonoff, *Foreword—Class Actions, Mass Torts, and MDLs:The Next 50 Years*, 24 Lewis & Clark Law Review 359 (2020)

*Application of the New Discovery Rules in Class Actions: Much Ado About Nothing,* 71 Vanderbilt L. Rev. 1949 (2018)

*Class Actions in the U.S. and Israel: A Comparative Approach*, 19 Theoretical Inquiries in the Law 151 (2018) (co-author)

*Class Actions Part II: A Respite from the Decline*, 92 N.Y.U. L. Rev. 971 (2017)

*The Remedy For Election Fraud Is A New Election,* Law 360 (July 20, 2017) (www.law360.com/whitecollar/articles/946569/the-remedy-for-election-fraud-is-a-new-election)

*Class Actions in the Year 2025: A Prognosis*, 65 Emory L.J. 1569 (2016)

*Why Most Nations Do Not Have U.S.-Style Class Actions*, 16 BNA Class Action Litigation Report, Vol. 16, No. 10, at 586 (May 22, 2015) (selected for presentation at the May 2015 World Congress of the International Association of Procedural Law, Istanbul, Turkey)

*Federal Rules Symposium: A Tribute to Judge Mark R. Kravitz -- Introduction to the Symposium*, 18 Lewis & Clark L. Rev. 583 (2014) (co-author)

*Class Actions for Monetary Relief Under Rule 23(b)(1)(A) and (b)(1)(B): Does Due Process Require Notice and Opt-Out Rights?*, 82 Geo. Wash. L. Rev. 798 (2014)

*The Decline of Class Actions,* 90 Wash. U. (St. Louis) L. Rev. 729 (2013)

*Reflections on the Future of Class Actions,* 44 Loy. U. Chi. L.J. 533 (2013)

*Richard Nagareda: In Memorium,* 80 U. Cin. L. Rev. 289 (2012)

*Introduction and Memories of a Law Clerk,* 47 Houston L. Rev. 529, 573 (2010)

*ALI's Aggregate Litigation Project Has Global Impact,* 33 ALI Reporter 7 (Fall 2010)

Book Review, *In the Public Interest,* 39 Env. Law 1225 (2009)

*The Public Value of Settlement,* 78 Fordham L. Rev. 1177 (2009)(co-author)

*Making Class Actions Work: The Untapped Potential of the Internet,* 69 U. Pitt. L. Rev. 727 (co-author)(2008), adapted and published in 13 J. Internet Law 1 (2009)

*The Class Action Fairness Act: An Ill-Conceived Approach to Class Settlements*, 80 Tul. L. Rev. 1695 (co-author) (2006)

*The Twentieth Anniversary of* Phillips Petroleum v. Shutts, *Introduction to the Symposium*, 74 UMKC L. Rev. 433 (2006)

6

*The Adoption of a Class Action Rule: Some Issues for Mississippi to Consider*, 24 Miss. C. L. Rev. 261 (2005)

*Antitrust Class Actions: Chaos in the Courts*, 11 Stan. J. L. Bus. & Fin. 1 (2005), reprinted in Litigation Conspiracy: An Analysis of Competition Class Actions (Stephen G.A. Pitel ed. Irwin Law 2006), and 3 Canadian Class Action Review 137 (2006)

*The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement*, 2004 Mich. St. L. Rev. 671 (2004)

*Class Action Rules — Are They Driven by Substance?*, 1 Class Action Litigation Report 504 (Nov. 10, 2000) (co-author)

*Response to May 2000 Article on Sponsorship Strategy*, 63 Tex. B.J. 754 (Sept. 2000) (co-author)

*A Look at Interlocutory Appeals of Class Certification Decisions Under Rule 23(f)*, 1 Class Action Litigation Report 69 (May 12, 2000) (co-author)

*The Mass Tort Class Action Gamble*, 7 Metro. Corp. Counsel 1, 8 (Aug. 8, 1999) (co-author)

"Legal Approaches to Sex Discrimination" (co-author), in H. Landrine & E. Klonoff, *Discrimination Against Women: Prevalence, Consequences, Remedies* (Sage Pub. 1997)

*Sponsorship Strategy: A Reply to Floyd Abrams and Professor Saks*, 52 Md. L. Rev. 458 (1993) (co-author)

*A Trial Lawyer's Roadmap for Handling Bad Facts: The Role of Credibility*, 16 Trial Diplomacy Journal 139 (July/Aug. 1993) (co-author)

*Opening Statement*, 17 Litigation 1 (ABA Spring 1991) (co-author)

Contributing Editor, *Criminal Practice Institute Trial Manual*, Young Lawyers Section, Bar Ass'n of D.C. (1986)

*The Congressman as Mediator Between Citizens and Government Agencies: Problems and Prospects*, 15 Harv. J. Legis. 701 (1979)

*A Dialogue on the Unauthorized Practice of Law*, 25 Villanova L. Rev. 6 (1979) (co-author)

*The Problems of Nursing Homes: Connecticut's Non Response*, 31 Admin. L. Rev. 1 (1979)

7

**SIGNIFICANT LEGAL EXPERIENCE:**

Argued eight cases before the U.S. Supreme Court

Authored dozens of U.S. Supreme Court filings (certiorari petitions, certiorari oppositions, merits briefs, reply briefs)

Briefed and argued numerous cases before various U.S. circuit and district courts and state trial and appellate courts

Tried dozens of cases (primarily jury trials)

Handled more than 100 class action cases as co-counsel, including *TransUnion v. Ramirez* (U.S. Supreme Court) and *In re National Prescription Opiate Litigation* (Sixth Circuit)

Served as an expert witness in numerous class action and other aggregate cases, including *NFL Concusssion, BP Deepwater Horizon, Wells Fargo Fraudulent Accounts, Volkswagen Clean Diesel, Parkland Shooting (Civil Litigation), Equifax Data Breach, JUUL Consumer Litigation,* and numerous others (*see* Appendix B, *infra*, for a sample list of courts citing my testimony)

Worked extensively with testifying and consulting experts on class action issues, including economists, securities experts, medical and scientific experts, and leading academics

Presented more than 100 cases to the grand jury while serving as an Assistant U.S. Attorney

Handled hundreds of sentencing hearings, preliminary hearings, and probation revocation hearings

**SIGNIFICANT TEACHING AND SPEAKING ENGAGEMENTS**

Speaker, Texas Tech School of Law MDL Judicial Summit, Aspen, Colorado (June 3, 2024)

Speaker, Private Law Course, Comparative (U.S./French) Aggregate Litigation, The Sorbonne Faculty of Law, Paris, France (November 6, 2023)

Speaker, Faculty Symposium, Comparative (U.S./South African) Aggregate Litigation, Stellenbosch University Faculty of Law, Stellenbosch, South Africa (October 26, 2023)

Bartlett Lecture Series, U.S. District Court, W.D. Mo., Kansas City, Mo. (June 30, 2023)

Speaker, Baylor MDL Judicial Summit, Aspen, Colorado (June 19, 2023)

Speaker, Navy JAG Corps Training on Litigation Strategy, Coronado, CA (May. 27, 2023)

Moderator, Panel on Federal Multidistrict Litigation, Duke University School of Law, Durham, North Carolina (May 25, 2023)

Speaker on Henrietta Lacks Case for Symposium, Southern University, Baton Rouge, LA (March 14, 2023)

Speaker on Multidistrict Litigation and Moderator on Case Management  Breakout Session, Mass Tort MDL Certificate Program, Bolch Judicial Institute, Duke University School of Law (Nov. 7, 2022) (held remotely)

Speaker on Class Actions and Moderator of Class Actions Breakout Session, 2022 Transferee Judges' Conference (approximately 125 federal judges), the Breakers, Palm Beach, Fla. (Nov. 1, 2022)

Speaker, Class and Aggregate Litigation in Europe and North America, New York University School of Law's Campus in Florence, Italy (July 8, 2022)

Speaker and Co-Organizer, McGovern Symposium on Civil Litigation, Duke University School of Law, Durham, North Carolina (May 27, 2022)

Moderator of Panel, Advanced MDL Certificate Program, Duke University School of Law, Durham, North Carolina (May 26, 2022)

Speaker, The Jewish Influences, Life & Legacy of Justice Ruth Bader Ginsburg, Cardozo Society of Washington State and Philadelphia Brandeis Society (April 5, 2022) (held remotely)

Panelist, Mass Torts/Bankruptcy Conference, Fordham University School of Law, New York, New York (Feb. 25, 2022)

Speaker on the Legacy of Justice Ruth Bader Ginsburg (held remotely), Temple Beth Sholom Synagogue, Salem Oregon (June 27, 2021)

Panel Moderator, Mass-Tort MDL Bench-Bar Conference (held remotely), George Washington University Law School, Washington, D.C. (June 10, 2021)

Speaker on Class Actions (held remotely), Oregon Association of Defense Counsel, Portland Oregon (May 20, 2021)

Speaker on Class Actions and Multidistrict Litigation (held remotely), South Ural State University Institute of Law, Chelyabinsk, Russia (April 8, 2021)

Speaker on Class Actions and Multidistrict Litigation (held remotely), Northwestern Pritzker School of Law, Complex Litigation Seminar, Chicago, Illinois (March 31, 2021, and again on March 30, 2022)

Speaker on Multidistrict Litigation, Class Actions, and the *Volkswagen Clean Diesel* Case (held remotely), Bahcesehir University, Istanbul, Turkey (July 15, 2020)

Speaker, Multidistrict Litigation Conference (held remotely), Emory University School of Law, Atlanta, Georgia (June 19, 2020)

Speaker, Class Action Conference, Fordham Law Review and the Institute for Law & Economic Policy, New York, New York (Feb. 27-28, 2020)

Keynote Speaker, Harold Schnitzer Spirit of Unity Peace Leadership Award Ceremony, Salem, Oregon (Nov. 20, 2019).

Conference Chair and Participant, 2019 Symposium on Class Actions and Aggregate Litigation, Pound Civil Justice Institute and Lewis & Clark Law School, Portland, Oregon (Nov. 1-2, 2019).

Speaker, International Class Actions Conference, Vanderbilt Law School, Nashville, Tennessee (Aug. 23, 2019)

Keynote Speaker, Pound Civil Justice Institute, Aggregate Litigation in State Court: Conference of State Court Appellate Judges, San Diego, California (July 27, 2019)

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July, 2019) (faculty member for summer program on Transnational Torts)

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (May, 2019) (taught Introduction to U.S. Law)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (April 2019)

Speaker, Impact Fund Class Action Conference, San Francisco, California (Feb. 22, 2019)

Speaker on Class Actions, 17th Annual Impact Fund Class Action Conference, San Francisco, California (Feb. 23, 2019)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (December 2018) (taught course on U.S. Class Actions)

Speaker on the National Football League Concussion case, National Taiwan University, Taipei, Taiwan (December 20, 2018)

Speaker on Class Actions, Live Webinar Broadcast, Rule 23 Will Be Amended in Four Days: Are You Ready, American Bar Association (Nov. 27, 2018)

Speaker, American Bar Association's 22d Annual Institute on Class Actions, Chicago, Illinois (Oct. 18, 2018)

Speaker, MDL at 50 –The 50th Anniversary of Multidistrict Litigation, New York University School of Law, New York, New York (Oct. 12, 2018)

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July 2018) (faculty member for environmental law program; lectured on environmental class actions)

Speaker on Class Actions, Freie University Faculty of Law, Berlin, Germany (June 26, 2018)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (April 2018) (taught course on Introduction to United States Law)

Co-Chair, Moderator, and Panelist, Posner on Class Actions, Columbia Law School, New York, New York (March 2, 2018)

Panelist on Civil Discovery, Vanderbilt University School of Law, Nashville, Tennessee (October 13, 2017)

Panelist on the Civil Rules Committee Process, University of Arizona College of Law, Tucson, Arizona (October 7, 2017)

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July 2017) (faculty member for environmental law program; lectured on environmental class actions)

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (May 2017) (taught course on Introduction to U.S. Law)

Panelist on Class Actions, Beard Group, Class Action Money and Ethics Conference, New York, New York (May 1, 2017)

Visiting Professor of Law, Tel Aviv University, Tel Aviv, Israel (January 2017) (taught course on class actions)

Panelist on Class Actions, Tel Aviv University, Fifty Years of Class Actions – A Global Perspective (January 4, 2017)

Panelist on Class Actions, New York University Law School Conference on Rule 23@50, New York, New York (December 2, 2016)

Panelist on Class Actions, Appellate Judges Education Institute, Philadelphia, Pennsylvania (November 11, 2016)

Speaker on Class Actions, National Legal Aid Defender Association National Farmworker Conference, Indianapolis, Indiana (November 10, 2016)

Panelist on Class Actions, American Bar Association Class Action Institute, Las Vegas, Nevada (October 20, 2016)

Panelist, Duke University Law School Conference on Class Action Settlements, San Diego, California (October 6, 2016)

Fulbright Scholar, Hong Kong University School of Law (August- September 2016) (taught course on class actions and delivered campus-wide lecture on criminal procedure)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (June 2016) (taught course on Introduction to United States Law)

Speaker on Class Actions, University of Zagreb Law School, Zagreb, Croatia (May 11, 2016)

Panelist on Civil Litigation, Association of American Law Schools Annual Meeting, New York, New York (January 8, 2016)

Visiting Professor of Law, Bahçeşehir University School of Law, Istanbul, Turkey (December 2015) (taught Introduction to United States Law)

Participant, Conference on Civil Justice (Pound Institute) Emory University Law School, Atlanta, Georgia (October 15, 2015)

Participant, Conference on Class Actions, Duke Law School, Arlington, Virginia (July 23-24, 2015)

Participant, Conference on Class Actions, Defense Research Institute, Washington, D.C. (July 23-24, 2015)

Participant, Civil Procedure Workshop, Seattle University Law School, Seattle, Washington (July 17, 2015)

Panelist on Class Actions, Annual Meeting, American Association for Justice, Montreal, Canada (July 12, 2015)

Speaker on Class Actions, International Association of Procedural Law, Istanbul, Turkey (May 28, 2015)

Panelist, Subcommittee on Class Actions of U.S. Judicial Conference Advisory Committee on Civil Rules, American Law Institute Annual Meeting, Washington, D.C. (May 17, 2015)

Moderator, Ethical Issues in Class Actions and Non-Class Aggregate Litigation, American Law Institute Annual Meeting, Washington, D.C., (May 17, 2015)

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (March 2015) (taught U.S. Class Actions)

Speaker on Class Actions, European University Institute, Fiesole, Italy (February 23, 2015)

Visiting Professor of Law, University of Notre Dame, Fremantle Australia (January 2015) (taught course on U.S. Civil Rights and Civil Liberties)

Visiting Professor of Law, Universidad Sergio Arboleda, Bogota and Santa Marta, Colombia (December 2014) (taught course on Introduction to United States Law)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (November 2014) (taught course on Introduction to United States Law)

Panelist, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 23, 2014)

Visiting Professor of Law, East China University of Political Science and Law, Shanghai, China (October 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Herzen State Pedagogical University of Russia, St. Petersburg, Russia (September 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (July 2014) (taught Introduction to United States Law)

Speaker on U.S. Legal Education, Universidad Sergio Arboleda School of Law, Bogota, Colombia (June 3 and 5, 2014)

Speaker on Class Actions, Superintendencia de Industria y Comercio, Bogota, Colombia (June 3, 2014)

Speaker on Class Actions and the Fukushima Nuclear Accident, Waseda University School of Law, Tokyo, Japan (January 24, 2014)

Speaker on Class Actions, Osaka Bar Association, Osaka, Japan (January 23, 2014)

Speaker on Class Actions, East China University of Political Science and Law, Shanghai, China (January 15, 2014)

Speaker on Class Actions, AmCham Shanghai, Shanghai, China (January 14, 2014)

Speaker on Development of Animal Law in the Legal Academy, 2013 Animal Law Conference, Stanford Law School, Palo Alto, California (November 25, 2013)

Speaker on U.S. Law and Legal Education, Royal University of Law and Economics, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Law and Legal Education, Paññāsāstra University of Cambodia, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Legal Education, International Association of Law Schools International Deans' Forum, National University of Singapore Law School, Singapore (September 26, 2013)

Speaker on Class Actions, Japan Federation of Bar Associations, Tokyo, Japan (September 19, 2013)

Speaker on Class Actions, Waseda University School of Law, Tokyo, Japan (September 19, 2013)

Speaker on Ethics of Aggregate Settlements, American Association for Justice Annual Meeting, San Francisco, California (July 22, 2013)

Speaker on the British Petroleum Class Action Settlement, International Water Law Conference, National Law University of Delhi, Delhi, India (May 31, 2013)

Speaker on U.S. Supreme Court Confirmation Process, Jewish Federation of Greater Portland's Food for Thought Festival, Portland, Oregon (April 21, 2013)

Speaker on Class Actions, Class Action Symposium, George Washington University Law School, Washington, D.C. (March 8, 2013)

Speaker on Class Actions, Impact Fund Class Action Conference, Oakland, California (March 1, 2013)

Speaker on Class Actions, Hong Kong University Department of Law (November 15, 2012)

Speaker on Class Actions, Fudan University Law School (Shanghai, China) (November 13, 2012)

Keynote Speaker, National Consumer Law Center Symposium, Seattle, Washington (October 28, 2012)

Speaker, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 25, 2012)

Speaker, Conference on Class Actions, Washington University St. Louis School of Law and the Institute for Law and Economic Policy (April 27, 2012)

Speaker, Conference on Class Actions, Loyola Chicago School of Law (April 13, 2012)

Panelist on leadership and world peace with Former South African President F.W. De Klerk, University of Portland (February 29, 2012)

Panelist on class actions before the Standing Committee on Rules of Practice and Procedure, Phoenix, Arizona (January 5, 2012)

Speaker on Class Actions Lawsuits in the U.S., University of the Philippines, College of Law, Quezon City, Philippines (August 2011)

Speaker on Environmental Class Actions, Kangwon University Law School, Chuncheon, South Korea (August 2011)

Speaker on Class Actions, Federal Judicial Center Conference on Class Actions, Duke University School of Law (May 20, 2011)

Speaker, Conference on Aggregate Litigation, University of Cincinnati College of Law (April 1, 2011)

Speaker on Class Actions, Seoul National University School of Law (May 18, 2010)

Keynote Speaker (addressing US Supreme Court confirmation process), Alaska Bar Annual Meeting (April 28, 2010)

Speaker, Conference on the Future of Animal Law, Harvard Law School (April 11, 2010)

Speaker, Conference on Aggregate Litigation: Critical Perspectives, George Washington University Law School (Mar. 12, 2010)

Speaker, U.S. Supreme Court Confirmation Process, Multnomah County Bar Association and City Club of Portland, (Sept. 30, 2009)

Speaker on Class Actions, American Legal Institutions, and American Legal Education at National Law Schools of India in Bangalore, Hyderabad, Calcutta, Jodhpur, and Delhi (August 2009)

Speaker, China/U.S. Conference on Tort and Class Action Law, Renmin University of China School of Law, Beijing, China (July 11-12, 2009)

Speaker on Class Actions, Southeastern Association of Law Schools annual meeting, Palm Beach, Florida (August 1, 2008)

Speaker on Class Actions, National Foundation for Judicial Excellence (meeting of 150 state appellate court judges), Chicago, Illinois (July 12, 2008)

Speaker on Class Actions, Practising Law Institute, New York, NY (July 10, 2008)

Speaker at Conference on Class Actions in Europe and North America, sponsored by New York University School of Law, the American Law Institute, and the European University Institute, Florence, Italy (June 13, 2008)

Speaker on Class Actions at the American Bar Association Tort and Insurance Section Meeting, Washington, D.C. (Oct. 26, 2007)

Speaker on Antitrust Class Actions at the American Bar Association's Annual Antitrust Meeting, Washington D.C. (April 18, 2007)

Chair, Organizer, and Moderator of Class Action Symposium at UMKC School of Law (April 7, 2006) (other speakers (26 in all) included, *e.g.*, Professors Arthur Miller,

Edward Cooper, Sam Issacharoff, Geoffrey Miller, and Linda Mullenix, as well as several prominent federal judges and practicing lawyers)

Speaker on Class Actions, Missouri CLE (Nov. 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 29, 2005)

Speaker on Class Actions, Kansas CLE (June 23, 2005)

Speaker on Class Actions at Bureau of National Affairs Seminar on the Class Action Fairness Act of 2005 (June 17, 2005)

Visiting Lecturer on Class Actions, Peking University (May 30-June 3, 2005)

Speaker on Oral Argument, American Bar Association 2005 Section of Litigation Annual Conference (April 22, 2005) (part of panel including Second Circuit Chief Judge Walker and several others)

Speaker on Class Actions, Federal Trade Commission/Organization for Economic Co-operation and Development, Workshop on Consumer Dispute Resolution and Redress in the Global Marketplace (April 19, 2005)

Speaker at Antitrust Class Action Symposium, University of Western Ontario College of Law (April 1, 2005)

Speaker at Class Action Symposium, Mississippi College of Law (February 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 30, 2004)

Visiting Lecturer on Class Actions, Peking University (June 2004)

Visiting Lecturer on Class Actions, Tsinghua University (June 2004)

Speaker at Class Action Symposium, Michigan State University (April 16-17, 2004)

Speaker on U.S. Supreme Court advocacy, David Prager Advanced Appellate Institute (Kansas City Metropolitan Bar Association) (Feb. 27, 2004)

Speaker on Class Actions, Institute of Continuing Legal Education in Georgia (Oct. 24, 2003)

Speaker on Class Actions, Practising Law Institute (July 31, 2003)

Speaker on Class Actions, Practising Law Institute (Aug. 5, 2002)

Speaker on Class Actions, Practising Law Institute (Aug. 16, 2001)

Speaker on many occasions throughout the country on "Sponsorship Strategy" (1990-present) and advocacy before the U.S. Supreme Court (1988-present)

**OTHER PROFESSIONAL ACTIVITIES:**

Member of American Bar Association Group Evaluating Qualifications of Merrick Garland to serve on the U.S. Supreme Court (reviewed Judge Garland's civil procedure opinions)

Member, Editorial Board of International Journal of Law in a Changing World (South Ural University, Chelyabinsk, Russia)

Board Member, The Judge John R. Brown Scholarship Foundation

Advisory Board, The Flawless Foundation (an organization that serves troubled children)

Member, Board of Directors, Citizens' Crime Commission (Portland, Oregon) (2007-2011)

Advisory Board Consulting Editor, *Class Action Litigation Report* (BNA)

Served on numerous UMKC School of Law committees, including Programs (Chair), Promotion and Tenure, Appointments, and Smith Chair Appointment

Chair of pro bono program for all 27 offices of Jones Day (2000-2004); also previously Chair of Washington office pro bono program (1992-2003)

Member, Board of Directors, Bread for the City (a D.C. public interest organization providing medical, legal, and social services) (2001-2003)

Master, Edward Coke Appellate Practice Inn of Court in Washington, D.C. (other participants include Ted Olson, Seth Waxman, Ken Starr, Walter Dellinger, and several sitting appellate judges) (2001-2003)

Member, Board of Directors, Washington Lawyers' Committee for Civil Rights and Urban Affairs (2000-2003); Advisory Board Member (2003-present)

Member, D.C. Court of Appeals Committee on Unauthorized Practice of Law (1997-2000)

Handled and supervised numerous pro bono matters (*e.g.*, death penalty and other criminal defense, civil rights, veterans' rights)

Played a major role in establishing a walk-in free legal clinic in Washington, D.C.'s Shaw neighborhood

**VOLUNTEER WORK:**

Numerous guest speaker appearances at public schools and retirement homes; volunteer at local soup kitchen; volunteer judge for Classroom Law Project.

# APPENDIX A

## SAMPLE LIST OF COURT AND ACADEMIC CITATIONS TO PROFESSOR KLONOFF'S SCHOLARSHIP

**Court Citations:**

*In re Jefferson Parish*, No. 23-30243, __ F4th __, 2023 WL 5445822 at *12 (5th Cir. Aug. 24, 2023);

*Wolff v. Aetna Life Ins. Co.*, 77 F.4th 164, 167 n.1 (3d Cir. 2023);

*Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 484 & n.18 (3d Cir. 2018);

*In re National Football League Players' Concussion Injury Litig.*, 775 F.3d 570, 576 (3d Cir. 2014);

*Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014) (Posner, J.);

*In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014);

*Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 468 (1st Cir. 2013);

*Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002).

**Academic Citations:**

J. Maria Glover, *Mass Arbitration*, 74 STAN. L. REV. 1283, 1291 (2022);

Andrew Faisman, *The Goals of Class Actions*, 121 COLUM. L. REV. 2157, 2159 n. 8 (2021);

Abbe R. Gluck & Elizabeth Chamblee Burch, *MDL Revolution*, 96 N.Y.U. L. REV. 1, 60 (2021);

Pamela K. Bookman, *The Arbitration–Litigation Paradox*, 72 VAND. L. REV. 1119, 1143 n.146 (2019);

Zachary D. Clopton, *National Injunctions and Preclusion*, 118 MICH. L. REV. 1, 34 n. 203 (2019);

Libby Jelinek, *The Applicability of the Federal Rules of Evidence at Class Certification*, 65 UCLA L. REV. 280, 286 n.27, 291 n.65, 297 n.101, 316 n.206 (2018);

Fred O. Smith, Jr., *Abstention in the Time of Ferguson*, 131 HARV. L. REV. 2283, 2346 n. 507 (2018);

18

Andrew D. Bradt & D. Theodore Rave, *The Information-Forcing Role of the Judge in Multidistrict Litigation*, 105 CAL. L. REV. 1259, 1269 n. 47 (2017);

Brian T. Fitzpatrick, *Justice Scalia and Class Actions: A Loving Critique*, 92 NOTRE DAME L. REV. 1977, 1979 (2017);

Maureen Carroll, *Class Action Myopia*, 65 DUKE L.J. 843, 846 n.8, 876–78 & nn.181, 183 & 190–93, 881 nn.211 & 213, 883 n.225 (2016);

Robert G. Bone, *The Misguided Search For Class Unity*, 82 GEO. WASH. L. REV. 651, 654 n.6 (2014);

David Freeman Engstrom, *Private Enforcement's Pathways: Lessons From Qui Tam Litigation*, 114 COLUM. L. REV. 1913, 1920 n.17 (2014);

Thomas O. Main, *The Fourth Era of American Civil Procedure*, 162 U. PA. L. REV. 1839, 1853 n.80 (2014);

Arthur R. Miller, Keynote Address, *The Preservation and Rejuvenation of Aggregate Litigation: A Systemic Imperative*, 64 EMORY L.J. 293, 294 n.7 (2014);

Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 COLUM. L. REV. 149, 151 n.5 (2003).


# APPENDIX B

# SAMPLE LIST OF COURT CITATIONS TO PROFESSOR KLONOFF'S EXPERT TESTIMONY

*Syngenta MIR 162 Corn* MDL litigation:

> *In re Syngenta AG MIR 162 Corn Litig.,* 357 F. Supp. 3d 1094, 1112 (D. Kan. 2018), *aff'd.*, *Kellogg v. Watts Guerra LLP*, 41 F.4th 1246, 1257 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1022 (2023);

> *In re Syngenta AG MIR 162 Corn Litig*., No. 14-MD-2591-JWL, 2018 WL 6839380, at *4 (D. Kan. Dec. 31, 2018) (accepting Klonoff testimony over contrary testimony by five other law professors), *aff'd.*, *Kellogg v. Watts Guerra LLP*, 41 F.4th 1246, 1257 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1022 (2023).

*Zakikhani v. Hyundai Motor Co.*, No. 8:20-cv-01584-SB-JDE, at *1 (C.D. Ca. May 5, 2023) (Doc. 160);

*Githieya v. Global Tel Link Corp.*, No. 1:15-cv-00986-AT (N.D. Ga. Aug. 30, 2022) (Doc. 369);

*In re Broiler Chicken Antitrust Litig.*, 2021 U.S. Dist. LEXIS 228367, at *47 n.4, *49–50 & n.5 (N.D. Ill. Nov. 30, 2021);

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020), *aff'd in relevant part*, No. 20-10249, 2021 WL 2250845 (11th Cir. June 3, 2021);

*Wells Fargo Unauthorized Accounts* litigation: *Jabbari v. Wells Fargo & Co.*, No. 15-cv-02159-VC, slip op. at 14 (N.D. Cal. June 14, 2018).

*Volkswagen Clean Diesel* MDL (numerous citations):

> *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prod. Liab. Litig.*, No. 3:15-md-02672-CRB, 2016 WL 6248426, at *18, *19, *20 (N.D. Cal. Oct. 25, 2016), *aff'd*, 895 F.3d 597 (9th Cir. 2018);

> Order Granting Final Approval of the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement, at *21, *24, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 2212783 (N.D. Cal. May 17, 2017) (Doc. No. 3229);

> Order Granting Final Approval of the Bosch Class Action Settlement, at *18, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 2212780 (N.D. Cal. May 17, 2017), *aff'd*, 746 F. App'x 655 (9th Cir. 2018) (Doc. No. 3230).

*In re Deepwater Horizon* (more than 60 cites to Klonoff testimony):

> *In re Deepwater Horizon*, 910 F. Supp. 2d 891, 903, 914–16, 918–21, 923–24, 926, 929–33, 938, 941, 947, 953, 955, 960, 962 (E.D. La. 2012), *aff'd*, 739 F.3d 790 (5th Cir. 2014);

> *In re Deepwater Horizon*, 295 F.R.D. 112, 133–34, 136, 138–41, 144–45, 147 (E.D. La. 2013);

> Order and Reasons, Case No. 2:10-md-02179-CJB-JCW, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010, 2:10MD02179 (E.D. La. Feb. 15, 2017) (Doc. No. 22252);

*AT&T Mobility* MDL litigation:

> *In re AT&T Mobility Wireless Data Serv. Sales Tax Litig.*, 789 F. Supp. 2d 935, 956–59, 961, 963–65 (N.D. Ill. 2011);

> *In re AT&T Mobility Wireless Data Serv. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 n.3, 1034–35, 1037, 1040, 1042 (N.D. Ill. 2011).