# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

DON GIBSON, LAUREN CRISS, JOHN
MEINERS, and DANIEL UMPA, on behalf of
themselves and all others similarly situated,

              Plaintiffs,

    v.

NATIONAL ASSOCIATION OF
REALTORS, et al.,

              Defendants.

Civil Action No. 4:23-cv-00788-SRB

[Consolidated with 4:23-cv-00945-SRB]

---

## PLAINTIFFS' MOTION AND SUGGESTIONS IN SUPPORT OF FINAL APPROVAL OF SETTLEMENTS WITH THE COMPASS, REAL BROKERAGE, REALTY ONE, @PROPERTIES, DOUGLAS ELLIMAN, REDFIN, ENGEL & VÖLKERS, HOMESMART, AND UNITED REAL ESTATE DEFENDANTS

i

I.      INTRODUCTION...................................................................................................... 1

II.     BACKGROUND AND SETTLEMENT TERMS ................................................... 2

        A.      The Litigation ................................................................................................ 2

        B.      Settlement Negotiations ................................................................................ 3

        C.      Summary of Settlement Agreements .............................................................. 4

                1.      Settlement Class ................................................................................. 4

                2.      Settlement Amounts .......................................................................... 4

                3.      Practice Changes ............................................................................... 5

                4.      Release of Claims Against Settling Defendants ................................. 6

        D.      Application for Award of Attorneys' Fees, Costs, and Class Representative
                Incentive Awards ........................................................................................... 7

III.    NOTICE WAS EFFECTIVELY DISSEMINATED TO THE SETTLEMENT CLASS . 7

IV.     THE REACTION OF THE MEMBERS OF THE SETTLEMENT CLASS TO THE
        SETTLEMENTS HAS BEEN OVERWHELMINGLY POSITIVE ............................... 9

V.      LEGAL STANDARDS AND SETTLEMENT APPROVAL ......................................... 9

        A.      The standard for reviewing a proposed settlement of a class action .................. 10

        B.      The Settlements satisfy each of the Rule 23(e)(2) factors ................................. 11

        C.      The *Van Horn* Factors also support approval ..................................................... 15

                1.      The Merits of the Plaintiffs' Cases, Weighed Against the Terms of the
                        Settlement .......................................................................................... 15

                2.      The Settling Defendants' Financial Condition ....................................... 15

                3.      The Complexity and Expense of Further Litigation ............................... 16

        D.      The Amount of Opposition to the Settlements ................................................... 16

VI.     THE COURT SHOULD CONSIDER AND OVERRULE EACH OBJECTION .......... 17

        A.      Overview and Legal Standard ........................................................................... 18

        B.      The Court Should Overrule the Pro Se Objections ............................................ 20

        C.      The Court Should Overrule Objections Submitted by Attorneys and Their Clients
                Who Filed Competing Cases .............................................................................. 23

                1.      The Court should overrule the South Carolina objection by Douglas,
                        Cheatman, Fender, and Fender (Doc. 464) ........................................... 25

a.  The Monetary Recovery Is Fair, Reasonable, and Adequate ...... 25

b.  The Scope of the Releases is Appropriate ................................. 27

c.  The Contents of Notice Were Robust ......................................... 29

2.  The Court Should Overrule the New York Objections. (Docs. 467 (Friedman), 470 (March)) ....................................................................... 33

3.  The Court Should Overrule the *Batton* Objections (Doc. 471 (Mullis)). 40

VII.  CLASS CERTIFICATION REMAINS APPROPRIATE ............................................. 52

VIII.  THE COURT SHOULD CERTIFY ITS ORDER AS FINAL ...................................... 52

IX.  CONCLUSION ............................................................................................. 52

# TABLE OF AUTHORITIES

**Cases**

*Adkins v. Nestle Purina PetCare Co.*, 2015 WL 10892070 (N.D. Ill. June 23, 2015) ................ 29

*Anderson v. Travelex Insurance Servs. Inc.,* 8:18-CV-362, 2021 WL 4307093 (D. Neb. Sept. 22, 2021) ....................................................................................................................................... 11

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................................ 44, 46

*Bishop v. DeLaval Inc.*, 2022 WL 18957112 (W.D. Mo. July 20, 2022) ..................................... 17

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ........................................................................ 22

*Branson v. Pulaski Bank*, 2015 WL 139759 (W.D. Mo. Jan. 12, 2015) ...................................... 47

*Brown v. Kansas City Live, LLC*, 931 F.3d 712 (8th Cir. 2019) .................................................. 41

*Burnett v. Nat'l Ass'n of Realtors*, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022) ............... 11, 12

*Cleveland v. Whirlpool Corp.*, 2022 WL 2256353 (D. Minn. June 23, 2022) ............................ 11

*Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) ............................................................. 10

*DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995) ........................................... 17, 18, 44

*Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752 (10th Cir. 2020) ............. 31

*Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579 (5th Cir. 2007) ................................... 20, 22, 23

*Flaum v. Doctor's Assocs., Inc.*, 2019 WL 2576361 (S.D. Fla. Mar. 11, 2019) ......................... 29

*Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35 (W.D.N.Y. 2018) ......................... 25

*Good v. Am. Water Works Company, Inc.*, 2016 WL 5746347 (S.D. W. Va. Sept. 30, 2016) ..... 32

*Gould v. Alleco, Inc.*, 883 F.2d 281 (4th Cir. 1989) .............................................................. 20, 22

*Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628 (11th Cir. 2015) ............................................ 24

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975) ........................................Passim

*Gulbankian v. MW Mfrs., Inc.*, 2014 WL 7384075 (D. Mass. Dec. 29, 2014) ............................ 24

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ..................................... 23

Case 4:23-cv-00788-SRB   Document 521   Filed 10/24/24   Page 4 of 62

*Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010) ..................................................................... 28

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1997) ........................................................................ 23

*In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740 (E.D.N.Y. 1984) ................................ 26

*In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987) .................................... 26, 49

*In re Am. Inv'rs Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226 (E.D. Pa. 2009)............................................................................................................................................ 28

*In re Bank of America Securities Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002) .................................. 47

*In re Capital One Consumer Data Sec. Breach Litig.*, 2022 WL 18107626 (E.D. Va. Sept. 13, 2022)............................................................................................................................................ 19

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003) ............................... 12, 46

*In re Coordinated Pretrial Proc. in Antibiotic Antitrust Actions*, 410 F. Supp. 669 (D. Minn. 1974)............................................................................................................................................ 16

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ................................ 44

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993)............................ 26

*In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10 (D.D.C. 2019) ............... 49, 50

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247 (11th Cir. 2021) .............. 49

*In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128 (8th Cir. 1984) ........................................ 16

*In re General Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800 (8th Cir. 2004) ..... 41, 42, 43

*In re HIV Antitrust Litig.*, 2023 WL 7397567 (N.D. Cal. Nov. 8, 2023)...................................... 51

*In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573 (N.D. Cal. 2015)............................................. 17

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011)....... 48, 49

*In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ........ 12

*In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002)........................ 16

*In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307 (S.D.N.Y. 2020) ..... 46, 50

*In re Packaged Ice Antitrust Litig.*, 2011 WL 717519 (E.D. Mich. Feb. 22, 2011) .................... 49

*In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985 (N.D. Ohio 2016)..................... 13

*In re Pork Antitrust Litig.*, 2022 WL 4238416 (D. Minn. Sept. 14, 2022) ................................... 13

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998)..... 24

*In re Prudential Ins. Co. of Am. Sales Prac. Litig. Agent Actions*, 962 F. Supp. 450 (D.N.J. 1997) ........................................................................................................................................... 28

*In re Sony SXRD Rear Projection T.V. Class Action Litig.*, 2008 WL 1956267 (S.D.N.Y. May 1, 2008) .................................................................................................................................. 15, 26

*In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968 (8th Cir. 2018)........... 45, 48

*In re Tex. Prison Litig.*, 191 F.R.D. 164 (W.D. Mo. 1999) ......................................................... 17

*In re TikTok, Inc., Consumer Privacy Litig.*, 2022 WL 2982782,n.20 (N.D. Ill. July 28, 2022) . 32

*In re Transpacific Passenger Air Transportation Antitrust Litig.*, 701 F. App'x 554 (9th Cir. 2017) ............................................................................................................................................ 51

*In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057 (8th Cir. 2013) ....................................................................................................................................... Passim

*In re Washington Pub. Power Supply Sys. Sec. Litig.*, 1988 WL 158947 (W.D. Wash. July 28, 1988) ........................................................................................................................................... 49

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 2004 WL 3671053 (W.D. Mo. Apr. 20, 2004) ............................................................................................................................................ 17, 18

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. 396 F.3d 922 (8th Cir. 2005) ......... 10, 11

*Jenson v. Cont'l Fin. Corp.*, 591 F.2d 477 (8th Cir. 1979)......................................................... 20

*Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241 (8th Cir. 1996) .............................................. 22

*Kagan v. Wachovia Securities, L.L.C.*, 2012 WL 1109987 (N.D. Cal. Apr. 2, 2012)................. 33

*Keil v. Lopez*, 862 F.3d 685 (8th Cir. 2017) ......................................................................... Passim

*Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301 (N.D. Ill. 2022) .................................... 23

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ............................................... 19

*Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No.*, 921 F.2d 1371 (8th Cir. 1990) ... 9

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)............................................................. 20

*Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) ................................................. 32

*Maine State Ret. System v. Countrywide Fin. Corp.*, 2013 WL 6577020 (C.D. Cal. Dec. 5, 2013)
.................................................................................................................................... 28

*Marshall v. Nat'l Football League*, 787 F.3d 502 (8th Cir. 2015) ........................................Passim

*Martin v. Cargill, Inc.*, 295 F.R.D. 380 (D. Minn. 2013) ............................................... 47

*McCabe v. Six Continents Hotels, Inc.*, 2015 WL 3990915 (N.D. Cal. June 30, 2015).............. 29

*Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650 (S.D.N.Y. 2015) .................................. 15, 26

*Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ........................ 11

*North Dakota v. Lange*, 900 F.3d 565 (8th Cir. 2018)..................................................... 51

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ......................................................... 44

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) ....................................................Passim

*Pro. Firefighters Ass'n of Omaha, Loc. 385*, 678 F.3d ................................................. 26

*Retta v. Millennium Prods., Inc.*, 2017 WL 5479637 (C.D. Cal. Aug. 22, 2017) ........................ 28

*Sanderson v. Unilever Supply Chain, Inc.*, 2011 WL 5822413 (W.D. Mo. Nov. 16, 2011)........ 10

*Schutter v. Tarena Int'l, Inc.*, 2024 WL 4118465 (E.D.N.Y. Sept. 9, 2024)............................... 48

*Shay v. Apple Inc.*, 2024 WL 1184693 (S.D. Cal. Mar. 19, 2024) .............................................. 28

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011)................................................... 48

*Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848 (S.D. Iowa 2020)........................................ 11

*TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456 (2d Cir. 1982)................................. 41

*Thompson v. Edward D. Jones & Co.*, 992 F.2d 187 (8th Cir. 1993)........................................... 41

*UAW v. General Motors Corp.*, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006)......................... 33

*Van Horn v. Trickey*, 840 F.2d 604 (8th Cir. 1988)........................................................ 10, 11, 17

*Vargas v. Capital One Financial Advisors*, 559 F. App'x. 22 (2d Cir. 2014) .............................. 32

*Vogt v. State Farm Life Ins. Co.*, 2021 WL 247958 (W.D. Mo. Jan. 25, 2021) .......................... 22

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ......................... 29, 43, 44

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................................ 8

Fed. R. Civ. P. 23(e)(1)(B) ............................................................................................ 9

Fed R. Civ. P. 11(b) ...................................................................................................... 37

Federal Rule of Civil Procedure 23(a) ................................................................... 51, 52

Federal Rule of Civil Procedure 23(e) ..............................................................Passim

Federal Rule of Civil Procedure 54(b) ....................................................................... 52

Rule 23 .................................................................................................................. 20, 22

Rule 23(b)(3) ................................................................................................................ 52

Rule 23(e)(2) .......................................................................................................... 10, 11

Rule 23(e)(3) ................................................................................................................ 10

Rule 23(e)(5)(A) .................................................................................................... 20, 23

**Other Authorities**

4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) .............. 20, 22

4 Newberg and Rubenstein on Class Actions § 13:35 (6th ed. June 2024 Update) .................... 18

*Manual for Complex Litigation, Fourth* § 21.312 (2005).............................................. 49

# I. INTRODUCTION

Plaintiffs seek final approval of proposed settlements with nine sets of Defendants: Compass, Real Brokerage, Realty ONE, @properties, Douglas Elliman, Redfin, Engel & Völkers, HomeSmart, and United Real Estate (the "Settling Defendants"). These Settlements create a total settlement fund of at least $110.6 million. This fund is in addition to other settlements submitted for approval in the *Burnett* action. All told, the total monetary value of settlements across both cases is more than $1 billion. In addition to providing for a monetary recovery for the class, the Settling Defendants obligate themselves to make important changes in their practices, detailed in the settlement agreements and summarized in the briefs in support of preliminary approval. *See* Docs. 161, 294, 303. When coupled with the practice change relief reflected in the NAR settlement, these reforms will promote price competition and, over time, are expected to bring about meaningful benefits for consumers.

This Court previously preliminarily approved proposed settlements with each of these Defendant families on April 30, 2024, July 15, 2024, and July 16, 2024. *See* Docs 163, 297, 348. In granting preliminary approval, the Court directed that notice be disseminated to the Settlement Class (or "the Class"), and preliminarily determined that the Settlements are fair, reasonable, and adequate, and that the Class Representatives and Class Counsel have adequately represented the Settlement Class. *Id.* at 2. Accordingly, the Court held that it would likely approve the Settlements, provisionally certified the proposed Settlement Class, and directed the Parties to issue notice to potential Class members. *Id.* In compliance with the Court's directions, the Claims Administrator, JND, implemented a robust notice program.

The Settlements have been extremely well-received by the Class. As of October 21, 2024, 463,339 Class members have submitted claims, with more claims likely to be submitted before the

1

May 9, 2025 claim deadline. In addition, a remarkably small number of objections for a class of this size have been filed with the Court. As discussed herein, the few objections filed fail to identify any reason why the Settlements are not fair, reasonable, and adequate. In support of this Motion, Plaintiffs submit the declarations of Eric Dirks (Ex. 1) (attorney for the Class), Steve Berman (Ex. 2) (attorney for the Class) and Jennifer Keough (Settlement Administrator) (Ex. 3).

## II. BACKGROUND AND SETTLEMENT TERMS

### A. The Litigation

The *Moehrl* and *Burnett* actions brought claims against five defendant families on behalf of home sellers who listed their properties on one of 24 covered multiple listing services ("MLSs") across the country. Building upon the groundwork laid in *Burnett* and *Moehrl*, Plaintiffs Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa, filed the above-captioned cases (together, "*Gibson*"), bringing similar claims against additional defendants on behalf of a nationwide class of home sellers. The cases were originally filed as two related actions, *Gibson, et al. v. NAR, et al.*, Case No. 4:23-CV-788-SRB ("*Gibson*") on October 31, 2023, and *Umpa v. NAR, et al.*, Case No. 4:23-CV-945-SRB ("*Umpa*") on December 27, 2023. On April 23, 2024, the Court granted Plaintiffs' motion to consolidate the *Gibson* and *Umpa* matters and to file a consolidated class action complaint under the *Gibson* caption. Docs. 144-45.

The Court appointed the six firms who serve as Class Counsel in *Moehrl* and *Burnett* as Interim Co-Lead Counsel on behalf of the class in the consolidated *Gibson* action. Doc. 180. In that order, the Court found that these firms "shall also be responsible for any settlement negotiations with Defendants that would propose to resolve claims on a class-wide or aggregate basis." *Id.* The Court separately appointed these six firms as Co-Lead Counsel for the Settlement Class. *See* Docs. 163, 297, 348. Based on their substantial work over the several years of hard-

2

fought litigation and their successful track record, Class Counsel bring unrivaled knowledge and expertise to the issues presented in this action. Plaintiffs and their counsel have worked diligently to advance the litigation. Prior to filing these actions, Class Counsel undertook significant research into the conduct of the Settling Defendants, their adherence to the challenged rules, and their market presence. Counsel reviewed publicly available information, including SEC filings, company websites, third-party websites, YouTube videos, and other sources to investigate the relationships between these companies and anticompetitive practices, including those found by the jury after trial to be antitrust violations in *Burnett*. Dirks Decl. ¶ 9. Based on this investigation, Plaintiffs filed detailed complaints alleging that each of the Defendants in this action followed and enforced anticompetitive rules adopted in MLSs across the country, including non-Realtor MLSs. *Id.* Since then, Plaintiffs and their counsel have diligently prosecuted the case through its early stages, including negotiating a scheduling order, ESI order, and protective order; serving and responding to discovery requests; and responding to a variety of dispositive motions. Dirks Decl. ¶ 9. Class Counsel continue to prosecute *Gibson* against non-Settling Defendants.

### B. Settlement Negotiations

The parties reached each settlement only after engaging in extensive arm's length negotiations. Dirks Decl. ¶¶ 20-21. As part of those negotiations, each Settling Defendant provided detailed financial records that Plaintiffs carefully analyzed and considered in determining each Defendant's ability to pay. *Id.*; Berman Decl. at ¶¶ 2, 6-11. In connection with the negotiations of many of the Settlements, the parties retained a highly experienced and nationally recognized mediator, Greg Lindstrom. Dirks Decl. at ¶ 20.

The parties reached the Settlement Agreements only after considering the strengths, risks and costs of continued litigation. Plaintiffs and Class Counsel believe the claims asserted have merit and that the evidence developed to date supports those claims. Plaintiffs and Class Counsel,

3

however, also recognize the myriad risks of and delay in further proceedings, including potential appeals, in a complex case like this, and believe that the Settlements provide substantial benefits to the Settlement Class. Dirks Decl. ¶ 21. In negotiating the settlements, Class Counsel considered the strengths and weaknesses of the Class members' claims, including potential claims. *Id*. at ¶ 21. Moreover, Plaintiffs and Class Counsel thoroughly analyzed and considered each Settling Defendant's ability to pay, including whether each could withstand a greater monetary judgment. Dirks Decl. ¶¶ 21-22; Berman Decl. at ¶¶ 2, 6-11. These considerations directly affected the monetary amounts that it was feasible to recover from the Settling Defendants through settlement or a judgment. *Id.*

### C. Summary of Settlement Agreements

#### 1. Settlement Class

Each Settlement is on behalf of a class of all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home. The Class includes anyone who sold a home on any multiple listing service nationwide, regardless of that MLS's affiliation with NAR (or not), including, for example, NWMLS, WPMLS, and REBNY/RLS. *See, e.g.,* Compass Settlement Agreement at ¶ 15; *see also* Doc. 232, Consolidated Am. Compl. at ¶ 182. Each settlement covers, at the very least, home sales from October 31, 2019 through July 23, 2024.

#### 2. Settlement Amounts

The proposed Settlements provide that the Settling Defendants will pay the following amounts for the benefit of the Settlement Class:

- Compass: $57.5 million
- Real Brokerage: $9.25 million
- Realty ONE: $5 million

4

- @properties: $6.5 million
- Douglas Elliman: at least $7.75 million
- Redfin: $9.25 million
- Engel & Völkers: $6.9 million
- HomeSmart: $4.7 million
- United Real Estate: $3.75 million

*See* Docs 163, 297, 348. The total amount of these Settlements is at least $110.6 million. These amounts are inclusive of all costs of settlement, including payments to Class members, attorney fees and costs, service awards for the Settlement Class Representatives, and costs of notice and administration.

The Settlement Amounts are non-reversionary: once the Settlements are finally approved by the Court and after administrative costs, litigation expenses, and attorney fees are deducted, the net funds will be distributed to Settlement Class members with no amount reverting back to the Settling Defendants, regardless of the number of opt-outs or claims made. These amounts are in addition to the over $900 million obtained in the *Burnett/Moehrl* Settlements.

### 3. Practice Changes

The proposed Settlements also require Settling Defendants, and their subsidiaries and affiliates, to make the following practice changes, to the extent they are not already implemented, within six months of the Settlement Effective Dates:

i.   advise and periodically remind company-owned brokerages, franchisees (if any), and their agents that there is no company requirement that they must make offers to or must accept offers of compensation from cooperating brokers or that, if made, such offers must be blanket, unconditional, or unilateral;

ii.  require that any company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-

specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government or MLS-specified form, then Settling Defendant will require that any company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

iii. prohibit all company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

iv. require that company-owned brokerages and their agents disclose at the earliest moment possible any offer of compensation made in connection with each home marketed to prospective buyers in any format;

v. prohibit company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi. advise and periodically remind company-owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of cooperative compensation offered provided that each such property meets the buyer's articulated purchasing priorities; and

vii. for each of the above points, for company-owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

*See, e.g.,* Compass Settlement Agreement at ¶ 49.

### 4. Release of Claims Against Settling Defendants

Upon the Effective Date, Plaintiffs and the Settlement Class will release and discharge the Settling Defendants, and their respective subsidiaries, related entities, affiliated franchisees, independent contractors, and other representatives from any and all claims arising from or relating to "conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of

6

any residential home." The complete terms of the releasees are contained in the Settlement Agreements. *See, e.g.,* Compass Settlement Agreement at ¶¶ 7, 11-13, 28-30.

The Settlement Agreements, however, do nothing to abrogate the rights of any member of the Settlement Class to recover from any other Defendant. *See, e.g.,* Compass Settlement Agreement at ¶ 59. The Settlement Agreements also expressly exclude from the Release a variety of individual claims that Class members may have concerning product liability, breach of warranty, breach of contract, or tort of any kind (other than a breach of contract or tort based on any factual predicate in this Action), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. *Id.* Also exempted are any "individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence, or other tort claim, other than a claim that a Class Member paid an excessive commission or home price due to the claims at issue in these Actions." *Id.*

### D. Application for Award of Attorneys' Fees, Costs, and Class Representative Incentive Awards

The Settlements authorize Class Counsel to seek attorneys' fees and costs incurred in prosecuting the litigation, as well as service awards for the Settlement Class Representatives. Plaintiffs submitted their application for an award of attorney fees, costs, and service awards, to be paid out of the Settlement Fund. *See* Doc. 399.

## III. NOTICE WAS EFFECTIVELY DISSEMINATED TO THE SETTLEMENT CLASS

The Settlement Notice Plan was robust and implemented in compliance with the requirements of the Court's Preliminary Approval Order consistent with Rule 23 and due process requirements. In consultation and collaboration with the parties, the Settlement Administrator, JND Legal Administration ("JND"), provided Notice to Settlement Class members in the manner

approved by the Court through first-class U.S. mail, electronic mail, and digital and print publication. Keough Decl. at ¶ 3. The Notice Plan "met, and exceeded, the standards for providing the best practicable notice in class action settlements." Keough Decl. at ¶ 4. The notices complied with Rule 23(c)(2)(B), in that they "clearly and concisely state in plain, easily understood language": a description of the nature of the case; the class definition; a description of the claims; issues, or defenses; that a Settlement Class Member may appear (including through any attorney) at the Fairness Hearing or otherwise; the time and manner for opting out or objecting; the binding effect of a class judgment; and the manner by which to obtain further information. *See* Fed. R. Civ. P. 23(c)(2)(B).

The Notice Program consisted in part of direct notices, in the form of postcard and email notice to all potential Settlement Class members that JND and Class Counsel were able to locate. Postcard notice was sent to over 13 million addresses, and email notice was sent to over 25 million email addresses. Keough Decl. at ¶¶ 16, 19.

In addition to the extensive direct notice program, JND also implemented a comprehensive digital and electronic media notice program which reached over 70% of the Settlement Class members. Keough Decl. at ¶ 39. The digital portion of the media effort alone delivered more that 300 million impressions. *Id*. at ¶ 22. The media notice program also included a press release and press coverage that resulted in 495 news stories with an additional 113 million potential viewers. *Id*. at ¶ 34, 38. Combined, the direct notice and publication notice programs reached at least **98%** of the class. *Id*. at ¶ 39.

JND also established and maintained a Settlement Website that had over 2 million unique visitors and over 11 million page views. *Id*. at ¶ 41.

## IV.   THE REACTION OF THE MEMBERS OF THE SETTLEMENT CLASS TO THE SETTLEMENTS HAS BEEN OVERWHELMINGLY POSITIVE

The Class's reaction to the Settlements has been positive and strongly supports final approval. As of October 21, 2024, JND has received 463,339 claims. Keough Decl. at ¶ 51. Because the funds are non-reversionary, all of the money from the net Settlement fund will be distributed to authorized Claimants. Plaintiffs expect that the claims rate will rise because Settlement Class members are eligible to submit claims through May 9, 2025.

In contrast, only 46 Settlement Class members requested exclusion from the Settlements and there were only six objections filed on behalf of 9 objectors total. Keough Decl at ¶¶54-55. These objections are discussed in Part VI, below.

## V.   LEGAL STANDARDS AND SETTLEMENT APPROVAL

Federal Rule of Civil Procedure 23(e) sets out a two-part process for approving class settlements. The Court already completed the first stage of the approval process, often called "preliminary approval," when it determined that "the Court will likely be able to approve the Settlements," and ordered that notice be directed to the class. Docs. 163, 297, 348; Fed. R. Civ. P. 23(e)(1)(B). Now that notice has been disseminated and reaction of the Class members has been received, the Court can make its final decision whether to approve the Settlements.

As a general matter, "the law strongly favors settlements. Courts should hospitably receive them." *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990) (noting it is especially true in "a protracted, highly divisive, even bitter litigation"); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) ("A strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."); *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) ("A settlement agreement is 'presumptively valid.'") (quoting *In re Uponor, Inc., F1807 Plumbing Fittings*

9

*Products Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013)); *Sanderson v. Unilever Supply Chain, Inc.*, 10-cv-00775-FJG, 2011 WL 5822413, at *3 (W.D. Mo. Nov. 16, 2011) (crediting the judgment of experienced Class Counsel that settlement was fair, reasonable, and adequate). The presumption in favor of settlements is particularly strong "in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005).

### A. The standard for reviewing a proposed settlement of a class action

The determination of whether a class action settlement is "fair, reasonable, and adequate is committed to the sound discretion of the trial judge. Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly." *Van Horn v. Trickey*, 840 F.2d at 604, 606-07 (8th Cir. 1988) (cleaned up). The ultimate question is whether the settlement is "fair, reasonable, and adequate." *In re Wireless*, 396 F.3d 922, 932 (8th Cir. 2005). Rule 23(e)(2) includes four factors the Court must consider, when evaluating whether a settlement is fair, reasonable, and adequate. Those factors are whether:

(A) the Class Representatives and Class Counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the Class is adequate, taking into account:

    (i)    the costs, risks, and delay of trial and appeal;

    (ii)    the effectiveness of any proposed method of distributing relief to the Class, including the method of processing Class-Member claims;

    (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Eighth Circuit has set forth four factors that a court should consider in determining whether to approve a proposed class action settlement: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." *In re Wireless*, 396 F.3d at 932 (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975)); *Van Horn*, 840 F.2d at 607; *see also Swinton v. SquareTrade, Inc.,* 454 F. Supp. 3d 848, 861 (S.D. Iowa 2020) (analysis of certain Rule 23(e)(2) factors will "necessarily include analysis of [certain] related *Van Horn* factors"); *Anderson v. Travelex Insurance Servs. Inc..*, No. 8:18-CV-362, 2021 WL 4307093, at *2 (D. Neb. Sept. 22, 2021) (approving settlement under Rule 23(e) by evaluating *Van Horn* factors); *Cleveland v. Whirlpool Corp.*, No. 20-cv-1906, 2022 WL 2256353 (D. Minn. June 23, 2022) (evaluating settlement under Rule 23(e)(2) and *Van Horn*).

## B.     The Settlements satisfy each of the Rule 23(e)(2) factors

**First**, Settlement Class Representatives and Class Counsel have adequately represented the Class. Class Counsel were previously appointed to serve as lead counsel in *Moehrl* and *Burnett* after the courts overseeing those cases found they would adequately represent the class. *Burnett*, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022); *Moehrl*, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023). Class Counsel subsequently won a jury trial in *Burnett.* And, in this case, the Court appointed Class Counsel with responsibility for any settlements for the nationwide class. Doc. 180. Altogether, Class Counsel have obtained over $1 billion in proposed and approved settlements as well as historic practice change relief. Class Counsel continue to represent the class as they have done in navigating the settlement process. Likewise, the Class Representatives have bought and sold homes and have demonstrated their commitment to the litigation by responding to discovery, providing relevant documentation, and participating in the settlement process.

**Second**, as discussed above, each Settlement was conducted in good faith and at arm's length by experienced counsel on both sides. Most of the settlements were reached only with the assistance of an experienced mediator. And all occurred only after Settling Defendants provided Class Counsel with sufficient financial information for Plaintiffs to make an informed decision about settlement. Dirks Decl. at ¶¶ 21-22; Berman Decl. at ¶¶ 2, 6-11. The lengthy history of the real estate commission litigation, which has proceeded for years through class certification in both the *Moehrl* and *Burnett* cases and a trial in the *Burnett* case, provide ample evidence of the skill and tenacity Class Counsel brought to the negotiation of the Settlements.

**Third**, for the reasons stated above, the relief for the Settlement Class is fair and adequate. The Settlements provide significant financial recoveries to the Settlement Class in light of the strengths and weaknesses of the case and the risks and costs of continued litigation, including potential appeals, and taking into account the Settling Defendants' financial resources. The Settlements also include meaningful changes to the Settling Defendants' policies. The parties dispute the strength of their claims and defenses. The Settlements reflect a compromise based on the parties' well-informed assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes. Plaintiffs' best-case scenario is obtaining class certification, prevailing and recovering on the merits at trial, and then upholding a verdict on appeal. But "experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003); *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020) ("Antitrust cases are particularly risky, challenging, and widely acknowledged to be among the most complex actions to prosecute."). And under the circumstances of this case, it would make

little sense to try the case against the Settling Defendants where none of them could pay anywhere near the level of any expected judgment. Dirks Decl. at ¶ 22; Berman Decl. at ¶¶ 11-12. And the only way that the Settlements were possible was if they provided for a nationwide recovery and release. Dirks Decl. at ¶ 25.

Against this risk, the Settlements provide for a $110.6 million recovery from the nine Settling Defendants and substantial practice changes. *See In re Pork Antitrust Litig.,* No. 18-1776, 2022 WL 4238416, at *2 (D. Minn. Sept. 14, 2022) (granting final approval of antitrust settlement that provided "substantial relief against the backdrop of a great deal of uncertainty where the merits are highly contested" in case involving alleged price-fixing conspiracy among pork processing companies); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 995-96 (N.D. Ohio 2016) (granting final approval of settlement in light of "real possibility that [plaintiffs] could have received much less—even zero—from a jury at trial or following an appeal"). The Settlements are also supported by the fact that these are partial settlements of the claims arising from the alleged conspiracy, and Class Counsel have continued to work to achieve additional recoveries on behalf of the Class.

Although some Class members have objected that they may not recover every dollar they paid to real estate agents, that assumes that the total amount of payments would be recoverable as damages and fails to take into account the risks of litigation and the defendants' ability to pay any higher sums. The essence of the settlement compromise and giving up the "highest hopes" in return for the certainty of payment, and in an attempt to obtain more would have perhaps resulting in no recovery at all.

The Court-appointed notice and claims administrator, JND, will work with Class Counsel in processing class member claims and distributing relief. JND has extensive experience in

distributing relief in connection with large and complex class action settlements. Keough Decl. at ¶¶ 1, 47-51. JND will be responsible for reviewing claim forms and evidence of purchase to determine whether a claim qualifies for payment, and any claim that cannot be substantiated may be subject to challenge, nonpayment, or a reduced share of the available funds. *See* Settlement Notice at ¶ 9. Class members with approved claims will have several options for receiving payment, including by debit card, Zelle, Venmo, or check. *See* Claim Form at p. 1.[1]

Finally, the attorneys' fee request is reasonable and in line with Eighth Circuit precedent. *See* Pltfs.' Mot. for Attorneys' Fees, Doc. 399.

**Fourth**, the Settlements treat Class members fairly and equitably relative to each other. The practice change relief applies the same to all Class members nationwide. With respect to the monetary relief, every person who meets the class definition is eligible to submit and receive compensation for a claim. That is all that is required. *Petrovic*, 200 F.3d at 1152–53 ("We do not agree with the objectors' contention that a mailed notice of settlement must contain a formula for calculating individual awards."). The settlement website advises both that: (i) settlement payment "will take into account the amount of commissions class member claimants paid to a real estate broker or agent"; and (ii) "[t]o the extent the value of total claims exceeds the amount available for distribution from the settlement funds, each class member's share of the settlement may be reduced on a pro rata basis." Settlement FAQ 11.[2] Finally, the requested service awards are reasonable and in line with other cases recognizing the work performed by the class representatives. *See* Pltfs.' Mot. for Attorneys' Fees, Doc. 399 at 15-16 (discussing cases supporting the requested service awards).

_____

[1] See https://www.realestatecommissionlitigation.com/claimformlanding.
[2] See https://www.realestatecommissionlitigation.com/gibson-faq.

**C.      The *Van Horn* Factors also support approval**

The *Van Horn* factors provide additional support for the Settlements.

### 1.      The Merits of the Plaintiffs' Cases, Weighed Against the Terms of the Settlement

As discussed above under the Rule 23(e)(2) factors, the Settlements reflect a compromise based on the parties' educated assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes, including potential financial outcomes of the Settling Defendants.

### 2.      The Settling Defendants' Financial Condition

The fairness, adequacy, and reasonableness of the Settlements are supported by the Settling Defendants' financial condition and their inability to satisfy a judgment. Dirks Decl. ¶¶ 21-22. In order to evaluate the Settling Defendants' financial condition, Plaintiffs reviewed the financial information of each Settling Defendant and its ability to pay. *Id.*; Berman Decl. at ¶¶ 2, 6-11. Class Counsel firmly believe these amounts are reasonable in light of limitations on the Settling Defendants' ability to pay. Dirks Dec. at ¶¶ 21-22. "[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) (quoting *In re Sony SXRD Rear Projection T.V. Class Action Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)); *see also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 125 (8th Cir. 1975) (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

### 3.  The Complexity and Expense of Further Litigation

Plaintiffs' claims raise numerous complex legal and factual issues under antitrust law. This is reflected in the voluminous briefing in *Moehrl* and *Burnett*, which includes extensive class certification and summary judgment briefing, as well as post-trial briefing in *Burnett*. In addition, plaintiffs have engaged in extensive appellate briefing, including Rule 23(f) petitions in both *Moehrl* and *Burnett* as well as two separate appeals in the *Burnett* litigation concerning arbitration issues, and a petition for certiorari to the United States Supreme Court.

By contrast, the Settlements provide for certain  recovery for the Class. In light of the many uncertainties of continued litigation, a significant and certain recovery weighs in favor of approving the proposed Settlements. *See In re Coordinated Pretrial Proc. in Antibiotic Antitrust Actions*, 410 F. Supp. 669, 678 (D. Minn. 1974) (approving settlement where price-fixing claims faced "substantial roadblocks" on top of the "difficulties inherent" in prevailing on such claims); *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1137 (8th Cir. 1984) (affirming final approval of settlement where "no reported opinion addresses the precise [merits] question presented here," which created "a substantial question whether [plaintiff] would prevail"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 393 (D.D.C. 2002) ("Any verdict would have led to an appeal and might well have resulted in appeals by both sides and a possible remand for retrial, thereby further delaying final resolution of this case. These factors weigh in favor of the proposed Settlement.") (cleaned up).

### D.      The Amount of Opposition to the Settlements

The Settlement Class Representatives in this action have approved the Settlements. More than 463,000 Class members have submitted claims, while only a small handful have objected and 46 have opted out. Keough Decl. at ¶¶ 51, 55. This supports granting final approval. *See, e.g.*, *Keil v. Lopez*, 862 F.3d 685, 698 (8th Cir. 2017) (determining with respect to  a settlement class of

16

approximately 3.5 million households, in which "only fourteen class members submitted timely objections," the "amount of opposition is minuscule when compared with other settlements that we have approved"); *Bishop v. DeLaval Inc.*, No. 5:19-cv-06129-SRB, 2022 WL 18957112, at *1 (W.D. Mo. July 20, 2022) ("A low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval") (quoting *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015)); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559 4:03-MD-015, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004) (of the 4,838,789 settlement class members who were sent notice, only 620 (0.012%) opted out of the settlement and only 33 (0.00068%) objected to the settlement, which "are strong indicators that the Settlement Agreement was viewed as fair by an overwhelming majority of Settlement Class members and weighs heavily in favor of settlement"); *In re Tex. Prison Litig.*, 191 F.R.D. 164, 175 (W.D. Mo. 1999) ("The objectors represent only about 8 per cent of the class, and this relatively low level of opposition to the settlement also indicates its fairness. The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement.") (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995)); *see also, e.g.*, *Van Horn*, 840 F.2d at 607 ("the amount of opposition to the settlement" is a key factor to be considered in the settlement approval process); *Marshall*, 787 F.3d at 513 ("We have previously approved class-action settlements even when almost half the class objected to it.").

## VI.     THE COURT SHOULD CONSIDER AND OVERRULE EACH OBJECTION

Class Counsel received six objections on behalf of nine objectors. Two are from *pro se* objectors. Docs. 451 (Khyber Zaffarkhan), 485 (Terry Wischer). Four are from objectors represented by attorneys with copycat cases encompassed by the Settlement Class in this case.

Docs. 464 (Robert Benjamin Douglas, Benny D. Cheatman, Douglas W. Fender II, and Dena Marie Fender), 467 (Robert Friedman), 470 (Monty March), 471 (James Mullis).

## A. Overview and Legal Standard

As an initial matter, the Court has already overruled objections that are similar, and in some cases identical, to each of the objections here. *See Burnett*, May 9, 2024 Order Granting Final Approval, Doc. 1487 at 13-29 (overruling objections). Although "[n]o particular standard governs judicial review of objections," courts evaluate objections in the course of "determining whether the settlement meets Rule 23's fairness standard." 4 Newberg and Rubenstein on Class Actions § 13:35 (6th ed. June 2024 Update). "[T]he trial court has some obligation to consider objections but is given significant leeway in resolving them." *Id.*

For a class of this size, or any size, the number of objections received is remarkably low. Indeed, there are only six sets of objections before the Court. This is out of a class compromised of millions of home sellers. This means that 99.99% of the Class did not object. And the claims made as of October 21, 2024 exceed objectors by 463,339-to-9 (or 51,482-to-1). While the Court should consider each objection, objections by a tiny minority should not prevent approval of the Settlements as fair, reasonable, and adequate. *See Marshall*, 787 F.3d at 513–14 ("The district court refused to give credence to the vocal minority" and "the court aptly noted that "only one-tenth of one percent of the class objected, and less than ten percent of the class ha[d] requested exclusion from the settlement."); *see also In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559, 4:03-MD-015, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004) ("[t]he Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their approval of the Settlement Agreement") (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995)). The Class's actions here reflect even stronger support for the Settlements than in *Marshall* or *In re Wireless*.

"[I]n determining whether to approve a class action settlement, the issue is not whether everyone affected by the settlement is completely satisfied. Instead, the test is whether the settlement, *as a whole*, is a fair, adequate, and reasonable resolution of the class claims asserted." *In re Capital One Consumer Data Sec. Breach Litig.*, No. 1:19-md-2915, 2022 WL 18107626, at *8 (E.D. Va. Sept. 13, 2022) (emphasis added). "As courts routinely recognize, a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017) (cleaned up); *see also Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes." (cleaned up)). "Objections that the settlement fund is too small for the class size, or that a defendant should be required to pay more to punish and deter future bad behavior, while understandable, do not take into account the risks and realities of litigation, and are not a basis for rejecting the settlement." *Capital One*, 2022 WL 18107626, at *8.

As discussed above, and as this Court provisionally determined in its Preliminary Approval Orders, the relief provided by the Settlements is "fair, reasonable, and adequate, in accordance with Rule 23(e) of the Federal Rules of Civil Procedure." Docs. 163, 297, 348. Importantly, any Class members who did not like the Settlements had the option to exclude themselves from the Settlement Class and to pursue damages and any other relief on an individual basis—as a number of Class members have done. This favors approval of these Settlements. *See, e.g.*, *Marshall*, 787 F.3d at 513 (affirming class settlement, stating that objectors "were not required to forgo what they believed to be meritorious claims—they could have opted out of the settlement to pursue their own claims, as some class members did"). When weighed against the

risks of and time required for litigation through a potential class judgment after trial, these immediate benefits strongly support a finding that the settlement relief is fair, reasonable, and adequate. *See Keil*, 862 F.3d at 697.

**B.    The Court Should Overrule the Pro Se Objections**

Plaintiffs received an objection from Khyber Zaffarkhan. Doc. 451. Mr. Zaffarkhan represents that he paid commissions across two home sales in 2016 and 2020. Mr. Zaffarkhan's objection does not comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." Nor does Mr. Zaffarkhan provide basic information about the homes he claims to have sold, including whether he hired a listing broker, whether the homes were listed on an MLS, or how any broker fees he paid may have been allocated among those brokers. Additionally, based on the limited information provided, Mr. Zaffarkhan's claimed 2016 home sale appears to fall outside of the settlement class period. Thus, Mr. Zaffarkhan has not established he has standing to object for that sale. *See Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals.") (citing *Jenson v. Cont'l Fin. Corp.*, 591 F.2d 477, 482 n.7 (8th Cir. 1979)); *Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579, 580 (5th Cir. 2007) ("[O]nly class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

Even considering Mr. Zaffarkhan's objections, none of them show that the Settlements should be rejected. *First*, Mr. Zaffarkhan objects that the monetary recovery is inadequate because the *Gibson* settlements (and other proposed and approved settlements in related cases) will not fully compensate him for the entirety of any commissions he may have paid. It is true that Class members will likely receive from these settlements only a portion of their best-day-in-court damages. But that fact is true for essentially any settlement and is not grounds for declining to approve the particular proposed settlements here. *Keil*, 862 F.3d at 696. As described herein, Plaintiffs sought to obtain the largest recovery they could in light of the risks of continued litigation, including each Settling Defendant's ability to pay limitations.[3] Mr. Zaffarkhan's objection does not account for or otherwise address those risks and limitations. Nor does he opine that these particular Settling Defendants could reasonably have paid more. Further, although Mr. Zaffarkhan acknowledges that "the Settlement Fund will continue to grow," Doc. 451 at 3 n.1, his objection does not account for the fact that the proposed Settlements would resolve claims against only one set of defendants and do not release claims against other defendants against whom Plaintiffs continue to seek relief on behalf of the class.[4]

*Second*, Mr. Zaffarkhan's objection notes Plaintiffs' requests to recover attorneys' fees, costs and expenses, and service awards. It is unclear which, if any, of these requests Mr. Zaffarkhan

---

[3] Mr. Zaffarkhan's assertion that individual class member awards should account for "higher value transactions", Doc. 451 at 2, is consistent with Plaintiffs' intentions as reflected in their notice to the class. *See* FAQ 11 ("It is anticipated that the plan will take into account the amount of commissions class member claimants paid to a real estate broker or agent during the relevant statute of limitations periods for the MLS in which the sale was made.").

[4] The calculations reflected in Mr. Zaffarkhan's objection appear to be based on other incorrect assumptions. For instance, his calculation of the number of homes sold does not appear to be accurate for the *Gibson* settlement class period. And his equation is stated in terms of "total commissions paid," rather than the amount by which he may have been injured.

intended to object to or what the basis of any objection might be. To the extent Mr. Zaffarkhan is objecting that Plaintiffs' attorneys' fee request is too high because it reduces the class recovery, Plaintiffs provided extensive legal authority and factual justification for their request. *See* Pltfs.' Mot. for Attorneys' Fees, Doc. 399; *see also Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) (paying attorneys out of the fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense"); *Vogt v. State Farm Life Ins. Co.*, No. 2:16-cv-04170, 2021 WL 247958, at *1 (W.D. Mo. Jan. 25, 2021) ("When a class action creates a common fund for the benefit of the class members, the Court may award class counsel reasonable attorneys' fees 'equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation.'") (quoting *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244-45 (8th Cir. 1996)). In addition, to the extent Mr. Zaffarkhan disagreed either with the amount of his recovery or the attorneys' fee request, he was free to opt out of the settlements and retain an attorney to pursue claims individually. But he chose not to do so.

The other *pro se* objector, Terry Wischer, objects that sellers could not have been harmed by Defendants' conduct. Doc. 485. As an initial matter, Mr. Wischer does not indicate whether he is a class member who sold an eligible home during the class period. Thus, he lacks standing, and his objection must be overruled. *See Gould*, 883 F.2d at 284 ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Feder*, 248 F. App'x at 580 ("only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing"); 4 Newberg and Rubenstein on Class Actions § 13:22 (6th ed. June 2024 Update) ("Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon nonclass

members" and "Courts regularly find that nonclass members have no standing to object to a proposed settlement[.]"). The burden is on the objector to show standing. *Feder*, 248 F. App'x at 581. Nor does Mr. Wischer comply with Rule 23(e)(5)(A), which requires that the "objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection."

In any event, Mr. Wischer's objection that sellers could not have been injured is incorrect both legally and factually. Under binding Supreme Court precedent, only direct purchasers are ordinarily eligible to sue for damages, and they may recover the entirety of any overcharge paid without consideration of any amount that may have been passed on to others. *See, e.g.*, *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1997); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968). Consistent with this case law, in similar cases, courts have held that home sellers (and not buyers) are direct purchasers under federal antitrust law, and a jury concluded in *Burnett* that those sellers were injured. *See Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 308-11 (N.D. Ill. 2022); *Burnett*, Verdict Form Doc. 1294 at ECF 2. Even if he had standing, Mr. Wischer's objection should be rejected on the merits.

### C. The Court Should Overrule Objections Submitted by Attorneys and Their Clients Who Filed Competing Cases

Four objections were lodged by plaintiffs and their counsel who filed copycat cases after *Moehrl* and *Burnett*, none of these cases has been certified, and all are in their infancy. Each is derivative of *Moehrl* and *Burnett* and was filed only after, and on the back of, Class Counsel's successes. Indeed, three of the four objections are by litigants who did not even file a case until *after* the *Burnett* plaintiffs obtained a favorable verdict and the complaint in this case was filed. Each of these cases arises out of the same alleged illegal course of conduct—the requirement that a seller pay for the buyer's broker. Yet they now seek to distinguish their cases in an effort to blow

up the important monetary and practice change relief made available in the Settlements. Each of these objectors could have opted out of the Settlements and pursued their own claims, but instead each chose to object. *See Marshall*, 787 at 520. None of these objections furthers the interest of Class members who will benefit from both the monetary and practice change relief afforded by the Settlements.

Such objections lodged by attorneys filing competing cases should be viewed at the very least with skepticism. *See, e.g.*, *Gulbankian v. MW Mfrs., Inc.*, No. 10-cv-10392, 2014 WL 7384075, at *3 (D. Mass. Dec. 29, 2014) ("in assessing the weight of objections to class settlement agreements, the district court may properly consider the fact that the most vociferous objectors were persons enlisted by counsel competing with [lead] counsel for control of the litigation") (citing *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998)); *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 633 (11th Cir. 2015) (affirming trial court in overruling objector whose competing case would be barred by settlement approval and stating "the Court now has serious concerns" about the objector's "ulterior motive").

Each objector essentially asks the Court to discard the Settlements because each wishes to continue pursuing its own copycat case on a classwide basis. But the objectors fail to address the essential problem underlying their position: the alternative to a nationwide settlement is sprawling litigation comprised of potentially dozens of local suits that would bankrupt each of these Defendants in the event any one case succeeds. Each objector nevertheless apparently seeks such a result, even though it would harm the Class members each seeks to represent by likely leaving them with no relief. They do so instead of supporting these landmark Settlements that will change the way homes are bought and sold and save money for consumers nationwide. Copycat counsels' objections should be rejected.

1. **The Court should overrule the South Carolina objection by Douglas, Cheatman, Fender, and Fender (Doc. 464)**

The lawyers prosecuting copycat cases in South Carolina filed an objection on behalf of four home sellers in South Carolina. South Carolina objectors did not file suit until *after* the *Burnett* verdict and after *Gibson* was filed. Instead of a global resolution, certainty, and practice changes, they seek to unwind the Settlements, which would result in protracted, inefficient, and costly piecemeal litigation that would unnecessarily proceed on a state-by-state basis and yield worse results for Class members, including their own clients.

a. **The Monetary Recovery Is Fair, Reasonable, and Adequate**

The South Carolina objectors complain that the aggregate monetary recovery reflected across all of the settlements in this action and the *Burnett* action is too low. Yet, they incorrectly assert that the "total recovery is only $318,500,000" (Doc. 464 at 3), when total settlements to date across both actions exceed $1 billion. Moreover, the South Carolina objectors do not argue that any particular settlement in this action is inadequate; indeed, they fail to address the individual settlements at all. They do not even say what total amount *would have* been reasonable and adequate, only that they do not like what was obtained. Nor do they assert that the Settlements were the product of collusion or any conflict.

The applicable standard is whether the settlements are fair, reasonable, and adequate—not whether they provide complete relief to all Class members. *See Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 54 (W.D.N.Y. 2018) ("The court's task, then, is simply to decide whether the settlement agreement *as written* is fair, reasonable, and adequate, not whether the parties or the court could conceivably have come up with a 'better' agreement.").

"As courts routinely recognize, a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair,

unreasonable or inadequate." *Keil*, 862 F.3d at 696; *see also Pro. Firefighters Ass'n of Omaha, Loc. 385*, 678 F.3d at 649 ("Appellant falls far short of establishing the settlement agreement was unfair or inadequate simply because the retirees did not get as much as they believed they should."); *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984) (approving settlement despite the fact that "the settlement amount would not begin to cover the total costs of medical treatment for the class which easily could amount to billions of dollars" and holding "[t]he fact that the settlement amount may equal but a fraction of potential recovery does not render the settlement inadequate"), *aff'd*, 818 F.2d 145 (2d Cir. 1987); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312–13 (N.D. Ga. 1993) ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. The trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." (cleaned up)).

Nor must a settlement exhaust all of a settling defendant's financial resources in order to be deemed fair, reasonable, and adequate. *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) ("[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate.") (quoting *In re Sony SXRD Rear Projection T.V. Class Action Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)); *see also Petrovic*, 200 F.3d at 1153 ("While it is undisputed that [the settling defendant] could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate."); *Grunin*, 513 F.2d at 125 (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

In reaching these settlements, Class Counsel, who have extensive antitrust experience and have vigorously litigated these related cases for years, sought to obtain the best possible recovery for the Class. There is no suggestion here, nor could there be, that Class Counsel were uninformed, lacked experience and expertise, or were somehow prevented from negotiating the best deals possible for the Class. To the contrary, Class Counsel negotiated these settlements based on their extensive knowledge of the issues, including liability, damages, the risks of continued litigation, and the financial condition of the Settling Defendants. Class Counsel also analyzed the finances of each of the Settling Defendants, including the risk that each could file for bankruptcy protection, which likely would have resulted in lower recoveries, if any, for the Class than will be obtained via the Settlements. Berman Decl. ¶ 12. The settlement amounts, which were ultimately reached only after arm's length negotiations between experienced counsel represented the most Class Counsel believed each Settling Defendant was reasonably able and willing to pay given the financial and legal circumstances existing at the time of each Settlement.

### b.     The Scope of the Releases is Appropriate

The South Carolina Objectors also purport to object to the scope of the releases reflected in the Settlements—but their objection is based on a plainly incorrect understanding of what the releases actually say and do. *First*, the South Carolina Objectors mistakenly claim that the Settlements include a release for "local realtors whose annual sales volume is less than Two Billion." Doc. 464 at 4. This is wrong. The Settlements at issue here do not contain such a provision. *Second*, the South Carolina Objectors appear to argue that certain MLSs would be released by the Settlements. This is likewise incorrect. The Settlements at issue here do not release any MLSs. *Third*, the South Carolina Objectors assert that they have sued "local entities" in South Carolina that would be released by the Settlements. *Id.* But the South Carolina Objectors do not point to any such "local entities" they have sued that would be released. Although the South

Carolina Objectors did sue Settling Defendants @World Properties and Realty ONE Group, both are real estate brokerage companies with a significant national presence.

In addition, the South Carolina Objectors refer to "Realtors" being released, but it is unclear whether they intended to object to the release of individual real estate agents or, instead, to "local entities" whose brokers are NAR members. *Id.* Regardless, the South Carolina Objectors have not sued individual real estate agents and do not explain how complex and expensive antitrust suits could proceed against more than a million individual real estate agents. Moreover, the release of individual real estate agents was bargained for as part of the settlement agreement. Such releases of employees and agents of defendants are common and appropriate. *See In re Am. Inv'rs Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 240 (E.D. Pa. 2009) (overruling objection to release of independent sales agents of insurance company because "the release of agents is a necessary component of the settlement agreement in order to provide finality. Otherwise, dissatisfied policyholders could sue the defendants' agents who would then, in turn, look to the defendants for indemnity or contribution.") (citing *In re Prudential Ins. Co. of Am. Sales Prac. Litig. Agent Actions*, 962 F. Supp. 450, 522-23 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)); *Shay v. Apple Inc.*, No. 3:20-cv-1629, 2024 WL 1184693, at *8 (S.D. Cal. Mar. 19, 2024) ("The release of non-party retailers is common practice in cases such as this, where the released claims against these non-parties concern an identical injury arising from common facts.") (citing *Hesse v. Sprint Corp.*, 598 F.3d 581, 590-91 (9th Cir. 2010)); *Maine State Ret. System v. Countrywide Fin. Corp.*, No. 10-CV-00302, 2013 WL 6577020, at *7, *17 (C.D. Cal. Dec. 5, 2013) (overruling objection that argued "non-parties cannot be released for the claims asserted in the Settlement Actions"); *Retta v. Millennium Prods., Inc.*, No. 15-CV-1801, 2017 WL 5479637, at *8 (C.D. Cal. Aug. 22, 2017) (overruling objection that release of third party retailers was

inappropriate: "this argument is meritless because the purpose of the settlement is to prevent duplicative litigation of identical claims . . . . Millennium is a manufacturer that sells its products through various retailers, so any claims Ference purports to have against third-party retailers of the Subject Products are going to be based on the same false or misleading labeling allegations asserted here. This objection is overruled."); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108–09 (2d Cir. 2005) (approving class settlement with broad releases including non-parties, such as member banks, insurance companies, and Swiss governmental entities).

The same is true with respect to releases of franchisees. *See Flaum v. Doctor's Assocs., Inc.*, No. 16-CV-61198, 2019 WL 2576361, at *3 (S.D. Fla. Mar. 11, 2019) (final approval of settlement releasing all Subway franchisees in suit against Subway franchisor); *Adkins v. Nestle Purina PetCare Co.*, No. 12-CV-2871, 2015 WL 10892070, at *4 (N.D. Ill. June 23, 2015) (final approval of settlement releasing variety of non-parties, including suppliers, manufacturers, retailers, and franchisees); *McCabe v. Six Continents Hotels, Inc.*, No. 12-CV-4818, 2015 WL 3990915, at *3 (N.D. Cal. June 30, 2015) (preliminary approval of settlement releasing franchisees) & ECF No. 167 (Feb. 8, 2016) (ordering final approval of settlement). Absent such releases, the Settling Defendants have said that they would have, through the very act of settling the litigation, exposed themselves to potential litigation by their franchisees. They further claim that they either would not have settled on the same terms agreed or would not have settled at all, thus reducing the overall recovery to the Class.

### c.    The Contents of Notice Were Robust

The South Carolina Objectors also object to the adequacy of the class notices. In doing so, they do not argue that the form of notice or manner for distributing class notice was deficient. Instead, they assert that the notices lacked the following information, which they claim was necessary for Class members to decide whether to participate in the Settlements: (1) the fact of a

jury verdict in *Burnett*; (2) an explanation of the size of the class; and (3) information "for class members to evaluate whether there could be better outcomes in their own jurisdictions." Doc. 464 at 5-7. None of these is a basis for rejecting the Settlements.

In fact, Class members were provided with the information the South Carolina Objectors advocate for. *First*, the notices indicated that "[o]n October 31, 2023, a jury found in favor of Plaintiffs against different defendants in a related action: *Burnett et al. v. National Association of Realtors, et al.*, Case No. 19-CV-00332-SRB (Western District of Missouri)."[5] The amount of the verdict was also reflected in Plaintiffs' Motion for Attorneys' Fees, which was posted on the settlement website. *See, e.g.*, Doc. 399 at 8, 12. *Second*, the notices reflect that the Settlement Class includes homes listed on MLSs throughout the country over a multi-year period. Any reasonable person would have understood such a class to encompass millions of home sellers. Even so, Plaintiffs' preliminary approval briefing, which was posted on the settlement website, made this point explicitly, advising that "Plaintiffs estimate that Settlement Class Members number in the tens of millions, dispersed across the United States." *See, e.g.*, Doc. 161 at 18. *Third*, the notices included a list of "other similar cases," among them the names and case numbers of both cases filed by the South Carolina Objectors.[6] The South Carolina Objectors do not say what other information Class members need "to evaluate whether there could be better outcomes in their own jurisdictions," Doc. 464 at 7, or explain why the detailed twelve-page long form notice, website FAQs, and other relevant documents included on the settlement website were insufficient.

---

[5] https://www.realestatecommissionlitigation.com/admin/api/connectedapps.cms.extensions/asset?id=b22f5e1b-4e96-4832-9f07-e588c4bd9f9b&languageId=1033&inline=true.

[6] https://www.realestatecommissionlitigation.com/admin/api/connectedapps.cms.extensions/asset?id=b22f5e1b-4e96-4832-9f07-e588c4bd9f9b&languageId=1033&inline=true.

Moreover, "the mechanics of the notice process are left to the discretion of the court subject only to the broad 'reasonableness' standards imposed by due process." *Grunin*, 513 F.2d at 120. "As a general rule, the contents of a settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with (the) proceedings." *Id.* at 122 (quotation omitted). "Valid notice of a settlement agreement 'may consist of a very general description' of settlement terms." *In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013) (quoting *Grunin*, 513 F.2d at 122).

The notice here easily satisfied this standard. Among other things, it apprised Class members of the nature of the action; the class claims and issues; and the settlement terms. It also advised Class members of their options, including their right to file objections, opt out, and appear at the fairness hearing. And it explained how Class members could obtain additional information including by contacting Class Counsel, contacting the claims administrator, and through the settlement website, which included numerous key case documents, FAQs, and every Settlement Agreement.

Courts regularly find that similar notices satisfy Rule 23's requirements. *See, e.g.*, *In re Uponor, Inc., F1807 Plumbing Fittings Products Liability Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013) (rejecting objectors' argument that notice was defective because it did not adequately explain the scope of liability releases where the notice explained that certain claims were being released and "provided a link to the settlement website, a description of the opt out procedure, and a toll free number to pose questions to the claims administrator" for more information); *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752, 764 (10th Cir. 2020) (rejecting objections to notice that described the "general" terms of the settlement and explained how to get

further information); *In re Uponor*, 716 F.3d at 1065 (notice that generally described claims being released, "provided a link to the settlement website, a description of the opt out procedure, and a toll free number to pose questions to the claims administrator," was adequate); *Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) ("The notice adequately described the nature of the pending action, the claims asserted therein, and the general terms of the proposed settlement. It informed the shareholders that additional information was available from the court's files. It also informed them of the time and place for the settlement hearing and their right to participate therein.").

Nor do the South Carolina Objectors cite any authority that would have required Plaintiffs to provide information beyond what was reflected in the class notice. With good reason. Courts are unanimous that not every detail of the litigation need be included in settlement notices and have rejected objections seeking the inclusion of every conceivable detail. *See, e.g.*, *Vargas v. Capital One Financial Advisors*, 559 F. App'x. 22, 27 (2d Cir. 2014) (a settlement notice need only apprise class members of the settlement terms and "of the options that are open to them in connection with the proceedings," and, consequently, rejecting objector's arguments that notice was inadequate because it failed affirmatively to advise unsatisfied class members to opt out and failed to calculate the damages sustained by each individual class member); *In re TikTok, Inc., Consumer Privacy Litig.*, 2022 WL 2982782, at *18 n.20 (N.D. Ill. July 28, 2022) ("Rule 23 does not require the settlement notice to contain every last bit of information necessary to file an objection."); *Good v. Am. Water Works Company, Inc.*, 2016 WL 5746347, *9 (S.D. W. Va. Sept. 30, 2016) ("The basic requirements of Rule 23 and due process are intended to ensure that notices fairly and reasonably apprise class members of a pending action affecting their rights and their options with respect to that action, but those requirements should not transform the notice into a

long brief of the parties' positions, precise in every detail and slated in such fashion as to please every litigant." (quotation omitted)).

Notices do not need to include every detail because "[c]lass members are not expected to rely upon the notices as a complete source of settlement information." *Grunin*, 513 F.2d at 122; *see also UAW v. General Motors Corp.*, 2006 WL 891151, *33 (E.D. Mich. Mar. 31, 2006) ("It is inevitable that some details will be omitted from a notice, but the fact that the notices do not fully explore certain issues is immaterial. Class members are not expected to rely upon the notices as a complete source of settlement information." (cleaned up)). For instance, in *Petrovic*, the Eighth Circuit rejected the "contention that a mailed notice of settlement must contain a formula for calculating individual awards" because "[t]he notice described with sufficient particularity the stakes involved: the settlement of environmental claims against [the defendant], the award of significant injunctive relief, and the potential aggregate payout of over seven million dollars in compensatory damages." *Petrovic v. Amoco Oil Co.*, 200 F.3d at 1152–53.

Moreover, notices that are overly long and complex are counter-productive because they reduce the likelihood that Class members will actually review and understand essential information. *See Kagan v. Wachovia Securities, L.L.C.*, 2012 WL 1109987, at *10 (N.D. Cal. Apr. 2, 2012) ("[The proposed notice] is simply too long. The Court is concerned that few class members will read a fifteen-page, single-spaced Class Notice.").

### 2. The Court Should Overrule the New York Objections. (Docs. 467 (Friedman), 470 (March))

Attorneys who filed two copycat cases in New York federal courts after both the *Burnett* verdict and the *Gibson* complaint have submitted objections to certain of the Settlements[7] on behalf

---

[7] The New York Objectors have stated that they are collectively objecting only to the Compass, Douglas Elliman, @properties, and Engel & Völkers Settlements.

of their clients, Robert Friedman and Monty March (the "New York Objectors"). The New York Objectors claim their cases are "wholly distinct" from the *Gibson* case (Doc. 467 at 3) and should not be subject to the nationwide releases reflected in the Settlements. They further assert that their claims do not share the same "factual predicate" as the *Gibson* case. They are wrong.

*First,* the basis behind the New York objection is unequivocally rebutted by the plain language of the *Gibson* Complaint. Plaintiffs here plead a nationwide conspiracy on behalf of a nationwide class that expressly challenges rules adopted by the Residential Listing Service ("RLS") of the Real Estate Board of New York ("REBNY"). *See* Doc. 232, Consolidated Am. Compl., ¶ 182. Indeed, the *Gibson* Complaint includes specific allegations regarding the particular anticompetitive policies adopted in REBNY RLS:

> The RLS offers an MLS service in New York City—primarily in Manhattan. Until recently, the RLS rules created a default rule that the compensation offered to buyer-brokers would be equal to 50% of the total compensation received by the listing broker. Moreover, the RLS rules required that any change in the original listing had to be entered into RLS, thus requiring that any change had to apply to all buyer-brokers and thus maintaining a requirement of blanket offers. RLS rules also restrained negotiation of offered buyer-broker commissions by providing, "Any negotiation of the reduction of a brokerage commission must be done with both the Exclusive Broker and the Co-Broker's approval of the commission reduction."

*Id.* ¶ 182. Given this language, the New York objection is open and shut. There is no basis to claim that the *Gibson* case's challenge to REBNY RLS rules does not share a "factual predicate" with other claims challenging those same RLS rules.

Even so, the Complaint further alleges that anticompetitive restraints, including those promulgated by NAR, apply to brokers nationwide, including to non-Realtor MLSs like REBNY RLS because:

> these MLSs and their participating brokerages are generally subject to the same or similar anticompetitive restraints that apply in MLSs that are under NAR's formal control, including because: (i) all realtor members of non-NAR MLSs are subject

to NAR's Code of Ethics; and (ii) each non-NAR MLS has adopted the same or similar anticompetitive restraints as those imposed by NAR on its affiliated MLSs.

*Id*.

The Complaint alleges that, as a result, "Defendants' conspiracy has had the following anticompetitive effects *nationwide*," including in REBNY RLS: (a) "Home sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their homes—thereby substantially inflating the cost of selling their homes"; (b) "Home sellers have been compelled to set a high buyer-broker commission to induce buyer-brokers to show their homes to home buyers."; (c) "Home sellers have paid inflated buyer-broker commissions and inflated total commissions."; (d) "The retention of a buyer-broker has been severed from the setting of the broker's commission; the home buyer retains the buyer-broker, while the home seller sets the buyer-broker's compensation"; (e) Price competition among brokers to be retained by home buyers has been restrained." *Id*. ¶ 225 (emphasis added); *see also id*. ¶¶ 28, 227 (describing "nationwide" impact).

The New York Objectors ignore that the supposed non-NAR MLS at issue in their cases is, in fact controlled by, "NAR-aligned brokerages and [is] not fully independent from NAR." *See id*. ¶ 182 (describing in detail NAR's and its members' control over and influence of MLSs not exclusively owned or operated by NAR associations). Indeed, there are more than 17,000 NAR members in the New York City area alone. *See* https://www.realtor.com/realestateagents/new-york_ny. Thus, to claim that these real estate agents are parties to a REBNY-only conspiracy is wrong.

*Second*, the New York Objectors' belated assertion that their claims do not share the same "factual predicate" as the *Gibson* case (Doc. 467 at 2; Doc. 470 at 3) is contradicted by their own prior judicial admissions. Although the New York Objectors *now* maintain that their cases are

"wholly distinct and unrelated" to this one,[8] they and their counsel filed complaints expressly linking their claims to the rules challenged in *Gibson*, including those adopted by NAR. For instance, the *March* complaint, 1:23-cv-09995 (S.D.N.Y.), which was filed two weeks after the *Burnett* verdict and the *Gibson* Complaint, alleges:

- **"NAR regulations include, in effect, the same rule as REBNY** that mandates the payment of commission by a Seller Broker to a Buyer Broker." Class Action Compl. at ¶ 73, *March v. REBNY*, 1:23-cv-09995 (S.D.N.Y. Nov. 13, 2023) (emphasis added).

- "**Like the REBNY Listing Service rule, the NAR Handbook and Code of Ethics** require residential real estate Sellers to make a blanket, unilateral, and effectively non-negotiable offer of compensation to any Buyer's Broker whenever listing a home on a MLS owned or controlled by a local NAR association. If a buyer, represented by a Buyer's Broker, purchases residential real estate, under such a non-negotiable offer of compensation, then the Buyer Broker receives the offered compensation as outlined in the listing agreement." *Id.* at ¶ 81 (emphasis added).[9]

- "REBNY Listing Service rules specifically require the Seller to make a non-negotiable offer of compensation (as a commission) to the Buyer Broker when listing Manhattan residential real estate for sale and to pay the Buyer Broker's commission." *Id.* at ¶ 9.

- "This rule forces a Seller to pay the Buyer Broker's commission, eliminates negotiation of the Buyer Broker's compensation, artificially inflates the Buyer Broker's commission, and substantially increases the transaction cost of the Seller." *Id.*

Similarly, the *Friedman* complaint, filed more than two months after the *Burnett* verdict and the *Gibson* Complaint, admits that "NAR rules similar to the [REBNY] broker allocation rules have been found to be anticompetitive." Class Action Compl., at p. 23, *Friedman v. REBNY*, 1:24-cv-0405 (S.D.N.Y. Jan. 18, 2024). The Complaint further alleges:

- "A jury has already found NAR and several brokerage firms liable for violating federal and state antitrust under a theory of liability similar to that alleged in this complaint." *Id.* at ¶ 84 (citing *Burnett* verdict).

---

[8] *See* Doc. 467 at 3.

[9] *See also id.* ¶¶ 81-100 (detailing NAR's anticompetitive rules, prior litigation challenging those rules, and the close relationship of both to REBNY's rules).

- "Like REBNY, both NAR and MLS PIN established rules that require Sellers to make blanket, unilateral, and effectively non-negotiable offers of compensation to Buyer Brokers whenever Seller Brokers list a home for sale on an MLS. If a Buyer represented by a Buyer Broker purchases a home under such a non-negotiable offer of compensation, then the Buyer Broker receives the offered compensation as outlined in the applicable listing agreement." *Id.* at ¶ 85.

- "The Broker Commission Allocation Rules also require Defendants to list residential properties . . .with blanket offers of Buyer Broker commissions at the time of listing. This helps ensure that Defendants both dominate REBNY Brooklyn's residential real estate market and steer home buyers to listings with high Buyer Broker commissions." *Id.* at ¶ 3.

- "Defendants' conspiracy has artificially inflated broker commissions to a range of 5-6% of the sale price in nearly all residential real estate transactions in REBNY Brooklyn—half of which automatically goes to the Buyer Broker—an overcharge that is borne entirely by the home seller. In a competitive market, the home seller negotiates and pays a fee to the Seller Broker, while the home buyer that employs the services of a broker negotiates and pays a fee to the Buyer Broker. In a market unrestrained by the Broker Commission Allocation Rules, brokers would be forced to compete on price, and home sellers would pay substantially less in broker fees when selling residential real estate." *Id.* at ¶ 4.

As the New York Objectors' own complaints reflect, the challenged NAR and REBNY rules are functionally identical. Indeed, in alleging, for instance, that "the NAR regulations include, in effect, the same rule as REBNY," counsel for the New York Objectors certified in federal court that: (i) they had conducted a reasonable inquiry into their allegations, and (ii) "to the best of [their] knowledge, information, and belief" those allegations had "evidentiary support." Fed R. Civ. P. 11(b). The New York Objectors are not permitted to walk back those allegations now simply because they may not be able to litigate their copycat cases if the Settlements they challenge are approved.

*Third*, consistent with Plaintiffs' allegations in *Gibson*, the evidentiary records in *Burnett* and *Moehrl* reflect that: (i) the REBNY RLS rules challenged here were anticompetitive in similar ways to the challenged NAR rules; and (ii) the challenged NAR rules applied nationwide,

including to transactions in REBNY RLS. Plaintiffs' experts analyzed rules implemented by non-NAR MLSs, including REBNY/RLS, (8-10-22 Schulman Reply Rept., *Burnett* Doc. 922-3 at pp. 23-25) and concluded that Realtors operating in those jurisdictions "remain obligated to compensate the buyer's agent per the NAR Code of Ethics and are thereby incentivized to require sellers to make unilateral offers of compensation to buy-side brokers/agents." *Id.* at ¶ 75 (8-10-22 Schulman Reply Rept., *Burnett* Doc. 922-3 at pp. 23-25). Prof. Einer Elhauge further opined as part of a detailed, multi-page analysis of REBNY's rules that "the RLS rules, like the NAR [Buyer Broker Commission Rule (BBCR)], required listings to include an offer of buyer-broker compensation whenever sellers wanted to sell to buyers who were represented by buyer-brokers" and "had several other restraints similar to the NAR version of the BBCR." Elhauge Class Cert. Rebuttal Report, at ¶ 67, *Moehrl v. Nat'l Assn. of Realtors* (N.D. Ill. Oct. 18, 2022) (Doc. 372). The New York Objectors ignore or misrepresent these analyses.[10] *See also Burnett* Trial Transcript at Tr. 1908:6-7 (noting that in REBNY "[t]his is one version of the practice of cooperative compensation"); D's Ex. 3785 (REBNY rules discussed at *Burnett* trial). Thus, the challenged REBNY rules were not "wholly unrelated" to *Burnett* or *Gibson*.

*Fourth*, the New York Objectors tack on to the end of their filings a laundry list of other objections almost entirely devoid of legal authority or explanation. To the extent the Court considers these objections at all, it should reject them.

---

[10] The New York Objectors also incorrectly assert that NAR's Mandatory Offer of Compensation Rule was adopted in 1996—after REBNY left NAR. Doc. 470 at 3. In fact, the *Gibson* Complaint alleges that the "[i]n *1992*, NAR adopted the Buyer Broker Commission Rule as part of its Handbook on Multiple Listing Policies" and that, prior to that date, NAR had similarly anticompetitive rules that mandated cooperative compensation to subagents. Compl. ¶¶ 133, 136 (emphasis added).

(A) The New York Objectors assert that the Class Representative "do not have standing" to settle their claims. Doc. 467 at 13. Yet they fail to point to any authority showing whether or how standing is relevant to settlement approval. Regardless, the Class Representatives allege that they were injured as part of the same anticompetitive conspiracy that impacts sellers of homes on REBNY RLS. That is sufficient.

(B) The New York Objectors complain that the total settlement amount is inadequate to fully compensate them for their injuries. But as described above, that is not the proper legal standard for assessing adequacy. The New York Objectors further claim that Plaintiffs have not provided evidence of the Settling Defendants' ability to pay limitations. That is incorrect. *See* Berman Decl. at ¶¶ 2, 6-11. In addition, Settling Defendants Douglass Elliman and Compass are publicly traded companies whose financial records are publicly accessible. Despite that fact, the New York Objectors make no effort to analyze those records or explain how they show that the Settlements are inadequate.

(C) Although the New York Objectors concede that the practice changes reflected in the settlements are a "commendable step in the right direction," they vaguely complain that those changes could have been stronger and lasted longer. Doc. 470 at 15. But that is true in essentially any settlement that is the product of compromise and is not a basis for rejecting the Settlements here. Even so, the New York Objectors say nothing about what other practice changes should have been included or how it would have been practical to obtain such practice changes from the Settling Defendants, rather than from REBNY—which is not released by the Settlements.

(D) The New York Objectors also incorrectly assert that Class members who sold homes on REBNY have not been given guidance on whether they "will be provided a *pro rata* distribution" or if the higher commissions some of those Class members paid will be reflected in

claim payments. Doc. 470 at 15. In fact, the settlement website advises both that: (i) settlements payment "will take into account the amount of commissions class member claimants paid to a real estate broker or agent"; and (ii) "[t]o the extent the value of total claims exceeds the amount available for distribution from the settlement funds, each class member's share of the settlement may be reduced on a pro rata basis." Settlement FAQ 11.[11]

(E) Objector Friedman asserts, with no basis whatsoever, that the Settlements' inclusion of sellers who listed homes on REBNY "appears to be the product of a so-called 'collusive settlement.'" Doc. 467 at 14. As discussed above at length, Class Counsel diligently sought to obtain the largest possible recovery on behalf of the nationwide, given the strength and risks of the litigation, including the Settling Defendants' financial limitations. The New York Objectors fail to point to any supposed evidence suggesting otherwise, beyond the mere fact that overlapping claims in a different lawsuit are within the scope of the release. That is not a basis for rejecting the Settlements.

Finally, the vast majority of Class members from New York favor approval of the Settlements. Although the claims deadline is still months away, over 13,000 New York residents have already submitted claims; and none have objected (aside from the clients of counsel with competing class litigation). Keough Decl. at ¶ 51. If the Settlements are not approved, many of these Class members risk receiving no compensation for their injuries.

### 3. The Court Should Overrule the *Batton* Objections (Doc. 471 (Mullis))

The *Batton* objectors seek to carve out indirect purchaser buyer claims from the releases. But that request ignores reality. Every class member sold a home during the class period, and most also bought homes. After all, few people sell a home without first buying it. And most home sellers

---

[11] https://www.realestatecommissionlitigation.com/gibson-faq

then buy a different home with the proceeds because they need somewhere to live. Thus, most Class members had possible claims both as home sellers and home buyers. Yet, Settling Defendants quite reasonably balked at paying large amounts in settlement only to have the same people they just paid sue them again for the same alleged antitrust conspiracy.

The parties carefully crafted the releases to incorporate the Eighth Circuit's "same factual predicate" standard, and to otherwise comply with federal law. This standard recognizes that basic fairness stops a party from suing twice for the same wrong. When cases go to final judgment, res judicata bars relitigating not only the claims tried, but also claims that "could have been raised" in that action. *Brown v. Kansas City Live, LLC*, 931 F.3d 712, 714 (8th Cir. 2019). The same holds true in class actions litigated to conclusion. *In re General Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 803 (8th Cir. 2004). And for class judgments that arise from settlement, courts have developed a parallel test that gives preclusive effect to all claims—even those not pleaded—that "arise out of the same factual predicate as the pleaded claims." *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013). The same rules apply because "'the situation is analogous to the barring of claims [under res judicata] that could have been asserted in the class action.'" *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 191 (8th Cir. 1993) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982)).

Each settlement incorporates the *Uponor* standard by limiting the term "Released Claims" to include only causes of action "arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions . . . ." Compass Settlement Agreement at ¶ 11. In addition, "[f]or avoidance of doubt" as to enforceability, the releases "extend[] to, but only to, the fullest extent permitted by law." Compass Settlement Agreement at ¶ 28. By using these legal terms of art, the parties

correctly restricted the releases' scope. The Class members would have been bound by res judicata if the case had proceeded to final judgment, and the releases impose no greater preclusive effect from settlement. The releases also apply only to people who accept benefits under the settlement. Every class member is free to weigh their competing claims and make a choice. If they choose to accept benefits under the settlement, then they release all claims, including indirect purchaser buyer claims. Or they can opt out and pursue buyer claims either individually or in *Batton* (should a court ever certify that class). And people with buyer-only claims are completely unaffected because they are not part of the class.

The *Batton* objectors argue that the settlements release indirect purchaser buyer claims "for no additional consideration." Doc. 471 at 8. Having properly limited the scope of the releases based on the "same factual predicate" standard, however, the parties were under no further obligation to assign separate settlement values to every distinct claim that Class members might have asserted. As the Eighth Circuit recognized in *In re General American Life Insurance Co. Sales Practices Litigation*, 357 F.3d 800, 805 (8th Cir. 2004), that argument ignores "the way settlements usually work."

Like the objectors here, the *General American* plaintiff tried to void a class settlement release by complaining that "the class representative gave away all modal-billing claims (in the release) and received nothing in exchange for them." *Id*. Thus, the argument went, class members (including the plaintiff) received compensation for one type of claim, but "plaintiff and others similarly situated received nothing for their modal-billing claims." *Id*. But the Court rejected this contention because it ignored the give-and-take nature of the settlement process:

> It simply is not true that modal-billing claims were given away for nothing. It is true that no separately stated consideration was paid for those claims, but that is quite another thing. In addition to the claims specifically pleaded in the class action, all claims related to policy charges, necessarily including modal-billing claims,

were released. The release of the latter category of claims was one of a series of benefits conferred on the defendant by the class as part of the settlement. On the other side, defendant conferred benefits on the plaintiff class, including a monetary settlement, from which the plaintiff in this case has benefitted, and a claims-evaluation procedure that could produce additional relief. No part of the consideration on either side is keyed to any specific part of the consideration of the other. Each side gives up a number of things.

*Id.*; *accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005) (quoting same). The Eighth Circuit further declined to enmesh itself in trying to determine "the relative value of the modal-billing clams," and instead deferred to the judgment of the class representative and class counsel that releasing all claims arising from the same factual predicate "was a proper thing to give up to obtain the benefits offered by General American." *In re General Am.*, 357 F.3d at 805.

The same applies here. Plaintiffs bargained for and obtained great benefits: money at the limits of Defendants' ability to pay, along with injunctive relief eliminating the challenged business practices. This relief is immediate and certain, eliminating litigation and bankruptcy risk threatened by complex additional proceedings. But every negotiation has two sides, and Plaintiffs made the judgment that providing a release tracking federal law by releasing all claims arising from the same conspiracy was "a proper thing to give up to obtain the[se] benefits." *Id.* There was no "discount applied" to buyer claims because "[n]o part of the consideration on either side" was "keyed to any specific part of the consideration of the other." *Id.* Rather, a complete release—including indirect purchaser buyer claims—was "part of the consideration necessary to obtain [one of] the largest antitrust settlement[s] in history." *Wal-Mart Stores*, 396 F.3d at 113. Nor were any Class members bound by this determination involuntarily; dissenters retained the right to opt out. The *Batton* objectors have offered no evidence to enable the Court to second-guess Plaintiffs' determination, and the Court should decline to do so.

43

The *Batton* objectors also argue that indirect purchaser buyers require their own subclass. Yet "[a] class need not be subdivided merely because different groups within it have alternative legal theories for recovery or because they have different factual bases for seeking relief." 7AA C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1760 (3d ed. June 2024 update). Rather, conflicts arise (and subclasses are required) only "when the class is found to have members whose interests are divergent or antagonistic." *Id.*; *see also DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995) ("There is no indication that DeBoer's interest was antagonistic to the remainder of the class or that the claims were not vigorously pursued."). *Cf. Petrovic,* 200 F.3d at 1146 ("If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that argument is untenable. It seems to us that almost every settlement will involve different awards for various class members."). No such conflict of interest is presented here.

The only people included in the settlement—and thus the only people giving any release—are people who sold homes during the class period.[12] Their interests are common and focused on achieving the greatest relief for the class. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes."). That many of these Class members also bought homes during the class period does not make their interests divergent or antagonistic.

The Supreme Court's decisions in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), provide no support for objectors' argument.

_____

[12] People who only bought homes during the class period are not Class members. They have released nothing and can continue to litigate indirect purchaser claims for damages should they so desire.

As the Eighth Circuit has recognized, *Amchem* and *Ortiz* were completely different product liability cases that involved stark conflicts of interest not present here. *Petrovic*, 200 F.3d at 1146. Both cases represented attempts to settle all asbestos cases, now and forever. *Id.* The "injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured." *Id.* Worse yet, the diseases had a latency period of up to 40 years, meaning that many class members currently suffered from no illness. *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 975 (8th Cir. 2018) (discussing *Amchem*). The Eighth Circuit stated that this latency period created an inherent conflict "between class members who already had asbestos-related injuries (and who would want to maximize immediate payout) and class members who might develop asbestos-related injuries in the future (and who would want to maximize testing, protection from inflation, and future fund size)." *Petrovic*, 200 F.3d at 1146. Adding to the problem, "the settlement offered no assurance that sufficient funds would remain to protect the interests" of future claimants. *In re Target Corp.*, 892 F.3d at 975 (discussing *Amchem*). In other words, both *Amchem* and *Ortiz* involved a strong likelihood that some claimants would be paid, but others (numbering in the hundreds of thousands) would receive nothing. That concern is not present here, where every class member sold a home and therefore will receive compensation. The settlements leave no Class members out.

The *Batton* objectors imply that *Amchem* and *Ortiz* require subclasses whenever Class members claim different amounts or types of damage. But *Petrovic* forecloses that argument. *Petrovic* was a class action arising from underground oil seepage originating from a petroleum refinery. In crafting settlement relief, the parties created three zones, labeled A, B, and C. Claimants in Zone A, situated above the underground oil, were "guaranteed to receive 54 percent of the value of their properties." *Petrovic*, 200 F.3d at 1145. Claimants in the surrounding Zone B

were guaranteed $1,300 per property. *Id*. And claimants in Zone C, the area farthest removed from the oil, could apply for compensation only by proving damage. *Id*. Faced with objectors from different zones, the Eighth Circuit held that *Amchem* and *Ortiz* required no subclasses: "If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable." *Id*. at 1146. Indeed, "almost every settlement will involve different awards for various class members." *Id*.

The same is true here. Every Class member stands to gain from the settlements, both in terms of money and injunctive relief. Each Class member could try to prove individual damages at trial and these amounts would all vary. But courts approve class settlements all the time that forgo these individual determinations. Indeed, the most common method for allocating settlement funds in antitrust cases is on a *pro rata* basis. *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020) ("courts uniformly approve as equitable" plans in antitrust cases that "allocate[] funds among class members on a *pro rata* basis."); *see also Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) (approving *pro rata* distribution of settlement fund as fair and reasonable).

*Amchem* and *Ortiz* also presented procedural settlement problems not presented here. As the Eighth Circuit recognized, each involved a settlement before litigation, presenting the district court with a complaint, proposed class, and proposed settlement all at the same time. *Petrovic*, 200 F.3d at 1145-46. This deprived the trial courts of "'the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.'" *Id*. at 1146 (quoting *Amchem*, 521 U.S. at 620). This case, by contrast, arises from facts extensively developed during the *Burnett* litigation and trial, giving the Court an extensive record on which to base its findings. *Id*. In

addition, *Amchem* and *Ortiz* presented the possibility of collusion between class counsel and the defendants. *Id*. No objector meaningfully alleges here any facts reflecting such collusion in connection with these settlements. The difficulties associated with *Amchem* and *Ortiz* therefore are not present.[13]

The *Batton* objectors also fail to demonstrate that the class representatives or counsel provided inadequate representation. The mere fact that some Class members might allege indirect purchaser buyer claims presents no divergent interests that would preclude general representation of an undivided class. This is because "[t]he interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they 'share common objectives and legal or factual positions.'" *Petrovic*, 200 F.3d at 1148 (quoting 7A Wright, Miller, and Kane, *Federal Practice and Procedure: Civil* 2d § 1769 at 367 (2d ed. 1986)). All Class members here "share the common objective" of ending Defendants' anticompetitive conspiracy and recovering the excessive commissions they paid as a result of that conspiracy. *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1064 (8th Cir. 2013).

The *Batton* objectors brush aside the valuable injunctive relief obtained by the settlements. But the financial payments to Class members are "not the only, or perhaps even the primary, benefit of the settlement agreement[s]." *Marshall*, 787 F.3d at 509. Rather, "the injunctive relief

---

[13] The *Batton* objectors' other cases are similarly distinguishable. *See In re Bank of America Securities Litig.*, 210 F.R.D. 694, 712 (E.D. Mo. 2002) (finding settlement unreasonable where it allocated no damages to set of claims that plaintiffs had previously pursued and represented as among the strongest in the case); *Branson v. Pulaski Bank*, No. 4:12-CV-01444-DGK, 2015 WL 139759, at *6-7 (W.D. Mo. Jan. 12, 2015) (rejecting settlement where there was no evidence of the merits of plaintiffs' claims and settlement appeared to stem from unequal bargaining power); *Martin v. Cargill, Inc.*, 295 F.R.D. 380, 385-87 (D. Minn. 2013) (rejecting proposed settlement submitted the day after complaint was filed when the court had no information about the potential damages or relative strengths and weaknesses of claims). The rest are cases where there were intractable conflicts between subclasses of class members holding present, known claims and those holding claims for potentially future, unknown injuries.

offered under the settlement[s] has value to all class members." *In re Target Corp.*, 892 F.3d at 974 n.6; *accord Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (argument that some class members "receive no money" fails because it "fails to acknowledge the injunctive relief offered by the settlement," which "is intended to benefit all class members regardless of individual monetary recovery."). The practice changes achieved by the settlements completely remake the residential housing market and will save *all* Class members many billions of dollars by lowering commissions on future home sales.

The *Batton* objectors also ignore the fact that the only people included in the settlements are people who sold homes during the class period. People who only bought homes are not Class members. Individuals who only purchased houses during the class periods can litigate indirect purchaser buyer claims any way they desire, whether individually or in *Batton*. *Batton* itself will continue to be litigated. This is not a case where anyone is releasing claims without compensation. Instead, all Class members "share the common objective of maximizing their recovery from [Defendants] for the same alleged misconduct." *Schutter v. Tarena Int'l, Inc.*, No. 21-CV-3502, 2024 WL 4118465, at *5 (E.D.N.Y. Sept. 9, 2024).

For these reasons, Objectors' reliance on *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011), is off the mark. *Literary Works* involved a settlement that placed claims in groups A, B, and C (each group arising under a different provision of the Copyright Act). *Literary Works*, 654 F.3d at 246. If claims exceeded a set cap, then Category C claims would be reduced first and might be eliminated entirely. *Id*. The Second Circuit therefore found a lack of adequate representation because Category A and B claims were "more lucrative" than Category C and "because the reduction of Category C claims could 'deplete the recovery of Category C-only plaintiffs in their entirety before the Category A or B recovery would be

affected.'" *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1277 (11th Cir. 2021) (quoting *Literary Works*, 654 F.3d at 252, 254). The settlement agreements here, by contrast, present "no risk that any members of the class will have their ability to get settlement benefits reduced to zero because some other members got more relief from the settlement." *Id.* Instead, "all class members are entitled to the same class benefits." *Id*. Again, the fact that many Class members both bought and sold a home presents no "fundamental conflict" that requires the use of subclasses or additional lawyers.

The *Batton* objectors also complain that "the settling parties have not made any plan of allocation available." Doc. 471 at 5. But this argument is premature and should be raised in the allocation phase. "[C]ourt approval of a settlement as fair, reasonable and adequate is conceptually distinct from the approval of a proposed plan of allocation." 2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update). "The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case," which "can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d. Cir. 1987).[14] Once the

---

[14] *See also In re Washington Pub. Power Supply Sys. Sec. Litig.*, MDL No. 551, 1988 WL 158947, at *4 (W.D. Wash. July 28, 1988) ("[D]eferral of allocation decisions is routinely followed in" these circumstances because "the appropriate allocation among class members can best be determined when further settlements have been achieved or the litigation is completely resolved."); *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019) ("In a case such as this, involving a large number of Class Members and two Non-Settling Defendants, it would be inefficient to distribute and process claims until the entire case has been resolved through litigation or otherwise and the Total Funds Available for Distribution are known."); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *2 (E.D. Mich. Feb. 22, 2011) (developing plan of allocation is properly delayed until after final approval of settlement where "the potential for additional settlements with other Defendants . . . may affect the final plan of allocation"); *Manual for Complex Litigation, Fourth* § 21.312 (2005) ("Often . . . the details of allocation and distribution are not established until after the settlement is approved.").

allocation plan is proposed, the Court will be in a position to consider that plan and approve "a second notice to Class Members, followed by a right to object and/or file a claim." *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019). That distribution decision will be "governed by the same standards of review applicable to approval of the settlement as a whole, *i.e.,* the distribution plan must be fair, reasonable and adequate." *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020). Any Class members who disagree with the proposed allocations—e.g., because they believe that plan insufficiently compensates home purchases—will be able to present such argument to the Court at that time. Nor do any Class members need allocation information in deciding whether to opt out of the settlements. The Eighth Circuit rejects the notion that Class members must be provided "a formula for calculating individual awards" when receiving notice—a description of the "potential aggregate payout" is enough. *Petrovic*, 200 F.3d at 1153.

Finally, the *Batton* objectors are wrong in arguing that buyer claims lie outside the same factual predicate as seller claims. In fact, releases in antitrust direct-purchaser settlements commonly cover all claims the settlement class members could raise against the settling defendant arising out of the same conspiracy, including when those direct purchasers may also have indirect-purchaser claims. *See, e.g.*, *In re Transpacific Passenger Air Transportation Antitrust Litigation* (N.D. Cal, 07-cv-5634), ECF No. 900-2 § 1.11 (releasing "any and all claims . . . on account of, arising from, or in any way related to, the pricing of passenger air transportation by JAL or Defendants . . . with respect to the facts, occurrences, transactions or other matters that were alleged or could have been alleged [in the action] . . . regardless of legal theory, and regardless of the type or amount of relief or damages claimed"); *In re: Processed Egg Products Antitrust Litigation* (E.D.P.A., MDL 2002), ECF No. 349-1 ¶ 25 (similar); *In re Intuniv Antitrust Litigation*

(D. Mass., 16-cv-12653), ECF No. 480-1 ¶ 10 (similar); *In re: Prograf Antitrust Litigation* (D. Mass. 1:11-md-2242), ECF No. 652-2 ¶ 10(a) (similar); *In re Pre-Filled Propane Tank Antitrust Litigation* (W.D. Mo. 14-md-2567 / MDL No. 2567), ECF No. 362-1 ¶ 12 (similar); *In re HIV Antitrust Litigation* (N.D. Cal, 19-cv-02573), ECF No. 711-2 at 11-12 (similar); *In re Broiler Chicken Antitrust Litigation* (N.D. Ill. 16-cv-8637), ECF No. 3324, ¶ 26 (similar). Courts have approved these settlements even over objections that the settlement improperly released or otherwise devalued a subset of claims. *See In re Transpacific Passenger Air Transportation Antitrust Litig.*, 701 F. App'x 554, 555-56 (9th Cir. 2017) ("The district court properly certified the settlement class and was not obligated to create subclasses for purchasers of U.S.-originating travel and direct purchasers of airfare. Federal Rule of Civil Procedure 23(a) does not require a district court to weigh the prospective value of each class member's claims or conduct a claim-by-claim review when certifying a settlement class."); *In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2023 WL 7397567, at *1 (N.D. Cal. Nov. 8, 2023) (rejecting indirect purchasers' request to set aside portion of direct-purchaser settlement).

Simply comparing the *Batton* complaint with Plaintiffs' complaint here shows that the buyer claims arise from the same factual predicate as the seller claims. *See also Batton I,* Mar. 5, 2021 Plaintiffs' Initial Joint Status Report, No. 21-cv-00430, at Doc. 48 ("In filing this case, Plaintiff took the position that this case is related to Moehrl v. NAR et al."); *Id.* at Doc. 59 – Transcript of Proceedings held on Mar. 23, 2021 (reflecting Mullis's counsel's representation that *Moehrl* "raises substantially similar allegations"). All such claims arise from the same common nucleus of operative facts, and any Class member with both seller and buyer claims would "ordinarily be expected to try them all in one judicial proceeding." *North Dakota v. Lange*, 900

51

F.3d 565, 568-69 (8th Cir. 2018). The Court therefore should reject the *Batton* objectors' attempt to force claim splitting between the seller and buyer claims.

## VII.    CLASS CERTIFICATION REMAINS APPROPRIATE

In its Preliminary Approval Orders, the Court provisionally certified the Settlement Class for settlement purposes, finding that the class met each of Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, and that the class met each of Rule 23(b)(3)'s predominance and superiority requirements. The Court was able to draw on its experience of overseeing related litigation for over five years in doing so. Nothing has changed since the Court's ruling to call the Court's conclusions regarding class certification into question. Accordingly, for the reasons set forth in the Preliminary Approval Motions and Orders, Plaintiffs ask that the Court certify the Settlement Class.

## VIII.  THE COURT SHOULD CERTIFY ITS ORDER AS FINAL

Finally, Plaintiffs and the Settling Defendants jointly request that this Court direct entry of a partial final judgment with respect to the Settlement Class's claims against the Settling Defendants pursuant to Federal Rule of Civil Procedure 54(b). Entry of a partial final judgment is appropriate here because there is no just reason to delay the practice change relief reflected in the Settlements or payments to Class members. It is also equitable to the Settling Parties to have a resolution as soon as possible in light of the arguments made in the record, and it is efficient because settlement approval leaves no remaining issues as to these Settling Defendants.

## IX.     CONCLUSION

The Settlement Agreements in this action with Compass, Real Brokerage, Realty ONE, @properties, Douglas Elliman, Redfin, Engel & Völkers, HomeSmart, and United Real Estate Defendants achieve the goals of the litigation, benefit the Settlement Class, and account for the

risks and uncertainties of continued, vigorously contested nationwide litigation. For the reasons set forth herein, the Settlements are fair, reasonable, and adequate, and merit final approval. Plaintiffs therefore respectfully request that the Court certify the Settlement Class, consider and overrule all objections to the Settlements, grant final approval of the Settlements, approve the requested attorneys' fees and expenses, and enter a final judgment as to the Settling Defendants. Plaintiffs will also submit a Proposed Final Approval Order for consideration by the Court.

October 24, 2024                                                Respectfully Submitted,


**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*
Steve W. Berman (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Rio S. Pierce (*pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
riop@hbsslaw.com

Jeannie Evans (*pro hac vice*)
Nathan Emmons (Mo. Bar. No. 70046)
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
jeannie@hbsslaw.com
nathane@hbsslaw.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Robert A. Braun*
Robert A. Braun (*pro hac vice*)
Benjamin D. Brown (*pro hac vice*)

**WILLIAMS DIRKS DAMERON LLC**

*/s/ Eric L. Dirks*
Eric L. Dirks                    MO # 54921
Michael A. Williams        MO # 47538
1100 Main Street, Suite 2600
Kansas City, MO 64105
Tele: (816) 945 7110
Fax: (816) 945-7118
dirks@williamsdirks.com
mwilliams@williamsdirks.com

**BOULWARE LAW LLC**

*/s/ Brandon J.B. Boulware*
Brandon J.B. Boulware        MO # 54150
Jeremy M. Suhr                    MO # 60075
1600 Genessee Street, Suite 956A
Kansas City, MO 64102
Tele:   (816) 492-2826
Fax:   (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com

**KETCHMARK AND MCCREIGHT P.C.**

*/s/ Michael Ketchmark*
Michael Ketchmark        MO # 41018
Scott McCreight             MO # 44002
11161 Overbrook Rd. Suite 210

Sabrina Merold (*pro hac vice*)
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
smerold@cohenmilstein.com

Daniel Silverman (*pro hac vice*)
769 Centre Street, Suite 207
Boston, MA 02130
Telephone: (617) 858-1990
dsilverman@cohenmilstein.com

**SUSMAN GODFREY L.L.P.**

*/s/ Marc M. Seltzer*
Marc M. Seltzer (*pro hac vice*)
Steven G. Sklaver (*pro hac vice*)
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Beatrice C. Franklin (*pro hac vice*)
One Manhattan West
New York, New York 10001
Telephone: (212) 336-8330
bfranklin@susmangodfrey.com

Matthew R. Berry (*pro hac vice*)
Floyd G. Short (*pro hac vice*)
Alexander W. Aiken (*pro hac vice*)
401 Union St., Suite 3000
Seattle, Washington 98101
Telephone: (206) 516-3880
mberry@susmangodfrey.com
fshort@susmangodfrey.com
aaiken@susmangodfrey.com

***Attorneys for Plaintiffs and the Class***

Leawood, Kansas 66211
Tele:   (913) 266-4500
mike@ketchmclaw.com
smccreight@ketchmclaw.com

***Attorneys for Plaintiffs and the Class***