**UNITED STATES DISTRICT COURT  FOR**
**THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

DON GIBSON, LAUREN CRISS, and JOHN
MEINERS, individually and on behalf of
themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF
REALTORS, et al.,

        Defendants.

Case No. 23-cv-788-SRB

**SUGGESTIONS IN SUPPORT OF FINAL APPROVAL OF THE SETTLING**
**DEFENDANTS' CLASS SETTLEMENTS**

<u>**TABLE OF CONTENTS**</u>

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND .................................................................................................. 2

III.    ARGUMENT ....................................................................................................... 6

        A.      The Settlements Are a Strong Result for Plaintiffs in Light of the Settling
                Defendants' Unique Defenses and Ability to Pay Limitations ............................ 6

        B.      Claims Related to Non-NAR-Affiliated MLSs Like REBNY are Properly
                Included in the Settlements. ................................................................................ 13

                1.      The operative complaints alleged claims related to non-NAR-
                        affiliated MLSs, including REBNY ......................................................... 13

                2.      Claims related to non-NAR-affiliated MLSs share the same factual
                        predicate as the claims in this case. ...................................................... 16

                3.      It would be improper and unfair to exclude the New York
                        Objectors' claims from the released claims. ........................................... 22

        C.      The Settlements Properly Encompass the Related Indirect, Buyer-Side
                Claims that Arise from Identical Facts. ............................................................. 25

IV.     CONCLUSION .................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. S. Farm Bureau Life Ins. Co.*,
493 F.3d 1276 (11th Cir. 2007) ...........................................................18

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
272 F. App'x 9 (2d Cir. 2008) ...............................................................18

*Albert v. Blue Diamond Growers*,
232 F. Supp. 3d 509 (S.D.N.Y. 2017)...............................................22, 23

*Albin v. Resort Sales Missouri, Inc.*,
No. 20-03004-CV-S-BP, 2021 WL 5107730 (W.D. Mo. May 21, 2021) ..............16

*Batton et al. v. Compass et al.*,
Case No. 1:23-cv-15618 (N.D. Ill.) ....................................................5, 26, 27

*Batton v. Nat'l Ass'n of Realtors*,
Case No. 21-cv-00430, 2024 WL 689989 (N.D. Ill. Feb. 20, 2024) .....................27

*In re Broiler Chicken Antitrust Litig.*
Case No. 16-cv-8637 (N.D. Ill.) .............................................................26

*Burgess v. Citigroup Inc.*,
624 F. App'x 6 (2d Cir. 2015)................................................................18

*Burnett et al. v. The Nat'l Ass'n of Realtors, et al.*,
Case No. 4:19-CV-332-SRB (W.D. Mo.)........................................ *passim*

*Burnett v. Nat'l Ass'n of Realtors*,
Case No. 4:19-cv-00332-SRB, 2024 WL 2842222 (W.D. Mo. May 9, 2024)............... *passim*

*In re Currency Conversion Fee Antitrust Litig.*,
264 F.R.D. 100 (S.D.N.Y. 2010) ............................................................23

*Dennis v. JPMorgan Chase & Co.*,
16-cv-6496 (LAK), 2021 WL 1893988 (S.D.N.Y. May 11, 2021) ......................23

*In re Digit. Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011).....................................................23

*Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*,
807 F. App'x 752 (10th Cir. 2020) ....................................................16, 18

*Ewart v. Y & A Grp. (In re Y & A Grp. Sec. Litig.)*,
　38 F.3d 380 (8th Cir. 1994) ............................................................16

*Friedman v. Real Est. Bd. of New York*,
　Case No. 24-cv-00405 (S.D.N.Y.)....................................................*passim*

*In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*,
　357 F.3d 800 (8th Cir. 2004) ...........................................................16

*Graves v. CAM2 Int'l LLC*,
　No. 3:19-CV-5089, 2020 WL 3968040 (W.D. Mo. July 13, 2020).......................27

*In re HIV Antitrust Litig.*,
　Case No. 19-cv-02573 (N.D. Cal, ) ....................................................26

*Huyer v. Wells Fargo & Co.*,
　314 F.R.D. 621 (S.D. Iowa 2016) ....................................................26, 28

*In re Intuniv Antitrust Litig.*,
　Case No. 16-cv-12653 (D. Mass.) ......................................................26

*Karg v. Transamerica Corp.*,
　No. 18-CV-134, 2019 WL 3938471 (N.D. Iowa Aug. 20, 2019)........................27

*In re Literary Works in Elec. Databases Copyright Litig.*,
　654 F.3d 242 (2d Cir. 2011)............................................................18

*March v. Real Est. Bd. of New York et al.*,
　Case No. 1:23-cv-09995 (S.D.N.Y. Nov. 13, 2023).....................................*passim*

*In re Nangle*,
　274 F.3d 481 (8th Cir. 2001) ..........................................................29

*New Hampshire v. Maine*,
　532 U.S. 742 (2001).....................................................................21

*In re Pre-Filled Propane Tank Antitrust Litig.*,
　Case No. 14-md-2567 / MDL No. 2567 (W.D. Mo. ) .............................26

*In re: Prograf Antitrust Litig.*,
　Case No. 1:11-md-2242 (D. Mass. ) ...................................................26

*In re Prudential Ins. America Sales Practice Litig.*,
　148 F.3d 283 (3d Cir.1998)............................................................19

*In re: Real Est. Comm'n Antitrust Litig.*,
　Case MDL No. 3100 (J.P.M.L. Dec. 27, 2023) ......................................20, 21, 26

*Reorganized FLI, Inc. v. Oneok, Inc. (In re Western States Wholesale Nat. Gas Antitrust Litig.)*,
   725 F. App'x 560 (9th Cir. 2018) ...........................................................................23

*In re T.G. Morgan, Inc.*,
   394 B.R. 478 (B.A.P. 8th Cir. 2008), *aff'd*, 343 F. App'x 171 (8th Cir. 2009).......................29

*Thomas v. Blue Cross & Blue Shield Ass'n*,
   333 F. App'x 414 (11th Cir. 2009) .........................................................................19

*Thompson v. Edward D. Jones & Co.*,
   992 F.2d 187 (8th Cir. 1993) .................................................................................26

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
   701 F. App'x 554 (9th Cir. 2017) ...........................................................................25

*Umpa v. Nat'l Ass'n of Realtors et al*,
   Case No. 4:23-cv-00945 (W.D. Mo.) ...............................................................9, 10, 12

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
   716 F.3d 1057 (8th Cir. 2013) ....................................................................22, 26, 28

*Van Horn v. Trickey*,
   840 F.2d 604 (8th Cir. 1988) ...................................................................................6

*Wai Hoe Liew v. Cohen & Slamowitz, LLP*,
   265 F. Supp. 3d 260 (E.D.N.Y. 2017), *as revised* (June 16, 2017) .........................................18

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005)...............................................................................22, 23

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005)......................................................................18

**Other Authorities**

Fed. R. Civ. P. 23(e)(2)..............................................................................................1

# I. INTRODUCTION

The Court should grant Plaintiffs'[1] motion for final approval of the class settlements with Compass, Inc. ("Compass"); Douglas Elliman Inc. and Douglas Elliman Realty, LLC (together, "Douglas Elliman"); Redfin Corporation ("Redfin"); Engel & Völkers GmbH, Engel & Völkers Americas, Inc., and Engel & Völkers New York Real Estate LLC (together, "Engel & Völkers"); HomeSmart International, LLC ("HomeSmart"); Realty ONE Group, Inc. ("Realty ONE"); Five D I, LLC d/b/a United Real Estate ("United"); At World Properties, LLC ("At Properties") and The Real Brokerage Inc. and Real Broker, LLC (together "Real Brokerage") (collectively the "Settling Defendants") and overrule all objections[2]. In addition to being fair, reasonable, and adequate under Fed. R. Civ. P. 23(e)(2)[3], as the Court previously found with nearly-identical settlements in *Burnett*, the settlements at issue herein ("Settlements") also expressly encompass nationwide claims related to non-NAR-affiliated MLSs such as the Real Estate Board of New York ("REBNY"), as well as claims brought by home buyers who were also home sellers. All of those claims were specifically part of the allegations in this case and share the same factual predicate as the claims in *Gibson*. Adequate notice was provided to these class members who had ample opportunity to remain part of the class and benefit from the Settlements, or to opt out from them. For the reasons explained below, and in addition to those advanced by the *Gibson* Plaintiffs, the Court should grant final approval of the Settlements and overrule all objections.

---

[1] Plaintiffs Don Gibson, Lauren Criss, and John Meiners (collectively, the "*Gibson* Plaintiffs").

[2] These suggestions discuss certain portions of two sets of objections: (1) Monty March, ECF No. 470 ("March") and Robert Friedman, ECF No. 467 ("Friedman") (March and Friedman together, the "New York Objectors"), and (2) James Mullis, ECF No. 471. United, Redfin, and Real Brokerage join in these suggestions only as to Mr. Mullis's objections because the New York Objectors do not object to their settlements.

[3] As explained in the *Gibson* Plaintiffs' Motion and Suggestions in Support of Final Approval, ECF No. 521, the class settlements with the Settling Defendants are reasonable, fair, and adequate, and also a particularly strong result for the class. The Settling Defendants incorporate the *Gibson* Plaintiffs' arguments by reference.

## II.    BACKGROUND

This Court is familiar with the facts, procedural history, and context of this case, so the Settling Defendants will not repeat them. Instead, only the most pertinent facts are described here:

None of the Settling Defendants in this action were defendants in *Burnett et al. v. The Nat'l Ass'n of Realtors, et al.*, Case No. 4:19-CV-332-SRB (W.D. Mo.) (the "*Burnett* Action"). The complaint in this case was filed on October 31, 2023—the same day the jury entered its verdict in the *Burnett* Action. *Compare* ECF No. 1, *with Burnett* Action, ECF No. 1294 (filed October 31, 2023). Thus, while the *Gibson* complaint (both the original and all those subsequent thereto) alleged nearly identical claims as those in the *Burnett* Action, the Settling Defendants in *Gibson* were not a party to, and thus, of course, were not found liable for any conduct by the jury in, the *Burnett* Action. *Compare Burnett* Action, ECF No. 477 at 1, *with* ECF No. 146 at 1.

Rather than engage in costly and protracted litigation, the Plaintiffs and Settling Defendants entered into settlement negotiations. On March 22, 2024, the *Gibson* Plaintiffs filed a notice with the Court that they had reached a pending settlement with Compass. ECF No. 135. This was shortly followed by notices of pending settlement with Douglas Elliman, Redfin, Engel & Völkers, HomeSmart, Realty ONE, United, At Properties and Real Brokerage. ECF Nos. 147, 148, 149, 157, 166, 249, 307, and 349. At the time of each settlement, the operative complaints against the Settling Defendants described the *Gibson* Plaintiffs as "home sellers who listed their homes on Multiple Listing Services in the United States . . ." who were purportedly forced to "pay an inflated amount" for real estate brokerage services because of "an anticompetitive restraint that requires home sellers to pay the broker representing the buyer of their homes . . . ." ECF No. 130 ¶ 1; *see also* ECF No. 146 ¶ 1; ECF No. 232 ¶ 1. The complaints defined the proposed class as "[a]ll persons in the United States who . . . used a listing broker affiliated with

any Corporate Defendant in the sale of a home listed on an MLS, and who paid a commission to the buyer's broker in connection with the sale of the home." ECF No. 130 ¶ 204; *see also* ECF No. 146 ¶ 246; ECF No. 232 ¶ 246. The complaints defined an MLS as "a database of properties listed for sale in a defined region that is accessible to real estate brokers and their realtors or agents, if they are in compliance with the rules of the MLS." ECF No. 130 ¶ 117; *see also* ECF No. 146 ¶ 131; ECF No. 232 ¶ 130. Importantly, the complaints did not limit the definition of an MLS to those MLSs that were affiliated with the National Association of Realtors ("NAR"), and instead specifically covered MLSs that were not affiliated with NAR. ECF No. 130 ¶ 117 (explaining that "many," but not all, MLSs are owned and operated by local realtor associations that are members of NAR). Likewise, the complaints expressly referenced that "[n]on-NAR controlled MLSs each have, or until recently have had, a similar Mandatory Offer of Compensation Rule and practice."[4] ECF No. 130 ¶ 120; ECF No. 146 ¶ 183 (similar); ECF No. 232 ¶ 182 (similar).

The Settlements expressly define the Settlement Class to include all MLSs nationwide, which would include REBNY. *See* ECF No. 161, 163 ¶ 3 (defining the "Settlement Class" as "all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home between October 31, 2019 and date of Class notice" and further stating that "Plaintiffs and Compass intend this Settlement Agreement to provide for a nationwide class with a nationwide settlement and release"); ECF No. 161-2 ¶15; ECF No. 161-3 ¶ 15; ECF No. 161-4 ¶ 15; ECF No. 161-5 ¶ 15; ECF No. 161-6 ¶ 15; ECF No. 294-1 at 17 and 49; ECF No. 303-1 at 17 and

---

[4] Moreover, the operative complaint when nearly all of the settlements at issue were reached explicitly referenced and discussed REBNY (and its Residential Listing Service ("RLS")) as a non-NAR MLS that had adopted similar anticompetitive restraints. ECF No. 146 ¶ 183.

54.[5]  The approved Notice of Proposed Settlements that went out to class members also specifically stated that the terms "multiple listing service" and "MLS" "encompass multiple listing services nationwide, regardless of whether they are affiliated with NAR or not, including, for example, NWMLS, WPMLS, and REBNY/RLS."  ECF No. 292-1 at 2.

At the time of the Settlements, both of the New York Objectors had filed their own class action complaints.  *See March v. Real Est. Bd. of New York et al.*, Case No. 1:23-cv-09995 (S.D.N.Y. Nov. 13, 2023), ECF No. 1 (hereinafter, "*March* Compl."); *Friedman v. Real Est. Bd. of New York et al.*, Case No. 1:24-cv-00405-UA (S.D.N.Y. Jan. 18, 2024), ECF No. 1 (hereinafter, "*Friedman* Compl.").  In the *March* Complaint, Mr. March described himself as "an individual who listed and sold Manhattan residential real estate" who "was forced to pay artificially inflated commissions" because he was "forced to pay a Buyer Broker's commission." *March* Compl. ¶ 2.  The *March* Complaint also described the "REBNY Listing Service" as "a comprehensive Manhattan residential real estate listing service that provides information to REBNY brokerage firms that are members of REBNY's Residential Brokerage Division" and alleged that "REBNY Listing Service requires brokerages and agents to acknowledge and agree, in writing" to the REBNY Listing Service Rules.  *Id.* ¶¶ 6-7, 60.  The key allegations described in the *March* Complaint were about "rules [that] specifically require the Seller to make a non-negotiable offer of compensation (as a commission) to the Buyer Broker when listing Manhattan residential real estate for sale and to pay the Buyer Broker's commission."  *Id.* ¶¶ 9, 58.

Similarly, in the *Friedman* Complaint, Mr. Friedman described himself as a home seller

---

[5] In fact, certain settlement agreements explicitly include "all persons who sold a home nationwide that was listed on any and all non-NAR multiple listing services, which shall include, but are not limited to, transactions associated with the Real Estate Board of New York ('REBNY') and transactions on the REBNY Residential Listing Service ('RLS')."  *See, e.g.*, ECF No. 161-6 ¶ 15.

who was harmed because of requirements that "a real estate broker representing a home seller . . . split the commission from a real estate transaction equally with the broker representing the home buyer . . . a commission that must be paid by the home seller." *Friedman* Compl. ¶¶ 1, 8. The *Friedman* Complaint also states that "[a]n MLS is a centralized database of properties listed for sale that allows residential real estate brokers and agents to identify homes for sale within a certain geographic area" and that the REBNY Listing Service "functions much like an MLS[.]" *Id.* ¶¶ 46, 49. The *Friedman* Complaint also alleges that "all REBNY members, including the Broker Defendants, are required to, and did, agree to the REBNY Rules in writing." *Id.* ¶ 53. Key to these allegations is the so-called "Buyer Broker Commission Rule," i.e., a seller must pay a commission to both the buyer broker and the seller broker, and the "Co-Broker's Commission" rule, i.e., that listings on the REBNY Listing Service must disclose the specific amount of commission being offered to a buyer broker. *Id.* ¶¶ 54, 58.

Mr. Mullis is a named plaintiff in the case *Batton et al. v. Compass et al.*, Case No. 1:23-cv-15618 (N.D. Ill.). The *Batton* case alleges the same purportedly anticompetitive rules and conduct alleged in this case, but on behalf of a purported class of home buyers. *See* Compl. ¶¶ 1-2, *Batton et al. v. Compass et al.*, Case No. 1:23-cv-15618 (N.D. Ill. Nov. 2, 2023) (hereinafter "*Batton* Complaint") (alleging a conspiracy based on rules that require sellers to offer and pay buyer-agent commissions). As he did in *Burnett*, Mr. Mullis again objects to the Settlements based solely on the assertion that this action "focuses exclusively on the harm incurred by home sellers" and therefore the Settlements should not release any claims regarding homebuyers. ECF No. 471 at 4. Mr. Mullis once again fails to allege any factual predicates that differ between this action and the so-called "home buyer" cases. The only alleged difference is the theory of harm. This Court, having already heard and rejected such argument in *Burnett*, should again reject this

argument and grant final approval in this action.

To date, neither the New York Objectors nor Mr. Mullis have opted out of the Settlements.

## III.   ARGUMENT

The Settlements are fair, reasonable, and adequate, particularly since many of the Settling Defendants had unique defenses that would have made them particularly difficult defendants against which to litigate.  The Settlements also properly include within their scope claims related to non-NAR-affiliated MLSs like REBNY and buyer-side claims.

### A.   The Settlements Are a Strong Result for Plaintiffs in Light of the Settling Defendants' Unique Defenses and Ability to Pay Limitations

As explained in the *Gibson* Plaintiffs' Motion and Suggestions in Support of Final Approval, ECF No. 521, the class settlements with the Settling Defendants are fair, reasonable, and adequate, and also a particularly strong result for the class.  A factor that courts in the Eighth Circuit look to when determining whether a class settlement is fair, reasonable, and adequate is the merits of the plaintiff's case weighed against the terms of the settlement.  *See Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988).

Given the unique defenses available to the Settling Defendants at various stages in the litigation, and their own respective ability to pay issues,[6] these factors strongly suggest that the Settlements are fair, reasonable, and adequate.  Moreover, the Settling Defendants would not have settled *Gibson* without a nationwide release for all of the Settling Defendants' entities who

---

[6] As this Court previously found in *Burnett*, the Settlement amounts were reached at arms-length, taking into account the financial condition of the defendants, and "this was the most they could reasonably pay."  *See Burnett v. Nat'l Ass'n of Realtors*, Case No. 4:19-cv-00332-SRB, 2024 WL 2842222 at *11 (W.D. Mo. May 9, 2024).  This Court agreed that "[o]btaining relief now, rather than risk bankruptcy or reversal on appeal, was the most prudent thing Class Counsel could have done."  *Id.*

were named or that could have been named in this case and related cases. In exchange for these comprehensive releases, class members will receive payments that pressed the limits of the Settling Defendants' ability to continue to operate in a market characterized by the highest interest rates in recent years.

Furthermore, as discussed herein, all the Settling Defendants would have presented strong defenses to the litigation. Settling Defendants each vigorously deny all of Plaintiffs' allegations and the legal sufficiency of their claims. If forced to litigate, Settling Defendants would also vigorously contest the application of "per se" antitrust analysis to Plaintiffs' claims. Further, Settling Defendants are confident that, if discovery would have progressed, they would have strengthened these defenses while developing and establishing numerous additional defenses. Each Settling Defendant maintains that, notwithstanding their respective settlement agreements, none of its conduct—even as alleged—violated the rule of reason and the antitrust laws. Certain additional defenses unique to certain Settling Defendants are provided below.

**Compass.** As explained in Compass's suggestions in support of its motions to dismiss and motion to strike, ECF Nos. 114, 116, 118, 120, and 121, Compass had a number of unique defenses. Compass was not even in existence until *fifteen years* after the alleged conspiracy began and was not operating in this State until 2021. ECF No. 118 at 1, 3. Compass also had no incentive to collude with NAR or any of the other brokerages, as Compass has long positioned itself and been treated by competitors as an innovator trying to break away from traditional, longstanding structures and norms within the industry. *See id.* at 3. Compass's buyer and seller agreement forms in several states also had arbitration provisions during the purported relevant time period, which could have defeated class certification or at least limited the size of the class that could potentially recover. *See* ECF No. 114 at 1.

**Douglas Elliman**. Similarly, as explained in Douglas Elliman's motions to dismiss, its motion to strike, and its suggestions thereto, ECF Nos. 101-02, 115, and 123-24, Douglas Elliman maintained several unique and meritorious defenses. As discussed in Douglas Elliman's individual Rule 12(b)(6) motion to dismiss, and would have been further established through discovery, Douglas Elliman had very little, if any, role in NAR, and it was not involved in the promulgation or enforcement of the rules at issue. *See, e.g.*, ECF No. 124 at 3-6. Finally, given these available defenses, and based on its financial condition and performance at the time of the settlement, as disclosed in its publicly-available financial statements, Douglas Elliman's settlement is a fair and excellent result for Plaintiffs. Indeed, Douglas Elliman's settlement includes certain contingent payments over the next several years that will ensure that if it can pay additional funds to Plaintiffs (based on certain agreed upon metrics), it is required to do so. ECF No. 161-6 ¶ 31. Thus, Plaintiffs have maximized their recovery from Douglas Elliman without depleting its cash on hand to the point where it could not operate.

**Redfin.** Redfin's settlement is fair, reasonable, and adequate in light of its ability to pay and its strong defenses on the merits, including as reflected in the Suggestions in Support of Defendant Redfin Corporation's Consolidated Motion to Dismiss. ECF No. 119. Redfin is a maverick in the real estate industry and its mission is to provide real estate consumers a better deal. Redfin competes aggressively on price—providing buyer commission rebates and offering listing fees as low as 1%—saving consumers substantial amounts of money. Accordingly, Plaintiffs would have significant hurdles plausibly to allege, much less establish, that Redfin participated in an alleged antitrust conspiracy to fix commissions. In fact, Redfin has a long history of publicly disagreeing with NAR, including on NAR's rules on commissions.

**Engel & Völkers.** Engel & Völkers' settlement also represents an excellent result for the

settlement class. Engel & Völkers entered settlement discussions with Plaintiffs but reached an impasse, and both parties agreed that it would not be possible to find agreement without the help of Greg Lindstrom as mediator. After a contentious mediation before Mr. Lindstrom, the parties reached—only just barely—agreement on $6.9 million. As a franchisor, E&V Americas does not earn any brokerage commissions itself. Rather, its entire revenue stream is composed of just a small fraction of its franchisees' revenue. The settlement amount thus represents the most that Plaintiffs could have recovered from Engel & Völkers without jeopardizing its U.S. operations. Engel & Völkers' settlement also reflects its strong defenses, including the lack of personal jurisdiction over its German corporate parent, which is a German company with no U.S. presence or operations and no plausible connection to the alleged conspiracy. Moreover, none of the Engel & Völkers entities have ever played a role in NAR, and Plaintiffs have tried to tie it to the alleged conspiracy by only implausible and unfounded allegations about its control over independently owned and operated franchisees. The Engel & Völkers settlement thus reflects a fair, reasonable, and adequate outcome to these cases for the settlement class.

**HomeSmart**. HomeSmart's settlement represents a fair, reasonable and adequate settlement that reflects HomeSmart's financial inability to pay and its unique and meritorious defenses as set forth in its Suggestions in Support of Motion to Dismiss. *Umpa v. Nat'l Ass'n of Realtors et al*, 4:23-cv-00945 (W.D. Mo.) ("*Umpa*"), ECF No. 181. HSI is a fixed flat-fee franchisor that does not itself implement or enforce the National Association of Realtors' ("NAR") adversary commission rule in Missouri, does not itself represent home buyers or sellers, does not broker home purchases or sales, is not a signatory as a broker to any listing agreement, does not share in broker commissions, and does not dictate commission rates or splits. Rather, HSI is a Franchisor, that franchises an independently owned Franchisee located in

Kansas that conducts only limited business in Missouri. In addition, HomeSmart engaged in extensive settlement negotiations in this case and in another parallel case pending in another district. During the negotiation process, HomeSmart provided a five-year period of private and confidential financial information that was analyzed in great detail by plaintiffs' counsel in each case. As a result of these arm's length negotiations, Plaintiffs maximized their recovery from HSI without depleting HSI's cash on hand to the point where HSI could no longer operate. Finally, given the available defenses, and based on HSI's financial condition and performance at the time of the settlement, HSI's settlement is a fair and excellent result for Plaintiffs.

**Realty ONE**. As set forth in greater detail in Realty ONE's suggestions in support of its motion to dismiss, which is incorporated herein by reference, Realty ONE had several unique defenses to the plaintiffs' claims that had a material impact on the settlement negotiations. *Umpa*, ECF No. 175. For example, Realty ONE is a brokerage franchisor with an innovative, 100 percent commission business model. *Id*. at 14. Unlike traditional brokerages that benefit from a commission split, Realty ONE is a franchisor offering its franchisees a 100 percent Commission Structure, meaning that when an agent joins a Realty ONE brokerage, they receive 100 percent of the commission with each transaction. *Id*. Instead of collecting revenue from commissions, Realty ONE collects fixed Monthly Agent Fees and fixed transaction fees from its franchisees, neither of which bears any connection to commissions. *Id*. The Realty ONE fees do not increase if the buyer broker commission increases because the fees are not tied to the amount of any commission. *Id*. at 15. Therefore, Realty ONE had no incentive to raise, fix or maintain buyer-broker commissions or overcharge sellers for buyer-broker services because Realty ONE's fees would be the same regardless. *Id*.

**Real Brokerage.** The Real Brokerage likewise filed a motion to dismiss, *Umpa*, ECF

Nos. 182-184, setting forth its unique defenses to the then-operative complaint—which only mentioned the Real Brokerage twice and provided no facts purporting to tie the company to the claimed conspiracy (e.g., who joined it, when, and how). Nor could Plaintiffs succeed in proving their conspiracy claim as to the Real Brokerage. The Real Brokerage did not exist until decades after the alleged conspiracy was formed in the 1990s, and the company's use of and focus on technology-backed services sets it apart from (and directly undercuts the argument that it supposedly colluded with) other traditional and established brokerages. Moreover, the suit never should have been brought against The Real Brokerage Inc. in this Court. As a Canadian corporation, The Real Brokerage Inc. is not subject to personal jurisdiction in Missouri, does not conduct business in the state, and does not otherwise have any meaningful or substantial contacts there. These and other defenses serve to support Real Brokerage's settlement with Plaintiffs. Finally, the high-seven-figure settlement that Real Brokerage negotiated at arm's length and before an experienced and respected mediator is demonstrably fair, reasonable, and adequate—particularly in view of (among other things) the company's early stage of operations, lack of profitability, available cash on hand, and other ability-to-pay considerations. These issues were all factored into the settlement analysis and contributed to the amount that the Real Brokerage and Plaintiffs ultimately agreed upon.

**United Real Estate.** United had strong arguments it could have used in its defense, including a mandatory arbitration provision that would have effectively limited the size of the class, as explained in its suggestions in support of its motions to dismiss and motion to strike. *See* ECF Nos. 103-06, 120-21. Critically, United and its affiliates do not operate under the "traditional" brokerage arrangement at issue in *Burnett*. Instead, United charges agents a flat fee per transaction. This means that United receives *none* of the commissions earned by their

agents. Thus, it had no incentive to join or otherwise participate in a conspiracy to raise commission rates, and any alleged participation is implausible. United would be prepared to defend this case on the facts that it did not direct its agents to set certain commission rates, it did not share in any of the commission revenue, and it did not participate any conspiracy. Moreover, the sum paid by United was substantial, and the settlement's structured payments over several years is a fair and reasonable result for the settlement class following arms' length settlement negotiations between United and Plaintiffs.

**At Properties.** At Properties also had strong defenses that would have made any case against it difficult to litigate and prevail upon. For example, it raised multiple, strong arguments in its motion to dismiss, including the implausibility of the Plaintiffs' theory connecting At Properties to the alleged conspiracy through allegedly anticompetitive limitations in a franchise disclosure document that flatly contradicted the *Gibson* Plaintiffs' theory. *See Umpa*, ECF No. 196. At Properties' involvement with NAR was minimal, and it was founded *after* many of the NAR policies at issue were promulgated. The vast majority of At Properties' listing agreements contained dispute resolution clauses that would have required At Properties class members to individually arbitrate their claims. *Umpa*, ECF No. 198. Finally, many of At Properties' listing agreements also contained class action waivers that At Properties could have used to strike large numbers of class members from the class definition. *Id*. Simply put, At Properties would not have paid the substantial sum to settle absent the nationwide release it secured via an arm's-length negotiation. As such, this settlement represents a fair and reasonable result for the settlement class.

**B.** **Claims Related to Non-NAR-Affiliated MLSs Like REBNY are Properly Included in the Settlements**.

      **1.** **The operative complaints alleged claims related to non-NAR-affiliated MLSs, including REBNY.**

The New York Objectors' Objections should be overruled because claims related to non-NAR-affiliated MLSs like REBNY, such as the claims of the New York Objectors, are properly included in the Settlements, as such claims were specifically included in the case allegations. While the *March* and *Friedman* plaintiffs now claim that their REBNY-related claims are separate from those at issue here, they have in fact targeted merely a regional subset of the larger nationwide conspiracy alleged in *Gibson*. The *Gibson* Plaintiffs described themselves as "home sellers who listed their homes on Multiple Listing Services in the United States . . ." who were purportedly forced to "pay an inflated amount" for real estate brokerage services because of "an anticompetitive restraint that requires home sellers to pay the broker representing the buyer of their homes . . . ." ECF No. 130 ¶ 1. Accordingly, the proposed class was "[a]ll persons in the United States who . . . used a listing broker affiliated with any Corporate Defendant in the sale of a home listed on an MLS, and who paid a commission to the buyer's broker in connection with the sale of the home." *Id.* ¶ 204. A "Multiple Listing Service" or an "MLS" was defined in the operative complaints as "a database of properties listed for sale in a defined region that is accessible to real estate brokers and their realtors or agents, if they are in compliance with the rules of the MLS." *Id.* ¶ 117. In no way were MLSs defined in the operative complaints as restricted to only MLSs directly affiliated with NAR—in fact, the operative complaints specifically discussed non-NAR-affiliated MLSs being included in the case.[7] *See, e.g.*, ECF No. 130 ¶ 117 (noting "many," but not all, MLSs are owned and operated by local realtor

---

[7] The *Gibson* Consolidated Complaint explicitly references REBNY/RLS as a non-NAR MLS. ECF No. 146 ¶ 183.

associations that are members of NAR); *id.* ¶ 120 (noting "[n]on-NAR controlled MLSs each have, or until recently have had, a similar Mandatory Offer of Compensation Rule and practice").

This understanding carried through the settlement notice process, with the parties plainly intending to include non-NAR-affiliated MLS-related claims as part of the settlement. *See* ECF No. 470 at 9 (March objection admitting that "the preliminary settlement approval papers make it abundantly clear that Plaintiffs and the Settling Defendants intend to release REBNY/RLS related claims"). Potential class members were also specifically notified of the fact that they could make claims on the settlement regardless of whether the MLS they used was affiliated with NAR, including if they used NWMLS, WPMLS, and REBNY/RLS. ECF No. 292-1 at 2 (Approved Notice of Proposed Settlement stating that the terms "multiple listing service" and "MLS" "encompass multiple listing services nationwide, regardless of whether they are affiliated with NAR or not, including, for example, NWMLS, WPMLS, and REBNY/RLS").

The REBNY Listing Service plainly falls within the operative complaints' definition of an MLS. For example, the *March* Complaint describes the REBNY Listing Service as "a comprehensive Manhattan residential real estate listing service that provides information to REBNY brokerage firms that are members" and explains that the "REBNY Listing Service requires brokerages and agents to acknowledge and agree, in writing" to the REBNY Listing Service Rules. *March* Compl. ¶¶ 6-7, 60. In other words, as described by the *March* Complaint, the REBNY Listing Service is a database of properties for sale in Manhattan that is accessible to real estate brokers and their realtors or agents who are in compliance with the rules of REBNY. The *Friedman* Complaint is even more explicit, alleging that "[a]n MLS is a centralized database of properties listed for sale that allows residential real estate brokers and agents to identify

homes for sale within a certain geographic area" and then goes on to admit that the REBNY Listing Service "functions much like an MLS." *Friedman* Compl. ¶¶ 46, 49.

Both *March* and *Friedman* are thus essentially tag-along cases filed immediately in the wake of the *Burnett* verdict (and this action), trying to leverage it into separate cases by breaking off pieces with narrow geographies and presenting them explicitly as derivative of *Burnett* and the allegations regarding NAR. The resulting cases are contrived, to say the least. Mr. March and Mr. Friedman both allege conspiracies limited to a single borough of New York City. *See March* Compl. ¶ 1; *Friedman* Compl. ¶ 1. Those conspiracies, they say, are separate and self-contained, even while they acknowledge an alleged nationwide conspiracy that involved many of the same brokerages, during essentially the same period of time, seeking the same goal, by allegedly imposing rules that are effectively the same.

Mr. March and Mr. Friedman may have been free to define arbitrary limits on their allegations of conspiracy in their own actions. But that does not give them the right to redefine *this* action as less than what it is: a suit alleging a nationwide conspiracy by which brokerages allegedly inflated broker commissions using rules promulgated by trade associations, including but not limited to NAR. Any allegations regarding REBNY are part and parcel of that dispute, which is also exemplified by the fact that even under the New York Objectors' theory of the two cases, there is substantial overlap in the alleged conspirators.

Accordingly, the Settling Defendants reasonably sought and entered into nationwide settlements that covered the claims alleged against them and received a release that covered non-NAR-affiliated MLSs such as REBNY. In turn, the settlement amounts Plaintiffs received from the Settling Defendants took into account the scope of the settlement and release. The New York Objectors cannot point to anything unreasonable or improper about Settlements resolving and

releasing the claims alleged against the parties in the case.

> **2.** **Claims related to non-NAR-affiliated MLSs share the same factual predicate as the claims in this case.**

Even if claims related to non-NAR-affiliated MLSs like REBNY were not directly alleged this case—and they were—the New York Objectors' Objections should be overruled because it would still be proper to release these claims because they are based on an identical factual predicate. Courts regularly approve class settlements that release broader claims than those pleaded in an action. *Burnett*, 2024 WL 2842222, at *11-12; *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) (explaining that "[t]here is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded"). A broader settlement is in fact often a necessity in complex class-action litigation to ensure finality for defendants and global settlements that run to the benefit of plaintiffs. *See Albin v. Resort Sales Missouri, Inc*., No. 20-03004-CV-S-BP, 2021 WL 5107730, at *5 (W.D. Mo. May 21, 2021) (concluding that the absence of "a single nationwide class action" would "discourage class action defendants from settling" (quotation omitted)). The covered claims need to "arise from or relate to conduct that was alleged or could have been alleged . . . based on any of all of the same factual predicate for the claims alleged . . . ." *Burnett*, 2024 WL 2842222, at *13; *accord Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752, 765-66 (10th Cir. 2020) ("[I]nherent in the nature of a class-action settlement is the release of the claims of every class member (except those who opt out). And if Defendants are going to pay anything to the class members, they would insist on a release . . . that would protect them against repeated litigation over the same subject matter.") (cleaned up). Settlements may even extend to defendants who were not parties to the action. *See Ewart v. Y & A Grp. (In re Y & A Grp. Sec. Litig.)*, 38 F.3d 380, 384 (8th Cir. 1994).

As discussed above, the *Gibson* Plaintiffs consist of "home sellers who listed their homes on Multiple Listing Services in the United States . . ." who were purportedly forced to "pay an inflated amount" for real estate brokerage services because of "an anticompetitive restraint that requires home sellers to pay the broker representing the buyer of their homes . . . ." ECF No. 130 ¶ 1. In the *March* Complaint, Mr. March describes himself as "an individual who listed and sold Manhattan residential real estate" who "was forced to pay artificially inflated commissions" because he was "forced to pay a Buyer Broker's commission." *March* Compl. ¶ 2. Mr. Friedman similarly describes himself as a home seller who was harmed because of requirements that "a real estate broker representing a home seller . . . split the commission from a real estate transaction equally with the broker representing the home buyer . . . a commission that must be paid by the home seller." *Friedman* Compl. ¶¶ 1, 8. In short, all three sets of plaintiffs, all of whom are home sellers, allege the same conspiracy: they claim that (1) the brokerage defendants agreed to certain trade association rules; (2) those rules required a real estate broker representing a home seller to split commissions with a broker representing the home buyer; (3) those rules required the commission be paid by the home seller; and (4) due to those rules, commissions were artificially inflated. *See* ECF No. 130 ¶¶ 3, 8; *March* Compl. ¶ 2; *Friedman* Compl. ¶ 1.

In the *Burnett* case, this Court explained these claims have the same underlying factual predicate, and stated that the released claims would "includ[e] but [are] not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home," and "extends to claims arising from or relating to transactions where [class members] either sold or purchased a home on any multiple listing service nationwide, **regardless of affiliation or association with NAR or not, and thus includes,** *e.g.*, **NWMLS, WPMLS, and REBNY/RLS."** *Burnett*, 2024 WL 2842222, at *13 (emphasis added). The

same reasoning applies here.

Moreover, the New York Objectors' argument that the claims must have strictly identical facts is without merit. Courts do not require the exact same facts, but rather focus on whether claims share the same factual *predicate*. *See, e.g.*, *Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1290 (11th Cir. 2007) ("The *Adams* Class Action . . . alleged an *overarching scheme* of fraud and deception by Southern Farm in connection with the sale of these flexible premium types of policies, a *broad nucleus of fact* that would encompass the fraud claims now being alleged by the appellants." (emphasis added)); *Wai Hoe Liew v. Cohen & Slamowitz, LLP*, 265 F. Supp. 3d 260, 274 (E.D.N.Y. 2017), *as revised* (June 16, 2017) ("That the factual predicate in the *Coble Class Action* and the instant action are identical is beyond doubt because they both arise from and allege the 'same core facts[.]'"); *cf. In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 341 (S.D.N.Y. 2005) (noting settlements may release that which "could not have been presented" (quotation omitted)).

As a result, courts reject attempts, like the New York Objectors' Objections here, to frame the "same factual predicate" too narrowly. *See, e.g.*, *In re Literary Works in Elec. Databases Copyright Litig.,* 654 F.3d 242, 248 (2d Cir. 2011) (rejecting "overly narrow view" of factual predicate where claims arose from same broad underlying facts); *Elna Sefcovic,* 807 F. App'x at 765-66 (same). Likewise, courts also regularly reject arguments that minor factual distinctions are sufficient to create a different factual predicate. *See, e.g.*, *Burgess v. Citigroup Inc.*, 624 F. App'x 6, 8-9 (2d Cir. 2015) (concluding that "additional facts, while certainly highlighting the specific form of harm and lost compensation … were not allegations that the [other action] depended upon for proof of the [Defendants'] liability, and thus do not constitute a separate factual predicate."); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 272 F.

App'x 9, 13 (2d Cir. 2008) (finding misrepresentation claims resulting from investment losses based on misleading opinions shared same factual predicate, even though class members relied on different documents).

The Objectors' argument that the purported use of different rules, namely REBNY rules instead of NAR rules, creates a distinct agreement and conspiracy is unavailing. Using different tools to achieve the same ends does not, in and of itself, create a distinct conspiracy, agreement, or factual predicate. *See Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F. App'x 414, 418-419 (11th Cir. 2009) (holding that despite differences in the mechanisms employed (computer billing vs. traditional methods), the underlying fraud was part of the same scheme and shared the same factual predicate as in settlement); *see also In re Prudential Ins. America Sales Practice Litig.*, 148 F.3d 283, 311 (3d Cir.1998) ("The named plaintiffs . . . all have claims arising from the fraudulent scheme perpetrated by Prudential. That *overarching scheme* is the linchpin of [the complaint], regardless whether each class member alleges a churning claim, a vanishing premium claim, an investment plan claim, or some other injury.") (emphasis added).

Here, the purported difference in means employed (REBNY rules v. NAR rules) does not break the common factual predicate because, among other things, the rules are functionally identical with respect to the alleged conspiracy, as objectors squarely asserted in their complaints. *See, e.g.*, *March et al. v. Real Est. Bd. of New York et al.*, 1:23-cv-09995 (S.D.N.Y), ECF No. 189 ¶¶ 94 ("NAR regulations previously included, in effect, the same rule as REBNY that mandates the payment of a commission by a Seller Broker to a Buyer Broker."), ¶ 99 ("Similar to the RLS rule, the NAR Handbook and Code of Ethics require residential real estate Sellers to make a blanket, unilateral, and effectively non-negotiable offer of compensation to any Buyer's Broker whenever listing a home [on a listing service]); *Friedman v. Real Est. Bd. of New*

*York*, 24-cv-00405 (S.D.N.Y.), ECF No. 77, ¶ 88 ("Like REBNY, both NAR and MLS PIN established rules that require Sellers to make blanket, unilateral, and effectively non-negotiable offers of compensation to Buyer Brokers whenever Seller Brokers list a home for sale on an MLS."). The purported differences in the rules on which the New York Objectors rely, such as a mandatory 50-50 broker commission splits for exclusive listings under REBNY rules, are not core facts that are material enough to create a separate factual predicate.

The proceedings before the Judicial Panel on Multidistrict Litigation ("JPML") further support the proposition that the settlements properly include claims related to non-NAR-affiliated claims and that such claims share the same factual predicate as this case. First, by quoting statements that some Defendants[8] made before the JPML concerning the operative complaint at that time, the New York Objectors ignore that the *Gibson* Plaintiffs strongly argued before the JPML that the REBNY-related cases[9] were appropriate for centralization and shared the same factual predicate. *See* Br. in Supp. of Mot. to Transfer at 5, *In re: Real Est. Comm'n Antitrust Litig.*, Case MDL No. 3100 (JPML December 27, 2023) (ECF No. 1) (explaining that the complaint filed by Mr. March includes direct references to the *Moehrl* and *Burnett* cases and that the complaint also "discuss[es] the essential role NAR has played in the conspiracy"). The *Gibson* Plaintiffs also pointed to the significant factual overlap between the *March* case and this case. *See id.* at 5-8 (discussing the overlap in facts and defendants between *March*, this case, and other cases). The parties were entitled to settle the full scope of these issues as part of the

---

[8] A number of these statements are clearly cherry-picked and irrelevant, *see, e.g.*, ECF No. 467 at 8 (pointing to social media posts made by individual agents rather than statements made by or on behalf of the brokerages), and a number are statements made by parties other than the Settling Defendants, *see* ECF No. 470 at 11 (pointing to statements made by REBNY).
[9] The *Friedman* Complaint had not yet been filed when the *Gibson* Plaintiffs moved the JPML for centralization.

Settlements.[10]

In any event, the JPML's decision did not accept that there was any material difference between the cases, even under the different standard for centralization.[11]  Instead, the JPML's decision was predicated on the expectation that nationwide settlements would resolve a broader set of claims.  In its order, the JPML provided that centralization was not appropriate at that time given the then-recent nationwide class settlements by NAR, Anywhere, Keller Williams, and RE/MAX.  Order Denying Transfer at 4, *In re: Real Est. Comm'n Antitrust Litig.*, Case MDL No. 3100 (JPML May 12, 2024) ("JPML Docket"), ECF No. 558.  The JPML explained that the NAR settlement agreement gave "MLSs that are not owned by an NAR affiliate," such as REBNY, a "mechanism . . . to opt-in."  *Id.*  The JPML further recognized "the broad contours of this new settlement" that "may well resolve at least some claims in this litigation, if not many."  *Id.*  Indeed, at least some of the defendants, like Engel & Völkers and Compass, withdrew their objections after their settlements or after the nationwide NAR settlement received preliminary approval from this Court—a fact that the New York Objectors conspicuously fail to acknowledge.  *See* JPML Docket, ECF Nos. 541, 547, 548.  Other defendants, such as At Properties, argued in favor of consolidation before the JPML.  *See, e.g.*, JPML Docket, ECF No. 555.  The JPML proceedings thus demonstrate that non-NAR-affiliated MLS-related claims, like

_____

[10] After Defendants' briefs were filed before the JPML, the *Gibson* Plaintiffs made explicit the fact that their nationwide conspiracy claims always included REBNY-related claims through clarifying allegations in amended complaints.  *See, e.g.*, ECF No. 130 ¶ 118 (Amended Complaint referencing non-NAR MLSs); ECF No. 146 ¶ 183 (Consolidated Complaint referencing numerous non-NAR MLSs, including REBNY/RLS).  Indeed, nearly all of the settlements at issue herein were reached after the *Gibson* Plaintiffs filed their Consolidated Complaint that explicitly referenced REBNY/RLS.  *See, e.g.*, ECF Nos. 157, 166 & 249.
[11] Accordingly, there is no issue of judicial estoppel based on any prior statements from any party that advocated against centralization of the cases at that time.  *See New Hampshire v. Maine*, 532 U.S. 742, 750-752 (2001) (holding judicial estoppel applicable only where a party successfully argues a point before changing position).

those of the New York Objectors, were properly part of the negotiations over and part of the scope of the Settlements.

### 3. It would be improper and unfair to exclude the New York Objectors' claims from the released claims.

There is no legal support for the New York Objectors to argue that their claims cannot be included in the settlements. A number of the cases they cite as support actually approve the settlements because they involve situations, like this one, where the settlement's scope was found to properly encompass a particular claim. *See, e.g.*, *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.* ("*Uponor*"), 716 F.3d 1057, 1065 (8th Cir. 2013) (rejecting objection that "the settlement contained an overbroad release" and finding that it permissibly released only claims "[r]elated to leaky brass fittings," i.e., the subject of the litigation); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) (finding that the settlement properly included claims from different cases because the factual predicate was identical).

The *Wal-Mart* decision is particularly instructive, and it does not provide objectors the support they claim. That case concerned alleged antitrust violations by Visa and MasterCard, who purportedly conspired to violate the antitrust laws under a "tying" theory. *Id.* at 101. The objector had brought a separate case based on a different antitrust conspiracy—a "boycott" theory. *Id.* at 108. The court rejected the objection, noting that "[w]hen considering the permissibility of a release, the overlap between elements of *claims* is not dispositive." *Id.* There, as here, it did not matter that different groups of plaintiffs had conceived of their claims somewhat differently; rather, because both suits centered on "exclusionary rules" by the defendants, they involved "essentially the same issues," and thus the identical factual predicate. *Id.* at 107-08. Similarly, in *Albert v. Blue Diamond Growers*, the court followed *Wal-Mart* to find that the settlement of claims about one alleged inaccuracy in the defendant's labeling had

released all related claims of inaccurate labeling, because the settlement "does, indeed, contemplate a broader range of claims than Plaintiffs raise here." 232 F. Supp. 3d 509, 512-13 (S.D.N.Y. 2017). Far from establishing the existence of a separate factual predicate, *Wal-Mart* only reinforces that separate actions based on the same factual issues, like here, share an identical factual predicate.

The New York Objectors' remaining cases likewise do not support their arguments. Those cases, which largely deal with situations where a party argued that a settlement covered claims based on an entirely different scheme rather than situations where the parties were seeking final approval of the settlement, are readily distinguishable. *See, e.g.*, *In re Digit. Music Antitrust Litig.,* 812 F. Supp. 2d 390, 400 (S.D.N.Y. 2011) (finding that new claims were not covered because the settlement related to allegations regarding the sale of CDs while the new claims involved the online music market, and thus the factual predicate underlying the settlement and the new claims were not the same); *Dennis v. JPMorgan Chase & Co.*, 16-cv-6496 (LAK), 2021 WL 1893988, at *5 (S.D.N.Y. May 11, 2021) (finding different factual predicate and noting that the two actions "relate[d] to the alleged manipulation of two distinct and unrelated benchmark rates"); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 118-20 (S.D.N.Y. 2010) (holding that different factual predicates existed between underlying scheme to fix prices and separate alleged conduct concerning foreign currency conversion practices); *Reorganized FLI, Inc. v. Oneok, Inc. (In re Western States Wholesale Nat. Gas Antitrust Litig.)*, 725 F. App'x 560, 561 (9th Cir. 2018) (natural gas case where the separate classes had, respectively, alleged they paid inflated prices on natural gas and alleged they paid inflated prices on futures contracts). In no case did the plaintiffs assert, as the New York Objectors do here, that their case was outside the factual predicate of a settlement simply because they had alleged

only a sub-component of the larger conspiracy—or even because they had alleged a different conspiracy to achieve the same price-fixing objective. Here, as described above—and as is clear from the plain language used in the complaints—the factual predicate is the same despite differences in how the claims may be framed in different cases.

In fact, and as pointed out by the *Gibson* Plaintiffs, *see supra* § III.B.2, the New York Objectors have described their cases as being closely related to this case and other similar cases. For example, the *March* Complaint describes this case and its similarities at length. *See, e.g.*, *March* Compl. ¶ 81 (stating that "[l]ike the REBNY Listing Service rule, the NAR Handbook and Code of Ethics require residential real estate Sellers to make a blanket, unilateral, and effectively non-negotiable offer of compensation to any Buyer's Broker whenever listing a home . . ."); *id.* ¶¶ 89-97 (describing other lawsuits involving buyer-broker commissions); *id.* ¶¶ 98-100 (describing how both NAR and REBNY made policy changes around the same time regarding buyer-broker commissions). In addition, in summarizing the factual predicate underlying Count I (the alleged conspiracy), the *March* complaint defines the factual predicate of the claim in almost exactly the same terms as the complaint here. *Compare* ECF No. 146 ¶ 257 (defining the alleged conspiracy as a "continuing agreement . . . to require home sellers to pay cooperating brokers and to pay an inflated amount") with *March* Compl. ¶ 107 (defining the alleged conspiracy as a "continuing agreement among Defendants to… require residential real estate sellers to pay artificially inflated Buyer Broker Commissions.").

The timing of when the New York Objectors filed their complaints also demonstrates that they believed the cases were based on the same facts—it was not until shortly after the jury verdict in the related *Burnett* case was announced and the complaint in this case was filed that the New York Objectors were spurred into action. *March* Compl. (dated November 13, 2023);

*Friedman* Compl. (dated January 18, 2024). Had New York Objectors truly believed their cases were wholly unrelated, they would not have filed so close in time.

The putative classes that the New York Objectors purport to represent benefit from the settlements in the form of monetary compensation, *see* ECF No. 292-1 at 2 (specifically stating that class members who used REBNY/RLS would qualify under the settlement), practice changes that apply nationwide (including in New York), and cooperation benefits. Indeed, the settlements were higher than they would otherwise have been precisely because the settlements were global and included the New York Objectors. *See Burnett*, 2024 WL 2842222, at *9 ("[B]ecause global peace is most valuable to defendants, defendants will pay more to obtain it, thus benefitting class members."). It would undermine the basic principles of settlements that New York Objectors could benefit from the Settlements with no corresponding release. If the New York Objectors did not want to be bound by the settlements, they could have opted out of them. Nothing they argue suggests that they can move to exclude their claims from settlements entered into at arm's length by the parties.

For these reasons, the Settlements properly settle and release claims related to non-NAR-affiliated MLSs such as REBNY, and the New York Objectors' objections should be overruled.

### C. The Settlements Properly Encompass the Related Indirect, Buyer-Side Claims that Arise from Identical Facts.

The objections asserted by Mr. Mullis concerning the inclusion of home buyers that were also home sellers during the relevant period should be overruled because buyer-side claims for home sellers like Mr. Mullis are also properly included in the Settlements, as they indisputably arise out of the exact same alleged conspiracy. Settlement classes like those here that include both direct and indirect purchases are appropriate, so long as those claims are based on the same factual predicate. *See In re Transpacific Passenger Air Transp. Antitrust Litig.*, 701 F. App'x

554, 555-56 (9th Cir. 2017) (finding a settlement class was properly certified even though it included both direct and indirect purchaser claims); *see also In re: Processed Egg Prods. Antitrust Litig.* (E.D. P.A., 08-md-2002, MDL 2002), ECF No. 349-1 ¶ 25 (releasing different types of claims so long as they are based on the same facts); *In re Intuniv Antitrust Litig.* (D. Mass., 16-cv-12653), ECF No. 480-1 ¶ 10 (similar); *In re: Prograf Antitrust Litig.* (D. Mass. 1:11-md-2242), ECF No. 652-2 ¶ 10(a) (similar); *In re Pre-Filled Propane Tank Antitrust Litig.* (W.D. Mo. 14-md-2567 / MDL No. 2567), ECF No. 362-1 ¶ 12 (similar); *In re HIV Antitrust Litig.* (N.D. Cal, 19-cv-02573), ECF No. 711-2 at 11-12 (similar); *In re Broiler Chicken Antitrust Litig.* (N.D. Ill. 16-cv-8637), ECF No. 3324 ¶ 26 (similar).

Once again, the issue is whether the factual predicate underlying the claims is the same. *See Uponor*, 716 F.3d at 1065 (rejecting objection that "the settlement contained an overbroad release" and finding that it permissibly released only claims "[ ]related to leaky brass fittings," i.e., the subject of the litigation); *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 190-91 (8th Cir. 1993) (affirming district court's approval of settlement that released claims which could have been but were not brought and finding that "the situation is analogous to the barring of claims [under res judicata] that could have been asserted in the class action"); *Huyer v. Wells Fargo & Co.*, 314 F.R.D. 621, 628 (S.D. Iowa 2016) (finding that the release was "not overly broad" because it was "only applicable to claims 'arising out of, or relating to'" the factual predicate giving rise to the plaintiffs' claims).

Here, the factual predicate underlying Mr. Mullis's claim and the claims in this case are indisputably identical. Mr. Mullis admits as much in his objection—he states "Mullis and the putative classes in *Batton*, *Davis*, and *Lutz* allege state-law indirect purchaser antitrust and unfair competition claims based on similar anticompetitive conduct alleged in this litigation." ECF No.

471 at 4.  In fact, according to Mr. Mullis, there is only one difference between his case and this case, which is that "he and putative class members suffered damages each time they *bought* a home and the seller paid a real estate commission . . . ." *Id.*  In other words, the only difference between the two cases are that Mr. Mullis's claims are limited to the indirect effects that the claims flowed from the purported conspiracy.  *See Batton v. Nat'l Ass'n of Realtors*, Case No. 21-cv-00430, 2024 WL 689989, at *2 and *10 (N.D. Ill. Feb. 20, 2024) (stating that the putative home buyer class is made up of indirect purchasers and explaining that Mr. Mullis and his co-plaintiffs were not allowed to seek injunctive relief because the home sellers in *Moehrl* and *Burnett* were better suited to seek the injunctive relief sought).

The cases on which Mr. Mullis relies fail to establish the existence of a separate factual predicate.  For example, both *Graves v. CAM2 International LLC,*and *Karg v. Transamerica Corp.* were straightforward textual inquiries assessing whether the language of a prior settlement barred the present action.  *Graves v. CAM2 Int'l LLC*, No. 3:19-CV-5089, 2020 WL 3968040, at *9 (W.D. Mo. July 13, 2020); *Karg v. Transamerica Corp.*, No. 18-CV-134, 2019 WL 3938471, at *4 (N.D. Iowa Aug. 20, 2019).  Neither case stated, or implied, that the settling parties *could not* have released a broader set of claims had they so chosen.  Neither mentioned the factual predicate doctrine.  The cases are thus not relevant here, where there is no question that the settling parties have agreed to release all claims, including buyer claims.

The fact that Mr. Mullis and other buyers are indirect purchasers—in addition to being direct purchasers as home sellers—does not undermine the fact that the *Batton* cases stem from the same factual predicate as this case.  As discussed above, courts in similar situations have routinely found that claims by subparts of a class all stem from the same factual predicate, such as the claims of indirect purchasers (home buyers) and direct purchaser claims (home sellers),

and that a settlement can properly include both. *Uponor*, 716 F.3d at 1065 (rejecting objection that "the settlement contained an overbroad release" and finding that it permissibly released only claims "[r]elated to leaky brass fittings," i.e., the subject of the litigation); *Huyer*, 314 F.R.D. at 628 (release was "not overly broad" because it was "only applicable to claims 'arising out of, or relating to' " the factual predicate giving rise to the plaintiffs' claims); *Burnett*, 2024 WL 2842222, at *12 (noting that "[r]eleases in antitrust direct-purchaser settlements commonly cover all claims the settlement class members could raise against the Settling Defendant arising out of the same conspiracy, including indirect-purchaser claims").

Furthermore, the supposed "additional facts" Mr. Mullis claims are required to prove his case are not different facts at all, and instead prove the point that his case is based on identical factual predicate. Mr. Mullis claims that the additional facts he needs to prove are that: (1) he purchased a home; (2) using a buyer-agent; and (3) that supracompetitive broker commissions caused him to pay more for his home than it would otherwise cost. ECF No. 471 at 7. These facts are all encompassed by the complaints here. *See, e.g.*, ECF. No. 130 ¶¶ 12-13 (explaining how broker compensation is linked to home price and how buyer-agents are paid in other countries); ¶ 19 (discussing when in the process that home buyers retain a buyer broker and alleging that "housing prices have significantly increased during the last several years" and that commissions have accordingly increased); ¶ 29 (explaining that the *Gibson* Plaintiffs were bringing a case related to situations where "a buyer broker commission" was paid); ¶ 112 (explaining that the listing agreement under the alleged conspiracy requires that the amount to be paid to the buyer broker be specified).

As Mr. Mullis admits, the Settlement "releases expressly adopt the 'same factual predicate' rule to define their scope." ECF No. 471 at 6. It would undermine the basic tenets of

settlement to undo what the parties negotiated and to exclude certain buyer's claims from the settlements and releases. Mr. Mullis and other seller/buyers were given clear notice of the terms of the settlements and could have opted out, much the way some other seller/buyers did. And the parties are not suggesting that pure buyer-side claims are extinguished—rather, only claims relating to individuals who both purchased and sold a home are included in the settlement. *Gibson* Pls.' Mot. and Suggestions in Supp. of Final Approval at 52, ECF No. 521.

This Court previously overruled Mr. Mullis's objections to the settlements in *Burnett*, and he makes no new arguments in this objection.[12]  2024 WL 2842222, at *12-13. The arguments and objections are identical here. *See* ECF No. 471 at 2 n.1 (acknowledging that in *Burnett* Mr. Mullis "objected on the same grounds asserted herein"). The Court should again overrule Mr. Mullis's objections for the reasons discussed above and for those in its earlier ruling.

## IV.     CONCLUSION

For the above reasons, the Settling Defendants respectfully request that the Court grant final approval for the Settlements.

---

[12] Given that Mr. Mullis made the same objections to nearly-identical settlements in the *Burnett* action, he was given the opportunity to be heard on those objections, and thereafter, this Court overruled those objections, Mr. Mullis's objections here are also barred by collateral estoppel. *In re T.G. Morgan, Inc.*, 394 B.R. 478 (B.A.P. 8th Cir. 2008), *aff'd*, 343 F. App'x 171 (8th Cir. 2009); *In re Nangle*, 274 F.3d 481, 485 (8th Cir. 2001).

Dated: October 24, 2024

Respectfully submitted,

/s/ Chahira Solh
Chahira Solh (*admitted pro hac vice*)
Daniel A. Sasse (MO #48997)
Eric Fanchiang (*admitted pro hac vice*)
**CROWELL & MORING LLP**
3 Park Plaza, 20th Floor
Irvine, CA 92614
Telephone: (949) 798-1338
Email: dsasse@crowell.com
Email: csolh@crowell.com
Email: efanchiang@crowell.com

*Attorneys for Compass, Inc.*

/s/ Michael L. Sibarium
Lauren E. Tucker McCubbin (MO #55179)
**POLSINELLI PC**
900 W. 48th Place, Suite 900
Kansas City, MO 64112
Telephone: (816) 753-1000
Email: ltucker@polsinelli.com

Michael L. Sibarium (*admitted pro hac vice*)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 17th St. N.W.
Washington, DC 20036
Telephone: (202) 663-9202
Email: michael.sibarium@pillsburylaw.com

Kenneth W. Taber (*admitted pro hac vice*)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
31 West 52nd Street
New York, NY 10019
Telephone: (212) 858-1813
Email: kenneth.taber@pillsburylaw.com

*Attorneys for Engel & Völkers Americas, Inc. & Engel & Völkers GmbH*

/s/ Kenneth R. David
Marc E. Kasowitz (*admitted pro hac vice*)
Hector Torres (*admitted pro hac vice*)
Kenneth R. David (*admitted pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1893
Email: kdavid@kasowitz.com
Email: mkasowitz@kasowitz.com
Email: htorres@kasowitz.com

Constantine "Dean" Z. Pamphilis (*admitted pro hac vice*)
J. Michael Wilson (*admitted pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1415 Louisiana, Suite 2100
Houston, Texas 77002
Telephone: (713) 220-8800
Email: dpamphilis@kasowitz.com
Email: mwilson@kasowitz.com

Trina R. Ricketts (MO #46080)
Daniel P. Johnson (MO #68966)
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
700 West 47th St., Suite 500
Kansas City, MO 64112
Telephone: (816) 471-1301
Email: trina.ricketts@ogletree.com
Email: daniel.johnson@ogletree.com

*Attorneys for Douglas Elliman Realty, LLC and Douglas Elliman Inc.*

/s/ James D. Lawrence
James D. Lawrence (MO #53411)
**BRYAN CAVE LEIGHTON PAISNER LLP**
1200 Main St., Suite 3800
Kansas City, MO 64105
Telephone: (816) 374-3200
Email: jim.lawrence@bclplaw.com

Timothy R. Beyer (*admitted pro hac vice*)
**BRYAN CAVE LEIGHTON PAISNER LLP**
1700 Lincoln Street, #4100
Denver, CO 80203
Telephone: (303) 866-7000
Email: tim.beyer@bclplaw.com

Lindsay Sklar Johnson (*admitted pro hac vice*)
**BRYAN CAVE LEIGHTON PAISNER LLP**
1201 W. Peachtree St., N.W., 14th Floor
Atlanta, GA 30309-3471
Telephone: (404) 572-6600
Email: lindsay.johnson@bclplaw.com

Emilee L. Hargis (MO #69119)
**BRYAN CAVE LEIGHTON PAISNER LLP**
211 N. Broadway, Suite 3600
St. Louis, MO 63102
Telephone: (314) 259-2028
Email: emilee.hargis@bclplaw.com

*Attorneys for Defendant Five D I, LLC (d/b/a United Real Estate)*

/s/ Leo D. Caseria

Leo D. Caseria (*admitted pro hac vice*)
Ann O'Brien (*admitted pro hac vice*)
Christopher M. Loveland (*admitted pro hac vice*)
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, DC 20006
Telephone: (202) 747-1924
Email: lcaseria@sheppardmullin.com
Email: aobrien@sheppardmullin.com
Email: cloveland@sheppardmullin.com

Helen C. Eckert (*admitted pro hac vice*)
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
4 Embarcadero Ctr.
San Francisco, CA 94111
Telephone: (415) 434-9100
Email: heckert@sheppardmullin.com

Amanda P. Ketchum (MO #51011)
Matthew W. Geary (MO #53328)
**DYSART TAYLOR MCMONIGLE BRUMITT & WILCOX, P.C.**
700 W. 47th Street, Suite 410
Kansas City, MO 4112
Telephone: (816) 931-2700
Email: aketchum@dysarttaylor.com
Email: mgeary@dysarttaylor.com

*Attorneys for Realty ONE Group, Inc.*

/s/ Gerald A. Stein

Brian J. Madden (MO #40637)
**WAGSTAFF & CARTMELL**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone: (816) 701-1100
Email: bmadden@wcllp.com

Eyitayo St. Matthew-Daniel (*admitted pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (219) 373-3229
Email: tstmatthewdaniel@paulweiss.com

MaryAnn T. Almeida (*admitted pro hac vice*)
Robert J. Maguire (*admitted pro hac vice*)
Emily Parsons (*admitted pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 757-8187
Email: maryannalmeida@dwt.com
Email: robmaguire@dwt.com
Email: emilyparsons@dwt.com

Gerald A. Stein (*admitted pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Telephone: (212) 402-4095
Email: geraldstein@dwt.com

*Attorneys for Redfin Corporation*

/s/ Scott Eric Anderson
Scott Eric Anderson (*admitted pro hac vice*)
Jacob S. Madsen (*admitted pro hac vice*)
Cameron N. Regnery (*admitted pro hac vice*)
**FREEMAN MATHIS & GARY, LLP**
100 Galleria Parkway, Suite 1600
Atlanta, GA 30339
Telephone: (470) 228-3500
Email: scott.anderson@fmglaw.com
Email: jacob.madsen@fmglaw.com
Email: cameron.regnery@fmglaw.com

John L. Mullen (MO #42309)
Christopher H. Harper (MO #59000)
**FRANKE, SHULTZ & MULLEN**
8900 Ward Parkway
Kansas City, MO 64114
Telephone: (816) 421-7100
Email: jmullen@fsmlawfirm.com
Email: charper@fsmlawfirm.com

*Attorneys for HomeSmart International, LLC*

/s/ David Marroso
David Marroso (*admitted pro hac vice*)
Craig P. Bloom (*admitted pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Email: dmarroso@omm.com
Email: cbloom@omm.com

Stephen McIntyre (*admitted pro hac vice*)
**O'MELVENY & MYERS LLP**
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-8382
Email: smcintyre@omm.com

Jennifer B. Wieland (MO #57271)
**BERKOWITZ OLIVER LLP**
2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108
Telephone: (816) 627-0266
Email: jwieland@berkowitzoliver.com

*Attorneys for The Real Brokerage Inc. and Real Broker, LLC*

*/s/ Robert J. Palmersheim*
Robert Palmersheim (admitted *pro hac vice*)
Molly McGinley (admitted *pro hac vice*)
Timothy Parilla (admitted *pro hac vice*)
**Honigman LLP**
155 North Wacker Drive, Suite 3100
Chicago, Illinois 60606
Telephone: (312) 701-9300
Email: rpalmersheim@honigman.com
Email:mmcginley@honigman.com
Email:tparilla@honigman.com

Elizabeth Vasseur-Brown, 58491
**Cooling & Herbers, P.C.**
2400 City Center Square
1100 Main Street
Kansas City, Missouri 64105
Telephone: (816) 474-0777
Email: lbrowne@coolinglaw.com

*Attorneys for At World Properties, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2024, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Chahira Solh*
Chahira Solh
*Attorney for Defendant Compass, Inc.*