# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

DON GIBSON, LAUREN CRISS, JOHN MEINERS, and DANIEL UMPA, on behalf of themselves and all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS, *et al.*,

        Defendants.

Civil Action No. 4:23-cv-00788-SRB

[Consolidated with 4:23-cv-00945-SRB]

## ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENTS WITH DEFENDANTS HANNA HOLDINGS, INC., WILLIAM RAVEIS REAL ESTATE, INC., EXIT REALTY CORP. INTERNATIONAL, EXIT REALTY CORP. USA, WINDERMERE REAL ESTATE SERVICES COMPANY, INC., WILLIAM L. LYON & ASSOCIATES, INC.

Before the Court is Plaintiffs'[1] Motion for Final Approval of Settlements with the Hanna Holdings, Inc. ("Hanna Holdings"), William Raveis Real Estate, Inc. ("William Raveis"); EXIT Realty Corp. International and EXIT Realty Corp., USA ("EXIT"); Windermere Real Estate Services, Company Inc. ("Windermere"), and Lyon & Associates, Inc. ("Lyon") Defendant families (collectively the "Settling Defendants"). Preliminary approval was granted on October 3, 2025. *See* Doc. # 813. Notice to the Settlement Class commenced on or around October 14, 2025, and Class members were provided with an opportunity to opt out of, or object to, the Settlements. The Court received three objections. The Settlement Class filed Suggestions in Support of Final Approval. (Doc. # 856). The Court held a hearing on February 5, 2026, at which arguments were

---

[1] "Plaintiffs" are Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa.

presented. Having fully considered the arguments at the hearing and in the written submissions, and based on all materials in the record, the motion for final approval is GRANTED.

The Court hereby ORDERS the following:

1.       Unless defined herein, all defined terms in this Final Approval Order and any accompanying Judgment shall have the respective meanings set forth in the Settlement Agreements.

2.       At preliminary approval, the Court appointed JND Legal Administration ("JND") as the Settlement Administrator. In connection with their final approval motion, Plaintiffs submitted a declaration of Jennifer M. Keough from JND summarizing the notice that was given to Class members and the resulting claims to date, opt-outs, and objections. (Doc. # 856-2). As directed by the Court, JND implemented the Class Notice Plan. Notice was provided by first-class U.S. mail, electronic mail, and digital and print publication. As stated in that declaration, over 25 million direct notices were mailed or emailed to the Class, and when combined with related notice campaigns, over 164 million notices were mailed or emailed to the Class. JND's digital notice effort delivered more than 355 million impressions. JND also implemented a Settlement Website that had over 4 million unique visitors and over 22 million page views. The Court finds that the notice program was adequate and reached more than 95% of identified Settlement Class members.

3.       As of the date of this Order, 2,698,327 claims have been submitted.

4.       Despite the reach of the notice program and large volume of claims, there were three objections and only 22 opt-outs from the Settlement Class.

5.       Based on the record, the Court finds that the notice given to the Settlement Class was the best notice practicable under the circumstances and satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and all applicable law. The Court further finds that

the notice given to the Settlement Class of the Settlements, separately, together, and in light of the previously approved settlements, was adequate and reasonable.

6. The notice fully and accurately informed members of the Settlement Class of all material elements of the Settlements. The Settlement Class Members received notice of: (a) the pendency of the Actions; (b) the terms of the proposed Settlements, including the Released Claims, Released Parties, and Releasing Parties; (c) their rights under the proposed Settlements, including how to receive the benefits offered by the Settlements; (d) their right to exclude themselves from the Settlement Class and the proposed Settlements; (e) their right to object to any aspect of the proposed Settlements; (f) their right to appear at the Final Approval Hearing; (g) Class Counsel's request for attorneys' fees and expenses; and (h) the binding effect of any final judgment and order approving the Settlements on all Persons who did not timely exclude themselves from the Settlement Class.

7. The Court also finds that the appropriate state and federal officials were timely notified of the Settlement Agreements under the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1715, and that ninety (90) days have passed without objection as to entry of approval from any governmental entity.

8. For the purposes of the settlement of the claims against Hanna Holdings and William Raveis this Court certified for settlement of claims as follows:

All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

    i.   homes in Arkansas, Kentucky, and Missouri: October 31, 2018 to the date of Class Notice;
    ii.  homes in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming: October 31, 2017 to the date of Class Notice;
    iii. for all other homes: October 31, 2019 to the date of Class Notice.

*See* Hanna Holdings Settlement Agreement at ¶ 15; William Raveis Settlement Agreement at ¶ 15.

9.     The proposed Settlements with EXIT Realty, Windermere, and Lyon this Court certified for settlement of claims as follows:

> All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date range: October 31, 2019 to date of Class Notice.

*See* EXIT Realty Settlement Agreement at ¶ 15; Windermere and Lyon Settlement Agreement at ¶ 15.

10.     The Court finds that certification of the Settlement Class is warranted under Federal Rule of Civil Procedure 23(a) because: (1) the members of the Settlement Class are so numerous that joinder is impracticable; (2) there are issues of law and fact common to the Settlement Class; (3) Plaintiffs' claims are typical of the claims of the Settlement Class Members; and (4) Plaintiffs and Co-Lead Counsel will fairly and adequately represent the interests of the Settlement Class members.

11.     The Court finds that certification of the Settlement Class is warranted in light of and solely for purposes of the Settlements under Federal Rule of Civil Procedure 23(b)(3) because common issues, including whether Settling Defendants entered into any conspiracy, predominate over any questions affecting only individual members of the Settlement Class in the settlement context, and settlement of the Actions on a class basis is superior to other means of resolving the Actions as to Settling Defendants.

12.     The Court reaffirms the appointment of Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa as the Settlement Class Representatives. The Court finds that the Settlement Class Representatives have and will fairly and adequately protect the interests of the Settlement Class because: (1) the interests of the Settlement Class Representatives are consistent with those

of Settlement Class members; (2) there appear to be no conflicts between or among the Settlement Class Representatives and the other Settlement Class members; (3) the Settlement Class Representatives have been and appear to be capable of continuing to be active participants in both the prosecution and the settlement of this litigation; and (4) the Settlement Class Representatives and Settlement Class members are represented by qualified, reputable counsel who are experienced in preparing and prosecuting large, complicated class action cases, including those concerning violation of the antitrust laws.

13.     In making these findings, the Court has considered, *inter alia*, (1) the interests of the Settlement Class members in individually controlling the prosecution or defense of separate actions; (2) the impracticality or inefficiency of prosecuting or defending separate actions; (3) the extent and nature of any litigation concerning these claims already commenced; and (4) the desirability of concentrating the litigation of the claims in a particular forum.

14.     The Court has specifically considered that the Settlement Class is nationwide and releases claims arising from sales of homes listed on NAR and non-REALTOR® MLSs, including all claims on behalf of Class Members, as sellers, buyers, or otherwise, arising from the same factual predicate. The Settlements resolve, among others, this case where Plaintiffs plead a nationwide conspiracy on behalf of a nationwide class that expressly challenges certain NAR rules as well as rules adopted by other MLSs such as the Residential Listing Service ("RLS") of the Real Estate Board of New York ("REBNY") and West Penn Multi-List ("WPML"). *See Gibson* Doc. #232, Consolidated Am. Compl., ¶ 182. The Complaint includes specific allegations regarding particular policies adopted in REBNY RLS and WPML that the Plaintiffs allege to be anticompetitive. *Id.* The Complaint alleges that, as a result, "Defendants' conspiracy has had the following anticompetitive effects *nationwide*," including in REBNY RLS and WPML: (a) "Home

sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their homes—thereby substantially inflating the cost of selling their homes"; (b) "Home sellers have been compelled to set a high buyer-broker commission to induce buyer-brokers to show their homes to home buyers"; (c) "Home sellers have paid inflated buyer-broker commissions and inflated total commissions"; (d) "The retention of a buyer-broker has been severed from the setting of the broker's commission; the home buyer retains the buyer-broker, while the home seller sets the buyer-broker's compensation"; and (e) "Price competition among brokers to be retained by home buyers has been restrained." *Id*. ¶ 225 (emphasis added); *see also id*. ¶¶ 28, 227 (describing "nationwide" impact).

15.     Here, the Court finds that certifying a nationwide class is warranted, including because Plaintiffs have pleaded a nationwide conspiracy and conducted extensive discovery into the alleged nationwide conspiracy and have thoroughly litigated the claims, providing a robust factual record on which to assess the claims and base negotiations. A nationwide settlement was a necessary condition of obtaining any settlement for the benefit of the class, a nationwide settlement will conserve judicial and private resources, and Class members were fully apprised of the settlement class definition through the notice process. The record reflects that it was both justified and necessary to achieve any settlement for the Settlement Class to include all MLSs for residential real estate nationwide and regardless of their formal affiliation with NAR. Moreover, the only way that the Settlements were possible was if they provided for a nationwide recovery and release.

16.     As a general matter, "[t]he law strongly favors settlements" and "[c]ourts should hospitably receive them." *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990) (noting it is especially true in "a protracted, highly divisive, even bitter litigation"); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) ("[A] strong

public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."); *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) ("A settlement agreement is 'presumptively valid.'" (quoting *Uponor, Inc*, 716 F.3d at 1063)); *Sanderson v. Unilever Supply Chain, Inc.*, 10-cv-00775-FJG, 2011 WL 5822413, at *3 (W.D. Mo. Nov. 16, 2011) (crediting the judgment of experienced class counsel that settlement was fair, reasonable, and adequate). The presumption in favor of settlements is particularly strong "in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005). However, the Court finds the Settlements, separately, together, and in light of the previously approved settlements, fair, reasonable, and adequate, regardless of any such presumption.

17.     The determination whether a class action settlement is "fair, reasonable, and adequate" is "committed to the sound discretion of the trial judge. Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly." *Van Horn v. Trickey*, 840 F.2d 604, 606-07 (8th Cir. 1988); *see also In re Wireless*, 396 F.3d 922, 932 (8th Cir. 2005) (the ultimate question is whether the settlement is "fair, reasonable, and adequate").

18.     Rule 23(e)(2) includes four factors the Court must consider, when evaluating settlement fairness. Those factors are whether:

(A) the Class Representatives and Class Counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the Class is adequate, taking into account:

(i)      the costs, risks, and delay of trial and appeal;
(ii)     the effectiveness of any proposed method of distributing relief to the Class, including the method of processing Class-Member claims;

(iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)    any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

19.    The Eighth Circuit has also set forth four factors that a court should consider in determining whether to approve a proposed class action settlement: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." *In re Wireless*, 396 F.3d 922, 932 (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975)); *Van Horn*, 840 F.2d at 607; *see also Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 861 (S.D. Iowa 2020) (finding analysis of certain Rule 23(e)(2) factors will "necessarily include analysis of [certain] related *Van Horn* factors"); *Anderson v. Travelex Insurance Services Inc..*, No. 8:18-CV-362, 2021 WL 4307093, at *2 (D. Neb. Sept. 22, 2021) (approving settlement under Rule 23(e) by evaluating *Van Horn* factors); *Cleveland v. Whirlpool Corp.*, No. 20-cv-1906, 2022 WL 2256353 (D. Minn. June 23, 2022) (evaluating settlement under Rule 23(e)(2) factors and *Van Horn*).

20.    Under Federal Rule of Civil Procedure 23(e)(2), the Court finds that the Settlements with Settling Defendants, as set forth in the Settlement Agreements, are fair, reasonable, and adequate and directs consummation of the Settlement Agreements according to their terms.

21.    First, Settlement Class Representatives and Class Counsel have adequately represented the Class. Class Counsel were appointed to serve as lead counsel in *Burnett* and *Moehrl* after the courts overseeing both cases found they would adequately represent the class. *Burnett*, No. 19-CV-00332-SRB, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022); *Moehrl*, No. 19-cv-01610, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023). Class Counsel subsequently obtained a jury verdict

in related litigation against NAR, HomeServices, and Keller Williams in *Burnett*. In this case, this Court appointed them as Interim Co-Lead Class Counsel for an alleged nationwide class with responsibility for any settlements. *Gibson* Doc. #180. Altogether, Class Counsel have obtained over $1 billion in proposed and approved settlements as well as significant practice change relief. Likewise, the Class Representatives have bought and sold homes and have demonstrated their commitment to the litigation by responding to discovery, providing relevant documentation, and participating in the settlement process.

22.     Second, the record reflects that the Settlements were separately conducted at arm's length. The settlement negotiations were contentious and hard fought. And each occurred only after Settling Defendants provided Class Counsel with sufficient financial information for Plaintiffs to make an informed decision about settlement. Dirks Decl. at ¶¶ 21-22. There is no indication that any of the Settlements were the result of anything other than tough negotiations. The lengthy history of the related litigation, which has proceeded for years, is further evidence of the arm's length nature of these Settlements.

23.     Third, for the reasons stated above, the relief for the Class is fair and adequate. The Settlements, separately, together, and in light of the previously approved settlements, provide for a significant financial recovery to the Settlement Class in light of the strengths and weaknesses of the case and the risks and costs of continued litigation, including appeal, and the Settling Defendants' financial resources. The Settlements also include meaningful changes to the Settling Defendants' policies. The parties dispute the strength of their claims and defenses. The Settlements reflect a compromise based on the parties' educated assessments of their best-case and worst-case litigation outcomes. The best-case outcome for Plaintiffs is success at class certification, trial, and appeal, and then actually receiving the awarded damages from Defendants. But "[a]ntitrust cases

are particularly risky, challenging, and widely acknowledged to be among the most complex actions to prosecute." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020). And it would make little sense to continue litigating against the Settling Defendants where they do not have the ability to pay the full amount sought. Dirks Decl. at ¶ 32-33.

24.     Against these risks, the Settlements add to the combined settlement pot of over $1 billion, as well as substantial practice changes. *See In re Pork Antitrust Litig.,* No. 18-1776, 2022 WL 4238416, at *2 (D. Minn. Sept. 14, 2022) (granting final approval of antitrust settlement that provided "substantial relief against the backdrop of a great deal of uncertainty where the merits are highly contested" in case involving alleged price-fixing conspiracy among pork processing companies); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 995-96 (N.D. Ohio 2016) (granting final approval of settlement in light of "real possibility that [plaintiffs] could have received much less—even zero—from a jury at trial or following an appeal"). The Settlements account for only part of the recovery that the Class has obtained, or could obtain, in connection with the claims arising from the alleged conspiracy. Specifically, Class Counsel obtained other settlements with other defendants that this Court previously finally approved.

25.     In addition, the record reflects that the proposed method for distributing relief to the Class, including the proposed method for processing Class member claims, will be effective. The Court-appointed notice and claims administrator, JND, will work with Class Counsel in processing Class member claims and distributing relief. JND has extensive experience in distributing relief in connection with large and complex class action settlements. Keough Decl. at ¶ 1. JND will be responsible for reviewing claim forms and evidence to determine whether claims should be approved, and any claim that cannot be confirmed may be subject to challenge,

nonpayment, or a reduced share of the available funds. *See* Settlement Notice at ¶ 8. Class members with approved claims will have several options for receiving payment, including by debit card, Zelle, Venmo, or check. *See* Claim Form at p 1. Finally, as discussed below, the attorneys' fee request is reasonable and in line with Eighth Circuit precedent.

26.     Fourth, the Settlements, separately, together, and in light of the previously approved settlements, treat Class members fairly and equitably relative to each other. The practice change relief applies to all Class members nationwide. With respect to the monetary relief, every person who meets the class definition is eligible to submit and receive compensation for a claim. That is all that is required. *Petrovic*, 200 F.3d at 1152–53 ("We do not agree with the objectors' contention that a mailed notice of settlement must contain a formula for calculating individual awards.").

27.     Finally, there are no requested service awards under these Settlements.

28.     The *Van Horn* factors also support settlement approval. As discussed above under the Rule 23(e)(2) factors, the Settlements each reflect a compromise based on the parties' educated assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes, including potential financial outcomes of the Settling Defendants. Plaintiffs' claims raise numerous complex legal and factual issues under antitrust law. This is reflected in the voluminous briefing in this and the related litigation, which includes extensive class certification and summary judgment briefing and evidence, as well as post-trial briefing. In addition, Plaintiffs have engaged in extensive appellate briefing in the related litigation, including Rule 23(f) petitions, as well as two separate appeals concerning arbitration issues, and a denial of certiorari by the United States Supreme Court. By contrast, the Settlements provide for certain and relatively swift recovery for the Class. In light of the many uncertainties of continued litigation, a significant and certain recovery weighs in favor of approving the proposed Settlements. *See In re*

*Coordinated Pretrial Proc. in Antibiotic Antitrust Actions*, 410 F. Supp. 669, 678 (D. Minn. 1974) (approving settlement where price-fixing claims faced "substantial roadblocks" on top of the "difficulties inherent" in prevailing on such claims); *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1137 (8th Cir. 1984) (affirming final approval of settlement where "no reported opinion addresses the precise [merits] question presented here," which created "a substantial question whether [plaintiff] would prevail"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 393 (D.D.C. 2002) ("Any verdict inevitably would have led to an appeal and might well have resulted in appeals by both sides and a possible remand for retrial, thereby further delaying final resolution of this case. These factors weigh in favor of the proposed Settlement.") (cleaned up).

29.     The fairness, adequacy, and reasonableness of the Settlements, separately, together, and in light of the previously approved settlements, are also supported by the Settling Defendants' financial condition and their inability to satisfy a worst-case judgment. As discussed above, the record reflects that, in order to evaluate the Settling Defendants' financial condition, Plaintiffs reviewed financial information pertaining to each Settling Defendant and considered each's ability to pay. These amounts are reasonable in light of limitations on the Settling Defendants' ability to pay. "[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) (quoting *In re Sony SXRD Rear Projection T.V. Class Action Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)); *see also Grunin*, 513 F.2d at 125 (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

30.     As discussed above, the litigation as a whole has been complex and expensive, and, if it were to proceed without settlement, it would remain so. The Court has observed first-hand the complexity and expense of the litigation. Settling Defendants have and would raise numerous procedural and legal challenges to the case if they were not settling.

31.     Finally, the lack of opposition to the Settlements supports approval of the Settlements. The Settlement Class Representatives have approved the Settlements. More than 2.68 million claims have been submitted, three repeat objectors have objected, and 22 opted out. Keough Decl. at ¶¶ 48, 51-52. This supports granting final approval. *See, e.g.*, *Keil v. Lopez*, 862 F.3d 685, 698 (8th Cir. 2017) (determining with a settlement class of approximately 3.5 million households, where "only fourteen class members submitted timely objections," the "amount of opposition is minuscule when compared with other settlements that we have approved"); *Bishop v. DeLaval Inc.*, No. 5:19-cv-06129-SRB, 2022 WL 18957112, at *1 (W.D. Mo. July 20, 2022) ("[A] low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval") (quoting *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015)); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559 4:03-MD-015, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004) (of the 4,838,789 settlement class members who were sent notice, only 620 (0.012%) opted out of the settlement and only 33 (0.00068%) objected to the settlement, which "are strong indicators that the Settlement Agreement was viewed as fair by an overwhelming majority of Settlement Class members and weighs heavily in favor of settlement"); *In re Tex. Prison Litig.*, 191 F.R.D. 164, 175 (W.D. Mo. 1999) ("The objectors represent only about 8 per cent of the class, and this relatively low level of opposition to the settlement also indicates its fairness. The Court has an obligation not only to the minority of class members who filed objections, but also to the majority who, by their silence, indicated their

approval of the Settlement Agreement.") (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995)); *see also, e.g.*, *Van Horn*, 840 F.2d at 607 ("the amount of opposition to the settlement" is a factor to be considered in the settlement approval process); *Marshall*, 787 F.3d at 513 ("We have previously approved class-action settlements even when almost half the class objected to it.").

32. This Court's order granting final approval of the Settlements is also supported by the substantial benefits to the class afforded by the practice changes obtained by the Settlements.

**The Objections are Overruled**

33. The Court has carefully considered each of the timely filed objections, and arguments made at the final approval hearing. All objections are overruled. As an initial matter, the Court has already overruled the same or similar objections from each of the three sets of objectors. *See Burnett*, May 9, 2024 Order Granting Final Approval, Doc. # 1487 at 13-29; *Burnett*, November 27, 2024 Order Granting Final Approval Doc. # 1622; *Gibson*, Nov. 5, 2024 Order Granting Final Approval, Doc. #530. In any event, the Court finds that none of the objections provides a basis for denying final approval of the Settlements. *See Marshall*, 787 F.3d at 513–14 ("The district court refused to give credence to the vocal minority" and "the court aptly noted that "only one-tenth of one percent of the class objected, and less than ten percent of the class ha[d] requested exclusion from the settlement.").

34. The Court also ordered on October 8, 2025: "It is hereby ORDERED that objecting Settlement Class Members appear in person, with or without counsel, at the hearing." (Doc. # 819). This order was then incorporated into the class notice.

35. This order is within the Court's discretion, particularly in light of the recent events in these cases that necessitated such appearances. *See Fauley v. Metro. Life Ins. Co.,* 52 N.E. 3d

427, 438-39 (Ill. App. Ct. 2016) ("requiring class members to be present in court to object did not violate their due-process rights" when the Court ordered "if you want the Court to consider your objection, then you must also appear at the final approval hearing."); *In re Train Derailment Near Amite La., Oct. 12, 2002*, No. CIV.A. MDL 1531, 2006 WL 644494, at *2 (E.D. La. Jan. 27, 2006) ("To preserve the right to be heard at the Fairness Hearing in opposition to the settlement, the objecting Class Member must appear at the federal court in person not later than 8:30 a.m. on the date the Fairness Hearing is to begin and register with Class Counsel."); *Dennings v. Clearwire Corp.*, No. C10-1859JLR, 2013 WL 3870801, at *8 (W.D. Wash. July 26, 2013) (finding when the Court ordered objectors' counsel's in person appearance, "[i]f Objectors' counsel intends to litigate in the State of Washington, he must be prepared to appear in Washington when ordered to do so by the court.").

36.     Objectors may not "essentially insert[] [themselves] into the dispute and then, without explaining why, refuse[] to play by the rules that the district court set." *In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th 849, 858 (8th Cir. 2024). An objector in *T-Mobile* refused to cooperate with counsel's efforts to conduct discovery ordered by the district court, claiming "that by subjecting her to a deposition, the district court 'unduly encumbered' her due-process right to be heard." *Id*. Both the Eighth Circuit and District Court disagreed with her refusal to follow the court's orders and struck her objection. *Id*. Similarly here, after the Court ordered their appearance, many objectors mailed letters protesting the Court's order and requesting excusal for various reasons. Failure to comply with a Court's order can result in an objection being struck or waived. *See Ferron v. Kraft Heinz Foods Co.*, No 20-CV-62136-RAR, 2021 WL 2940240, at *41 (S.D. Fla. July 13, 2021) (finding when an objector failed to follow the Court order of appearing after providing the Court intent to appear at the final approval hearing, he provided the

Court "sufficient grounds alone to strike his Objection."); *In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 682 (D. Colo. 2014) ("As a threshold matter, National Roofing's objection failed to comply with the Court's order . . . [t]hus, National Roofing's objection is deemed waived[.]"). All Objectors who did not appear in person failed to comply with the Court's order. Therefore, all objections filed by such Objectors are waived for failing to comply with the Court's order.

37.    Separate from this, the Court has carefully considered the objections, and overrules each on its merits.

38.    The objections were received from plaintiffs and their counsel who filed their own cases after *Moehrl* and *Burnett*. None of these cases have certified classes, and all appear to be in their infancy.

39.    Several of these objections make arguments of various kinds challenging the scope of the Settlements and their releases. In the settlement context, however, courts regularly certify classes that are broader in some respect than the classes that were originally litigated. *See, e.g.*, *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) ("There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded. In fact, most settling defendants insist on this."); *Smith v. Atkins*, 2:18- cv-04004-MDH, Order Approving Settlement, at ECF 53 (W.D. Mo. June 26, 2020) (approving settlement of nationwide class with 2-year practice change requirement); *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 318 (C.D. Cal. 2016) (court can "expand the scope of a settlement class") (citing *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 325-26 (3d Cir. 1998)); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-cv-1827, 2011 WL 13152270, at *9 (N.D. Cal. Aug. 24, 2011) ("For the history of class certifications, courts have generally certified settlement classes broader than the previously-certified litigation classes; the

claims released are typically more extensive than the claims stated. Courts have noted that concerns about manageability and/or the class-wide applicability of proof (which can serve to limit or defeat class certification for trial) are in large part no longer relevant when establishment of a defendant's liability is replaced by a settlement."); *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 190 (S.D.N.Y. 2005) ("[A] court may approve a settlement class broader than a litigation class that has already been certified."); *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 661 (E.D. Va. 2001) (certifying settlement class broader than previously certified litigation class); *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 172 (same).

40.     Broad classes are often a practical prerequisite to reaching any settlement because a defendant will not agree to any meaningful settlement unless it can obtain global peace. *See, e.g.*, *Albin v. Resort Sales Missouri, Inc.*, No. 20-03004-CV-S-BP, 2021 WL 5107730, at *5 (W.D. Mo. May 21, 2021) (reasoning that the absence of "a single nationwide class action" would "discourage class action defendants from settling") (quotation omitted); *accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 103 n.5, 106 (2d Cir. 2005) ("Broad class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country. Practically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability" (quotation omitted)); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 247-48 (2d Cir. 2011) ("Parties often reach broad settlement agreements encompassing claims not presented in the complaint in order to achieve comprehensive settlement of class actions, particularly when a defendant's ability to limit his future liability is an important factor in his willingness to settle."); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 310-11 (3d Cir. 2011) (en banc) (affirming nationwide settlement in an antitrust case and stating: "[Without] global peace . . . there would be no

settlements."). Conversely, because global peace is most valuable to defendants, defendants will pay more to obtain it, thus benefitting class members. *See, e.g.*, *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 705 (E.D. Mo. 2002) ("[Defendants] paid both classes of plaintiffs more in the instant global settlement out of a desire to obtain 'total peace' than they would have paid either group of plaintiffs individually.").

41. Moreover, the objections challenge the nationwide geographic scope of the Settlements. But the Settlements' nationwide scope does not expand the geographic scope of the class pleaded in the settled "actions." Among the actions settled and released is *Gibson*. The *Gibson* complaint reflects nationwide claims and alleges that the conspiracy's scope impacted transactions nationwide, including in non-Realtor MLSs such as WPMLS and RLS/REBNY. *See Gibson* Amended Complaint (Doc. #232) at ¶¶ 182, 225, 227.

**The Court Overrules the South Carolina Objections by Benny D. Cheatham, Robert Douglass, and Douglas W. Fender II (Doc. #845)**

42. The South Carolina objection is overruled.

43. At the outset, many of the objections do not relate to these Settlements but rather appear to relate to a previously-filed objection to the NAR Settlement. That objection is overruled.

44. The South Carolina objectors argue that the aggregate monetary recovery reflected across the settlements are small. Yet the total settlements to date across both all actions exceed $1 billion. Moreover, the South Carolina objectors do not argue that any particular settlement in this action is inadequate; indeed, they fail to address the individual settlements at all. They do not even say what total amount *would have* been reasonable and adequate, only that they do not like what was obtained. Nor do they assert that the Settlements were the product of collusion or any conflict.

45.     The applicable standard is whether the settlements are fair, reasonable, and adequate—not whether they provide complete relief to all Class members. *See Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 54 (W.D.N.Y. 2018) ("The court's task, then, is simply to decide whether the settlement agreement *as written* is fair, reasonable, and adequate, not whether the parties or the court could conceivably have come up with a 'better' agreement.").

46.     "As courts routinely recognize, a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." *Keil*, 862 F.3d at 696; *see also Pro. Firefighters Ass'n of Omaha, Loc. 385*, 678 F.3d at 649 ("Appellant falls far short of establishing the settlement agreement was unfair or inadequate simply because the retirees did not get as much as they believed they should."); *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984) (approving settlement despite the fact that "the settlement amount would not begin to cover the total costs of medical treatment for the class which easily could amount to billions of dollars" and holding "[t]he fact that the settlement amount may equal but a fraction of potential recovery does not render the settlement inadequate"), *aff'd*, 818 F.2d 145 (2d Cir. 1987); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312–13 (N.D. Ga. 1993) ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. The trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." (cleaned up)).

47.     Nor must a settlement exhaust all of a settling defendant's financial resources in order to be deemed fair, reasonable, and adequate. *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) ("[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate.") (quoting *In re Sony SXRD Rear Projection T.V. Class Action*

*Litig.*, No. 06-cv-5173, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008)); *see also Petrovic*, 200 F.3d at 1153 ("While it is undisputed that [the settling defendant] could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate."); *Grunin*, 513 F.2d at 125 (affirming antitrust settlement and explaining that a "total victory" for plaintiffs after trial "would have been financially disastrous if not fatal" to the defendant, and the final settlement "gave valuable concessions to the [settlement class] yet maintained [the defendant's] corporate viability").

48.     In reaching these settlements, Class Counsel, who have extensive antitrust experience and have vigorously litigated these related cases for years, sought to obtain the best possible recovery for the Class. There is no suggestion here, nor could there be, that Class Counsel were uninformed, lacked experience and expertise, or were somehow prevented from negotiating the best deals possible for the Class. To the contrary, Class Counsel negotiated these settlements based on their extensive knowledge of the issues, including liability, damages, the risks of continued litigation, and the financial condition of the Settling Defendants. Class Counsel also analyzed the finances of each of the Settling Defendants, including reviewing internal financial documents and evaluating the risk that each could file for bankruptcy protection, which likely would have resulted in lower recoveries, if any, for the Class than will be obtained via the Settlements.   Decl. ¶¶ 22-32. The settlement amounts, which were ultimately reached only after arm's length negotiations between experienced counsel represented the most Class Counsel believed each Settling Defendant was reasonably able and willing to pay given the financial and legal circumstances existing at the time of each Settlement.

49.     The South Carolina Objectors also purport to object to the scope of the releases reflected in the Settlements—but their objection is based on a plainly incorrect understanding of

what the releases actually say and do. *First*, the South Carolina Objectors mistakenly claim that the Settlements include a release for "local realtors whose annual sales volume is less than Two Billion." Doc. 464 at 4. This is wrong. The Settlements at issue here do not contain such a provision. *Second*, the South Carolina Objectors appear to argue that certain MLSs would be released by the Settlements. This is likewise incorrect. The Settlements at issue here do not release any MLSs. *Third*, the South Carolina Objectors assert that they have sued "local entities" in South Carolina that would be released by the Settlements. *Id.* But the South Carolina Objectors do not point to any such "local entities" they have sued that would be released. Indeed, many other Settling Defendants do not even do business in South Carolina. Although the South Carolina Objectors did sue Hanna Holdings, that case has made no progress and is currently stayed.

50.      As to Settling Defendants' local Realtors, releases of employees and agents of defendants are common and appropriate. *See In re Am. Inv'rs Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 240 (E.D. Pa. 2009) (overruling objection to release of independent sales agents of insurance company because "the release of agents is a necessary component of the settlement agreement in order to provide finality. Otherwise, dissatisfied policyholders could sue the defendants' agents who would then, in turn, look to the defendants for indemnity or contribution.") (citing *In re Prudential Ins. Co. of Am. Sales Prac. Litig. Agent Actions*, 962 F. Supp. 450, 522-23 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)); *Shay v. Apple Inc.*, No. 3:20-cv-1629, 2024 WL 1184693, at *8 (S.D. Cal. Mar. 19, 2024) ("The release of non-party retailers is common practice in cases such as this, where the released claims against these non-parties concern an identical injury arising from common facts.") (citing *Hesse v. Sprint Corp.*, 598 F.3d 581, 590-91 (9th Cir. 2010)); *Maine State Ret. System v. Countrywide Fin. Corp.*, No. 10-CV-00302, 2013 WL 6577020, at *7, *17 (C.D. Cal. Dec. 5, 2013) (overruling objection

that argued "non-parties cannot be released for the claims asserted in the Settlement Actions"); *Retta v. Millennium Prods., Inc.*, No. 15-CV-1801, 2017 WL 5479637, at *8 (C.D. Cal. Aug. 22, 2017) (overruling objection that release of third party retailers was inappropriate: "this argument is meritless because the purpose of the settlement is to prevent duplicative litigation of identical claims . . . . Millennium is a manufacturer that sells its products through various retailers, so any claims Ference purports to have against third-party retailers of the Subject Products are going to be based on the same false or misleading labeling allegations asserted here. This objection is overruled."); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108–09 (2d Cir. 2005) (approving class settlement with broad releases including non-parties, such as member banks, insurance companies, and Swiss governmental entities).

51. The same is true with respect to releases of franchisees. *See Flaum v. Doctor's Assocs., Inc.*, No. 16-CV-61198, 2019 WL 2576361, at *3 (S.D. Fla. Mar. 11, 2019) (final approval of settlement releasing all Subway franchisees in suit against Subway franchisor); *Adkins v. Nestle Purina PetCare Co.*, No. 12-CV-2871, 2015 WL 10892070, at *4 (N.D. Ill. June 23, 2015) (final approval of settlement releasing variety of non-parties, including suppliers, manufacturers, retailers, and franchisees); *McCabe v. Six Continents Hotels, Inc.*, No. 12-CV-4818, 2015 WL 3990915, at *3 (N.D. Cal. June 30, 2015) (preliminary approval of settlement releasing franchisees) & ECF No. 167 (Feb. 8, 2016) (ordering final approval of settlement). Absent such releases, the Settling Defendants have said that they would have, through the very act of settling the litigation, exposed themselves to potential litigation by their franchisees. They further claim that they either would not have settled on the same terms agreed or would not have settled at all, thus reducing the overall recovery to the Class.

52.     The South Carolina Objectors also object to the adequacy of the class notices. Given they have objected from the earliest settlements and have inserted themselves into the litigation over two years ago, these arguments lack credibility. Objectors assert that the notices lacked the following information, which they claim was necessary for Class members to decide whether to participate in the Settlements: (1) "there is only mention of a 42 Million Dollar settlement involving ten (10) defendants without any mention of home sales involved"; (2) "there is no explanation of the net worth of these settling defendants"; and (3) information "for class members to evaluate whether there could be better outcomes in their own jurisdictions."

53.     In fact, Class members were provided with the information the South Carolina Objectors advocate for. The notices reflect that the Settlement Class includes homes listed on MLSs nationwide over a multi-year period. Any reasonable person would have understood such a class to encompass millions of home sellers. And objectors and their counsel know this because they have objected to nearly every previous settlement in this case and related litigation. In any event, the notice included a list of "other similar cases," among them the names and case numbers of both cases filed by the South Carolina Objectors. The South Carolina Objectors do not explain why the detailed long form notice, website FAQs, and other relevant documents included on the settlement website were insufficient.

54.     Moreover, "the mechanics of the notice process are left to the discretion of the court subject only to the broad 'reasonableness' standards imposed by due process." *Grunin*, 513 F.2d at 120. "As a general rule, the contents of a settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with (the) proceedings." *Id.* at 122 (quotation omitted). "Valid notice of a settlement agreement 'may consist of a very general description' of settlement terms." *In re*

*Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013) (quoting *Grunin*, 513 F.2d at 122).

55.     The notice here easily satisfied this standard. Among other things, it apprised Class members of the nature of the action; the class claims and issues; and the settlement terms. It also advised Class members of their options, including their right to file objections, opt out, and appear at the fairness hearing. And it explained how Class members could obtain additional information including by contacting Class Counsel, contacting the claims administrator, and through the settlement website, which included numerous key case documents, FAQs, and every Settlement Agreement.

56.     Courts regularly find that similar notices satisfy Rule 23's requirements. *See, e.g.*, *In re Uponor, Inc., F1807 Plumbing Fittings Products Liability Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013) (rejecting objectors' argument that notice was defective because it did not adequately explain the scope of liability releases where the notice explained that certain claims were being released and "provided a link to the settlement website, a description of the opt out procedure, and a toll free number to pose questions to the claims administrator" for more information); *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752, 764 (10th Cir. 2020) (rejecting objections to notice that described the "general" terms of the settlement and explained how to get further information); *In re Uponor*, 716 F.3d at 1065 (notice that generally described claims being released, "provided a link to the settlement website, a description of the opt out procedure, and a toll free number to pose questions to the claims administrator," was adequate); *Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) ("The notice adequately described the nature of the pending action, the claims asserted therein, and the general terms of the proposed settlement. It informed

the shareholders that additional information was available from the court's files. It also informed them of the time and place for the settlement hearing and their right to participate therein.").

57.     Nor do the South Carolina Objectors cite any authority that would have required Plaintiffs to provide information beyond what was reflected in the class notice. With good reason. Courts are unanimous that not every detail of the litigation need be included in settlement notices and have rejected objections seeking the inclusion of every conceivable detail. *See, e.g.*, *Vargas v. Capital One Financial Advisors*, 559 F. App'x. 22, 27 (2d Cir. 2014) (a settlement notice need only apprise class members of the settlement terms and "of the options that are open to them in connection with the proceedings," and, consequently, rejecting objector's arguments that notice was inadequate because it failed affirmatively to advise unsatisfied class members to opt out and failed to calculate the damages sustained by each individual class member); *In re TikTok, Inc., Consumer Privacy Litig.*, 2022 WL 2982782, at *18 n.20 (N.D. Ill. July 28, 2022) ("Rule 23 does not require the settlement notice to contain every last bit of information necessary to file an objection."); *Good v. Am. Water Works Company, Inc.*, 2016 WL 5746347, *9 (S.D. W. Va. Sept. 30, 2016) ("The basic requirements of Rule 23 and due process are intended to ensure that notices fairly and reasonably apprise class members of a pending action affecting their rights and their options with respect to that action, but those requirements should not transform the notice into a long brief of the parties' positions, precise in every detail and slated in such fashion as to please every litigant." (quotation omitted)).

58.     Notices do not need to include every detail because "[c]lass members are not expected to rely upon the notices as a complete source of settlement information." *Grunin*, 513 F.2d at 122; *see also UAW v. General Motors Corp.*, 2006 WL 891151, *33 (E.D. Mich. Mar. 31, 2006) ("It is inevitable that some details will be omitted from a notice, but the fact that the notices

do not fully explore certain issues is immaterial. Class members are not expected to rely upon the notices as a complete source of settlement information." (cleaned up)). For instance, in *Petrovic*, the Eighth Circuit rejected the "contention that a mailed notice of settlement must contain a formula for calculating individual awards" because "[t]he notice described with sufficient particularity the stakes involved: the settlement of environmental claims against [the defendant], the award of significant injunctive relief, and the potential aggregate payout of over seven million dollars in compensatory damages." *Petrovic v. Amoco Oil Co.*, 200 F.3d at 1152–53.

59. Moreover, notices that are overly long and complex are counter-productive because they reduce the likelihood that Class members will actually review and understand essential information. *See Kagan v. Wachovia Securities, L.L.C.*, 2012 WL 1109987, at *10 (N.D. Cal. Apr. 2, 2012) ("[The proposed notice] is simply too long. The Court is concerned that few class members will read a fifteen-page, single-spaced Class Notice.").

60. The South Carolina Objectors incorrectly state that they were not informed that their presence would be required at the fairness hearing. They knew this because the notice specifically stated so and these same objectors have been previously required to attend. *See* Notice at ¶ 18 ("If you send an objection, you may need to personally appear at the Fairness Hearing on February 5, 2026, or your objection may be waived. Please check the settlement website and/or Court docket for the Court's instruction."); *id.* at ¶ 19 ("If you send an objection, you may need to personally appear at the Fairness Hearing on February 5, 2026 at 1:30 PM and 2:30 PM for Gibson and Keel II, respectively, or your objection may be waived. Please check the settlement website and/or Court docket for the Court's instruction.").

61. And South Carolina Objectors are just wrong that the Court does not have authority to assert jurisdiction over them. Objectors are not "entitled to dictate the means by which the court

considers the fairness of the proposed settlement." *Hershey v. ExxonMobil Oil Corp.*, No. 07-1300, 2012 WL 5306260, at *2 (D. Kan. Oct. 26, 2012). Once parties "insert [themselves] into the dispute" by filing an objection, they must "play by the rules that the district court set[s]." *T-Mobile*, 111 F.4th at 858. *See also Hershey*, 2012 WL 5306260, at *4 ("courts have specifically approved the requirement that an objector seeking to thwart a proposed class-wide settlement ... personally attend the fairness hearing") *aff'd*, 550 Fed. Appx. 566; *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 n.13 (E.D. Mich. 2003) (requiring objectors to attend final approval hearing); and *James v. JPMorgan Chase Bank, N.A.*, No. 8:15-cv-2424, 2016 WL 6908118, at *3 (M.D. Fla. Nov. 22, 2016) (same).

62.     Indeed, district courts often impose significantly ***more*** burdensome requirements than the attendance requirement here, such as requiring objectors to sit for depositions. *In re Equifax Inc. Customer Data Security Breach Litigation*, 999 F.3d 1247, 1266–67 (11th Cir. 2021). As with in-person attendance at a hearing, depositions "are a normal part of litigation" that require objectors and attorneys to travel and take time away from other obligations. *Id.* Preparing and sitting for a deposition is more taxing than simply attending a hearing. Yet the Eighth Circuit and others recognize that due process allows deposition requirements. *T-Mobile*, 111 F.4th at 858 ("Pentz objects that by subjecting her to a deposition, the district court 'unduly encumbered' her due-process right to be heard. We doubt it.").

63.     And including in-person attendance is particularly important to ferret out "objections that are lawyer-driven" or "filed with ulterior motives." *Equifax*, 999 F.3d at 1266. That is the case here, where the objections were filed by plaintiffs recruited by lawyers to participate in copycat lawsuits. And as the Court is aware at least one previous objector used the approval process to hurl threats and accusations of misconduct. That objector's conduct was so

alarming that the U.S. Marshals Service and the U.S. Attorney's Office had to become involved. Given this background, the District Court is well-justified in requiring all objectors to appear in person. Appearing for a single hearing is a small burden given the stakes involved: industry-wide practice reforms millions of dollars in recovery.

**The Court Overrules the Spring Way Objection (Doc. # 847)**

64.     The Pennsylvania objection to the Settlements is overruled. The Pennsylvania objection was filed by the plaintiffs and lawyers who brought another case filed after the *Burnett* verdict and after *Gibson*. The Pennsylvania objectors claim that the Pennsylvania real estate industry is somehow unique. But this is contradicted by the Pennsylvania objectors' own Amended Complaint, which says the opposite: "Defendants' anticompetitive practices are not unique--as they represent western Pennsylvania's local version of collusive practices that are widespread within the residential real estate industry." Amended Complaint (Doc. 30) at ¶ 11, *Moratis v. West Penn Multi-List, Inc.*, et al, No. 23-cv-2061 (W.D. Pa.). The Amended Complaint further stated: "Recently, a federal jury in *Burnett, et al. v. The National Association of Realtors, et al.*, 4:19-cv-00332-SRB (Western District of Missouri), found that rules, policies, and practices similar in both design and effect to those at issue here violated federal antitrust law. The jury in *Burnett* imposed a historic ten-figure judgment on the defendants." *Id*. The Complaint further alleges: "Like the defendants in *Burnett*, Defendants' conduct unlawfully restrains trade and competition, harms home sellers in the form of inflating the cost of selling a house (therefore eating into the equity a seller may have accrued in his or her property), and is, therefore, violative of federal antitrust law." *Id*. at ¶ 12. Thus, the Pennsylvania objectors' own allegations reflect that a nationwide class settlement is appropriate due to the similarity of practices and alleged anticompetitive effect across the United States. Indeed, even in their objection, Pennsylvania objectors admit that Pennsylvania

MLSs "used similar mechanisms" to accomplish the conspiracy (Doc. 847 at 3), and that "the framework and incentive for this iteration of the conspiracy was made by NAR and the franchisors" *Id.* at 6.

65.    Moreover, the Pennsylvania objectors' claim that "[t]hese plaintiffs did not conduct any discovery regarding the operation of related conspiracies in other states and regions, including Western Pennsylvania" is wrong.

66.    In addition, the court in *Moratis* entered judgment against the Plaintiffs. *Moratis v. W. Penn Multi-List, Inc.*, No. 2:23-CV-2061, Doc. 167. This is contrary to the Pennsylvania objectors' assertions that they could do better in their own regional cases. If anything, the Settlements appear to be the best way, if not the only way, for Pennsylvania class members to obtain any recovery. Indeed, 53,160 Pennsylvania claims have been filed under the Settlements. Keough Dec. at ¶ 48. Thus, the Pennsylvania objectors' argument that the recovery under the Settlements is insufficient rings hollow.

67.    Similarly, the Pennsylvania objectors' argument that Settling Defendants could have paid more is overruled, and as discussed above, was the most Plaintiffs could reasonably hope to obtain.

68.    The Pennsylvania objectors' argument that the practice change relief should not contain a sunset provision is also rejected. A time limitation on practice changes is common and reasonable. No company wishes to stay under the enforcement power of a court indefinitely, nor does a court wish to retain indefinite jurisdiction. For these reasons, injunctive relief settlements with sunset provisions are routinely approved, often for shorter periods than the five-year periods at issue here. *See, e.g.*, *Smith v. Atkins*, 2:18- cv-04004-MDH, Order Approving Settlement, at ECF 53 (W.D. Mo. June 26, 2020) (approving settlement of nationwide class with 2-year practice

change requirement); *Zepeda v. PayPal, Inc.*, No. 10-CV-1668, 2017 WL 1113293, at *13 (N.D. Cal. Mar. 24, 2017) (approving final settlement with expiration of injunctive relief after two years: "ensuring that Defendants maintain such practices until two years following the date of the Preliminary Approval Order"); *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. and Sales Practices Litig.*, No. 12-MD-2320, 2015 WL 7282543, at *10 (D.N.H. Nov. 16, 2015) (approving final settlement and overruling objections "that the injunctive remedies go away in five years" and observing the injunctive relief "provides a valuable benefit to the class" and just because the injunction is not as broad as some class members wanted "does not make this settlement inadequate"); *Fla. ex rel. Crist v. HCA, Inc.*, No. 03-CV-177, 2002 WL 32116840, at *4 (M.D. Fla. Apr. 23, 2002) (entering a final consent judgment in a Sherman Act case, in which monetary payments and injunctive relief were provided and the judgment was set to expire in five years); *In re HP Inkjet Printer Litig.*, No. 05-CV-3580, 2011 WL 13156938, at *5 (N.D. Cal. Mar. 29, 2011) (order approving settlement with injunctive relief expiring within at least three years). Not to mention that the Settlements at issue here provide a longer period of injunctive relief than other settlements that have been reached in other real estate commission antitrust suits. *See Nosalek v. MLS Property Information Network, Inc.,* No. 20-cv-12244 (D. Mass,) (Doc 268-1) ¶ 9(a) (MLS PIN injunction of three years).

69.     Next, the Pennsylvania objectors' argument that the long form notice is insufficient also fails for the same reasons discussed above.

70.     Pennsylvania objectors argument that they should not be required to attend the final approval hearing is also overruled as discussed above.

71.     Finally, Pennsylvania objectors argue that they should be permitted to opt out and object at the same time. The court overrules this objection. *See Jenson v. Cont'l Fin. Corp.,* 591

F.2d 477, 482 (8th Cir. 1979) ("Opt-outs and general creditors are not members of the class and hence are not entitled to the protection of Rule 23(e)."); *In re Ins. Brokerage Antitrust Litig.,* 282 F.R.D. 92, 110 (D.N.J. 2012) (same); *Manual for Complex Litigation,* § 21.643 (4th ed.) ("Any class member *who does not opt out* may object to a settlement, voluntary dismissal, or compromise that would bind the class.") (emphasis added); *4 Newberg and Rubenstein on Class Actions* § 13:23 (6th ed.) ("What this means is that class members may either object or opt out, but they cannot do both.").

**The Court Overrules the Buyer Objection (Doc. #848 (Mullis)).**

72.    The buyer objectors[2] seek to carve out indirect purchaser buyer claims from the releases.  But every Class member sold a home during the class period, and most also bought homes. After all, few people sell a home without first buying it. And most home sellers then buy a different home with the proceeds because they need somewhere to live. Thus, most Class members had possible claims both as home sellers and home buyers. Yet Defendants would not have paid the large amounts in settlement only to have many of the same people they just paid sue them again for the same alleged antitrust conspiracy.

73.    The parties addressed this by crafting releases that incorporate the Eighth Circuit's "same factual predicate" standard and limiting their scope to the extent permitted by federal law. The same factual predicate standard recognizes that a party may be precluded from suing twice for the same wrong. When cases go to final judgment, res judicata, for instance, bars relitigating not only the claims tried, but also other claims that "could have been raised" in that action. *Brown v. Kansas City Live, LLC*, 931 F.3d 712, 714 (8th Cir. 2019). The same holds true in class actions

---

[2] Mullis's counsel filed three buyer cases, *Batton, Davis,* and *Lutz.* The only buyer case involving a Settling Defendant is *Davis*. For sake of consistency with previous settlement approval orders, the Court refers to the buyer objectors as the "*Batton/Davis* objectors."

litigated to conclusion. *In re Gen. Am.*, 357 F.3d at 803. And for class judgments that arise from settlement, courts have developed a parallel test that gives preclusive effect to all claims – even those not pleaded – that "arise out of the same factual predicate as the pleaded claims." *Uponor, Inc.*, 716 F.3d at 1065. Similar rules apply because "'the situation is analogous to the barring of claims [under res judicata] that could have been asserted in the class action.'" *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 191 (8th Cir. 1993) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982)).

74.    Each Settlement incorporates the *Uponor* standard by limiting the term "Released Claims" to include only causes of action "arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions . . . ." *E.g.,* Hanna Agreement ¶ 11. In addition, "[f]or avoidance of doubt" as to enforceability, the releases "extend[] to, but only to, the fullest extent permitted by law." *E.g.,* Hanna Agreement ¶ 28. By using these legal terms of art, the parties permissibly restricted the releases' scope. Every Class member was free to weigh potential competing claims and make a choice. They could have opted out and maintained the freedom to pursue buyer claims either individually or in the *Batton/Davis* cases (should a court ever certify those classes). And people who did not sell during the relevant time, and may have buyer-only claims, are completely unaffected because they are not part of the Settlement Class.

75.    The *Batton/Davis* objectors argue that the Settlements release indirect purchaser buyer claims "for no additional consideration." Doc. #848 at 8. Having properly limited the scope of the releases based on the "same factual predicate" standard, however, the Court finds the parties were under no further obligation to assign separate settlement values to every distinct claim that Class members might have asserted. As the Eighth Circuit recognized in *In re General American*

*Life Insurance Co. Sales Practices Litigation*, 357 F.3d 800, 805 (8th Cir. 2004), that argument ignores "the way settlements usually work."

76.     Like the objectors here, the *General American* plaintiff tried to void a class settlement release by complaining that "the class representative gave away all modal-billing claims (in the release) and received nothing in exchange for them." *Id*. Thus, the argument went, class members (including the plaintiff) received compensation for one type of claim, but "plaintiff and others similarly situated received nothing for their modal-billing claims." *Id*. But the Eighth Circuit rejected this contention because it ignored the give-and-take nature of the settlement process:

> It simply is not true that modal-billing claims were given away for nothing. It is true that no separately stated consideration was paid for those claims, but that is quite another thing. In addition to the claims specifically pleaded in the class action, all claims related to policy charges, necessarily including modal-billing claims, were released. The release of the latter category of claims was one of a series of benefits conferred on the defendant by the class as part of the settlement. On the other side, defendant conferred benefits on the plaintiff class, including a monetary settlement, from which the plaintiff in this case has benefitted, and a claims-evaluation procedure that could produce additional relief. No part of the consideration on either side is keyed to any specific part of the consideration of the other. Each side gives up a number of things.

*Id*.; *accord Wal-Mart Stores*, 396 F.3d at 113 (quoting same). The Eighth Circuit further declined to enmesh itself in trying to determine "the relative value of the modal-billing clams," and instead deferred to the judgment of the class representative and class counsel that releasing all claims arising from the same factual predicate "was a proper thing to give up to obtain the benefits offered by General American."  *In re Gen. Am.*, 357 F.3d at 805.

77.     Plaintiffs here bargained for and obtained many benefits: money at the limits of Defendants' ability to pay, along with injunctive relief eliminating the challenged NAR rules and business practices. This relief is immediate, eliminating the litigation and bankruptcy risks threatened by complex additional proceedings. But every negotiation has two sides, and Plaintiffs

made the reasonable judgment that providing a release tracking federal law by releasing claims arising from the same conspiracy was "a proper thing to give up to obtain the[se] benefits." *Id.* There was no "discount applied" to buyer claims because "[n]o part of the consideration on either side" was "keyed to any specific part of the consideration of the other." *Id.* Rather, a complete release – including indirect purchaser buyer claims – was "part of the consideration necessary to obtain [one of] the largest antitrust settlement[s] in history." *Wal-Mart Stores*, 396 F.3d at 113. Nor were any class members bound by this determination involuntarily; dissenters retained the right to opt-out. The *Batton/Davis* objectors have offered no evidence to enable the Court to second-guess Plaintiffs' determination, and the Court declines to do so.

78.     The *Batton/Davis* objectors also argue that those Class members with potential indirect purchaser claims require their own subclass. Yet "[a] class need not be subdivided merely because different groups within it have alternative legal theories for recovery or because they have different factual bases for seeking relief." 7AA C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1760 (3d ed. June 2024 update). Rather, conflicts arise (and subclasses are required) only "when the class is found to have members whose interests are divergent or antagonistic." *Id*.; *see also DeBoer*, 64 F.3d at 1175 ("There is no indication that DeBoer's interest was antagonistic to the remainder of the class or that the claims were not vigorously pursued."). *Cf. Petrovic,* 200 F.3d at 1146 ("If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that argument is untenable. It seems to us that almost every settlement will involve different awards for various class members."). No such division of interest is presented here.

79.     The only people included in the settlements – and thus the only people giving any release – are people who sold homes during the class period.[3] Their interests are common and focused on achieving the greatest relief for the class. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes."). That many of these Class members also bought homes during the class period does not make their interests divergent or antagonistic.

80.     The Supreme Court's decisions in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), provide no support for objectors' argument. As the Eighth Circuit has recognized, *Amchem* and *Ortiz* were very different product liability cases that involved stark conflicts of interest not present here. *Petrovic*, 200 F.3d at 1146. Both cases represented attempts to settle all asbestos cases, now and forever. *Id.* The "injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured." *Id.* Worse still, the diseases had a latency period of up to 40 years, meaning that many class members currently suffered from no illness. *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 975 (8th Cir. 2018) (discussing *Amchem*). The Eighth Circuit stated that this latency period created an inherent conflict "between class members who already had asbestos-related injuries (and who would want to maximize immediate payout) and class members who might develop asbestos-related injuries in the future (and who would want to maximize testing, protection from inflation, and future fund size)." *Petrovic*, 200 F.3d at 1146. Adding to the problem, "the settlement offered no assurance that sufficient funds would remain to

---

[3] People who only bought homes during the class period are not Settlement Class members. They have released nothing and can continue to litigate indirect purchaser claims should they so desire.

protect the interests" of future claimants. *In re Target Corp.*, 892 F.3d at 975 (discussing *Amchem*). In other words, both *Amchem* and *Ortiz* involved a strong likelihood that some claimants would be paid, but others (numbering in the hundreds of thousands) would receive nothing. That concern is not present here, where every Class member sold a home and therefore will receive compensation.

81.     The *Batton/Davis* objectors imply that *Amchem* and *Ortiz* require subclasses whenever Class members claim different amounts or types of damage. But *Petrovic* forecloses that argument. *Petrovic* was a class action arising from underground oil seepage originating from a petroleum refinery. In crafting settlement relief, the parties created three zones, labeled A, B, and C. Claimants in Zone A, situated above the underground oil, were "guaranteed to receive 54 percent of the value of their properties." *Petrovic*, 200 F.3d at 1145. Claimants in the surrounding Zone B were guaranteed $1,300 per property. *Id*. And claimants in Zone C, the area farthest removed from the oil, could apply for compensation only by proving damage. *Id*. Faced with objectors from different zones, the Eighth Circuit held that *Amchem* and *Ortiz* required no subclasses: "If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable." *Id*. at 1146. Indeed, "almost every settlement will involve different awards for various class members." *Id*.

82.     The same is true here. Every Class member stands to gain from the settlements, both in terms of money and injunctive relief. Each Class member could try to prove individual damages at trial and these amounts would all vary. But courts approve class settlements all the time that forgo these individual determinations. Indeed, the most common method for allocating settlement funds in antitrust cases is on a *pro rata* basis. *In re Namenda Direct Purchaser Antitrust*

*Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020) ("courts uniformly approve as equitable" plans in antitrust cases that "allocate[] funds among class members on a *pro rata* basis."); *see also Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) (approving *pro rata* distribution of settlement fund as fair and reasonable). And if a Class member does not like this result, they could opt-out.

83.     *Amchem* and *Ortiz* also presented procedural settlement problems not presented here. As the Eighth Circuit recognized, each involved a settlement before litigation, presenting the district court with a complaint, proposed class, and proposed settlement all at the same time. *Petrovic*, 200 F.3d at 1145-46. This deprived the trial courts of "'the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.'" *Id*. at 1146 (quoting *Amchem*, 521 U.S. at 620). This case, by contrast, arises from facts extensively developed during the *Burnett* litigation and trial, giving the Court an extensive record on which to base its findings. *Id*. In addition, *Amchem* and *Ortiz* presented the possibility of collusion between class counsel and the defendants. *Id*. No objector meaningfully alleges here any facts reflecting such collusion in connection with these settlements. The difficulties associated with *Amchem* and *Ortiz* therefore are not present.[4]

---

[4] The *Batton/Davis* objectors' other cases are similarly distinguishable. *See BankAmerica.*, 210 F.R.D. at 712 (finding settlement unreasonable where it allocated no damages to set of claims that plaintiffs had previously pursued and represented as among the strongest in the case); *Branson v. Pulaski Bank*, No. 4:12-CV-01444-DGK, 2015 WL 139759, at *6-7 (W.D. Mo. Jan. 12, 2015) (rejecting settlement where there was no evidence of the merits of plaintiffs' claims and settlement appeared to stem from unequal bargaining power); *Martin v. Cargill, Inc.*, 295 F.R.D. 380, 385-87 (D. Minn. 2013) (rejecting proposed settlement submitted the day after complaint was filed when the court had no information about the potential damages or relative strengths and weaknesses of claims). The rest are cases where there were intractable conflicts between subclasses of class members holding present, known claims and those holding claims for potentially future, unknown injuries.

84.     The *Batton/Davis* objectors also fail to demonstrate that the class representatives or counsel provided inadequate representation. The mere fact that some Class members might allege indirect purchaser buyer claims presents no divergent interests that would preclude general representation of an undivided class. This is because "[t]he interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they 'share common objectives and legal or factual positions.'" *Petrovic*, 200 F.3d at 1148 (quoting 7A Wright, Miller, and Kane, *Federal Practice and Procedure: Civil* 2d § 1769 at 367 (2d ed. 1986)). All Class members here "share the common objective" of ending Defendants' alleged anticompetitive conspiracy and recovering the excessive commissions they paid as a result of that conspiracy. *Uponor, Inc.*, 716 F.3d at 1064.

85.     The *Batton/Davis* objectors brush aside the valuable injunctive relief obtained by the settlements. But the financial payments to Class members are "not the only, or perhaps even the primary, benefit of the settlement agreement[s]." *Marshall*, 787 F.3d at 509. Rather, "the injunctive relief offered under the settlement[s] has value to all class members." *In re Target Corp.*, 892 F.3d at 974 n.6; *accord Sullivan*, 667 F.3d at 329 (en banc) (argument that some class members "receive no money" fails because it "fails to acknowledge the injunctive relief offered by the settlement," which "is intended to benefit all class members regardless of individual monetary recovery.").

86.     The *Batton/Davis* objectors also ignore the fact that the only people included in the Settlements are people who sold homes during the class period. People who only bought homes are not Class members. Such "buyer only" individuals have released nothing and can litigate indirect purchaser buyer claims any way they desire, whether individually or in the *Batton* cases. Those cases will continue to be litigated. The sole limitation imposed is that people who accept

settlement benefits here cannot turn around and pursue a second recovery for the same conduct. This is not a case where anyone is releasing claims without compensation. Instead, all Class members "share the common objective of maximizing their recovery from [Defendants] for the same alleged misconduct." *Schutter v. Tarena Int'l, Inc.*, No. 21-CV-3502, 2024 WL 4118465, at *5 (E.D.N.Y. Sept. 9, 2024).

87.     For these reasons, objectors' reliance on *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011), is not persuasive. *Literary Works* involved a settlement that placed claims in groups A, B, and C (each group arising under a different provision of the Copyright Act). *Literary Works*, 654 F.3d at 246. If claims exceeded a set cap, then Category C claims would be reduced first and might be eliminated entirely. *Id*. The Second Circuit therefore found a lack of adequate representation because Category A and B claims were "more lucrative" than Category C and "because the reduction of Category C claims could 'deplete the recovery of Category C-only plaintiffs in their entirety before the Category A or B recovery would be affected.'" *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1277 (11th Cir. 2021) (quoting *Literary Works*, 654 F.3d at 252, 254). The settlement agreements here, by contrast, present "no risk that any members of the class will have their ability to get settlement benefits reduced to zero because some other members got more relief from the settlement." *Id.* Instead, "all class members are entitled to the same class benefits." *Id*. Again, the fact that many Class members both bought and sold a home presents no "fundamental conflict" that requires the use of subclasses or additional lawyers.

88.     The *Batton/Davis* objectors also complain that "the settling parties have not made any plan of allocation available." Doc. #1561 at 5. But this argument is premature and should be raised in the allocation phase. "[C]ourt approval of a settlement as fair, reasonable and adequate is

conceptually distinct from the approval of a proposed plan of allocation." 2 McLaughlin on Class

Actions § 6:23 (20th ed. Oct. 2023 Update). "The prime function of the district court in holding a

hearing on the fairness of the settlement is to determine that the amount paid is commensurate with

the value of the case," which "can be done before a distribution scheme has been adopted so long

as the distribution scheme does not affect the obligations of the defendants under the settlement

agreement." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d. Cir. 1987).[5] Once the

allocation plan is proposed, the Court will be in a position to consider that plan and approve "a

second notice to Class Members, followed by a right to object and/or file a claim." *In re Domestic*

*Airline*, 378 F. Supp. 3d at 22. That distribution decision will be "governed by the same standards

of review applicable to approval of the settlement as a whole, *i.e.,* the distribution plan must be

fair, reasonable and adequate." *Namenda Direct Purchaser*, 462 F. Supp. 3d at 316. Any Class

members who disagree with the proposed allocations—e.g., because they believe that plan

insufficiently compensates home purchases—will be able to present such argument to the Court at

that time. Nor do any Class members need allocation information in deciding whether to opt out

of the settlements. The Eighth Circuit rejects the notion that class members must be provided "a

---

[5] *See also In re Washington Pub. Power Supply Sys. Sec. Litig.*, MDL No. 551, 1988 WL 158947, at *4 (W.D. Wash. July 28, 1988) ("[D]eferral of allocation decisions is routinely followed in" these circumstances because "the appropriate allocation among class members can best be determined when further settlements have been achieved or the litigation is completely resolved."); *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019) ("In a case such as this, involving a large number of Class Members and two Non-Settling Defendants, it would be inefficient to distribute and process claims until the entire case has been resolved through litigation or otherwise and the Total Funds Available for Distribution are known."); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *2 (E.D. Mich. Feb. 22, 2011) (developing plan of allocation is properly delayed until after final approval of settlement where "the potential for additional settlements with other Defendants . . . may affect the final plan of allocation"); *Manual for Complex Litigation, Fourth* § 21.312 (2005) ("Often . . . the details of allocation and distribution are not established until after the settlement is approved.").

formula for calculating individual awards" when receiving notice – a description of the "potential aggregate payout" is enough. *Petrovic*, 200 F.3d at 1153.

89.     Finally, the Court disagrees with the *Batton/Davis* objectors' argument that buyer claims lie outside the same factual predicate as seller claims. In fact, releases in antitrust direct-purchaser settlements commonly cover all claims the settlement class members could raise against the settling defendant arising out of the same conspiracy, including when those direct purchasers may also have indirect-purchaser claims. *See, e.g., In re Transpacific Passenger Air Transp. Antitrust Litig.* (N.D. Cal, 07-cv-5634), ECF No. 900-2 § 1.11 (releasing "any and all claims . . . on account of, arising from, or in any way related to, the pricing of passenger air transportation by JAL or Defendants . . . with respect to the facts, occurrences, transactions or other matters that were alleged or could have been alleged [in the action] . . . regardless of legal theory, and regardless of the type or amount of relief or damages claimed"); *In re Intuniv Antitrust Litig.* (D. Mass., 16-cv-12653), ECF No. 480-1 ¶ 10 (similar); *In re: Prograf Antitrust Litig.* (D. Mass. 1:11-md-2242), ECF No. 652-2 ¶ 10(a) (similar); *In re HIV Antitrust Litig.* (N.D. Cal, 19-cv-02573), ECF No. 711-2 at 11-12 (similar); *In re Broiler Chicken Antitrust Litig.* (N.D. Ill. 16-cv-8637), ECF No. 3324, ¶ 26 (similar). Courts have approved these settlements even over objections that the settlement improperly released or otherwise devalued a subset of claims. *See In re Transpacific Passenger Air Transp. Antitrust Litig.*, 701 F. App'x 554, 555-56 (9th Cir. 2017) ("The district court properly certified the settlement class and was not obligated to create subclasses for purchasers of U.S.-originating travel and direct purchasers of airfare. Federal Rule of Civil Procedure 23(a) does not require a district court to weigh the prospective value of each class member's claims or conduct a claim-by-claim review when certifying a settlement class."); *In re HIV Antitrust Litig.*, No. 19-

CV-02573-EMC, 2023 WL 7397567, at *1 (N.D. Cal. Nov. 8, 2023) (rejecting indirect purchasers' request to set aside portion of direct-purchaser settlement).

90.     Comparing the complaint in *Davis* with Plaintiffs' complaint here shows that the buyer claims arise from the same factual predicate as the seller claims. *Davis*, No. 2:24-cv-02374, Doc. 84, at 14 n.4 (describing Plaintiffs' representations of *Moehrl* as involving "virtually the same factual allegations"); *id.* at 30 (characterizing *Moehrl* as "the same alleged conspiracy"). *Batton/Davis* Objectors' representation that Plaintiffs intentionally excluded *Batton* from their request for JPML consolidation because it was a different kind of case is wrong. Plaintiff stated: "movants do not object to the centralization of those additional actions" and also stated that multiple cases that were not initially included was because "they are more advanced or differ in other respects . . ." *See* Doc. 848-2 at 12. Tellingly, Plaintiffs expressly excluded *Moehrl* from their MDL request. That in no way leads to an admission that *Moehrl* somehow had a different factual predicate. All such claims arise from the same common nucleus of operative fact, and any class member with both seller and buyer claims would "ordinarily be expected to try them all in one judicial proceeding." *North Dakota v. Lange*, 900 F.3d 565, 568-69 (8th Cir. 2018). The Court therefore rejects the *Batton/Davis* objectors' attempt to force claim splitting between the seller and buyer claims. The seller and buyer claims share the same factual predicate.

**The Settlement Class, Settlement Processing, Attorneys' Fees, Injunction, and Related Issues**

91.     The Court finds the requirements of Rule 23(g) of the Federal Rules of Civil Procedure are met, and the Court reaffirms the appointment of the law firms of Ketchmark and McCreight P.C., Williams Dirks Dameron LLC, Boulware Law LLC, Hagens Berman Sobol

Shapiro LLP, Cohen, Milstein, Sellers & Toll, PLLC, and Susman Godfrey LLP as Co-Lead Counsel for the Settlement Class ("Class Counsel").

92. The 22 persons and entities identified by Class Counsel (*see* Exhibit I to Keough Decl.) have timely and validly requested exclusion from the Settlement Class and are therefore excluded from the Settlement Class and are not bound by this Order, and may not make any claim upon or receive any benefit from the Settlements. Nothing in this Order should be construed as a determination by this Court that the excluded persons and entities are members of the Settlement Class or that they meet other prerequisites, such as standing, for bringing claims alleged in the Actions. Each Settlement Class member who is not listed in Exhibit I to the Keough Declaration is bound by this Order and will remain forever bound, including by releasing all Released Claims of Releasing Parties against Released Parties. The Court specifically approves these releases as set forth in the Settlement Agreements.

93. Settlement Class Members are hereby enjoined from filing, commencing, prosecuting, intervening in, or pursuing as a plaintiff or class member any Released Claims against any of the Released Parties. *See* 28 U.S.C. § 1651; *Bank of Am., N.A. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 914 (8th Cir. 2010) (noting that "the district court has the inherent ability to protect its own jurisdiction over the dispute pending before it"); *Janson v. LegalZoom.com, Inc.*, No. 2:10-CV-04018-NKL, 2012 WL 13047852, at *2 (W.D. Mo. Apr. 30, 2012) ("In order to protect the continuing jurisdiction of the Court, prevent a multiplicity of lawsuits, and protect and effectuate the Court's Judgment in this Litigation, Plaintiffs and Class Members . . . are barred and enjoined from instituting, commencing, or continuing to prosecute . . . any action in this Court, any other state or federal court, or any other tribunal or forum of any kind, against any Released Party that asserts any claims that are Released Claims under the terms of the Settlement[.]") (granting final

approval); *accord Almanzar v. Home Depot U.S.A., Inc.*, No. 2:20-CV-0699-KJN, 2024 WL 36175, at *13 (E.D. Cal. Jan. 3, 2024); *Smith v. Floor & Decor Outlets of Am., Inc.*, No. 1:15-CV-04316-ELR, 2017 WL 11495273, at *6 (N.D. Ga. Jan. 10, 2017); *In re Ortho. Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 188 (E.D. Pa. 1997). Released Claims include any and all manner of federal and state claims regardless of cause of action that arise from or relate to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home. For the avoidance of doubt, this injunction extends to claims arising from or relating to transactions where Settlement Class members either sold or purchased a home on any MLS nationwide, regardless of affiliation or association with NAR or not, and thus includes, *e.g.*, NWMLS, WPML, and REBNY/RLS. This injunction does not extend to any individual claims that a plaintiff or class member may have against his or her own broker or agent based on breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in these Actions), breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in the Actions.

94.     This Order does not settle or compromise any claims by Class Representatives or the Settlement Class against entities or persons other than Released Parties, and all rights against any other person or entity are specifically reserved.

95.     Settling Defendants shall issue payment in accordance with their respective Settlement Agreements.

96.     Class Counsel have adequately represented the Class. Their application for an award of attorneys' fees and reimbursement of costs as set forth in the Motion for Attorneys' Fees

and Costs (Doc. #837) is hereby approved and shall be paid in accordance with the Settlement Agreements.

97.    Courts in the Eighth Circuit typically use the "percentage-of-the-fund method" to award attorneys' fees from a common fund. *See, e.g.*, *Rawa v. Monsanto Co.*, 934 F.3d 862, 870 (8th Cir. 2019). "In the Eighth Circuit, use of a percentage method of awarding attorney fees in a common-fund case is not only approved, but also 'well established,'" *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 991 (D. Minn. 2005) (quoting *Petrovic*, 200 F.3d at 1157), or even "preferable,'" *Barfield v. Sho-Me Power Elec. Co-op.*, No. 11-CV-4321, 2015 WL 3460346, at *3 (W.D. Mo. June 1, 2015) (quoting *West v. PSS World Med., Inc.*, No. 13-CV-574, 2014 WL 1648741, at *1 (E.D. Mo. Apr. 24, 2014)). The percentage method aligns the interests of the attorneys and the class members by incentivizing counsel to maximize the class's recovery. *See Johnston*, 83 F.3d at 245 ("[T]he Task Force [established by the Third Circuit] recommended that the percentage of the benefit method be employed in common fund situations.") (citing *Court Awarded Attorneys Fees,* Report of the Third Circuit Task Force, 108 F.R.D. 237, 255 (3rd Cir. 1985)).

98.    The Court will therefore use the percentage approach to award fees in this case. This Court and others within the Eighth Circuit confirm that one-third of the common fund is an appropriate amount for class counsel's fees in complex class actions, including antitrust litigation. Eighth Circuit and Missouri courts "have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in other class actions." *Huyer*, 849 F.3d at 399 (quoting *In re Xcel,* 364 F. Supp. 2d at 998); *see also Rawa*, 934 F.3d at 870 ("courts have frequently awarded attorneys' fees ranging up to 36% in class actions") (quoting *Huyer*, 849 F.3d at 399); *Yarrington v. Solvay Pharm., Inc.*, 697 F. Supp. 2d 1057, 1064 (D. Minn. 2010) (holding

fee award of 33% reasonable); *In re U.S. Bancorp Litig.,* 291 F.3d 1035, 1038 (8th Cir.2002) (affirming fee award representing 36% of the settlement fund as reasonable); *In re Xcel,* 364 F.Supp.2d at 998 (collecting cases demonstrating that district courts routinely approve fee awards between 25% and 36%). This District recently approved one-third of the fund in a settlement valued at $325 million. *See Rogowski v. State Farm Life Ins. Co.*, No. 22-CV-203, 2023 WL 5125113, *4-5 (W.D. Mo. April 18, 2023). Thus, judges in the Western District of Missouri and the Eighth Circuit routinely apply the one-third-of-the-fund fee calculation, even to large settlements.

99.     In doing so, courts typically consider some or all of the relevant factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). *See In re Target Corp.*, 892 F.3d at 977. The *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 977 n.7. To be sure, "[m]any of the *Johnson* factors are related to one another and lend themselves to being analyzed in tandem." *Swinton.*, 454 F. Supp. 3d at 886. Therefore, courts in the Eighth Circuit often focus on the most relevant *Johnson* factors in evaluating fee requests. *See Huyer*, 849 F.3d at 398–400 (affirming trial court's award of one-third of the common fund after review of Johnson factors one to five only); *In re Xcel*, 364 F. Supp. 2d at 993; *Tussey v. ABB, Inc.*, No. 06-CV-4305, 2019 WL 3859763, at *2 (W.D. Mo. Aug. 16, 2019); *Yarrington*, 697 F. Supp. 2d at 1062; *Hardman v. Bd. of Educ. of Dollarway, Arkansas Sch. Dist.*, 714 F.2d 823, 825

(8th Cir. 1983). The Court has considered the *Johnson* factors here, and finds that each weighs in favor of Plaintiffs' fee request. *See also* Klonoff Fee Decl. at ¶¶ 26, 34, 36, 39.

100.    Here, Class Counsel's time and labor invested was substantial and necessarily precluded other work. In addition to the over 124,000 hours they have dedicated to the litigation through October 31, 2025. Class Counsel also expended over $17.4 million of their own money toward the combined litigation. That work was undertaken without any guarantee of payment. Moreover, the litigation faced low odds of early settlements given the litigation challenged certain practices that were central to the real estate brokerage industry.[6] Indeed, the industry took the position that the cases were "baseless."[7] In sum, "the extraordinary level of work and result achieved here in the face of enormous risk warrants a substantial fee percentage." Doc. #702-10, Klonoff Fee Decl. at ¶ 89.

101.    "Courts have recognized that the risk of receiving little or no recovery is a major factor in awarding attorney fees." *Yarrington*, 697 F. Supp. 2d at 1062 (quoting *In re Xcel*, 364 F. Supp. 2d at 994); Theodore Eisenberg & Geoffrey Miller, *Attorney Fees In Class Action Settlements: An Empirical Study*, 1 J. Emp. L. Studies 27, 27, 38 (2004) ("Fees are also correlated with risk: the presence of high risk is associated with a higher fee, while low-risk cases generate

---

[6] *See, e.g.*, *How the $1.8 Billion Real-Estate Commissions Lawsuit Came to Be*, Wall Street Journal (Nov. 26, 2023), https://www.wsj.com/real-estate/how-the-1-8-billion-real-estate-commissions-lawsuit-came-to-be-106433d1 ("Antitrust cases almost always settle before trial, giving attorneys some assurance they will get paid something. But in this case, the damages were so high and the threat to the industry so existential that plaintiff attorneys thought it unlikely NAR would settle.").

[7] *See, e.g.*, *Realtor Group Moves to Dismiss Class Action Lawsuit Alleging Collusion,* Forbes (May 21, 2019), https://www.forbes.com/sites/alyyale/2019/05/21/realtor-group-moves-to-dismiss-class-action-lawsuit-alleging-collusion/ ("According to John Smaby, president of NAR, all three claims have no merit. 'In today's complex real estate environment, REALTORS and Multiple Listing Services promote a pro-consumer, pro-competitive market for home buyers and sellers, contrary to the baseless claims of these class action attorneys,' he said. 'Our filing today shows the lawsuit is wrong on the facts, wrong on the economics and wrong on the law.'").

lower fees . . . . [This] is widely accepted in the literature."). "Unless that risk is compensated with a commensurate award, no firm, no matter how large or well-financed, will have the incentive to consider pursuing a case such as this." *Tussey*, 2019 WL 3859763, at *3. "Courts agree that a larger fee is appropriate in contingent matters where payment depends on the attorney's success." *Been v. O.K. Indus., Inc.*, No. 02-CV-285, 2011 WL 4478766, at *9 (E.D. Okla. Aug. 16, 2011). And critically, "[t]he risks plaintiffs' counsel faced must be assessed as they existed in the morning of the action, not in light of the settlement ultimately achieved at the end of the day." *In re Xcel*, 364 F. Supp. 2d at 994.

102.    In addition, the complexity and difficulty of prosecuting the claims in this case supports the requested attorneys' fees. Courts regularly award one-third of the fund in antitrust suits involving especially complex, expensive, and difficult to prosecute claims. *See In re Peanut Farmers Antitrust Litig.,* No. 19-CV-00463, 2021 WL 9494033, at *6 (E.D. Va. Aug. 10, 2021) ("[A]n award of one-third is also common in antitrust class actions.") (citing cases); *In re Urethane*, 2016 WL 4060156, at *5 (awarding one-third of $835 million settlement, noting "a one-third fee is customary"); *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 100, 106 (E.D. Pa. 2013) (awarding one-third of the settlement fund as attorneys' fees in which court relied upon the fact that class counsel had litigated a number of hotly contested *Daubert* challenges)*; see also* Klonoff Fee Decl. at ¶ 41.

103.    Courts often judge class counsel's skill against the "quality and vigor of opposing counsel . . . ." *In re Charter Commc'ns, Inc.*, No. 4:02-CV-1186, 2005 WL 4045741, at *17 (E.D. Mo. June 30, 2005) (citing *In re IBP, Inc. Sec. Litig.*, 328 F. Supp. 2d 1056, 1064 (D.S.D. 2004)). In the litigation, Class Counsel faced off against no fewer than forty highly-respected law firms over the course of the litigation. Although Class Counsel's team included some of the

country's most accomplished class action and trial lawyers, Defendants also hired some of the country's most prominent and respected defense attorneys. This weighs heavily in favor of the requested award.

104.  In the Eighth Circuit, courts have "frequently awarded attorneys' fees ranging up to 36% in class actions." *Huyer*, 849 F.3d at 399. Courts have recognized that prosecution of antitrust claims should result in a one-third-of-the-fund fee award. *See In re Peanut Farmers,* 2021 WL 9494033, at *6 ("[A]n award of one-third is also common in antitrust class actions.") (citing cases); *In re Urethane*, 2016 WL 4060156, at *5 (awarding one-third of $835 million antitrust settlement and noting "a one-third fee is customary").

105.  Moreover, the requested one-third fee award is equal to or less than what the actual Named Plaintiffs—those with the most on the line and most involved in the case—agreed to at the outset of the case. Some class representatives agreed to a 35% fee. Dirks Fee Decl. (Doc. #837-1) at ¶28. Others agreed to a fee of up to 33.3%. Berman Fee Decl. (Doc. #702-4) at ¶ 10. These factors also support Plaintiffs' request. Klonoff Fee Decl. (Doc. #702-10) at ¶¶ 62.

106.  The Fund is also cash only and non-reversionary; so, the Settlements, plus interest earned until its distribution, require no further valuation. In requesting a fee as a percentage of the Fund, Class Counsel necessarily seek a fee proportionate to the degree of monetary success obtained.

107.  Here, the request is supported by both the size of the recovery and the results obtained as compared to the risk of a lesser recovery or none at all. Moreover, the Settlements represent only a part of the recovery to the Class because Class Counsel have prosecuted these joint and several liability claims against other Defendants. Thus, any past and future settlements or judgments will also benefit the Class. This factor supports a contingency percentage of one-

third, particularly given the benefits achieved. Importantly, success—including "exceptional success"—is not measured solely by the maximum damages alleged but must be evaluated against any "unusually difficult or risky circumstances and the size of plaintiffs' recovery." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1204–05 (S.D. Fla. 2006).

108.    The requested fee award is also supported by the significant practice change relief reflected in the Settlements which require the Settling Defendants, among other things, to eliminate and not enforce rules mandating compensation offers to cooperating broker on all MLS listings. Counsel is not seeking any additional fee for this valuable relief on these Settlements, but the value of this relief is substantial and is appropriately considered in evaluating the fee that is sought. *See* Klonoff Fee Decl. at ¶¶ 97-99.

109.    A lodestar crosscheck is "not required" in the Eighth Circuit. *Keil v. Lopez*, 862 F.3d 685, 701 (8th Cir. 2017); *PHT Holdings II, LLC v. N. Am. Co. for Life & Health Ins.*, No. 4:18-CV-00368-SMR-HCA, 2023 WL 8522980, at *7 (S.D. Iowa Nov. 30, 2023).[8] However, performing such a crosscheck here confirms that the requested fee is reasonable and should be approved. As noted above, the Court finds that Class Counsel have reasonably expended over 124,000 hours through October 31, 2025 in prosecuting this case as well as the *Keel*, *Umpa*, *Burnett*, and *Moehrl* matters, and the Class Counsel's hourly rates are reasonable, including because they are consistent with the market rates of other lawyers practicing complex litigation of this type, including the firms defending this case. These hours result in an overall lodestar of over $100 million. When considered together with fees previously awarded in *Burnett* and this case, the

---

[8] "'[T]o overly emphasize the amount of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services.'" *Rawa*, 934 F.3d at 870 (quoting *In re Charter Commc'ns*, 2005 WL 4045741, at *18). *Cf. In re T-Mobile Customer Data Security Breach Lit.*, 111 F.4th at 862 (observing that a lodestar crosscheck is not required but can be warranted "when a megafund case settles quickly").

current fee request results in an approximate 3.27 multiplier on lodestar, which is well within the range of reasonableness. *See* Klonoff Fee Decl. at ¶ 122; *Rawa*, 934 F.3d at 870 (observing a lodestar multiplier of 5.3 is within the bounds of reasonableness); *Huyer*, 849 F.3d at 399–400 (observing lodestar multipliers of up to 5.6 times class counsel's lodestar to be in the reasonable range for a lodestar crosscheck); *In re T-Mobile Customer Data Security Breach Litig.*, 111 F.4th at 861 (observing in a case that settled early in the litigation that a multiplier of 5.3 is on the "high" side of reasonableness) (citing *Rawa*, 934 F.3d at 870)); *In re Charter Commc'ns, Inc., Sec. Litig.*, No. 4:02-cv-1186-CAS, 2005 WL 4045741, at *18 (E.D. Mo. Jun. 30, 2005) (finding 5.61 lodestar multiplier reasonable); *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2019 WL 1274813, at *5 (D. Kan. Mar. 20, 2019) ("a multiplier of 3 is well within the range allowed in other cases involving large settlements"). Moreover, Class Counsel has continued to work on the litigation. Plaintiffs' request of fees of one-third of the fund is reasonable.

110. Additionally, upon review, the Court finds that Plaintiffs' request of fees of one-third of the fund is reasonable in light of the Eighth Circuit precedent in *In re T-Mobile Customer Data Security Breach Litigation*. Unlike the parties in *T-Mobile*, who following "a few days of mediation, and less than a month after class counsel had filed the complaint," agreed to the basic terms of a settlement, here Plaintiffs have spent more than five years, over 124,000 hours, and over $17.4 million in reasonable and necessary expenses. *T-Mobile*, 111 F.4th at 855; Dirks Fee Decl. at ¶ 47. Additionally, Plaintiffs' counsel dealt with over forty different firms representing multiple Settling Defendants. The current Settlements were only reached after significant arms-length and adversarial negotiations with each Settling Defendant. While "recovery in a particular case [may] stem[] more from class size than attorney effort and so might merit a lower fee award," given the immense time and effort expended by Plaintiffs' counsel with multiple Settling Defendants and

their respective counsel, Plaintiffs' request of fees of one-third of the fund is reasonable. *T-Mobile*, 111 F.4th at 860.

111. The Court also grants Plaintiffs' request for their costs. The expenses submitted were reasonable expenses in such a large and complex litigation.

112. The Settlement Administrator shall be paid in accordance with the relevant Settlement Agreements.

113. The Court authorizes payments to be made from the Escrow Accounts under the Settlement Agreements as qualified settlement funds ("QSF") as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations and retains continuing jurisdiction as to any issue that may arise in connection with the formation or administration of the QSFs. Co-Lead Counsel are, in accordance with the Settlement Agreements, authorized to withdraw up to the amounts allowed by the Settlement Agreements out of the Escrow Accounts.

114. Co-Lead Counsel are directed to prepare and submit for Court approval a plan of allocation for the Settlement Fund, and to propose a schedule for comment and Court review. The proposed plan of allocation must be posted to https://www.realestatecommissionlitigation.com and emailed to all individuals who submit a claim in order to provide those individuals an opportunity to comment on the plan. After the plan of allocation is proposed and an opportunity to comment has been provided, the Court will evaluate the proposed plan and any objections thereto. The Court's review of the plan of allocation will be conducted separately from this final review of the Settlements. The Court believes that this additional layer of protection to the Class supports the Court's finding that the Settlements treat Class members equitably.

115. Pursuant to Federal Rule of Civil Procedure 54(b), this Court directs entry of final judgment of dismissal with prejudice and without costs (except as provided in the Settlements) as

to the defendants covered by the Settlements. This case contains claims against multiple parties, and there is no just reason to delay the entry of final judgment as to these Settling Defendants, especially considering the practice change relief and money to be paid to the class should not be delayed.

116.	Settling Defendants have denied any liability, fault, or wrongdoing of any kind in connection with the allegations in the Actions, and as such, neither the Settlements, nor any of their respective terms or provisions, nor any of the negotiations or proceedings connected with the Settlements shall be construed as an admission or concession of the truth of any of the allegations, claims, point of fact or law on the part of any party, or of any liability, fault, or wrongdoing of any kind by Settling Defendants.

117.	The Court retains continuing and exclusive jurisdiction over all matters relating to the administration and consummation of the Settlements and to interpret, implement, administer and enforce the Settlements (including with respect to the scope of the Settlement Class, Released Claims, and Released Parties), in accordance with their terms, and to implement and complete the claims administration process, in accordance with the Settlements, for the benefit of the Settlement Class. The Court does this for the purpose of satisfying the requirements of *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994), concerning the obligation of a Court entering a settlement agreement to speak clearly when it wishes to retain jurisdiction.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: February 5, 2026