# EXHIBIT A

RHONDA BURNETT, et al., on behalf of themselves and all others similarly situated,

        Plaintiffs,

v.

THE NATIONAL ASSOCIATION OF REALTORS, et al.,

        Defendants.

Case No. 4:19-cv-00332-SRB

DON GIBSON, et al., on behalf of themselves and all others similarly situated,

        Plaintiffs,

v.

NATIONAL ASSOCIATION OF REALTORS, et al.,

        Defendants.

Case No. 4:23-cv-00788-SRB

## SUPPLEMENTAL DECLARATION OF JENNIFER M. KEOUGH

I, Jennifer M. Keough, declare as follows:

1. I am Chief Executive Officer, President, and Co-Founder of JND Legal Administration LLC ("JND"). I submit this Supplemental Declaration in response to the Court's Order of May 26, 2026 in the matter of *Burnett et al. v. National Assoc. of Realtors et al.* (Doc. 1731[1]), as well as to

---

[1] For the sake of convenience, unless otherwise indicated, the remaining docket citations in this Supplemental Declaration refer to the *Burnett* docket.

1

the Court's Order of May 22, 2026, in the matter of *Gibson et al. v. National Association of Realtors et al.* (Doc. 920), each of which directed the parties to show cause on or before June 18, 2026, why the Court should not appoint a special master to audit past and future JND bills, and which ordered that JND receive no payments until the Court has determined whether to appoint a special master.

2. This declaration contains six sections. *First*, it will describe JND's background and qualifications. *Second*, it will explain that JND was selected as the Claims Administrator in this action following a competitive bidding process and has only an arms-length relationship with Class Counsel. *Third*, it will describe how the scope of work that JND was originally retained to perform changed dramatically and that all of the changes in work were directed and approved by Class Counsel. *Fourth*, it will explain that JND has advanced nearly $3 million in outstanding out-of-pocket costs for the benefit of the class. *Fifth*, it will demonstrate that JND has no financial relationship with Huntington National Bank or Morgan Stanley, and that JND played no role in the selection of either bank. *Sixth*, it will explain how JND's billing practices have been transparent and consistent with industry practices.

## I. JND'S BACKGROUND AND QUALIFICATIONS

3. JND was founded in the spring of 2016 by three former attorneys and industry veterans who had each built their careers at The Garden City Group, Inc. ("GCG"), which by the end of 2015 was the largest legal administration firm in the country. The firm's name—JND—reflects its three founders: Jennifer Keough (J), Neil Zola (N), and David Isaac (D).

4. Each founder brings substantial individual credentials:

a. I am a graduate of Seattle University, where I earned both an MSF and JD. I began my career at Perkins Coie in Seattle, as a class action settlement manager. I joined GCG in 2003 to establish its West Coast office and later served as Chief Operating Officer of GCG from 2009 through 2015.

b. **Neil Zola** (Co-Founder) graduated from the University of Pennsylvania, *cum laude*, in 1987 and from UCLA School of Law in 1990. He began his career at Wolf Haldenstein Adler Freeman & Herz in New York, where he specialized in securities class action litigation and became a partner in 1997. He joined GCG as its first-ever General Counsel in 2000 and became President of GCG in 2006.

c. **David Isaac** (Co-Founder) graduated from the Benjamin N. Cardozo School of Law in 1989. Mr. Isaac is also a former attorney at Wolf Haldenstein. He began his administration career at Poorman Douglas (later known as Epiq) in 1995 and joined GCG in 1996. Mr. Isaac later became GCG's Chief Executive Officer.

5. At GCG, Mr. Zola, Mr. Isaac, and I worked together on numerous landmark administration programs. These included the $20 billion Gulf Coast Claims Facility ("GCCF"), where we were retained by and worked directly for Kenneth Feinberg—the nation's foremost administrator of large-scale compensation programs. *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179 (E.D. La.) (Barbier, J.). As part of that effort, we built and operated an 80,000-square-foot mail processing and claims intake facility in Hammond, Louisiana—that has been described as a "shining star" of the administration program. (*See* Doc. 1696-1 at 7.)

3

6. After years of building GCG into the industry's leading firm, Mr. Zola, Mr. Isaac, and I made the decision to strike out on our own, founding JND. JND was immediately sought out for its expertise in large, complex matters.

7. JND is an approved vendor for the United States Securities and Exchange Commission, the Federal Trade Commission, and the Consumer Financial Protection Bureau. JND has also worked with numerous other government agencies, including the U.S. Equal Employment Opportunity Commission (which engaged JND just recently to audit the work of a competitor administrator), the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Federal Communications Commission, the Department of Justice, and the Department of Labor. Each government engagement was awarded only after rigorous review of JND's systems, privacy policies, and procedures.

8. JND has over 300 employees. (*See* Doc. 1696-1 at 3.) And because of the dedication and hard work of these employees, JND was named the No. 1 class action claims administrator in the country by *The National Law Journal* in its very first year of operation in 2016, and has received that recognition every year since by at least one leading legal publication. *The National Law Journal* has honored JND with its prestigious Hall of Fame designation every year since 2022.

## II. JND WAS SELECTED THROUGH A COMPETITIVE BIDDING PROCESS

9. JND's work in the instant matter reflects the same standards of diligence, responsiveness, and professionalism that have built the company's reputation. JND was selected through a formal competitive Request for Proposal ("RFP") process.

4

10. JND received an invitation to submit a proposal on October 2, 2023, on behalf of all co-lead class counsel: Boulware Law LLC, Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, Ketchmark and McCreight PC, Susman Godfrey LLP, and Williams Dirks Dameron LLC ("Class Counsel"). The RFP covered a joint class certification notice for the *Moehrl* matter and notice of settlements for both *Moehrl* and *Burnett*. The RFP was revised by counsel via email on October 5, 2023, and October 6, 2023. JND submitted its proposal on October 20, 2023, and was informed it had been selected on November 8, 2023.

11. Importantly, the original RFP was limited in scope: it covered noticing efforts only and expressly excluded costs for claims processing and distribution, because, as Class Counsel advised at the time, "we don't yet know what that's going to look like." The substantial expansion of JND's role—and the corresponding costs—occurred only later, as the litigation developed and at Class Counsel's direction.

12. JND has no ownership relationship, referral arrangement, or financial entanglement with any of the Class Counsel firms. While Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP have engaged JND on other matters over the years, those law firms also regularly hire JND's competitors, and JND is not their exclusive vendor. To illustrate the arm's-length nature of the relationship: JND aggressively pursued the administration work for Hagens Berman's largest case ever—the NCAA matter regarding compensation of collegiate athletes. Nevertheless, JND was not selected for that engagement. None of the Class Counsel firms has any ownership or investment interest in JND. (*See* Doc. 1730-2 ¶ 14; Doc. 1696 ¶ 12; *Gibson* Doc. 532, Transcript of Oct. 31, 2024 Settlement Hearing, at 6:18-7:24.) These relationships are, and have always been, strictly arms-length.

5

## III. THE SCOPE OF WORK CHANGED DRAMATICALLY AFTER RETENTION; ALL CHANGES WERE DIRECTED AND APPROVED BY CLASS COUNSEL

13.     Since JND submitted its October 2023 proposal, the scope of this project has changed dramatically. What began as an RFP for a single combined notice campaign has developed into six separate noticing campaigns involving over 138 million emails and over 44 million postcards. (*See* Doc. 1730-2 ¶¶ 5, 7; Doc. 1730-3.) With every change, JND followed the direction of Class Counsel and acted only with their approval. Throughout the administration, JND routinely provided Class Counsel with real-time information about the costs associated with their requested changes, as well as advice regarding how to potentially save the class money without sacrificing the adequacy of notice.

14.     A detailed summary of all work performed is set forth in Exhibit 3 to Plaintiffs' May 18, 2026 Statement (Doc. 1730-3). The following paragraphs address several specific categories of cost that may benefit from explanation.

### A.     Separate Noticing Campaigns

15.     As part of its service, JND routinely looks for opportunities to recommend efficiencies and cost-saving opportunities. In this case, for instance, JND recommended saving the class money by deferring notice until additional settlements were reached and, later, by combining noticing efforts. For example, JND suggested that the *Moehrl* Notice of Pendency and initial *Burnett* settlement notice could be combined, given that the *Moehrl* class was a subset of the *Burnett* population. However, Class Counsel directed that those campaigns proceed as separate efforts.

16. Similarly, in the summer of 2024, JND recommended combining all pending notice campaigns into a single consolidated effort, which would have been more efficient. That did not happen, however, because of the timing of the finalization of the settlement in the various cases.

17. These four separate direct-mail campaigns—the *Moehrl* Notice of Pendency, the February 2024 *Burnett* mailing, the August 2024 *Burnett* mailing, and the July 2024 *Gibson* mailing—cost approximately $18.7 million in postage alone. (*See* Doc. 1730-3.) JND makes no money on postage. The entire $18.7 million was a pass through expense.

## B. Purchase of Class Member Contact Data

18. Class Counsel advised that the direct-notice data used in the *Burnett* Notice of Pendency, a notice program for which JND was not responsible, had been fraught with bad addresses. Accordingly, Class Counsel asked JND to develop a notice plan that did not rely on defendant-supplied data. Further, while not originally contemplated in the proposal, JND researched and negotiated with third-party data providers to obtain the best available noticing lists at the best cost to the class to further increase direct notice. The purchase of all data lists was approved by Class Counsel. JND also received and absorbed 36 spreadsheets of buyer and seller data from Settling Defendants, containing more than 6.5 million records. JND standardized and deduplicated that data against the existing class database to identify new class members. Where only mailing addresses were provided, and with Class Counsel's approval, JND performed an email append process to locate email addresses and reduce paper mailing costs.

## C. Destruction of More Than 10 Million Already-Printed Postcards

19. One significant and unforeseeable cost arose in January 2024. With Class Counsel's approval, JND had begun printing postcards for the Anywhere Real Estate and RE/MAX settlements when

counsel urgently directed JND to halt the print run because an additional defendant was entering into a settlement. JND advised Class Counsel that destroying the more than 10 million already-printed postcards would result in approximately $520,000 of waste. Class Counsel determined that this cost was acceptable in order to avoid the substantially greater postage expense that would have been incurred by sending Keller Williams Realty, Inc. as a standalone campaign. Accordingly, JND complied with Counsel's directive, destroyed the printed materials, reprinted all postcards with newly approved content, and performed expedited and unplanned work on the settlement website and toll-free number scripting.

**D.    Contact Center Operations**

20.    When JND first began work on this case, after the RFP, the proposal did not contemplate telephone or email agent staffing. Nonetheless, JND handled class member communications forwarded by Class Counsel and inquiries received through JND's main telephone number. At Class Counsel's request, JND also created a dedicated email address to receive and respond to class member inquiries, separate from the main inbox used for opt-out, objection, and claim form submissions. At the direction of Class Counsel, full-time telephone and email agents were added in July 2024. JND provided a cost estimate for contact center staffing prior to Class Counsel authorizing that expense. To date, JND has handled more than 30,000 telephone calls and 43,000 emails from class members. (*See* Doc. 1730-2 ¶ 8.)

**E.    Claims Intake and Fraud Prevention**

21.    Throughout the claims period, JND received and processed more than 2.7 million claim submissions—a volume that dwarfs what was anticipated at the time of the original RFP. (*See* Doc. 1730-2 ¶ 9.) JND conducted routine and robust fraud identification and prevention efforts to

identify bad actors submitting illegitimate claims. JND also identified a third-party website that was causing confusion among class members, coordinated with Class Counsel upon discovery, and provided guidance that led the third party to revise its website and marketing materials to eliminate misleading messaging.

## IV. JND HAS ADVANCED NEARLY $3 MILLION IN OUT-OF-POCKET COSTS FOR THE BENEFIT OF THE CLASS

22. To serve the best interests of the class and Class Counsel, JND agreed to front the costs associated with the *Moehrl* Notice of Pendency ("NOP") until case resolution or until a settlement was reached. In connection with the NOP, JND sent over 5 million postcards, 13.5 million emails, and completed a media publication campaign. JND agreed to defer payment of its invoices until after any Settlements were entered into and approved, or until after any payments were received as a result of a final judgment. While settlements have since been entered into and approved by this Court, certain objectors have appealed, and settlement funds have not been distributed. Accordingly, JND has not received any payment for the *Moehrl* Notice of Pendency work, totaling $2,996,807.75, even though JND incurred those expenses over two years ago. (*See* Doc. 1730-2 ¶ 5; Doc. 1696 ¶ 4.)

## V. JND HAS NO FINANCIAL RELATIONSHIP WITH HUNTINGTON NATIONAL BANK OR MORGAN STANLEY, AND PLAYED NO ROLE IN THE SELECTION OF EITHER INSTITUTION

23. JND had no involvement in the selection of Huntington National Bank ("HNB") as the escrow agent for settlement funds in this matter. That decision was made exclusively by Class

9

Counsel. (*See* Doc. 1718, Transcript of Oct. 16, 2025 Status Hearing, at 3:22-4:14.) The escrow agreement governing the settlement funds is a contract between Class Counsel and HNB. JND is not a party to that agreement. In fact, JND was not yet retained when those bank accounts were first established—a fact evidenced by the circumstance that the tax identification numbers for the original accounts were created by a different settlement administrator. JND later coordinated with Class Counsel to supply new tax identification numbers for the existing accounts and for newly created accounts, but JND was not otherwise involved in the creation or management of the escrow accounts.

24. JND has never received any payment of any kind from Huntington National Bank—directly, indirectly, or through any arrangement of any sort, as confirmed by the sworn testimony of Christopher W. Ritchie, the Executive Managing Director of HNB's National Settlements Team. (Doc. 1718, Transcript of Oct. 16, 2025 Status Hearing, at 29:1-30:19.) HNB's letter to the Court, dated June 5, 2025, likewise confirmed: "HNB makes no payments, contractual or otherwise, to JND Legal Administration in this matter, or in any other matter, for the distribution of class proceeds" (Doc. 1694 at 1).

25. Similarly, the decision to transfer the settlement escrow from HNB to a Morgan Stanley institutional money market platform was made exclusively by Class Counsel, without any involvement by JND. (Doc. 1718 at 3:22-7:24; *see also* Class Counsel's Notice of Change in Escrow Agent, Doc. 1716). JND likewise has no financial relationship of any kind with Morgan Stanley.

26. As JND previously reported to the Court: "None of JND, its employees and officers, or any entity affiliated with JND has received any compensation (including but not limited to rebates,

10

awards, and/or credits) from any bank, vendor, or other third party in connection with any of our work on the NOP or Realtors Settlements." (Doc. 1696 ¶ 11.) That statement remains true today. JND has repeated that representation in each of its subsequent quarterly accountings. (*See* Doc. 1720 ¶ 12; Doc. 1723 ¶ 5; Doc. 1726 ¶ 5; Doc. 1727 ¶ 5.) Indeed, JND has no relationship with HNB or Morgan Stanley. If and when parties to settlements hire those banks as escrow agents and instruct us to work with those banks, or any other banks, we follow such direction and do so.

## VI. JND'S BILLING PRACTICES ARE TRANSPARENT AND CONSISTENT WITH INDUSTRY STANDARDS

27. In virtually every engagement, as here, JND provides a pricing proposal to its clients and bills in accordance with that proposal unless there are material changes to the scope of the engagement—which, as described above, occurred repeatedly and at Class Counsel's direction in this matter. Where JND works with vendors on a regular basis, it attempts to negotiate volume discounts based on the cumulative volume of work over time, not based on any individual case. These and other billing practices are outlined in JND's standard terms and conditions, which are provided with every proposal, as they were here.

28. In this matter, JND submitted monthly invoices to three plaintiff firms: Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Williams Dirks Dameron LLC. In addition, JND has provided monthly summaries on each of the cases to Class Counsel that details all of the work JND performed each month.

11

## VII. CONCLUSION

29.     JND has done substantial work in this matter—all of it requested by Class Counsel and all of it of the highest quality. JND vigilantly looks for cost-saving opportunities to benefit the class in each matter it handles, but has never compromised the adequacy of class notice to save money, as reflected by the Court's recognition that "the direct notice program was extremely successful." (Doc. 1487 at 2.)  In this matter, JND not only prevailed in a competitive bidding process, but kept Class Counsel informed at every step of changing costs as settlement parameters evolved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 17, 2026, in Seattle, Washington.

_____
JENNIFER M. KEOUGH