DMITRY SHKIPIN (*pro se*)
support@homeopenly.com
325 Sharon Park Dr. #416
Menlo Park, CA 94025
Telephone: 650.281.6962

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION

| | |
|---|---|
| DON GIBSON, LAUREN CRISS, JOHN MEINERS, and DANIEL UMPA, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, et al.,<br>Defendants. | Case No.: 4:23-cv-00788-SRB<br>[Consolidated with 4:23-cv-00945-SRB]<br><br>**GEODOMA'S AMICUS CURIAE BRIEF IN SUPPORT OF CONSUMERS**<br><br>Judge:    Hon. Stephen R. Bough |
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, et al.,<br>Defendants. | Case No.: 4:19-cv-00332-SRB<br><br><br>Judge:    Hon. Stephen R. Bough |

## CONTENTS

TABLE OF AUTHORITIES ...................................................................................................2

BACKGROUND .................................................................................................................3

ARGUMENT ......................................................................................................................6

CONCLUSION..................................................................................................................17

## TABLE OF AUTHORITIES

**Cases**

Gibson et al. ....................................................................................................... passim

Grace et al., v. Bay Area Real Estate Information Services, Inc., et al., Case No. 4:23-cv-06352 (N.D. Cal.)................................................................................................................... 6

Sitzer/Burnett, et al. ................................................................................................. 5

The PLS.Com, LLC v. NAR, et al., (C.D. Cal. 2021) ........................................................ 18

Top Agent Network, Inc. v. NAR, et al., (N.D. Cal. 2021) ................................................ 18

Tuccori et al. ........................................................................................................ 18

Tuccori v. At World Properties, LLC, 1:24-cv-00150 (N.D. Ill.) (Docs. 149; 180)..................... 18

**Statutes**

12 C.F.R. § 1024.14(g)(1)(v) ...................................................................................... 3, 8

12 U.S.C. § 2607(c)(3).............................................................................................. 3, 8

False Claims Act..................................................................................................... 3, 9

Section 1 of the Sherman Act ....................................................................................... 3

# BACKGROUND

Your Honor, the aggregate nationwide damages for the <u>Gibson et al.</u> class action lawsuit were estimated to exceed $200 billion before automatic trebling (Source: [https://www.housingwire.com/articles/whats-different-about-the-200b-gibson-commission-lawsuit/](https://www.housingwire.com/articles/whats-different-about-the-200b-gibson-commission-lawsuit/) ). However, the Settlements with all defendants in <u>Gibson et al.</u>, to date, total about $1 billion (Source: [https://www.hbsslaw.com/cases/real-estate-broker-commissions-antitrust](https://www.hbsslaw.com/cases/real-estate-broker-commissions-antitrust) ).

Subject to the 1/200 settlement fund vs. potential damages ratio, Defendants have also agreed to maintain specific Practice Changes starting on August 17, 2024. I am now writing to inform this Court of the fact that these Practice Changes are NOT only dishonored, but the Defendants have further devised a conspiracy to defraud the United States Government to avoid their Court-ordered obligations. To knowingly and materially defraud the United States Government is a federal crime under the False Claims Act (FCA). ***Even though courts do not investigate crimes, this Court continues to maintain full jurisdiction over the Defendants and their compliance (or lack thereof) with all terms of the Settlement made with Consumers.***

By itself, sharing commissions between listing brokers and buyer brokers is legal if it is done without restraint of trade prohibited by Section 1 of the Sherman Act. The government cannot ban brokers from sharing fees with one another (which is expressly allowed subject to the lawful Real Estate Settlement Procedures Act (RESPA) 12 C.F.R. § 1024.14(g)(1)(v) and 12 U.S.C. § 2607(c)(3) broker-to-broker commissions sharing exemption) to help facilitate a sale - the law only bans agreements that restrain trade unreasonably.

When used correctly and legally, 12 U.S.C. § 2607(c)(3) is a very helpful and beneficial exemption because it allows real estate brokers to share seller-paid commissions outside GSE's Interested Party Contributions (IPCs) limits. On Geodoma, our seller-paid commission sharing policy reads:

"In 40 US states jurisdictions where buyer brokers are able to offer buyer rebates, in full compliance with the Federal Housing Finance Agency (FHFA), Fannie Mae and Freddie Mac (the Enterprises) guidelines, and in accordance with local common and customary practices, Buyer Agent Commissions amounts offered on Geodoma are customarily paid by the seller and are not required to be counted towards the IPC limits for the transaction as described in Selling Guide B3-4.1-02, Interested Party Contributions (IPCs)

By making a fully-optional cooperative offer of Buyer Agent Commission on Geodoma in 40 US states jurisdictions where buyer brokers are able to offer buyer rebates, the home seller agrees to pay all commissions to their seller's real estate broker who, in turn, makes an offer to pay the buyer's real estate broker commission pursuant to cooperative brokerage arrangement made in a real estate brokerage capacity, subject to the Real Estate Settlement Procedures Act (RESPA) 12 C.F.R. 1024.14(g)(1)(v) and 12 U.S.C. 2607(c)(3) exemption." (See https://geodoma.com/ipcs-limits )



*Buyer Agent Commissions amounts offered on Geodoma are customarily paid by the*

*seller and are not required to be counted towards the IPC limits for the transaction as described*

*in Selling Guide B3-4.1-02, Interested Party Contributions (IPCs)*

In 40 U.S. states, buyer brokers are allowed to negotiate buyer rebates with their clients,

where "rebates are no different from simply charging a lower commission fee, and one should

ask why the ability to rebate can mitigate the disincentive to compete through lower commission rates" according to an economic analysis paper published on the US-DOJ website titled "How Rebate Bans, Discriminatory MLS Listing Policies, and Minimum Service Requirements Can Reduce Price Competition For Real Estate Brokerage Services and Why It Matters" (Source: https://www.justice.gov/atr/how-rebate-bans-discriminatory-mls-listing-policies-and-minimum-service-requirements-can-reduce )

In U.S. states where rebates are permitted, buyer brokers can reduce the commissions paid by the homebuyers, even if Buyer Broker Compensation (BAC) is offered in "blanket" form on MLS. If MLS operates in states without rebate bans, the policy of transmitting optional "blanket" offers of Buyer Broker Compensation (BAC) is not, by itself, harmful to buyers.

The NAR rules were anticompetitive for three distinct reasons:

*(1) NAR allowed buyer brokers to advertise services as "free" when, in fact, they received compensation offered via NAR-affiliated MLSs.*

*(2) Until October 2023, NAR required listing agents to make an offer of Buyer Broker Compensation (BAC) (even if just $1) in order to use NAR-affiliated MLSs.*

*(3) NAR allowed NAR-affiliated MLSs to utilize blanket offers of compensation in Alaska, Oregon, North Dakota, Kansas, Oklahoma, Missouri, Louisiana, Mississippi, Alabama, New Jersey, and Tennessee, where buyer agent rebates are banned by state laws.*

The transmission of all these anticompetitive rules via local NAR-affiliated MLS systems is the primary reason why the jury in Sitzer/Burnett et al. lawsuit had, correctly, decided that the trade was being restrained and awarded Consumers almost $1.8 billion in damages (Source: https://www.forbes.com/advisor/legal/inflated-real-estate-commissions-damages/ ) Any listings transmitted by illegal means listed as Items (1) - (3) by the NAR-affiliated MLSs indeed

constituted price-fixing of hundreds of billions of USD in closing costs and overinflated home values over the years.

However, in a parallel copycat lawsuit, Grace et al., v. Bay Area Real Estate Information Services, Inc., et al., Case No. 4:23-cv-06352 (N.D. Cal.), the federal court also held that whenever MLS rules do not require the listing broker to share compensation with the buyer broker, the optional compensation rules could not form the basis of the conspiracy. Northern District of California judge, Haywood S. Gilliam, Jr., held that BAREIS' MLS rules "simply do not on their face require the results Plaintiff alleges they do" when dismissing the case against BAREIS and BAREIS-affiliated MLS Participants because BAC offers were optional.

## ARGUMENT

Two years later, it is a well-established fact that nothing has changed since the Gibson et al. settlement took effect on August 17, 2024 –

> Anecdotal evidence from inside the industry suggests you will have to pay near 6%. One real-estate broker who is a member of the Moneyist Facebook (META) Group is less optimistic about any significant reduction in commission rates. "***That lawsuit essentially did nothing but add more paperwork.*** Essentially if you want to sell your house and be protected as much as possible, you'll pay 5%-6%, usually split between your agent and the buyer's agent," she wrote. (Source: https://www.morningstar.com/news/marketwatch/2026052523/im-selling-my-1-million-home-will-my-agent-really-charge-less-than-a-6-commission )

"Nothing has changed" since August 17, 2024, in how commissions are paid. (Source: https://www.cnbc.com/2025/08/26/where-real-estate-commissions-stand-a-year-after-new-rules-were-introduced.html ). Why NOT? What happened? The real explanation is GSEs IPCs limits.

Today, two homebuyers, Buyer A and Buyer B, want to purchase a $1M home in Missouri. Both of them hire NAR-affiliated MLS Participants and sign the required Buyer Broker Agreements (BBAs) to receive professional real estate settlement services (hopefully,

free from 25%-40% RESPA-banned kickbacks shelled out into Zillow Preferred (Flex), Realtor.com (OpCity-UpNest), Rocket/Rocket Homes, Redfin Partner Program, Lower.com/OJO, Opendoor Key Agent/Opendoor Home Loans, HomeStory, Blend Realty, Better.com Real Estate, Veterans United Home Loans/Veterans United Realty, New American Funding/NAF Homes, HomeLight, Clever Real Estate, IDEAL AGENT, EffectiveAgents, FastExpert, TopAgentsRanked, SOLD.com, homegenius, HouseCanary (ComeHome), Dave Ramsey RamseyTrusted Agent, "Real Estate Agents Glenn Beck Trusts," etc.)

Buyer A goes out of their way to negotiate a competitive 1% fee ($10,000), and Buyer B simply accepts the "typical" 3% fee ($30,000) without hard negotiations (or any other negotiated rates: I am merely suggesting these figures as an example). Buyer A submits an offer for $1,010,000 with a concession request for $10,000, and Buyer B submits an offer for $1,030,000 with a concession request for $30,000. The seller nets the same exact amount from either offer - the seller literally does not care which one of these offers to accept.

Because the economic value difference between $1,010,000 and $1,030,000 is negligible, Buyer A and Buyer B are making nearly identical offers for the same home, but they are also paying very different commissions ($10,000 vs. $30,000). This is why the United States Government strictly caps concessions made toward buyer-paid closing costs as Interested Party Contributions (federally-funded mortgage loans are not meant to pay for real estate commissions; they are primarily meant to fund the actual appraised value of the home). GSE's Interested Party Contributions caps protect the borrower, the lender, and the overall integrity of the transaction.

According to NAR (which is true), *"the total value of concessions is typically limited to a percentage of the home's sale price, with maximum seller concessions set between 3%-6%, but this may vary."* (Source: https://www.nar.realtor/closing/seller-concession ) which is how the

United States Government equalizes the problem for homebuyers being able to ask for reasonable concessions to help them cover buyer-paid closing costs, made as part of their home purchase offers.

To create a viable catalyst for Buyer B to negotiate their "typical" 3% fee ($30,000) for a competitive 1% fee ($10,000), Buyer B must be told that these fees expressly count toward the maximum seller concessions limits set between 3%-6%. When counted against the IPCs limits, the higher 3% buyer brokerage fee ($30,000) becomes a deterrent against the 3%-6% IPCs caps. IF (and ONLY IF) Buyer B has an incentive to preserve 3%-6% IPCs caps for other valuable concessions, such as 2/1 builder buydowns, etc. (See: https://selling-guide.fanniemae.com/sel/b2-1.4-04/temporary-interest-rate-buydowns ), then the much lower alternative 1% buyer brokerage fee ($10,000) is truly "worth it" to negotiate over.

In the alternative, when home seller negotiates and pays for the "full" ~6% fee ($60,000) that is then split with the buyer broker pursuant to cooperative brokerage arrangement made in a real estate brokerage capacity, subject to the Real Estate Settlement Procedures Act (RESPA) 12 C.F.R. § 1024.14(g)(1)(v) and 12 U.S.C. § 2607(c)(3) exemption, home seller pays for this fee with reduced net equity (which gives them a reason to negotiate this "full" ~6% fee ($60,000) to a lower figure.) However, when a home seller is presented with two competing offers from Buyer A and Buyer B with two different concession requests ($10,000 and $30,000) to cover buyer-paid closing costs, the seller only cares about the net amount between the two purchase offers. In effect, a home seller can only truly negotiate commissions that they are responsible for paying to their own listing brokerage.

For this reason, when Buyer B signs Buyer Broker Agreement (BBA), they must be made fully responsible for this obligation, in order for them to have a genuine reason to negotiate a 3%

fee ($30,000) down to a 1% fee ($10,000).

Most importantly, it is not optional to bake buyer-paid closing costs into federally-funded loans as seller-paid closing costs. Since August 17, 2024, NAR has been involved in a massive and ongoing False Claims Act (FCA) conspiracy that they caused by a seemingly irrelevant lie. This lie is called responsibility. The NAR wants to avoid responsibility because it serves them not to have any. Lack of responsibility allows the NAR to keep the cartel intact, without any real changes.

The Practice Changes administered under the <u>Gibson et al.</u> Settlement Agreement did not produce any intended outcomes, but not because of <u>Gibson et al.</u> Settlement Agreement Terms were inadequate, but because these Terms are not being followed. <u>Gibson, et al.</u> Settlement Agreement Terms are, in fact, being deliberately and purposefully circumvented by NAR's highly specific lie. Right now. Today.

To preserve their price-fixing cartel from collapse, since August 17, 2024, NAR has lied about the Interested Party Contributions (IPCs) outcome produced by the <u>Gibson et al.</u> Settlement Agreement. This outcome directly relates to almost all federally funded loans in the United States. As this Court is well aware, it is highly illegal to defraud the United States Government. The FCA imposes severe penalties for knowingly submitting false claims to the federal government. Meaning, to lie to the government that funds programs for public purposes is extra harmful. Our government funds the vast majority of all mortgage loans (backed, insured, or purchased by federal agencies and Government-Sponsored Enterprises e.g., US-HUD, Fannie Mae, Freddie Mac, US-FHA, US-FHFA, etc.)

> "The False Claims Act establishes liability for a variety of false or fraudulent conduct, including when a person "knowingly presents or causes to be presented a false claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

*Key words in these provisions require the false claim or statement to be "knowing" and "material."* The False Claims Act defines "knowingly" to mean that a person or entity "has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information." In other words, the False Claims Act requires more than mere negligence or a simple mistake to hold a person liable." (Source: https://www.justice.gov/archives/opa/blog/false-claims-act-federal-housing-administration-lending )

Both *"knowing"* and *"material"* elements exist here because NAR knows about GSEs' IPC limits and had explicitly requested guidance from the GSEs about the applicability of IPCs limits against Gibson et al. Settlement Agreement (Source: https://www.nar.realtor/washington-report/fhfa-confirms-gses-guidance-on-ipcs ). What GSEs actually said, versus what NAR claims was said - is the lie.

The GSEs-backed loans are funded under strict rules, including Interested Party Contributions (IPCs) Guidelines. It is illegal, under Interested Party Contributions (IPCs) Guidelines, to include costs in federally funded loans exceeding the so-called Interested Party Contributions (IPCs) caps, aka IPCs limits (typically calculated after correctly stating all settlement charges listed for both the borrower and home seller "sides" of the Settlement Statement HUD-1 Form. Source: https://archives.hud.gov/news/2009/pr09-058-hud1.pdf ). All federally funded mortgage loans must always comply with GSEs' IPCs Guidelines. If anyone wants to avoid the GSEs' IPCs limits on purpose, they engage in mortgage fraud.

Since August 17, 2024, under the terms of Gibson et al. Settlement Agreement, no actual changes exist. Nobody does anything differently, ONLY because NAR deliberately aims to bypass these IPCs limits and also causes all NAR-affiliated MLS Participants to concurrently operate in non-compliance with GSE's IPCs Guidelines.

According to NAR Settlement FAQs in Gibson, et al. lawsuit (which is true) -

"Fannie Mae, Freddie Mac, and the FHA do not allow commissions to be added to the balance of the mortgages." (Source: https://www.nar.realtor/the-facts/nar-settlement-faqs )

Also, according to the same NAR Settlement FAQs in Gibson, et al. lawsuit (which is both, false and a $500 billion FCA liability) -

"[Q:] Does the settlement change access to mortgages for buyers?

[A:] No. Under the settlement, buyers still have the same options when it comes to compensating their agents. That is, the listing agent can compensate the buyer agent, the seller can compensate the buyer agent, or the buyer can compensate their agent directly. Buyers will still be able to get financing from Fannie Mae, Freddie Mac, and the FHA under these scenarios. The FHA confirmed this in a letter after NAR sought to affirm our interpretation of existing guidance. Likewise, Fannie Mae and Freddie Mac published *explicit confirmations that commissions for buyer agents paid by the seller would not count against the buyer.* However, none of these agencies will allow the buyer to finance a commission into the mortgage at this time. (Updated 7/8/24)" (Source: https://www.nar.realtor/the-facts/nar-settlement-faqs )

Fannie Mae, Freddie Mac, and the FHA all issued 100% accurate IPCs Guidance because these Advisories restate the existing General IPCs Guidance, which reads the exact same thing:

"Selling Guide B3-4.1-02, Interested Party Contributions (IPCs) permits interested parties (including property sellers) to make contributions to the borrower's closing costs subject to maximum limits ranging between 2% and 9% of the property value.

Typical fees and/or closing costs paid by a seller in accordance with local custom, known as common and customary fees or costs, are not subject to the IPC limits described in Selling Guide B3-4.1-03, Types of Interested Party Contributions (IPCs). *If a seller or seller's real estate agent continues to pay the buyer's real estate agent commission in accordance with local common and customary practices, these amounts are not required to be counted towards the IPC limits for the transaction.*" (Source: https://singlefamily.fanniemae.com/news-events/selling-notice-real-estate-commissions-and-interested-party-contributions )

Fannie Mae, Freddie Mac, and the FHA all issued 100% accurate IPCs Guidance,

because these Advisories simply re-state the existing General IPCs Guidance, that simply reads this exact same thing:

> "Typical fees and/or closing costs paid by a seller in accordance with local custom, known as common and customary fees or costs, are not subject to Fannie Mae maximum financing concessions." (Source: https://selling-guide.fanniemae.com/sel/b3-4.1-02/interested-party-contributions-ipcs )

and

> "Exceptions: The maximum financing concession limits above do not apply to: Financing concessions contributed by Freddie Mac as the property seller for Mortgages originated for the purchase of Freddie Mac REO properties [and] Borrower fees or costs customarily paid by the property seller according to local convention." (Source: https://guide.freddiemac.com/app/guide/section/5501.6 )

**However, in the real world, the Fannie Mae, Freddie Mac, and the FHA "Real Estate Commissions and Interested Party Contributions" April 15, 2024 Guidance simply DOES NOT APPLY to the NAR-affiliated MLS Participants, bound by the <u>Gibson et al.</u> Settlement Agreement. Under the <u>Gibson et al.</u> Settlement Agreement with home sellers: (1) homebuyers MUST negotiate and are LEGALLY responsible for PAYING buyer broker commissions when working with NAR-affiliated MLS Participants.**

As this Court is well aware, every Contract must contain these six essential elements: (1) Offer; (2) Acceptance; (3) Awareness; (4) Consideration; (5) Capacity; and (6) Legality. Gibson et al. Settlement Agreement requires homebuyers to enter into a Buyer Broker Agreement (BBA) with each NAR-affiliated MLS Participant that binds them to tangible bargained-for Consideration (even just $1) as payment for services rendered.

According to a recent HousingWire article, titled "Buyer owes $24K after breaching buyers broker agreement, arbitration finds," published on December 8, 2025, by Brooklee Han -

*"Arbitration awarded $24,000 to a brokerage after a buyer breached an exclusive broker agreement under new NAR rules"*

"Since August 17, 2024, when the business practice changes went into effect, Lichtenstein said his firm has completed 381 buy side transactions, and they have ultimately looked into three contracts for issues.

"For the brokerage community, if the Buyers Broker Agreement (BBA) is written up and executed properly and the Buyer purchases, it means we will get compensated for the work we have done. That is reassuring on our end and a sigh of relief as most every other profession gets paid as they do their job and with health and 401k benefits," Lichtenstein wrote in an email. "Our pay structure is by choice, and we get out of it what we put into it. But, getting compensated is something we expect at the end of a deal."

According to Lichtenstein, at the end of 2024, he and his team were alerted by a mortgage broker that a buyer the mortgage professional knew was working with Echo Fine Properties had just presented another offer with a different buyer's broker. He said they immediately notified the buyer of the issue; however, the buyer ignored the communication, resulting in Echo filing for arbitration after the transaction had closed.

During the discovery related to the arbitration, Lichtenstein said his firm found that the day after they had alerted the buyer to the issue, one of the buyers signed an amended buyer broker agreement, swapping out the name of the original buyer for that of his mother.

Three weeks later, another amendment to the contract saw things reversed with the mother's name swapped for that of the original buyer. Through arbitration, the arbitrator concluded that the buyer broker agreement used by Echo Fine Properties is unambiguous, and its terms were clearly stated. Additionally, the arbitrator found testimony from the buyer that he did not read the agreement before signing it, that the 180-day protection period for the agreement is "excessive," and that the agent from Echo Fine Properties provided little to no benefit or help were unpersuasive.

Due to the arbitrator's findings, the buyer was found to have breached his contract by entering into a purchase agreement without the involvement of his Echo Fine Properties agent and subsequently refusing to pay the commission Echo Fine Properties was entitled to based on the buyer broker agreement. *As a result, the arbitrator awarded the brokerage $24,000 due to the breached contract.*

*This sum represented the 3% commission agreed upon in the buyer broker contract on the purchase of the $800,000 property.* Lichtenstein noted that even if only 1% of transactions have an issue, in a year with just 4 million existing home sales, that could potentially mean 40,000 arbitration cases a year, involving a purchaser owing a commission to a brokerage.

"We have no desire for this, but collections is appearing to be a new category for brokerage houses as a result of the BBA," Lichtenstein wrote. "***For purchasers, if you've committed to a [real estate agent], then don't try to pull a fast one.*** Understand how much work is involved. The brokerage community takes a client on with no guarantee of being paid unless one buys a home. Agents put in a tremendous amount of time and their knowledge and that work is what educates a client and helps to get a deal over the finish line."" (Source: https://www.housingwire.com/articles/buyer-broker-agreement-arbitration/ )

Under the law, when entering into a Buyer Broker Agreement (BBA) with NAR-affiliated MLS Participants, homebuyers are fully responsible for paying their NAR-affiliated MLS Participants, who are all bound by the Gibson et al. Settlement Agreement (up until 2031, when the Settlement Agreement is set to expire).

Today, homebuyers are NOT fully aware of this responsibility, in part, because NAR continues to publish false claims that there are *"explicit confirmations that commissions for buyer agents paid by the seller would not count against the buyer."*

On the contrary, under the Gibson et al. Settlement Agreement, buyer-paid commissions very much DO "count against the buyer." The Gibson et al. Settlement Agreement was not a "favor" to either the NAR or to the NAR-affiliated MLS Participants - this was retribution for breaking the law, meant to punish the cartel for causing $200 billion in damages in collusion with 1,500,000 NAR-affiliated MLS Participants - imposed upon by millions of Consumers.

NAR continues to lie about the total fallout produced by the Gibson et al. Settlement Agreement. NAR was FORCED to enter into a highly unfavorable Gibson et al. Settlement Agreement because they LOST before a jury with a $1.8 billion verdict (subject to being multiplied by (50) U.S. states at $200 billion (x3) = $600 billion). Nobody would even give NAR a bond for an appeal against $600 billion. The Gibson et al. Settlement Agreement was nothing short of a step away from a total demise of this massive price-fixing cartel. This cartel very much continues to exist, subject to explicit lies about GSEs IPCs limits applicability.

In fact, commissions have gone up, according to Redfin:

"Commissions are now at roughly the same level they were in the first quarter of 2024, when the National Association of Realtors (NAR) first announced a settlement dictating new commission rules in response to a class action lawsuit brought by home sellers.

The third quarter marked the anniversary of new commission rules that went into effect in August 2024. The average buyer's agent commission fell to a low of 2.36% that quarter (Q3 2024), but has nudged slightly higher since, as a slowdown in home sales gave buyers more negotiating power.

Beth Behling, a Redfin Premier real estate agent in Chicago, said commissions in her area were largely unchanged following the introduction of the new rules." (Source: https://www.redfin.com/news/commissions-q3-2025/ )



**Buyer's Agent Commissions Tick Up For Third Consecutive Quarter**

Average commission paid to U.S. real estate agents representing buyers

Source: Redfin data · Created with Datawrapper

*Since August 17, 2024, NAR-affiliated MLS Participants have been baking in buyer-paid closing costs into federally-funded loans as seller-paid commissions outside IPCs caps. Buyer broker commissions have gone up because buyers negotiate buyer-paid fees that, according to NAR's lies, "would not count against the buyer."*

The NAR's lies about this do not go away under law, but, more importantly, they impede an open marketplace by removing an economic incentive for homebuyers to negotiate real estate commissions. The NAR's lies do not solve anything, because they exist for the sole reason: to preserve the cartel against the fundamental requirement produced by the Gibson et al. Settlement Agreement that mandates that NAR-affiliated MLS Participants' buyer commissions are negotiated by homebuyers and are treated as the **buyer's responsibility**.

Half-truths are often more dangerous than outright lies because they contain just enough truth to appear credible. This is exactly what NAR did by establishing a cardinally false claim that *"Fannie Mae and Freddie Mac published explicit confirmations that [until 2031] commissions for [NAR-affiliated MLS Participants] buyer agents paid by the seller would not count against the buyer."* This Court is well-versed in logic, and it must see the rudimentary lie that the NAR used to misinterpret the actual guidance that strictly applies to closing costs paid by a seller (i.e., costs that are the **seller's responsibility**) *"are not subject to the IPC limits."* (Source: https://singlefamily.fanniemae.com/media/38706/display )

This Court holds the full power to fix NAR's false misinterpretations about IPCs limits produced by the Gibson et al. Settlement Agreement. This Court can and should require Defendants to stop their deliberate lies. If the Gibson et al. Settlement Agreement to have any effect, the Defendants must treat seller concessions made to help buyers pay for buyer-paid commissions as Interested Party Contributions (IPCs) made by third parties with a vested interest in the transaction to cover costs that are the **buyer's responsibility**.

The United States Government can also easily increase the Interested Party Contributions (IPCs) limits (to help buyers cover the amounts of buyer-paid closing costs). Brokerage Defendants can also stop using NAR-affiliated MLSs and use alternative services that did not

violate federal antitrust laws. However, deliberate lies devised to bypass GSE's Interested Party Contributions (IPCs) limits are not a "solution" – it is a desperate, half-baked, and highly toxic liability deliberately made to avoid the true outcome of a $200 billion lawsuit.

<u>**CONCLUSION**</u>

This Court can easily verify the GSEs' IPCs Guidance and NAR's Settlement FAQs and see that what I am saying here is true. Simply because home sellers can and typically do advance a concession to homebuyers to help them cover buyer-paid commissions (since August 17, 2024, when working with NAR-affiliated MLS Participants) does not make these costs seller-paid commissions. Only commissions negotiated by sellers for services rendered to sellers by their listing brokers are the *sellers' responsibility* and are the seller-paid closing costs. There is a cardinal difference between seller-paid and buyer-paid closing costs. Sharing seller-paid commissions splits between bona fide real estate brokers under the broker-to-broker RESPA exemption requires full compliance with all laws, at all times, including Section 1 of the Sherman Act, an obligation NAR had failed to uphold with unlawful MLS BAC sharing rules.

Admittedly, the information I offer comes from a competitor to NAR and NAR-affiliated MLSs (today, Geodoma is a single-person company - an MVP for a product - as opposed to a genuine listings service with fully developed network effects). However, this does not make my information biased. If anything, I am fully informed.

I also have been (and continue to) warn the industry for years about other cardinal violations of laws, such as RESPA-banned kickbacks being shelled out for referrals into so-called "referral fee networks" (Source: https://www.housingwire.com/articles/opinion-broker-to-broker-referral-exemption-does-not-apply-to-agent-matching-platforms/ and https://www.regulations.gov/document/CFPB-2022-0037-0001 ). Today, Zillow Flex (Source: https://www.hbsslaw.com/cases/zillow-agent-class-action ) Rocket Homes (Source:

https://www.hbsslaw.com/cases/rocket-homebuyer-class-action ) and Veteran United Realty

(Source: https://www.hbsslaw.com/cases/veterans-united-home-loans-class-action ) are all facing

massive RESPA class actions for this exact illegal conduct (in these RESPA/RICO lawsuits, all

"referral fee networks" self-admit to partaking in kickbacks, where one only has to show that

broker-to-broker safe harbor does not apply to the Zillow Flex ~40% referral fees. One can,

logically, prove that Zillow Flex ~40% referral fees violate RESPA's referral fee ban without

having to collect a jury as soon as they show that the "referral fee network" serves real estate

brokers as customers and a supplier of leads. The broker-to-broker RESPA exemption does not

apply to "agent-matching platforms" that serve brokers as customers.)

NAR is consistently involved in massive litigation (such as Top Agent Network, Inc. v.

NAR, et al., (N.D. Cal. 2021); The PLS.Com, LLC v. NAR, et al., (C.D. Cal. 2021); etc.) NAR is

a cartel that cannot be trusted, and it continues to restrain trade by other means. For instance,

according to the Ninth Circuit -

> "[NAR's] Clear Cooperation Policy prevented innovative competitors from
> entering the market and growing large enough to meaningfully compete with the
> MLSs, leaving both buyers' agents and sellers' agents with fewer choices, supra-
> competitive prices, and lower quality products." (Source:
> https://cdn.ca9.uscourts.gov/datastore/opinions/2022/04/26/21-55164.pdf )

I also submitted almost identical information and argument before Hon. Lindsay C.

Jenkins, who currently oversees Tuccori et al. buyer-side lawsuit, asking the court in that lawsuit

to adjust the proposed Tuccori et al. Practice Changes to clarify that the buyer-paid commissions

are the ***buyer's responsibility***. See Tuccori v. At World Properties, LLC, 1:24-cv-00150 (N.D.

Ill.) (Docs. 149; 180). Notably, I do not disagree or object to the half-of-a-penny settlement sums

in either of these lawsuits (even if Consumers can get a $200 billion payout after all of the

appeals – this money was spent a very long time ago and does not exist).

The <u>Gibson et al.</u> Settlement Practice Changes, however, firmly require NAR-affiliated MLS Participants "working with a buyer [to] enter into a written agreement before the buyer tours any home" – a condition that cardinally shifts the responsibility for compensation to buyers. It is not optional for Defendants to skirt the terms of the agreed-upon Settlement – specifically because Defendants were allowed to settle a $200 billion lawsuit for only $1 billion. The equity of justice is already under attack because Consumers cannot plausibly recover their $200 billion. NAR attacks it again by devising a fraudulent scheme to skirt the integral terms of the Settlement with flawed interpretation of GSE's guidance about IPCs limits.

Today, NAR-affiliated MLS Participants lock the homebuyer into a BBA agreement, but also tell them: "Don't worry about it – we will just bake your 3% buyer-paid commission cost into the purchase offer – and it does not count against you," but if that same homebuyer violates this agreement – they end up having to pay $24,000 that they have expressly agreed to pay. NAR wishes for these fees to be classified concurrently as seller-paid AND buyer-paid costs – ***which is logically impossible***. The <u>Gibson et al.</u> Settlement Practice Changes are crystal clear: buyers must agree to pay and are fully-responsible for paying buyer-paid fees. Your Honor, I am an interested third-party and this Court can easily ignore me, but please do not ignore the truth.

Thank you for your time,

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 23, 2026

*/s/ Dmitry Shkipin*

Dmitry Shkipin, pro se