**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| RHONDA BURNETT, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, et al.,<br><br>Defendants. | Case No. 4:19-cv-00332-SRB |
| DON GIBSON, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, et al.,<br><br>Defendants. | Case No. 4:23-cv-00788-SRB |

**DECLARATION OF STACEY R. GILMAN IN SUPPORT OF NON-PARTY JND LEGAL ADMINISTRATION LLC'S MOTION TO RECUSE SPECIAL MASTER CHRIS HELLUMS**

I, Stacey R. Gilman, declare as follows:

1. I am a partner at the firm Berkowitz Oliver LLP and counsel for Non-Party JND Legal Administration LLC ("JND") in the above-captioned litigation. I submit this declaration in support of JND's Motion to Recuse Special Master Chris Hellums.

2. Attached hereto as **Exhibit 1** is a true and correct copy of an email chain obtained from JND's system reflecting communications between Chris Hellums and Neil Zola and Jennifer M. Keough of JND, dated from December 18, 2025 through January 6, 2026.

3. Attached hereto as **Exhibit 2** is a true and correct copy of the Declaration of Jennifer M. Keough in Support of Plaintiffs' Motion for Approval of Distribution Plan, filed on April 23, 2026 at Docket No. 3419-2 in *In re: Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406.

4. Attached hereto as **Exhibit 3** is a true and correct copy of the Order Approving Plan of Distribution and Authorizing Distribution of Net Settlement Fund, entered by the Court on April 24, 2026 at Docket No. 3420 in *In re: Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406.

5. Attached hereto as **Exhibit 4** is a true and correct copy of the Affidavit of Proposed Special Master Pursuant to Federal Rule of Civil Procedure 53(b)(3)(A), filed on July 27, 2026 at Docket No. 1741-1 in *Burnett v. National Association of Realtors*, No. 19-cv-00332-SRB (W.D. Mo.).

I declare under penalty of perjury that the above is true and correct to the best of my knowledge, information, and belief.

Dated: August 7, 2026

/s/ *Stacey R. Gilman*
Stacey R. Gilman

# EXHIBIT 1

**From:** Neil Zola <Neil.Zola@jndla.com>
**Sent:** Tuesday, January 6, 2026 3:12 PM
**To:** Chris Hellums <chrish@pittmandutton.com>
**Cc:** Jennifer M. Keough <Jennifer.Keough@jndla.com>
**Subject:** RE: (No subject)

Chris, I am disappointed that you were not on the video call today when we presented our proposal. We went through every page of the proposal and answered all questions posed to us by the lawyers who were on the call. Perhaps if you speak to them, you will change your mind as to JND.

Best, Neil Zola


Neil Zola
EXECUTIVE MANAGING DIRECTOR/FOUNDER
JND Legal Administration | 3333 New Hyde Park Road, Suite 314, New Hyde Park, NY 11042
o: 800.207.7160 | m: 516.643.4211 | Neil.Zola@jndla.com | www.jndla.com | LinkedIn.com



CONFIDENTIALITY NOTICE: This email transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distr bution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.


**From:** Chris Hellums <chrish@pittmandutton.com>
**Sent:** Monday, January 5, 2026 3:07 PM
**To:** Neil Zola <Neil.Zola@jndla.com>; Jennifer M. Keough <Jennifer.Keough@jndla.com>
**Subject:** RE: (No subject)


**Security Notice:** This email originated outside of JND. Use caution when clicking links or opening attachments.


Neil

I am not lead counsel and I am not a member of the PSC. I do not have any specific authority to make decisions related to this matter. I do have some experience in this area, as I have previously been appointed appointed by a federal judge to investigate and prepare a report and recommendations related to claims administration irregularities and will shortly be undertaking an RFP process for a large digital distribution. If asked by the special master, court, or leadership, my recommendation will be that JND not be allowed to handle any digital distributions. My reasoning is simple. Without the information requested, a proper and transparent analysis cannot be performed.

Chris Hellums
Pittman, Dutton, Hellums, Bradley & Mann, P.C.

---

**From:** Neil Zola <Neil.Zola@jndla.com>
**Sent:** Wednesday, December 24, 2025 12:16 PM
**To:** Chris Hellums <chrish@pittmandutton.com>; Jennifer M. Keough <Jennifer.Keough@jndla.com>
**Subject:** RE: (No subject)

**CAUTION:** This email originated from outside of the organization. Do not click links or open unexpected attachments unless you recognize the sender and know the content is safe.

Chris, thank you for your email. Yes, we are well aware of the recent scrutiny on banks, administrators, card vendors and class counsel. As such we were trying to be very transparent in our proposal and in our answers to your questions. We will try again. In this case, JND has received no credits or rebates or any other revenue sharing from vendors and will not do so. That does not change the fact that contractually we are allowed to. As far as the identify of "your custodial bank," please be advised that JND did not select any bank in this matter, nor will we be doing so. At some point, if JND is authorized to handle the card distribution, we will engage a card company to assist with that part of the distribution. We will not tell that card issuer which bank to use, any more than we will tell class counsel which bank to select when we distribute the checks. We are not "refusing" to identify a card issuer. We have not yet selected one.

Finally, while we note that recently letters have been submitted to the Court from claimants demanding to know when they will be paid, considering the number of claims filed here — over 8 million — the volume of such letters is quite small. More importantly, we want to make sure you understand that JND has been more than diligent in administering this case since we were given the green light to proceed in earnest barely 12 months ago. Prior to that, our efforts were put on hold by the parties, the Special Master and the Court for a year while negotiations were playing out regarding administration fees and class counsel fees. Once JND's budget was approved and we were given Court authorization to move forward, we have worked zealously to finish this case. Moreover, we are well under budget. We hope that with all the scrutiny into the administration activities, the lawyers in this case also recognize what a great job JND has done here.

I know that Megan Jones was planning to set up a call to discuss our digital payment proposal. Perhaps we can all discuss these issues in January once she does that. I hope you have a wonderful

Christmas.

Neil Zola
EXECUTIVE MANAGING DIRECTOR/FOUNDER
JND Legal Administration | 3333 New Hyde Park Road, Suite 314, New Hyde Park, NY 11042
o: 800.207.7160 | m: 516.643.4211 | Neil.Zola@jndla.com | www.jndla.com | LinkedIn.com

CONFIDENTIALITY NOTICE: This email transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distr bution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.

---

**From:** Chris Hellums <chrish@pittmandutton.com>
**Sent:** Tuesday, December 23, 2025 12:24 PM
**To:** Neil Zola <Neil.Zola@jndla.com>; Jennifer M. Keough <Jennifer.Keough@jndla.com>
**Subject:** RE: (No subject)

**Security Notice:** This email originated outside of JND. Use caution when clicking links or opening attachments.

Mr. Zola

As previously stated, I have read and am familiar with both your proposal and the contract. That is in part the reason for the questions presented. There are also other overarching reasons for the inquiry.

The opaque nature of the economic benefits (rebates, breakage, commissions, volume discounts, etc.) that has defined the card/distribution industry has historically not been fully disclosed to courts and counsel. Courts are now forced to wrestle with these issues. This was a daily topic of conversation and panel discussions last month at the Cabo Conference by both judges and practitioners.

The following articles can perhaps provide some background. Facebook's $725 Million Settlement Faces New Hurdles Over Claims Administration Transparency – Legal News Feed<https://urldefense.com/v3/__https://legalnewsfeed.com/2025/08/19/facebooks-725-million-settlement-faces-new-hurdles-over-claims-administration-transparency/__;!!H5a-iwIg4hw!ngeuNpOcQhjnSSHyz4weCPkdKWU7g9pseAE1AoiW976iwvJDXxf9pu0azsP4JmZMLjPYxYbVASLAHhFeKzns$>. How Private Equity-Owned Companies Quietly Pocket Class Action Payouts<https://urldefense.com/v3/__https://www.forbes.com/sites/jeffkauflin/2025/05/21/how-private-equity-owned-companies-quietly-pocket-class-action-payouts/__;!!H5a-iwIg4hw!ngeuNpOcQhjnSSHyz4weCPkdKWU7g9pseAE1AoiW976iwvJDXxf9pu0azsP4JmZMLjPYxYbVASLAHlsaix1R$>. Class Counsel in Real Estate Commission Settlements Change Banks After Judge Orders Disclosures| Law.com<https://urldefense.com/v3/__https://www.law.com/2025/10/23/class-counsel-in-real-estate-commission-settlements-change-banks-after-judge-orders-disclosures/?slreturn=20251119075800__;!!H5a-iwIg4hw!ngeuNpOcQhjnSSHyz4weCPkdKWU7g9pseAE1AoiW976iwvJDXxf9pu0azsP4JmZMLjPYxYbVASLAHo

zlsI3K$>. Judge approves $100 million Google settlement despite transparency concerns | Courthouse News Service<https://urldefense.com/v3/__https://www.courthousenews.com/judge-approves-100-million-google-settlement-despite-transparency-concerns/__;!!H5a-iwIg4hw!ngeuNpOcQhjnSSHyz4weCPkdKWU7g9pseAE1AoiW976iwvJDXxf9pu0azsP4JmZMLjPYxYbVASLAHpAYbdR_$>.

Another article appeared this morning. Kroll settles payment dispute in settlement case | News, Sports, Jobs - Morning Journal

As you stated in your response, your contract provides, "***JND may receive rebates or credits from vendors in connection with the volume of work performed for all of its Clients***." This would indicate at the time it was presented to leadership, JND intended to receive some sort of undisclosed revenue sharing from "vendors." This begs the obvious question… what specific commissions, rebates, credits, and revenue sharing were you intending to receive and what have you already received? Considering the current environment and demands for more transparency by courts, the fact that you highlight the provision of your contract that allows JND to receive rebates and credits from vendors while at the same time refusing to identify your custodial bank and card vendor only magnifies the concern.

There are discounts on Paypal and Venmo transactions for mass/volume submissions. There are commissions for placing media and marketing. There are commissions, rebates, discounts, and breakage on digital cards that flow from the issuing bank to the card provider/digital payment platform provider and may flow to the claims administrator or some other special purpose entity. I am familiar with the Blackhawk and Tremendous revenue share models, and I believe that historically you have used Blackhawk. Critical to any objective analysis is confirmation of the number of debit card payments, Venmo and Paypal disbursements, and digital cards, if any. I understand what you are "charging", but what I am asking is the same thing courts and others are now wanting to know…what are you paying and what discounts, commissions, rebates, credits, kickbacks, (fill in the blank), if any, are you receiving or deferring to others?

Finally, you inquire about the urgency around digital cards and if class counsel has decided on the distribution bank. As to these questions, I would direct you to Ed Gentle of the Court for a more complete answer. It could possibly have something to do with the number of angry calls, emails, letters, that all of us, including the court, are receiving from class members demanding to know when they will be paid and trying to ensure the distribution occurs as quickly, efficiently, and transparently as possible. As to the second question related to the distribution bank, that ties directly to my request that you provide the identify of your custodial bank so that an analysis of cost, distribution rails, float, or loss thereof, can be performed.

Chris Hellums
Pittman, Dutton, Hellums, Bradley & Mann, P.C.

---

**From:** Neil Zola <Neil.Zola@jndla.com>
**Sent:** Friday, December 19, 2025 2:44 PM
**To:** Chris Hellums <chrish@pittmandutton.com>; Jennifer M. Keough <Jennifer.Keough@jndla.com>
**Subject:** RE: (No subject)

**CAUTION:** This email originated from outside of the organization. Do not click links or open unexpected attachments unless you recognize the sender and know the content is safe.

Chris, I don't know whether you have seen JND's confidential proposal that we submitted to Ed Gentle, but in Section V. on page 9 we say very clearly that we are charging $0.35 per PayPal and Venmo payment, and $0.10 per Debit Card payment. Importantly, this is the same **EXACT** pricing that we put in our final budget that was approved by all parties, the Special Master and the Court in November 2024, after a year of negotiation. We are not sure how we can be any more precise than that.

As far as the card issuer we will be using, we have not yet made that decision. But in terms of the pricing we are charging, that doesn't matter. We will charge the class precisely what we outline above. And just so there is no further misunderstanding, JND will not be receiving a dime from whichever card issuer we select, even though we are entitled to such compensation under paragraph 4 of the contract that was negotiated and signed by Boies Schiller, Hausfeld, Burns Charest, and JND in this matter. That paragraph provides that "JND may receive rebates or credits from vendors in connection with the volume of work performed for all of its Clients." The paragraph further provides that such rebates and credits are solely the property of JND.

Finally, we are not sure we understand the urgency around Debit Cards. That is but one small part of the distribution and is dwarfed in size by the number of checks that will be going out and the dollar value of those checks, as we explained in our proposal. Has Class Counsel decided yet which bank you would like us to use when we distribute the checks or are you planning to do an RFP for that as well? Please advise.

Best wishes for the holidays.

-Neil Zola

Neil Zola
EXECUTIVE MANAGING DIRECTOR/FOUNDER
JND Legal Administration | 3333 New Hyde Park Road, Suite 314, New Hyde Park, NY 11042
o: 800.207.7160 | m: 516.643.4211 | Neil.Zola@jndla.com | www.jndla.com | LinkedIn.com

CONFIDENTIALITY NOTICE: This email transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distr bution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.

**From:** Chris Hellums <chrish@pittmandutton.com>
**Sent:** Friday, December 19, 2025 11:11 AM

**To:** Jennifer M. Keough <Jennifer.Keough@jndla.com>
**Cc:** Neil Zola <Neil.Zola@jndla.com>
**Subject:** RE: (No subject)

**Security Notice:** This email originated outside of JND. Use caution when clicking links or opening attachments.

Jen

Are you going to respond to my email with the information requested? If you are not going to disclose the information, please simply say so. I have asked you for the information previously and you have not provided it. Please also understand that I have made similar requests to Huntington Bank.

Let me also be clear about the nature of the request. I have evaluated both proposals and I am not able to reconcile the results without additional information from both parties.

Chris Hellums
Pittman, Dutton, Hellums, Bradley & Mann, P.C.

---

**From:** Jennifer M. Keough <Jennifer.Keough@jndla.com>
**Sent:** Thursday, December 18, 2025 2:43 PM
**To:** Chris Hellums <chrish@pittmandutton.com>
**Cc:** Neil Zola <Neil.Zola@jndla.com>
**Subject:** Re: (No subject)

**CAUTION:** This email originated from outside of the organization. Do not click links or open unexpected attachments unless you recognize the sender and know the content is safe.

Hi Chris - I wasn't invited to a call tomorrow.

Jennifer M. Keough
CEO & PRESIDENT
JND Legal Administration | 1201 2nd Ave, Suite 3400, Seattle, WA 98101
m: 206.919.5768 | Jennifer.Keough@jndla.com | www.jndla.com | LinkedIn.com

CONFIDENTIALITY NOTICE: This email transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distr bution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.

On Dec 18, 2025, at 12:20 PM, Chris Hellums <chrish@pittmandutton.com> wrote:

**Security Notice:** This email originated outside of JND. Use caution

when clicking links or opening attachments.

Jen

In preparation for the call tomorrow, can you provide me with a couple pieces of information. First, what custodial bank and card issuer are you planning to use for digital distributions. Also, in your proposal you state that "we will receive no compensation other than what is outlined in this proposal and our Budget." Can you be more specific on precisely the amount of revenue you are budgeting to make from digital distributions?


**Chris Hellums | Attorney**

**P**: 205-322-8880 **F**: 205-328-2711
2001 Park Place North, Suite 1100
Birmingham, AL 35203
www.pittmandutton.com | chrish@pittmandutton.com

# EXHIBIT 2

FILED
2026 Apr-23 PM 01:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A

**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF ALABAMA SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION MDL 2406** | : : : : : : : | **Master File No. 2:13-cv-20000-AMM**<br><br>**This document relates to Subscriber Track cases** |

**DECLARATION OF JENNIFER M. KEOUGH IN SUPPORT OF PLAINTIFFS' MOTION FOR APPROVAL OF DISTRIBUTION PLAN**

1. I am President and Chief Executive Officer ("CEO") of JND Legal Administration ("JND"). JND has extensive experience with all aspects of legal administration and has administered settlements in thousands of class action cases.

2. JND was appointed as the Notice and Claims Administrator[1] in the above captioned litigation for the purposes of administering the Settlement Agreement, dated October 30, 2020, which was approved preliminarily by the Court in its Memorandum Opinion and Order Preliminarily Approving Settlement, Plan of Distribution, and Notice Plan, and Directing Notice to the Class, dated November 30, 2020 ("Preliminary Approval Order" or "Notice Order"). The Settlement Agreement was later granted Final Approval by Judge Proctor in its Final Order and Judgment Granting Approval of Subscriber Class Action Settlement and Appointing Settlement Administrator, dated August 9, 2022 ("Final Approval Order").

3. I previously filed several Declarations in this matter including, but not limited to, a Declaration Regarding Proposed Notice Plan, dated October 30, 2020 ("First Keough

[1] Unless otherwise noted, capitalized terms have the same meaning as in the Settlement Agreement.

Declaration"), Declaration Regarding Notice Plan and Settlement Administration, dated September 3, 2021 ("Second Keough Declaration"); and Declaration Regarding Exclusion Requests, dated June 24, 2022 ("Third Keough Declaration").

4. This Declaration is being filed to report on the overall notice and administration efforts of JND and to advise the Court of our readiness to make an initial distribution of Settlement Funds and to seek approval to do so. In light of Judge Proctor's resignation from this case and the appointment of Judge Anna Manasco, this Declaration has been prepared with an abundance of detail and reiterates certain information in my prior Declarations to ensure the Court receives a comprehensive account of JND's activities since we were appointed in this case.

5. This Declaration is based on my personal knowledge, as well as upon information provided to me by experienced JND employees, and if called upon to do so, I could and would testify competently thereto.

## I. NOTICE PLAN SUMMARY

6. The Notice Plan that was designed and executed by me and other JND team members under my direction, and which was approved by the Court as noted in Paragraph IV.G. of the Notice Order, included a substantial direct notice effort, an extensive consumer and entity media campaign, and other extended efforts. The Notice Plan ran from March 26, 2021, through May 31, 2021. After the initial Notice efforts, we also implemented a reminder notice program. In my experience, this was one of the most comprehensive overall notice programs ever in a class action settlement.

7. The direct notice effort included postcard and/or email notice to all Damages Class Members for whom the Settling Defendants provided contact information. In total, we sent more than 100 million direct notices. When you include the reminder notice campaign we sent several hundred million direct notices.

8. The media campaign included: (a) a combination of digital ads (English and Spanish) placed on the leading digital network (Google Display Network – "GDN") and the top social media platform (Facebook); (b) a full-page color notice in two popular magazines (People and Better Homes & Gardens); (c) 30-second radio spots (English and Spanish) broadcast through a leading satellite radio provider, two premiere radio networks, syndicated programming in the top ten African American markets, and two leading Spanish radio providers in the top ten Hispanic markets; (d) digital ad impressions served on two major streaming audio services; and (e) a 30-second television spot broadcast on a variety of popular cable networks, syndicated programs, and network morning news programming.

9. The entity media campaign consisted of digital notice placements with the leading professional social media platform (LinkedIn) and top business and human resource websites, as well as industry e-newsletters.

10. Extended efforts included a third-party outreach effort to a purchased list of HR/employee benefit and other relevant job titles, an internet search campaign, a multichannel news release ("MNR"), and a link to the case Settlement Website, www.BCBSSettlement.com, that was placed on BCBS.com by Settling Defendants.

11. Immediately following the conclusion of the Notice Period, JND began sending reminder email notices to potential Damages Class Members who had not yet filed a claim or opted out of the Class. JND continued to send such reminder email notice to Damages Class Members until just before the November 5, 2021 claims filing deadline. In total we sent over 200 million reminder emails. In addition, JND launched a targeted media campaign to further encourage potential Damages Class Members to submit their claims before the claim's deadline.

12. JND established and has maintained a dedicated Settlement Website for this case where information about the Settlement, as well as copies of relevant case documentation,

including but not limited to the Settlement Agreement, the Plan of Distribution, the Long Form Notice, and the Claim Form, are accessible to Class Members. The Settlement Website was also the main mechanism for claim filing in this Settlement and Damages Class Members were encouraged to file claims online through the secure Settlement Website portal. The website is ADA-compliant and mobile-enabled. In addition, JND created a QR Code (a matrix barcode) that allowed for quick and direct access to the Settlement Website through mobile devices.

13. JND also established and has maintained two P.O. boxes, an email address, and a toll-free telephone number with dedicated operators available Monday through Friday between 9:00 am and 5:30 pm Central Time. During non-business hours, an Interactive Voice Recording system ("IVR") is available so that Class Members can listen to a menu of options providing various information about the Settlement and can also request a Long Form Notice and Claim Form.

14. As a result of these comprehensive notice efforts, more than 8.4 million claims were filed, 99% of which have been filed online. Claims were filed from all fifty states and five US territories. Based on my experience in developing and implementing class notice programs, I believe the Notice Plan met, and exceeded, the standards for providing the best practicable notice in class action settlements. The specifics of the Notice Plan are discussed in detail below.

## II. NOTICE PLAN IMPLEMENTATION DETAILS

15. According to this Court's Notice Order, Notice was scheduled to begin once Defendants, or their representatives, produced a "complete set of Class Member Data" to JND. The deadline for submitting that complete set of data, per the Notice Order, was March 1, 2021. After such receipt, JND had three months, until May 31, 2021, to implement the Notice Plan. Therefore, once the Notice Order was granted in late November 2020, JND immediately began extensive advance preparations to ensure that we were ready to launch the Notice process.

16. For example, we began immediately building the framework for the Settlement Website, which needed to be able to withstand tens of millions of "hits," developing telephone operator scripts from the Settlement Agreement and other case documents, preparing for printing and emailing the Notice to tens of millions of potential Damages Class Members, and making sure that we would be able to procure the necessary media ad space on a multitude of platforms. However, the most daunting task in preparing for Notice was parsing the Damages Class Member data we were expecting to receive here. It was imperative that we did as much up-front work as possible to be ready for the transfer of all data by March 1, 2021.

## A. DATA TRANSFER

17. Handling notice and administration in this case required the processing of hundreds of millions of pieces of data from some 35 different Blue Cross Blue Shield ("BCBS") entities ("Blue Plans").[2] The production of data involved many steps. First, each Blue Plan was required to submit its data to Defendants' data expert, Charles River Associates ("CRA"). Second, because social security numbers and dates of birth were not going to be supplied to JND, CRA performed some data analysis and preparation prior to transmitting the data to JND. Third, JND and CRA needed to work together so that the data could be transferred to JND in a way that would allow us to apply our deduplication process to the files and to perform the necessary printing and mailing, as well as emailing of Notice.

18. To facilitate this transfer, JND and CRA, together with various counsel for the parties, began having weekly conference calls in December 2020, so that JND could understand how the data was being assembled by CRA and how it would be transferred to JND. I personally

[2] We actually received data from 37 Blue Plans, but two such plans appeared to be subsumed by other BCBS Plans.

attended these calls. Other participants, at times, from JND included my partner, Neil Zola, as well as several of our most senior IT and Systems team members.

19. Because of the very tight timeline for JND to effectuate Notice once the data was actually produced, we requested test files from CRA so that we could identify potential issues in the production before we received actual data. We asked CRA to produce this test data to JND for multiple, different Blue Plans — as well as a statistically reliable sample size for each — so that JND could examine the exact fields of data that were being produced in the varying forms that they were kept by different Blue Plans over the life of the Settlement Class Period after CRA's initial work with the data was completed. This helped us plan how we were going to take some 400 million Class Member records and develop a Class List complete with contact information and plan of allocation data, while simultaneously resolving as much duplication as possible.

20. Complicating this test file production was that the parties were simultaneously working with JND to obtain an additional cyber insurance policy to protect any data being produced to JND. In order to effectuate production of test data prior to that policy being in place, JND set up two standalone computer terminals, segregated in offices with cardkey access, so that files could be transmitted via hard drive that would be loaded onto the terminals to only be accessed and reviewed by two very senior JND IT officers. The first hard drive containing sample data arrived on January 19, 2021. These initial hard drives provided us with a better understanding of the data that we would eventually receive.

21. CRA began producing actual data to JND on February 13, 2021. For every file received from CRA, JND applied 16 separate data validation checks that we designed as a result of the test data we received to identify potential data issues with the provided files. JND checked for several data issues including, among others, missing primary member flags (used to determine if an individual is a subscriber being noticed or a non-subscriber member), subscriber IDs with no

covered member record (used to identify which individual within a subscriber group is the subscriber receiving notice), covered member records without member demographic data (indicating an individual exists that should be noticed but no demographic data was provided for that individual), and employer groups with no member counts data (indicating an employer group exists but has no associated subscribers).

22. This process was very time intensive, particularly because of the volume at issue. Between February 13, 2021, and March 1, 2021, JND received from CRA a total of 57-member demographic data files containing in excess of 430,000,000 records associated with 35 Blue Plans. Of the 57 files provided, 52 were original member demographic data files and five were replacement files for the original member demographic data. Although the production was supposed to be complete on March 1, 2021, beginning on March 2, 2021, and continuing through May 25, 2021, JND received from CRA an additional 22-member demographic data files containing in excess of 58,000,000 member demographic records belonging to 11 of the 35 Blue Plans.[3] These 22 files were comprised of 12 replacement files (complete replacements of previously provided data) and 10 supplemental files (additional data for previously provided files). Thus, in total, we received 79 separate files of member data, 17 of which were complete replacement files, requiring us to jettison any work we had done to that point on those original files and begin anew once we received the replacement files.

23. In several instances, the replacement files contained less data than the original files. Therefore, after processing all member demographic data files, the total member population was in excess of 420,000,000 records.

[3] The production of data continued into June and July 2021 as well. We received our last file from CRA on July 30, 2021.

24. In addition to this member data, between February 13, 2021, and March 1, 2021, JND received 48 data files containing in excess of 8,900,000 employer group records belonging to the 35 Blue Plans. Of these 48 files provided, 44 were original demographic group data and four were replacement files for original demographic group data. Between March 2, 2021, and May 25, 2021, JND again received an additional 17 data files containing approximately 1,000,000 employer group records belonging to 11 of the 35 Blue Plans. Of these 16 files provided, 9 were replacement files and 8 were supplemental files to the original data.

25. As with the member data files, in many instances, the replacement group files contained less data than the original files, resulting in a slight reduction in the overall group data population of approximately 8,700,000 records. Thus, JND received a grand total of 144 separate data files containing nearly 430,000,000 records that formed the basis for JND's work to develop the Class List here.

26. As explained above, CRA was charged with performing initial analysis and data preparation of its files. Based on JND's experience in handling class action mailings, JND was trusted by the Parties to institute deduplication measures based on and in accord with industry best practices to combine records so that we could reduce duplicate mailings.

**B. <u>DEDUPLICATION EFFORTS</u>**

27. In performing deduplication on each Blue Plans' member demographic data, JND's expertise was applied. JND analyzed the data provided by CRA and determined the following rules would be most effective at identifying member demographic records that were, in fact, for the same individual. JND took special care to ensure that records with similar information were not erroneously associated and denoted as duplicates. To accomplish this, JND first compared full name and address (first name, last name, street, address2, address3, city, state, and zip). Next, JND compared partial name, partial address, and a hashed Individual Unique Identifier or hashed Date

of Birth ("DOB") (first 3 characters of first name, last name, first 10 characters of street, city, state, and hashed Individual Unique Identifier or hashed DOB). Finally, JND compared first name, partial address and hashed Individual Unique Identifier or hashed DOB (first name, first 10 characters of street, city, state, and hashed Individual Unique Identifier or hashed DOB).

28. For cross plan deduplication, meaning reducing duplication not just within individual plans but across multiple plans, JND again analyzed the data to determine the most effective rules in order to achieve the highest quantity of deduplication while not deduplicating individuals that were not conclusively the same person. Because each plan organizes its data in a distinct manner, JND had to be very careful when searching for names and addresses across plans to make sure that the deduplication was effective without losing any Class Member information. Since the data came from some 35 different sources, this was one of the biggest challenges in the deduplication effort. The first cross plan deduplication JND performed was on partial name, partial address, and hashed Individual Unique Identifier (first three characters of first name, last name, first 10 characters of street, city, state, and hashed Individual Unique Identifier). JND performed four more cross plan deduplication analyses comparing things like first name, partial address, hashed Individual Unique Identifier, hashed DOB and other permutations of the data.

29. As explained above, we received 420 million member records. JND was able to identify 235 million as primary members. Using the deduplication techniques outlined above, JND was able to reduce the number of unique records associated to primary members to 131 million. At that point, JND then performed an advanced credit bureau address search against all unique records for which an email address was not included, to identify a current mailing address. JND also performed a United States Postal Service ("USPS") National Change of Address ("NCOA")

search to identify recent address changes and obtain the best possible postage rate from the USPS.[4] After address cleanup and standardization, JND combined the individual Blue Plan member demographic data to perform a second deduplication process. This allowed JND to refine the member demographic data to just over 100.3 million unique Damages Class Members according to the Settling Defendants' data.

30. For the employer group data, we were able to refine that data set from over 8.7 million records to just over 2.6 million employer group records. In total, we entered the notice phase of the program with approximately 103 million Damages Class Member records, a reduction of more than 75% from what was produced to us by CRA, thus saving the program tens of millions of dollars in potential postage charges alone.

31. We believe the deduplication process was very effective here, particularly considering the vast amount of data involved, the condensed time period for performing the mailing, the fact that we received multiple replacement files, and the fact that we continued to receive tens of millions of pieces of data even after the deadline for production and while we were in the middle of performing the actual mailings.

## C. DIRECT NOTICE

32. As explained in detail below, direct notice was accomplished through a postcard mailing and/or via email. Both notices provided important summary information about the Settlement, including its terms, important dates, and how to participate. Both notices also directed potential Class Members to the Settlement Website, where detailed information was available, including all of the Settlement documents and an extensive Frequently Asked Questions ("FAQ")

[4] The NCOA database is the official USPS technology product which makes change of address information available to mailers to help reduce undeliverable mail pieces before mail enters the mail stream. This product is an effective tool to update address changes when a person has completed a change of address form with the USPS. The address information is maintained on the database for 48 months.

section. For people with additional questions, both notices provided a toll-free telephone number, and a dedicated email address so that people could ask additional specific questions. Finally, both notices included a Spanish-language tag that directs Spanish-speaking Damages Class Members to the Settlement Website, which is available in Spanish.

**1. <u>Postcard Mailing</u>**

33. The Notice Order provided that JND would mail postcard notice to all potential Damages Class Members identified in Settling Defendants' data where a mailing address was available, and no email address was available. In addition, we were to send a postcard to all Damages Class Members where an email address was available, but the email bounced back as undeliverable. Based on the data received from Settling Defendants, there were far more post office addresses than email addresses for this population, making the largest component of the direct notice program the postcard printing and mailing.

34. Postcards have become a much-used mailing vehicle in class action settlements. This is largely because of the enormous cost savings, particularly in postage, when sending a postcard rather than an envelope mailing. However, in order to make sure that a class action notice postcard is not discarded as junk mail, it is important to make it stand out. Here, we used several design elements for that purpose. First, this was not a standard two-sided postcard where all information was open to anyone who saw the postcard. Rather, we used a double-panel, sealed postcard so that the JND Unique record ID was hidden from public view. This required the formatting of four separate postcard panels that were printed, folded, and sealed for privacy. Second, the postcard design included blue color highlights and different fonts. Third, we also utilized the BCBS logos, permissions for which were provided by Settling Defendants' Counsel.

35. Another element that really stood out here was JND's creation of a QR Code (a matrix barcode) that allowed quick and direct access to the Settlement Website through mobile

devices. While QR Codes have been used in settlement notice programs before, the general public has not been completely familiar with them. Interestingly, the timing of the COVID-19 pandemic increased the utility of the QR Code here. That is because restaurants throughout the country started using QR Codes during the pandemic instead of paper menus to decrease touch points among customers. Thus, these QR Codes entered the mainstream like never before.[5]

36. Printing a postcard with this many design elements and with volume in the tens of millions requires very exact formatting so that the massive print presses can continue to run without interruption and without error. One of the biggest potential dangers is formatting a postcard without enough white space in the margin where the machinery can cut off a piece of the language. Therefore, we ran substantial test batches and formatted and reformatted the postcard several times to make sure that there would be no "bleed." Also, digital production samples of the postcards were reviewed for accuracy of the data file merge and the notice content, as approved by the Court. Once formatting and test printing was complete, we moved into production mode, with significant auditing on the printing floor to pull batches of printed postcards to confirm name, address, mailing barcodes, JND Unique record ID, and the QR code that leads to the Settlement Website. Additionally, we confirmed that each printing used the correct BCBS blue, Pantone Matching System color 2995. We began printing and mailing postcards on March 29, 2021. Continued production of data by Defendants after the March 1, 2021 deadline complicated this process. As we received this new and updated data, we had to prepare new files for printing and we had to do our best to continue the deduping process, even as tens of millions of notices were already in the mail.

37. In all, this was one of the largest notice mailings ever in the history of class action administration. From March 29, 2021, through May 28, 2021, JND mailed the Postcard Notice to

[5] We also included QR codes in other elements of the Notice Program, including the media print ads, as discussed below.

77,360,606 Damages Class Members for whom an email address was not known at the time of the mailing or for whom the email notice was deemed ultimately undeliverable. Notices returned by the United States Postal Service as undeliverable were reviewed for updated addresses and, where available, updated addresses were entered into the Settlement Database and notices were mailed to the updated addresses.

38. As explained above, prior to printing and mailing, JND updated all addresses with the most current available information from both a credit bureau advanced level search and also the USPS NCOA search. One of the benefits of the NCOA search is that in addition to providing updated address information it allows a company to group print files by region and ZIP code, thus enabling discount postage rates.

39. Here, the NCOA search, coupled with our analysis of Blue Plan data files and grouping of records into geographic zones by ZIP code, allowed for saturation of the mail stream to obtain maximum postage savings. As a result, our overall blended postage rate was substantially reduced from the standard USPS postcard rate. Based on the enormous volume here, the reduced postage rate yielded a savings of several million dollars.

40. Due to all the work that went into perfecting the mailing database in accord with industry standards, including obtaining the best address possible for each individual through credit bureau search and NCOA, the undeliverable rate here was relatively low, particularly considering that this Class stretches back to 2008 thus saving substantial remail printing and postage fees. As of August 26, 2021, only 5,803,408 Postcard Notices, less than 8%, were returned undeliverable by the USPS. Of that amount, 779,551 were promptly re-mailed to the forwarding address provided by the USPS.

41. Thus, of the 77,360,606 Postcard Notices sent, 72,336,749 or 93.5% were delivered.

**2. Email Notice**

42. As explained above, the Notice Order directed JND to send email notice to any potential Damages Class Members where the data from Settling Defendants included a valid email address.

43. JND uses industry-leading email solutions to achieve the most efficient email notification campaigns. Among some of the steps we took here to ensure high deliverability of the Email Notice were the following: (1) JND worked with Plaintiffs' Class Counsel to craft the Email Notice to avoid spam language to improve deliverability, including running the email through spam testing software, DKIM for sender identification and authorization, and hostname evaluation and checked the send domain against the 25 most common IPv4 blacklists; (2) we used a verification program to eliminate invalid email and spam traps that would otherwise negatively impact deliverability; (3) the email content was formatted and structured in a way that receiving servers expect, allowing the email to pass easily to the recipient; (4) we avoided the use of attachments, which can send an email right to spam, and instead provided a call-to-action button (i.e., "File a Claim"), as well as direct links to the Settlement Website for more detailed information; (5) with the exception of the recipient name, we avoided the use of all capitalization, exclamation points, colored font, case-caption boxes, excessive legalese, and common trigger words to reduce spam; (6) we created an email subject line identifying the Defendant, with whom the email recipient is very familiar; (7) we used the Damages Class Member's name as the email opener to authenticate and personalize the email; (8) to ensure readability of the Email Notice, our team reviewed and formatted the body content into a structure that is applicable to all email platforms; (9) before commencing the email notice campaign, we sent a test email to multiple ISPs and opened the email on multiple devices (iPhones, Android phones, desktop computers, tablets,

etc.) to ensure the email opens as expected; and (10) JND included an "unsubscribe" link at the bottom of the Email Notice.

44. Despite all of these best efforts, sometimes emails will not go through on the first attempt. Emails that are returned to JND are generally characterized as either "Soft Bounces" or "Hard Bounces." Hard Bounces are when the ISP rejects the email due to a permanent reason such as the email account is no longer active. Soft Bounces are when the email is rejected for temporary reasons, such as the recipient's email address inbox is full. When an email was returned due to a soft bounce, JND attempted to re-email the email notice up to three additional times in an attempt to secure deliverability. The email is considered undeliverable if it is a Hard Bounce or a Soft Bounce that is returned after a third resend.

45. Based on all of this work, from March 26, 2021, through May 20, 2021, JND successfully delivered the initial Email Notice to 27,497,063 Damages Class Members.

46. While the direct notice program here was extensive, JND also implemented a comprehensive media notice campaign to supplement the direct notice program, as discussed below.

## D. CONSUMER MEDIA CAMPAIGN

47. JND designed and implemented a robust consumer media campaign, which alone reached more than 85% of potential members of the Settlement Classes.[6]

48. The consumer media campaign consisted of the following: (a) digital effort (GDN, Facebook); (b) print effort (People, Better Homes & Gardens); (c) radio effort (SiriusXM, iHeart Radio's Premiere Networks, Pandora/Spotify audio streaming, as well as leading syndicated

[6] Reach is the percentage of a specific population group exposed to a media vehicle or a combination of media vehicles containing a notice at least once over the course of a campaign. Reach factors out duplication, representing total different net persons.

programs in the top ten African American markets and Spanish radio in the top ten Hispanic markets); and (d) television effort (cable, syndicated programming, and network morning news).

**1. Digital Effort**

49. On April 1, 2021, JND caused the digital effort to launch with GDN and Facebook. The digital effort concluded on May 30, 2021, delivering 427,557,696 impressions to adults 18 years of age or older (Adults 18+) throughout the U.S. via GDN and 30,462,085 via Facebook.[7] A total of 46,146,313 impressions, or 10% of the total impressions, were allocated to Spanish language sites through GDN and Spanish language accounts through Facebook. The digital ads were served across all devices (desktop, laptop, tablet, and mobile), with an emphasis on mobile.

**2. Print Effort**

50. The print effort consisted of a full-page color notice placement in the April 26, 2021 issue of People, which was on sale beginning April 16, 2021, and the June issue of Better Homes & Gardens, which was on sale beginning May 14, 2021. Both People and Better Homes & Gardens are highly read consumer magazines. JND created a QR Code and placed it prominently within each print notice. This allowed quick and direct access to the Settlement Website through mobile devices.

**3. Radio Effort**

51. From April 1, 2021, through May 23, 2021, JND caused approximately 1,299 radio spots to be broadcast through Sirius XM, satellite radio. From April 26, 2021, through May 16, 2021, JND caused 9,048 radio spots to be broadcast through iHeart radio's two Premiere Networks (the Scope and Spectrum networks). Some of the radio formats in which our ads

[7] Impressions or Exposures are the total number of opportunities to be exposed to a media vehicle or combination of media vehicles containing a notice. Impressions are a gross or cumulative number that may include the same person more than once. As a result, impressions can and often do exceed the population size.

broadcast included Adult Contemporary, Country, and Urban Contemporary. From April 12, 2021, through May 9, 2021, JND caused 159 radio spots to be broadcast on popular syndicated programs among African Americans in the top ten African American markets; and 359 radio spots to be broadcast on two dominant Hispanic radio providers ("SBS" and Univision Radio) in the top ten Hispanic markets. From April 1, 2021, through May 23, 2021, JND caused 10,702,236 impressions to stream through Pandora/Spotify audio services.

### 4. **Television Effort**

52. From April 5, 2021, through May 23, 2021, JND caused 2,625 television spots to be broadcast across a variety of cable networks, including Animal Planet, Comedy Central, Discovery Channel, HLN, The Weather Channel, and TNT. We were able to get placements on several marquee programs including "NBA Basketball", "The News with Shepard Smith", "South Park", "PGA Tour Golf", and "Shark Tank." From April 26, 2021, through May 21, 2021, JND caused 20 television spots to be broadcast across various syndicated programs including "Wheel of Fortune", "Wendy Williams", and "Judge Mathis". From April 6, 2021, through May 23, 2021, JND caused 26 television spots to be broadcast on network news programming, such as "Today Show", "CBS This Morning", and "Good Morning America".[8]

53. As the result of our negotiation with broadcasters, the television effort broadcast 1,702 spots more than what was originally planned for the same price. Additionally, 1,597,028 "bonus" or free impressions were negotiated with NBC Universal to stream through its Over-The-Top Digital Video service.

[8] A total of seven additional network morning news spots aired as "makegoods" due to a local programming change on the ABC stations in five markets: Los Angeles, Phoenix, Portland (OR), San Diego, and Seattle. On Saturday, May 1, 2021, the local ABC stations in the five markets aired the "NFL Draft" instead of "Good Morning America" and preempted the BCBS scheduled spot. The "makegood" spots aired during the week of May 10th in network morning news on various affiliates in the affected local markets.

54. The consumer media campaign alone reached at least 85% of potential Class Members. The extensive direct notice effort, as well as the entity media campaign, the third-party outreach effort, the internet search campaign, and the distribution of the MNR, all of which are discussed below, extended reach and notice exposure further.

## E. ENTITY MEDIA CAMPAIGN

55. To buttress notice to entities/companies/businesses, JND employed a digital effort targeting individuals responsible for filing claims on behalf of entity Damages Class Members, including senior level Human Resources employees who are engaged in handling and managing employee benefits and health plan issues for Class Member entities, as well as business owners and partners of Class Member entities.

### 1. Entity Digital Effort

56. From April 1, 2021, through May 30, 2021, JND caused 957,779 digital impressions to be served through LinkedIn, the leading professional social media platform, and 1,011,906 digital impressions to be served through leading business websites such as Yahoo Business, CNBC.com, FastCompany.com, Forbes.com, Bloomberg.com, Entrepeneur.com, WSJ.com, BusinessInsider.com and AllBusiness.com.

57. From April 1, 2021, through April 25, 2021, JND caused 101,446 digital impressions to be served through the Society for Human Resource Management website (shrm.org). From April 1, 2021, through April 30, 2021, JND caused 155,734 digital impressions to be served through Human Resource Executive (hrexecutive.com). From April 1, 2021, through May 30, 2021, JND caused 35,285 digital Impressions to be served through the National Association of African Americans in Human Resource (NAAAHR.org).

58. Overall, the entity digital effort delivered 81,550 impressions more than what was originally planned.

2. **<u>Entity E-Newsletters</u>**

59. JND also caused notices to be placed in leading business and healthcare and employee benefits e-newsletters including: the April 6, April 20, May 4 and May 18 issues of Franchise Times; the April 5, April 12, April 19 and April 26 issues of Entrepreneur; the April 7, April 14, April 21, and April 28 issues of Harvard Business Review Management Tip of the Day; the April 5, April 12, April 19, and May 5 issues of SHRM HR Daily; the April 20, April 27, May 4 and May 11 issues of HREBenefits; the April 29 and May 27 issues of Employee Benefit News Wellness; the April 30 and May 14 issues of Employee Benefit News First Look;[9] the April 19, April 30, May 5 and May 10 issues of Healthcare Dive;[10] the April 6 issue of NAAAHR;[11] and the April 19, April 20, April 21, April 22, and April 23 issues of BenefitsPRO Daily.

60. Overall, the entity e-newsletters delivered 1,777,525 more sends than what was originally planned.

61. The media campaign significantly overdelivered beyond what was originally planned. Overall, we received 32,319,045 bonus consumer digital impressions (includes 30,019,781 digital impressions, 702,236 radio streaming impressions and 1,597,028 television streaming impressions), 1,165 bonus radio spots, 1,702 bonus television spots, 81,550 bonus entity digital impressions, and 1,777,525 bonus entity e-newsletter sends for no additional cost.

---

[9] *Employee Benefit News* changed the name of its e-newsletter from *Healthcare* to *Wellness* and moved its distribution day from Tuesday to Thursday. Two of the issues of *Employee Benefit News Wellness* were sold out at the time of placement. As a result, the sold-out placements were replaced with two placements in *Employee Benefit First Look* e-newsletter.

[10] *Healthcare Dive* weekly e-newsletter was sold out at the time of placement. As a result, the sold-out insertions were replaced with four insertions in *Healthcare Dive In-Line*, which provides a larger audience.

[11] *NAAAHR* is a monthly e-newsletter. Originally two insertions were planned; however, at the time of placement one of the two insertions was sold out. As a result, an extra month of activity was placed at *NAAAHR*'s website.

**F. ADDITIONAL EFFORTS**

62. JND undertook additional efforts to further disseminate notice to Class Members, including a third-party outreach effort, a specially designed internet search campaign, and a Multichannel News Release ("MNR") that worked in tandem with the media campaign to increase awareness of the Settlement. In addition, a link to the Settlement Website was placed on BCBS.com by Settling Defendants. JND also implemented a media claims stimulation reminder effort prior to the claims filing deadline to alert Class Members of the approaching claims deadline.

**1. Outreach Effort**

63. JND purchased a list of HR/employment benefit employees, and other relevant job titles through a third-party outreach list provider. On May 7, 2021, JND utilized the information from the purchased list to send mailed notice to over 165,094 contacts. The cover letter that we sent was a personalized letter from me asking for assistance in getting notice out to the constituents of the organizations. I received hundreds of responses directly to me by phone and email asking how they could assist and telling me that they were disseminating notice.

**2. Internet Search Campaign**

64. From April 1, 2021, through May 30, 2021, JND caused 703,008 impressions to be delivered through an internet search effort. When purchased keywords related to the Settlement were searched, a paid ad with a hyperlink to the Settlement Website would sometimes appear on the search engine results page. The search effort was monitored and optimized. For instance, keyword adjustments were made based on user search queries and modifications were made to boost text ad placement specifically between 7am-11:30am, to correspond with the expected increase in site traffic due to the airing of CBS television network AM news spots.

### 3. Press Coverage

65. On April 6, 2021, JND caused the MNR to be distributed into newsrooms, online syndication, and PR Newswire for Journalists, an exclusive members-only community of more than 41,000 influential journalists and bloggers. The MNR assisted in getting "word of mouth" out about the Settlement. Additionally, the MNR included online access to the radio and television spots. As of August 13, 2021, the MNR received 16,727 total page views, reaching 13,157 unique users. In addition, the MNR received 199 pickups with a total potential audience of 153,531,155.

66. From October 31, 2020, through May 2021, JND monitored press coverage about the Settlement beyond that of the MNR. JND found there to be extensive news coverage, increasing exposure and reach to Class Members. Overall, we found more than 100 articles covering the Settlement, some of which were picked up by multiple news sources.

## III. CLAIMS STIMULATION EFFORTS

67. Once the Notice Program was completed, JND immediately began its efforts to encourage those Class Members who had not yet submitted a claim to do so. The best way to stimulate claims is the same as the best way to get out notice – through direct contact with Class Members. As such, once the Notice Period ended, we began a robust outreach through email. We did the following on that score: (1) Sent reminder emails to all potential Damages Class Members based on the data provided by the Blue Plans. These emails went to potential Damages Class Members who have not filed a claim or excluded themselves; (2) We conducted an email append process through a credit bureau search and located email addresses for people where the Blue Plans had none. We sent reminder emails out to this group as well, again, only to individuals who had not yet filed a claim or excluded themselves. In total, we sent over 175 million reminder emails to the Class.

68. In addition, we continued to follow up with the HR groups. On June 17, 2021, JND utilized the information from our purchased list to send email notice to over 54,155 contacts. We heard from many representatives who told us that they proactively reached out directly to their members and urged them to file claims.

69. It is evident that these direct outreach efforts were effective. Once we began the reminder email efforts, we received approximately 25,000 claims per day up until the claims deadline.

70. We continued to perform these efforts until one week before the claims filing deadline. In addition, we instituted a reminder mailing to all entities with 30+ owned entities and we also sent a mailing to the largest entities measured by lives under Plans.

71. We also instituted a media reminder campaign. The reminder program consisted of People Magazine, radio, a consumer digital campaign, an entity e-newsletter effort, and a press release.

72. The reminder consumer digital campaign included: (1) targeting to key demographics; (2) retargeting; (3) look-alike targeting; (4) email matching; and (5) a search effort. Digital banner ads were targeted to demographics that achieved the best key performance indicators ("KPIs") during the Notice Period, such as click throughs to the Settlement Website and online claims filed; as well as to individuals who visited the Settlement Website but did not complete a claim submission form (retargeting), and individuals who demographically/geographically match with those Damages Class Members who have already filed online claims (look-alike targeting). An audience custom list was also derived from emails of Damages Class Members who had not yet filed a claim or opted out. These emails were matched with the emails of our programmatic partner, as well as Facebook and Instagram accounts. Ads were then served through our programmatic partner, and across Facebook and Instagram to active matched accounts. The digital search effort focused on keywords/phrases that achieved the best KPIs during the Initial Notice Plan.

73. The reminder entity e-newsletter effort consisted of digital ads being placed in entity e-newsletters that achieved the best KPIs during the Initial Notice Plan (e.g., SHRM HR Weekly, BenefitsPro Daily, Healthcare Dive).

74. Finally, a press release with a claims deadline reminder message was distributed nationwide to approximately 15,000 media outlets, including both English and Spanish outlets, as well as to Human Resource Influencers who are looking for news on benefits, best practices, diversity, equal opportunity employment, labor relations news, and more.

## IV. SETTLEMENT WEBSITE

75. The overall notice effort was designed to drive people to the Settlement Website, www.BCBSsettlement.com, where they could find an abundance of information about the Settlement as well as the portal to file a claim online. Considering the size of the Class here, designing the website was a Yeoman's effort because not only did it need to have a user-friendly interface, but it also needed a robust back-end infrastructure to allow its performance to handle millions of hits, all while guarding against cyber-attack. Building the Settlement Website actually required building multiple sites as follows: First, we launched a registration website on December 16, 2020. This provided a mechanism for people who wanted to confirm that they would be receiving notice to provide us with their contact information. Second, on February 5, 2021, we expanded this pre-launch version of the website to include a stylish homepage design, certain FAQs, important documents, and key dates. On March 16, 2021, in anticipation of the start of the actual Notice Program we launched the online claim filing portal, added a section regarding the Second Blue Bid information and updated the remainder of the site in anticipation of the Postcard Notice mailing. This Launch version of the Settlement Website hosts copies of important case documents including downloadable copies of the Long Form Notice, the Claim Form, the Class Action Complaint, the Settlement Agreement, the Plan of Distribution, and the Preliminary

Approval Order; contains answers to frequently asked questions; provides key dates; and provides contact information for the Claims Administrator. The Settlement Website also allowed Class Members to submit claims electronically through a secure claim filing portal. The Settlement Website is available in English and Spanish. JND's team continuously works on maintenance and optimization of the site to make sure the performance continues to be robust and that all necessary security features are working as required.

76. In addition to reserving the Settlement Website URL – www.BCBSsettlement.com – we also reserved hundreds of additional URLs of similar sound and construction in order to prevent them from being used for nefarious purposes. For example, it is not uncommon for bad actors to purposely purchase URLs with common typographical errors in the hopes of luring unsuspecting visitors to the wrong site. These sites may be used to generate advertising revenue using ads and pop-ups, host malware, or even attempt to impersonate or "spoof" an official settlement website. JND also performed searches for URL's potentially related to the BCBS Settlement by using unique search terms. Discovered URLs were then reviewed for suspected phishing, spoofing, and malicious material. In addition, our team continuously monitors the site for suspicious activity.

77. Because the Settlement Website was the easiest and most cost-effective way for Class Members to receive information about the Settlement and Claims process, it was important to make sure people could easily find the site on the Internet. Thus, the Settlement Website was designed to maximize search engine optimization through Google and other search engines. Keywords and natural language search terms were included in the site's metadata to maximize search engine rankings.

78. As importantly, the Settlement Website was built to withstand an expected load of millions of "hits." The Settlement Website was built in accordance with industry standard best practices to ensure the security and privacy of information submitted. Secure coding practices and

adherence to the Open Web Application Security Project's (OWASP) Top Ten standards were employed throughout the development lifecycle. Penetration testing was also performed to verify the security of the site. The site has been designed in accordance with standard 3-Tier (Web/App/Data) architecture with Web Application Firewalls (WAF) deployed in front of the site to monitor for malicious traffic and security event logs transmitted to a Security Information and Event Management (SIEM) solution. Transport Layer Security (TLS) encryption is employed for all communication with the Settlement Website, and encryption is utilized for communication between the 3 tiers, as well. Additionally, data submitted to the Settlement Website is encrypted when at rest in the database.

79. To make sure everything would work as expected, the Settlement Website was tested using both automated tools and human assessment to comply with best practices found in Web Content Accessibility Guidelines 2.1 and Section 508 of the federal Rehabilitation Act. The site is mobile-enabled and ADA compliant. It was thoroughly tested on various devices and browsers. The Settlement Website also underwent load testing where the simulated user load was run from multiple geographic regions to assess all layers of the site infrastructure, including networking, application, and data storage layers. Testing was done to exceed thresholds of actual traffic from other large projects.

80. JND also retained a reputable, independent, third-party cybersecurity firm to perform penetration testing on the Settlement Website throughout the development and deployment process. These tests were designed to assess, in part, the security of the web application's logic, configuration, software, data flow, authentication, and authorization and were performed using a combination of automated and manual testing methodologies. Automated testing was performed utilizing a combination of tools, such as, web application vulnerability scanners, port scanners, and packet and protocol analyzers. After automated scan results were

analyzed, a detailed manual examination of the site was performed utilizing advanced techniques and tactics by GIAC (Global Information Assurance Certification) certified individuals.

81. The Settlement Website handled load extremely well, with no reports of slowness or latency. As of December 31, 2025, the Settlement Website has tracked over 47 million sessions. Also, as explained more fully below, we have received more than 8.4 million claims via the Settlement Website claim filing portal.

## V. DEDICATED CALL CENTER AND EMAIL

82. Other vehicles for handling Class Member inquiries in this case include the call center and an email address, info@BCBSsettlement.com.

83. We established and have maintained a dedicated toll-free telephone number (888-681-1142) with an automated IVR, available 24 hours a day, seven days a week. The toll-free telephone line provides Settlement-related information to Class Members, and the ability to request and receive the Long Form Notices and the Claim Form by mail. Class Members also have the option to speak with Customer Service Representatives five days a week during business hours. ¶Just as with the Settlement Website, we launched the call center in stages. The IVR launched way back on October 30, 2020, when the Preliminary Approval Motion was filed, with a placeholder message "We will be launching the BCBS Settlement phone line soon. Please check back later. Thank you." The placeholder message was changed on January 26, 2021, to "The Blue Cross Blue Shield Settlement phone line will go live when Class Notice begins in the spring of 2021. Until then, please visit the website BCBSsettlement.com for the most up-to-date information."

84. The IVR was updated on March 10, 2021, to include the option to leave a voicemail. The full message was "Thank you for calling the Blue Cross Blue Shield Settlement Claims Administrator. Class Notice will begin in the Spring of 2021. For the most up-to-date information,

please visit BCBSsettlement.com. If you would like to leave a message for the Claims Administrator and receive a return call, please press one to leave a voicemail."

85. The full Call Center, with live agents, was launched on March 26, 2021, a few days before the Postcard Notice Mailing commenced. The training for telephone agents was extensive here. With the input of counsel for both sides, JND developed a 29-page telephone script, containing some 136 potential FAQs. The script is continually updated as caller trends suggest new FAQs. As of December 31, 2025, the script has been updated nearly a hundred times. These updates occurred at different stages of the settlement as JND assessed the most likely information needed by the Claimants at each stage of the administration, and also by actively monitoring Claimant communications and fine-tuning answers to best address Claimants' current questions. Training consisted of classroom sessions, quizzes, games, mock calls, and other simulations. We initially launched the program with 100 operators to handle the expected volume. As the Notice Program progressed, we increased our staffing to as high as 240 agents on the phones in one day. Throughout the course of the administration, we ramped up and down depending on need balancing the goal of short wait times with the competing goal of cost-efficiency. As of December 31, 2025, we were down to under 25 operators. We expect to ramp up substantially once we begin to issue payments. Operators are available to answer calls in English and Spanish.

86. In addition to the call center agents, JND has escalation phone agents who are available to handle calls transferred from the call center agents. The escalation agents are trained to handle Class Member questions that require more sophisticated knowledge; responses that require collaboration with counsel and/or the case project team; third-party filer questions; and HR professional calls. More specifically, they handle requests to speak to a supervisor; calls that require clarification beyond the scripted response to questions; upset and/or concerned callers, including those who want to confirm the legitimacy of the Settlement, notice, website, etc., those

concerned about providing personal information or inquiring how we received their information, those having difficulty providing information or locating the specific documentation needed to support their claim, and those needing step-by-step or ADA assistance filing a claim. The escalation agents also return calls; assist with inbound calls when the volume is high; identify scripting needs or updates; assist the email team with processing incoming emails and completing call back requests received via email; and handle quality assurance including reviewing and monitoring calls, providing feedback, and coaching call center agents.

87. As of December 31, 2025, the toll-free line has received 2,093,008 incoming calls.

88. Similar to the call center agents, JND also has email team agents who handle Class Member, general public, counsel, and business entity email inquiries. The email agents review and respond to incoming emails that are sent in many languages, including Spanish, French, Korean, and Chinese, among others. The email team responds to a multitude of questions. The most common issues at the beginning of the administration revolved around Class Member requests for assistance with filing a claim, modifying a submitted claim, withdrawing a claim, confirming receipt of a Claim Form, address update requests, or questions about other submitted documentation. At this stage most email requests deal with specific claim questions and questions regarding payment timing. The email team also responds to Class Members who could not be contacted via telephone after multiple attempts, if an email address is on file.

89. As of December 31, 2025, we have received and responded to more than 500,000 emails.

## VI. CLAIM PROCESSING PROCEDURES

90. Under the terms of the Settlement and as set forth in the Notice, each Settlement Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund

was required to complete and submit to JND a properly executed Claim Form postmarked (if mailed) or online no later than November 5, 2021.

91. In preparation for receiving and processing Claims, JND: (i) reviewed the Settlement Agreement and Plan of Distribution in order to document a set of processing rules; (ii) created a unique database to store Claim details, images of Claims, and supporting documentation ("Settlement Database"); (iii) trained staff in the specifics of the Settlement so that Claims would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of Settlement Class Members' claim information; and (vi) began developing a proprietary "calculation module" to calculate premium amounts across valid Claimants.

92. Settlement Class Members seeking to share in the Net Settlement Fund were directed in the Notice to submit their Claims to a post office box address specifically designated for the Settlement or to submit their Claims online through the Settlement Website. Throughout the administration we received much correspondence to the post office box in addition to Claim Forms. All correspondence received at the post office box was reviewed and, when necessary, appropriate responses were provided to the senders.

## A. TIMING

93. As explained above, in late March 2021, JND began sending Notice to potential Class Members based on the data provided by BCBS. It is now over 4 years from that date and some Class members are asking why it has taken this long, implying that JND has somehow been delinquent in its work. That is not the case. Putting aside the fact that we received over 8.4 million claims in an extremely complicated settlement, there were two intervening issues out of JND's control where our work was largely paused by the parties. First, there were several appeals here to the Eleventh Circuit and then even to the U.S. Supreme Court during which time JND was

instructed to hold off on the bulk of its claims processing work in case any appeals changed the Settlement or even blew up the Settlement. This Appeals period lasted between October 5, 2022, and June 24, 2024.

94. Second, beginning in November 2023, JND, the Special Master, the Parties, and the Court were engaged in a year-long negotiation regarding JND's remaining budget, as well as issues related to certain of plaintiffs' counsel's fees and other costs that were to be paid out of the Notice Fund. During this time, JND made at least four video presentations to the parties and the Special Master and provided many different iterations of a proposed ongoing budget based on requests from the parties and the Special Master. These discussions culminated in a day-long mediation session in front of Judge Proctor, on November 12, 2024, during which JND accepted the budget proposed by the Special Master without exception. However, during this time period we were again instructed to pause many administration activities. It was not until December 2024, that we were authorized to continue in earnest to finish the bulk of our processing work.

95. We now turn to a discussion of that work itself.

## B. PROCESSING CLAIMS

As explained above, the vast bulk of claims were submitted electronically via the case website. There were actually three methodologies of Claim submission here – paper claims, electronic claims and what we call bulk claims. Of the 8,421,270 Claims Received, 279,424 Claims were submitted on paper, 8,123,317 via the online filing portal of the Settlement Website and 18,529 from claim preparer organizations (also called bulk claims). We discuss all three below. Also, JND received claims from Employers, Employees and also Individuals – people who purchased health insurance directly from the Blues instead of through their place of employment.

**1. <u>Paper Claims and Electronic Claims</u>**

96. Once received, paper Claims were opened and prepared for scanning. This process included unfolding documents, removing staples, copying nonconforming-sized documents, and sorting documents. This manual task of preparing the paper Claims is very laborious and time intensive. Once prepared, paper Claims were scanned into the Settlement Database together with all submitted documentation. Subsequently, each Claim was assigned a unique Claim number.

97. In order to support capturing the claim data from the paper claims, JND built custom screens that allowed streamlined entry. Once the paper claim was scanned, the information from each Claim Form, including the Claimant's name address, employer detail, health plan detail and Alternative Option detail, where present, was entered into the Settlement Database. Once entered into the Settlement Database, each Claim was reviewed to verify that all required information had been provided.

98. Claims that were submitted via the Settlement Website were automatically uploaded to the Settlement Database. For these claims, we could skip the steps explained in the preceding two paragraphs. However, making sure that a Claim was successfully integrated into our Settlement Database was only step 1. Step 2 involved making sure that the submitted claims, whether filed in hard copy or electronically, matched to Class Data that was provided by Defendants.

**a. Matching Claims to Class Data**

99. Each claim was required to be matched back to original Class Data provided by the BCBS Defendants in order to be considered a valid claim. In order to facilitate this process, every Class Member received a Unique ID with which to file a claim under their class record.

Nevertheless, we also needed to address situations where Claimants filed a claim without a Unique ID.[12]

100. Other anomalies included situations where Class Members shared their Unique IDs with other potential Class Members. In some instances, multiple people filed using the same Unique ID. Because of these scenarios, extensive work was required to make sure that a claim which appeared to be linked to a class record via a Unique ID was in fact that entity or individual. Additionally, the 959,253 claims filed without a Unique ID had to be matched to Class Data that was anywhere between two and fourteen years old. Any claim not matched to Class Data was deemed deficient as a non-Class claim.

101. The process of validating and matching over 8.4 million claims to over 100 million class records involved thousands of hours of data analysis, report writing, and manual review of records for potential matches or mismatches. This matching involved reviewing and comparing full and partial names, full and partial address, email address, and health plan IDs. In addition, due to the age of the Class Data as well as the claim data aging during appeals and holds on work, both sets of data needed to be run through address updating processes including advanced address searches and NCOA so both the Class Data and the claims data was as current as possible when matching. Where potential matches existed, such as Unique ID, last name and address matched but first name did not, reports were produced and operations staff reviewed to validate the accuracy of the match.

102. In situations where an employee's claim was matched to an employer record, usually because the employer shared the company's unique ID with their staff, the analysis

[12] JND also carefully reviewed all Claims to ensure that they were not submitted by or on behalf of "Excluded Persons" to the extent that the identities of such persons or entities were known to JND through the list of Defendants and other excluded persons and entities set forth in the Settlement Agreement. JND also reviewed all Claims against the list of 2,152 persons and entities who were excluded from the Settlement Class pursuant to request.

required the employee claims to be decoupled from the employer record and then a search was required to identify the correct class record and relink the claim to the correct class record. Additionally, this process needed to ensure that an employer claim still existed on the original employer record.

103. One of the most complex matching efforts was matching employer claims to employer class records when no unique ID was used. Because a business can have a legal name, a DBA name, Inc., LLC and a variety of other ways they may refer to themselves when filing a claim, this was very complicated. In addition, a business can have many addresses; the address they used when filing their claim did not necessarily match what was in Defendants' data. On the Class Data side, the BCBS data can also store the business name in a variety of ways depending on how the employer signed up for coverage, and in some cases, the purpose (Retired, Cobra, etc.). A huge effort of both automated and manual analysis was performed making best efforts to connect employer claims to employer class records.

**b. Alternative Option Claims**

104. Each insurance plan that covered a company as well as its employees required employees to pay a certain percentage of the total premiums and required the employer to pay a certain percentage of the total premiums. For example, one company might pay 80% of the total premiums, leaving the employees to pay 20%, and another might have a 50/50 split or something closer to a 90/10 split. The BCBS Defendants have no records of the breakdown for each policy. Therefore, the parties, when crafting their Settlement, established a "Default Percentage" that would be used in all cases based on industry studies and the analysis of Kenneth Feinberg Per the Plan of Distribution, the default percentages for employees on fully insured plans was 15% where the person had single coverage, and 34% where the person had family coverage. The residual amounts in both cases (85% and 66%, respectively) are allocated to the fully insured employer. The default

percentage for employees on self-funded plans was 18% where the person had single coverage, and 25% where the person had family coverage. The residual amounts in both cases (82% and 75%, respectively) are allocated to the self-funded employer.

105. As discussed above, because Defendants' data did not contain actual percentages of premium payment distribution, and therefore default percentages were assigned universally, the Plan of Distribution provided Claimants with the option of accepting the Default percentage or claiming an Alternative percentage. Those Claimants who wished to receive a different (Alternative) allocation were required to complete the Alternative Option section of the claim form and provide supporting documentation proving the claimed amounts per the Alternative percentage.

106. As might be expected, the vast majority of Claimants accepted the Default percentage. In total, JND received only 34,485 Alternative Option claims out of the 8.4 million total. Of those, 26,028 provided supporting documentation supporting their claim. The remaining 8,457claims (those who did not provide supporting documentation) were sent Deficiency Notices via email or mail and given the opportunity to cure the deficiency by providing the required supporting documentation.

107. Per the Plan of Distribution, the supporting documentation for Alternative Options claims was first reviewed by JND, and an initial determination was documented for each alternative percentage per claim per year. As we expected at the outset of this administration, the documentation submitted in support of the alternative percentage claims ran the gamut from a few simple pages to hundreds of pages of pay stubs, tax forms, company memos, communications from Human Resources and more. Reviewing this documentation was an enormous undertaking. Each piece of supporting documentation could contain the necessary information to support a claim of alternative percentage, but the data could be presented differently from document to document, from year to year and from Claimant to Claimant. As an example, for each pay stub, the payment

to a BCBS Defendant for health care coverage, for the relevant class period, must be identified. The amount must then be evaluated to determine if it is a weekly, bi-weekly or monthly payment. The periodic payment must be evaluated against the year-to-date amount to determine if the amount was paid consistently for the year or if it changed at some point. If there was a change, was it due to a change in coverage, change in employment or something else impacting the annual premium? This discussion relates to one paystub for one Claimant. This analysis needed to be repeated thousands of times.

108. Despite the enormity of the review required by JND, it was not our role to determine whether the claimed alternative percentage was correct. Rather, we performed a gate-keeping function. As per the Plan of Distribution, if JND determined there was sufficient information to make a colorable claim for the alternative percentage, based on data, records, or other materials provided by the Claimant, then we forwarded that claim to the Settlement Administrator, The Honorable Judge Irma Gonzalez (Ret.), for review.

109. Claims that included documentation that was deemed adequate to receive Alternative Allocation review went through a review process collaboratively between the Settlement Administrator and the Claims Administrator. For each claim entering the review process, JND produced a term sheet for Judge Gonzalez that summarized the Claimant details, the employer details, the Defendant health plan(s), the calculated premiums and ASO (Administrative Service Organization) fees per year, the claimed alternative percentages/amount per year, and JND's recommended alternative percentage/amount per year. We also provided supporting documentation to Judge Gonzalez for her review. Judge Gonzalez reviewed each claim individually to make a final determination or raise questions needing clarification. When questions were asked, JND would immediately review and provide additional information to Judge Gonzalez either during the review session or prior to the next review session. Once all open questions were

resolved on an alternative claim, Judge Gonzalez would either approve the recommended alternative percentage/amount, approve different alternative percentages/amounts, or deny the alternative claim, which would result in the claim reverting to the Default percentage. JND and Judge Gonzalez met more than 25 times for these collaborative discussions.

110. Per the Plan of Distribution, in situations where JND, in its discretion, determined that a Claimant seeking to elect the Alternative Option did not provide sufficient supporting materials to establish a specific alternative allocation, the Claimant was treated as having accepted the Default option. As with all Default Option Claimants, these Claimants received Premium Notices that allowed them to review their Total Annual Premiums, as discussed further below.

**2. <u>Bulk Filer Claims</u>**

111. In mega settlements such as this, it has become commonplace for Third-Party claim filers and others to file claims in bulk. That is, instead of filing thousands of individual claims, the filers submit collections of claims as a package that includes data and back-up information for hundreds or thousands of claims. These collections of claims are processed and managed as a bundle for the bulk filer, with special communication and oversite. In this case, while the volume of Bulk Filer claims received by JND constitutes a small proportion of the total claims received, extensive time was required to process these claims. Among other things, Bulk Filers typically made multiple submissions and continued to submit additional information even after we performed the initial processing of their claims. Therefore, we were required to continually reprocess these claims over time. As instructed by Counsel, JND did its best to honor all of these additional submissions and give Bulk Filers wide latitude in submitting additional supporting documents to validate their claims. JND expended considerable hours dedicated to this task. Again, even though the volume of claims was relatively small, the dollars these claims represented were enormous, with the premiums exceeding $29 billion and over $4 billion dollars in ASO fees paid.

112. Part of the complexity of handling Bulk Filers was based on the lack of uniformity of the Bulk Filer submissions themselves. Some Bulk Filers were very diligent, detail-oriented filers, who were consistently willing to work with JND to get their claims as complete and ready for payment as possible. On the other side of the spectrum were Claimants who submitted incomplete claim filing requests and dragged their feet when we asked for additional information. We also saw everything in between these extremes with varying degrees of responsiveness and compliance to claim requirements. The lack of uniformity and consistency among Bulk Filers meant JND needed to spend time on lengthy review processes and years of back and forth with these filers to assist them.

113. One consistency among Bulk Filer claims is that most were submitted without containing the Unique ID that JND sent to Class Members. Rather, Bulk Filers typically sent JND multiple spreadsheets containing entity names, sometimes with an address, sometimes without, and varying degrees of health plan information. Some also sent paper claims via email, some mailed in boxes filled with paper claims, and some submitted a mixture of the above, including filing claims online. JND's review found not only duplicate but quadruple duplicate claims from the same Bulk Filers submitted on behalf of the same entity. Therefore, the deduplication efforts here were extremely time and labor intensive as the claims were manually processed.

114. JND further received incessant requests from Bulk Filers (up through December of 2025) for us to search the BCBS data received to try and find a match to the frequently insufficient information from the Bulk Filer, often just a name of an entity. This led to a lengthy back and forth process because we need additional data points, namely a complete name and address as well as any DBAs to align with BCBS data. Often, when responses finally arrived, the address provided did not match the data from BCBS, leading us to have to go back to the filer again and ask them about potential matches found during our research. Since the BCBS data

we received was both incomplete and often contained dozens or even hundreds of potential matches nationwide, we had to compile these potential hits and reach back out to the Bulk Filers and confirm their affiliation. The response rate varied greatly, and the process continued for over 4 years.

**a. The Challenge of Non-Class Claims**

115. Non-Class Bulk Filer claims underwent manual matching based on the name and address information provided by the Bulk Filers through various documents. These included things like Authorization Documents, multiple Addendums to those documents received over the years, and various Schedules containing entity name and address information, ranging from a handful of names and addresses to over 500 names and addresses per entity. In certain cases where a match was not found but the Bulk Filer insisted there should be a Class record, some provided additional health plan data. JND's Data Team analyzed this data in order to match as many claims to Class Data as possible.

116. For any claim filing requests submitted by Bulk Filers where JND was unable to match the claim to BCBS data based on information originally provided by the Bulk Filer, JND filed a placeholder claim. Later during the processing phase, if the filer provided supplemental data allowing us to match the claim, JND had to then request JND's Data Team to move the claim to the correct BCBS record in the Settlement Database. Since we were continuously receiving updates and additional requests from Bulk Filers, the process of moving claims remained ongoing and required constant review and audit.

**b. Processing Nuances**

117. As is probably evident from the discussions above, Bulk Filer claim processing differs in many ways from processing standard employer, employee and individual claims. The vast amount of data received from Bulk Filers was, for the most part, entered manually into the

Settlement Database by JND. Furthermore, some Bulk Filers also filed Online Claim Forms in conjunction with utilizing the Bulk Filer process established by JND.

118. In order for a Bulk Filer's claim to be considered valid, they must have submitted a signed Authorization Document authorizing them to file a claim on the Class Member's behalf in the BCBS Settlement. Additionally, the Bulk Filer must serve as the primary point of contact, as well as being eligible to receive any Settlement payments on the Class Member's behalf. While the Authorization Document requirement was made clear to filers from the beginning, getting them to comply proved to be an enormous challenge. Some Bulk Filers produced valid Authorization Documents quickly and effortlessly while others failed to provide any documentation. Others sent, for example, PDF files of various types of online forms purportedly "signed" by their client. This resulted in extensive back and forth discussions between JND and the various Bulk Filers as to what constitutes an acceptable Authorization Document.

119. Another processing challenge presented itself when JND received multiple claims submitted by multiple Bulk Filers on behalf of the same Class Member. This created an ownership conflict that JND had to resolve. A similar issue arose when a Class Member and a Bulk Filer, who was authorized to represent the Class Member, both filed a claim for the Class Member. Extensive back and forth communication and research were required for JND to resolve these conflicts.

120. Adding to the complexity of resolving claim ownership conflicts between Bulk Filers were scenarios where Employer Group Class Members had different members of their organization, such as the CFO and COO, authorize different Bulk Filers to file claims on behalf of their organization. Resolving these conflicts frequently required updated authorization from the Class Member identifying the correct Bulk Filer.

121. Where Bulk Filers were authorized to represent Employees or Individual Subscribers, it was common for both the Bulk Filer and the Class Member to file claims. Similar to resolving Employer Group conflicts, JND needed to contact the parties involved and receive a final determination on who was authorized to file the claim.

**c. Deficiency Processing**

122. As is probably clear from the discussion above, many Bulk Filer claims contained deficiencies that had to be addressed. Claimants were granted a 30-day period to address and remedy any deficiencies identified in their claims during the official deficiency cure phase.[13] Bulk Filers were sent Deficiency Notice via email containing their claim summary spreadsheet. This spreadsheet listed each claim submitted, spelling out all the issues per claim in a detailed matrix generated by JND. Bulk Filers were able to cross-filter the various types of deficiencies and outstanding questions. They were also informed of the opportunity to provide supplemental documentation to cure their claims. Although Bulk Filers were subject to the same 30-day cure window as all other Claimants, many Bulk Filers did not adhere to this 30-day day deficiency cure period. Several requested an extension, with multiple filers requesting more than one extension after their initial extension had already been granted.

123. Sorting through the immense amount of individual emails, attachments, file sharing folders, and other material submitted by Bulk Filers in an attempt to cure their claim deficiencies was yet another hurdle. Often the manner in which the documents were submitted lacked organization or consistent file naming conventions, making it nearly impossible to finalize processing one claim but rather having to go back and reprocess and inform the filer of the issues they did not address or the new issues that surfaced when an affiliated claim was found.

[13] This was true for all claims, not just Bulk Filer claims. In the next section below we discuss the larger deficiency process.

124. The time involved in processing Bulk Filer claims extended far beyond the official deficiency phase. First, they were provided multiple opportunities prior to the official deficiency phase to cure their claims and submit additional information when JND sent the individual Bulk Filers various updates via their claim summary spreadsheet. Second, over the years Bulk Filers sent voluminous requests to file new claims, amend filed claims, withdraw claims, research potential additional affiliated entities, and discuss their claims over the phone to resolve claim conflicts.

125. In summary, Bulk Filer claim processing required years of diligent effort by JND, as we processed and updated bulk claims while Bulk Filers submitted piecemeal information and documentation in fragments in an attempt to cure their deficiencies. Despite JND's ongoing efforts to help them complete their claims, some Bulk Filers remained largely unresponsive throughout the process. Several filers requested multiple extensions during various phases including the deficiency period and the premium dispute period, further contributing to the considerable length of time and resources involved. Nevertheless, JND is dedicated to ensuring that every Claimant has the opportunity to perfect its claims, and our approach to working with Bulk Filers exemplifies that and reflects this commitment.

## C. THE DEFICIENCY PROCESS

In addition to the deficiency process for Bulk Filer claims, there was also a deficiency process for all other claims filed in this case as discussed below.

### 1. Non-Class Claims

126. All claims had to be matched to the Class Data provided by the Defendants in order to be determined valid. JND provided a Unique ID to every noticed Class Member in order to streamline the claims process. The claims filing portal encouraged Claimants to file their claim using the Unique ID provided to them, again to make claims processing as simple and efficient as

possible. The overwhelming majority of Claims were filed with the correct Unique ID provided to the Class Member, which allowed them to be matched correctly to Defendants' data.

127. However, there were some 959,253 claims submitted without a Unique ID. For those claims we were required to perform extensive automated and manual analysis in order to match a Claimant to a class record. This was particularly burdensome given the age and quality of certain amounts of the data, plus due to the sheer volume of data involved. As stated above, this required thousands of hours of data analysis, development of automated matching processes, report generation, and manual review to both match claims without unique IDs as well as validate the matching of the claims that did submit with a unique ID.

128. In addition, several hundred thousand claims were submitted with a Unique ID but the individual or entity submitting the claim did not match the Class Data – this is because the Claimant used someone else's Unique ID. Due to the large volume of Claimants who submitted claims using a unique ID other than their own, every single claim that was automatically matched to a Class record by unique ID required a thorough review and validation. This analysis required the same effort, due diligence, and audit review as other matching analysis performed. Matching anomalies were not simply because the claim submitted related to the "wrong" Class Member. Also, the matching process could be further complicated by the fact that the Claimant moved, resulting in a discrepancy between addresses. Sometimes, the Claimant got a new job, so the email did not match, or maybe the Claimant got married and their last name did not match. For these reasons, among many others, matching required significant manual review as well as systematic review.

129. For the 296,148 claims filed where JND could not match the Claimant data to a class record, JND sent a Non-Class Deficiency Notice via email or postcard. The Claimant then had 30 days to provide additional information to assist with matching them to a Class record. That

information might include additional names, additional addresses or additional health plan data. Once again, to streamline that process, JND's IT team built a portal that allowed Claimants to respond online. This portal was designed to simplify the response process for the Claimant and allowed them to log in with an ID, enter any additional information they had, and submit it with just a few clicks.

130. For the 10,578 respondents to the non-Class notice, JND performed both automated and manual matching, as discussed above, to link these Claimants to Class records. Through this process, JND validated an additional 1,395 claims

131. For the 9,183 Claimants that still did not match Class Data, JND sent the Claimant a notice that provided the Claimant with a path to provide supporting documentation for premiums paid to a BCBS Defendant health plan. JND then processed the claim based on the supporting documentation.

**2. <u>Duplicate Claims</u>**

132. In an administration of this magnitude, with over 8.4 million claims, it is expected to receive duplicate claims that must be identified and resolved before payments can be made. Here, each class record was required to match to only one valid claim. For the class records that linked to more than one claim, JND took several steps. First, we performed an analysis to determine if any of the Claimant data did not match the Class Data, in which case the claim was unlinked from the class record. For those "unlinked" claims, a matching analysis was performed to identify the correct class record. This analysis following the "unlinking" of claims to Class Data followed the same in-depth matching analysis discussed previously, and involved automated, data matching, manual data analysis, and manual matching review. This process was very extensive and involved building potential matching logic based on the available data both on the claim and in the Class Data, generating reports with tens of thousands of possible matches, and having

operations staff review the potential matches and flag correct matches. Where we were able to identify correct class records for a particular claim, that claim was then linked to the class record and hence became a valid claim. Where no match was found, the claim became a non-Class claim and followed the non-Class notice process described above. For the remaining class records with multiple matching claims, one claim was identified as the primary and valid claim, while the remaining claims were flagged as duplicates. That is the situation where, for example, John Smith at 123 Main Street, apt #3, in Des Moines, Iowa, submitted four identical claims, only one claim is approved, not all four.

133. For the 340,962 such claims ultimately determined to be duplicates, JND sent email and post card notices notifying the Claimants that they had both a valid and duplicate claim on their class record. If the Claimants disagreed with JND's determination that they had duplicate claims, they had 30 days to respond in writing and provide information on why their claims were not duplicate, but actually unique.

134. For the 305 duplicate claim notice responses received, JND processed the responses and either resolved the duplicate by reassigning the claim to a new Class record or confirming the duplicate claim was, in fact, still a duplicate.

## VII. PREMIUM NOTICING

135. The Settlement awards in this case are all based on the Premiums paid by Class Members to the Defendants over the years. Therefore, it was important to the Parties, and to JND, to make sure all Claimants clearly understood the exact Premium amounts that were being used by the Claims Administrator to calculate payment awards. If the Premium amounts were incorrect then the awards would necessarily be incorrect. Therefore, we gave all Valid Claimants the opportunity to review the Premium amounts for their claims before we made any payment calculations. This important step is discussed in detail below.

136. Per the Plan of Distribution, Authorized Claimants were provided the opportunity to review the Total Premiums Paid and/or Total Administrative Fees Paid upon which their Claim Payment is based prior to distribution of the Net Settlement Fund. This provision was inserted in the Claims Protocol in large part because the data provided to us by BCBS, while extensive, was incomplete in many instances. Moreover, as evidenced above, there were many complexities in the analysis of data. Therefore, this notice step was a crucial safeguard in the entirety of the process. Essentially, the notice afforded Claimants the opportunity to understand the total premiums on which their ultimate payment would be based. Claimants then had the chance to review and dispute the calculated premium amount if they wanted. If a Claimant wished to challenge their Total Premiums Paid and/or Total Administrative Fees, they needed to submit supporting documentation demonstrating a different total.

137. In order to facilitate Authorized Claimants reviewing Total Premiums Paid and/or Total Administrative Fees Paid, JND built a Premium Review Portal that allowed Authorized Claimants to log in and review on-line the Premiums and/or Administrative Fees provided by the Defendants. The Premium Review Portal also allowed the Claimant to request a Premium Correction and upload documentation in support of their correction request. JND spent considerable time designing a portal that was simple to use and effectively presented Claimants with the information needed so they could make an informed decision on accepting the premiums provided by BCBS. They could also request a premium correction request if they disagreed with the Premium Total determined by JND. With a few simple clicks, the portal allowed the Claimant to review their premiums, enter Premium Correction amounts per year, and upload all documentation needed to support their request. The Premium Review Portal was also designed so no Personally Identifiable Information ("PII") was displayed on the screen to the user to ensure the highest level of data security was always maintained.

138. For the 7,771,228 valid Damages Class Claims, JND sent notice via email or postcard notifying the Authorized Claimants how to log into the Premium Review Portal and what action they could take based on the Total Premiums and/or Total Administrative Fees displayed in that portal. In addition, JND accepted premium correction requests via mail and email when a Claimant chose to submit their requests via those methods. Claimants were given 30 days to review their Total Premiums and/or Total Administrative Fees and respond with a correction request.

139. The premium noticing was sent on a rolling basis throughout 2025 as the premium data analysis was finalized for each valid Claimant. The premium data we presented to each Claimant required extensive analysis since we had to combine all premiums from across all health plans for each Claimant. As an example, a single Claimant could have insurance coverage over a 10-year period, spanning 5 different states, and 4 separate health plans, some as single coverage and others as family coverage. The premiums for each health plan needed to be assembled, calculated correctly factoring in the default percentages for employees and individuals, single or family, and whether the plan was fully insured or ASO.

140. This analysis for premium determination had to be done for ALL of the approximately 7.75 million valid claims. The development effort to calculate the premiums was an extremely large project in and of itself, and the auditing effort to validate the premium analysis was equally extensive.

## A. Premium Correction Request Processing

141. As explained above, Claimants were advised that they had the right to request a correction to the Premium amounts provided by JND if they could demonstrate that a different premium amount was appropriate.

142. JND sent a total of 7,771,228 premium notices to Class Members. In response to those notices, JND received only 27,737 premium correction requests, meaning the vast majority of claimants agreed with JND's determinations. For each correction request received, JND reviewed all documentation provided, in many cases hundreds of pages of documentation, to confirm that the amounts requested were accurate, the health plan being paid premiums was a Defendant in the matter and the services being paid for were qualifying services.

143. While the volume of correction requests was low compared to the number of claims, the work to review these requests was rigorous. The complexity and effort to process a single Premium/ASO fee correction request ranged from very simple with a single year disputed for an individual health plan and a single piece of supporting documentation, to hundreds or even thousands of pages of documentation ranging across 12 years and multiple health plans. For JND to validate a premium correction we were required to review all documentation, determine that the documentation was for the correct Class Member, conclude that the amounts presented reasonably represented covered health care services, and confirm that the premiums or ASO fees were being paid to a BCBS Defendant.

144. In addition, analysis was required to validate that the Class Member did not have additional previously unidentified Class Data that required additional roll up of premiums that would address the dispute amounts. While simple reviews could be performed in 10 minutes or less, thousands of premium correction requests were much more complex and took hours each to resolve. For example, an employer with a valid claim might submit a correction request with 100 documents, each requiring the review and validation mentioned above. The employer has 9 class records across 2 health plans. Reviewing all such documents and associated Class Data could easily take several hours to review by one of our senior processors.

## F. PREMIUM / ASO FEE DATA

145. JND Received billions of lines of data from the 35 BCBS Defendants. In addition to having contact data for individuals, employees and employer groups, this data contained the Premium and ASO Fee data for all Class Members. This data was the key to determining the total Premiums and ASO Fees for each valid Claim.

146. The Premium and ASO Fee data we received did not provide a breakdown between what an employee versus an employer paid; it just provided the total amounts paid and the number of lives covered. JND applied the rules and percentages defined in the Plan of Distribution to allocate default amounts to employers and employees. These amounts were also updated during the Alternative Option processing for those Claimants that requested an alternative percentage and who provided valid supporting documentation.

147. As previously discussed, the Premium and ASO fee data provided to JND by the Defendants was extremely complex to process due to its volume, the unique data characteristics across the 35 Defendants and situations requiring records to be linked and Premium and ASO fee data rolled up to present a single set of dollars for a valid Claimant. Following the extensive time spent linking the Class Data records for noticing purposes, well over 1000 hours were spent associating the premiums to the covered lives for employers so an amount per employer, per covered live, per time period could be determined. Adding to the complexity were anomalies and errors in the data received from the Defendants, such as duplicate coverage for the same person for the same time period for the same health plan. These anomalies needed to be identified, evaluated for frequency, and coded around to eliminate errors in the resulting outcome.

148. As discussed above, the Premium and ASO Fee amounts that were assembled during this process from Defendant data were updated from Alternative Option processing, where an Alternative Option amount was accepted. The final Premium and ASO fees were presented to

Claimants on the Premium Review Portal, as discussed above, and the Claimant was given the opportunity to submit a Premium/ASO fee correction request.

149. The final Premiums and ASO fees after both Alternative Option processing and Premium/ASO fee Correction Request Processing, are the values utilized in the calculation to determine the benefit payment being made to each valid claim.

## VIII. CALCULATION

150. Now that all claims are fully processed and we have determined which claims are eligible for payment and which are not, we need to determine the amount of Recognized Loss that each Claimant suffered under the parameters of the Settlement Agreement. To do so, we needed to develop a calculation program following the strictures of the Settlement Agreement. The BCBS calculation required us to design and develop code that processed two settlement funds, with their own class periods, spanning multiple years and billions of transactions of fee data. For any Class Member, the coverage periods could cross multiple health plans and coverage types (medical, pharmaceutical, dental, and vision). The rules and requirements for the calculation program we developed internally were built based on the Court approved Plan of Distribution.

151. The Defendant data was produced by each of the 35 Defendant health plans, and while each data set was similar in many ways, many had their own unique design features. The data was aggregated both at the employer as well as the employee and individual subscriber level, across the 35 health plans, to determine the total premiums and/or ASO fees paid and the number of covered lives for each calendar period of each health plan for each employee, employer and individual subscriber. All of this had to be taken into consideration when building the calculation.

152. An employer will be eligible for compensation across all the health plans they provided to their employees while an employee is only eligible to receive compensation on any premiums paid in the health plan they subscribed to on a pro-rated basis. Additionally, there are

millions of individuals that purchased their own health insurance plan that might be eligible for compensation on the entirety of the premiums they paid. Due to minor differences in the way that each one of the participating health plans captured their data and subsequently provided the data to the Claims Administrator, each health plan's aggregation and calculation methodology had to be individually modified/customized to ensure uniformity on the way losses were calculated across the health plans.

153. The calculation has been run numerous times on the data in an iterative process that allowed for in depth review of each step. Beyond the thorough analysis of each step, the entire process has undergone rigorous scrutiny, including targeted audits of both the largest and smallest health plans. These audits involved a detailed review of major employers, their claims, and all associated employee claims to ensure accuracy and completeness.

154. JND is in the process of running and performing validation on the final calculation in preparation for initial distribution. The final run of the calculation will be completed in early May, and JND will continue to run audits and quality control checks up until the distribution commences on May 11th to ensure all distributions are sent accurately.

## IX. QUALITY ASSURANCE

155. An integral part of the overall claims administration process is the Quality Assurance review. Throughout the administration process, JND's Quality Assurance personnel worked to verify that Claims were processed properly by ensuring that information was entered correctly into the Settlement Database, deficiency codes were assigned accurately, and Deficiency Notices and Deficiency Emails were sent appropriately. After all Claims were processed, Deficiency Letters and Deficiency Emails were sent, and Claimants' responses to Deficiency Letters and Deficiency Emails were reviewed and processed, JND's Quality Assurance personnel performed additional reviews. These final Quality Assurance reviews further ensured the

correctness and completeness of all Claims processed prior to preparing this declaration in support of distribution of the Net Settlement Fund. As part of the Quality Assurance reviews, JND, among other things:

a. Verified that the premium and/or ASO Fee data assembled for each Claimant with a valid Claim was complete and accurate;

b. Verified that true duplicate Claims were identified, verified, and rejected;

c. Verified that Claimants not matching Class Data were rejected;

d. Verified that Claimants matching to Class records were the same entities;

e. Verified that persons and entities excluded from the Settlement Class did not file Claims or their Claims were rejected upon review;

f. Performed a final Quality Assurance audit of Claims and supporting documentation to ensure completeness of Claims;

g. Verified that all valid claims received Premium Notices;

h. Determined that Claimants requiring Deficiency Letters and Deficiency Emails were sent such notification; and

i. Tested and re-tested the accuracy of the calculation program, as mentioned above.

156. JND took a layered approach to defend against fraudulent filers in the BCBS Settlement. Tools and technology built into the claim filing website was the first layer that identified and limited fraudulent bot activity. Next JND monitored online claim traffic, identifying patterns that were indicative of fraud or bot-based claims, and if identified, flagged the claims for further review. Additionally, all valid claims were required to match to Class Data, which ensured only individuals that paid Premiums and ASO fees would be compensated from the settlement.

Finally, the extensive duplicate analysis previously discussed ensured a Claimant was only paid once for the Premiums and ASO fees they paid.

## X. RECOMMENDATIONS FOR APPROVAL AND REJECTION

157. As noted above, the total number of Claims is 8,421,346.

### 1. Valid Claims

158. A total of 7,774,992 claims were determined by JND to be eligible to participate in the Settlement and are recommended for approval ("Eligible Claims"). The total Premiums Paid amount for these Eligible Claims is $327,977,369,010.00 and the total ASO Fees Paid is $24,995,349,677.00

### 2. Rejected Claims

159. After the responses to Deficiency Notices and Deficiency Emails were processed, a total of 646,354 Claims remain recommended for rejection ("Rejected Claims") for the following reasons:

a. 298,143 Claims did not match to a Class record – (Non-Class Claim);

b. 339,406 Claims were identified as duplicative, with a single valid claim retained for each class record (Duplicate Claims);

c. 5,662 Any Other reason (Fraud, Entry Error, Claimant Cannot Claim); and

d. 3,143 Claims were Withdrawn.

## XI. INITIAL DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

160. Should the Court concur with JND's determinations concerning the provisionally accepted and rejected Claims, JND recommends the following distribution plan ("Distribution Plan"):

a. JND will conduct an initial distribution ("Initial Distribution") of the Net Settlement Fund, after deducting all payments approved by the Court, and after payment of any estimated taxes, the costs of preparing appropriate tax

returns, and any escrow fees, while maintaining a 10% reserve to address any late disputes or Premium and ASO Fees, tax liability and claims administration-related contingencies that may arise following the Initial Distribution, as follows:

(1) JND will calculate award amounts for all Authorized Claimants as if the entire Net Settlement Fund were to be distributed now. In accordance with the Court-approved Plan of Allocation, JND will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund based on the amount of the Authorized Claimant's Recognized Claim in comparison to the total Recognized Claims of all Authorized Claimants.

(2) JND will, pursuant to the terms of the Plan of Distribution, eliminate from the Initial Distribution any Authorized Claimant whose *pro rata* share calculates equal to or less than $5.00. These Claimants will not receive any distribution from the Net Settlement Fund and will be so notified by JND. This de minimis threshold was set by the Parties in the Settlement Agreement.

(3) After eliminating Claimants who would have received equal to or less than $5.00, JND will recalculate the *pro rata* share of the Net Settlement Fund for Authorized Claimants who would have received $5.01 or more. A "Distribution Amount" will be calculated for each of these Authorized Claimants, which shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants who would have

received $5.01 or more, multiplied by the total amount in the Net Settlement Fund.

(4) Authorized Claimants with a Distribution Amount less than $200.00 will be paid their full Distribution Amount in the Initial Distribution ("Claims Paid in Full"). These Authorized Claimants will receive no additional funds in subsequent distributions.

(5) After deducting the payments to the Claims Paid in Full, 90% of the remaining balance of the Net Settlement Fund will be distributed *pro rata* to Authorized Claimants whose Distribution Amount calculates to $200.00 or more. The remaining 10% of the Net Settlement Fund will be held in reserve (the "Reserve") to address any late Premium or ASO Fee disputes, tax obligations and claims administration-related contingencies that may arise following the Initial Distribution. To the extent the Reserve is not depleted, the remainder will be included in the "Second Distribution" described in paragraph 161 below.

b. To encourage Authorized Claimants to deposit their payments promptly, all distribution checks will bear a notation: "CASH PROMPTLY. VOID AND SUBJECT TO REDISTRIBUTION IF NOT CASHED BY NINETY (90) DAYS AFTER ISSUE DATE." For Authorized Claimants whose checks are returned as undeliverable, JND will endeavor to locate new addresses through reasonable methods. Where a new address is located, JND will update the Settlement Database accordingly and reissue a distribution check to the Authorized Claimant at the new address. In the event a distribution

check is lost or damaged or otherwise requires reissuance, JND will issue replacements. Distribution reissues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, JND will void the initial payment prior to reissuing a payment. In order not to delay further distributions to Authorized Claimants who have timely cashed their checks, JND's outreach program shall end thirty (30) days after the initial void date. Authorized Claimants will be informed that, if they do not cash their Initial Distribution checks within ninety (90) days of the mail date, or they do not cash check reissues within thirty (30) days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited, and the funds will be reallocated to other Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received no later than forty-five (45) days prior to the next planned distribution. Requests for reissued checks in connection with any subsequent distributions (should such distributions occur) will be handled in the same manner.

c. Authorized Claimants who do not cash their Initial Distribution checks within the time allotted or on the conditions set forth above will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available for distribution to other Authorized Claimants in the Second Distribution. Similarly, Authorized Claimants who do not cash their second or subsequent distribution checks, should such distributions occur,

within the time allotted or on the conditions set forth above will irrevocably forfeit any further recovery from the Net Settlement Fund.

d. For all PayPal and Venmo payments where a distribution is attempted utilizing the information provided by the Claimant on their claim form, but the attempted payment was not redeemed by the Claimant, or the payment was returned by the vendor as undeliverable, JND will treat similar to an undeliverable check and perform an advanced address search, an NCOA search, and send the Claimant a payment via check.

e. For valid claims that chose to receive an electronic debit card, the recipient will be sent an email containing a code that can be redeemed for a Virtual Visa disbursement card in the amount of the benefit payment. In instances where the email sent to the recipient is returned undeliverable, the redeemable code will be mailed via postcard to the address provided by the claimant via USPS. For electronic debit cards that are redeemed, the funds do not expire. However, after 18 consecutive months of inactivity, the card will incur an inactivity fee of $0.75 per month. For electronic debit cards that are not redeemed within 12 months, following 3 email reminders sent to the recipient by JND encouraging the recipient to activate and use their Virtual Visa disbursement card, the funds will be returned to the settlement fund.

f. In addition to the abovementioned methods of distribution, JND is performing outreach to Employers and Bulk Filers receiving large payments in order to give them the opportunity to receive Electronic Fund Transfers in lieu of checks.

161. After JND and the Parties have determined that the Initial Distribution is complete and all best efforts have been made to have Claimants accept their awards, JND will conduct a second distribution of the Net Settlement Fund ("Second Distribution"). Any amounts remaining in the Net Settlement Fund after the Initial Distribution, including from the Reserve and the funds allocated for all void stale-dated checks, and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, any escrow fees, and appropriate reserves, will be distributed to all Authorized Claimants in the Initial Distribution (other than Claims Paid in Full) who cashed their distribution checks and who would receive at least $5.01 in the Second Distribution based on their *pro rata* share of the remaining funds. Additional distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter at six-month intervals until Lead Counsel, in consultation with JND, determines that further distribution is not cost-effective.

162. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on April 09, 2026

JENNIFER M. KEOUGH

# EXHIBIT 3

FILED
2026 Apr-24 PM 12:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No.: 2406)** | **Master File No.: 2:13-cv-20000-AMM**<br><br>This document relates to Subscriber Track Cases |

**ORDER APPROVING PLAN OF DISTRIBUTION AND AUTHORIZING DISTRIBUTION OF NET SETTLEMENT FUND**

Before the court is Subscriber Plaintiffs' Motion to Distribute Net Settlement Funds. Doc. 3419. The Motion is supported by a Memorandum in Support, Doc. 3419-1, and the Declaration of Jennifer Keough, the President and Chief Executive Officer of JND Legal Administration, the Claims Administrator, Doc. 3419-2.

JND has reviewed and processed all claims submitted in this Action and has provided recommendations concerning the acceptance and rejection of claims. Doc. 3419-2 ¶¶ 157-159. Subscriber Class Counsel agree with JND's recommendations. Doc. 3419 at 12. The court finds that those recommendations are consistent with the court-approved Plan of Distribution. Doc. 2931 at 86-87. The court also understands that JND's recommendations have the support of Defendants and the court's Special Master.

Having reviewed and considered the Motion, the Memorandum in Support, the Keough Declaration, and the Final Approval Order, Subscriber Plaintiffs' Motion to Distribute Net Settlement Funds, Doc. 3419, is **GRANTED**. It is further **ORDERED** as follows:

1. The recommendations of the Claims Administrator concerning the acceptance of 7,774,992 eligible claims and the rejection of 646,354 ineligible claims are hereby **APPROVED.**
2. The proposed Distribution Plan is hereby **APPROVED**, including as described in the Motion and the Keough Declaration:
    a. The Initial Distribution to Authorized Claimants;
    b. The $5.00 de minimis threshold, below which no payment shall be made;
    c. The $200.00 threshold for claims to be paid in full;
    d. The 10% reserve from the Net Settlement Fund; and
    e. The Second Distribution process.
3. Subscriber Class Counsel and the Claims Administrator are hereby **AUTHORIZED** to distribute the Net Settlement Fund to Authorized Claimants in the manner described in the Motion, Supporting Memorandum, and Keough Declaration.

4. The Claims Administrator, JND, is hereby **DIRECTED** to begin the Initial Distribution **on or about May 11, 2026**.

5. Following the conclusion of the Initial Distribution, Subscriber Class Counsel and JND **SHALL** file a status report with the court.

**DONE** and **ORDERED** this 24th day of April, 2026.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| DON GIBSON, LAUREN CRISS, JOHN MEINERS, and DANIEL UMPA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, et al.,<br><br>Defendants. | ) | Case No. 4:23-cv-00788-SRB |

**AFFIDAVIT OF PROPOSED SPECIAL MASTER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 53(b)(3)(A)**

**STATE OF ALABAMA** )

**COUNTY OF JEFFERSON** )

I, Chris Hellums, being duly sworn, depose and state as follows:

**I. Background and Qualifications**

I am an attorney duly licensed to practice law in the states of Alabama and Colorado. I am and have always been in good standing with each State's Bar. I have been actively practicing for 33 years, with a concentration in complex litigation.

I have been asked by the Honorable Stephen R. Bough to serve as Special Master in the above-captioned matter pursuant to Federal Rule of Civil Procedure 53.

**II. Disclosure Under Rule 53(b)(3)(A)**

Pursuant to Rule 53(b)(3)(A), I am required to disclose any ground for disqualification under 28 U.S.C. § 455.



Case 4:23-cv-00788-SRB Document 1374-1 Filed 08/07/26 Page 75 of 77

I have reviewed the parties, counsel of record, and known witnesses in this matter. Based on that review, I make the following disclosures:

a. **Financial Interests (§ 455(b)(4)):** I do not have any financial interest in the underlying matter, nor do I have any financial interest in a party to the proceeding.

b. **Prior Involvement (§ 455(b)(1)– (3)):**
I have no personal knowledge of underlying evidentiary facts in the above-referenced proceeding. I have not served as a lawyer in the matter in controversy, nor have I been a material witness concerning it, nor have I previously expressed an opinion concerning the merits of the underlying case in controversy.

**III. Additional Disclosures**

2. In the interest of full transparency, I disclose the following additional relationships or circumstances that, while not rising to the level of disqualification, may be relevant to the Court and the parties:

   a. My law firm and I have been involved in cases in which JND served as the claims administrator.

   b. I am possibly a class member in this litigation as I may have had real estate transactions during the relevant class period. To the extent I am a potential class member, I would waive any claim for benefits.

**IV. Conclusion**

3. Other than as disclosed above, I am not aware of any ground for disqualification under 28 U.S.C. § 455 that would preclude my service as Special Master in this matter.

4. I understand my continuing obligation to disclose any ground for disqualification that may arise during the course of my service.

All the above statements are true and correct to the best of my knowledge.

Chris T. Hellums

**STATE OF ALABAMA )**

**JEFFERSON COUNTY )**

Before me, the undersigned Notary Public in and for said county and state, personally appeared Chris T. Hellums, who after being duly sworn by me, deposes and states as follows: My name is Chris T. Hellums. I have read the above and foregoing Affidavit, and the facts and information stated therein are true and correct.

This the 17th day of July, 2026.

Notary Public

My Commission Expires: 10.31.2029

MICHAEL C. BRADLEY
MY COMMISSION EXPIRES
OCTOBER 31, 2029
NOTARY PUBLIC
STATE OF ALABAMA