IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
2                      WESTERN DIVISION

3   SCOTT AND RHONDA BURNETT,          )
    RYAN HENDRICKSON, JEROD BREIT,     )
4   SCOTT TRUPIANO, and JEREMY KEEL,   )
    on behalf of themselves and all    )
5   others similarly situated,         )
                         Plaintiffs,   )Case No.
6            vs.                       )19-CV-00332-SRB
                                       )
7   THE NATIONAL ASSOCIATION OF        )Kansas City, Missouri
    REALTORS, et al.,                  )October 17, 2023
8                        Defendants.   )

9            ............................
          TRANSCRIPT OF JURY TRIAL - VOLUME 1 OF 11
10         BEFORE THE HONORABLE STEPHEN R. BOUGH
            UNITED STATES DISTRICT COURT JUDGE
11

12      Proceedings recorded by electronic stenography
               Transcript produced by computer
13

14                      APPEARANCES

15   For the Plaintiffs:      MR. MICHAEL S. KETCHMARK
                              MR. BENJAMIN H. FADLER
16                            MR. SCOTT A. McCREIGHT
                              Ketchmark & McCreight PC
17                            Two Hallbrook Place
                              11161 Overbrook Road, Suite 210
18                            Leawood, Kansas 66211

19                            MR. BRANDON J.B. BOULWARE
                              Boulware Law LLC
20                            1600 Genessee Street, Suite 416
                              Kansas City, Missouri 64102

21

22

23

24

25
                             1

```
 1                    APPEARANCES
                      (continued)
 2
     For the Defendant        MR. ROBERT D. MacGILL
 3   HomeServices of America:  MR. MATTHEW T. CIULLA
                               MacGill PC
 4                             156 E. Market Street, Suite 1200
                               Indianapolis, Indiana 46204
 5
                               MR. JAY VARON
 6                             Foley & Lardner LLP
                               3000 K Street, NW, Suite 600
 7                             Washington, DC 20007-5109

 8                             MR. JEAN PAUL BRADSHAW, II
                               Lathrop GPM LLP
 9                             2345 Grand Avenue, Suite 2200
                               Kansas City, Missouri 64108
10
     For the Defendant NAR:    MR. ETHAN GLASS
11                             MS. GEORGINA INGLIS
                               MS. SAMANTHA STRAUSS
12                             Cooley LLP
                               1299 Pennsylvania Avenue NW Ste 700
13                             Washington, DC 20004

14                             MS. BEATRIZ MEJIA
                               Cooley LLP
15                             3 Embarcadero Center, 20th Floor
                               San Francisco, California 94111
16
                               MS. SARAH M. TOPOL
17                             Cooley LLP
                               55 Hudson Yards
18                             New York, New York 10001

19   For the Defendant        MR. TIMOTHY RAY
     Keller Williams:          MR. BARACK S. ECHOLS
20                             Holland & Knight
                               150 N. Riverside Plaza, Ste 2700
21                             Chicago, Illinois 60606

22                             MS. ANNA P. HAYES
                               MR. DAVID C. KULLY
23                             Holland & Knight
                               800 17th Street NW
24                             Washington, DC 20006

25
                               2
```

```
1                    APPEARANCES
                     (continued)
2

3                    MS. DINA McKENNEY
                     Holland & Knight
4                    1722 Routh Street, Suite 1500
                     Dallas, Texas 75201
5
                     MR. DAVID R. BUCHANAN
6                    Brown & James, PC-KCMO
                     2345 Grand Blvd., Suite 2100
7                    Kansas City, Missouri 64108

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23            Gayle M. Wambolt, RMR, CRR
            U.S. Court Reporter, Room 7552
24         Charles Evans Whittaker Courthouse
      400 East Ninth Street - Kansas City, MO 64106
25
                          3
```

Case 4:19-cv-00332-SRB    Document 1323    Filed 11/28/23    Page 3 of 192

```
 1                          INDEX
                          JURY TRIAL
 2                      OCTOBER 17, 2023

 3    EVENT                                    PAGE

 4    Proceedings in Courtroom                    5

 5    Instructions Read                          13

 6    Plaintiffs' Opening Statement              13

 7    Defendant NAR Opening Statement            81

 8    Defendant HomeServices Opening Statement  115

 9    Defendant Keller Williams Opening Statement 149

10    Proceedings in Courtroom                  173

11    Gary Keller by Videotaped Deposition      181

12    Gino Blefari by Videotaped Deposition     182

13    Robert Goldberg by Videotaped Deposition  183

14    Proceedings in Courtroom                  184

15

16

17

18

19

20

21

22

23

24

25
                            4
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

TUESDAY, OCTOBER 17, 2023

2    (The following proceedings were had out of the presence of the

3    jury:)

4              THE COURT:  Good morning.  We are outside the

5    presence of the jury.  Thank you for getting in early today.

6    You got my email last night about Juror No. 44.  Of course,

7    I'm horribly frustrated that she couldn't tell us this

8    yesterday.  Sure makes this difficult.

9              So I've got -- I've been thinking about options, as

10   I'm sure each of you have as well.

11             Option one, flogging, kick her off the jury.

12             Option two would be start late on October 19th if

13   she's able to somehow figure out how to get her disabled son

14   to school each morning.  Both of those involve dragging her in

15   here whenever she gets here to kind of explore where she's at,

16   because if she can't get to school -- get the kid to school,

17   then we've got a problem.

18             Mr. Ketchmark?

19             MR. KETCHMARK:  Your Honor, we thought about this a

20   lot yesterday, and we have sympathy for her situation.

21             So what we're able to do and if it's an option for

22   the court, we've trimmed the plaintiffs' case down.  We

23   actually reached I think a tremendous agreement with Keller

24   Williams' counsel that involves us literally taking about an

25   hour and a half out of our case from video that we were going

                                  5

to play. We've narrowed it down to now allow them, without
objection on our part, to play some designations from the
Illinois litigation we had objected to before and will
dramatically narrow it down.

We will still get our case in by Friday even if we
started later. If we started overall at nine o'clock, I
believe that we're not going to -- we wouldn't have an issue.
I'm not suggesting that or trying to rearrange everyone's
schedule, but I believe that certainly would be an option.

You're going to see a very efficient case coming in
from the plaintiff, and so we would have no problem, we
believe, having a start time every day at nine, if that was
necessary because of the childcare issues, but certainly not
have a problem on the date of that doctor's appointment.

What I'm concerned about in the day of COVID,
obviously, is, as I know the court is and everyone else, is
putting ourself in a bad situation out of the gate.

And so -- and I do believe, and I'm not going to
speak for any of the defendants, but based upon conversations
we've had, they've been real forthright about who they intend
to call, and they've reserved the right to change their minds
on that.

But I think the case is narrowing down. I would be
very surprised if it ended up going the full three weeks
anyway. But I know that our case will still be very

6

efficient, and we could accommodate what I've just said to the
court, if that's the path you choose.  Whatever the court
decides, we're going to respect and honor.

        THE COURT:  Mr. Ray, sir?

        MR. RAY:  We would be inclined to start later on the
19th, Your Honor, and allow her time to do what she needs to
do.

        THE COURT:  Glass?

        MR. GLASS:  Agreed, Your Honor.

        THE COURT:  MacGill?

        MR. MacGILL:  Yes, Your Honor.  We would agree to do
so as well.

        THE COURT:  You guys are all just too nice.  There
will be no flogging today.

        MR. KETCHMARK:  Let's not go that far.

        THE COURT:  Anything we need to address this
morning?

        MR. KETCHMARK:  The only thing I would request is
that we were talking about some potential modifications to one
of those instructions.  I don't know if the court has the
instructions that you plan to read.  We'd like to take
thorougher eyes on them before that happens.

        THE COURT:  Before 9?  One of these before -- 1
through 9?

        MR. KETCHMARK:  Right.

7

```
 1              THE COURT:  Which one?

 2              MR. KETCHMARK:  Is this the same ones that were

 3   handed to us yesterday?

 4              THE COURT:  That's the only ones I've got.

 5              MR. KETCHMARK:  It's the one I made the record of.

 6   Let me see.  It wasn't -- I just wanted to make certain, and I

 7   guess I wasn't paying attention.  Mr. McCreight was.  But

 8   Instruction 3 was the one that was read yesterday; correct?

 9              THE COURT:  I have not read 3 yet.

10              MR. KETCHMARK:  Right.  So Instruction 3 where it

11   states "Now defendants" --

12              THE COURT:  Counsel, could you approach so we can

13   all look at this piece of paper together.

14              MR. KETCHMARK:  This is the one I was making the

15   record of yesterday where we had defendants and includes

16   Anywhere and RE/MAX as defendants.  We were suggesting that

17   they be moved and placed down here.

18              Plaintiffs claim that defendants violated an

19   antitrust act by entering into a conspiracy with -- along

20   with, and then we're saying RE/MAX and Anywhere because

21   they're not defendants.

22              MR. GLASS:  But I believe the court just said he was

23   going to strike it.

24              THE COURT:  What I was going to do is strike this

25   and stick with the others.
                              8
```

```
 1            MR. KETCHMARK:  I understood.  I just hadn't seen
 2   that had been stricken yet.  Now it is going to be --
 3            THE COURT:  I'm not going to print off a copy every
 4   day.
 5            MR. KETCHMARK:  I apologize, and I do understand
 6   that.
 7            MR. RAY:  I do have one issue to raise, Your Honor.
 8            THE COURT:  Which page?
 9            MR. RAY:  8.
10            THE COURT:  Instruction No. 8 or page 8?
11            MR. RAY:  Page 8.  "It will be your duty."
12            THE COURT:  Which one is it?
13            MR. RAY:  Page -- I'm sorry.  Instruction 3, it will
14   be -- starting with "it will be your duty."  And it will be
15   your duty to decide from the evidence whether the plaintiffs
16   are entitled to a verdict against any of the defendants.
17            Two, it will be your duty to decide from the
18   evidence whether the plaintiffs are entitled to a verdict
19   against defendants.
20            THE COURT:  You want it to say "any"?
21            MR. RAY:  I want it to say whether the plaintiffs
22   are entitled to a verdict against defendants -- against any of
23   the defendants.
24            THE COURT:  It says "the defendants."
25            MR. RAY:  "Any of the defendants," correct.
```

9

```
 1              MR. KETCHMARK:  We're fine with that.

 2              MR. RAY:  Thank you.

 3              MR. MacGILL:  So one quick administrative matter.

 4    Mr. Ketchmark has agreed for us to sit at his table during

 5    opening.  Is that okay?

 6              THE COURT:  Yes.

 7              MR. GLASS:  Mr. Ketchmark couldn't find a larger TV.

 8              THE COURT:  Really?

 9              MR. KETCHMARK:  It's actually not my TV.  It's the

10    court's.

11              THE COURT:  You guys are welcome to move any and all

12    of your chairs to wherever you want.

13              MR. KETCHMARK:  We actually agreed to give them the

14    table.  We know they need to move things, and we're going to

15    vacate our table for opening.

16              THE COURT:  Okay.  Anything from any of the

17    defendants this morning?

18              MR. MacGILL:  None from HomeServices, Your Honor.

19              MR. GLASS:  No, thank you, Your Honor.

20              THE COURT:  Okay.  She's going to keep -- Sara is

21    going to keep checking on whenever she gets here, No. 44, and

22    we'll bring her in and figure out what accommodations we can

23    potentially reach to make it happen.

24                   (A recess was taken.)

25                   (The following proceedings were had out of the
                                   10
```

```
1    presence of the jury:)

2              MR. RAY:  Judge, could we approach?

3              THE COURT:  Yes.

4              (Counsel approached the bench and the following

5    proceedings were had:)

6              MR. RAY:  I noticed that Mr. Ketchmark mentioned --

7    I had just noticed that Mr. Ketchmark had mentioned that there

8    were a bunch of agents here supporting him.  I just don't want

9    that said in front of the jury.

10             MR. KETCHMARK:  I'm not going to make any reference

11   to any agents in the audience supporting us.

12             THE COURT:  Don't make any reference to agents.

13   Thank you.

14         (The proceedings returned to open court.)

15             THE COURT:  Good morning.  You've got a postpartum

16   appointment you need to make Thursday.  We can make that

17   accommodation.  We can start a little bit later, if that helps

18   get your son to school.  Will that be able to keep you on the

19   jury?

20             VENIREMAN 44:  So my son goes to a special needs

21   school.  He goes in at 12 and then -- yeah, because it's a

22   special needs school; so they only go a half day.  That's

23   Tuesdays and Thursdays.

24             Someone was, like, you should have mentioned that to

25   the judge because -- so he's visually impaired and has a

                              11
```

```
 1   tracheostomy and everything.  I'm his caregiver; so it's just
 2   rough.  But I didn't mention it because it's just my life, and
 3   so I was, like, it will be fine.
 4            THE COURT:  And do you think you can -- are there
 5   people who can help get him there, or if we started at 8:30
 6   and took an hour and a half lunch?  You said you live in
 7   Kansas City.  Would that --
 8            VENIREMAN 44:  Yeah.  I could --
 9            THE COURT:  How about this:  Let's address this
10   again at lunch today.  You think about -- if we keep starting
11   at 8:30 and give you an hour and a half lunch on Tuesdays and
12   Thursdays, or you start dreaming about the possibility.  I'm
13   dreaming about keeping you on the jury.
14            VENIREMAN 44:  Thank you.  I appreciate it.
15            THE COURT:  You're an important part of this.  So
16   you help me dream about what would be easiest, and we'll do
17   our absolute best to make that happen.
18            VENIREMAN 44:  Then for Thursday we just shift the
19   schedule possibly too?
20            THE COURT:  We would shift the schedule on Thursday
21   to -- so you can go to that appointment, come in afterwards.
22            VENIREMAN 44:  Okay.  We'll talk at lunch.
23            THE COURT:  Thank you.
24        (The proceedings returned to open court.)
25            (The following proceedings were had in the presence
                                  12
```

of the jury:)

THE COURT: Good morning. Welcome back. We're going to get started right out the gate. I'm going to read you some jury instructions that will help you with your process here. Then we're going to break into openings from both sides. Because it's a long trial, the openings are going to be a little bit longer.

So if anybody needs a break during the middle of Mr. Ketchmark's opening, all you've got to do is look at me and wave, and we'll take an immediate break so that we don't push anybody too hard.

(Instructions read.)

THE COURT: Mr. Ketchmark.

MR. KETCHMARK: May it please the court.

THE COURT: Please proceed.

MR. KETCHMARK: Your Honor, we agreed, as a courtesy to defense counsel so they can see the jury, to vacate our table and let the attorneys sit here during our opening statement.

May it please the court?

THE COURT: Please proceed.

MR. KETCHMARK: At the heart of this case lies the laws in our country that are designed to protect people when they go to sell one of their single most valuable assets for many of us. Our homes.

13

```
 1              For those of us who are lucky enough to own an home,
 2      it means something.  It's a place of security, a place of
 3      safety, a place to build value, not just for the homeowners
 4      but for the future generations of their families.
 5              What we will prove to you and the evidence will show
 6      during the course of this trial is that corporate real estate
 7      defendants joined together with the National Association of
 8      Realtors in a conspiracy to follow and enforce a rule that had
 9      the purpose and effect of raising, inflating, or stabilizing
10      the prices for brokers' fees when you go to sell your house.
11              We will prove to you and the evidence will show that
12      that's unfair.  We will ask that it be stopped and they be
13      held responsible for that and we return the housing market to
14      fair competition.
15              The National Association of Realtors is the nation's
16      largest trade association.  There's over 1.5 million members
17      of that association.  We're going to prove to you and the
18      evidence will show at the core of this case is a rule that's
19      been in place at the National Association of Realtors for a
20      long time and that the defendants, the corporate real estate
21      defendants, joined together to follow and enforce that rule.
22              Keller Williams -- and we talked about this during
23      voir dire, Keller Williams is the corporation that sits at the
24      top of the local agents who are described as independent
25      contractors, the men and women who sell, I believe, they said
```
14

1    4,500 of them throughout the state, whatever the number was.

       2           Those people are not -- local agents are not

       3    defendants in this case.  We are bringing this case against

       4    the National Association of Realtors and the corporation that

       5    we will prove to you is following and enforcing this rule and

       6    forcing that rule down on the front lines across the state of

       7    Missouri.

       8           HomeServices, one of the other largest corporate

       9    real estate companies in the United States, they're a

      10    defendant.  We will prove that they have also joined together

      11    with Keller Williams to follow and enforce this rule from the

      12    National Association of Realtors.

      13           During the trial, you're going to hear evidence

      14    about two other companies, HSF Affiliates and BHH Affiliates.

      15    What those are referred to is subsidiary corporations.

      16           You have a corporation that's a parent that's at the

      17    top.  There's nothing wrong with this.  There's nothing --

      18    there's no conspiracy, or we're not alleging a conspiracy

      19    amongst the parent corporation and the subsidiaries.  The

      20    parent corporations can set up subsidiaries.  They're allowed

      21    to do that.  Those are to be separate legal entities.

      22           But what we will prove to you during this trial and

      23    what the evidence will show is that they acted, as it relates

      24    to this rule, as a single entity.  We will prove to you and

      25    we'll show that they have common officers and a common vision

                                        15

1   and goal to make sure this rule that you're going to learn

 2   about today and during this trial, that it's followed and

 3   enforced at all levels and that it is then put down to the

 4   street level and that these local agents are the ones that

 5   carry that out and the impact that has on homeowners when they

 6   go to sell their house.

 7           Two other corporate defendants been involved in all

 8   aspects of this case, as the judge said.  Every deposition

 9   that you're going to see, the sworn testimony -- they had

10   lawyers -- that they participated in it.  Anywhere, you're

11   going to learn more about that corporation, also a member of

12   this conspiracy that we're alleging; that they joined with

13   Keller Williams and HomeServices and the subsidiaries to

14   follow and enforce that rule.

15           I am not only standing here on behalf of the people

16   who are homeowners who sold houses through Keller Williams and

17   through HomeServices and the subsidiaries but also on behalf

18   of the homeowners who sold under Anywhere.

19           As part of this trial, you're going to be able to

20   hear all of the evidence that was collected about Anywhere's

21   participation in the conspiracy and how they're a part of it

22   with these two other corporate defendants and with the

23   National Association of Realtors.

24           The same with RE/MAX.  You're going to see the sworn

25   testimony that was collected.  Every single time that sworn

                                16

1  testimony was there, the other corporate defendants were

2  present at those depositions.  Their lawyers were there.  They

3  had an opportunity to ask any questions they wanted to ask,

4  and that testimony that's shown to you is the testimony that

5  all parties agree is important for you to understand in those

6  witnesses.

7         You know, at the core of this case is what we talked

8  about a little bit yesterday, the Sherman Antitrust Act.  It's

9  a federal act.  It's been around for a hundred years.  It was

10  passed at a time when corporations had a tremendous amount of

11  power in our country, and they still do in a lot of ways.

12         At the core of this law -- and the court's going to

13  instruct you on the law.  What I'm saying now is not the law.

14  The court's told you that.

15         But to give you some context on this, it's a law

16  that talks about what corporations cannot do when they get

17  together and competitors get together, even at trade

18  associations.  And, look, you know who knows this?  The

19  National Association of Realtors.  They know this.  They

20  actually put out training for these corporate defendants and

21  their officers and all their different folks.

22         It's called -- this is from the National Association

23  of Realtors.  It's called "Navigating Legal Risks," and it's

24  created by their legal team.  In fact, Ms. Johnson is the

25  general counsel, the top lawyer at the National Association of

                                17

```
 1   Realtors.  They introduced her -- their attorney introduced
 2   her to you.  She's here in the courtroom today.  Her team put
 3   this together.
 4              It was developed by Mr. Goldberg, who's the chief
 5   executive officer now of the National Association of Realtors,
 6   to tell folks like the defendants what the rules are that they
 7   have to follow in order to comply with this federal law in the
 8   United States of America.
 9              And when you look at this -- and they all got it.
10   You're going to hear the evidence in this case.  They know
11   this.  It's available actually on the internet.  In fact, it
12   struck me for the first time, when I was here listening to the
13   instructions, a number of references to the internet in your
14   jury instructions.  You're going to hear how it's
15   revolutionized a lot of areas of our lives, including jury
16   duty.
17              But you're going to see and we're going to show you
18   how they used this rule to conspire against homeowners.  What
19   does this policy show?  This is their policy.  This isn't from
20   me.  This is evidence we found in this case.
21              They say in their written policy about the Sherman
22   Antitrust Act, they acknowledged trade association activities
23   are common venues for hatching unlawful conspiracies, since by
24   their very nature they involve collective action by
25   competitors who are members of the organization.
                                  18
```

1        That is coming from the National Association of

2  Realtors, from their legal team, from Ms. Katie Johnson and

3  her team of lawyers who work for them, who is presently here

4  in the courtroom.

5        And who are these competitors who are a part of this

6  that they say it's a common venue for hatching unlawful

7  conspiracies?

8        It's HomeServices, the CEO, you're going to hear

9  testimony from today; Keller Williams, the chairman, Gary

10  Keller; RE/MAX's chief executive officer we're going to have

11  testimony from; and Anywhere's chief executive officer.

12        These are the competitors who have made a decision

13  to become -- to have these rules from the National Association

14  of Realtors enforced within their companies to follow and

15  enforce it across the board.

16        And what do they say in their policies about this

17  federal law?  Unlawful per se of restraints.  They say

18  conspiracy to fix prices such as real estate commissions or to

19  fix other terms of the client-broker relationship, that is a

20  conspiracy.  That's unlawful under the federal Sherman

21  Antitrust Act.

22        At the end of this case when you receive the

23  instructions from the court, you'll be able to apply that law,

24  but they know that at the highest corporate levels, these

25  defendants.

19

```
 1            They said fixing commission splits.  We're going to

 2   learn a lot in this case about a seller's agent or broker

 3   who's representing the home seller and a buyer's agent or

 4   broker who's representing the buyer.  They're saying here in

 5   their own written policies, under the law -- you're going to

 6   see the law later -- that, in particular, listing brokers may

 7   not agree on a commission split.

 8            So you're listing the home as the seller, you cannot

 9   agree on a commission split for the buyer's side.  Even if

10   they produce a ready, willing, and able buyer, you can't agree

11   upon the split because it's illegal.

12            Rhonda Burnett, one of our class representatives

13   with her husband Scott and their two boys and their

14   daughter-in-law and grandchild.  When their son was going to

15   college here in Kansas City, Rhonda and Scott helped this

16   family buy a house at 36th and Holmes.

17            And when he was done and ready to move and the

18   Burnetts were going to sell the house that they had invested

19   in and put their money in for him and his family, they went to

20   sell it.

21            You're going to learn about the connection between

22   ReeceNichols.  It falls under the -- these folks who are part

23   of the HomeServices umbrella.  They had an agent there.  It

24   was a seller's agent representing them selling that house.

25   And the buyer came in from St. Louis represented by RE/MAX.
```
                                   20

1    When they went to sell the house and they got the

2    proceeds from the house, they get something called a

3    settlement statement that says, as a seller of the home, it's

4    what you're getting to see where your proceeds are, where the

5    money from the sale of your house goes.  This will be in

6    evidence in this case.

7    And it shows that the Burnetts -- that Rhonda

8    Burnett and her husband, they were charged $15,298 in

9    commissions.  The $298 is a fee that HomeServices taxed on top

10   of the other commission.  And it shows who they paid.  Where

11   did the money come from?  Where did that $15,298 come from?

12   We don't have to guess.  The settlement statement

13   for the Burnetts as well as the other class members and all of

14   the folks we represent, it came from the seller's funds.  They

15   paid that commission.  They're the ones who paid for that

16   broker's commission.

17   Remember, the Burnett family was represented as a

18   seller of the home by the HomeServices person, by the

19   ReeceNichols.  So it shows right here that they paid

20   ReeceNichols, which makes sense.  You should pay the person

21   who's listing your home.

22   But the settlement statement shows what about the

23   buyer's agent, the person who's representing the buyer, the

24   person who comes in -- and their job is to represent the

25   buyer.  Nothing wrong with that.  Their job is to say your

                                    21

```
 1    house is -- you're charging too much money.  You need a new

 2    air conditioner.  Your roof's bad.  You got these different

 3    problems.  Trying to represent the buyer, get the lower price.

 4            Well, what does the settlement statement show there?

 5    They were paid 3 percent of the sales price, because this is

 6    3-percent profit.  They were paid that.

 7            And where did that come from?  Oh, the Burnetts paid

 8    that.  It came from them.  They're the ones who paid it.

 9            So you heard me.  As the seller of the home, they

10    not only paid their agent, but they had to pay the buyer's

11    agent.  And we're going to show you and you're going to learn

12    this, because of this rule that's been put in place at the

13    National Association of Realtors that these corporate

14    defendants are now following and enforcing, if you want to

15    sell your house, using the MLS and the internet -- we're going

16    to learn more about that -- you have to follow that and it's

17    not right.

18            So what happened in 2019, there's starting to be

19    some attention to this issue being raised, and Rhonda and

20    Scott Burnett kind of read about this in "The Kansas City

21    Star," and they reached out to Mr. Boulware, who is over

22    there.  He's with another firm here in town.  He knows our

23    firm looks into stuff like this and class actions like this

24    where we think there's something going on that shouldn't be.

25            So he sent them over to us.  We started doing an
```

investigation, and we found out about this rule. I started

learning more about this rule from the National Association of

Realtors that they're following and enforcing. Not just in

Kansas City for the Burnetts, but it's across the state.

And we're able to go back under the statute of

limitations four years back from the time when we first get

involved in this, and we collect all of the data for all of

the home sales, not just across the state of Missouri but in

these border towns that are affected by the Missouri rule, and

they're dealing with these agents who are being forced to

follow these rules here.

And we see that these corporate defendants, Keller

Williams and HomeServices and Anywhere, that are part of the

conspiracy we're alleging, and RE/MAX, that they're all

following and enforcing this rule.

So we take the data forward, and we have to stop at

a certain point of time because, look, we can't keep

collecting this home data. It's a massive amount.

We're going to have an economist who's going to come

in and explain that. Massive amount of data, if you think

about it. We find there's 265,697 homeowners who we saw who

had this rule forced them as the seller of the home to pay the

buyer's agent.

So what we did was we -- because of the statute of

limitations, this is the only time period that we're allowed

23

1    to talk about.  I can't go back in time and say, hey, this

2    rule's been around since the 1970s or 1996.  They'll probably

3    explain to you when it came in place.  We're not allowed to go

4    back and ask for damages for all those people and all those

5    homeowners.  We're limited to this time period.

6           Because there's a cutoff, it doesn't mean it's

7    stopped now.  It hasn't.  That rule is still in place.  It's

8    still impacting people today, but we had to stop the window at

9    a certain point.  So what we did is we said, look, it's not

10   just the Burnetts, it's all of these people.

11          So I have now been appointed.  We filed something,

12   in essence, for me to be appointed to represent this class of

13   people, to be a voice for all of these homeowners because it's

14   extremely hard for a single homeowner.  You're going to hear,

15   on average, it's about $7,000 it costs them to undertake the

16   massive undertaking that's been involved to bring this case

17   forward.

18          But now I am proud to stand here on behalf of all of

19   these homeowners, and when you talk about the number of

20   spouses or family members or joint people who own the homes,

21   it's nearly half a million people.

22          And there are some that's called a class

23   representative.  What is that?  These are people to give a

24   face to what happens.  So these are people who can come in and

25   testify what happens.  The Burnetts in Kansas City.  You're

                                    24

going to hear how it happened to everyone in Columbia, Frances

Harvey and her daughters.

Hollee Ellis, from down in the Springfield area, is

one of the class representatives. Her mom actually used to be

a member of the National Association of Realtors. She worked

in real estate. Hollee is going to come here and tell you

this isn't fair. She's a teacher down there -- used to be a

teacher down there, and she's come to come in and testify.

All of these people are going to testify.

Jerod Breit, who was a police officer over in

St. Louis before he ended up leaving the police force after he

had seen one -- way too many horrible fatalities from drunk

drivers. He actually left the police force and now works for

the Mothers Against Drunk Drivers. He's one of the class

representatives.

Jeremy Keel, the thing that's interesting about

Mr. Keel, he's here in Kansas City. He's a lawyer. You know,

you heard during voir dire that there's some attorneys. He

said, I didn't even understand this when this was happening.

He's one of the class representatives. These are people just

to give voice for the others.

So what we did, we collected all this data, massive

amount of data. I mean, there are economists who are coming

up here and using words like "gigabyte." I'm going to be

honest with them, I don't really understand what that means.

25

```
 1    I just know it's a lot.  He collects that.  He's had a team of
 2    people pouring over all of the sales because they -- it comes
 3    on the Excel sheet.  When I saw it, it was, like, probably
 4    reaches up to the ceiling.  It was massive.
 5             And they say we are going to look at that data, and
 6    we're going to see what percentage, what commission did those
 7    sellers of those homes -- as a seller of the home, what did
 8    they pay the buyers' agents?  Because our position is they've
 9    been using that rule to stabilize prices or to try to get it
10    where it's right around that 2 and a half to 3 percent.
11             And that's the purpose behind it, because we -- our
12    evidence we're going to show would be, in a free marketplace,
13    you would expect there to be differences in prices, right?  So
14    we crunched all the data.  We didn't do it.  We had our
15    economist do it, really bright man.  He's a professor down at
16    Texas A&M.  He's got a team of people who did it.
17             So this is for Kansas City.  There's different areas
18    that this supplies.  In Kansas City, during this time period
19    from April 29th, 2015, to June 30th, 2022, what did he find?
20    Shocking evidence, we will prove, of what's happened.  Over --
21    not over -- 103,562 homes where they nailed them for 3
22    percent, or where the sellers all paid that 3 percent
23    commission to the buyer's agent.  Sometimes it comes down to 2
24    and a half.  They're stabilizing it in between those two.  98
25    percent of the time between 2 and a half and 3 percent.
```

26

In order to understand this more, we're going to
really move and talk now a little bit about being a homeowner
and what that means and how this rule applies.  You know, you
first start off, you're a homeowner.  You own the house.  But
at some point in time, you turn to a home seller.  You want to
sell your home.

                The reason the money is there, it represents what
bankers or accounts would call equity.  What that is -- that's
the mortgage payments you made on a house.  That's the
sacrifice you made in -- to spend the money to improve it, to
have a new roof or things that you need in the home.

                In our country, people use seller's agents.  It's a
very common thing.  That's common around the world.  Someone
to help you list your home.

                And how is that done?  It's done through something
called the multiple listing service, the MLS.  It's a book.
In fact, here's a copy of an old one.  I actually had to go on
eBay to get this.

                And I remember.  I remember it like it was
yesterday, when my wife and I went to sell our first home in
Lee's Summit before we moved to the current house.  And we'd
been there for almost ten years.  And she's here right now.  I
remember it like it was yesterday.

                That book comes.  We opened it, and I looked at that
picture of my house.  I thought, wow, that's our house.

                                        27

That's cool.  And they listed how much it was listed for.  It had gone up from what we first bought it for, $75,000, about 125.  I thought, wow, that's the value that it's increased. All the effort we did in taking care of the home -- she did taking care of the home -- was there.  It was a cool moment. That's how it used to be.

What is an MLS?  A multiple listing service is a catalog of agent and broker-listed homes.  It's a catalog.  It literally use to be like this.

Only real estate agents have access to the MLS. They used to only have access to these books, and now you're going to see when it's online, they've worked really hard to keep it that way because it's to enforce their conspiracy.

For sale by owners couldn't be in these old books. You want to sell your house by owner, couldn't be in these books.  Can't be on their MLSs now.  You're going to hear about that.  Supports their conspiracy.  Supports that rule that stabilizes prices.

The books, some more pictures of older books.  They used to put stamps on them.  Confidential, NAR members only.

They would put on here, fine, use of this by nonmembers, people who weren't members of this association, NAR, can result in suspension.  That's what they would tell the buyers' agents who would receive those books.

Don't let fall into unauthorized hands, you see,

28

because historically they've been using this system to force this commission payment.  These books then would have gone to buyers' agents.

I remember when we bought a house.  We sat down at a Perkins in Lee's Summit, and we put little flags on the houses we thought we could afford.  We'd look at the square footage and all the information.  We'd go around to open houses. That's how it used to work.  The buyer's agent would meet with the buyer and they would show that.

The person sells their house, they pay the seller's agent.  You have the buyer, person working for the buyer.  You would expect in a fair market, the buyer would be paying their own commission.

What you're going to learn is that half the time these corporate defendants represent sellers of homes.  Their agents represent sellers.  Half the time they're representing buyers.

So what they've learned over time with this rule is they use this rule to stabilize prices so they make sure they're making their cut, their 6-percent cut.  It's classic price fixing is what we will prove to you and the evidence will show.

And they do it to say the seller can pay your commission, but they say you also have to pay -- you have to follow and enforce this rule to pay the buyer's agent.  They
29

1    actually call it a "cooperative compensation rule."

        2    Competitors, they've actually named it "cooperative

        3    compensation."

        4            And they all do that, and we will prove that.  They

        5    follow and enforce that rule with the purpose and effect of

        6    stabilizing prices.

        7            Something came along that you think might disrupt

        8    this, actually use words like "disrupt," the internet.  I

        9    mean, the internet has changed almost -- a lot of things.

       10            I remember when I first started practicing law in

       11    1990, if I needed to travel, we would use a travel agent.

       12    They actually had one in the basement of the -- by where I

       13    worked.  You'd go in and you'd pay them.  Many of you here who

       14    are younger, you certainly don't remember that.  They would

       15    charge you 10 percent of the cost of the flight or 10 percent

       16    of the cost of the hotel for the services they provided

       17    because you didn't have access to do that.

       18            I remember as a kid growing up, my parents --

       19    they're here.  They would remember this.  When I was a kid, we

       20    had White Pages, and we'd look up phone numbers.  And if it

       21    wasn't in there, I'd call 411, information.  Then the bill

       22    would come.  It was a quarter every time I called it.  He'd

       23    go, I can't believe you called information four times last

       24    month.  You don't understand the value of a dollar.

       25            And good lessons were taught, but the point is all

                                           30

```
 1    of that has changed, hasn't it?  And you know who knows that
 2    more than anybody?  The defendants.  The National Association
 3    of Realtors, from their website, they have real estate in a
 4    digital age.  This is their website.  They say on their
 5    website, While the expertise of realtors remains vital to the
 6    home buying and selling process, the internet serves as a tool
 7    for all generations of home buyers; 97 percent of all home
 8    buyers use the internet in their home search.
 9              So if you're a buyer, 97 percent, all generations
10    regardless of their age.
11              They say 76 percent of home buyers used a mobile or
12    tablet search device.  Use their thumb to search.  And the
13    younger people, twice as likely to use a mobile device.
14              They go on and say -- this is from their data.  This
15    isn't an expert we put in.  This is from their website, their
16    data, the National Association of Realtors.  They say
17    72 percent of buyers found their home they bought without
18    using a real estate agent.  72 percent.  They're not out there
19    sitting at a Perkins going through the books.  No.  They're
20    going on their mobile phones and looking at videos and doing
21    things that people do.
22              And then they're backing into the agent.  The
23    internet has made it much easier for people to shop for all
24    types of things, including homes.  And they know that.  And
25    they were worried about that.
```
31

1    We will prove that the corporate defendants and the
2    National Association of Realtors and RE/MAX and Anywhere, they
3    were worried about that.  You see, there was a great concern
4    when the internet first started coming around that it was
5    going to wipe this out, these books out.
6          Before this, you could put it in these books.  We'll
7    find you.  Don't let other people use it.  Falls into the
8    wrong hands, you'll be kicked out.  They were worried these
9    buyers would start doing that and they wouldn't be there using
10   the buyer's process and paying that commission.
11         So they pushed the buyers aside and came up with
12   this rule that had been in place for a long time, but they
13   thought, man, this internet, we can really supercharge it if
14   we control the data.  And you're going to learn how they did
15   that through this rule, this cooperative compensation rule.
16         Now, it had been around before.  And what did it
17   say?  In filing property with the multiple listing service,
18   participants make blanket offers of compensation to other MLS
19   participants and shall, therefore, specify on each listing
20   filed with the service the compensation being offered to the
21   listing broker.
22         If you're listing your house as a seller, you have
23   to -- before you even know who the buyer is, they have an
24   agent, or what their agent did, you have to list what you're
25   going to pay them.  Who in our country says you're going to

                              32

```
 1   pay for something sight unseen?

 2            Well, the defendants, the National Association of

 3   Realtors.  That's not fair competition, but that's what

 4   they're doing.  They do it through this multiple listing

 5   service.  They have that rule in place.

 6            And what do they know?  This is part of their manual

 7   from the National Association of Realtors.  They know that

 8   price fixing, antitrust problems frequently arise out of

 9   agreements or conspiracies amongst competitors.

10            And they say the biggest price-fixing issue out

11   there is brokers must not agree on commission rates and must

12   take great care to even imply that they're discussing fees.

13   They're saying, look, when you have brokers together, you

14   can't even imply that you're talking about commissions because

15   one of the positions they're taking in this case, like these

16   corporations like Keller Williams and HomeServices, they're

17   saying all these agents down here on the front lines in our

18   streets, that they're independent contractors and that they

19   actually -- they say they compete with each other.

20            So they say a local Keller Williams' place can

21   compete with another local Keller Williams.  And they're

22   saying here when these folks get together, you can't talk

23   about the commissions.  You can't talk about commissions being

24   at 6 percent.  You can't even apply.

25            From another manual from the National Association of
```

```
 1    Realtors, an antitrust compliance guide for realtors seems
 2    pretty important to us; right?  When I found that, I thought,
 3    well, let's see what that says.  I asked Mr. Goldberg, the CEO
 4    of the National Association of Realtors, about it.  Listen to
 5    what he said.
 6                (Video played.)
 7                He told me he didn't know.  I think what he didn't
 8    know is I had his book, because they write there that it's
 9    unique to the real estate industry, this dual tradition.  It
10    doesn't exist in other parts of the world.
11                We will prove during this trial that they've all
12    followed and enforced this rule and that there's a conspiracy
13    to follow and enforce that rule that has the purpose or effect
14    of inflating or stabilizing commission rates.
15                What does it mean to inflate, raise, or stabilize?
16    What does stabilizing commission rates mean?  Let's think
17    about that.
18                If there's a house in 1990 with a 6-percent
19    commission that's paid on it, it's $6,000 in commission, but
20    as the housing prices have skyrocketed in our country, if that
21    percentage stays the same, what happens to the math?  The
22    housing price skyrockets, goes up to $175,000.  Now that 6
23    percent becomes $10,500.
24                Ten years later, that 6 percent on a quarter of a
25    million dollar house, you're paying $15,000 in commission as
```

34

1   the seller of the home.  Ten years later, it goes to $325,000,

2   you're paying $19,500.

3           You see how stabilizing that commission between 5

4   and a half, 6 percent can involve tripling of the amount of

5   money they're making.  The internet has made things much

6   easier.  It hasn't brought the benefits to homeowners, the

7   commissions.

8           And then they split it 50/50.  It's a tremendous

9   amount of money.  You know, you don't have to -- that's not

10  just a slide I prepared.  Actually, I came up with that from

11  Keller Williams.  This is part of their training material.

12  You're going to hear about this thing called a Family Reunion

13  that they have where they pull all these agents together.

14          They say the value of a first-time home buyer,

15  3-percent commission that the home seller is going to pay, and

16  they have a slide that they put on all these presentations for

17  these thousands of agents, including competitors who get

18  together.  They say, look, that 3-percent commission, it goes

19  from $6,750 to $16,000.  If you stabilize it, tremendous

20  amount of money.

21          Gary Keller, the chairman and founder of Keller

22  Williams, 2022, he was named as the most powerful person in

23  real estate in the world.  Definitely in the United States.

24  Maybe not the -- I'll get to the bottom of that when he's

25  here.  But the most powerful person in real estate, according

                              35

1  to this publication.  He writes books that are out there not

2  just for his company but for the competitors, other defendants

3  in this case.

4          In this book he says, What makes real estate sales

5  so remarkable is how amazingly cooperative it can be.  Yes,

6  we're competitors, but we see the value in working together.

7  During this trial, we'll show you they know the financial

8  value of doing that.

9          Our trade associations, local boards, and multiple

10  listing services have evolved into a system of cooperative

11  competition.  Call it co-opetition.

12          That's his words.  That's not competition.  That's

13  not the fair marketplace.  And these are the folks, the other

14  conspirators who are part of that.

15          And remember under the Sherman Antitrust Act, you're

16  going to hear, and they know from their own training, they

17  must take great care to avoid or even implying talking about

18  commissions amongst each other.

19          In fact, Keller Williams has a compliance manual

20  that is supposed to govern the conduct of their officers and

21  their brokers and their agents and all their folks.  The

22  written compliance manual for Keller Williams, they call it

23  the local offices of Keller Williams, local broker, they call

24  it a market center, and the sales agents who work for them

25  have market centers.  So you might have multiple market

centers, multiple franchises in different cities, like
Springfield or Kansas City.

They say market centers shall not be present --
associates, salespeople associated with their local places
shall not be present at any discussion of commission rates
charged by any other real estate brokers in the community or
within any community affiliated with any other real estate
brokers, including Keller Williams' brokerages.  They say we
cannot talk about commissions because that's what the law
says.

They have this thing called a Family Reunion every
year.  They get all their agents together, and they invite
competitors there.  They -- you're going to see the testimony.
On average, they have about 500 people from competitors, from
companies like HomeServices and RE/MAX and Anywhere, that
gather together to hear Gary Keller talk.

This is the -- the internet's kind of catching up to
him.  This is -- you can see this on YouTube.  This is one of
their family reunions, and here he's up on the stage.

I have a video that we have of him at one of the
Family Reunions.  I showed it to him during his deposition.
This is his sworn deposition.  All the defense lawyers were
there.

Let's listen to what he says.

(Video played.)

37

What else do they do at those Family Reunions?  They clearly know they talk about commissions.  He just knows they can't.  So he's hoping that you're going to believe that's what he was doing.

They have slides up here.  It's from 2008.  It says "Family Reunion."  This is something they produced in this case.  We said, Give us your documents from your Family Reunions.  They gave us these PowerPoint slides.

Family Reunion.  If a seller says -- a homeowner says to their agent, I don't want to pay 6 percent.  Agent:  Okay.  How about 5.99 percent?

Draw a line in the sand.  They actually have a line in the sand.  Let's listen.

(Video played.)

He said, We're not talking about commissions because, if we were, we'd be talking about sellers and buyers.

I can't make this up.  Literally above the word "commissions" is "sellers and buyers."  We're not talking about commissions.

I took that deposition after this lawsuit was filed.  I thought, They're going to stop; right?  They can't do this.  They know they can't do this.  We've now filed this lawsuit.  They know the day is coming when they have accountability, the day we're here at, 2022.  After his deposition, after all these lawyers are there, he gets on the stage again and does

38

```
 1   it again.

 2            The average commission for sellers, average for the

 3   buyers, and, look, don't get the idea that there's some big,

 4   rocky, big -- during the period of this lawsuit, 2015 to 2022,

 5   and this is -- they stretch it from 2 and a half to 3 to kind

 6   of make it look like, man, that's stability, and they're

 7   telling all those brokers who were there this is what you do.

 8            They did it again this year, 2013 [sic].  I about

 9   fell out of my chair when I saw this.  He's on the stage, does

10   it again.

11            What about your compliance manual, I thought, that I

12   showed him in his deposition that governs, that says you are

13   not to do this, that your people are to leave the room if this

14   happens?  They shall not be present when that happens.

15            I take the deposition of Darrell King, their chief

16   compliance officer, responsible for getting that manual in the

17   hands of the franchises of their local market centers so

18   people who are there know that that's not allowed.

19            Said, How does this happen?  I asked him about it.

20   This is his sworn testimony.  You're going to hear it in this

21   case.  Let's listen.

22            (Video played.)

23            It's been brazen.  We will prove to you and the

24   evidence will show they continued to do it.  We're going to

25   ask that it stops.  Because it has been enforced.  They
                                  39
```

haven't done it, and the people who have been injured by that

are homeowners.

Mr. Keller -- there's something called a Mega Camp.

It's also where -- they have a lot of these, not just Family

Reunion, Mega Camp.  They bring all these folks together.

2011 Mega Camp, he's on the stage and he gets an email from an

agent who's there.  He says, I'm writing in regard to

something that was said on the stage Wednesday.  One of the

agents said they only charge -- they charge 4 and a half

percent on the listing side to the homeowner, and they leave

it -- the co-broker up to the homeowner.  Say, Hey, look.  You

want to pay the buyer's agent, pay them later.  Do what you

want.

They say here to Mr. Keller, I thought this might

have presented an excellent opportunity to talk about the

importance of protecting our industry, that would be important

to say, no, do it at 6 percent.  We can't let the homeowners

decide.

How does Mr. Keller respond?  This is his email.  He

responds, The reality is we can't actually discuss commission

rates or splits.  We have to simply talk in concepts and hope

others get where we're coming from, because he knows to pull

agents together to talk about commissions and splits, we will

prove is a violation of the law.  It's a conspiracy.  It's

price fixing.

```
 1              I asked him about that.  Let's watch.

 2              (Video played.)

 3              MR. KETCHMARK:  You see -- you're going to see this

 4    testimony during his deposition.  I pulled the books out and

 5    held them up.  These are the books you're holding up; so I'm

 6    going to talk to him about those books.  So I showed him the

 7    books.  He just got done telling you.  Remember, that's under

 8    oath.  Utterly approachable, just like he's right there.  He

 9    says they don't deal with commissions.

10              (Video played.)

11              MR. KETCHMARK:  Another one of his books.

12              (Video played.)

13              MR. KETCHMARK:  It's going to be in evidence in this

14    case from the book.  You allow for a 6-percent agent

15    commission on the sale of the house, and then you split it.

16              It's not just been Keller Williams that have been

17    following and enforcing this rule.  It's been HomeServices.

18    And, look, these two subsidiaries, they're part of this case.

19    They're separate companies, but this is an important fact and

20    an important thing that you're going to hear during the case

21    and the evidence will be the law is.

22              We're not suggesting HomeServices is liable because

23    it's conspiring with two subsidiaries.  We're not suggesting

24    that or with the agents.  We're going to prove to you and the

25    evidence will be this is a single entity carrying it out from
```

41

the top down following, enforcing this rule along with Keller
Williams.

        Gino Blefari is the CEO of HomeServices.  He's the
chairman of the subsidiary HFS.  He's the chairman of BHH,
LLC, and that's okay.  You can have the same chairman of the
different -- that's not like a conspiracy.  But what that is,
is it's showing that they're acting as a single family.
They're carrying out this plan.  They're enforcing that plan.

        They do training for these agents who work under
this, and they have it available and they have it at all
levels.  And we're going to show you -- we talked to him about
that.

        And we asked them, Give us your training materials
that you provide to these families of people who you're
exercising control over.

        They have one called "Earning Your Full Commission."
They have a slide in there, in this PowerPoint presentation at
HomeServices, with the person wearing a 6-percent sign, an
agent talking to a homeowner, a husband and wife.

        What gives you the impression I won't negotiate my
commission with 6 percent?  He has a training video that they
have.  I'm just showing you portions of this.  There will be
evidence in the case, and the whole thing will be shown later.
The defendants can show the whole thing, but this gives you a
sense of the mindset of what's happening at the top of these

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

corporations.  This is from their training material that they
produced to us.

          (Video played.)

          MR. KETCHMARK:  They'd write 6 percent in, and then
they would answer confidently.  They'd say to HomeServices,
Can you negotiate it?  Yes, but it only goes up.

          I asked him about this in his sworn deposition.
Let's see.

          (Video played.)

          MR. KETCHMARK:  We'll prove to you under the law
that it's not just negotiating.

          The Burnetts, when they have their contract, it
comes, 6 percent is already written in.  HomeServices'
contract.

          Look, they say you can pay a commission, that $298
fee, of 7 percent, 8 percent, 9 percent, 10 percent, check a
box, but precooking in 6.

          Sure, it's negotiable, but it only goes up.
6-percent split because half the time companies like Keller
Williams, who are over here on the buyer side, and RE/MAX or
Anywhere, and they're benefiting from that.  And half the time
when Keller Williams is over here, HomeServices is over here,
and it's taking all the money away from the homeowners.

          Nick Bailey, the CEO of RE/MAX, his sworn testimony
in this case.  You're going to see this.

```
 1              (Video played.)

 2              MR. KETCHMARK:  I asked him again.

 3              (Video played.)

 4              MR. KETCHMARK:  Realogy used to be -- Anywhere used

 5   to go under the brand name Realogy.  Changed their name to

 6   Anywhere.  So if you hear testimony in this case about

 7   Anywhere -- I'm sorry -- about Realogy, it's now the brand

 8   name Anywhere.  They changed it during the course of this

 9   lawsuit.

10              They have local franchises like Better Homes and

11   Gardens, Century 21, and Coldwell Banker, ERA from the streets

12   of our towns and our communities.  This is their CEO.  I take

13   his deposition.  They have a corporate antitrust policy that

14   talks about how they're going to follow and comply with this

15   federal antitrust act, the Sherman Act.

16              In that they have an example of things they cannot

17   do.  Let's watch what he says about it.  This is their policy.

18              (Video played.)

19              MR. KETCHMARK:  Seems like it's kind of appropriate.

20   Don't use these words or phrases where a jury can infer

21   they're engaging in an illegal conspiracy.  Don't say things

22   like "can't lower my commission."

23              What do they do?  Anywhere puts out policies for

24   these folks that they call independent contractors.  This is

25   one of them at Better Homes and Garden handling an objection.
```

Would you cut your commission?  I could not cut my commission
because I would never offer you less than the best.  A word or
phrase to infer a conspiracy.  It's on page 146.

So I go and I pulled it from Coldwell Bankers, what
they say is an independent contractor.  They think you're
walking into a Better Homes and Garden, and they walk down the
street to Coldwell Banker.

Page 146 of the Coldwell Banker policy for training.
It's exactly the same.  Can you cut your commission?  I could
not cut my commission because I would not offer you less than
my very best.

Century 21, same exact, can you cut your commission?
I could not cut my commission because I would offer you -- not
offer you less than my very best.

From their own policy, it's an acknowledgment of a
conspiracy, and they're carrying it through with this rule.
They have training material at Anywhere.  I mean, it goes this
far.  Coldwell Banker, this is the training material.  We want
you to cut your commission.  You're a homeowner.  We want you
to cut your commission.  Answer:  No.  Any other questions?
Sign the contract.

There's something out there, and all of these
defendants are doing it.  It's called the steering collusion
theory.  And what does that mean?  You're going to hear
testimony from experts in the field on this, on antitrust and

45

1    on collusion.

2          What the steering theory is -- Michelle Figgs is a

3    senior industry analyst at Keller Williams.  And when she

4    first started working there in 2015, I took her deposition,

5    and this is one of the materials that she had, an email that

6    she sent.

7          She sent it to one of the top economists at Keller

8    Williams, and she attached an article on fixed commissions and

9    social waste.  She was trying to figure out, from an economic

10   standpoint, why these commissions were always so stable.

11         In this article that she attached, it says, Real

12   estate agents typically charge 6 percent regardless of the

13   price of the house.  Think about that.  $100,000 house, 6

14   percent; million dollar house, 6 percent.  Over in St. Louis,

15   some of the houses over there, $13 million homes, 6 percent.

16   It's not ten times the work to sell the house.

17         The apparent uniformity -- this is an article she

18   attaches and sends to the chief economist or the chief person

19   over at Keller Williams, whatever his title is.  The apparent

20   uniformity of commission rates presents an enormous puzzle,

21   especially if one believes that cost and effort necessary to

22   sell a house doesn't increase one to one with the price of the

23   house.  Why do you have that uniformity?

24         In this article, one possibility is that it reflects

25   collusion by real estate brokers, perhaps enforced by the fact

                                    46

1  that every realtor has to work, it's mandatory, has to work

2  with MLS, which makes price cutting easily detected.

3       You see in the MLS, they have to put how much

4  they're going to pay before the buyer broker is even known,

5  and the competitors can see if they're playing along.  And if

6  they're not, what she's saying is they can be punished.  This

7  conspiracy can punish people who don't set it at 6 percent.

8       I asked Mr. Keller, Does steering exist?  What is

9  the concept of steering?  When you put it into the MLS, when

10 it's listed in the MLS, they have to list how much they're

11 paying to the buyer's agent, how much is going to come from

12 the seller of the home to the buyer's agent.

13      Steering is the idea that the corporations will

14 train the brokers, the local brokers, not to send them to the

15 homes that are -- don't pay enough.

16      I asked Mr. Keller about this.  Let's see what he

17 says.

18      (Video played.)

19      MR. KETCHMARK:  He just swore under oath he's never

20 seen evidence of it.  He explained what it was, steering

21 somebody away from a house that doesn't have the 6 percent as

22 a buyer's side.  That's what it would be.  He said, I've never

23 seen evidence of it.

24      Ms. Figgs, a prolific note taker, and as part of

25 this case we were able to, through a request for production of

                                47

documents, get a subpoena and tell the other side, We want all
of her notes.  And she makes some notes of a business meeting
that takes place May 29th, 2015.  And she's taking notes now,
kind of like a court reporter.  Very prolific note taker.
Gary Keller is participating in that.

           Look what she says in these notes.  I asked her
about it.

           (Video played.)

           MR. KETCHMARK:  In this case we're going to prove to
you that they used this rule to stabilize commissions amongst
the defendants, and Gary believes strongly in why they're
stable is because of this co-opetition and the collusion that
exists in the industry with the National Association of
Realtors through this rule that exposes, that allows for that
steering and with HomeServices and the other defendants in
this case.

           We're going to prove that when Gary Keller swore
that I've never seen evidence of collusion theory, he was not
telling the truth.  In fact, after that, we got their training
materials at Keller Williams that they use to train people
with, and they train the front-line agents and brokers to tell
homeowners that this collusion exists.

           They say here, if you don't list it at 6 percent and
do the 3-percent split, people will not show the home.  They
use that to prop up and stabilize the prices.

                              48

```
 1              I asked him about it.  Let's look.

 2              (Video played.)

 3              MR. KETCHMARK:  The seller of the home, the

 4  homeowner, can you reduce your commission?  Of course.

 5              But let me explain what happens when a commission is

 6  reduced.  First of all, half the commission usually goes to

 7  the buyer's broker.  When you reduce your commission, you

 8  reduce the incentive for that agent to bring a buyer to your

 9  house.  If an agent has ten different houses, nine of which

10  offer 3 percent, the price they're shooting for in this

11  conspiracy, and one would -- and one of which comes to 2 and a

12  half percent commission, which house do you think they're

13  going to show?

14              Then they pause.  The one with the larger

15  commission.  Absolutely.  They're training them:  Put yourself

16  at a competitive disadvantage to reduce your commission.

17  Wouldn't you agree?  I guess that's true.

18              And how are they doing that?  Through this MLS,

19  through this rule.  It allows for these commissions to be seen

20  by the other members of the conspiracy.  And it's a mandatory

21  rule.  Listed on the MLS, it's mandatory that you do that.

22              Homeowners ought to be able to decide when they sell

23  their house.  If somebody produces somebody, did they do the

24  work?  Did the buyer's agent do the work?  Agree at that

25  point.  No, not here.  It's ahead of time.
```

49

1    So what happened during this time period, we had

2    Professor Schulman, who's from the department of economics and

3    has a Ph.D. and focuses on antitrust matters -- he's devoted

4    his life to it -- with the research group, pulled the data for

5    all of these home sales.

6    And this one we saw earlier for Kansas City area,

7    that's what it showed.  We had him look around the state.

8    This is the data for Keller Williams, HomeServices, Anywhere,

9    and RE/MAX.  The home sellers we represent that we're going to

10   be asking that you return damages on behalf of, that's what it

11   showed in Kansas City.

12   What did it show in Southwest Missouri?  96 percent

13   of them right there in that 3 percent for the buyer's

14   commission.  Remember, this is the commission that homeowners

15   are paying the buyer's commission.

16   What about Columbia?  95 percent.  This isn't some

17   scattered graph that you would expect in a fair market.

18   We said, let's see St. Louis.  St. Louis was

19   different.  St. Louis, I'm like -- when it first happened, I'm

20   like St. Louis is at 2.7 percent.  Well, that's weird.  Why

21   such uniformity over there?

22   Then you know what we found out?  In the St. Louis

23   area, they've actually -- over there, they've decided, instead

24   of stabilizing at 3 percent for the buyer's side, they're

25   going to keep a little more money on the seller's side.

50

1   They're going to shoot for 2.7 percent on the buyer's side.

2   Houses are more expensive over there.  So they said 2.7.

3           How do they do it?  HomeServices and their

4   subsidiaries, they have different groups under there that

5   are -- that they call them independent contractors and

6   franchises.  But we're going to show they're not.  They're

7   part of the same family.

8           This is one of them.  You're going to hear the

9   testimony from the president of this company.  Berkshire

10  Hathaway HomeServices Alliance Real Estate is what they call

11  them over there.  They actually have a commission guideline.

12  They say, our current policy for buyer's agency commission is

13  a minimum of 2.9 percent, plus they want that same fee.

14          That's -- and look, it works.  And Keller Williams

15  and Anywhere and RE/MAX are following that same price setting,

16  price fixing in St. Louis.

17          So we add them all up for the entire nation -- I'm

18  sorry -- for the entire Missouri, state of Missouri.  And

19  during the class period, 98 percent of them are right there

20  stabilized between 2 and a half and 3 percent.  1 percent of

21  the time it's less, but, yeah, you know, we make it up because

22  1 percent of the time it's more at 3.3.  98 percent of the

23  time in between the two.

24          Back in 2012 -- don't raise your hand.  We can't

25  talk like we did during voir dire.  But if you've ever heard

                                    51

1    of a whistleblower before, you're going to meet one.  Linda

2    O'Connor, she was out in Massachusetts.  She was a member of

3    the National Association of Realtors.

4            And she wrote a memorandum to the general counsel,

5    the top lawyer out at the National Association of Realtors,

6    saying the Sherman Antitrust Act is very clear about price

7    fixing.  We all understand we cannot set fees, other than our

8    own.  There can be no standardization, express or implied,

9    regarding fees of any nature.  My contention is the

10   traditional method of compensation of a seller on that side

11   and a broker setting compensation to be paid to the buyer's

12   broker's firm is the ultimate form of restraint of trade and,

13   indeed, represents price fixing in a free market.

14           She told them that in 2012.  If they had listened to

15   her voice, we wouldn't be here.  These damages would not have

16   been suffered.  She actually -- when you saw my diagram

17   earlier, she's the one who wrote it.  That's what -- I came up

18   with that idea.

19           She says, Look, you have a seller's agent, they

20   should set their own prices.  You have a buyer's agent, they

21   ought to do it on their own.  We shouldn't be involved in

22   setting how much sellers have to pay buyers' agents.  She

23   calls it the "ultimate form of price fixing."  She asked that

24   it be changed.  She said, Let's strip this out of the rule of

25   ethics, and let's implement this and change this.

52

1        And you know what they do with it?  They vote it
2   down at NAR.  2012, they just ignore it.  It goes away.  It's
3   not until discovery during this lawsuit.
4        The National Association of Realtors, they have
5   material where they actually -- they talk about on their web
6   page that they know there's 3 point -- or $32.1 trillion in
7   housing wealth out there.  That's how much equity people have
8   in their homes, and they want a piece of it with their
9   clients, with their defendants through that rule.
10        All this was happening.  And I was involved in this
11  case, and this case had been going on for two years, taking
12  depositions, many of which you've seen.  2021, I'm on the
13  internet and I'm searching it, and I find this article for
14  this gentleman, Professor Alford, who's going to come in and
15  testify.
16        He's got a background in antitrust.  He writes this
17  article before I ever even met him.  He's a person, he's an
18  interesting background.  He worked in the Trump administration
19  as a deputy attorney general in the antitrust division, and he
20  wrote this article with a gentleman named Benjamin Harris, who
21  is from the Obama administration, dealing with antitrust.
22        And what he told me when I talked to him on the
23  phone, read this article.  Said, man, this isn't politics.
24  This is one thing all Americans can agree on.  We should have
25  a free market.

                              53

```
 1          This article that he wrote, he said the heart of the
 2   problem, anticompetition in buying and selling homes.  The
 3   National Association of Realtors' market power is hurting
 4   America's mobility is the article.  He says the heart of the
 5   problem is the set of rules maintained by NAR, a powerful
 6   trade association representing 1.5 million members.
 7          The NAR rule requires real estate brokers to be
 8   members of the association in order to gain access to the MLS,
 9   where houses are posted for sale.  Through this requirement,
10   the NAR imposes cooperative rules to limit competition and
11   raise the prices paid by home buyers and home sellers.
12          The most problematic of these rules is a requirement
13   that sellers predetermine, before even knowing the buyer, the
14   amount of the commission to be paid.
15          He goes on and states that this is a unique problem
16   in the United States that doesn't exist around the world
17   because they don't have these MLSs.
18          When I called him, I'm like, this is -- you're
19   speaking to my soul because this is what I've been doing.
20   Will you be an expert witness in this case?  He said, I've
21   never testified in front of a jury, kind of nervous.  Just
22   come and tell them.  Tell them the story.  Tell them what you
23   do.
24          He's a law professor now at Notre Dame, who teaches
25   antitrust classes.  He's going to come here.
```
                                    54

```
 1          Competition at the core, that's what we should have.

 2   This is from their training videos.  Let's watch what they say

 3   about that at HomeServices.

 4          (Video played.)

 5          MR. KETCHMARK:  How are we doing that in Missouri?

 6   They have these local MLSs that they're members of.  You have

 7   one in Kansas City and one in Springfield, one in St. Louis,

 8   and one in Columbia.  And these -- the NAR rule applies that

 9   and controls.  And when they have their policies, they have to

10   send it to NAR to be approved, and they have to make sure

11   they're following that rule.

12          If you're a real estate agent and you're a home

13   seller that the agent -- they have to join NAR.  In order to

14   list it on MLS, they have to put it in and agree how much

15   they're going to pay the buyer's agent, or they can't list it

16   on MLS because that's what the rule requires.

17          And then when the buyers' agents get it, this feeds

18   it out to them.  And homebuyers are out there, and they're

19   searching this.  And this is where the rule is.  This is the

20   core of the rule.  You're going to see where it's at.  It's

21   been around I think since -- I don't know -- a long time.  The

22   '70s or the '90s, but certainly the whole time period of this

23   lawsuit.

24          It's a mandatory rule.  It's not -- it's a mandatory

25   rule.  It's not just a "if you want an option."  They make it
```

55

1    mandatory.

2           What does the rule say?  Cooperative compensation

3    rule, there it is.  To list it on the MLS, you have to agree

4    to pay the buyer's agent, the seller of the property does.

5           And they say down here multiple listing services

6    shall not publish listings that do not include an offer of

7    compensation expressed as a percentage or definitive dollar

8    amount, nor shall they have invitations of brokers to discuss

9    the relationship.  We don't want them discussing it.  Just pay

10   it.  That's the rule.  They all follow it.

11          Mr. Goldberg, CEO of NAR.

12          (Video played.)

13          MR. KETCHMARK:  Mr. Keller.

14          (Video played.)

15          MR. KETCHMARK:  All of their local agents have to

16   become members of the National Association of Realtors to

17   follow that rule.

18          Mr. Blefari.

19          (Video played.)

20          MR. KETCHMARK:  Same from Mr. Gorman and Mr. Bailey.

21   You'll see their testimony.

22          You know what started happening?  Local agents

23   started -- they try to get away from this.  We started seeing,

24   some of you may remember, signs would pop up in neighborhoods,

25   "Coming soon to MLS."  Coming soon.  These coming soon signs

                                    56

1    that we'd see.

2          They hadn't put it in the MLS yet because in a hot

3    market, they didn't have to do that because neighbors would

4    buy homes, or people would see these houses and drive around.

5          So what happens is the defendants, they're worried

6    about that.  It's threatening this rule that they have they're

7    following.

8          So they came up with what they call a clear

9    cooperation policy that's put in place by HomeServices that

10   they recommended it and was put in place to the National

11   Association of Realtors.  And it says these pocket listing

12   where they're not putting them on MLS threatens the

13   fundamental concept of cooperation, which is the bedrock of

14   our industry.

15         They tell all the members of HomeServices to vote

16   yes on changing this policy at the National Association of

17   Realtors.  They call it "clear cooperation."  During this

18   lawsuit it passes the National Association of Realtors.

19   You're going to hear testimony about that, that a lot of

20   agents didn't like that.

21         What does the rule say?  Within one business day of

22   marketing a property to the public, the listing broker must

23   submit it to the MLS for cooperation with other MLS

24   participants.  Public marketing includes, but is not limited

25   to, fliers, yard signs, digital marketing, emails, websites.

                                  57

```
 1              Within 24 hours of an agent who signs a contract
 2    with a homeowner or putting out a flier or giving a flier to
 3    somebody at church or a ballgame, putting a yard sign out,
 4    they've got to plug it in the MLS.  If they don't, there's
 5    sanctions taken against them.  They could lose their access to
 6    MLS.  They could be fined.
 7              And it passes.  It's adopted during this lawsuit, in
 8    fact.
 9              How does that work as a practical matter?  Go to
10    sell your house.  This is an example of a house, red door.  Go
11    get a HomeServices person who's helping you sell it.  They
12    plug it in here in Kansas City into the MLS.  They say we're
13    going to pay you for this 3-percent commission.  If you don't,
14    you're at a competitive disadvantage to the buyer's agent.  It
15    gets plugged in there.  That's how it gets in there.
16              So then you see here, Heartland MLS, HomeServices.
17    As an example, there's the red house that pops up.
18              So someone does a Google search in Kansas City.
19    You're unaware of the fact this is happening because they've
20    done it for so long.  You type in "Kansas City house for sale"
21    in your phone or computer.  There it pops up, populates the
22    house with the red door, quarter of a million dollars or
23    $225,000.  You click on it and it comes up under the Keller
24    Williams' site.  Remember, it's listed by HomeServices.
25    That's the listing agent.
```

58

1    But it feeds it through the MLS, and it populates it
2   out to other sites like Keller Williams or Anywhere or RE/MAX.
3   And when that happens, you call those agents, and that's how
4   you get pulled in.  You may have already found your house.
5   You're one of the 72 percent of the people who found the house
6   without using an agent.  You call them and you're like, hey,
7   we won't charge you anything.  It's free because the
8   homeowners are the ones who are paying.
9    What happens if you want to do a for sale by owner
10  and you think, I'm going to step out of that system?  I don't
11  want to be a part of that system.  I want to save money.
12   What the evidence in this case is going to show and
13  we will prove to you, if you're using something like Zillow or
14  realtor.com or Trulia and people are using that and you think
15  that you're getting a fair shake and you're not part of all
16  this, what we're going to prove to you in this conspiracy
17  that's happening, go in Zillow in Kansas City.  You're going
18  to hear expert testimony about how this works.  And you type
19  in -- type in Kansas City, Missouri, and you click return, and
20  it pops up the houses.
21   What you don't know is that NAR, they don't let them
22  commingle it.  So when it comes up here, it's only going to
23  list the agents who are part of their association.
24   5,172 homes at the time I ran this one.  If you want
25  to find for sale by owner, well, you've got to click over

59

1    here.  You've got to click on this.  You need to go into
       2    another screen.  You need to change another screen, and then
       3    it finally shows you the 91 houses that aren't a part of the
       4    system.
       5            But then when you leave it, your phone or your
       6    computer, you go back in and you do another search, it sends
       7    you right back to them.  What is the practical matter when
       8    that happens?
       9            It depresses the amount of money that a person who
      10    is selling their house by owner can do.  And you know who
      11    knows this?  They know it.  They know how effective it is.  In
      12    fact, in training at the National Association of Realtors,
      13    they have a script for a seller's agent.  They call this for
      14    sale by owner people, and they say at NAR -- they -- you call
      15    somebody about a home.  You say, hey, I don't want to use real
      16    estate.  I don't want to full pay the commission.
      17            Then NAR trains them to say, This year and every
      18    year for decades, the National Association of Realtors' survey
      19    of sellers found homeowners who don't use an agent get an
      20    average of 20 percent less, because they're depressing the
      21    amount of buyers.  They're keeping eyeballs off the house.
      22    They're taking 20 percent of the value away from those
      23    homeowners.
      24            We're going to ask that this stops and that they be
      25    held accountable for what they're doing.

                                        60

```
 1                THE COURT:  Mr. Ketchmark, are we at a close time
 2      for a break?
 3                MR. KETCHMARK:  It's a perfect time for a break,
 4      Your Honor.
 5                THE COURT:  Very good.
 6                Ladies and gentlemen of the jury, I'll just remind
 7      you don't talk about this case to anyone.  It's 10:20.  Let's
 8      plan on being back in here at 10:30.
 9                     (A recess was taken.)
10                (The following proceedings were had in the presence
11      of the jury:)
12                THE COURT:  Mr. Ketchmark.
13                MR. KETCHMARK:  How is it working around the rest of
14      the world?  That kind of struck me when I started thinking
15      about this.  So how is the rest of the world, the developed
16      countries, selling houses?
17                You know in that article, when I was reading this
18      from Professor Alford, who's going to be here to testify, he
19      wrote in his article commissions in the United States are two
20      to three times higher than in other developed countries, such
21      as Australia, Canada, Ireland, the Netherlands, and the United
22      Kingdom.  Two to three times higher.  It's because of this
23      rule.
24                You know who knows that?  The National Association
25      of Realtors and the defendants in this case, because what they
```
                                   61

actually did, they put a report out called the D.A.N.G.E.R.

Report.  They labeled that the D.A.N.G.E.R. Report.

And they interviewed all the top executives of these

large real estate corporations for this report about what

dangers were facing their industry.  And in this D.A.N.G.E.R.

Report, they talked about commissions spiraled downward.  They

say a variety of powerful forces exert significant downward

pressure on real estate commissions around the world.

Technology, the internet.  They gave examples of

what the average real estate brokers pay around the world.

The United Kingdom, 1 to 2 percent; Singapore, 1 and a half to

2 percent; Netherlands, 1 and a half to 2 percent; Australia,

2 to 3; Belgium, 3 percent; Germany, 3 to 6 percent.

So I thought to myself when I saw this why -- why

can't that be here?  Why can't homeowners in our country

benefit from this technology?  Why do the defendants have a

right to have a stranglehold on it?

So my partner Ben Fadler, who's here, came up with I

just thought a profoundly brilliant idea.  He's, like, let's

talk to a real estate broker in Australia.

So he did.  He just picked up the phone and called a

gentleman and put me in contact with him.  His name is Todd

Reynolds.  He's an Australian real estate -- he's got a whole

background and history selling real estate.  Fascinating

person.

```
 1              And I talked to him and said, Hey, would you be
 2    willing to come to Missouri from Australia and explain how
 3    this works?  And I explained this MLS to him and how we have
 4    the system in our country where, as a seller of a home, you
 5    have to put it in the system of MLS, and they control it.  You
 6    have to say how much you're paying buyer's brokers before they
 7    even know.
 8              And you know what he says and he's going to testify
 9    about?  What he told me on the phone is -- and I remember the
10    day it happened -- Well, don't you have the internet in
11    Missouri?
12              And I'm, like, Yes.
13              He says, Well, we just don't do that here.  We
14    don't -- there are no buyers' commissions in Australia.  We
15    just don't have them.
16              We have sellers' agents and some people -- I mean,
17    people find their homes through the internet, through these
18    free services where they list them.  And if somebody wants
19    to -- they'll go and they'll find a house, and then if they
20    want to pay somebody to help them with the paperwork, the
21    banks will do that or folks will do that.
22              So sometimes high-end buyers come in from other
23    countries, and they'll -- they pay for it and they do that,
24    but that's the marketplace.  We don't have these buyers'
25    commissions here.
```

63

And they knew that.  And they were terrified at the
National Association of Realtors that that was going to take
effect here; that the internet's going to be opened up so
people can list their homes without doing that.

                And what we're here in this case about on behalf of
the 265,697 home sellers who are impacted during this window,
to ask that we do that; that we free them from this mandatory
rule and that they refund the overcharge; that we hit the
reset button.  Don't make it a mandatory rule.

                If you want to pay a commission to a buyer's agent,
have it be a voluntary thing.  Let that person show up first
and explain, hey, this is who I have and this is the deal
we're going to cut, but you don't go blindly as a mandatory
thing in order for your home to be listed.

                Change that.  That's what this lawsuit is about.
That's what our goal is on behalf of these people.

                And in a case like this, it's not a case where
there's emotional pain and suffering or damages like a
personal injury case.  This is a refund case.  Return the
money that we say was wrongfully taken because of this
conspiracy to stabilize and inflate the prices.  Just refund
the money.  Let them know you can't do this.

                That many homes that we have, 265,697 homes.  You're
going to hear the expert testimony the average seller paid
$6,700 to the buyer's broker when the house was listed before

                                    64

they could even be a part of the system.

Within 24 hours of marketing the home, their agent has to put that in the MLS. You go to church, you hand out a flier to somebody, has to be put in the MLS according to them. HomeServices made sure of that. NAR is making sure of that. Agents are punished if they don't do that.

Put a yard sign out, 24 hours has to be in there. Send an email out, 24 hours. When you take that times -- that number of homes times $6,700, that's the damages, and as we talked about during voir dire, there's going to be a single line for damages.

When you go through all the law -- and we're going to prove it. We welcome the burden of proof. We welcome proving that this is happening. We welcome the opportunity to show that to you.

When we do that and we prove the conspiracy, when you see the testimony from Gary Keller where he's already said the reason they're so stable, if you stabilize prices, it's a conspiracy, is because of this rule because of steering. When you do that and you refund that money, you take that times the number of homes, that's $1.78 billion in damages.

We're going to ask at the end of this case that you write that on the line; that it's turned over for the supervision to be returned to these people; and that we collectively use our voice to change the system, to return it

65

1    to the free marketplace.

2         Why in the United States of America, when we have a

3    law like that, are they getting away with this?  And they've

4    done it for so long.  We're going to ask that it stops.

5         That's the nature of the conspiracy.  The thing

6    about this is this isn't some smoke-filled room or some

7    meeting where there's emails or they're sitting around

8    doing -- it's so brazen that it's a rule that they've adopted;

9    that they're following and enforcing.  Following and enforcing

10   that rule is the conspiracy if that rule has the effect of

11   stabilizing prices.

12        Look, you don't have to be there.  When that rule

13   has been in place for a long time, you're going to hear at the

14   end of this case -- the judge will give you the

15   instructions -- you do not have to be there when a conspiracy

16   starts.  You don't have to be there at the time that it's

17   adopted.

18        So this rule could have been in place for a long

19   time.  When Keller Williams decides to join the conspiracy by

20   following and enforcing that rule, they're liable for it under

21   the law.

22        When HomeServices and its subsidiaries decides to

23   follow and enforce that rule, they become liable for it, for

24   the damages cost.  The same with Anywhere and RE/MAX.  And

25   under the law, when you're engaged in a conspiracy, you're

                                66

responsible to all the victims of the conspiracy.  So that's
what we're going to ask happens.

Look, I can't put them all up here, but the
franchises are, like, all under this.  Keller Williams is up
there and all these local market centers and franchises.
Like, this is the one here in Lee's Summit and Springfield and
Lake of the Ozarks and St. Louis.  They have a whole bunch of
them.  They're underneath it.

They force -- they have that rule up top, and they
send it down.  And they do that by a franchise disclosure
document that they give to these franchises, that they say you
have to join.  They say join.

And as a practical matter, if you're a front-line
agent, they don't have a choice because it's the only way that
they can get them on the MLS.  That's what Keller Williams is
doing.

Again, HomeServices and the two subsidiaries, we're
not suggesting or arguing -- you're never going to hear me say
there's a conspiracy between HomeServices and the
subsidiaries.  We're saying it's a single entity.  They're
functioning together with common officers and rules.  It's a
family, and they're pushing that down through Mr. Blefari,
who's the chairman, CEO of HomeServices, the chairman of HSF
Affiliates, the chairman of BHH Affiliates.

You know, I wanted to make sure that you heard from

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

the right person, that you had the testimony from the right

person.  This is an important case.

So I actually went down to Florida and took the

founder and chairman of HomeServices' deposition.  He retired

as a CEO in 2018.  And I was asking him about this rule that

we've all learned about, this mandatory compensation rule.

I said, Is it the policy of HomeServices to follow

that?

He says, I can't speak to you about HomeServices.  I

don't know.  Talk to Mr. Blefari.

So I said, Is Mr. Blefari the person who does this?

Does he run the day-to-day operations?

He says, He does.

So I thanked him for his time and wished him well in

his retirement, and we got Mr. Blefari's testimony.

Now, I understand, and we'll see if it happens,

that -- this is Mr. Peltier.  He's going to come in, but if he

does, I'm going to show and I'm going to remind him he told me

it's Mr. Blefari who's in charge.  He's the one I have to

speak with.  That was his sworn testimony, which is what I

did, which is what you will see.  Mr. Blefari is the one in

the videos.  Mr. Blefari is the one who's in charge.

Underneath HomeServices, it's these subsidiaries.

They have local franchises in St. Louis, in Kansas City.  The

one in St. Louis is this Berkshire Hathaway.  They have a

68

franchise agreement.  This Berkshire Hathaway HomeServices

Real Estate Alliance, and then all of the agents, the 450

agents will be beneath them.  They call them independent

contractors.

And in that contract, they sign it with a

subsidiary, BHH; and then they're under another subsidiary,

HSF; and they're under HomeServices.  I'm not picking on that.

Corporations can set up the way they want, but it's one

corporate family is the point.

When you look at that, the salespeople now for that

local company are there underneath that; so we get their

documentation.  What are the agents given by this corporate

family?  They're given -- they call it an independent

contractor agreement.  Well, independent contractor means you

make your own decisions.  You're an independent contractor.

You're going to be the plumber, and I'm not going to be

telling you how to fix my sink.  You're making your own

decision.

What do they do?  They control that in their

independent contractor agreement that they have.  They say

salesperson agrees to join NAR and to follow NAR and to follow

these rules because it's part of the carrying out the

conspiracy.

I asked the president of this St. Louis franchise --

it's actually now been bought and is owned by HomeServices.

69

1    For a while it was a separate franchise.  Then it was

2    purchased and owned by HomeServices.

3            I took his deposition just this last Friday because

4    it was important for you to hear from him.  This is what he

5    says.

6            (Video played.)

7            MR. KETCHMARK:  That was their policy in 2014, and

8    it runs all the way up.  You'll see the testimony and evidence

9    in this case to present.  In fact, it was just last Friday

10   that I was with him, maybe a week ago Friday.  It's kind of

11   blurring together.  A week ago Friday.

12           Thank you for correcting me.

13           They actually give commission guidelines to these

14   people who they say are independent contractors.  Kind of

15   started clicking to me now why this 2.7 percent.  What do they

16   say?  That's where the 2.7 percent comes from, and everybody

17   over in St. Louis that's part of this conspiracy is following

18   that.

19           They have a disclosure statement that they give.  If

20   you're a home seller and you're meeting with an agent over

21   there, they say, look, these are all part of the family of

22   companies that are HomeServices.  You sign this.  It's the

23   home seller disclosure saying you're maybe having this agent

24   here with Berkshire Hathaway, but they're part of the

25   HomeServices' family.  What does it say in that disclosure

                                70

statement?

They tell you what you're going to be charged. Commission between 6 and 10 percent. Remember, Blefari says, it's negotiable at 6, but it only goes up. They actually put that in writing that these people have to follow. That's why it's happening.

I say, So what's going on over here in Kansas City with this ReeceNichols? We look at it in this case, and we discover and we learn, and you're going to see the evidence, and we will prove to you they use the same form over here.

Now, look, they can use the same forms if they want, but the point is these are not independent contractors. These agents over here, these independent -- they're being controlled by this corporate family.

It's the same contract over here that home sellers are paying. ReeceNichols is wholly owned directly or indirectly by HomeServices.

Charge, commission, 6 percent; a fee, that $295 that the Burnetts got dinged for and everybody else, plus the 6 percent. Over here, unlike St. Louis, they don't even say it's negotiable. They just say that's going to be the fee, and then you sign that and you do it and it gets baked in the contract.

What ends up happening for people who are trying to buy a home or -- you walk in -- you're trying to sell. You

walk into one place.  You walk into ReeceNichols.  You think
you're dealing with a ReeceNichols' person, who's supposed to
be an independent contractor, who they claim is competing.
The defendants will say they're competing with the Berkshire
Hathaway Real Estate Alliance, that other franchise they have.

So you leave the ReeceNichols, you walk over here.
It's the same corporate family.

So the Burnetts, when they signed that, that's where
that 6 percent -- they bake it in there.

It's called a corporate representative.  It's a
deposition.  We're entitled to tell these affiliates, out of
all of your employees, name somebody to speak as the voice to
you.  That's called a corporate representative because they
treat it like people.  They pick who they want to answer
deposition questions under oath to be the voice to you.

I asked her questions.  This is Rosalie Warner, vice
president, and the voice for these two subsidiaries.

(Video played.)

MR. KETCHMARK:  Every single one of their agents
belongs, and every single one of their agents has to list
within 24 hours.  They are doing their part and enforcing this
rule that's benefiting these other corporate real estate
companies.

How does it work?  ReeceNichols.  This franchise
they have over here.  They have a -- Mike Frazier is the CEO.

```
 1            Who's over Berkshire Hathaway over in St. Louis?
 2   Who is in charge of that one?
 3            That's Mike Frazier.  I asked her about that.
 4            (Video played.)
 5            MR. KETCHMARK:  That's the voice of the corporate
 6   defendants.
 7            They're functioning as a single family to follow and
 8   enforce that rule, and Anywhere and RE/MAX is doing the same
 9   thing under different brand names.  You're going to hear
10   evidence of all of that.
11            You know, it's all done through this rule of the
12   National Association of Realtors.  And what I've been hearing
13   throughout this case, and I anticipate what we're going to
14   hear evidence of, is they're going to say, well, at the
15   National Association of Realtors, we don't get commissions.
16   They don't get any of the 6-percent commissions.
17            No.  But what they do and when that rule is enforced
18   and all of these people, these local agents have to join and
19   the fees are between $250 and $500 to join and there's annual
20   dues, you take that times 1.5 million, it adds up.  1.5
21   million times $500 is $750 million.  That's where they're
22   making their money in the conspiracy, in the mandatory dues.
23            You're going to hear evidence that agents -- the
24   only reason they're even a part of the National Association of
25   Realtors is to get access to the MLS because of that rule.
```
73

You know, the defendants claim and they've been
arguing that this rule has been around for a long time.  It's
been around forever.  I mean, I've heard it going back to the
1900s, whatever.  We'll wait and see.

          They're going to say, Well, it's been around since
1972 or the current version was adopted in 1996.  Look, one of
the things that's at issue here, I -- if it's been around
since 1996, I can't help those homeowners.  We can only focus
on 2015 to 2022.  What we're going to prove to you and the
evidence will show just because someone's been getting away
with something for a long time doesn't make it right.

          You're not allowed under the law, we will prove and
you will see and you'll be instructed and follow the court's
instructions, you can't join an existing conspiracy and claim,
Well, it was there before I did it.  You can't go out -- if a
conspiracy has been around to fix prices and something illegal
and you join later and say, Oh, well, they've been doing it
ever since the '60s, it's not allowed.  We're going to ask
they be held accountable.

          I don't know.  I believe we're going to hear this.
I don't know.  We're going to find out together.  I've
actually heard, Well, the homeowners agreed upon the price.
They made a deal.  A deal is a deal.  I am a big believer in
the concept that your word is your bond and a deal's a deal.

          But price fixing at its core, there's always the
                               74

deal.  You're always agreeing to the fixed price.  You just
don't know it.  And the law is that corporations cannot do
that.  And if we prove to you that they've done it, the fact
that somebody was an unwitting participant in that by the
buyer is not okay.

It's like buying chicken when the price has been
fixed, we will prove to you, and you'll hear evidence from the
witness on the stand, our expert.  It's like the chicken
prices are fixed, and so you buy it.  You don't know it.  You
make it up and you cook it at your barbecue and everyone
enjoys it.  They eat it.  It's great chicken.

And then you later find out you were the victim of
price fixing that was rigged at the highest level.  That's not
okay.  That's what we will prove to you.

So any attempt to say that someone cut a deal, every
price-fixing case, we will prove to you that that's not a
defense.  That's an attempt to distract.  And that's what
happened to these people.

And the idea that there was some kind of negotiation
that took place, you're going to see the testimony about that,
about how homeowners are pushed into that process, and it's 6
percent.  And it's just baked into our culture that it's 6
percent.

But you know what?  They have taken tremendous
advantage of it.  The internet?  Not to bring prices down, not

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

1  to make homes more affordable or to save prices.  They do
2  it -- they have electronic signatures now.  There's nothing
3  wrong with that.  But I remember when my wife and I bought a
4  house, we actually showed up at the real estate.  We were
5  going through pages of documents, and you go to the title
6  closer.  Now it's all done eDocs, which is fine.  That's not
7  illegal.  It's not a conspiracy.

8          But the point is, this is an electronic -- they
9  actually use this dotloop at HomeServices that the Burnetts
10  signed, and Keller Williams uses the same dotloop.  The
11  contracts are sent with the commission already baked in there.

12          One of the things I've heard is that they say, Well,
13  you can put any amount that you want in there as a seller of
14  the home.  You can put a penny or a dollar, they said.  You
15  know what that ignores is all of the evidence that there is of
16  steering, and that they're telling the homeowners who try to
17  do that they won't be able to sell the house.

18          And you'll hear that that's not what's happened.
19  People don't put a penny or dollar in there.  If you do, by
20  their own training materials, people are scared that they
21  won't sell their house.

22          They are training and enforcing to get that 6
23  percent in there.  That's what the stability is.  Do we see in
24  this graph houses at a penny or a dollar?  No.  It's all right
25  there and has the purpose and effect of getting that percent.

76

```
 1              The evidence will show, and we will prove to you
 2     during the course of this trial, that the plaintiff class, the
 3     people we represent, paid the inflated commissions to buyers'
 4     brokers.  They did that.  And but for this rule, like the rest
 5     of the world, it would not be happening.  Remove the mandatory
 6     nature of this.  Hold them accountable.
 7              And let's make no mistake who's paying that.  It's
 8     not these folks.  Not like the -- I've heard them say, Well,
 9     it's the sellers' agents who's paying it; it's not the seller
10     themself.  Kind of a last hope to get out of responsibility.
11              But when you look at the closing documents, you'll
12     hear our expert testimony, the money, the settlement
13     statement, it came from the seller of the home.  They're the
14     ones who are paying that.
15              If you take away that buyer's commission, they're
16     paying -- the Burnetts, this is their closing statement, both
17     paid to HomeServices, and they paid RE/MAX.  They're the ones
18     who paid RE/MAX.  They did it.  Came from their funds.  If
19     that was removed like it is around the rest of the world, that
20     wouldn't be happening.
21              We've been -- I've been hearing like it's been
22     moving around.  It's a bit of a Whack-A-Mole work.  Everyone
23     knows that game, Whack-A-Mole that kind of pops up.  The mole
24     keeps popping up with different arguments.  I've even heard
25     now they're saying, Well, cash-strapped buyers and -- the
                                    77
```

National Association of Realtors and the defense say, well,

2   we're really doing this because it helps cash-strapped buyers

3   who can't afford this commission, and it really helps them.

4           The evidence will be that these buyers all signed

5   contracts saying that if the seller is not forced to pay it,

6   that they would cover it.  People -- they would actually pay

7   for it.  But like the rest of the world, they might not use

8   buyers' agents.  You would let the market decide how that

9   happens, but that's not a reason.

10          So I thought cash-strapped buyers, well, what do you

11  base that on?  They name an expert witness to give his

12  deposition.  So I fly out.  I believe that was in D.C.,

13  correct?  Flew out to D.C. to take his deposition.

14          Used to be involved in HUD, I believe, and now he

15  has a consulting company.  And I say, What do you base your

16  concept that this is really -- this rule really helps

17  cash-strapped buyers?  He does a report.  He cites this

18  article.  Be careful what you're asking for:  The economic

19  impact of changing the structure of real estate fees.  It's

20  written in 2022.

21          I said, Well, that seems like it's pretty spot on.

22  Then I'm looking at it, and he cites it five times in his

23  article saying this will hurt cash-strapped buyers.

24          And then I thought, What's going on here?  I looked

25  down there, and it says the authors would like to thank

HomeServices of America for providing financial support for
this paper.  I'm like what?  I asked him, Who gave you this
paper?  And he tells me it's Mr. MacGill, Mr. Varon, the
lawyers who are for them here.  I said, Wait, these attorneys
in this litigation gave you this paper?  He says, Yes, but it
doesn't necessarily support the views of HomeServices.

We'll prove to you that it does support it.  It's
been bought and paid for.  That's not evidence, folks.  You
don't go out and have your client write an article to prop up
that.  But fundamentally, this isn't a case about buyers or
how that works.  It's about letting the free market decide.

We're going to ask at the end of this case that you
follow the law, and I know you will.  And we will prove to you
this conspiracy that exists.  And the question that's going to
be there is why is this a mandatory rule?  If it's such a
great thing, I mean, it's being represented to me it's like
the best thing since sliced bread.

If it's so good, make it voluntary.  Let people have
an option to decide to do it.  Don't put it into the MLS where
everyone can see if it's being followed.  And let a buyer, if
they have an agent, show up and say, This is what I'm doing.
Will you pay me for it?

That's what happens in a fair marketplace.  It's not
what's been happening here.  We're going to ask they be held
accountable.

79

1          And it's weird, sort of surreal.  We're here in this

2    courtroom.  You can see this testimony, but this is real lives

3    of people all across Missouri and all of our cities and towns

4    and in when we're in Kansas.  This is about the future of

5    housing.

6          Thank you very much for your time.  And it's not

7    lost on me.  I was here and heard the sacrifices that you're

8    all making.  I know that.  Our system would collapse if we

9    didn't have people like you.  I'll be respectful of your time,

10   and I thank you for it this morning.

11         Thank you.

12         THE COURT:  Mr. Ray, are you up first?

13         MR. RAY:  No.  No, I'm not, Your Honor.

14         THE COURT:  You're the first up out of your chair.

15         MR. RAY:  I'm moving over here.

16         THE COURT:  Mr. Glass, are you presenting for NAR?

17         MR. GLASS:  I am not, Your Honor.  I am just

18   plugging into the equipment.

19         THE COURT:  Perfect.  We can get that TV moved.

20         MR. GLASS:  Just going to check and make sure my

21   clicker works this far.

22         THE COURT:  Sure.

23         MR. GLASS:  I think I figured out the exact range,

24   Your Honor.  Thank you.

25         May it please the court.

```
 1            THE COURT:  Please proceed.

 2            MR. GLASS:  Thank you, Your Honor.

 3            Good morning again.  My name is Ethan Glass.  I

 4    represent the National Association of Realtors.

 5            As we told you yesterday, the National Association

 6    of Realtors, since this is such an important case, is going to

 7    have a representative in court every single day.  Today we

 8    have Ms. Johnson again.

 9            We thank you for the time and sacrifices that you're

10    making to be here today.  We know that jury duty is hard, but

11    this is NAR's opportunity to tell our story.  The plaintiffs

12    have been telling their story for years, and now we get to

13    tell you and the world why they're wrong.

14            As the evidence will show, NAR is a voluntary trade

15    association.  Its mission is to promote the American dream of

16    homeownership, and we take that very seriously.

17            NAR is comprised of 1.6 million people.  You heard

18    that quite a bit this morning.  But let's think about what NAR

19    is, what a trade association is.  It's 1.6 million people,

20    26,000 here in Missouri alone.

21            Those are the people that you heard about yesterday,

22    the local agents who are working hard for their clients to buy

23    and sell property.  Some are struggling; some are incredibly

24    successful.  NAR is there to support them as they help their

25    clients try to achieve homeownership.
```

```
 1              Now, the typical member of the National Association

 2    of Realtors is a 60-year-old female who runs her own local

 3    business.  There's nothing against corporations and large

 4    companies, but they are not members of the National

 5    Association of Realtors.

 6              The members of the National Association of Realtors

 7    are the people on the ground.  That is what the National

 8    Association of Realtors stands for.  And what I'll tell you is

 9    that over 50 percent of the business that members of the

10    National Association of Realtors get comes from referrals or

11    repeat business.

12              These are people who live and work in our

13    communities and are trusted, who gets clients because somebody

14    else trusted them or because their own clients come back.

15              Now, important, we heard some stories yesterday, and

16    I want to make sure this is very clear.  Not every real estate

17    agent is a realtor.  A realtor is a member of the National

18    Association of Realtors.  That is a label that can only be

19    used by the people who commit to our code of ethics.

20              About half of licensed real estate agents belong to

21    NAR; about half do not.  The half that belong to the National

22    Association of Realtors have committed -- and we're going to

23    go through some of these very important provisions of the

24    codes of ethics.

25              In addition to providing these ethical standards so
```

82

```
1    that a client, when they see a realtor, they know that they're
2    going to abide by ethical standards that are public and known;
3    that we can go on the internet and see.
4          In addition to those ethical standards, NAR provides
5    the things that we would expect from a trade association.
6    Training.  We do research projects, advocacy.  All of those
7    acts are legal.
8          The evidence will show that the National Association
9    of Realtors does not sell any real estate, does not own any
10   real estate agencies, does not own any or even operate any of
11   these multiple listing services you heard from the plaintiffs.
12   NAR has never represented a buyer or a seller in a real estate
13   transaction, and it does not receive commissions.
14         And I'd like to correct one thing that you heard.
15   He gave an example of a $500 annual fee.  Well, that's not
16   true.  NAR members pay $150 to join.
17         So I'm excited to tell you more about NAR, but I
18   really need to address -- as my grandma used to say, you got
19   to follow the pea.  Remember that shell game?  Three shells,
20   one pea?  There's lots of shells going on in the presentation
21   we saw this morning, one pea.  That pea is the model rule.
22         In a moment I'm going to show you the model rule,
23   but I'll tell you, you didn't see that rule until half an hour
24   into plaintiff's presentation.  You know why?  Because it
25   doesn't say what the plaintiffs claim.
```

83

You can read the rule itself.  I'm going to tell you
the exhibit where you can find it as you deliberate.  It will
show it.  NAR does not set commissions of any type.  NAR does
not set commissions at 6 percent, 5 percent, 3 percent, 2
percent.  I saw all kinds of numbers that were the alleged
fixes.  None of those are in NAR's rules.  NAR doesn't even
mention commissions in that rule.

                The rule, contrary to the plaintiffs' claim, has
nothing to do with the conspiracy.  In fact, we only need to
look in the rule itself because a sentence that you might have
seen flashed on the screen that the plaintiffs' lawyer didn't
read to you, explains exactly why NAR has the rule, and we're
going to see it.

                That purpose, that intent is simple.  Everyone has a
right to know how much they're going to get paid before they
work.  That's it.  It's not about forcing sellers to do
anything.  The rule doesn't reference sellers.  It's not about
forcing buyers to do anything.  Buyers have choice.  It's not
about forcing agents to do anything.  It's merely so that
people know how much they're going to get paid before they do
work.

                You know, I don't work for free.  I don't think
anybody in this room will work for free.  Everybody has a
right to know how much they're going to get paid before they
start working.

                                    84

```
 1          The evidence will also show that this rule has been

 2    around for over 25 years.  Now, there was lots of talks about

 3    statute of limitations, but the reality is that this rule has

 4    been around for a long time.  The entire time it's been

 5    around, it's been public.

 6          The rule is found in NAR's public documents on its

 7    website.  What kind of conspiracy is done out in public?  I'll

 8    tell you, there isn't one.

 9          What we will show at this trial is the plaintiffs

10    want to turn and twist something that's good into a

11    multi-billion-dollar federal lawsuit.  In fact, the evidence

12    will show that NAR and its members benefited the plaintiffs.

13    They benefited from what NAR does.

14          I already talked about NAR's code of ethics.  Each

15    of the plaintiffs hired a realtor.  Remember, that's the half

16    that have agreed to follow a code of ethics.  Each of the

17    plaintiffs benefited from hiring a realtor who has agreed to

18    follow the code of ethics that's on the internet and is

19    available to everybody.

20          They also benefited from choice:  Choice that NAR

21    helps to preserve.  In fact, the plaintiffs had a choice

22    whether they wanted to hire an agent at all.  The plaintiffs

23    had the choice of which agent they wanted to hire, and the

24    plaintiffs had the choice of how much they wanted to pay those

25    agents.
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

1          In fact, NAR gives clients, consumers, choice all

         2   the way up until the time they sign the contract, and they

         3   did.  You heard from the plaintiffs' lawyers, each plaintiff

         4   signed a contract, and I'm not talking about the closing

         5   statement.  You saw the closing statement several times.  The

         6   closing statement has nothing to do with this case.

         7          This case is about selling the home, not closing.

         8   And we'll have witnesses who come and explain the difference.

         9   But you'll see in the rules that the closing statement is

        10   nothing that NAR rules speak about.

        11          Those written contracts told each plaintiff exactly

        12   how much they had agreed to pay, and they didn't have to sign.

        13   They could walk away.

        14          It also says in another provision that each

        15   plaintiff acknowledges that their agent might pay other agents

        16   to help sell the house.

        17          Now, that might sound a little odd, and I'm going to

        18   get to that.  Why would an agent pay other agents to help sell

        19   the house?

        20          Well, here's a spoiler alert, little preview.

        21   Because if I try to sell a house by myself, it will be harder

        22   to sell than if I have all the agents in my city trying to

        23   sell a house.  Why does that matter?  Because agents don't get

        24   paid until the house closes, until the house is sold, and so

        25   the seller's agent does all this work.  They help get the

                                      86

1    house ready for sale.  They use the multiple listing service.

2    They go around and they print advertisements.  They hire

3    photographers, all out of their own pocket.

4            The only time they get paid is when the house sells.

5    And so like those marketing activities, like driving around in

6    their car distributing pamphlets -- we've all gotten those,

7    those color sheets.  Like hiring a professional photographer,

8    like using the internet to advertise the home.  The sellers'

9    agents also use other agents to help sell the house.

10           I'll tell you, in light of these choices that

11   everybody at every step of the way had, choices that were not

12   restricted by NAR but preserved by NAR, the plaintiffs turn to

13   an argument that I find quite remarkable.

14           The plaintiffs are claiming that buyers shouldn't

15   get agents.  Yeah, that's their case.

16           Sellers get agents; buyers don't.  And you know what

17   they point to to say that's good?  If I could bore a hole

18   through the Earth straight down, you would get there.  Yeah,

19   Australia.  You're going to hear that the plaintiffs believe

20   that the rule converts Missouri into Australia.

21           I'll also tell you that the rule was generated by

22   free market forces and consumer advocates who disagreed with

23   the way they do things in Australia.

24           Prior to the mid 1990s, buyers didn't have their own

25   agents.  Buyers interacted with an agent who worked for the

                                    87

```
 1   seller.  That's how it worked.

 2              In the mid 1990s, the free market forces,

 3   competition, and consumer advocates said, Buyers should have

 4   their own agents.  Buyers need representation.  That wasn't

 5   driven by NAR, but NAR responded and said, We are going to

 6   make sure that choice is available.

 7              What plaintiffs want to do is they want to undo the

 8   hard work the free market made and consumer protection

 9   advocates sought.

10              Now, let's briefly turn to what the plaintiffs must

11   prove.  The court, of course, will instruct you on the law.

12   This is a general idea of what I expect you'll hear.

13              They have to prove four things.  Remember, they have

14   to prove it by a preponderance of the evidence.  That means

15   plaintiffs bear the burden.  If it's a tie, the plaintiffs

16   lose; NAR wins.

17              The first thing is that there was a conspiracy at

18   all to follow and enforce the model rule.  And you'll see

19   there's no evidence of that.

20              The second is that NAR, HomeServices, Keller

21   Williams, RE/MAX, and Realogy each voluntarily and

22   intentionally joined that alleged conspiracy.  Can't be an

23   accident.

24              Third, that the purpose or effect of the conspiracy

25   is to raise, inflate, stabilize broker commission rates.  The
```
                                   88

purpose or effect.  We're going to talk about the purpose
today.  You're going to hear NAR witnesses explain what the
purpose and effect are.

And the last is that the class plaintiffs suffered
injury.

Plaintiffs need evidence.  Plaintiffs cannot come
up, take documents out of context, play video clips.  What
you're going to hear for most of the next week is video.  Next
week, when the defendants get to go, we'll bring live
witnesses, but for most of next week, you're going to hear
those video clips that you saw today.

They need to show evidence and that the witness
testimony and documents could be evidence, but it's not what
the lawyers said.  It's not how the lawyers move the shell
around so you get distracted on which one has the pea.  Simply
saying there's a conspiracy is not enough.

Now, I'd like to pause here for a moment.
Plaintiffs claim that four corporations, RE/MAX, Realogy,
Keller Williams, and HomeServices, conspired with 1.6 million
members of NAR, local agents.  I find that uncredible.
Moreover, everything that NAR does is open and public.

Now, it's true that NAR has some meetings.  It's
true that NAR has rules, but the agendas are available.  In
fact, the plaintiffs said they pulled them off the internet.

On the left is what we normally see in a conspiracy

89

case -- excuse me -- some recording or secret meeting.
Remember, you heard plaintiff say there is no recordings in a
smoke-filled room. And I'm not even sure there's a room in
Missouri that could fit 1.6 million people plus four
corporations.

There's no emails or texts conspiring. You heard
that from the plaintiff. All they have is conjecture that 1.6
million people, through a public process and public documents,
have somehow hoodwinked the entire world for over 25 years
until the plaintiffs figured it out.

In the face of this reality, the plaintiffs' claim
boils down to just a few elements, that NAR has a model rule;
that buyers should not have their own agents; that NAR is a
trade association; and that some of the companies, and you saw
a lot of them, have internal discussions, internal trainings.

What I'll tell you is that on those internal
documents, there's no evidence that there was any
communication between NAR and HomeServices or Keller Williams,
RE/MAX, or Realogy, none.

NAR doesn't get to see those internal trainings.
NAR is not involved in internal operations of the corporate
defendants. NAR leaves that up to their members how they want
to run their business.

You also saw some meetings that were done by Keller
Williams and other brokerages. NAR doesn't attend those

90

either.  Again, shell, you look under it, no pea.

Now, let's do what the plaintiffs did not.  Let's look at the rule.  Now, there's a lot of words.  It's in real estate parlance.  We're going to have witnesses come and tell you what every single word means.

But what I will say is, if you read the first clause, it says "filing property with multiple listing service."  That means you are submitting a home for sale to a library of homes for sale, where agents can go look at that library and see the home and show it to their buyers.  Or if they don't have a buyer, agents can go market that property and try to sell it themselves.

Participants make blanket, unilateral offers of compensation.  Now, plaintiffs, they glided right over that word.  They showed it in very, very small print.  This is the biggest I could get it.  If I could get it bigger, I would.  Maybe I'll bring in one of those physical boards.

Participants.  Participants are agents.  Participants are not sellers.  Participants are not buyers.

I promised you I'd tell you where this is going to be found.  It's going to be PX4587.  PX4587 at page 39.  That is the rule at the center of this case.

Now, what you'll see when you look at that PX4587 is it has all kinds of provisions.  Why does it exist?  Well, because there's these multiple listing services.  These are

91

companies that are separate from NAR.  NAR does not own or operate them.

But NAR, again, is trying to promote homeownership, and in trying to promote homeownership, NAR publishes model rules that multiple listing services can follow.  And those model rules are the ones that tell multiple listing services nuts and bolts things.  And one of the nuts and bolts things is this.

But others are the things you expect.  If you're going to put information into this database, you've got to provide the address.  You've got to provide how many bedrooms there are, how many bathrooms there are, what the listing price is, who the agent is you should contact if you want to bring a buyer or if you want to try to buy the home.

So what plaintiffs have done is they've plucked one sentence out of a series of rules, all of which are designed to help these multiple listing services run better.  There's no dispute that multiple listing services are good.

Now, turning back to the rule at the core of this case, participants make blanket, unilateral offers of compensation to other MLS participants.  Participants are agents.

The rule does not require sellers to do a single thing.  In fact, none of the rules require sellers to do a single thing.  You'll get hundreds of pages of public NAR

documents, none of which will say sellers need to do anything.
All this says is that an agent makes these offers of
compensation.

Second, it doesn't say that sellers must pay the
buyer broker 6 percent, 5 percent, 2 percent, 3 percent.  It
doesn't say the sellers must pay their broker any amount.  It
doesn't say that the agent who is selling the house has to pay
other agents any particular amount.  It leaves that open for
choice.  NAR leaves it open for choice.

Now, that we've seen the model rule, let's turn to
this concept of an agent paying other agents.  Now, there's
something I need to correct.  NAR does not have an antitrust
policy that prohibits agents from paying other agents.  I
believe counsel misspoke when he read the provision from NAR's
antitrust policy.

That policy says that agents cannot conspire.  They
cannot agree with other agents how much they're going to
offer, but it does not prohibit an agent trying to sell a home
from encouraging other agents to help them sell the home by
telling them how much they'll get paid to do work.

The evidence will show that that has evolved from
the free market.  In fact, in Missouri -- and I want to get
this right, and I'm going to read it -- in any real estate
transaction, the buyer's agent -- so that's the agent
representing the buyer -- compensation may be paid by the

93

seller, the buyer, a third party, or by the seller's agent.

                Nothing NAR does tells anybody who pays whom and how
        much.

                All right.  When I first got involved in these
        cases, I was a little confused.  Why would a seller's agent
        ever pay for a buyer's agent?  We talked about that a little
        bit in my introduction.  I want to spend a little bit of time
        talking about it.

                The seller's agent enters into a contract, and we're
        going to see an example.  I'm going to show you an example of
        a contract.  The contract provides that the amount that the
        seller is going to pay the seller's agent only happens if the
        house sells.

                The seller's agent works and works and works
        sometimes for months, sometimes every day, to sell the home,
        and she will only get paid when the house sells.  And so some
        agents have said, If we are willing to pay other agents to
        help us sell the home, we can sell the home faster.  That
        means that the seller's agent is paid faster.  She's happy.

                The home sells faster.  The seller is happy.  The
        buyer is getting access to the home because the buyer broker
        is out there trying to market the property.  The buyer's
        happy.  Everyone's happy.

                And there's lots of things that the seller's agent
        does.  The seller's agent often hires a professional

                                    94

1  photographer. That can cost $1,000. That comes out of her

2  pocket.

3       The seller's agent sometimes will buy time on an

4  advertising service, like Zillow. You saw Zillow. That comes

5  out of their pocket. That comes out of her commission.

6       Sometimes real estate agents have receptionists or

7  other people in the office to make sure that every time a

8  client calls, the phone is answered, doesn't go to an

9  answering service. That helps sell the home. That helps the

10 seller. That comes out of the real estate agent's pocket.

11      And that is exactly what the plaintiffs are

12 complaining about here, is that out of her pocket, out of her

13 commission, a seller's agent is paying the buyer's agent who

14 helps sell the home.

15      You know, I've been trying to think, because we

16 heard a lot about how this is so unique and has never happened

17 before. I've been trying to think of a good example, an

18 example that hopefully will resonate with some of you.

19      Think of a lost dog. Yeah, your pet. Your pet runs

20 away. Someone left the gate open. The dog is gone.

21      Now, you and your family can try to find that dog,

22 and maybe you will. Maybe the lost dog is just around the

23 neighborhood or went to the neighbor's house. That's great.

24 But sometimes the dog runs to another neighborhood.

25      So what do we do to get strangers, people who have

1  nothing to do with our family or our dog to help look for the
2  dog?  Reward sign.  We say, If you find my dog and bring her
3  to me, I will pay you money.
4       Now, the important thing is I'm not paying the money
5  until I get my dog, and I'm only paying money to the person
6  who finds the dog.  But it's really clever.  The reward sign
7  is great.  Lots of strangers are looking for my dog.  The one
8  person who finds the dog gets paid.  Win.  I get my dog.  Win.
9       And that's what sellers agents are doing here.
10  Sometimes they can find the dog on their own, but sometimes
11  it's better for them to hire other agents in the area who have
12  different expertise and different client contacts to help them
13  sell the home.  And, of course, they should be paid for that.
14       Now, NAR is going to bring four witnesses, but I
15  want to talk about one in particular.  Ms. Sharon Millett.
16  Ms. Millett is a wife, mother.  She's a real estate agent and
17  a realtor.  There's a difference.
18       She runs a very successful local business in a small
19  town.  Ms. Millett was elected by NAR members to be the
20  president of the National Association of Realtors.
21  Ms. Millett will talk about how much work it is to sell a
22  home, how much work it is to buy a home.
23       And it's much more than just going on the internet.
24  You heard from the plaintiffs just go on Zillow, find your
25  home, done.

96

1        Ms. Millett will explain how the internet has made

2   things harder.  There's even more information.  How do you

3   know which neighborhood to look in?  How do you know whether a

4   house is next to a garbage dump or is next to a factory?

5        You can do all that research yourself, of course,

6   and people do.  You don't have to hire a real estate agent.

7   But they have tremendous value, and Ms. Millett will talk you

8   through that.

9        But I want to talk a little bit about her time as

10  president of NAR.  Ms. Millett led NAR's Presidential Advisory

11  Group in the mid-1990s.  So you'll hear about this

12  Presidential Advisory Group.  You didn't hear it from

13  plaintiffs, but you'll hear it from Ms. Millett, that the

14  Presidential Advisory Group was created in response to a

15  change in market conditions, a change from consumer protection

16  advocates that buyers should have agents.

17       Remember, I told you that prior to the 1990s, buyers

18  didn't get their own agents?  Well, that changed, and so NAR

19  commissioned this Presidential Advisory Group.  And they

20  looked at a lot of things.  There were a lot of things that

21  NAR considered, and one very, very, very small part was to

22  modify the real issue in this case.  Ms. Millett's group, they

23  did that.

24       Now, under plaintiffs' story, Ms. Millett and her

25  colleagues, they're the villans.  They're the ones setting up

97

1    this price-fixing conspiracy of which there's no evidence.

         2              But Ms. Millett will testify that NAR didn't invent

         3    agents paying other agents for helping them sell a home.

         4    Ms. Millett will testify that her group wasn't even focused on

         5    commissions at all.  She'll testify that NAR was motivated by

         6    helping people, helping people make sure they had a choice;

         7    that if a buyer wanted their own agent, they could.

         8              So Ms. Millett and her team, they followed the free

         9    market.  They didn't push the free market.  Plaintiffs' case

        10    is a broadside challenge on the progress that the free market

        11    and consumer protection advocates made in the mid-1990s.

        12              As I said, in plaintiffs' world, buyers don't get

        13    agents, or I believe I heard correctly, some of the

        14    high-income people could have agents.  They could pay for

        15    agents on the high-priced homes.

        16              The only explanation the plaintiffs give on why, if

        17    you eliminate that rule, there would be no buyer agents, is

        18    they looked to Australia.  And you saw they looked to other

        19    countries, but those countries are different.  We all know

        20    that.  We live in the United States.

        21              Having no buyer agents hurts the buyer.  Having no

        22    buyer agents hurts the seller.  Imagine a world in which the

        23    buyer has to directly interact with the seller's agent, how

        24    difficult that makes the progress.

        25              They don't have a professional to help guide them.
                                        98

1  And it's true that some buyers would struggle to find the
2  money to hire an agent because they would have to come out of
3  pocket.  They would have to pay the agents to represent them.
4        Now, sure, in the fancy, expensive neighborhoods,
5  maybe that's not a problem.  But not my neighborhood.  Every
6  dollar matters, and that actually hurts the sellers.  Let me
7  explain to you why.
8        If I'm going to buy a home and I have to pay $1,000
9  out of pocket to hire an agent, guess what?  I've got $1,000
10 less to pay for the home.
11       Finally, this idea of Australia makes me chuckle
12 because the buyer's agent still does a ton of work.  Someone
13 has to pay for it.  If the buyer's agent is eliminated, it
14 just means the seller's agent is going to work harder.  That's
15 not going to mean the seller's agents are going to cut their
16 price or reduce their rates.  They're going to go up.  If the
17 seller's agent has to do more, sellers are going to pay more.
18 In plaintiffs' world, everyone loses except maybe the
19 plaintiffs, who already benefited from the rules.
20       So I heard a rhetorical question from counsel:  If
21 this is so good, why does NAR have a rule at all?
22       Well, that's because everybody has a right to know
23 how much they're going to be paid before they do work.  The
24 buyer's agents have a right to know how much they're going to
25 get paid before they start trying to sell someone else's

                          99

1    listing.

2           Now, I'm not just making this up.  Here is the

3    sentence that you did not see in the rule itself:  Agents have

4    a right to know what their compensation will be prior to

5    commencing their efforts to sell.  That is the purpose of the

6    rule.  It's in the rule itself.  It's been on the internet for

7    decades.  It's there for the world to know.

8           Again, this is found at PX4587 at page 39.

9           These are NAR's own documents.  These are the

10   documents that show not only is there no conspiracy, but what

11   NAR is doing is trying to help people, trying to promote

12   homeownership.

13          Now, as I said, and as you saw, the rules don't say

14   how much somebody should offer to other agents helping them.

15   What this rule does is allows the buyers' agents to decide.

16   Do they like how much they're being offered, and they want to

17   do the work?  Do they not like how much they're being offered,

18   and they find other work to do?  Or something in the middle,

19   like they get someone else to pay, or they go and they ask for

20   more money?

21          The important part of the rule is that the agents

22   know before they start to work how much they're going to get

23   paid.

24          So the rule reminds people of the unremarkable

25   proposition that nobody wants to work for free.  Nobody wants

                                  100

to be surprised after doing work they're getting paid less than they thought.  This explains why NAR has the rule.

Now, let's look at some other documents that you didn't see.  Code of ethics.  NAR has a code of ethics.  It's guided by the golden rule.  NAR's code of ethics does not include the obligation to share commissions, fees, or otherwise compensate another broker.

So this is a choice that the agent who's trying to sell a home can make.  Do they want to try to sell themselves, or do they want to try to have other people help them sell it?  If they want to try to have other people sell it, do they want to offer $3, $15, $25?  This document is found at DX4034.  And this is Article 3.

THE COURT:  Mr. Glass, I don't mean to interrupt you.  Are we going to break soon, or should we break for lunch?  Just keeping in mind --

MR. GLASS:  I've got, Your Honor, ten minutes maybe.

THE COURT:  That sounds great.  Thank you.

MR. GLASS:  This is the evidence.

Now, we've spoken a lot about the shell game, the pea, the rule, the things that the plaintiffs are ignoring that will come in in the evidence.

Now I get my favorite part of opening statements.  I get to tell you a little bit more about the National Association of Realtors.

101

1              So as I told you, it's a trade association.  NAR is

         2     a grouping of 1.6 million people who are in the same

         3     profession in the same trade.  And they are competitors.

         4     Absolutely, they are competitors.

         5              But there's nothing wrong with competitors being

         6     members of a trade association, and that's not unique.  Trade

         7     associations are ubiquitous.  We heard yesterday lots of

         8     people belong to associations.  Trade associations are legal,

         9     and trade associations benefit their members and the people

        10     they serve.  For example, as you heard, NAR provides education

        11     and research, a code of ethics.

        12              Now, just because competitors are members of a trade

        13     association does not mean there's a conspiracy.  In fact, NAR

        14     has been really careful.  You just saw a number of slides this

        15     morning in plaintiffs' opening about NAR's numerous policies

        16     that prohibit antitrust violations.

        17              Now, the plaintiffs cut the introductory paragraph

        18     out and didn't show you the rest.  But you will see the

        19     evidence at trial; that when NAR describes the risks that come

        20     from having competitors together, it immediately turns, and it

        21     says, here's how you should be careful.  Don't conspire.

        22     Don't fix prices.

        23              Now, as I told you, membership in NAR is not [sic]

        24     voluntary.  About half of real estate agents don't belong to

        25     NAR.  Remember, corporations do not belong to NAR.

                                        102

```
 1            NAR members are of all shapes and sizes from all
 2    over the country, every walk of life, urban, rural, suburban.
 3    They are our neighbors, our mothers, our daughters who live
 4    and work in our community.  There's 1.6 million of them, and I
 5    bet you there's 1.6 million stories like the one you're going
 6    to hear from Ms. Millett.
 7            Now, let me show you the very first provision of the
 8    code of ethics.  Remember, this is DX4034, Article 1.
 9    Realtors pledge themselves to protect and promote the
10    interests of their client.  This obligation to the client is
11    primary.
12            NAR puts this on the internet.  It distributes this
13    in paper.  Every opportunity NAR has, it tells people this.
14    Because this is what you get when you hire a realtor instead
15    of a real estate agent.  You get somebody who is protecting
16    and putting your interests above their own.
17            Clients can rely on this, and, therefore, it would
18    violate the core principles of being a realtor to put your
19    interests above your client and try to gouge them, overcharge
20    them, or fix prices.
21            Let's look at a few more documents you didn't see
22    this morning.  Now, again, this is in the same document that
23    has the rule at issue in this case, 4587, PX4587.  Page 21 in
24    red, notice to association members.  Under the
25    long-established policy, commissions are solely a matter of
                                103
```

negotiation between the broker and his or her client.

Now, let me pause because that actually is a twofer. Compensation is solely a matter of negotiation. NAR encourages negotiation. Now, again, it's up to the broker and his or her client how they want to negotiate, what prices they want to come to, what policies they want to have on the negotiation, but NAR encourages negotiation between the broker and the client.

Second, the price is not set by NAR. The price is set solely by that negotiation between the broker and her client.

Now, that takes care of the payment from the seller to their broker. Right. The payment from the seller to their broker is solely subject to negotiation between that broker and the client.

But what about the payment from the seller's agent to other agents who are helping them sell the home? NAR has another document. This is DX3883. Commissions are negotiable. That's the title of this document. Again, this is public. It's distributed widely.

It says, NAR never prohibits negotiations between the listing broker -- that's the agent who's trying to sell the home -- and a cooperating broker -- that's a broker who is trying to find a buyer -- at any time during the transaction.

That's important. It's important to know that NAR

104

1  ensures everybody has a choice.

 2         Now, I'm going to turn back to that same document we

 3  saw before.  It also says that the compensation is not fixed,

 4  controlled, recommended, or maintained by any person that's

 5  not a party to the listing agreement.  NAR tells the world,

 6  tells its members that they should not fix, control,

 7  recommend, or maintain.  The only people who are determining

 8  the compensation are the seller and the broker.

 9         There's one more in the same document.  Again, NAR

10  can't say this enough.  Members shall not fix, control,

11  recommend, or suggest the commissions or fees charged for real

12  estate brokerage services.

13         Now, we saw a number of NAR antitrust policies, and

14  it is proud that it has antitrust policies.  That's what a

15  good trade association does.  These are competitors after all,

16  and we train them.  We provide them with education on how they

17  can avoid antitrust liability.

18         And you saw one of these, the Antitrust Compliance

19  Guide for Realtors.  This is a pamphlet.  It's a nice,

20  pocket-sized document.

21         And you saw plaintiffs pull the quote out, but this

22  is what NAR is directing its members.  And it's a little

23  complex because it's doing two points at once.  It says that

24  members must determine their cooperative compensation policies

25  in the same unilateral and independent manner that they

                          105

establish the commissions for fees charged to clients.

So breaking that apart, looking at the second part, unilateral and independent; that means not conspiring. That means making those decisions solely between the broker and their client. And that's to establish commissions or fees charged to their clients.

The first part says that cooperative compensation, that's the money that the seller's agent is paying to other agents to help them sell the home. That also has to be determined in the same unilateral and independent manner.

NAR in its antitrust compliance guide that the plaintiffs put up in sections they didn't show you tells people there's risk, but don't do it. Here's how you can avoid that risk.

The final thing I'll say about NAR's rules is that NAR prohibits conspiracies on commissions. It requires commissions be determined solely by the client and their broker. NAR encourages negotiations.

Now, let me tell you a little bit about what the evidence will be on how NAR ensures that buyers and sellers have choices. So we've heard buyers and sellers don't have to hire a real estate agent. We actually saw. Plaintiffs made my point that while there is this choice that you could sell your home on your own, you benefit from hiring a professional. I believe that plaintiffs put up a document that said you get

106

20 percent more for your house.

That's not because of any conspiracy.  That's because you're hiring a professional who knows how to market a home.  If you try to hire me, you're going to get 20 percent less.  If you hire an NAR member, you're going to get 20 percent more.  That's the value that realtors bring.  It's not required.  You can do it on your own.

Within NAR, there's all kinds of different choices.  You can have a high-service broker.  You can have a discount broker.  You can have a flat-fee broker.  Those are all choices that consumers make.

And there's one other way that NAR preserves choice.  In its code of ethics, and I want to get you to the document number just in case you want to find it in the record.  DX4034 at standard practice 1-12 and 1-13.

1-12 says that realtors must advise the seller about the amounts of any compensation.  1-13 says the same thing for buyers.  Buyers must advise on the amount of any compensation.  Excuse me.  Buyer's agents must advise buyers of the amounts of any compensation.  This is DX4034 at SOP 1-12 and 1-13.

You know what?  The plaintiffs in this case, they got exactly that choice.  They got exactly that disclosure.  They got exactly that information.

Here's Mr. Breit.  Remember, Mr. Breit?  He was the former police captain.  Mr. Breit signed a contract.  Now,

107

1   this is the listing contract.  This is the contract between

        2   the seller, Mr. Breit, and his agent, the realtor.

        3          This is not that closing document that you saw

        4   plaintiffs show because the closing document is not the

        5   contract that the rule pertains to.

        6          If you read this contract, and it's PX2211, you will

        7   see that Mr. Breit agreed to pay his realtor a commission of

        8   5.5 percent.  So he could have taken a discount broker.  He

        9   could have had a full-service broker.  Looks like he got

       10   somebody somewhere in between.  That's his choice.

       11          In the same contract, he acknowledged that his agent

       12   was going to try to sell the home by using other agents in the

       13   community.  He acknowledged that his agent was going to pay

       14   2.7 percent to buyers' agents.

       15          Now, if the buyers' agents never showed up, he still

       16   agreed to pay his seller commission, and that's how it

       17   normally works, is that if an agent sells it on their own,

       18   they keep the entire commission.

       19          But if the agent wants to use others in the

       20   community, they've got to pay them.  Everybody deserves to be

       21   paid for work they do.  And all the rule says is that when

       22   Mr. Breit agreed and acknowledged that his broker could try to

       23   use other agents to sell the home and pay them 2.7 percent,

       24   that his agent was going to tell people that.  And

       25   Mr. Ketchmark said there's nothing bad about telling people.

                                         108

I don't even understand how you can tell people price -- I
don't even understand how you can work without telling people
a price.

I think in the plaintiffs' world, there is a whole
bunch of work being done, and you eventually just guess at how
much you're going to get paid?  No, you need to provide
information just like you need to provide the address of the
home, the sale price of the home, who to contact to buy the
home.

Mr. Breit signed this.  This document has legal
consequences.  If you don't understand it, consult your
attorney.  This is one of the five.  You'll see all of the
contracts that we have.  This is what plaintiffs in Missouri
sign and agree to.

Mr. Breit signed it.  He used one of those
electronic signatures.  In Missouri, that's okay.

Here is the kicker.  We got to take depositions too.
Mr. Ketchmark played a bunch of videos.  I'm not going to play
you a video.  I'm just going to show you a quick question and
answer.

Mr. Breit was asked:  And were you happy with the
services he, his agent, provided to you?

I was.

And, in fact, you used him again later when you sold
your house, right?

109

```
1          Correct.

2          Mr. Breit was satisfied.

3          Ladies and gentlemen and Your Honor, thank you for

4    being patient with me.  I really appreciate you listening to

5    NAR's story.  NAR exists to help its members promote

6    homeownership, and it's a challenge.  Buying a home is harder

7    today than it ever has been.

8          NAR is doing what it can to help.  This case is a

9    broadside attack on the exact things NAR has done to help.

10   It's followed the free market.  It's made it so that people

11   have a choice whether they want to hire a broker.  It's made

12   it so people know the information and can negotiate the

13   commissions if they want to.

14         NAR doesn't tell anybody what to do.

15         Ladies and gentlemen, thank you so much for your

16   patience.  We look forward to spending three weeks with you.

17         THE COURT:  Ladies and gentlemen of the jury, we're

18   going to go ahead and take our lunch break.  I'm going to

19   remind you that during this recess and every other recess, do

20   not discuss this case among yourselves or with anyone else,

21   including your family and friends.  Do not allow anyone to

22   discuss this case with you or within your hearing.  Do not

23   discuss also means do not email, send text messages, blog, or

24   engage in any other form of written, oral, or electronic

25   communication as I've instructed you earlier.
```

110

1        Let's plan on hearing from the other two defense

2   lawyers for their opening statements starting at 1:10.

3        No. 44, if we could maybe start back here at one to

4   talk about that issue we talked about.

5        We'll see you all after your lunch break.

6            (A recess was taken.)

7        (The following proceedings were had out of the

8   presence of the jury:)

9        THE COURT:  How are you, ma'am?  What's the easiest

10  way to take care of it?

11       VENIREMAN 44:  Let's just go back.  So my son, I

12  have an almost three-year-old, turns three next week.  He has

13  disabilities.  He goes to a special school called The

14  Children -- The Center for Children with Vision Impairments.

15  It's CVI, 31st and Main.  He only goes two days a week, 12 to

16  3 Tuesdays and Thursdays.

17       THE COURT:  Down on Main?

18       VENIREMAN 44:  Yes, 31st and Main.  So not too far.

19       His nurse has to go to school with him, and she's

20  been coming to the house at 10 a.m. to get him ready for

21  school.

22       Pickup isn't a worry.  Dad can pick him up.

23       Now, my daughter was -- is a month old, and she and

24  I have my postpartum appointment on Thursday.  They haven't

25  told me a time yet.  They said early morning.  They said

                              111

they'll get me in as early as they can. So nine, I'm

assuming.

And that's because after six weeks of having a baby,

you go to your postpartum appointment. So that is that.

And then last thing, like I said, my son is getting

ready to turn three. I don't know if you know, but when

kiddos turn three who have special needs, they start up an

IEP, so an individualized education plan. Tomorrow is his IEP

meeting at 12 o'clock.

So that one I'm like I could virtually do that one

here. But I should have said all of this before. It's just

that it's just my life, and so I don't consider it like these

big hard hurdles. It's just you just do what you've got to

do.

THE COURT: Well, you're impressive. Working moms

are impressive.

VENIREMAN 44: Thank you. It's hard.

THE COURT: It's hard. Way to go.

VENIREMAN 44: Thank you.

THE COURT: So let's go in order.

VENIREMAN 44: Yes.

THE COURT: Let's do daughter because that's easy.

We won't start on Thursday until you get here.

VENIREMAN 44: Okay.

THE COURT: So if you think it's nine, how about we

```
 1   call it 10:30?

 2            VENIREMAN 44:  Okay.

 3            THE COURT:  That way we can tell the other jurors

 4   what's going on.  The lawyers can be told what's going on so

 5   they know what to do.

 6            VENIREMAN 44:  Okay.

 7            THE COURT:  So 10:30 on Thursday, which is -- that's

 8   the 18th, right?

 9            So that's what we'll do on Thursday.  And we can't

10   and won't start without you.  So 10:30 on the 18th.

11            And your son, he -- tomorrow if we take an 11:30

12   lunch on Tuesdays and Thursdays till one, will that -- I don't

13   know where you live, but you said KCMO.

14            VENIREMAN 44:  Not very far.  Right down the street

15   actually.  Yeah, if we did that, 11:30 to 1 lunches on

16   Tuesdays and Thursdays?

17            THE COURT:  Uh-huh.  Thursday, the 19th at 10:30.

18            VENIREMAN 44:  Yep.

19            THE COURT:  And then on Tuesdays and Thursdays

20   throughout the trial, we do 11:30 to 1?

21            VENIREMAN 44:  Lunch, okay.

22            THE COURT:  Will that allow you to get your son to

23   CVI?

24            VENIREMAN 44:  I think so, yeah.

25            THE COURT:  Can you get started at 8:30?  Does that
                                113
```

work?

VENIREMAN 44:  Yeah.  The only accommodation for tomorrow, can I bring my laptop?

THE COURT:  You bet.  You bet.  And Sara will communicate that to the folks that will be -- promptly on Wednesday, we'll have a noon break, so you'll get out a little bit early and get you a room where you can do your IEP.

VENIREMAN 44:  Okay.  Yep, that works.  Yeah, thank you.

THE COURT:  I'm not going to tell any of the other jurors about any of this other than just to address the timing.

What else can we do?

VENIREMAN 44:  Let's start there.

THE COURT:  Thank you for your service.

VENIREMAN 44:  Thank you.  Thank you so much. Appreciate it.

(The following proceedings were had in the presence of the jury:)

THE COURT:  Mr. MacGill.

MR. MacGILL:  Yes.  Your Honor, may it please the court.

THE COURT:  Please proceed.

MR. MacGILL:  I'd like to pass out hard copies of the exhibits that we're going to be using, if I may, to the

114

```
 1   court and Mr. Ketchmark.

 2            THE COURT:  Thank you.

 3            MR. MacGILL:  Good afternoon.  Ladies and gentlemen,

 4   I introduced myself yesterday when we had a larger session and

 5   a larger group.  I want to make one more introduction, if I

 6   may.

 7            I represent three companies, HomeServices of

 8   America, HSF, and the franchisor organization.  I'd like to

 9   introduce two of the representatives from our companies that

10   are here with us this afternoon.

11            First is Mr. Mike Brown, who is seated in the first

12   row here, and to his right is Marian Pierre Warren.  Also,

13   these are our client representatives that will be here

14   throughout the trial.

15            So what I'd like to do is start out with sharing

16   with you who we are, number one, and showing you, at least

17   schematically, our companies and how we operate and how we are

18   organized.

19            So HomeServices of America is the parent company.

20   You heard a little bit about that company so far.  This is a

21   parent company that has ownership interests in a company

22   called HomeServices of MOKAN, LLC.  And then they have

23   subsidiary operations.

24            So we are the indirect parents of these brokerage

25   firms, and these three brokerage firms are here in Kansas
                                 115
```

City:  ReeceNichols.  You see Berkshire Hathaway of Kansas City Realty and Berkshire Hathaway Alliance Real Estate.

So that is the -- in terms of that side of the operation, ladies and gentlemen, that is the wholly-owned subsidiary operation.

Separately the company HomeServices of America has, again, an operation, a franchisor that it owns.  It owns HSF, and, in turn, there's BHH and their franchisee operations.

So two or three more things to share with you as we get started.

So what is HomeServices, and what are these companies?

HomeServices of America is a holding company that owns these companies.  It does not operate these subsidiaries. It does not operate these franchisees, and I'll tell you more about that later.  It owns, does not operate, and that's what the evidence will show you in this case.

Second, this HSF is also a holding company.  It owns the franchisor organization, and it, in turn, executes agreements, franchise agreements, with different realty companies, and they are the franchisees.  So they have that operation.

With respect to these details here, and you'll hear this in more detail in a few minutes, but HSF owns this company, but HSF does not operate the brokerages.  Okay?

116

```
 1              Now, you'll decide the case on the facts.  You'll
 2    decide what's helpful and what's not helpful as soon as you
 3    sort out the evidence and the meaning of the evidence.  But
 4    I'm going to make one suggestion.  You may find that this
 5    chart is quite helpful in sorting out who's involved in what
 6    way.
 7              So let's turn to some of the additional details
 8    here.  What we have to say to you here initially is we think
 9    the evidence will confirm to you two very fundamental things.
10              One, that there's no conspiracy that existed.
11    There's no evidence -- to repeat, no evidence -- that any one
12    of our clients entered into a conspiracy to follow and enforce
13    the offer of compensation model rule.
14              If I could repeat myself in one way.  No evidence of
15    our clients.  Who am I speaking about?  HomeServices of
16    America, HSF, and the franchisor.
17              And, second, the evidence will confirm that there
18    is -- or has been no injury that's been proven by any expert,
19    and there's no proper damage analysis that has been made in
20    this case.
21              So those are the two things that we think the
22    evidence will confirm through the proceedings here, and those
23    are the two conclusions we think that you can and you should
24    reach in this case.
25              So let's turn to a little bit of the history.  On
```
117

1 this I'd like to be very specific and go kind of slowly on one

2 part.  You see in the heading here, I've said "the American

3 practice of cooperative compensation," and then separately

4 "and the rule."

5 So what I'd like to do is start first in speaking to

6 you about this to look only and specifically at the American

7 practice of cooperative compensation.  Why is that important?

8 The practice of cooperative compensation in this country

9 developed as a natural series of events in our marketplace in

10 this country.

11 It was a natural sequence where buyers and sellers

12 of real estate decided that they should practice cooperative

13 compensation.  There will be some discussion about that.  But

14 this practice developed here in the United States over

15 decades.

16 So when you think about Mr. Ketchmark, all the

17 things that he had to say, Mr. Glass, and you think about this

18 cooperative compensation, did it come into existence in the

19 year 1996?  No.

20 The practice has been in existence in this country

21 for decades, and it came not because of a NAR rule or not

22 because anybody made any rule and not because anybody

23 conspired with anyone, according to the evidence that you're

24 going to hear.

25 But it occurred because in this country, people

118

decided, buyers and sellers, this was best.  It was a way to facilitate transactions.  I think that's what you'll conclude when you hear all the evidence in this case.

All right.  So why?  What are you going to hear in the evidence in this case?  Why in the United States -- and if you don't mind, I'm going to remind you about one of the phrases you heard from Mr. Ketchmark.  Remember, he talked about rest of the world?

Well, we're not talking about the rest of the world in this case for many different reasons.  Let's focus on the United States for just a minute.  Why in this country did the practice of cooperative compensation come into existence? Why?

It came into existence for good reasons, many good reasons.  Americans learned over decades that sharing, getting your arms around the whole marketplace not in a bad way, but I'm a broker, and I'm going to put my arms around every other broker so that we can cooperate and create more demand for houses and make transactions work.  Putting your arms around people for that reason, I think you will find there's nothing wrong with that and that's good.

Well, the American public, I think you'll find, decided it was good.  Because what does that practice do?  The practice increases the demand for homes.  You'll hear evidence from that, from our expert witness, Dr. Wu.

119

1      It helps buyers who are low on cash by having this
                    2   cooperative compensation because the buyer doesn't pay the
                    3   commission, and buyers can afford agents.  We think that
                    4   you'll find that that is why in this country it developed to
                    5   be a practice.
                    6      Now, what was NAR's rule in all of this?  Well,
                    7   we'll talk about it specifically, but NAR's rule was to -- you
                    8   know, it was certainly aware of the practice, and NAR, for its
                    9   part -- you'll hear from their own witnesses, not from a
                   10   deposition clip or a phrase here of testimony and a phrase
                   11   there of testimony but from real witnesses who are sworn in
                   12   the presence of this United States judge and you to describe
                   13   why did they legislate a rule when the practice already
                   14   existed?  Why?
                   15      Well, the answer is you're going to hear from a
                   16   witness, and the witness that's going to tell you -- or
                   17   witnesses are going to tell you that the rule improves the
                   18   practice because it simplifies transactions and creates
                   19   efficiency.  It tells people how much they're going to be paid
                   20   if they bring a buyer in a uniform system in a uniform way.
                   21      That's the evidence that you'll hear on the practice
                   22   how it developed in this country and separately the rule
                   23   itself and how the NAR rule is something that came into effect
                   24   to simplify transactions and create efficiencies.
                   25      Now, with that background, having got to talk with

                                        120

1    you a bit about this, I'd like to talk about our company and

2    what our involvements were, if any, on the rule and how we

3    existed in this format and have you take a look.

4              This is the presentation I want to make to you, that

5    we respectfully submit to you that we believe that you will

6    conclude that the evidence in this case -- that no one

7    conspired with anyone about this rule, number one.

8              Number two, we think you'll decide after all the

9    evidence is presented to you that our companies, not one of

10   our companies was involved in a conspiracy of any kind in

11   relation to the rule.  And these are the companies:

12   HomeServices of America, HSF, and the franchisor organization.

13             I'd like to give you just a bit of history as to why

14   we say this to you and what the evidence is going to show you

15   in this respect.  Here's some history.  You heard a little bit

16   about this this morning.  We talked about the practice and the

17   development here in the United States.  Well, when was it that

18   NAR first put a rule out to help improve the practice?

19             Well, NAR's first rule was in 1972.  That's the

20   first version of a rule that you're going to hear about.

21   Okay?

22             Mr. Ketchmark and the lawyers here at this side of

23   the courtroom want to focus not on that history, not focus on

24   that rule, but for their purposes, they want to focus on the

25   1996 rule.

                          121

1          Well, that's fine, and it doesn't make any

         2     difference, we think, in terms of the analysis that you'll

         3     make as the case ends and is placed in your hands because that

         4     rule is what they claim is the beginning of the conspiracy

         5     where a lot of corporations, including our companies, somehow

         6     were involved in a conspiracy.

         7          Well, I'd like to give you a little corporate

         8     history.  First, with respect to HomeServices of America, we

         9     did not come into existence until two years after the alleged

        10     conspiracy, two years.

        11          What about this organization, HSF and BHH?  What

        12     about those organizations?  Well, with respect to the

        13     conspiracy that the plaintiffs have alleged, these companies

        14     didn't come into existence until 16 years after the alleged

        15     conspiracy was formed.

        16          We think that, when you look at that history, that

        17     may be informative as to whether we did anything at any time

        18     to follow and enforce that rule.

        19          Let's look at some more details here, and with

        20     respect to just one final point -- with respect to this, and

        21     this is not being disrespectful or unkind, so to speak, about

        22     the rule.  We're just -- the rule did what it did.  It

        23     improved efficiency, as I've described.  I'm not claiming the

        24     rule is bad, but we're just saying we weren't there at the

        25     time it was enacted.  Okay?

                                      122

So if we look at this, the evidence here, we want to

bring you people that founded our company, the person who

founded our company, and have Mr. Peltier testify in court to

you directly and allow you to hear from him with your own ears

and hear what he has to say.

          Mr. Peltier, he founded HomeServices of America, and

what he's going to describe to you is that they had a business

model, and the business model was relatively straightforward.

They wanted to identify and purchase the best HomeServices

company in each local market.

          But, ladies and gentlemen, it wasn't just

brokerages.  What HomeServices wanted to do is provide all

kind of services to homebuyers and sellers, like title

companies, mortgage companies, and insurance.

          So that's what the acquisition aims were to make it

a one-stop shop -- shopping outlet for people who were buying

or selling homes in each of these ways.  That was his vision,

and he implemented it, as he will describe to you in this

courtroom, in the ways that we've described.

          Now, one other thing Mr. Peltier is going to share

with you in terms of what he's going to say specifically, he's

going to say there was a founding philosophy that he had at

the time that he created this company, HomeServices of

America.  The company wanted to support the subsidiaries but

stay out of the way operationally.

                              123

1    And, if we could stop there, when we say
2    "subsidiaries," what are we talking about?  We're talking
3    about subsidiaries like ReeceNichols, subsidiaries like
4    Berkshire Hathaway of Kansas City Realty, et cetera, and the
5    franchise, this franchise organization as well.
6         Stay out of their way operationally.  Let them do
7    what they do, run real estate brokerages, make decisions about
8    what to do, whether to join NAR, whether to participate in the
9    MLS, all those kinds of things.  Founding philosophy, it's not
10   run from top down, as you heard from the plaintiffs'
11   presentation.  It is run right here.  It's operated at this
12   level of the subsidiaries, and it's operated at this level of
13   the franchisees.
14        So one other philosophy that he had:  Sharing is a
15   good idea.  You'll hear Mr. Peltier talk about why sharing
16   ideas is critical to having a good company operation, and that
17   that was fundamental to the entire formation of his company.
18        But what does he mean when he talks about sharing?
19   Well, their company practices that were the ethic of this
20   company that you're going to hear about, and that ethic was
21   from HomeServices of America.  We should have our subsidiaries
22   determine their best practices, but also we should allow them
23   to communicate with one another and decide how best they
24   should run their businesses, how they best should run their
25   businesses.

124

Now, before going to the next slide, I want to share
one detail about opening statement that you heard today.  A
gentleman by the name of Mike Frazier was mentioned to you in
the opening statement today.  And Mr. Ketchmark, in his lawyer
words, characterized his activities.

                    Let me share with you right now.  Mr. Frazier is
going to come here and he's going to describe to you exactly
how he operates his business and exactly how he can be CEO of
this company, ReeceNichols, and Berkshire Hathaway Kansas City
Realty and why, in his view, that makes operational sense.

                    You, with the assistance of this United States
judge, will determine if that's proper and legal in every
possible respect, and I think that you'll find that it's -- at
the end of the case, it's operationally correct and proper,
and it's certainly proper legally.  But that will be up to you
based on what this court instructs.

                    So let's turn to another gentleman that you heard a
lot about, and I want to share just a few things about this
gentleman, about him personally because I think it's relevant
to his appearance in the courtroom, and it's relevant to
everything that we want to talk to you about in terms of our
clients.

                    Gino Blefari is a very motivated person.  He's a
person that was born with a serious learning disability.
You'll hear about that.  He has dyslexia, which is serious.

                                125

1  Reading any document of any kind is a struggle.  He's lived
2  with that his entire life, from the time he was in elementary
3  school until today.
4           When he sits at that witness stand, if he's asked to
5  read something on a small screen that's not massively large,
6  it's not going to happen.  He can't do it.  Okay?
7           But this is relevant for several reasons, because
8  you're going to hear from the evidence in this case that
9  Mr. Blefari had a lot of responsibilities and did a lot of
10  things in his life that relate to what he's going to tell you.
11          Number one, he was convinced that he was going to go
12  to college.  Notwithstanding a learning disability, he went to
13  junior college for three years.  He wanted a bachelor's
14  degree, and he went to college in California and got a
15  bachelor's degree after five years.
16          What he did was he got that degree.  He had to put
17  himself through, and he did.  He worked full-time at a golf
18  course every one of those five years.
19          So what happened next?  Well, Mr. Blefari wanted to
20  go in the real estate business; so he became a real estate
21  agent in northern California.  And that's really important for
22  what we're going to talk to you about today because his role,
23  as you might predict, as a gentleman with these challenges in
24  life that has gotten a college degree at this point, he was a
25  very motivated and successful real estate agent.

                                  126

1    Some would say he was the best agent in California.

2    For 20 years he was certainly one of our top agents, if not

3    one of the top agents that we knew about in the state of

4    California.

5         Well, with somebody that successful, he was promoted

6    into management, and he was in management at different

7    companies, but after the promotion what happened is he decided

8    in his mid forties to leave his company and start his own

9    company.

10        Well, Mr. Blefari started in northern California a

11   company, and he had zero agents to start.  Within one year, he

12   had 1,000 agents.  Okay?

13        So why do I tell you this?  Because they wanted to

14   mention here, and they had some clips, some partial clips of

15   Mr. Blefari suggesting that this sales training he did was

16   somehow a directive from HomeServices to each of these

17   subsidiary companies.  I think you'll find from the evidence

18   anything but.  That's not correct.

19        And what he'll describe to you and we'll go through

20   it in some detail is why he was called upon to make one

21   training exercise with one of these subsidiaries.  And we'll

22   show you that training exercise.  That was not top down.  That

23   was an invited speech.  We'll talk about that.

24        Now, we're going to talk about sales training in a

25   few minutes, but before going there, we need to talk about the

127

evidence that applies to the core issue in this case. The plaintiffs -- I wasn't a clock watcher, but I think it was almost two hours of presentation. But during that almost two hours of presentation, I with my own notes tried to keep track of how many minutes were devoted to the issues in this case.

That is, did any one of these people in these companies, did any of the companies direct anybody to follow and enforce the cooperative compensation model rule? That's the issue in the case. Okay?

Our judge explained that when he read this to you. We heard very little about that issue. We'd like to talk about that issue in terms of what you're going to hear now.

On this question of did HomeServices of America do anything to follow or enforce the cooperative compensation rule, that rule, the answer is no. Mr. Blefari is going to come here and testify in person, and he's going to describe the company he's CEO of does not control day-to-day operations of any of its subsidiaries.

He's going to confirm it does not require its subsidiaries to follow and enforce the offer of compensation model rule. That's the question in this lawsuit. That is the question in this lawsuit, and he will describe to you specifically that the CEO of the company in his company, they do not direct any subsidiaries, any franchisees, anybody to follow and enforce that rule.

128

```
1              Whether somebody follows that rule or takes part in
2    the MLS in their particular region, that's decided at the
3    franchise level or the subsidiary level.
4              But there's more.  Mr. Blefari is going to describe
5    to you that HomeServices of America has never directed its
6    subsidiaries to join NAR, never.  Has never directed any of
7    its subsidiaries to join a local realtor association or any
8    MLS, and HomeServices itself is not a member of NAR.
9              Now, we're going to talk for a minute about what
10   Mr. Ketchmark -- he showed you a -- he showed you a clip and
11   played a clip from a Mr. Goffstein.  Mr. Goffstein is in this
12   organization right here.  Yeah, they have a policy, and we'll
13   talk about that.  That has nothing to do with HomeServices of
14   America.  That's their policy at the brokerage level, and
15   we'll talk about that in just a minute.
16             Now, Rosalie Warner -- we'll bring Ms. Warner here
17   to testify.  I believe you heard a sentence -- I'm sorry.  You
18   heard certain lines of testimony from Rosalie Warner.  She'll
19   be here to testify in context in full for you to hear her
20   testimony.  She will confirm -- if you don't mind, I'm going
21   to point this out again.  This is HSF, the holding company.
22   She's the senior vice president of network services of the
23   holding company.
24             She will say they don't control the day-to-day
25   operations of these franchisees.  They don't require the
                                129
```

franchisees to follow and enforce the offer of compensation

model rule.

And same as you heard before with respect to

HomeServices, HFS and BHH have never directed their

franchisees to join NAR, any local realtor associations, or

any MLS, and specifically that HFS and BHH are not members of

NAR.

One more dimension here of testimony on how we

operate the companies, how the companies are operated.  These

are separate companies, as I think you've gathered by now, and

I think you'll conclude that based on the evidence in this

case.  They're all separate companies.

But we wanted you to have one more layer or context

as you evaluate this.  ReeceNichols, that is a subsidiary

company.  Ms. Krista Wilson will be here.  She's the senior

vice president of brokerage, and she will confirm, yes, there

is no directive from HomeServices of America, and they never

directed us to follow or -- and enforce the NAR rules.  That's

the issue in the case.  Never so directed.

She will also say that they at ReeceNichols have

independent operations and specifically that ReeceNichols is

independently managed.  And, as you might have expected, she's

going to testify that it makes its own policy decisions at

this level, and you'll see that across the board.  These

brokerages, these franchisees make their own decisions.

Now, as we tie up some of this conspiracy
discussion, I wanted to share with you Mr. Ketchmark is going
to -- the plaintiffs, I should say, are going to call an
expert by the name of Schulman.  Dr. Schulman is here.  He'll
be testifying here live, as I understand it.

          And you didn't hear much about Dr. Schulman in the
opening statement from Mr. Ketchmark.  I think there was a
paragraph or two about him, but we have several things we want
to share with you to preview the evidence you're going to hear
in this court about Dr. Schulman and from Dr. Schulman.

          First of all, the entire case is premised on this
idea that my clients, our company somehow directed people to
follow and enforce these rules, and there was a conspiracy
with NAR and others.

          Their own expert has admitted he has never seen a
single document or any testimony showing that any defendant
discussed commissions with each other.  That from their own
expert, and you'll hear that in the context -- or not -- not
in the context.  You'll hear it from this witness stand here
in this courtroom.

          So, ladies and gentlemen, on the conspiracy summary,
to give you the details here, you've already heard about the
cooperative compensation offer -- or I should say the offer of
compensation model rule.  It's been described by many people.

          But to summarize a couple of things, there is no

                                131

evidence that HomeServices of America, HSF, or BHH entered into a conspiracy to follow and to enforce this particular rule.

Now, don't mean to be disrespectful in any sense, but I need to speak very directly to you about this next topic. There is no evidence -- in our view, there is no evidence that you will hear that we followed or enforced the cooperative compensation rule in any of these companies.

What we think you're going to hear, and I think you heard almost two hours of it today, is that the plaintiffs want to change the subject from who directed, if anyone, anything about following and enforcing the rule, and they point -- I think you're going to hear evidence in this case four times, four different ways they're seeking to change the subject.

You heard in the opening statement of the plaintiffs, they want to talk about the clear cooperation policy. That policy is 13 years after the policy at issue. This policy is made after this lawsuit was filed, and it has nothing to do with cooperative compensation. It's simply a rule that says if you have a listing and if you make it public, you can't hide it. You have to put it on the market. You have to put it on the MLS. No hiding of listings, no pocket listing, so to speak. It has nothing to do with this lawsuit.

132

Our company supported that policy in 2019 because it
was important to give consumers options and to give other
brokerages options to have listings not held in pockets by
people.  Every broker would have an opportunity to participate
in a sale.

          Industry meetings, you heard a number of different
references.  We have participated as a company in different
industry meetings over time.  We certainly have, but not one
of them -- and you didn't hear about one of them -- according
to the evidence in this case, involved any of our companies
ever meeting to discuss anywhere the cooperative compensation
rule ever.

          So they can talk about industry meetings, but there
will be no evidence in this case that you will hear that we
went to any industry meeting and ever talked about the rule
that's at issue in this case at any time.

          Operations by independent subsidiaries.  You heard
some of that in the opening statement.  We never can predict
what we're going to hear, but in this case, we thought we
might.  Operations by independent subsidiaries, and somehow
that's a follow or directive.  Well, let's talk about that
specifically.

          Mr. Goffstein, you heard -- well, you listened to
the testimony they played, and what Mr. Ketchmark played for
you is the video of him testifying.  Here's what he said.

                              133

1          The question from Mr. Ketchmark was, and then you go

2    on in here and state, These independent contractors shall

3    agree to join the local board of NAR and thereby join the

4    National -- or and thereby join the Missouri and National

5    Association of Realtors, that the Missouri, NAR and the

6    National Association of Realtors, that's -- all the defendants

7    agree to that; correct?  Agree to do that; correct?

8          Answer:  Active agents are obligated to have a NAR

9    and MAR and whatever local board it is they're members of.

10          These people you referred to as independent

11    contractors, you're placing a requirement on them; correct?

12          Absolutely.  That is the brokerage making the

13    decision.  That is this company right here, this brokerage.

14    The president of the company testified carefully, truthfully,

15    and appropriately, yes, we run our brokerage.  We make

16    decisions.  Nobody tells us what to do.  We make these

17    decisions.  We enter into contracts with our independent

18    contractors, is what they'll tell you.  We choose it, meaning

19    Berkshire Hathaway Alliance Real Estate decides what that

20    contract will say.

21          So it is a subsidiary operation, has nothing to do

22    with whether HomeServices of America, HSF, or BHH directed

23    anybody to follow or enforce the cooperative compensation

24    rule.

25          Now, as I've just shown you, Mr. Goffstein, that's

                                  134

his photograph.  That's his company that you see here.

Now, I want to move to a final topic on this --
under this headline of changing the subject from the question
at hand.

You heard partial testimonies -- or partial excerpts
from Mr. Blefari's sales training.  Mr. Blefari, based on his
20 years of being a star performer as an agent, not as a
manager, as an agent in northern California, was invited by
this company, Berkshire Hathaway -- Berkshire Hathaway and
HomeServices, to give a lecture or a training video to
describe how he -- how he acted as a sales agent, not I'm
telling you what to do.

Come tell us, Mr. Blefari, so we can tell our --
show us in the video how you were successful as an agent, and
that's exactly what he did.  It had nothing to do with any
directive by anybody from his -- from HomeServices or HSF or
the franchisor.

Here's what actually occurred, and there's context
here.  This is two minutes, but bear with us.

(Video played.)

MR. MacGILL:  So that's Mr. Blefari on elevating
confidence in terms of what he said in an invited lecture,
invited presentation by one of these subsidiary companies on
what he did and how confidence is important.

One more, two and a half minutes.

135

```
1              (Video played.)

2              MR. MacGILL:  So, ladies and gentlemen, I think

3    you'll find from the evidence in this case that the core

4    principle of the sales training given to this group of people

5    at this level of the company or the franchisor organization is

6    to describe what you're going to hear repeatedly is the way to

7    be successful in real estate sales is to have collaboration

8    between the listing agent and the buying agent or the listing

9    broker and the buying broker.

10             So to summarize, ladies and gentlemen, on

11   conspiracy, we remind you that there's a history here that

12   there's -- the practice didn't just -- it came into existence

13   over many decades.  It's the practice of cooperative

14   compensation has existed for good reasons we've indicated.

15   You'll hear that from the evidence.

16             But when you look at this, when you look at the

17   claims that are now -- if we can just talk about my clients

18   for a moment, when you look at this with respect to our

19   clients, our companies, HomeServices of America, HSF, and our

20   franchisor organization, at no time gave any directive to

21   anyone anywhere that they should follow or enforce the

22   cooperative compensation rule.

23             So, ladies and gentlemen, that brings us to the

24   second portion of our opening statement to you here this

25   afternoon, and that is I want to talk to you about two things.
```
136

This offer of compensation model rule did not cause injury of any kind, and, second, this offer of compensation model rule caused no damages of any kind. And Dr. Schulman is wrong, and you'll hear expert testimony about that, why he's wrong as a matter of economics.

So let's talk a little bit about Dr. Schulman. Pardon me. Let's first talk about choice.

You may find from the evidence in this case that the plaintiffs contracted for services and got exactly what they asked for; and that they made many choices and they were bound by contracts associated with those choices, contracts they signed, contracts they negotiated. That may be what you find.

What did they choose? Well, first of all, they chose the type of representation that they would have. Did they want to do a for sale by owner? Some do it and some do it successfully. That's choice one.

Did they want to use a discount agent? Did they want a full-service agent?

Well, ladies and gentlemen, the choice made by the representative plaintiffs in this case, they all rejected for sale by owner, rejected discount, and decided they wanted a full-service broker. So that was the choice they made.

They also chose whether they wanted to have their listing put on the MLS so it was exposed to all of the potential buyers. They made that choice, the second choice,

137

```
 1   and each of them made that choice.

 2              But I point out something that you may find

 3   important.  That choice isn't just obvious.  It's not just an

 4   obvious result.  20 percent of the people here in Missouri

 5   choose not to use the MLS.  Each of the plaintiffs did.  So

 6   they chose full service, and they chose the MLS listing.

 7              Third, they made a contract.  Okay.  They made a

 8   contract.  And that will be the evidence in the case, and

 9   we'll show you those contracts.  We'll examine the plaintiffs

10   about their contracts.  And there were listing terms in that

11   contract that they agreed to.  They had agreed to a listing

12   commission, but they made two other agreements.

13              They made an agreement that there would be

14   cooperative compensation, and they made an agreement as to the

15   amount of cooperative compensation.  Three, price -- there's

16   three percentage terms in that -- in those listing terms, the

17   listing commission, whether or not they would agree to and

18   acknowledge and assent to cooperative compensation, and the

19   amount.  Okay?

20              Those were their choices.  These are the plaintiffs

21   you'll hear from, and you'll hear -- the plaintiffs will bring

22   them to the court, and we'll have some questions for them

23   also.

24              Now, just to be specific, if I may, to give you a

25   little bit about how they documented their choice that they
                                  138
```

1    made.  This is Rhonda Burnett and Scott Burnett's choice.

2    That was with ReeceNichols, this company here, one of our

3    companies.  They agreed to pay ReeceNichols a commission

4    consisting of $298 in circle one, and then there's 7, 8, 9,

5    10, or 6 percent.  They chose 6.  That was the commission they

6    negotiated for the sale of their house.

7              So they came to ReeceNichols, and they agreed --

8    full service, and they came to ReeceNichols.  They knew it was

9    going to be an MLS listing, and they agreed to the overall

10   price, 6 percent.

11             But that wasn't it.  They also consented to

12   cooperative compensation.  Broker will offer a commission

13   split of 3 percent of listing side and 3 percent of selling

14   side.  So they made an agreement that said, yeah, it's going

15   to be 6 percent, and, yes, cooperative compensation is agreed

16   to, and, yes, it's 3 percent.  Okay?

17             So if -- you'll hear that testimony.  It will be not

18   just the Burnetts.  You'll hear that from others as well.  We

19   think that, based on the evidence in this case, you will

20   conclude specifically that the rule does not cause cooperative

21   compensation, because even without cooperative compensation,

22   it would be offered.  In other words, the rule doesn't cause

23   it.

24             If you don't mind, I'll go back to what I said a few

25   minutes ago.  Cooperative compensation, the practice developed

                                139

over decades and was the prevailing practice here in the
United States for decade after decade.  The rule only took
that practice and made it better and more efficient.

So based on that history, what would you predict?
Well, you'll have a chance to hear the evidence, and you can
think about it.  But I think the prediction that you may make
as a matter of linear logic is pretty clear.  The rule doesn't
cause cooperative compensation.  It's always been the case in
the United States, okay?  In the United States, you'll find
that that's always been the case.

So what happens?  We didn't hear much about
Dr. Schulman, but I need to explain a few things about
Dr. Schulman.  Dr. Schulman says, Well, I'm an economist, and
I have a Ph.D., and I can make economic predictions of what
would happen if the world did not require a blanket unilateral
offer.  I, as an economist, he will tell you, I can make
predictions.

What does he predict?  The sellers would not pay
buyer agents at all.  That's one prediction.

Second, the buyer agents use would be rare.  You may
find that's -- there's no logic in that whatsoever.

And if used, buyers would pay their own agents.  You
may find there's absolutely no logic to that, but we'll talk
about that.  But these will be your decisions.

So let's look at what the concerns are with that

140

that you will have to evaluate as jurors in this case. We will present evidence to you that has three parts. We will tell you that Dr. Schulman is wrong for at least three reasons.

One, there's a flawed foundation to everything he says. There's no economic support. There's no true economic analysis that can be made to get to that prediction, and, two, he's relied on one document improperly.

U.S. market outcomes, we'll talk about that. Outcomes in the United States have proven him wrong, and, third, there are many reasons to offer cooperative compensation.

First, the flawed foundation, Dr. Wu will be here. He'll testify on behalf of the defense, and he will say that he's economically not correct. On economic principles, he's not correct.

Dr. Schulman says, I have a basis for my -- I have a basis for making a prediction. It's called the D.A.N.G.E.R. Report. Mr. Ketchmark made reference to that. He said, Well, look at this. Commissions spiraled downward outside the United States. Look at these low commission rates.

Dr. Schulman says, This is all I need. This is all I need is to just look at this. He couldn't be more incorrect if you look at the evidence the way the defense does.

Let's talk about this report. This D.A.N.G.E.R.

Report was written by a man named Stefan Swanepoel.
Dr. Swanepoel will be a witness in this case. He's a South
African; so we had to go to Hawaii of all places to take his
deposition, which we did. We took his deposition, and you're
going to hear Dr. Swanepoel -- or pardon me -- Mr. Swanepoel
testify about Schulman's reliance on his report.

And what he says in part, I don't know the person,
Schulman, but he's incorrect. They were not used as
comparators. There were many countries that are more
comparable to the United States. That's specifically what
Dr. Schulman will say and more about whether or not this is a
proper foundation for his testimony.

Now, what about the United States? You heard the
phrase from class counsel "rest of the world." The rest of
the world you may find is not necessary for your analysis at
the end of the day because here in the United States, we have
markets that do not have the blanket unilateral offer of
compensation rule.

We have several markets. I can talk to you about
two of them. The first market is in New York, and the other
market is in the Seattle area, the Northwest MLS. They do not
have the same language in the rule there, and in years of
experience since that rule, detail has been taken out in those
two markets.

Well, what happened? Well, without that rule,

1    99 percent of the listings in the Real Estate Board of New

2    York still have cooperative compensation.  99 percent.  That's

3    what you would predict based on American history.

4              And in the Northwest MLS, 100 percent of the

5    listings have cooperative compensation even though there's not

6    the same applicable rule language.

7              And then, finally, the data there, those two markets

8    alone show that buyers continue to be represented by buyer

9    agents.

10             So for those reasons, we think that you may find

11   that the data in the U.S. markets confirm specifically that

12   Dr. Schulman is wrong in terms of his economic predictions,

13   wrong to say that he can look to other countries and ignore

14   the United States.  The United States' markets give the

15   analysis, and the prediction is cooperative compensation

16   continues.  Buyers still want to be represented.

17             Now, to tie up this part, let me just share what

18   Dr. Wu is going to explain to you.  He's going to explain

19   specifically that there -- as an economist, there are economic

20   reasons that sellers have for offering cooperative

21   compensation.  He's not just going to give you the history,

22   but he's going to talk about economic reasoning as to why a

23   seller would choose to continue to offer cooperative

24   compensation.

25             He will confirm to you that doing so increases the
                                   143

1    demand for real estate by making this offer; much like

2    Mr. Glass said, the reward for the lost dog.  Well, this kind

3    of circulation, this collaboration among the seller side and

4    the buyer side creates the kind of energy that he will testify

5    to.  It increases demand.

6           Another reason Dr. Wu will confirm to offer

7    cooperative compensation, it helps buyers who are low on cash.

8    The cooperative compensation, if it's offered, the buyer who

9    needs to be able to finance the home or to buy the home

10   doesn't have to pay a real estate commission.  If you have a

11   $300,000 house, that's a $9,000 commission; right?

12          If you don't have to give $9,000 to pay your buyer

13   agent, you have more money to buy the house.  He will explain

14   that.

15          The buyers can afford agents this way.  In other

16   words, the agent's services are provided in the context of the

17   listing agreement that we've described.  So buyers get to have

18   a representative, and that's good, as Dr. Wu will confirm.

19          Then the last thing with Dr. Wu, he will explain

20   that, just as Mr. Glass had indicated, that when NAR improved

21   the practice by enacting this rule, when they improved the

22   practice that already existed, it simplified transactions, and

23   it created efficiencies.

24          Now, two final slides to cover with you.  David

25   Stevens is the former federal housing commissioner, and he's

                                144

going to be brought here to the courtroom to testify to you as
to why specifically the cooperative compensation offer that --
that there are reasons to offer cooperative compensation and
there are cash limitations if you don't.

If you have cash limitations, they're barriers to
homeownership.  Cooperative compensation will increase the
amount of cash buyers that have the ability to make a cash
down payment.  And changing the system, he will confirm to you
here by his testimony, if you were to change this system, that
is do what the plaintiffs are advocating for is make the
buyers pay, you would increase the amount of cash the buyer
needs at closing, and that would have a significant effect on
the entire residential real estate industry.

So Dr. Wu -- to summarize what he will testify to
here in the courtroom with you is he will describe that even
without the rule, cooperative compensation would still be
offered.  He'll provide his reasoning to you.  He will
describe specifically the buyer agents provide valuable
services that help both buyers and home sellers.  Homebuyers
and home sellers.

He'll describe the reasons to offer cooperative
compensation even without the rule as we talked about a minute
ago.  He'll also confirm the data from -- actual data in the
United States confirms that the predictions by Dr. Schulman
are simply wrong.  So that is the injury.

145

```
 1              The last thing I want to say about this damage
 2       portion -- I want to talk about the damage portion.  We've
 3       talked about there's no injury.  I want to talk a little more
 4       about one technical matter.  Damages.  Okay.
 5              Damages.  Dr. Schulman -- you've heard some
 6       arithmetic by the lawyers for the class.  I think -- I don't
 7       have it precise in my mind, but I think it was 265,000 homes
 8       were sold, and there were commissions of around $6,000.  And,
 9       therefore, just those commissions alone mean, according to
10       Dr. Schulman, that he can just use a method to present to you
11       as a credible method that just do the multiplication, and you
12       get to $1.9 billion.
13              Dr. Wu will say that that approach as a matter of
14       economics is just simply wrong because Dr. Schulman did not
15       account for the value of buyer agent services that were
16       received by the class members during the class period.  He
17       will describe to you what that means and the failure to
18       account for that value.
19              So what -- if you don't mind me saying, so what?
20       Well, that's a big so what, because what it means is not only
21       is there no injury, but there's no proper damage calculation
22       from Dr. Schulman.
23              So that's an important thing that we think you
24       will -- let me say it this way.  I think you will decide
25       that's very important to showing that there's no credible
```

146

1  damage theory that's been presented to you.

2        Now, on this point, the named plaintiffs are going

3  to be here.  They're going to be giving testimony, and you'll

4  need to consider, as you look at Dr. Wu's second point there,

5  the value of buyer agent services received by class members.

6        Mr. Keel, Keel, Ellis, and Breit will testify.  They

7  will say that they not only sold a house, they bought a house,

8  and they did so in the sale where they paid and when they

9  bought, they didn't.  Okay.

10       So the application of the practice or the rule, they

11  would win.  All right.  Dr. Wu will describe why as an

12  example, that shows the method, that the method being used by

13  Dr. Schulman to calculate the damages is wrong.

14       So, ladies and gentlemen, I want to summarize with

15  this just to say that we think at the end of the case, you

16  will decide that there is no injury -- pardon me -- that there

17  is no conspiracy that's been demonstrated involving anyone.

18  We also think more importantly for our purposes or for all

19  purposes, that there's no conspiracy.  Certainly, that there

20  is no evidence of our clients entering into a conspiracy to

21  follow and enforce the offer of compensation model rule.

22  HomeServices did no such thing.  HSF did no such thing, and

23  BHH did no such thing.

24       Second, that the plaintiffs, the economic prediction

25  about some injury resulting is wrong, and the plaintiffs'

147

1  prediction about some damage theory is improper, improperly

2  supported.  So those are the things that we think you'll

3  conclude after hearing all the evidence in this case.

4          I want to say a couple things.  One, we thank you

5  for what you're doing here.  As you can see, there are a lot

6  of people here interested in this case, including every party

7  and every lawyer.  This is an extremely important case, as

8  Judge Bough has said from the beginning.

9          Your analysis and review of the evidence is

10  essential to everyone, and we are thankful for your service.

11  We will be thankful for your service every morning and every

12  afternoon.  Our system of justice does not operate without

13  jurors properly finding the facts and making conclusions under

14  the guidance of the court.

15          So we thank you for your time and service, and,

16  finally, and I really mean finally, please listen to all the

17  evidence and remember that plaintiffs go first.  We'll bring

18  you evidence next week beginning next week, we hope.

19          Thank you very much.

20          MR. KETCHMARK:  Your Honor, may we approach very

21  briefly?

22          (Counsel approached the bench and the following

23  proceedings were had:)

24          MR. KETCHMARK:  I don't want to interrupt Mr. Ray,

25  but by agreement, you were to go two hours and 15 minutes.  By

                            148

1    my calculation, that leaves 25 minutes.

        2            I agreed to limit to two hours based on your

        3    division of the time.  I'm assuming you're 25 minutes or less.

        4    If not, I'm going to ask the court to stop it because I don't

        5    want another 55 minutes because that would be unfair to the

        6    plaintiffs.  I already gave you 15 minutes more.

        7            MR. RAY:  If -- so are you asking me to go 25

        8    minutes?

        9            MR. KETCHMARK:  I ask the defendants to collectively

       10    go two hours and 15 minutes.

       11            THE COURT:  Are you going to go more than 25

       12    minutes?

       13            MR. RAY:  Probably about 30, 35 minutes, Judge.

       14            THE COURT:  That's okay.  Objection overruled.

       15        (The proceedings returned to open court.)

       16            THE COURT:  Anybody want to stretch their legs as

       17    Mr. Ray gets repositioned?  Feel free to stand up.

       18            MR. RAY:  Good afternoon.  As I shared with you

       19    yesterday, my name is Timothy Ray, and I represent defendant

       20    Keller Williams Realty, Inc.  And today is a good day.

       21            Why is it a good day?  The reason that it's a good

       22    day is we've been waiting almost five years to tell our side

       23    of this story, and today starts that process.

       24            Keller Williams' real estate agents here in Missouri

       25    have helped thousands of home sellers and buyers achieve their

                                        149

1  goal of buying and selling homes.  In the competitive real

2  estate market, agents only succeed if they help their clients

3  succeed.

4          Satisfied sellers and buyers become repeat

5  customers, and then they tell their family and friends about

6  those agents.  These plaintiffs benefited from the work that

7  their agents did for them as sellers, and in each instance,

8  the plaintiffs agreed in advance to a fair commission to

9  compensate that agent for their work.

10          Plaintiffs agreed to compensate their agent for

11  their work because they wanted that agent to help them quickly

12  sell their home, and it benefited them to pay their agent to

13  do so.  Plaintiffs chose to pay commissions to their listing

14  agent and understood that their listing agent would in turn

15  split their commission with buyer agents here in Missouri who

16  would bring them a qualified buyer.  That was the agreement

17  that they made.

18          Plaintiffs made the choice to pay their agent a

19  commission to use as they saw fit, and each plaintiff

20  benefited from that choice.  Buyer agents were able to find

21  buyers willing and able to purchase their homes.  That's what

22  their listing agents paid those buyer agents to do, yet here

23  in this lawsuit, the plaintiffs want a do-over.  They want the

24  money that their agents paid to those buyer agents returned to

25  them as if those buyer agents provided no value at all, zero.

150

1          And in fact they're going to call Dr. Schulman, who

2   Mr. Ketchmark talked about this morning.  He says that buyer

3   agents are worthless, that they have zero value.  That's what

4   he's going to say.

5          But yet you heard them talk about how agents are

6   important.  He's going to say that they're worth zero.  That's

7   what the evidence is going to show.

8          You heard Mr. Ketchmark accuse Keller Williams of

9   participating in a conspiracy with the other defendants.  That

10  allegation is false.  Neither we, nor the agents here in

11  Missouri are part of any conspiracy.

12         Let me start by introducing you to my client, but

13  before I do, he showed you some video footage of Gary Keller

14  talking about he wasn't discussing commissions.  Gary Keller's

15  coming here.  He's going to testify.  He's going to explain to

16  you himself what he meant by that.  You will hear from him.

17         Keller Williams was founded in 1983 by Gary Keller

18  and Joe Williams.  It started as a single real estate

19  brokerage in Austin, Texas, but today it has become a

20  franchise company that licenses its names and business systems

21  to others who operate real estate brokerages under the Keller

22  Williams' name.

23         Keller Williams does not own or operate brokerages

24  here in the state of Missouri.  We do not buy and sell real

25  estate here in the state of Missouri.

151

```
 1              We refer to our franchisees as market centers.  In
 2    fact, there are ten market centers in the state of Missouri.
 3    These are those market centers.  They are KW Kansas City
 4    North, KW Platinum Partners in Lee's Summit, KW Lake of the
 5    Ozarks Realty, Lake Ozark, KW Springfield, which is where I
 6    was the last -- a couple weeks ago.
 7              This is the map of all of our market centers here in
 8    Missouri.  There are 4,400 agents, buyers and sellers agents
 9    who work in these market centers.
10              Now, how does our franchise system work?  There is
11    KW corporate headquarters, which as I told you is in Austin,
12    Texas.  Then there are the KW market centers that are
13    independently owned and operated franchisees.  Those are the
14    ten that I just showed you.
15              Within those market centers, that's where the
16    independent contractor agents do business.  Those market
17    centers recruit the independent contractor agents to help
18    them, to -- and those are the people who assist buyers and
19    sellers here in Missouri.
20              In this example we use Jane Agent.  KW Platinum
21    Partners, that's in Lee's Summit, as you just saw.  This is a
22    listing that Jane Agent may have.  You see the home, you see
23    the price.  It tells you that it's provided by KW Platinum
24    Partners.
25              KW Realty, Inc. in Austin, Texas, does not control
```
                                    152

```
1   any of these market centers.  We do not control any of these
2   independent contractor agents, and we certainly don't control
3   Jane Agent.
4              The men and women, who work in these market centers,
5   you've probably seen them in your communities.  They work hard
6   day and night to assist buyers and sellers in realizing the
7   American dream of homeownership, whether you're trying to sell
8   a home or you're trying buy a home.  They're in our
9   communities working hard every day.
10             As I will remind you, the evidence will show Keller
11  Williams Realty, Inc., does not buy or sell real estate here
12  in the state of Missouri.  That's the only way transactions
13  are conducted here in Missouri.
14             These agents that you see here, they're all
15  independent contractors, and, yes, we're going to talk about
16  independent contractors because that's our business.  That's
17  what they are.  We are the franchisor.  These independent
18  contractor agents are who interact with buyers and sellers.
19             What does it mean to be an independent contractor
20  agent?  Let's stay on Jane Agent for a minute.  That means
21  that Jane Agent runs her own business day in and day out.
22             She decides the list of services that she will offer
23  to her clients and the related pricing for those services.
24  She's on the ground here.  She makes that decision.
25             She decides on her own the commissions that she will
```
153

charge, and they're not going to bring in anybody to tell you
otherwise.  We're going to have an agent testify in our case,
and I'm going to talk about that in a minute.

She covers her own expenses.  She does not receive a
salary from the market center or from Keller Williams Realty,
Inc.  She's out here working every day.  She sets her own
schedule.  She finds her own clients, both buyers and sellers,
and she competes fiercely with other agents to do so day in
and day out.

She determines whether she wants to represents
buyers or sellers.  She determines the number of clients that
she will have at any given time.

Let's talk about how Keller Williams' agents are
paid.  Real estate brokers and agents work entirely on
commissions.  They are paid only when they succeed in helping
the client sell or purchase a home.  If an agent is hired to
help sell a client's home, the agent makes no money if the
home does not sell, and the agent is also not reimbursed for
any money that they spend on marketing or helping that seller
get their home ready to be sold.

Buyer agents also work entirely on commissions.  A
buyer agent might spend many hours driving around, burning gas
to show a buyer multiple homes just to find the one that
they're interested in.  And even then, as many of us have
experienced recently in a hot real estate market, they might

154

1  have to write dozens of offers to find the one that will

2  accept their terms.

3         Only once the offer is accepted and the sale closes,

4  which could be months later, does the buyer agent receive any

5  payment.

6         Let's talk about how Keller Williams' agents are

7  trained.  I want to make three points about that.  Agents

8  decide what training they need.  Keller Williams does not

9  require agents to engage in training.

10        Two, rather than a one-size-fits-all, agents can

11 select the training that suits their needs.

12        Three, they have the freedom to follow or disregard

13 any ideas in the training they choose to take.

14        Let's talk about plaintiffs' case against Keller

15 Williams.  Plaintiffs allege that Keller Williams Realty, Inc.

16 and the agents here in Missouri have conspired with the other

17 defendants to harm home sellers by following and enforcing

18 rules that inflate real estate commissions.

19        The evidence will show that nothing could be further

20 from the truth.  Keller Williams did not work with the

21 National Association of Realtors or with any of the other

22 defendants to follow or enforce rules plaintiffs claim result

23 in higher commissions.

24        Keller Williams did not work with the National

25 Association of Realtors or any other defendant to maintain or

enforce those rules.

Keller Williams has always followed its own path in the real estate industry. You'll hear that Keller Williams has had little to do with the National Association of Realtors since our existence.

We instead encourage our agents to focus their time on building businesses by cultivating good leads and good client relationships, working hard on behalf of their clients.

The conspiracy that plaintiffs allege where Keller Williams worked together with other companies to inflate and set commissions is not how we've done business as a company, and it's not supported by any evidence. That's what I was talking about yesterday when I asked if you believe in conspiracy theories or do you require proof.

Let's talk about what they allege as evidence of this conspiracy. They don't have any -- they don't have any evidence of Keller Williams engaging in secret meetings with the National Association of Realtors or with HomeServices. They claim that Keller Williams' open and public activities are how we conspire; that this is a conspiracy in the open.

What do they identify in support for this conspiracy? A speech, a book, and rules. A speech before thousands of agents, a New York Times bestselling book, and Keller Williams' company policies. Let's talk about each of these.

156

1               For over 20 years, Mr. Keller has delivered what he
         2     calls his vision speech at a Keller Williams' event called
         3     Family Reunion.  It's an annual conference that Keller
         4     Williams' agents attend from all over the world.  The speech
         5     lasts about an hour and a half to two hours, and it covers all
         6     aspects of what's going on in the residential real estate
         7     industry.
         8               Mr. Keller reports in his speech on every statistic
         9     and marker that impacts real estate, explaining to an audience
        10     of agents the state of the market and what they should be
        11     thinking about as they're moving forward.
        12               He reports on the national average of mortgage rates
        13     and explains how that -- those rates drive the real estate
        14     economy.  He reports on the gross domestic product and
        15     explains how that impacts real estate.  He reports on the
        16     national housing inventory and how that impacts real estate.
        17               During this speech, Mr. Keller displays slides
        18     reporting on the national average commission rates across all
        19     Keller Williams' offices in all 50 states.  And those slides
        20     show how commission rates have trended for almost two decades.
        21     Let me show you those.
        22               That's the commission study for the average seller
        23     over from 2002 to 2019, over a 17-year period.  This
        24     information consists of over 100,000 transactions per year
        25     over a 17-year period.  That's why it's an average, and that's
                                             157

1    what it comes out to.  That's on the seller side.

2           The same is true on the buyer side.  Hundreds of

3    thousands of transactions that are compiled over the years

4    over a 17-year period.  You can see the spikes.  You can see

5    the ebbs.  You can see it up, down.  It's not a flat across --

6    it's not 3-percent flat across.  It's -- you see the variation

7    in commissions over a 17-year period.  Once again, that's why

8    it's called an average.

9           Plaintiffs identify the reporting of this

10   information during the vision speech as Keller Williams'

11   involvement in an industry-wide conspiracy.  This information

12   right here.

13          They claim that Mr. Keller is telling the thousands

14   of agents in the audience and competitor agents, who are

15   invited to attend, what commission they should charge and that

16   the agents, including the agents here in Missouri, Jane Agent,

17   that she blindly follows what Gary Keller tells her to do.

18          The evidence will show that there is absolutely

19   nothing wrong with reporting on the national average

20   commission rates over almost a two-decade period.  That's why

21   we continue to do it.

22          That's why.  It's not a mystery.  He didn't catch us

23   doing anything.  The evidence will also show that all of these

24   agents set their commissions based on their own business

25   judgments and what is best for them in the markets where they

                              158

1  work.

2        Plaintiffs allege that the reporting of Keller

3  Williams' national average commission information is in

4  violation of our company policy.  That's what he told you this

5  morning.  It's not.

6        You're going to see our company policy.  We're going

7  to show it to you, and we're also going to show you the vision

8  speech, which we're not going to show you like he clipped it

9  and you heard the last like 15 seconds of it.

10       We're going to give you some perspective.  We're

11  going to show you what is talked about during the course of

12  these vision speeches.  Context, perspective.  In doing so,

13  you will see that the speech is simply about trends in the

14  real estate industry, and there is nothing conspiratorial

15  about that.

16       Most important of all, most important of all, it has

17  nothing to do with the National Association of Realtors' rule

18  that is the subject of this case.  That's a fact.

19       We talked about the speech.  Now, let's talk about

20  the book.  Gary Keller has written several books over the 40

21  years that he's been in the real estate industry.  Plaintiffs

22  point to Gary Keller's first book, The Millionaire Real Estate

23  Agent, as further evidence of Keller Williams' involvement in

24  the conspiracy with the National Association of Realtors and

25  with the other defendants.

                              159

1    This is a book whose very cover states that it's not
2    about the money.  It's about being the best that you can be, a
3    book that since 2004 has been on Amazon for the entire world
4    to see, a book that is a New York Times bestseller.
5    This is that book.  We're not hiding it.  We're
6    going to show it to you.  And that's Exhibit D3578.
7    The evidence will show that this book helps to
8    convey to agents that in order for them to be successful, it's
9    important to operate like a business person.  What does that
10   mean?  Paying attention to expenses, paying attention to how
11   the money you're making and bringing in, how that relates to
12   your expenses, dedicating time every day to contacting
13   potential clients.
14   The book includes a chart, which it refers to as a
15   model.  That chart is a tracking tool for organizing agents'
16   goals for around revenues and expenses, information that
17   agents need to keep track of as they determine the amount of
18   money they want to make in any given month or any given year.
19   Let me show you a chart.  That chart is on page 183
20   in this book.  We're going to show it to you.  That's the
21   chart right there.
22   Now, because the chart includes an assumption that
23   agents will earn 3 percent on each transaction, plaintiffs
24   will ask you to believe that Gary Keller was telling agents
25   that's what they had to charge.

160

1          Now, you see where this chart refers to an average
2   sales price of $250,000 a year?  If you believe what they say,
3   then you would also have to believe that Gary Keller was
4   instructing agents here in Missouri that they cannot sell
5   homes for less than $250,000.
6          You would also have to believe that agents here in
7   Missouri would have to take -- for listing appointments,
8   308.76 a year.  That's 25 appointments a month.  You would
9   also have to believe that the listing sales volume would need
10  to be about $40 million a year or $3.33 million a month.
11         If you believe -- you would have to believe all of
12  those assumptions.
13         Based on the book and other training, plaintiffs
14  allege that Keller Williams trains agents to not accept
15  commissions below 6 percent; that Gary Keller and Keller
16  Williams are responsible for setting commissions that agents
17  charge here in Missouri; and that the agents here in Missouri
18  blindly follow what Gary Keller says.
19         Nothing, and I do mean nothing, could be further
20  from the truth.  Nothing what they say about this book is
21  true.
22         On a more fundamental level, the evidence will
23  undercut the whole premise behind plaintiffs' suggestion that
24  everyone in the industry charges 6 percent.  It's simply not
25  true.  It's a common misperception.  Commissions are well

161

below 6 percent, and they vary by market even within the state of Missouri.

Commissions also vary based on the services -- remember, I was telling you about Jane Agent and the services that she charges for? It's true. Commissions vary based on the services each individual agent provides to their client or that their client requests.

You will see evidence that we're going to show you that commission rates have for years always been closer to 5 percent than to 6 percent. There is no evidence that Keller Williams or any real estate brokers have agreed to require 6-percent commissions. This is an important point; so I'm going to come back to it in a minute.

So I've talked about the speech. I've talked about the book. Now let's talk about the rules.

Plaintiffs will try to distract you by talking a lot about 6-percent commissions. That was his entire opening statement this morning. 6-percent commissions, 6-percent commission. You heard that over and over and over again.

But the real target of their case is the multiple listing service rule that the National Association of Realtors' lawyer already discussed. The rule requires brokers, who represent home sellers, they're called listing brokers, to disclose the amount of their commission they will split with the agent who brings them a buyer. That's it.

162

1          The National Association of Realtors' offer of
2    compensation rule does not require any agent to charge clients
3    6 percent.  Let me repeat that.  It does not require any agent
4    to charge clients 6 percent.
5          As the lawyer for the National Association of
6    Realtors told you, the rule promotes transparency so that the
7    agent representing the buyer understands, like all of us want
8    to know, how much you're going to be paid.  If I bring you a
9    buyer, how much am I going to be paid?  That's what the rule
10   does.
11         The rule also ensures that both sides are
12   represented in the transaction; that sellers are represented
13   and buyers are represented.  Buyer agents are crucial to this
14   process.  They're not worthless.  They're not worth zero.  We
15   reject what Dr. Schulman is going to say.  We're going to
16   provide evidence to the contrary.  Buyers and sellers benefit
17   from buyers having representation.
18         It might sound a little odd to say that sellers
19   benefit when buyers have their own agents, but it is common in
20   the course of real estate transactions that disputes can arise
21   between sellers and buyers.  I think many of you told me
22   yesterday that you were homeowners; so you probably know what
23   I'm talking about.
24         You will hear that the presence of agents on both
25   sides, each acting in the interest of their own client, can

                              163

help find solutions to problems that might otherwise derail
the transaction thereby leaving both the seller and the buyer
worse off.

During the course of this trial, you're going to
hear the word "co-opetition."  In fact, you heard it from
Mr. Ketchmark this morning.  He attributed that word to Gary
Keller.  The word has actually been around since 1913, and
it's a business school term that's been around that long.

Like I told you yesterday, all that word simply
means is that in the residential real estate industry, agents
compete vigorously against one another to be selected to
represent buyers and sellers, but when it comes to ensuring
the transactions close successfully for their clients; in
other words, get to the finish line, the buyer agent needs to
cooperate with the listing agent.  That's how transactions
close.  That's how deals get done in this country.

This process of cooperating is good and is how homes
are bought and sold.  That was the first rule.

Let's talk about the second rule.  Plaintiffs allege
that Keller Williams has a rule that requires agents to join
their local National Association of Realtors' board of
realtors and to join their local multiple listing service.
It's true.  We do.  It's right there.

And like all franchisors, we have policies and
guidelines.  This is part of our policies and guidelines

manual.  In our policies and guidelines manner, since at least 1989, seven years before the National Association of Realtors' offer of compensation rule was implemented, we've had this policy.

Keller Williams has required agents to join their local board of realtors and multiple listing service, unless an agent asks for an exemption from their team leader.

We've required that they can ask for an exemption from their team leader.  Why have we required it?  We've required it because that is how agents get access to be able to help buyers and sellers.  Having access to the multiple listing service is critical if you're trying to sell a home.

It also exposes the listing to the broadest possible audience.  The existence of this requirement does nothing to support plaintiffs' argument that either Keller Williams or agents here in Missouri participated in a conspiracy.

It just simply shows that basically we understand that in order for agents here in Missouri, here in Missouri to participate in the multiple listing service, they need to be a member of their local board of realtors, which gives them access to the local multiple listing service.

And having access to the local multiple listing service helps agents, helps their client.  We have always seen the value in agents having access to the multiple listing service but have always allowed an exemption to preserve

165

1  options for agents who might feel differently because of the
2  way they might want to run and operate their businesses.
3          The evidence will show that requiring agents to join
4  the local multiple listing service is not evidence of Keller
5  Williams' participation in the conspiracy, but like we've
6  known since 1989, it just makes good business sense.
7          Now, let's talk about this timeline here.  In 1983,
8  Keller Williams was founded as a single real estate brokerage.
9  In 1989, Keller Williams becomes a franchise company.  That's
10  what happened in 1989.  That's the reason why in 1989, we
11  decided to require that agents become members of their local
12  board of realtors unless exempted by their team leader.
13          We went national.  It wasn't until 1996, seven years
14  later, that the National Association of Realtors' rule was
15  implemented, which we had nothing to do with, but the
16  requirement predated that.  Our requirement predated that.
17          Plaintiffs need to be able to answer the who, the
18  what, the how, and the when questions about the conspiracy
19  that they allege, but you will see that they answer none of
20  these questions.
21          For instance, who from Keller Williams participated
22  in the alleged conspiracy to adopt or maintain the National
23  Association of Realtors' rules?  What did Keller Williams or
24  the agents here in Missouri do in furtherance of the so-called
25  conspiracy or to support it?

                              166

How did Keller Williams' agents here in Missouri
contribute to the so-called conspiracy?  When did Keller
Williams' agents here in Missouri join the so-called
conspiracy?  You didn't hear any of that this morning in
almost two hours.

        Let's get some key facts out of the way.  Keller
Williams has not reached an agreement with the other
defendants to do anything, nothing.  We're not part of any
conspiracy.  You won't see evidence of any communications with
HomeServices or the National Association of Realtors or any
other real estate company about the National Association of
Realtors' offer of compensation rule that is the heart of
plaintiffs' case.  You won't see those communications because
they didn't exist.

        You will see no evidence of any involvement by
Keller Williams or any of the 4,400 agents operating here in
Missouri in the adoption or enforcement of the rule, the offer
of compensation rule.  You won't see it because it did not
happen.

        Keller Williams has never had any type of meaningful
role with the National Association of Realtors.  You will see
no emails, as Mr. Ketchmark correctly identified, after over
five years of working on this case.  You won't see any text
messages.  You won't see any records of meetings where we
discussed the rule; phone call logs, minutes of official
                            167

meetings and recordings discussing the rule. You won't see any of that.

You won't see it because it did not -- it doesn't exist. There just haven't been any discussions about the rule either at the KWR eye level or even in our franchisee market centers. They've been at this for five years. No evidence of it.

In fact, there is not one single document where anyone in our company has discussed the cooperative compensation rule with any other defendant in this case or in -- and the same is true of any agent here in Missouri. No agent here in Missouri has even had a discussion about the rule. None.

The same can be said about any evidence of a conspiracy to charge 6 percent. Plaintiffs allege that commissions here in Missouri are too high because the system is rigged.

Keller Williams' agents here in Missouri are not part of a rigged system and neither is Keller Williams Realty, Inc. We have -- in fact, Keller Williams, Inc., as I've stated earlier, has no involvement whatsoever in setting agents' commissions here in the state of Missouri. Agents, as I told you, do what's best for them.

Keller Williams is a company built by agents for agents and we let our agents operate their business as they

168

```
 1   see fit.  It's all individual decisions by them as -- in terms
 2   of what works best for them.  The evidence will show what
 3   works best for an agent here in Kansas City may not work
 4   what's best for an agent in Lee's Summit.  Different markets.
 5           We're going to call some witnesses to testify during
 6   the course of this trial.  The first one we're going to call,
 7   as I mentioned earlier, is Gary Keller.  Gary Keller is the
 8   founder and chairman of Keller Williams Realty, Inc.  He is an
 9   entrepreneur whose success is in large part due to his desire
10   to do things his own way.
11           It's earned him a reputation in the industry as a
12   maverick.  He's been in the industry for over 40 years.  He
13   will tell you about the culture of our company and how the
14   company does business.
15           The next witness we're going to call is Marc King.
16   He is the president of Keller Williams and is from right here
17   in Kansas City.  He's a local boy made good.
18           In 2002, he started working with a Keller Williams
19   market center in Lee's Summit, Missouri, and eventually helped
20   to manage multiple market centers, including some in St.
21   Louis.  Mr. King will tell you how Keller Williams and its
22   market centers compete fiercely with other real estate
23   companies.
24           The last witness we're going to call is a woman by
25   the name of Jen Davis.  She leads a successful team of agents
```
                                   169

in Springfield, Missouri.  She has worked as a real estate

agent since 2007 specializing in representing home buyers,

buyer's agent.  She also recently started working for Keller

Williams Realty, Inc., as vice president of its coaching

division where she helps newer agents build their businesses.

She will explain how buyer agents do much more than

just help buyers identify homes on the market and that they

protect buyers from serious risks.  That's what she's going to

testify to.

Let's talk about the plaintiffs in this case.  All

of the plaintiffs were -- are or were homeowners who

successfully sold their home.  Each plaintiff interviewed and

selected his or her own agent.  Each plaintiff negotiated a

listing agreement, a contract with their agent, which included

the amount that the plaintiff agreed to pay their agent and

the amount that their agent would split with the buyer agent

working to find them a buyer.

Each plaintiff had different considerations and

issues that were important to them.  Each plaintiff decided

the selling price for their home and what amount to accept as

an offer.  Nobody forced that on them.  It was their call to

make.

Many of these plaintiffs bought and sold homes with

the same agent.  He mentioned -- Mr. Ketchmark mentioned Jerod

Breit.  He hired the same agent multiple times.  Why?  Because

170

1   he thought the agent had done such a good job for him on the

2   first transaction.

3          All of these plaintiffs had good things to say about

4   the agent who represented them in their transaction and their

5   overall experience with selling their home.  All of them.

6          None of them during the time of any of these

7   transactions expressed remorse about any aspect of their

8   overall experience, not one.  None of them complained to

9   anyone about any aspect of their experience.

10          Now years after their sale, plaintiffs want you to

11  undo their contract and to return the commissions that their

12  agents paid to buyer agents as if these buyer agents provided

13  no value to plaintiffs when they sold their homes.

14          These buyer agents are women and men who found

15  buyers for the plaintiffs' homes, led buyers on tours of

16  plaintiffs' homes, burned gas to get there to do it, worked

17  with the plaintiffs' listing agents through inspection and

18  closing through their involvement.  They helped the buyers to

19  understand what issues were important to these plaintiffs.

20          They made sure that the buyers met each of the

21  plaintiffs' terms and conditions.  Plaintiffs benefited from

22  these buyer agents making sure that they achieved what the

23  plaintiffs wanted.

24          What's that?  The sale of their home.

25          Many of them received offers above asking.  The

                                    171

evidence will show that these buyer agents did everything that
they were asked to do, and I do mean everything.  Now
plaintiffs want the commissions their listing agents paid to
these buyer agents to be returned to them.  They want it all
back.  That's what this case is about.  That's what it's
about.

Plaintiffs get to present their case first, and then
I and the other defendants will get a chance to present our
case.  All I ask of you, you're going to hear a lot of like --
you're going to see a lot of videos of a lot of negative
testimony and all that stuff.

But all I ask is you keep an open mind until you
receive all of the evidence and hear all of the testimony.  I
believe that when you review all of the evidence and you hear
all of the testimony, that it will be clear that Keller
Williams Realty, Inc. and the 4,400 agents in Missouri, did
not enter into an agreement or participate in a conspiracy
with the other defendants.

At the end of this case, we will be asking you to
award zero dollars in damages and to make a finding in favor
of Keller Williams.

Thank you, and I appreciate your service.  Thank you
very much.

THE COURT:  Ladies and gentlemen of the jury, good
time for a break.  It's 15 till three.  Let's plan on being

172

1   back in here at three o'clock.

2        During this recess and every other recess, do not

3   discuss this case among yourselves.

4        (A recess was taken.)

5   (The following proceedings were had out of the presence of the

6   jury:)

7        MR. RAY:  Judge, we have an issue.  In

8   Mr. Ketchmark's opening, he shared embedded exhibits into his

9   deposition videos, effectively publishing to the jury exhibits

10   not in evidence, including some we continue to object to.

11   Mr. Ketchmark's position is that by overruling objections to

12   the testimony, the court admitted those evidence.  We

13   disagree, and we need to know how to cover -- how the court

14   wants to handle that.

15        MR. KETCHMARK:  Your Honor, we shared with defense

16   counsel every single exhibit.

17        THE COURT:  That's okay.

18        MR. KETCHMARK:  And they're all coming into evidence

19   through the video depositions and through the witnesses.

20        MR. RAY:  Actually, they can't come in that way.

21   They -- Your Honor was correct in saying that documents need a

22   sponsoring witness.  And to just simply have documents

23   referenced -- that he referenced in depositions that he did

24   not properly lay the foundation for somehow now they should be

25   able to come in simply because they're talking about them in

173

1  the deposition, we vehemently disagree with that.

2         MR. McCREIGHT:  Well, Your Honor, the federal rules

3  do not recognize the concept of sponsoring witness.  There is

4  no independent requirement for sponsoring witness under the

5  federal rules of evidence.

6         What there is, is authentication.  There is hearsay.

7  Sometimes courts will say you will use a sponsoring witness to

8  authenticate a document.  That's one way you can do it.  It's

9  not the only way you can do it.

10        These documents are -- the authenticity is not

11 disputed.

12        THE COURT:  I'm assuming there's going to be a video

13 coming up today?

14        MR. KETCHMARK:  Absolutely.  Right now.

15        THE COURT:  That has this issue in it?

16        MR. KETCHMARK:  It was ruled upon during these

17 designations that were overruled by the court and ruled

18 admissible.

19        THE COURT:  I don't know what exhibit I've got here

20 in front of me, and I don't know what affidavit or whatever

21 you're going to do to try to get it in.

22        So, I mean, I don't know what to tell you to do

23 because if there -- if we're going to play a video, how you

24 going to get the exhibit into evidence?

25        MR. KETCHMARK:  The way it's going to come into

                              174

evidence is the same way it did when we designated the video, and we laid the foundation with the witness and the court reviewed the objections.  They made all of these objections at the time for the deposition, which I objected.

We show Gary Keller, say, this is your email, this is your policy, this is your procedure.  We laid it there.

And then they made these very same objections in the deposition designations, and they were overruled.

THE COURT:  Mr. McCreight, do you have other things to lay the foundation?

MR. McCREIGHT:  It depends on the document, Your Honor.

So for authenticity, almost all of these documents were produced by the defendants.  The case law that we cited in our trial brief says that once a -- once a party produces a document, it's presumed to be authentic unless there's some reason to think that it's not.  They're not disputing it's not authentic.  These are statements of a party opponent for hearsay.  They're business records.  There's no question about authenticity.  There's no question about hearsay.

What they want to say is that, in addition to those things, that you need this sponsoring witness, and that's what's not recognized under the federal rules of evidence.

MR. GLASS:  Your Honor, may I bring some weight?

THE COURT:  Yeah.

175

```
 1            MR. GLASS:  First, a lot of these documents have

 2    embedded hearsay; so there are evidentiary problems with these

 3    documents that weren't resolved when the court admitted the

 4    deposition testimony.

 5            So saying that documents that happen to be read to a

 6    witness in the deposition are automatically admitted because

 7    you admitted the deposition testimony is just wrong.

 8            Second, Mr. McCreight is wrong.  We are -- we need a

 9    sponsoring witness because otherwise the attorneys are the

10    ones who are testifying about the document.  We need somebody

11    who knows about the document, who can testify to its meaning;

12    otherwise, the jury is speculating, and the lawyers are making

13    it up as they go.  That's the purpose of sponsoring witness.

14            It is independent of laying the foundation for a

15    business record.  It is independent of authenticity.  We're

16    not claiming these are inauthentic.  We're saying that you

17    can't just dump a bunch of documents into the record with no

18    witness and then argue about them and then basically have

19    lawyers testifying about what documents mean.

20            MR. KETCHMARK:  Your Honor, every one of these

21    exhibits was shown to the witness, and we're only putting up

22    portions of it.  In every one of them, the witness is Gary

23    Keller.  This is your policy and procedure.  This is from you

24    at the Keller Williams Family Reunion.  This is your email.

25            Every one of these attorneys here were there with
```

```
 1   Mr. Keller.

 2            THE COURT:  I just don't know what I've got to rule

 3   on.

 4            MR. KETCHMARK:  Understand.  We're not moving them

 5   in now.  At the conclusion of the deposition testimony that

 6   the court has already ruled on, we will take these matters up.

 7            THE COURT:  But if they're not admitted, you can't

 8   show them to them.

 9            MR. MacGILL:  May I raise a practical example, or

10   would you prefer not?

11            THE COURT:  He was supposed to have joy.  I didn't

12   feel any joy.  So maybe you can pick one of these.

13            MR. GLASS:  Love?  Did I bring love?

14            MR. MacGILL:  So let me give an example.  I think we

15   can deal with these as they come up, but here's an example.

16   That cartoon today -- remember in the opening statement? -- I

17   only go up from 6 percent.  That cartoon was part of a

18   California subsidiary training document.  It happened to be --

19   it's never been authenticated by anybody, but that cartoon has

20   been a subject of questioning by Mr. Ketchmark with three

21   witnesses, but it's never been authenticated.

22            We have the documents where it came from, et cetera.

23   It didn't come from Gino.  It came to him just as a CEO.  He

24   got it.  It came to him somehow, but he -- it is not his

25   document.  It is not his cartoon.  He had nothing to do with
```

177

it, and his company had nothing to do with it.

So I raised this just as an example. When we have testimony that you have reviewed for other purposes, when it's attached to a document, there are some real problems that I think we ought to take up when they come up because I don't know how the court would have context otherwise.

I'm not suggesting we stop deposition every time, but we've looked at this, and we think that we can stand down on most of the authentication issues. But when we come to this example, we would stand up and say we want to approach the bench and let the court decide.

But it's -- I don't think it's wholesale by anybody on the defense side that we just want to, you know, fight over every time, but there are some things that are pretty serious here that we're trying to deal with in a reasonable way.

MR. KETCHMARK: Your Honor, under the scheduling order, it was set forth very specifically. We're to file designations. They're to take objections. If we have issues like this, we're to address them. And that was all ruled on. And we --

MR. GLASS: Well --

MR. KETCHMARK: Hang on. I didn't interrupt you guys.

So then what we do -- they did object, and those objections were overruled. And so then we cut the deposition

178

1   exhibit -- deposition testimony.

2          Now they know that we're here, and this is going to

3   be our case.  They know this.  If they had these issues, you

4   don't wait before I'm going to stand in front of this jury and

5   play these depositions that have been ruled admissible.  I

6   gave them these videos last week that they had.  They could

7   have done this last Friday.  We could have addressed this last

8   Friday.

9          Now they're doing it now.  And it's this type of

10  sandbagging that they just want to cut me out now so I don't

11  have any witnesses put on.

12         We followed the court's scheduling order.  We gave

13  the designations.  They made all of these objections in their

14  designations, and the court ruled that the vast majority of

15  these are coming in because of the exceptions.  And the

16  court's ruled this.

17         We have business record affidavits.  We have the

18  witnesses who have testified about it.  Mr. Keller has

19  testified about it.  We're not going to move these into

20  evidence as they're being shown.  We will do it afterwards,

21  and then they can address that.

22         But all this has been ruled admissible.  They

23  literally -- if they had any of these issues, the time to do

24  that isn't when I'm standing, when we have a jury out, getting

25  ready to hit play.

                              179

THE COURT:  Now you're repeating yourself.

          MR. KETCHMARK:  I'm sorry.

          MR. GLASS:  Your Honor, there are two separate
issues that are being conflated by Mr. Ketchmark.  One is the
admissibility of the deposition testimony.  Your Honor already
ruled on those objections.

          The second is the admissibility of exhibits.  Those
objections --

          THE COURT:  Didn't you object?  I remember in the --

          MR. GLASS:  We did object.

          THE COURT:  In the documents, you objected about
those; right?

          MR. GLASS:  We have made objections to a number of
the documents that they want to move into evidence, and those
objections have not been ruled on.  And those objections are
still pending, and we have thousands --

          THE COURT:  I think I've ruled on them.  We're going
to stick by the previous orders.

          You can play the videos.

          And then afterwards, outside the presence of the
jury, you can make any other objections to the individual
ones.

          But we're going to play them and go with my earlier
rulings.

          MR. RAY:  Thank you, Your Honor.

                            180

```
 1                    (The following proceedings were had in the presence
 2     of the jury:)
 3                    THE COURT:  Mr. Ketchmark, you may call your first
 4     witness.
 5                    MR. KETCHMARK:  Plaintiffs call Gary Keller to the
 6     stand via his sworn deposition testimony taken on
 7     January 19th, 2022, in the presence of all defense counsel
 8     here as well as counsel for RE/MAX and Anywhere.
 9                    (Video played.)
10                    MR. KETCHMARK:  We're ready for our next witness,
11     Your Honor.
12                    THE COURT:  Sure.
13                    MR. KETCHMARK:  At this time the plaintiffs in this
14     case call Mr. Gino Blefari to the stand from his sworn
15     videotaped deposition taken on February 8th, 2022, in the
16     presence of defense counsel, who are present in this case, as
17     well as the attorneys for RE/MAX and the attorneys for
18     Anywhere.
19                    (Counsel approached the bench and the following
20     proceedings were had:)
21                    MR. RAY:  We want to just preserve our objection to
22     those exhibits.
23                    MR. KULLY:  Is Mr. Ketchmark moving the exhibits
24     that were referred to in the deposition into evidence?
25                    MR. KETCHMARK:  We talked about doing that outside
                                        181
```

```
 1    the presence of the jury after this was done.  I wasn't going
 2    to take up the court's time to do that.
 3              THE COURT:  Your objection is preserved.  You can
 4    have a continuing objection.
 5              MR. RAY:  Thank you.
 6         (The proceedings returned to open court.)
 7              MR. KETCHMARK:  Call Mr. Blefari to the stand.
 8              (Video played.)
 9              (Counsel approached the bench and the following
10    proceedings were had:)
11              THE COURT:  I'm assuming you don't have a 30-minute
12    witness.
13              MR. KETCHMARK:  We timed it to have a 30-minute
14    witness, Your Honor.
15              THE COURT:  Okay.  You've got all your objections
16    preserved.
17              MR. MacGILL:  That's what I was going to ask.  And
18    the motion to strike will be preserved as well?
19              THE COURT:  Sure.
20              MR. MacGILL:  Okay.  Thank you.
21         (The proceedings returned to open court.)
22              MR. KETCHMARK:  We timed it to have a 30-minute
23    witness, Your Honor.  We will call our last witness for the
24    day to the stand.  Counsel is ready.
25              Plaintiffs call Robert Goldberg to the stand.  His
```
182

videotaped deposition was taken on November 22nd, 2021, in the
presence of the defense counsel in this case as well as the
defense attorneys for RE/MAX and the defense attorneys for
Anywhere.

                    (Video played.)

                    (Counsel approached the bench and the following
proceedings were had:)

                    MR. KETCHMARK:  We have about eight minutes.  I want
to be respectful of the court and the jury's time.  Do you
want us to finish this witness or start tomorrow?

          (The proceedings returned to open court.)

                    THE COURT:  Eight minutes.  Keep going?

                    A JUROR:  Okay.

                    THE COURT:  All right.  Let's play.

                              (Video played.)

                    THE COURT:  Ladies and gentlemen of the jury, I'm
going to remind you on this recess and every other recess do
not discuss this case among yourselves or with anyone else,
including your family and friends.  Do not allow anyone to
discuss this case with you or within your hearing.

                    Do not discuss also means do not email, send text
messages, blog, or engage in any other form of written, oral,
or electronic communication, as I've instructed you before.
Leave your notes in your chair, and we'll see you back at 8:30
tomorrow.

                              183

```
 1              (The following proceedings were had out of the

 2  presence of the jury:)

 3              MR. KETCHMARK:  May we approach, Your Honor?

 4              THE COURT:  I don't believe you need to approach.

 5              MR. KETCHMARK:  On this issue, I believe we do.

 6              (Counsel approached the bench and the following

 7  proceedings were had:)

 8              MR. KETCHMARK:  When we were sitting there, there

 9  was a reporter for a national publication called Inman that

10  does the reporting for the real estate industry, which is

11  driving a lot of this press.

12              I got a request for a comment.  One of the

13  attorneys -- I'm not suggesting any of the defense counsel.

14  But somebody clearly had a communication with them about our

15  juror.  It is one of the attorneys, who is here watching this

16  for the industry, has commented to the reporter that one of

17  the jurors has a five-and-a-half-week-old baby at home and has

18  to breast-feed an hour and a half a day, and that's delaying

19  the trial.

20              I'm not making that accusation these guys are --

21          (The proceedings returned to open court.)

22              THE COURT:  If everybody could just wait for a

23  second before you leave.

24              Could you close the doors real quick.

25  (Counsel approached the bench and the following proceedings
                                184
```

```
 1   were had:)

 2          MR. KETCHMARK:  A comment was sent to me asking if

 3   plaintiffs' counsel had any comment about that.  I was

 4   stunned.

 5          THE COURT:  I got it.

 6          MR. RAY:  We have not spoken with the press.

 7          MR. GLASS:  We have not either.

 8          MR. KETCHMARK:  No, I'm not suggesting you guys --

 9      (The proceedings returned to open court.)

10          THE COURT:  For the reporters in the room, I'm

11   instructing you not to report on the identity of any of the

12   jurors.

13          So you are free to report on everything that goes on

14   there, and this is a prior restraint of trade -- or prior

15   restraint of communication on the First Amendment.  Somebody

16   can bring it up if they'd like, but I think I can have a prior

17   restraint when we have an administration-of-justice issue.

18          So my prior restraint is simply do not report on the

19   identity of the jurors.  Otherwise, knock yourself out, but

20   please don't write about any juror's name.

21          Thank you.

22          All right.  So we've got a host of objections to the

23   exhibits.  I told you all those were preserved.

24          MR. GLASS:  May we have a very short break?

25          THE COURT:  You bet.  You bet.
```

185

```
 1              MR. KETCHMARK:  I have a proposal on that.

 2              THE COURT:  They want to go potty; so I'm going to

 3    let them go potty.

 4              MR. KETCHMARK:  Making an offer.  We're tracking

 5    these.  The vast majority of them have been stipulated to.  We

 6    don't have a problem.

 7              I would suggest that we coordinate this evening.  We

 8    narrow it down to whether there's really an issue about it so

 9    we don't waste the court's time on that.  We can come tomorrow

10    morning at eight o'clock and say here's what the issue is.

11              The rest of them aren't issues.  I think most of

12    them are not problematic.  Instead of trying to do that now

13    with the court and the reporter.  If you want to talk about

14    that before or however you want to handle it.

15              THE COURT:  I'll patiently wait until you come back.

16    That will give you something to think about in the restroom.

17                       (A recess was taken.)

18              THE COURT:  Mr. Glass, you want to do this in the

19    morning or tonight?

20              MR. GLASS:  We only have an objection to one

21    document.  Do you want us to argue this?

22              THE COURT:  Oh, please.

23              MS. INGLIS:  We have objection to Plaintiff's

24    Exhibit 215 on the basis of hearsay.

25              THE COURT:  Thank you.
```
                                186

Anything you'd like to tell me about that?

          MS. INGLIS:  Just that it was introduced in Bob
Goldberg's deposition testimony and the testimony that was
read during the deposition.  None of that testimony was in an
email to Bob directly.  It was forwarded to him.  So hearsay.

          THE COURT:  Thank you.  Was that -- you can go back
to the podium if you'd like or wherever you'd like, ma'am.

          Was that one of those that was ruled upon in the
depositions when those were designated by plaintiff and
objected to by defense?

          MR. GLASS:  Well, Your Honor, the deposition
testimony was, but these exhibits weren't provided to the
court to rule on.  I mean, it would be impossible for the
court to have even ruled upon the admissibility of this
because all that had been provided to the court were the
transcripts.

          So the court had ruled that the testimony -- we're
not objecting to that at this point.

          THE COURT:  But that question was asked in the
designated portions; true?

          MR. GLASS:  That question was asked.

          THE COURT:  And the exhibit was asked about in the
designated portions; true?

          So for this and all other ones that I've ruled upon
in the depositions, I'm sticking by those rulings.  You can
                              187

Case 4:19-cv-00332-SRB    Document 1323    Filed 11/28/23    Page 187 of 192

1  have a continuing objection to this one and any others, and

2  you can preserve any others that you would like.  But I'm

3  sticking by all my prior rulings on those.

4          MR. KETCHMARK:  Just for the record, it's also

5  Exhibit 215.  There has been a stipulation as to the

6  authenticity of that.

7          THE COURT:  They have a different objection.  They

8  have hearsay.

9          MR. KETCHMARK:  I understand.

10         THE COURT:  I understand too.

11         MR. KETCHMARK:  At this point in time, Mr. Fadler

12  would remove -- what we've done with these, in order to comply

13  with the court's motions in limine, we've actually just done

14  sub As so we're not moving the whole document in, not moving

15  the whole antitrust policy.

16         So what we'll do this evening for you, for your

17  convenience, we'll send those over, and we'll move them in

18  first thing at eight o'clock tomorrow morning.

19         MR. RAY:  I just had a question, point of

20  clarification.  When you said you're sticking by your prior

21  rulings, does that mean they need to have a sponsoring witness

22  for the documents?

23         THE COURT:  I'm saying the ones I ruled on in the

24  depositions, the parties sent those to me and I read those and

25  I ruled on them, that's the ruling I'm sticking by.

                              188

```
 1              MR. KETCHMARK:  I guess, since there was no

 2      objection to the other ones, we just go ahead and Mr. Fadler

 3      would just move those into evidence at this time or in the

 4      morning?

 5              MR. MacGILL:  We have objections.

 6              MR. KETCHMARK:  I just heard that there was no

 7      objections to any of them except one of them that we just took

 8      up.

 9              MR. GLASS:  That's for NAR.

10              THE COURT:  One at a time.

11              MR. KETCHMARK:  I'm sorry.  I thought that was

12      collectively.  My apologies.

13              THE COURT:  My ruling is going to be the same for

14      all you all's objections.

15              MR. MacGILL:  I'd just like to put on the record, if

16      I may, three sentences.  Your Honor, we'd move to strike from

17      Mr. Blefari's testimony page 38, lines 20 through 39, as

18      violating the court order, Docket 1236 entered on Friday.

19      There was a discussion.  You -- we moved on this yesterday.

20      There was a discussion.  You cautioned Mr. Ketchmark on the

21      record not to go too far with any of this.  He did it all.

22      Okay?

23              So this -- I want to make a motion to strike.  I

24      think he's violated what you told him yesterday specifically

25      and dramatically by that as one example.
```

189

```
 1            Second, Exhibit 692 is representative of issues that
 2   we have.  692 is a 2009 letter unsigned by Mr. Peltier.  What
 3   happened was Mr. Ketchmark, without laying a foundation on a
 4   witness -- pardon me -- Mr. Ketchmark, without laying any
 5   foundation of any kind or nature on Exhibit 692:  Was it sent,
 6   who authored it, et cetera -- questioned the chief executive
 7   officer of our company extensively about the content of that
 8   letter.
 9            There is no -- that's not in evidence, and the
10   questions were all improper because they were all premised,
11   Your Honor, on Exhibit 692, which has not been authenticated
12   by anyone, and it's a 2009 unsigned letter.
13            So we would move to strike all testimony elicited in
14   relation to 692 by Mr. Blefari.
15            THE COURT:  Thank you.  That motion is overruled.  I
16   don't believe he went beyond what I told him.  In fact, I
17   heard him doing his best to walk that line.  That evidence can
18   be used for multiple reasons, which is what I think my order
19   tried to make clear, but I appreciate your objection, sir, and
20   it's noted for the record.
21            MR. KULLY:  David Kully for Keller Williams, Your
22   Honor.
23            THE COURT:  David Kully.
24            MR. KULLY:  We have something that hopefully should
25   be easy.  There were three of the exhibits the plaintiffs used
                                190
```

```
 1   with Mr. Keller with his designations that are incomplete

 2   documents, and we think that's inappropriate and misleading

 3   and that the entirety of the document should be placed in

 4   front of the jury to be put into evidence.

 5            I have --

 6            THE COURT:  How about this:  It doesn't sound like

 7   that's going to be that big of an issue.  Would you guys talk

 8   about that so we can make sure we know the entirety of it?  I

 9   also understand Mr. Keller is coming later.

10            MR. KULLY:  He is, and we would intend to probably

11   use these documents --

12            THE COURT:  Use the whole amount and --

13            MR. RAY:  Yes.

14            MR. KULLY:  But I'm not sure the plaintiffs at this

15   point have stipulated to the admissibility of the entirety of

16   the documents.  So I just wanted to get the numbers.

17            THE COURT:  I bet you, if you talk to them, they

18   will.

19            MR. KETCHMARK:  You talking about the Keller

20   Williams' documents?

21            THE COURT:  Let's talk about it outside so I can go

22   home.

23            Anything else, Ben?

24            MR. FADLER:  Your Honor, I'm just going to move in

25   the documents which --
                              191
```

```
 1          THE COURT:  Talk about those tonight with everyone
 2    else.
 3          Anything else, Mr. Glass?
 4          MR. GLASS:  No, thank you, Your Honor.
 5          THE COURT:  Mr. Ray?
 6          MR. RAY:  No, Your Honor. Thank you.
 7          THE COURT:  Mr. MacGill?
 8          MR. MacGILL:  No, thank you.
 9          THE COURT:  Mr. Jean Paul Bradshaw?
10          MR. BRADSHAW:  No, thank you, Your Honor.
11              ***************************
12              REPORTER'S CERTIFICATE
13
14          I certify that the foregoing pages are a correct
15    transcript from the record of proceedings in the
16    above-entitled matter.
17
18    _____      _____
         Date               /s/Gayle M. Wambolt
19                         GAYLE M. WAMBOLT, CRR, RMR
                           United States Court Reporter
20
21
22
23
24
25
                              192
```