```
 1              IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
 2                    WESTERN DIVISION

 3   SCOTT AND RHONDA BURNETT,          )
     RYAN HENDRICKSON, JEROD BREIT,     )
 4   SCOTT TRUPIANO, and JEREMY KEEL,   )
     on behalf of themselves and all    )
 5   others similarly situated,         )
                       Plaintiffs,      )Case No.
 6           vs.                        )19-CV-00332-SRB
                                        )
 7   THE NATIONAL ASSOCIATION OF        )Kansas City, Missouri
     REALTORS, et al.,                  )October 18, 2023
 8                     Defendants.      )

 9           .............................
          TRANSCRIPT OF JURY TRIAL - VOLUME 2 OF 11
10        BEFORE THE HONORABLE STEPHEN R. BOUGH
            UNITED STATES DISTRICT COURT JUDGE
11

12     Proceedings recorded by electronic stenography
              Transcript produced by computer
13

14                      APPEARANCES

15   For the Plaintiffs:     MR. MICHAEL S. KETCHMARK
                             MR. BENJAMIN H. FADLER
16                           MR. SCOTT A. McCREIGHT
                             Ketchmark & McCreight PC
17                           Two Hallbrook Place
                             11161 Overbrook Road, Suite 210
18                           Leawood, Kansas 66211

19                           MR. BRANDON J.B. BOULWARE
                             Boulware Law LLC
20                           1600 Genessee Street, Suite 416
                             Kansas City, Missouri 64102
21

22

23

24

25                        193
```

```
 1                        APPEARANCES
                          (continued)
 2
     For the Defendant        MR. ROBERT D. MacGILL
 3   HomeServices of America: MR. MATTHEW T. CIULLA
                              MacGill PC
 4                            156 E. Market Street, Suite 1200
                              Indianapolis, Indiana 46204
 5
                              MR. JAY VARON
 6                            Foley & Lardner LLP
                              3000 K Street, NW, Suite 600
 7                            Washington, DC 20007-5109

 8                            MR. JEAN PAUL BRADSHAW, II
                              Lathrop GPM LLP
 9                            2345 Grand Avenue, Suite 2200
                              Kansas City, Missouri 64108
10
     For the Defendant NAR:   MR. ETHAN GLASS
11                            MS. GEORGINA INGLIS
                              MS. SAMANTHA STRAUSS
12                            Cooley LLP
                              1299 Pennsylvania Avenue NW Ste 700
13                            Washington, DC 20004

14                            MS. BEATRIZ MEJIA
                              Cooley LLP
15                            3 Embarcadero Center, 20th Floor
                              San Francisco, California 94111
16
                              MS. SARAH M. TOPOL
17                            Cooley LLP
                              55 Hudson Yards
18                            New York, New York 10001

19   For the Defendant        MR. TIMOTHY RAY
     Keller Williams:         MR. BARACK S. ECHOLS
20                            Holland & Knight
                              150 N. Riverside Plaza, Ste 2700
21                            Chicago, Illinois 60606

22                            MS. ANNA P. HAYES
                              MR. DAVID C. KULLY
23                            Holland & Knight
                              800 17th Street NW
24                            Washington, DC 20006

25
                                194
```

APPEARANCES
(continued)

MS. DINA McKENNEY
Holland & Knight
1722 Routh Street, Suite 1500
Dallas, Texas 75201

MR. DAVID R. BUCHANAN
Brown & James, PC-KCMO
2345 Grand Blvd., Suite 2100
Kansas City, Missouri 64108

Gayle M. Wambolt, RMR, CRR
U.S. Court Reporter, Room 7552
Charles Evans Whittaker Courthouse
400 East Ninth Street - Kansas City, MO 64106

195

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

Case 4:19-cv-00332-SRB    Document 1324    Filed 11/28/23    Page 3 of 168

```
1                            INDEX
                          JURY TRIAL
2                      OCTOBER 18, 2023
```

3   EVENT                                              PAGE

4   Proceedings in Courtroom                            197

5   Rodney Gansho by Videotaped Deposition              206

6   Rene Galicia by Videotaped Deposition               207

7   Michelle Figgs by Videotaped Deposition             207

8   Proceedings in Courtroom                            208

9   Meredith Maples by Videotaped Deposition            209

10  Nick Bailey by Videotaped Deposition                210

11  Proceedings in Courtroom                            211

12  Michael Gorman by Videotaped Deposition             281

13  Proceedings in Courtroom                            282

14                  CHRONOLOGICAL INDEX

15  PLAINTIFFS' WITNESSES:

16                          DIR   CROSS   CROSS  RDIR   RCRS

17  HOLLEE ELLIS            213    242     259    275
    RHONDA BURNETT          283    297     322
18  JEREMY KEEL             326    335     353

19                  PLAINTIFFS' EXHIBITS

20  NO.   DESCRIPTION                      OFFRD        ADMTD

21  216   NAR Handbook                      320          321

22  503   MREA Catalog                      201          201

23  505   Catalog                           201          202

24  675   2019 Article                      202          203

25  679   Email                             203          203

                         196

```
 1              PLAINTIFFS' EXHIBITS

 2   NO.   DESCRIPTION              OFFRD        ADMTD

 3   684   Email                    203          203

 4   686   Email                    203          204

 5   692   Peltier Letter           204          204

 6   695   Email                    204          204

 7   2200  Contract                 290          290

 8   2201  Settlement Statement     293          294

 9   2204  Listing Flyer            296          296

10   2205  Photographs              284          284

11   2225  Contract                 331          331

12   2226  Settlement Statement     333          333

13   2228  Photographs              329          329

14   2229  Settlement Statement     226          226

15   2231  Photographs              220          221

16   4588  Disclosure Statement     287          287

17              DEFENDANTS' EXHIBITS

18   NO.   DESCRIPTION          OFFRD        ADMTD

19   3578  Book                  200          200

20   3600  SHIFT                 200          200

21   3675  Email                 309          309

22   3680  Vision Speech         201          201

23   3701  Contract              250          250

24   3750  Contract              255          255

25   3767  Contract              358          358
                        197
```

| | | | |
|---|---|---|---|
| 1 | **DEFENDANTS' EXHIBITS** | | |
| 2 | **NO.** **DESCRIPTION** | **OFFRD** | **ADMTD** |
| 3 | 3772  Closing Disclosure | 342 | 342 |
| 4 | 3857  Contract | 347 | 347 |
| 5 | 3858  Change Form | 346 | 346 |
| 6 | 3859  Right to Sell | 344 | 345 |
| 7 | 3908  Text Messages | 257 | 258 |
| 8 | 3944  Buyer Agency Agreement | 349 | 349 |
| 9 | 4086  Webpage | 305 | 306 |
| 10 | 4086A Webpage | 324 | 325 |

198

1      WEDNESDAY, OCTOBER 18, 2023

2      (The following proceedings were had out of the presence of the

3      jury:)

4            THE COURT:  All right.  Mr. Fadler, you've got some

5      to enter into evidence?

6            MR. FADLER:  I do, Your Honor.  Do you mind if I do

7      it while seated?

8            THE COURT:  No.  Please be seated.  I'm just taking

9      the chance to stand.

10           MR. FADLER:  You're seated.  I feel bad.

11           Your Honor, we move into evidence Plaintiffs'

12     Exhibit 202.

13           MR. GLASS:  Your Honor, before we start going

14     through this list, so the exhibits are selections of

15     documents; they're not complete documents.  And NAR has not

16     had the time to go through and decide which ones we want the

17     rule of completeness to apply to.

18           So we would ask that we have some more time to

19     review these documents and talk with counsel about which ones

20     need to be the complete document and which ones we're not

21     going to ask for the rule of completeness.

22           MR. FADLER:  We're happy to move the whole document

23     in.  That's fine with us.

24           MR. GLASS:  Your Honor, we don't because some of the

25     complete documents will violate the court's motion in limine

                              199

```
 1   orders.  That's why we need time to go through these and
 2   determine which ones we want the rule of completeness on or
 3   not.
 4            MR. KETCHMARK:  We can take that up later.
 5            MR. FADLER:  I was all excited.
 6            THE COURT:  You did great, Mr. Fadler.
 7            MR. FADLER:  Next time I'll stand up.
 8            MR. RAY:  We do want our exhibits -- all of them
 9   moved to complete exhibits.  That's a P0491.
10            THE COURT:  You haven't put them on yet.  Just the
11   ones you used in --
12            MR. RAY:  The one that -- they used them yesterday,
13   and they've used, like, parts of them.  We wanted the entire
14   document to go in.  There are three of them that fall into
15   that category that Mr. Ketchmark has agreed to.
16            MR. KETCHMARK:  Yeah.  Mr. Fadler has the numbers.
17            MR. FADLER:  Go ahead, Mr. Ray.  Happy to.
18            MR. RAY:  P0491.
19            THE COURT:  P or D?
20            MR. RAY:  I'm sorry.  D3578, Your Honor.
21            MR. FADLER:  That is the entire book?
22            MR. RAY:  That's right.  That's right.
23            MR. FADLER:  Okay.
24            MR. RAY:  D3600.
25            THE COURT:  Admitted.
                              200
```

Case 4:19-cv-00332-SRB   Document 1324   Filed 11/28/23   Page 8 of 168

```
 1          MR. MacGILL:  Which number?

 2          MR. RAY:  3600.

 3          MR. MacGILL:  Thank you.

 4          MR. RAY:  And then -- let me know when you're ready,

 5     Your Honor.

 6          THE COURT:  No objection?

 7          MR. FADLER:  No objection.

 8          THE COURT:  Admitted.

 9          MR. RAY:  D3680.

10          MR. FADLER:  Mr. Ray, which one is 3680?

11          MR. RAY:  3680 is the -- I believe that is the 2016

12     vision speech.

13          MR. FADLER:  Oh, right.  No objection.

14          THE COURT:  Admitted.

15          MR. RAY:  And then there's also P503.

16          THE COURT:  Are you saying P?

17          MR. RAY:  P now, yes.

18          THE COURT:  That's not on the exhibit list.  All

19     yours are D.

20          MR. FADLER:  That would be on our exhibit list, Your

21     Honor.

22          THE COURT:  On plaintiffs'.  Okay.

23          MR. FADLER:  No objection.

24          MR. RAY:  Then P505.

25          MR. FADLER:  No objection.
                              201
```

```
 1            THE COURT:  Admitted.

 2            MR. RAY:  Thank you.

 3            MR. FADLER:  Mr. Ray, do you mind if we run through

 4  the rest of the ones that were used yesterday?

 5            MR. RAY:  Yes, not a problem.

 6            THE COURT:  Not on the record.  Just go run through

 7  them.  Then you can write them down on a little sticky note

 8  and hand them to me.  Then I'll just magically admit them all.

 9            MR. FADLER:  Okay.  Happy to, Your Honor.

10            THE COURT:  I've got sticky notes if you need them.

11            MR. GLASS:  So, Your Honor, for the exhibits that

12  were used with the Goldberg deposition, that was the only NAR

13  witness yesterday, we'll meet and confer with the plaintiffs

14  and figure something out.

15            MR. FADLER:  I'll just email you a list.

16            MR. GLASS:  Thank you.

17            MR. MacGILL:  Your Honor, for HomeServices, we're

18  ready to make a quick series of points now, if it would move

19  things forward.

20            THE COURT:  That sounds great.

21            MR. MacGILL:  So we have -- I'll give you the

22  exhibit number and counsel as well, and we can resolve right

23  now on these.

24            Exhibit 675, we objected to yesterday.  The court

25  has ruled on 675, but we would like the entire document
```
                                    202

1    brought in, not just the selected pages.

2             So under the rule of completeness, we'd like -- I

3    think it's 28 pages -- all 28 pages there.

4             MR. FADLER:  No objection to 675, Your Honor.

5             THE COURT:  Admitted.

6             MR. MacGILL:  Your Honor, on Exhibit 679, we do not

7    object to the admission of the evidence so long as the entire

8    exhibit is brought in.  Page 2 has been taken out.  That's

9    meaningful to the document.  We would like that included as a

10   part of the admission of 679.

11            MR. FADLER:  No problem.  That's fine, Your Honor.

12   Thank you.

13            THE COURT:  679 is admitted.

14            MR. MacGILL:  689, Your Honor, with respect to this,

15   we would like all 25 pages of Exhibit 679 submitted to the

16   court and jury.

17            MR. FADLER:  Did you say 679?

18            MR. MacGILL:  68- -- I'm sorry.  I misspoke.  684.

19            MR. FADLER:  That makes more sense.  Yeah, no

20   objection.

21            THE COURT:  684 is admitted.

22            MR. MacGILL:  Your Honor, the next exhibit is

23   Exhibit 686, the training video.  We ask that the entire video

24   be admitted for the rule of completeness.

25            MR. FADLER:  Yeah, no objection.
                                203

```
 1            THE COURT:  686 is admitted.
 2            MR. MacGILL:  692.  Pardon me.  One quick question.
 3            Your Honor, we've already made objection to 692.
 4  There's not a rule of completeness issue with 692.  I believe
 5  the court has already made a determination on the Exhibit 692.
 6            MR. FADLER:  And we move that to be admitted into
 7  evidence, Your Honor.
 8            THE COURT:  Subject to all those same objections,
 9  692 is admitted.
10            MR. MacGILL:  Your Honor, our next exhibit is
11  Exhibit 695.  We ask that the entire exhibit be put in.
12            MR. FADLER:  No objection, Your Honor.
13            THE COURT:  Admitted.
14            MR. MacGILL:  Just a couple more, Counsel, and Your
15  Honor.  Exhibit 234A, that is the redacted exhibit we have --
16  HomeServices has no objection, Your Honor, to that redacted
17  exhibit.
18            MR. CIULLA:  This is the shortened -- shortened
19  D.A.N.G.E.R. Report.
20            MR. FADLER:  No objection to that 243A, which would
21  be the cover of that document, and then pages 22 and 23 --
22  234.
23            MR. MacGILL:  Your Honor, counsel for NAR has
24  indicated that they would like to reserve on 234A and 235A; so
25  we'll just wait their further guidance on that.
                              204
```

```
 1            We have nothing further, Your Honor, with respect to
 2    HomeServices.
 3            THE COURT:  Thank you, Mr. MacGill.
 4            MR. FADLER:  Mr. MacGill, could we go ahead and move
 5    in 684 as well?
 6            THE COURT:  684 has been admitted.
 7            MR. FADLER:  Then I won't do it again.  Thank you,
 8    Your Honor.
 9            THE COURT:  It's double admitted.
10            MR. RAY:  I do need to understand.  Is the jury
11    going to be shown, like, the entire document or just the page?
12            MR. FADLER:  Right.  So what we said last night, the
13    exhibits that have A behind them are truncated just so we're
14    not moving in a bunch of stuff that doesn't make any
15    difference.
16            If you want, as rule of completeness, Mr. Ray,
17    everything, that's fine with us.  We're just trying to keep
18    the record as narrow and clean as possible, but I'll email you
19    those exhibits right now, and we'll work from there.
20            MR. RAY:  For our documents, we would like the
21    entire document in.
22            MR. FADLER:  Understood.
23            THE COURT:  All videos all day?
24            MR. KETCHMARK:  This morning we're doing videos, and
25    this afternoon class representatives, three class reps.  If
                                  205
```

```
 1   they're done, we can go back to videos.

 2         My intention is each day at five to approach and

 3   tell you how much time we have left, and then you make the

 4   call.  I'm trying to time it.  It can't always be perfect.

 5         THE COURT:  That's hard.  Give me -- if we're

 6   calling somebody at 4:30, give me a little heads-up.

 7         MR. KETCHMARK:  Our plan is to do that.

 8         THE COURT:  And, you know, yesterday worked great.

 9   You had somebody for 30 minutes.  We got done at 5:08.

10         MR. KETCHMARK:  My son has spent thousands of hours

11   putting these videos together; so he's the one who deserves

12   the credit.

13         MR. FADLER:  Your Honor, my parents from

14   Springfield, Missouri, are here now.

15         THE COURT:  Off the record.

16       (A discussion was had off the record.)

17             (A recess was taken.)

18         (The following proceedings were had in the presence

19   of the jury:)

20         THE COURT:  Mr. Ketchmark.

21         MR. KETCHMARK:  Your Honor, the plaintiffs would

22   like to call Mr. Rodney Gansho to the stand via his sworn

23   deposition testimony.  Counsel for all corporate real estate

24   companies and the defendant NAR were present.

25         (Video played.)
                            206
```

```
 1              MR. KETCHMARK:  Your Honor, for our next witness, we

 2    call Mr. Rene Galicia to the stand.  His deposition was taken

 3    on March 4th, 2022.  The corporate defendants were present

 4    with their attorneys along with the attorneys for NAR.

 5              (Video played.)

 6              MR. KETCHMARK:  Your Honor, for our next witness,

 7    the plaintiffs call Michelle Figgs from Keller Williams to the

 8    stand.  Her deposition was taken on February 4th, 2022, in the

 9    presence of all defense counsel.

10              THE COURT:  How long is this one, Mr. Ketchmark?

11              MR. KETCHMARK:  This is 12 minutes, Your Honor.

12              THE COURT:  We can do 12.

13              MR. KETCHMARK:  Okay.

14              (Video played.)

15              MR. RAY:  Your Honor, may we approach?

16              THE COURT:  Sure.

17              (Counsel approached the bench and the following

18    proceedings were had:)

19              MR. GLASS:  Should we let the jury go?

20              THE COURT:  Is this a good time for a break?

21              MR. RAY:  Yeah, it is, and we can discuss it during

22    the break.  Absolutely.

23         (The proceedings returned to open court.)

24              THE COURT:  Ladies and gentlemen of the jury, we're

25    going to take our morning break now.  We'll come back at 5
```

207

1  after, so 10:05.  Please don't talk about this case or

2  research this case.  Thank you.

3              (The following proceedings were had out of the

4  presence of the jury:)

5              THE COURT:  Please be seated.

6              Mr. Ray.

7              MR. RAY:  Your Honor, I'm glad you got a chance to

8  see that video.  It crystallizes the issues that we were

9  talking about with respect to Exhibit 654, her notes.  As you

10  can see, Mr. Ketchmark was asking her about her notes, and she

11  was referring to something that she heard.  And she really

12  couldn't even describe where it came from.

13             That's the danger that we've been talking about with

14  respect to allowing a document with embedded hearsay in it to

15  be, one, played before the jury; but, two, now they're going

16  to try to move this into evidence.

17             So we've continued to make this objection.  I'm glad

18  you got a chance to see it, and it really crystallizes the

19  point that we were making.

20             MR. KULLY:  I'll add it was clear that she was

21  asked:  Do you know who the speaker was?  And she said:  Well,

22  it was either Gary Keller or it was somebody else.

23             But she couldn't identify it.  It's the plaintiffs'

24  burden to identify who the speaker was in order to have the

25  applicability of the hearsay exception.

                                208

And they didn't do it based on that testimony or any

other.

                MR. KETCHMARK:  Your Honor, it was a meeting of the

top executives of one of their industry analysts on this very

issue.  She's taking effectively minutes during that meeting.

                She says it's either likely Gary Keller or somebody

who reports that Gary Keller is saying that during this top

executive business meeting that goes to the core issue in this

case.  That's what's important.  She laid the foundation for

it.  The court properly ruled before, and it is clearly

admissible.

                THE COURT:  Objection is overruled.  You preserved

your objection.  We're moving forward.

                        (A recess was taken.)

                (The following proceedings were had in the presence

of the jury:)

                THE COURT:  Mr. Ketchmark.

                MR. KETCHMARK:  Your Honor, the plaintiffs call to

the stand Meredith Maples whose videotaped deposition of sworn

testimony was taken on -- was taken in this case.  I don't see

the date on this here.  I'm sorry.

                And counsel for all of the corporate real estate

companies and the defendants were present, and this deposition

is 71 minutes long, Your Honor.

                        (Video played.)
                                209

```
 1           THE COURT:  How long is the next one?

 2           MR. KETCHMARK:  The next one will be 23 minutes,

 3    will be the shorter of the two.

 4           THE COURT:  Let's do it.

 5           A JUROR:  Your Honor, can I use the restroom?

 6           THE COURT:  We're going to take a real quick

 7    restroom break.  Don't talk about the case.  We'll be back

 8    here in five, ten minutes.

 9           MR. KETCHMARK:  I need to go too, so it's good

10    timing.

11                (A recess was taken.)

12           (The following proceedings were had in the presence

13    of the jury:)

14           THE COURT:  Mr. Ketchmark.

15           MR. KETCHMARK:  Your Honor, the plaintiffs call Nick

16    Bailey to the stand.  His deposition was taken on August 9th,

17    2022.  All of the corporate defendants were present along with

18    the attorneys for them and for NAR as well as the attorneys

19    for RE/MAX and Anywhere.

20           (Video played.)

21           THE COURT:  Ladies and gentlemen of the jury, we're

22    going to go ahead and take our lunch break.  We'll be back

23    here at one o'clock.

24           Please don't talk, email, blog, anything about this

25    case.  We'll see you at one.
                           210
```

```
 1                (The following proceedings were had out of the

 2    presence of the jury:)

 3                THE COURT:  Anything from plaintiff?

 4                MR. KETCHMARK:  Not at this time, Your Honor.

 5                THE COURT:  Anything from any of the defendants?

 6                MR. KETCHMARK:  Oh, I apologize.  That's not an

 7    accurate statement, Your Honor.

 8                Right after lunch, we're going to be calling up

 9    the -- Mr. McCreight, can you come up -- we're going to be

10    calling the named plaintiffs.  The court granted the motion in

11    limine that we're only to be talking about the sales

12    transactions that are at issue here.  We can take them witness

13    by witness; but with Hollee Ellis, she sold her house down in

14    Southwest Missouri and then moved to South Carolina.

15                And when she moved to South Carolina, she rented for

16    a period of time, then she was a buyer.  There was a

17    tremendous amount of cross-examination about her buying in

18    South Carolina in her deposition.  A tremendous amount of the

19    exhibits deal with her purchase of that home in South

20    Carolina.  Nothing to do with this case.

21                It's our position under the motion in limine, that

22    stays out.  It's our understanding the court was very clear in

23    saying that they could talk about a sale; and if there's an

24    immediate buy afterwards, maybe the immediate buy afterwards.

25    But the idea that they're going to stretch it into the buyers'
```
                                   211

| 1 | histories, they can't do it.

| 2 | Another witness we're calling, for example, is

Ms. Rhonda Burnett.  They sold their house here.  Then later

at different times, they were home purchasers.  When they

moved here from Georgia, they were home purchasers.  At

different times, they were home purchasers, but not this

transaction.

It's our understanding in the motion in limine, the

extensive arguments we had about it, that the only thing they

can get into are the transactions at issue here.

THE COURT:  I think the beautiful thing about my

rulings is they were horribly unclear.  I mean, they're not

clear to anybody.

MR. KETCHMARK:  There you go.

THE COURT:  What I understood was that I told

defense counsel that they could ask about buying by the named

class representatives.

Was that your understanding, Mr. MacGill?

MR. MacGILL:  That's our understanding.  We will

limit it to that, and that's how we'll proceed this afternoon.

MR. KETCHMARK:  In South Carolina even?

THE COURT:  Is it subsequent?

MR. KETCHMARK:  Subsequent, yes.

THE COURT:  Yeah.

MR. KETCHMARK:  Okay.  Understood.  Thank you, Your

212

Honor.

MR. RAY:  Your Honor, we had one other housekeeping matter.

THE COURT:  Is it another unclear motion in limine?

MR. RAY:  I'm not confused about your rulings, Your Honor.

THE COURT:  I've been looking at this.  Hope is not in there.

MR. RAY:  I want it to be about happiness.

THE COURT:  We'll go with happiness, Mr. Ray.

MR. RAY:  I'm turning it over to my colleague, David Kully.

MR. KULLY:  Your Honor, we just wanted to make our record on some of the exhibits that were used in Meredith Maples' deposition designations.

So you heard her say that there were a number of presentations that Mr. Ketchmark showed her.  She didn't know if they were actually played at Family Reunion.  Mr. Ketchmark said at the end -- interestingly enough, he says it's not our job to disprove that these weren't played at Family Reunion.  But it is, in fact, their job.  If they want to tell the jury that someone has gone on the stage at Family Reunion and presented these materials, it is their job to have evidence to show that that actually happened, and that evidence doesn't exist.

213

1            So it is a problem under rule -- we think it's

2    irrelevant under 401 and also under 901 where it's their

3    burden to show that the materials were what they say they

4    were.  If they want to say that Keller Williams has documents

5    in our files that say 3 percent, that's one thing.  They want

6    to tell the jury in a misleading way that these were actually

7    presented, they don't have the evidence to support that.

8            I can give the court the numbers of the exhibits

9    that --

10           THE COURT:  I think we've got those already in the

11   record in the videotaped deposition.

12           Are you planning on saying that those actual

13   presentations, based only on that deposition testimony, were

14   actually shown at the Family Reunion?

15           MR. KETCHMARK:  She actually testified they were

16   during her direct examination.  They tried to back off it in

17   their cross-examination.  I'm prepared to let the jury assess

18   the evidence they saw.  She told me it was played at the

19   Family Reunion.  They tried to back her off that.

20           And there were -- sent in response to requests for

21   production of documents --

22           THE COURT:  Well, I don't remember that.  So if

23   you're going to get up and argue that in closing, you better

24   have that part ready to show me because they're going to

25   object, and I don't remember that.

                                214

```
 1            MR. KETCHMARK:  Understand.  I'll have it, Your

 2  Honor.

 3            THE COURT:  Thank you.

 4            MR. KETCHMARK:  Thank you.

 5                 (A recess was taken.)

 6                 AFTERNOON SESSION

 7  (The following proceedings were had in the presence of the

 8  jury:)

 9            THE COURT:  Mr. Ketchmark.

10            MR. KETCHMARK:  The plaintiffs call Hollee Ellis to

11  the stand.

12            THE COURT:  Ms. Ellis, come on up, ma'am.

13  HOLLEE ELLIS, being duly sworn by the courtroom deputy,

14  testified:

15  DIRECT EXAMINATION BY MR. KETCHMARK:

16   Q    Can you please state your name and introduce yourself to

17  the jury.

18   A    Sure.  My name is Hollee Ellis.

19   Q    Ms. Ellis, where are you from?

20   A    I am from -- originally from Ash Grove, Missouri.  I

21  currently live in Republic, Missouri.

22   Q    Can you tell the jury a little bit about that part of

23  the -- neck of the woods of Missouri?

24   A    Sure.

25   Q    How big the towns are and where it's at.
```
215

```
1   A    Sure.  So the town I grew up in, Ash Grove, it's about

2   15 miles northwest of Springfield.  Population is somewhere in

3   the neighborhood of about 1,500, and the town I currently live

4   in is just west of Springfield.  And the population, I

5   believe, of Republic, it's growing.  I believe the current

6   population is somewhere in the neighborhood of like 12,000.

7   Q    And what did your mom and dad do when you were growing

8   up?

9   A    When I was growing up, my mother was a real estate

10  agent, and my father was an accountant.  They both owned their

11  own businesses.

12  Q    How long was your mom a real estate agent for?

13  A    Right around 30 years.

14  Q    And was your mom actually a member of the National

15  Association of Realtors?

16  A    She was.

17  Q    Can you tell the jury a little bit about your first

18  memory or experiences of your mom being a real estate agent?

19  A    Yeah, sure.

20  Q    Give us, like, the time period.

21  A    Yeah.  It would have been mid-'80s is kind of my first

22  memories of my mom working in real estate.  I have pretty

23  vivid memories of going with her to showings and kind of

24  sitting in the car and being quiet and still while she

25  completed her work.
```

216

```
1    Q    Where did you go to high school?

2    A    Ash Grove High School.

3    Q    And what did you do after high school?

4    A    After high school, I went to college at Central

5    Methodist University in Fayette, and ended up transferring and

6    graduating from Central Missouri State University.

7    Q    And what did you get your degree in?

8    A    My degree is in mass communications and marketing.

9    Q    What did you do after you graduated from college?

10   A    After I graduated with my undergraduate degree, I went

11   to Joplin, Missouri, and worked as the membership and

12   marketing director for the Joplin Family YMCA.

13   Q    Did you get married during that time period?

14   A    I did.

15   Q    And tell the jury -- was that your first husband?

16   A    It was, yes.

17   Q    And did you and your first husband have kids?

18   A    We do.  I have two sons, Gunnar and Garren.

19   Q    How old is -- when was Gunnar born?

20   A    Gunnar was born in 1994.

21   Q    And how about Garren?

22   A    1995.

23   Q    And I'm not going to get into the details of this, but

24   there came a time period where your husband ended up leaving

25   you and your sons, right?
                        217
```

```
 1   A    We did.  We separated and divorced around 2000.  I was a

 2   single mom for about six years.

 3   Q    I'm going to show you what's been marked in this case as

 4   Exhibit No. 2231.

 5        Tell the jury --

 6   A    Yeah.  That is a picture of me shortly after our

 7   divorce.  I was a single mom, and I was T-ball coach for my

 8   boys.

 9   Q    How did that work out?

10   A    It was fun.  Slightly challenging with a bunch of

11   preschool-age kids, but it was fun.

12   Q    And when you found yourself being a single mom and

13   raising those boys, did you decide that you needed to start

14   working and doing some work?

15   A    I did.  I actually worked two jobs at that time.  I --

16   we moved back to Ash Grove, and I worked as an assistant for

17   my mother in her real estate brokerage, and then I also

18   substitute taught.

19   Q    Substitute teacher?

20   A    Yes.

21   Q    Let's break those out, and first tell the jury what you

22   were doing when you were working for your mom.

23   A    I simply worked as her assistant.  I did most of her

24   office work for her, some filing, those types of things.  I

25   did occasionally do showings, would take clients to show; but,
```

218

```
 1    for the most part, just worked as her assistant.
 2    Q    And you said you were working as a substitute teacher?
 3    A    I was.
 4    Q    And how did you -- what got you interested in doing
 5    that?  Tell the jury about that.
 6    A    Well, I come from a family of educators.  My mom
 7    actually taught school right out of college for herself.  I
 8    have aunts that are teachers.
 9          So education is kind of in my blood, and just knew
10    substituting would be a good schedule for being a single
11    mother and also a great way to make money and actually ended
12    up being my calling, led me to the classroom.  And I taught
13    for 17 years -- 16 years.
14    Q    The irony of this isn't lost on me as fast as I talk;
15    but for our court reporter, can we maybe slow it down?
16    A    I will do that.  I'm sorry.
17    Q    If I do this, I'm just trying to get us to slow down.
18    A    Got you.
19    Q    I should have asked you before.  Is this the first time
20    you've been in a courtroom?
21    A    It is, yeah.
22    Q    So you said the first time you started substitute
23    teaching was when?
24    A    I started substituting the year 2000.
25    Q    And how long were -- did you continue to work as a
```
                                 219

```
 1   substitute teacher?
 2    A    Not long.  I actually did a long-term sub stint and for
 3   one school year.  And then the next school year, the principal
 4   came to me and asked me if I would consider going back to
 5   school to get certified, and I was in the classroom ever
 6   since.
 7    Q    So the principal came to you and asked you if you would
 8   go and be a certified teacher?
 9    A    Right.  I did night school and summer school for about
10   two and a half years.
11    Q    While you were raising the boys?
12    A    I was.  Yeah, I was.
13    Q    When you finished that, what did you do?
14    A    I was in the classroom.  Taught high school English for
15   16 years.
16    Q    Where did you teach?
17    A    High school English.  I did have the speech and theater
18   program; so I should know to speak slower.  And I also had the
19   mass media department.
20    Q    Now, I'm going to show you a picture that's been marked
21   as 22 --
22          MR. KETCHMARK:  I should move 2231A into evidence.
23   I apologize for that, Your Honor.
24          THE COURT:  The Ellis photos are not in evidence.
25          MR. KETCHMARK:  I'm moving them into evidence.
                              220
```

```
 1              THE COURT:  Oh.

 2              Any objection?

 3              MR. MacGILL:  No objection.

 4              MR. RAY:  No objection, Your Honor, but we will

 5   reserve the objections we have after he's done.

 6              THE COURT:  Very good.

 7              MS. TOPOL:  None for NAR, Your Honor.

 8              THE COURT:  2231 is admitted.

 9   Q    (BY MR. KETCHMARK)  Can you tell the jury what that's a

10   photograph of?

11   A    Yeah.  This would have been one of my first years in the

12   classroom, and that's my oldest son's kindergarten graduation.

13   Q    And I'm going to show you what's been marked as -- or as

14   the next exhibit, photograph from the same exhibits.  This is

15   from 2231.  Tell the jury what we're looking at there.

16   A    That is the home that we -- my family and I owned in

17   Ash Grove on Piper Street.

18   Q    Did you -- tell the jury, are you currently married?

19   A    I am.

20   Q    What's your husband's name?

21   A    My husband's name is Jerry.

22   Q    How did you and Jerry meet?

23   A    Jerry and I actually -- we kind of grew up about 7 miles

24   away from each other, never knew one another, and were

25   introduced by mutual friends.  He was a single dad for about
                             221
```

```
 1   the same period of time that I was a single mom and just met

 2   and fell in love and became a blended family.

 3   Q    How many kids does -- did Jerry have --

 4   A    He has three.

 5   Q    So he has -- his three children are part of your

 6   family --

 7   A    They are.

 8   Q    -- and your two boys?

 9   A    That's correct.

10   Q    I'm going to show you what's -- the next photograph is

11   2231.  Is that your husband?

12   A    That is, yeah.

13   Q    It's important that we don't talk over each other.  I

14   should have covered that with you.

15   A    Okay.

16   Q    Tell the jury what type of work Jerry does.

17   A    Jerry is currently a forklift driver at Interstate

18   Battery in Springfield.

19   Q    You said you guys got married what year?

20   A    We were married in 2016.  I'm sorry -- 2006, 2006.

21   Q    And I'm going to show you what's been -- the next

22   photograph here, 2231.  Tell the jury who's in that

23   photograph.

24   A    So that is Jerry and myself and my two boys and --

25   Gunnar and Garren, and our two dogs that at the time was Susie
```

222

1  and Sam.  Sam is still with us.

2  Q    Now, the next photograph here, 2231, kind of walk

3  through -- what is that a picture of?

4  A    So that is my entire extended family.  That is a picture

5  of my grandmother and my grandfather, who both passed, and my

6  mom as well as my sister and her husband and my three nephews.

7  And, then, that's also Jerry and my two boys and my aunt and

8  my cousin.

9         We all went to the same church together in

10  Ash Grove, and this was one Sunday -- I think this was the

11  Christmas Sunday service, and we all took a picture together

12  after church that Sunday.

13  Q    And the cursor I have up, is that mom?

14  A    That is mom, yes.

15  Q    Now, if we go back to this photograph we have of the

16  home, what is the address of that house?

17  A    317 South Piper.

18  Q    Is that the home that you and Jerry raised your family

19  in until you ended up moving?

20  A    Yeah.  We were there ten years.

21  Q    And why did you end up -- why did you guys decide to

22  move?

23  A    I actually had a job opportunity in South Carolina and

24  with an education nonprofit.  Kids were all in a good place,

25  and we saw it as kind of a big adventure; so we sold the

                               223

```
 1   house.  I took the job in South Carolina, and we relocated.
 2   Q    Were the boys -- where did your two boys, Gunnar and
 3   Garren, go?  You said they were in a good place.  What were
 4   your boys doing?
 5   A    At that time, Gunnar had just graduated with his
 6   undergraduate degree, and Garren had enlisted in the Air
 7   Force, and he was getting ready to go to basic.
 8   Q    So you picked up and moved to South Carolina?
 9   A    We did.
10   Q    And had you been out there before?
11   A    Just for the interview for the position and just to
12   visit the location when they were interviewing me.
13   Q    When you decided to -- did you decide to sell your home
14   there on Piper?
15   A    When we were relocating?
16   Q    Yeah.
17   A    Yeah, we needed -- yeah, we needed to sell the home for
18   the relocation.
19   Q    And who did you use -- did you end up using a real
20   estate agent?
21   A    We did.
22   Q    Tell the jury who you used as your agent.
23   A    The agent to sell our home was Joe Bex.
24   Q    And how did you know Mr. Bex?
25   A    Mr. Joe and I have been friends for a very long time.
                                224
```

```
 1    When I was 16 years old, I was selected to sing in a
 2    contemporary Christian touring group, and Joe was the director
 3    of that group and served as a mentor for me for many years.
 4    Q    And just briefly tell me a little bit about that --
 5    about what type of singing you did and where you went and
 6    things like that.
 7    A    Yeah.  So it was by audition, and there were 12 of us in
 8    the group.  And it was other high school students from --
 9    gosh, I think we were from Missouri, Oklahoma, and Illinois,
10    and we traveled throughout the state of Missouri performing at
11    churches and festivals and events.
12              And we also did some in Oklahoma and Illinois as
13    well.  It was for about six weeks, I believe, during that
14    summer and was based out of Central Methodist, and Joe was the
15    director and traveled with us.
16    Q    And did you have a good experience with him when he was
17    your real estate agent?
18    A    I did.
19    Q    And I'm going to -- do you remember -- do you recall as
20    you sit here now how much you sold that -- or how much you
21    bought that -- or sold that house for and what year would it
22    have been that you sold that house?
23    A    We sold it in 2016.
24    Q    And I'm going to show you Exhibit No. 229.
25              MR. KETCHMARK:  And we'd move that into evidence as
                                    225
```

```
 1    the settlement statement.

 2              THE COURT:  229 is something different.

 3              MR. KETCHMARK:  Sorry.  2229.  I apologize, Your

 4    Honor.

 5              THE COURT:  Any objection, Mr. MacGill?

 6              MR. MacGILL:  May I see the next page?  Do you have

 7    a paper copy?

 8              Thank you.  One moment, Your Honor.

 9              MR. KETCHMARK:  I should have asked the preference

10    that I don't publish it before.

11              THE COURT:  Don't publish it until it's admitted.

12              MR. KETCHMARK:  Thank you.  Apologize, Your Honor.

13              MR. MacGILL:  No objection from HomeServices.

14              THE COURT:  Ray?

15              MR. RAY:  No, Your Honor.

16              THE COURT:  Glass?

17              MS. TOPOL:  No objection for NAR, Your Honor.

18              THE COURT:  I'm sorry, ma'am.  What's your name

19    again?

20              MS. TOPOL:  Sarah Topol.

21              THE COURT:  2229 is admitted.

22              MR. KETCHMARK:  I apologize for publishing that.

23    I'll not do that next time.

24     Q   (BY MR. KETCHMARK)  Can you -- do you see this here?

25    I'm going to help us here.
```
                              226

```
 1              Do you see that as a copy of the -- what's called a

 2   settlement statement for seller?  Do you see that?

 3   A    I do.

 4   Q    And we see that it's listed here as -- is this the

 5   address of your home at 317 South Piper Road in Ash Grove,

 6   Missouri?

 7   A    It is.

 8   Q    And do we see you, your name, and Jerry's name on that

 9   home?

10   A    Uh-huh.

11   Q    Yes?

12   A    Yes.

13   Q    And it shows the settlement date of December 30th, 2016?

14   A    That is correct.

15   Q    And the date that the money was distributed, the same

16   distribution date, correct?

17   A    That's correct.

18   Q    When we look at this, it indicates the -- it lists the

19   sales price, the sale price of your home there.  Can you tell

20   the jury how much your home sold for?

21   A    $126,000.

22   Q    And at the time that your home sold for $126,000, do you

23   recall as you sit here now, how much money you still owed on

24   the home you and Jerry still owned?

25   A    I don't recall without looking back at paperwork.
```

227

```
 1   Q    I'll turn to the next page.  There's something called a
 2   payoff section.  Do you see that?
 3   A    I do.
 4   Q    So this mortgage that you've been paying on now at that
 5   point for almost ten years, correct?
 6   A    That's correct.
 7   Q    You still owed how much money on it?
 8   A    $107,605.43.
 9   Q    When you're making those mortgage payments, it takes
10   quite a bit of effort to pay down that principal amount when
11   you're paying interest, doesn't it?
12   A    It does.
13   Q    And as part of that, we see here that on the front page
14   of this exhibit that there's a section on here under seller
15   payout that talks about the commission.  That's --
16        Apologize -- on here, your settlement statement, it
17   shows the amount of commission that you had to pay as the
18   seller of the home.  Do you see that?
19   A    I do.
20   Q    And there's two amounts.  One is to the Coldwell Banker
21   real estate agent associated with Anywhere.  That would have
22   been this -- Mr. Joe Bex, correct?
23   A    That's correct.
24   Q    And shows that he is receiving $3,700 -- or that
25   Coldwell Banker, Anywhere would have been receiving $3,780,
```
                              228

1    correct?

2    A    That is correct.

3    Q    And then there's a commission to the buyer's agent that

4    you were paying.  And who is listed there, the agency

5    associated with the buyer's agent?

6    A    Keller Williams.

7    Q    I'm going to show -- I've prepared for demonstrative

8    purposes just some calculations on this.

9          MR. KETCHMARK:  It's not my intent to move it into

10    evidence.  I'll show it to opposing counsel before I display

11    it to the jury.

12          Any objection to displaying this to the jury,

13    counsel?

14          MR. MacGILL:  No.

15          MR. RAY:  No objection.

16          MS. TOPOL:  No objection.

17          MR. KETCHMARK:  My undergraduate degree was in

18    philosophy, so this kind of helps me with math.

19    Q    (BY MR. KETCHMARK) You see here where I've listed the

20    sale price of your home for the $126,000.  Do you see that?

21    A    I do.

22    Q    And you still owe the mortgage on that of $107,605,

23    correct?

24    A    That is correct.

25    Q    It shows the money that was left over there, and I put

229

```
 1    as Hollee's money, but certainly would have been yours and
 2    Jerry's.  So the money that was left over was $18,395,
 3    correct?
 4    A    That is correct.
 5    Q    And is that something that you know that in the real
 6    estate industry that they kind of talk about what your equity
 7    would have been in the home?
 8    A    Right, right.
 9    Q    The next page of this, we have the same calculations
10    above.  But when we see the buyer's commission, which would
11    have been 3 percent of the sale of price of the home, you see
12    that?
13    A    Uh-huh.
14    Q    Yes?
15    A    Yes.
16    Q    And that's 3 percent.  The sale price of the home would
17    have been $3,708, correct?
18    A    Correct.
19    Q    Do you see where that's calculated?  What percentage of
20    the equity in the home that you and your husband had is it
21    reflected there as?
22    A    20.55 percent.
23    Q    When you went through all these closing procedures or
24    you did all of that and you saw how much money was remaining,
25    did you have any reaction?
```

1   A    It was a hard pill to swallow that we were walking away

2   with so little.

3   Q    Now, at the time that you purchased or the time that you

4   were using -- going to sell this home, you had your background

5   and experience that your mom had been a real estate agent for

6   many years, correct?

7   A    That's correct.

8   Q    And you had worked yourself in the real estate industry

9   for a period of time, correct?

10  A    Yes.

11  Q    Did you -- what was your belief about the process about

12  the buyer's agent or how all that worked?  Just tell the jury

13  in your own words.

14  A    It was my belief during the time period that my mother

15  was an active agent and the period of time that I was her

16  assistant, as well as the transactions that I had, that that

17  was standard practice; that that 6-percent commission was

18  paid, and half went to the buyer's agent and half went to the

19  seller's agent, and that's just the way it was.  That was just

20  the standard practice.  In every transaction I'd been a part

21  of in any way, that's how everything had been split.

22  Q    Did you think that in your mind when you did that either

23  in that transaction or the subsequent ones I'm going to talk

24  about when you moved to South Carolina or back to Missouri,

25  did you believe that this is something that you could be

                            231

1   negotiating or debating or having conversations about?

2    A    I never knew that was an option.

3    Q    When you and your husband moved to South Carolina and

4   you ended up paying that -- the commission, the 20 percent of

5   your equity to the Keller Williams' person, were you able to

6   go out and buy a new home in South Carolina?

7    A    Not immediately, no.

8    Q    And what did you do when you moved out there?

9    A    We rented for about 18 months.

10   Q    And did you end up eventually buying a home?

11   A    We did.

12   Q    Now, as part of this -- you're a class representative,

13  and you're here representing the people who are other clients

14  in this case.  You understand that?

15   A    I do.

16   Q    Before I get into the details of your subsequent

17  purchases and things of that sort, tell the jury why you

18  got -- why you're willing to be here, take the time to be here

19  as a class representative.  What's going through your mind?

20   A    Well, I think what's going through my mind is that, you

21  know, in the transactions I was involved in, I just didn't

22  think it was a fair practice.  And, you know, I have five

23  adult children that are kind of starting their lives,

24  professional careers, and purchasing their own homes.  They're

25  starting families.

                            232

```
 1            And if I can be a part of this process to reverse
 2    this unfair practice and to help them, as well as other
 3    consumers down the road, you know, if I can help my kids out,
 4    I'm going to do it.
 5    Q    And how do you feel about being involved in a lawsuit
 6    like this as a class representative when the National
 7    Association of Realtors is a defendant, and you know your mom
 8    was a member of that organization?  What's going through your
 9    mind there?
10    A    I feel like I'm doing it for her as well because, you
11    know, she operated under that assumption and that practice and
12    that standard for so many years, whereas I know she worked
13    very, very hard for some of her buyers and possibly could have
14    negotiated a different rate.  And, you know, I kind of feel
15    like I'm doing it for my mom as well to just make the practice
16    fair for anyone that's involved in the industry.
17    Q    When you moved out to South Carolina, did you end up
18    purchasing a home out there?
19    A    We did.
20    Q    Did you use a buyer's agent out there?
21    A    We did.
22    Q    And were you happy with that buyer's agent?
23    A    We were.
24    Q    And if someone -- if an attorney stood here and said,
25    Well, look, you benefited as a seller of a home or you -- when
```
233

```
 1   you bought the home, you didn't pay the buyer's commission; so
 2   why should you complain when you sold the home, what's your
 3   response to that?
 4   A     Well, I think at the time I didn't know that there was
 5   any other difference.  But now that I do know that there's a
 6   difference, you know, we used a buyer's agent.  But all of the
 7   homes we looked at in South Carolina, I found and asked, you
 8   know, for him to get us into the house to take a peek at.
 9          So if I had known that I had an option to pay other
10   than the 3 percent, I might have gone a different direction.
11   Q     So when you moved to South Carolina, how did you find
12   the home that you and your husband ultimately moved into?  How
13   did you find that?
14   A     I found it on the internet.
15   Q     Yourself?
16   A     I did.
17   Q     And then you said that you contacted a buyer's agent to
18   show you the house, you said?
19   A     That's correct.
20   Q     Did the seller of that home pay that commission?
21   A     They did.
22   Q     And were you happy with that buyer's agent in South
23   Carolina?
24   A     We were.
25   Q     And how long did you live in South Carolina?
```

234

```
1    A    Until '21.

2    Q    How did you find that working for that not for profit

3    out there, nonprofit?

4    A    It was a great job.  I was still in education.  I was

5    able to work with, gosh, thousands of students across the

6    Southeast in Missouri and Oklahoma and Texas.

7              I kind of consider it my purpose to help people and

8    to help them reach their potential as an educator.  And I was

9    able to do that in that work for the nonprofit.

10   Q    Remind me again.  If you told me, I'm sorry.  I'm

11   getting a bit tired.

12   A    Sure.

13   Q    What type of work was it again?

14   A    It was with the National Beta Club, which is a student

15   achievement organization.  It's kind of if you take the Key

16   Club and National Honor Society and mixed them together,

17   community service-type organization for achievement.

18   Q    Did you and Jerry end up moving back to Missouri?

19   A    We did.

20   Q    And why is that?

21   A    Multiple reasons.  We -- my -- our daughter AshLynn was

22   pregnant at the time, and her baby had been diagnosed with

23   multiple congenital heart defects.  And we knew that she was

24   going to have a long road, and we felt we needed to be there

25   to support her.
```

235

```
 1            My son Garren was getting ready to be deployed, and
 2    he had a two-month old.  We wanted to be close to his wife to
 3    be able to help and support her.
 4            And my mother's health was failing, and we felt it
 5    was important to be back to be close to our mom too.
 6            So priorities and family brought us home.
 7    Q    And where did you move back to?
 8    A    We initially moved back to the Springfield area, and we
 9    ended up in Republic.
10    Q    When you first moved back, did you buy a house?
11    A    We did not.
12    Q    What did you do when you first moved back?
13    A    We rented.
14    Q    Did you eventually buy a house?
15    A    We did.
16    Q    And when you did that, did you use a buyer's agent?
17    A    We did.
18    Q    And when that happened, were you happy with the buyer's
19    agent?
20    A    We were.
21    Q    How did you find that house?
22    A    I found it myself actually through word of mouth.  And I
23    went into the house.  It wasn't -- went into the house and
24    looked at it and then contacted our agent to write the offer.
25    Q    During -- when you moved back and moved into that house,
```
                                    236

```
 1    is that where you live now?

 2    A    It is.

 3    Q    How long you been living there?

 4    A    A little over a year.

 5    Q    Now, there's been some conversation in this case about a

 6    cash-strapped buyer.  Do you recall that?  I'm just going to

 7    tell you that, about cash-strapped buyers.  You remember

 8    that's something they covered with you in your deposition?

 9    A    Uh-huh, uh-huh.  Yes.

10    Q    When you moved out to South Carolina, did you consider

11    yourself to be in a situation where you were kind of low on

12    cash and cash strapped?

13    A    Yes.

14    Q    Would it have made a difference if the -- Keller

15    Williams -- if part of that sale -- if the Keller Williams'

16    agent, the buyer's agent in that situation, hadn't been paid

17    with 20 percent of your equity?

18    A    Yes.

19    Q    When you moved back from South Carolina to Missouri, did

20    you end up paying -- you sold your house out there?

21    A    We did.

22    Q    Part of the same system?

23    A    Yes.

24    Q    So it sounds like in South Carolina, they're part of the

25    same system that's at issue here?
```

237

```
 1    A    Correct.

 2    Q    What was your commission out there that was paid?

 3    A    It was 6 percent:  3 percent to the selling agent; 3

 4    percent to the buyer's agent.

 5    Q    So it doesn't make a difference if you're down in

 6    Southwest Missouri or if you're out in South Carolina, the

 7    same things happen?

 8    A    That is correct.

 9    Q    When you moved back to Missouri, if you hadn't had to

10    pay that 3 percent for the buyer's side in South Carolina, you

11    would have had that money; is that fair?

12    A    That is correct.

13    Q    Now, look, there's been some suggestion that you as a

14    class representative -- that somehow you're against buyers'

15    agents, or you want to be against buyers' agents.  Is that

16    even close to being true?

17    A    Not at all.

18    Q    Tell the jury about that.

19    A    No.  I'm not against buyers' agents.  I think they serve

20    a purpose.  I just -- I'm not of the belief that it's my duty

21    as a seller to pay them.  They don't work on my behalf.  I

22    didn't select them to work for me.

23         So the person that selected them, thus the buyer and

24    the person with whom they're working to represent, should be

25    the one responsible for paying them.
```

238

1  Q    And if my memory's right, when you moved from South

2  Carolina back here, were there some issues you experienced

3  with the buyer's agent?

4  A    Yes.

5  Q    Tell the jury about that.

6  A    Yeah.  So the South Carolina transaction ended up being

7  somewhat complicated, and the buyer's agent on that end drug

8  the transaction out much longer than it needed to.

9        It did take my seller agent to kind of step in.  We

10  were almost 30 days past original closing date before it

11  closed.  Actually longer, I think.  And I was incredibly

12  frustrated by that process, and my husband was as well because

13  it just -- that buyer's agent made it much more complicated

14  and much more difficult for it to close than it ever needed to

15  be.

16  Q    You moved back here.  And tell the jury a little bit

17  about your family now.  How many grandkids do you have?

18  A    Sure.  So we have four grandchildren that are with us.

19  We did lose the granddaughter that my -- our daughter was

20  pregnant with.  She passed in November of '21.

21        But we do have four.  We have Mack, who will be nine

22  in November, and Lenora, who is three and a half, and then

23  Lyla, who's just turned two, and Lizzie, who's about four

24  months.

25  Q    How is your mom doing?

239

1   A    My mom has dementia and now has also been diagnosed with

2   Alzheimer's.  And that's progressing a little bit quicker than

3   we had hoped.  We thought we would have a little bit more

4   time.

5   Q    Do you understand as a class representative in this

6   case, that you're not asking for anything more than the other

7   homeowners that we represent across the state?  Do you

8   understand that?

9   A    I do.

10  Q    If somebody would tell you that, well, this is about

11  money, or you're just asking this about money, what would your

12  response to that be?

13  A    It's not for me.  It's not about money at all.  It's

14  about reversing a practice that I feel is unfair that will

15  help my children and my grandchildren in the future.  And, you

16  know, if it helps other consumers in the state of Missouri and

17  helps the industry to be more fair for other agents that have

18  worked at it for years and years and years, like my mom did,

19  then that's what it's about for me.

20          MR. KETCHMARK:  Thank you.  I have no further

21  questions for you, but I know the lawyers for the other side

22  will.  Thank you.

23          THE WITNESS:  Thank you.

24          THE COURT:  Mr. Ray?

25          MR. RAY:  May we approach, Your Honor?

                         240

```
 1          THE COURT:  Yes.

 2          (Counsel approached the bench and the following

 3   proceedings were had:)

 4          MR. RAY:  You had admonished us during the motion in

 5   limine hearing to be very careful about opening the door.

 6   Mr. Ketchmark asked this witness on two separate occasions

 7   about her use of a buyer's agent, and she specifically said

 8   that she didn't know that she could negotiate during the

 9   transaction when she moved to South Carolina and the

10   subsequent transaction when she moved back to Missouri.

11          We would like an opportunity now to delve into those

12   and ask questions about those transactions because we believe

13   that they bear on her understanding of this process.  She

14   clearly --

15          THE COURT:  What do you think you're going to open

16   the door to?

17          MR. RAY:  Well, about she said that she didn't know

18   that she could negotiate.  I mean, that's --

19          MR. KETCHMARK:  I don't care.  I'm not going to

20   object.  Go ahead.

21          MR. RAY:  Okay.  Okay.  Thank you.

22      (The proceedings returned to open court.)

23          THE COURT:  Who's going first for the defendants?

24          MR. ECHOLS:  Your Honor, Barack Echols on behalf of

25   Keller Williams.
```
                              241

```
 1              THE COURT:  Come on up, sir.  While you're coming
 2   up, I'm going to ask her a question real quick.
 3              Is Republic, Missouri, your most favorite place that
 4   you've ever lived?
 5              THE WITNESS:  It is a nice town to live in, yes.
 6              THE COURT:  Class of 1989.
 7              THE WITNESS:  Interesting.  Excellent.
 8              A JUROR:  The judge is prejudiced.
 9              THE COURT:  All you, sir.
10              MR. ECHOLS:  Thank you, Your Honor.
11   CROSS-EXAMINATION BY MR. ECHOLS:
12    Q    Good afternoon, Ms. Ellis.  How are you?
13    A    I'm good.  Thank you.
14    Q    My name is Barack Echols, and I am one of the attorneys
15   for Keller Williams Realty.  I just have a few questions to
16   briefly go through to follow up on Mr. Ketchmark's
17   questioning.
18              Now, you spoke with Mr. Ketchmark about the
19   317 Piper property and the subsequent purchases in South
20   Carolina and back in Republic.
21              Is it also true that you bought and sold a couple of
22   properties in Missouri prior to the Piper house?
23    A    I did, yeah, prior -- yes, I did.
24              MR. KETCHMARK:  Objection, Your Honor.  My
25   understanding, we were not getting into prior purchases.
                                 242
```

```
 1              THE COURT:  Let's see where it goes.  Overruled.

 2    Q    (BY MR. ECHOLS) Okay.  Well, and, in fact -- well, just

 3    to -- I guess, to circle the wagons, in total over the years,

 4    you've had -- you've bought five different homes and sold four

 5    homes; is that right?

 6    A    That is correct.

 7    Q    Now, to Mr. Ketchmark's point, the very first sale that

 8    you had at the Oak Ridge in Joplin, Missouri, that was a

 9    transaction that you handled yourself; you didn't use a real

10    estate agent; is that right?

11    A    That is correct.  With my mother's assistance.

12    Q    So there you didn't have to pay any seller commission or

13    any buyer commission?  That was just your elbow grease?

14    A    That's correct.

15    Q    And you know that that is an option for homeowners

16    looking to sell their properties, to do for sale by owner, or

17    what they call FSBO, I guess?

18    A    Option as of today?

19    Q    Well, today you think it is more likely that you would

20    want to use an agent; is that correct?

21    A    Yes.

22    Q    And you in that instance were able to complete the sale

23    without using a listing agent, right?

24    A    I had the assistance of my mother, yes.

25    Q    Okay.  She wasn't receiving a commission from --
                                 243
```

```
 1    A    She did not.

 2    Q    So you didn't pay 6 percent to any seller agent; you

 3  didn't pay 3 percent to any buyer agent, correct?

 4    A    Not on that transaction, no.

 5    Q    You were saying today is a little different.  Today you

 6  wouldn't consider doing for sale by owner in today's market,

 7  right?

 8    A    As of today, I would not be opposed to it.  I would

 9  investigate it.

10    Q    Oh, okay.

11    A    Yeah.

12    Q    But you would agree with me that today's market is very

13  different than the market you were in when you sold that house

14  nearly 30 years ago?

15    A    Yes.

16    Q    And it's also your belief, is it not, that marketing and

17  the marketing assistance for selling a home is key, it's

18  useful?

19    A    Yes.

20    Q    And your history has been also to work with buyer's

21  agents whenever you've purchased a home?

22    A    In the recent transactions, yes.

23    Q    Yes.  And in the earlier transactions, you know --

24         MR. ECHOLS:  Let me ask you, Mr. Ketchmark.  I have

25  these broken out as a demonstrative.
```

                                  244

```
 1              MR. KETCHMARK:  I have no idea.

 2              MR. ECHOLS:  These are from her interrogatories.

 3              MR. KETCHMARK:  Is there any reason this wasn't

 4    shared with me as we're to share all exhibits?

 5              MR. ECHOLS:  It's a demonstrative.

 6              MR. KETCHMARK:  You can show it to her, I guess.  I

 7    ask next time we share like I've been doing with you guys.

 8    It's fine.

 9              MR. ECHOLS:  Very good.  If you wouldn't mind,

10    please, putting up demonstrative 004.

11    Q    (BY MR. ECHOLS)  And what we've tried to do here,

12    Mrs. Ellis, is pull together the information that you've

13    provided in this case just to list out where you had purchased

14    and where you had sold houses over the past years.

15              If you wouldn't mind please taking a look and

16    letting us know if that's accurate.

17    A    It does look accurate to me.

18    Q    Okay.  And one thing I just want to clear up with the

19    jury.  I'm not going to ask you very many questions about any

20    of these, although I will show you a couple of documents.

21    Unfortunately, I only have sales transaction documents for

22    about two or three of these.

23              And just to be clear with the jury, you looked for

24    copies of the real estate sales and purchase contracts in

25    connection with this case and provided them to counsel,
```

                                  245

```
 1   correct.

 2   A    That is correct.

 3   Q    And you gave what you found.  And if you didn't find it,

 4   then we didn't get it?

 5   A    That's correct.

 6   Q    So it's not that I'm trying to avoid the documents.

 7   Neither of us have them.

 8            So very briefly, on the -- we talked about the for

 9   sale by owner.  The Meadow View property, you have the

10   purchase there in 1999 and the sale in 2002.  On that

11   occasion, you used your mother as your buyer agent, correct?

12   A    That is correct.

13   Q    And she helped you in the home buying process?

14   A    She did.

15   Q    She helped you determine what a fair offer would be on

16   the property?

17   A    She did.

18   Q    And she, in fact, helped you write the offer for the

19   property?

20   A    She did.  She was the only real estate agent in Ash

21   Grove; so, yeah.

22   Q    I remember reading you saying that before.

23   A    Yeah.

24   Q    She handled the negotiations with the sellers for you

25   too, right?
```

246

```
 1   A    Correct.
 2   Q    You would agree, would you not, ma'am, that your mother,
 3   as your buyer agent in this transaction, provided a valuable
 4   contribution to you being able to buy this house?
 5   A    She did.
 6   Q    And at this time -- I understand you think differently
 7   now.  But at this time of this purchase, you didn't have any
 8   concern, didn't raise any concern with her that the seller was
 9   going to -- the seller's agent was going to pay her
10   commission, correct?
11   A    That's correct.  That was just standard understood
12   practice.  And I don't 100 percent remember for sure, but it's
13   -- being the only real estate agent, it's likely she might
14   have had the property listed as well.  But I don't know that.
15   Q    Okay.  Thank you.  Thank you.
16        Now, you used your mother again when you sold this
17   property in 2002 or 2003, and you paid her a commission as the
18   listing agent, correct?
19   A    I don't recall.
20   Q    Well, this is the property that was kind of difficult to
21   sell, if you recall.  It was a rent-to-own situation?  Do you
22   recall that?
23   A    That's correct.
24   Q    Describe what happened to the jury there.
25   A    Sure.  So I was getting divorced or had recently been
                              247
```

```
 1   divorced at this time, and there was a new educator, new coach
 2   coming in to work at the high school that I was teaching at,
 3   and he was looking for a house.  So I agreed for he and his
 4   family to rent my home under a rent-to-own contract, and with
 5   the understanding that at the end of the year of their
 6   renting, they would purchase it.
 7           However, at the end of that year, they chose not to
 8   purchase the home; and, in fact, had damaged the house quite a
 9   bit.  Had some pets that I didn't know about, tore off some
10   cabinets, some damage to some walls when they vacated the
11   property.
12   Q    What that meant for your mother as the selling agent was
13   that -- well, this deal fell through, correct?
14   A    It did.
15   Q    Yeah.  So she had done all of this work to assist you in
16   selling this property and she wouldn't receive any commission
17   at all because the sale didn't close?
18   A    That's correct.
19   Q    And you had to relist the property, and eventually you
20   got it sold about a year or so later, correct?
21   A    Uh-huh.  That's correct.
22   Q    Now, to the property that we saw the pictures of, the
23   one that is the initial one discussed in this case, 317 South
24   Piper Road, you hear -- Mr. Ketchmark covered this.  Obviously
25   you have a choice of tens of thousands of real estate agents
                              248
```

```
 1   you could work with --

 2   A    Uh-huh.

 3   Q    -- in Missouri?

 4   A    Uh-huh.

 5   Q    But you selected Joe Bex.

 6   A    That's correct.

 7   Q    Because he was a family friend?

 8   A    That's correct.

 9   Q    And you could -- you trusted him, you could count on

10   him?

11   A    Uh-huh.

12   Q    You trusted him as an agent, as a real estate agent, and

13   you also trust that he's not going to do you wrong?

14   A    That's correct.

15   Q    So you didn't interview any other agents or brokers?

16   A    I did not, no.  At this time -- when I purchased the

17   home in 2006, my mother assisted.  But at this time that we

18   were selling, my mom was no longer working in real estate.  So

19   we went with someone we trusted, you are correct.

20   Q    Got it.  Got it.

21        And similarly, you didn't think about doing this as

22   a for sale by owner at this point?

23   A    We were locating out of state.

24   Q    Right.  With this sale, you had Mr. Bex, did you not,

25   list the home on the MLS?
                             249
```

```
 1   A    That was standard practice.

 2   Q    Right.  And you know that the biggest advantage to

 3  listing on the MLS is the exposure to potential buyers or

 4  exposure to agents that are in a buyer capacity, correct?

 5   A    Yes, but I think that's just standard.  I don't think he

 6  had a choice.

 7   Q    Yeah.  And you -- for you as a seller, you wanted to

 8  maximize the number of interested buyers in your house,

 9  correct?

10   A    Correct.

11   Q    I want to look briefly at the contract, the sales

12  contract that you signed for the sale of the Piper Avenue

13  property.

14           MR. ECHOLS:  If we could please take a look at

15  D3701.

16           MR. KETCHMARK:  It's not in evidence, Counsel, but I

17  have no objection.

18           MR. ECHOLS:  I thought it was admitted.  Sorry.

19           MR. KETCHMARK:  I have no objection.

20           THE COURT:  Admitted.

21           MR. ECHOLS:  Thank you, Your Honor.

22           MR. KETCHMARK:  I did the same thing, so we're even.

23           MR. ECHOLS:  All right.

24   Q    (BY MR. ECHOLS) All right.  If you wouldn't mind taking

25  a brief look here, ma'am, at this D3701, you'll see it's
```
                                 250

```
 1   titled "Real Estate Contract."  And you see at the top there
 2   it says, This is a legally binding contract.  If not
 3   understood, seek legal advice.
 4           Do you see that?
 5   A    I do.
 6   Q    Below that in the property, that's your house there, the
 7   317 South Piper Road, right?
 8   A    That is correct.
 9   Q    And you and your husband -- and there's a daughter on
10   the list there?
11   A    I'm sorry?
12   Q    It looks like three people, Hollee D. --
13   A    Yeah, I'm confused by that as well.
14   Q    Okay.  Well, you duplicated yourself as being the
15   seller?
16   A    Uh-huh.
17           MR. ECHOLS:  If you would, flip a couple of pages
18   into this contract, please.  I'm going to skip the next one,
19   Mike, and go to page 7 of 8.
20   Q    (BY MR. ECHOLS)  Now, you explained just a moment ago
21   you had already moved to South Carolina, right?
22   A    That is correct.
23   Q    And so you were pretty impatient to get this house sold,
24   but it wasn't showing; it wasn't moving, right?
25   A    That is correct.
```
                            251

```
 1   Q    And in order to try to prime the pump to provide an
 2   incentive to get the house sold, you added some things here to
 3   the contract that you would agree to do, costs that you would
 4   undertake, correct?
 5   A    That is correct.  I think at the time that this house
 6   went under contract in 2016, it was kind of the standard
 7   practice that the seller, buyer would negotiate some of those
 8   types of costs.
 9   Q    Right.  And that's something that you know just from
10   your personal experience and from being a real estate agent
11   that terms of real estate purchase and sale contracts are
12   negotiable?
13   A    In terms of the final sale price.
14   Q    Certainly.  The sale price.  And how about here, $4,000
15   in buyer's closing costs, that wasn't a standard 4,000 in the
16   industry; that was something that you agreed to pay in order
17   to get this house sold?
18   A    Right.  Correct.  Without looking at amendments, I'm not
19   sure if that's where we started at that amount or if that's
20   the amount that we ended on.
21   Q    Sure.  Sure.  And then similarly, you've got the home
22   warranty.  That's something -- it's not always required to
23   offer or to provide, but it was something you offered here
24   because you wanted this house to sell quicker than it was
25   selling?
```
252

1     A     Sure, yes.

2     Q     And the transaction eventually did close, and you were

3   satisfied when that transaction closed, weren't you?

4     A     We were satisfied that the transaction was closed.  We

5   weren't necessarily satisfied with the proceeds we left with.

6     Q     Sure.  The commission that you paid, Mr. Ketchmark asked

7   you about.  Now, that commission was what Joe Bex asked for in

8   his contract with you as your selling agent, right?

9     A     I don't know that he asked for it.  It was just present

10  in the contract, and I didn't know any different.

11    Q     Present insofar as it was the money he was expecting to

12  get paid if he got the house sold?

13    A     It was present in the contract as -- and it was filled

14  in and told me that standard practice was the 6 percent that

15  was included in the contract.

16    Q     That's right.  Because in some of these contracts, you

17  fill in things.  You know, there's blanks, and you fill in

18  what you want the number to be, right?

19    A     And it was there already filled in for me.

20    Q     And this time this particular number, you say, was

21  filled in when you looked at it?

22    A     That's correct.

23    Q     You didn't ask your family friend, Joe Bex, to take a

24  haircut?

25    A     No.

                              253

```
 1   Q    If we flip ahead to the South Carolina briefly.  I don't
 2   want to take too much time on this.
 3              But the agent you used in South Carolina to purchase
 4   your house was a Mr. Hurry?
 5   A    That's correct.
 6   Q    And the way you got to Mr. Hurry as the agent was
 7   through your friend and agent Joe Bex?
 8   A    Correct.
 9   Q    You, again, never interviewed other agents; you took Joe
10   Bex's recommendation and picked and said this is the guy we
11   want to work with?
12   A    Right.  Joe referred to us Mr. Hurry because they both
13   worked within the Coldwell Banker agencies, and we did
14   interview Mr. Hurry when we first arrived in South Carolina
15   and felt very comfortable with him.  So we continued to move
16   forward.
17   Q    And that process took quite a while, I understand.  It
18   took about nine months or so in order for you to find the
19   property?
20   A    It did.
21   Q    And you found it yourself --
22   A    I did.
23   Q    -- eventually.
24              Now, any houses you asked Mr. Hurry to show you, he
25   never refused to show you any house that you asked for?
```
                                    254

```
 1    A    He did not.

 2    Q    Briefly if we can look at what is D3750.

 3         MR. ECHOLS:  Is this in evidence?

 4         MR. KETCHMARK:  No, it's not.

 5         MR. ECHOLS:  Any objection?

 6         MR. KETCHMARK:  If it's important to you, I have no

 7    objection.

 8         THE COURT:  Admitted.

 9    Q    (BY MR. ECHOLS) Now, D3750, if you take a look, this is

10    the contract to purchase the South Carolina house, correct?

11    A    That is correct.

12    Q    And like we were just talking about, some of the blanks

13    are filled in; others are not.  Let's make sure I'm looking at

14    the same pages that you are.  We look down at the bottom of

15    this document in the conveyance closing/possession.

16         Now, here is kind of an obvious example.  Would you

17    agree with me that you have the ability to modify terms in

18    real estate purchase and sale contracts, right?

19    A    I think this is just a modification of the possession

20    date.

21    Q    Yeah, yeah, exactly.  So the closing date, you know,

22    originally it was blank, but someone typed in May 2nd, 2018.

23    Do you see that?

24    A    I do.  But, again, I think it's just the possession

25    date.  There's no financial implications with that.
```

255

1   Q    No.  Just dates of your possession of the house, you

2   know, and somebody then wrote in.  I don't know if this was

3   you or if this was the sellers, April 1, 26, 2018.

4            So you changed that provision of the contract to fit

5   what you wanted and what you needed at the time?

6   A    Someone did, yes.  That was not me.

7   Q    If you go, please, to the next page.  You see the

8   highlighted portion two-thirds of the way down there.  It says

9   "at closing."

10           Now, here once again we have a situation where there

11  is a blank, but the blank has been filled in with a term that

12  I'm assuming you agreed with, which was seller will pay

13  buyer's transaction costs not to exceed $4,000, correct?

14  A    Again, those were terms negotiated in the -- coming to

15  the final purchase price.

16  Q    Right, right.  And you have that ability with various

17  terms and where there's blanks to negotiate those?

18  A    I knew that that was negotiable.

19  Q    If you flip to the next -- or two pages further in,

20  paragraph 14 at the top, you'll see there's a provision for a

21  home warranty.  And here, to make it a little bit easier for

22  you, they give you two check boxes, will or will not be

23  provided.  And once again, this was a provision that you and

24  your husband would decide what you wanted to have in there and

25  select?

256

1    A    Again, at that time in that market, these were common

2    negotiables.

3    Q    But they're good too, right?  It's good to get a home

4    warranty, isn't it?

5    A    Yes.

6    Q    And it's good to have them pay $615 towards the home

7    warranty?  That's a positive thing that you were able to

8    negotiate and obtain?

9    A    Correct.

10   Q    Because this was a purchase contract, you did not have

11   to pay Mr. Hurry's buyer's agent commission, correct?

12   A    That is correct.

13   Q    I'm going to skip -- move ahead from the sale of South

14   Carolina -- you explained how there was some problems in that

15   process -- and go to the Missouri -- the Republic, Missouri,

16   home.  And this is a situation where you asked Mr. Bex to

17   represent you again for the purchase of that home?

18   A    That's correct.

19   Q    And this closed in June 20, 2022, in -- I'll just ask

20   you about the communication you had with them during the

21   process of purchasing this.

22        If you --

23        MR. ECHOLS:  I'll ask counsel here first.

24        MR. KETCHMARK:  No objection.

25        MR. ECHOLS:  All right.  If we could move, Your
                          257

1  Honor, Exhibit D3908 into evidence.

2         THE COURT:  No objections; so it's admitted.

3  Q    (BY MR. ECHOLS) This is just a scan of the text back and

4  forth, it appears, that you had with Mr. Bex, and you see

5  there you're asking him in the middle whether the seller will

6  be paying the commission for this transaction, correct?

7  A    I'm asking him for clarification on the wording, yes.

8  Q    Right.  And he agrees with you that the wording here is

9  confusing and explains the listing states the compensation; so

10  it's not an issue, meaning your commission, buyer commission

11  will be covered?

12  A    That's his response, correct.

13  Q    And, likewise, Mr. Bex here is helping you to provide

14  you with information that you didn't have about the specifics

15  of the VA process at the bottom, right?

16  A    That is correct.

17  Q    It was a value to you for Mr. Bex to be providing you

18  that service as your buyer's agent?

19  A    Yes.  He provided some, but our lender actually gave us

20  quite a bit of information regarding that VA process as well.

21  Q    Okay.  Good, good.

22         You know, just to wrap up here, Mrs. Ellis, as we've

23  looked and briefly discussed, you personally have been

24  involved in nine real estate transactions over the years.

25  Would you agree with me that at a certain point, seller and

                                258

```
 1   buyer agents have to cooperate to get a deal closed?

 2    A    I would agree with that.

 3    Q    And lastly, ma'am, do you believe that it's good for

 4   sellers' agents to work together with buyers' agents to reach

 5   a common goal?

 6    A    I do believe that that cooperative relationship is good

 7   to reach a common goal, but seller agent works for me; buyer's

 8   agent works for the buyer.

 9         MR. ECHOLS:  Okay.  Thank you very much, ma'am.

10   CROSS-EXAMINATION BY MR. MacGILL:

11    Q    Good afternoon, ma'am.  My name is Rob MacGill.  I

12   represent -- I'm one of the lawyers representing HomeServices

13   of America and BHH and another company called HSF.  I have

14   just a very few questions for you.

15         I wanted to ask a couple things about what you just

16   testified to on cross-examination, and I wanted to ask you,

17   first, about the sale of the -- pardon me -- South Piper Road

18   residence.  You recall your testimony about that just a few

19   minutes ago?

20    A    Yes.

21    Q    Now, there was a cooperative compensation arrangement in

22   connection to that particular sale; is that correct?

23    A    As standard in the contract, yes.

24    Q    As the standard, which essentially was approximately

25   3 percent for the seller's side and 3 percent for the buyer's
```

259

1  side?  Is that, roughly speaking, at least what it was?

2  A    As is the standard practice, yes.

3  Q    Okay.  And that was the standard practice, as you

4  understood it, in the year as of the time of that sale, which

5  was 2016?

6  A    That is correct.

7  Q    Now, did you benefit from the results of that practice

8  and from that context of having cooperative compensation in

9  the sense that your house was sold?

10  A    I benefited from the work that my selling agent did in

11  the sense that -- the effort he put in to represent me to get

12  that house sold.

13  Q    And did his or her cooperation with the buyer's agent

14  help facilitate that transaction so it did, in fact, get

15  closed?

16  A    Yes.  But I -- it was minimal.

17  Q    All right.  But were you -- well, let me ask this:  In

18  terms of how cooperative compensation and the practice of

19  cooperative compensation worked for you and for your husband

20  in the year 2016, the net of that was that you and your

21  husband yielded $18,395 of net proceeds in connection with the

22  sale of your house; is that correct?

23  A    I would have to look at that settlement statement again.

24  Q    But do you recall testifying to Mr. Ketchmark just a few

25  minutes ago that that, in fact, was the number?  You remember

                          260

```
 1   that he put some calculations that he had done on the
 2   television screen for the jury?  Do you remember that?
 3    A    I do remember that, but in terms of having the precise
 4   number, I would need to look at the settlement statement
 5   again.
 6    Q    Fair enough.  But approximately you and your husband,
 7   from this cooperative compensation practice that you have
 8   described by your own testimony, yielded approximately $18,000
 9   in net proceeds in connection with the sale of that particular
10   house; is that right?
11    A    I believe that's what the net proceeds were prior to any
12   fees being taken out.
13    Q    Okay.  Prior to the commission being paid?
14    A    Part of the fees, yes.
15    Q    Now, relative to that particular transaction, did you
16   sign a contract that provided for approximately 6-percent
17   commission?
18    A    That was already completed in the sales contract, yes,
19   as standard practice, yeah.
20    Q    And that was the document that you signed?
21    A    That is correct.
22    Q    And you did so voluntarily?
23    A    I did.
24    Q    And your husband did as well?
25    A    We did.
```

261

1    Q    And at the time that you did sign that contract, you

2    understood yourself that you were agreeing that the listing

3    agent, the listing brokerage would be paid 6 percent, fair?

4    A    I agreed that the commission would be 6 percent and

5    didn't -- that's -- was standard.  I didn't know any

6    different.

7    Q    And with respect to that particular contract that you

8    signed and with respect to that contract that your husband

9    signed, you understood it was going to be a binding legal

10   contract, right?

11   A    I did.

12   Q    All right.  Now, with respect to the next step in the

13   real estate transactions, and I won't go through all of them,

14   but I just had a couple of questions about the next

15   transaction.

16         You then purchased the property at Cornucopia Lane

17   that you described in cross-examination.  Do you remember

18   that?

19   A    Uh-huh.

20   Q    And that was the purchase where?  In the state of South

21   Carolina?

22   A    The address was in Inman, South Carolina.

23   Q    All right.  Now, with respect to that purchase, you used

24   a buyer's brokerage, right?

25   A    We used a buyer's agent, correct.

262

```
 1   Q    And who was the agent there?

 2   A    Brian Hurry.

 3   Q    All right.  Now, with respect to Mr. Hurry's services, I

 4   believe that you described the services were to your

 5   satisfaction; is that right?

 6   A    They were.  The particular home that we ended up buying

 7   was one I located myself.

 8   Q    Well, okay.  Fair enough.

 9        But in connection with what you did to close the

10   transaction, did your agent, your buyer's agent, assist you in

11   making sure the home was closed properly, according to local

12   customs, procedures, and regulations?

13   A    He directed me to the attorney that completed the

14   closing transaction.

15   Q    And he did -- he did some other things as well to help

16   you get to the closing table; did he not?

17   A    He did a few things, yes, yeah.

18   Q    All right.  Now, I'd like to do just a quick math

19   calculation with you, if I could.

20        Now, on cross-examination, you testified, I believe,

21   that that house was purchased at a price of $166,000; is that

22   right?

23   A    That is correct.

24   Q    And was this the case where the transaction had been

25   agreed to in the -- in that particular transaction, that the
```

```
 1   seller would pay the commission for your buyer's agent?

 2   A    As was standard practice.

 3   Q    Okay.  So is this a case where cooperative compensation,

 4   again, was the context, so to speak, for your purchase

 5   transaction?  In other words -- let me restate it.

 6           Cooperative compensation was a practice that was

 7   utilized in connection with your purchase of the home at

 8   Cornucopia Lane; is that fair?

 9   A    There was the cooperative relationship, the cooperative

10   working relationship between the two agents, yes.

11   Q    Approximately 3 percent for the seller's side and

12   approximately 3 percent for the buyer's side, right?

13   A    As was -- as standard practice, yeah.  I didn't know any

14   different.

15   Q    And, again, if you don't mind, can you confirm to this

16   jury and to this court that cooperative compensation then

17   worked for you a second time in the sense that you purchased a

18   home this time, and you did not -- you did not pay a buyer's

19   commission, right?

20   A    I -- as was standard practice and didn't know any

21   different, that's the way it's written in the contract.

22   Q    But this time cooperative compensation worked for you in

23   a different way than it did when you were a seller because you

24   did not pay 3 percent on $166,000, right?

25   A    Right.  Had I known at that time what I know now and
```

1    would have been able to negotiate -- I'm told that that's an

2    option now -- I don't know that I would have paid the 3

3    percent to Brian in that transaction.

4    Q    Well, but in that transaction, it was the seller that

5    paid your buyer agent, right?

6    A    Right.

7    Q    Now, if you can trust me on some math, $166,000 times

8    3 percent is $4,980, according to my calculations.  Does that

9    sound correct to you?

10   A    Sure.

11   Q    So for your part and your husband's part in connection

12   with the purchase of this sale when you were the buyer, you

13   and your husband did not pay a buyer's commission of

14   approximately $4,980; is that fair?

15   A    That is fair.  But the transaction prior, we had paid

16   close to 4,000 to buyer's agent that --

17   Q    Okay.

18        MR. KETCHMARK:  Mind letting her finish?

19        MR. MacGILL:  Don't mean to interrupt.

20   A    Thank you.  As the transaction prior, you know, we -- as

21   the seller, we paid the buyer's agent, you know, nearly $4,000

22   that had I known that this was an option or, you know,

23   something different, I would have gone a different direction.

24   Q    (BY MR. MacGILL)  Okay.  Now, just by context, just one

25   follow-up to questions that you answered on direct

265

1   examination.

2           Your mother was a real estate agent for many years?

3   A    That's correct.

4   Q    How many years?

5   A    Nearly 30.

6   Q    Nearly 30?

7   A    Uh-huh.

8   Q    And she was a member of the National Association of

9   Realtors for more than -- or approximately 30 years?

10  A    She was.

11  Q    Okay.  Now, just a couple more transactions that I want

12  to ask you about.

13          You then became a seller on the Cornucopia Lane

14  property; did you not?

15  A    That's correct.

16  Q    When you sold that, you sold that property in the year

17  August -- pardon me.  In the month of August 2021; is that

18  right?

19  A    That is correct.

20  Q    Now, if you don't mind, I'd like to just set a little

21  bit of context for August 2021.  Are you aware that this

22  lawsuit was filed approximately two years prior?

23  A    Yes.

24  Q    Okay.  So the lawsuit that you filed in this honorable

25  court was two -- in the year 2019.  Yes?

                              266

```
 1   A    Correct.

 2   Q    And so two years after you filed the lawsuit in this

 3  court, you engaged in another transaction that also involved

 4  cooperative compensation; did you not?

 5            MR. KETCHMARK:  Objection, Your Honor.  Mr. MacGill

 6  knows she joined this lawsuit well after that.

 7            THE COURT:  Overruled.  You can answer his question.

 8   Q    (BY MR. MacGILL)  So may I repeat, ma'am, just so

 9  there's no confusion?

10            So with respect to this lawsuit that was filed in

11  the year 2019, in August of 2021, you sold the Cornucopia Lane

12  house; is that right?

13   A    That is correct.

14   Q    And at the time that you made that sale, you signed a

15  listing agreement that included cooperative compensation; did

16  you not?

17   A    I did.

18   Q    Now, just to be precise -- and we do have these

19  contracts.  To be precise, your listing agreement said that

20  there would be a total commission of 6 percent; is that right?

21   A    That was completed for me, yes.

22   Q    Yes.  And that was with your agent, Mr. Hurry?

23   A    That is correct.

24   Q    And that's a gentleman that you placed your trust in?

25   A    That is correct.
```

267

```
 1    Q    And you agreed for your part and your husband agreed for

 2    his part to pay a 6-percent listing commission; is that right?

 3    A    A 6-percent commission.

 4    Q    Okay.  Now, with respect to that, you also understood

 5    that there would -- that your agent, your selling agent, would

 6    split that commission, 3 percent to the selling side and 3

 7    percent for the buying side, right?

 8    A    I understood that 3 percent of my proceeds would go to

 9    the selling agent, and 3 percent of my proceeds would go to

10    the buying agent.  And, again, I -- standard practice, I knew

11    nothing different.

12    Q    Now, my question in follow-up to these circumstances

13    that you just described is the following:  So did you and your

14    husband again benefit from cooperative compensation, the

15    practice, by specifically having a successful sale of your

16    home?

17    A    In that transaction, I would disagree with that.  Our

18    selling agent definitely worked to our benefit, but the

19    buyer's agent in that transaction did not work to our benefit.

20    Q    Was the buyer's agent in that case working for the buyer

21    and not you in your view?

22    A    That is correct.

23    Q    Now, did that surprise you that the buyer was being an

24    advocate for the buyer in that particular context of that

25    sale?
```
268

```
 1    A    Can you repeat, please?

 2    Q    Happy to.  So you understood at the time your

 3  transaction was going forward in the Cornucopia Lane

 4  circumstance, that there was somebody representing you, the

 5  seller's agent, right?

 6    A    Correct.

 7    Q    And you also understood at the same time in order to get

 8  this transaction moving, there was a buyer's agent

 9  representing the interests of the buyer?

10    A    That's correct.

11    Q    Now, and relative to that, you understood that the

12  commission that you, for your part and your husband for his,

13  had agreed that 6 -- that 6-percent commission would be split

14  equally; 3 percent for one side and 3 percent for the buyer's

15  side, right?

16    A    That was the standard practice, yeah.

17    Q    Equal split?

18    A    That was the standard practice, yes.

19    Q    Now, the result was you had -- the result of that

20  context that you've just described to this jury is that you

21  ended up with a successful transaction in the sense that you

22  sold your home, right?

23    A    We did.

24    Q    And did you net proceeds yourself, you and your husband?

25    A    Net proceeds?
```
                              269

```
 1   Q    Yes.

 2   A    We did.

 3   Q    Can you tell the jury here what the profit was in

 4   connection with that sale?

 5   A    Without looking at a settlement statement, I would not

 6   know exact numbers.

 7   Q    Can you give the jury any approximation, ma'am, of what

 8   you yielded in particular with that sale?

 9   A    Again, without a settlement statement, I don't really

10   know.

11   Q    Let me back up one step since you didn't recall that.

12   Let me ask one follow-up to your first sale on South Piper

13   Road.

14        You indicated to Mr. Ketchmark and to this jury and

15   the court that you yielded approximately $18,000 from the

16   successful sale at South Piper Road.  Do you remember that

17   testimony?

18   A    That was the number that was put, but that was not the

19   number that we left the closing with.

20   Q    All right.  Well, you left the money with -- let me ask

21   it in this way:  So you left the closing table with net

22   proceeds from South Piper Road; is that right?

23   A    We did, yeah.

24   Q    And those proceeds, did you use those proceeds to

25   purchase the house at Cornucopia Lane?
```

                                  270

```
 1    A    Again, looking at the settlement statement, I'd have to

 2   get the exact number, but I believe our net proceeds were less

 3   than $2,000 off of that sale.  So again, it was minimal.

 4           Had I known and I'd had the almost $4,000 I paid to

 5   the buyer's agent, I would have been able to have more funds

 6   to use towards the purchase of the house in South Carolina.

 7    Q    I've got one more transaction to ask you about, ma'am,

 8   and that is you were also involved in a transaction where you

 9   purchased a home in June of 2022 at East K Street; is that

10   correct?

11    A    That is correct.

12    Q    And in that case, you worked with Mr. Bex; is that

13   right?

14    A    He was our buyer's agent, yes.

15    Q    And had you worked with him before?

16    A    We had.

17    Q    And you'd worked with him successfully in prior times?

18    A    He was our selling agent for 20 -- for Piper Road.

19    Q    So you went back to him?

20    A    Correct.

21    Q    You had been satisfied with his services as a seller's

22   agent; is that right?

23    A    That is correct.

24    Q    And now you were coming to him to represent you as a

25   buyer's agent; is that right?
```

```
 1    A    That is correct.

 2    Q    And with respect to this particular transaction, once

 3   again, this was a cooperative compensation transaction, wasn't

 4   it?

 5    A    It was.  It was somewhat unique as well.  The seller of

 6   that house on K Street was owner agent.  So the transaction

 7   looked a little bit different for that reason.

 8              And also in that transaction, working with Joe as my

 9   buyer's agent, this was another instance where I located the

10   home.  I actually located almost the homes that he showed us

11   during the course of that house search and asked him to take

12   us into it.

13    Q    But Mr. -- pardon me.

14              But Mr. Bex, for his part, certainly helped you

15   prepare your offer, right?

16    A    He did help with the paperwork because that was required

17   through the MLS.

18    Q    And getting his counsel on what a proper offer would be

19   in connection with that transaction was helpful to you; was it

20   not?

21    A    He actually didn't help us with that part.  We actually

22   worked with our lender to determine the options in terms of

23   what would be a fair offer and financially what would be

24   feasible for us.

25    Q    All right.  Now, to be fair to Mr. Bex and to be
```
272

```
 1   specific about what Mr. Bex did to help you and your husband
 2   relative to this purchase, he had been working with you for
 3   almost a year to find a house, hadn't he?
 4   A    He had been off and on working, showing us homes that I
 5   would locate and contact him and ask if he would take us in
 6   because they were all on the MLS, and I couldn't -- you know,
 7   had to have his access to get in.
 8   Q    So is it fair to say that he, at least for his part, had
 9   been dedicated to the service of you and your husband as you
10   attempted to buy a new home, which ended up in your purchase
11   on East K Street; is that right?
12   A    Yes.
13   Q    All right.  How much was -- what was the purchase price
14   at East K Street?
15   A    Again, I'd have to see the settlement statement in front
16   of me, but I believe it was 262.  I don't recall off the --
17   the exact number.
18   Q    260 some thousand?
19   A    Yeah, I believe it was.  But again, I'd need to see the
20   settlement statement to know the exact number.
21   Q    And so in connection with that, your understanding is
22   that the buyer's agent, your agent, Mr. Bex, was paid
23   approximately 3-percent commission on that; is that correct?
24   A    That is correct.
25   Q    So in that case doing rough math, if you don't mind, you
```

273

1  and your husband did not pay approximately $7,800 in a buyer's

2  agent commission in connection with that purchase, did you?

3  A    We did not.  We actually -- our offer to the selling

4  agent, owner agent was actually increased so that some of that

5  would be covered, some of that commission would be covered

6  because as the owner agent, she did not take anything on her

7  side.

8  Q    So my final question, ma'am, then is, so with respect

9  to -- once again, the practice of cooperative compensation as

10 you and your husband were involved in it, was successful in

11 the sense that you ended up purchasing a home successfully on

12 East K Street; is that right?

13 A    It was successful in terms that we ended up purchasing a

14 home successfully, yes.

15 Q    And it was also successful because there was cooperative

16 compensation, a system that I think you acknowledged has been

17 in effect for quite some time as a standard practice, because

18 of this, you and your husband for your parts did not pay a

19 commission to your agent of approximately $7,800; is that

20 fair?

21 A    We did not pay that, but that -- again, that 3 percent

22 was set and as a -- for the buyer's agent.  And as the buyer

23 using Mr. Bex as our buyer's agent, I probably would have

24 worked to negotiate a different rate for him, given that I

25 felt like I did most of the legwork in that search.

                              274

```
 1   Q    With respect to your participation in this particular
 2   transaction, this participation in this transaction was some
 3   three years, some three years after the filing of the lawsuit
 4   in this court, right?
 5   A    That's correct.  But I didn't join the lawsuit until
 6   early '22.  I believe it was like March of '22 is when I
 7   joined the lawsuit.
 8   Q    Okay.  In March of '22, that's when your best memory is
 9   that you joined the lawsuit?
10   A    That is correct.
11   Q    Okay.  And then the final question I have is that you
12   purchased the home some three months later after joining the
13   lawsuit, right?
14   A    Yes.
15   Q    Okay.
16           MR. MacGILL:  Nothing further, Your Honor.
17           THE WITNESS:  I would have to do math again.
18           THE COURT:  Ms. Topol?
19           MS. TOPOL:  Nothing from NAR, Your Honor.  Thank
20   you.
21           THE COURT:  Thank you, ma'am.
22           MR. KETCHMARK:  Couple things.
23   REDIRECT EXAMINATION BY MR. KETCHMARK:
24   Q    I want to go back to this issue.  We've got this -- it's
25   like a transcript that comes to me, this realtime.  It's
```
275

```
 1    pretty cool that Ms. Wambolt types it up and it comes across.

 2              Mr. MacGill before, when he was asking you

 3    questions, stood here and said that, in talking about the

 4    sale, if you recall, in August, that we did this purchase in

 5    August of 2021.  Do you remember that in South Carolina?

 6    A    Purchase or the sale?  The sale was in August.

 7    Q    I'm sorry, the sale.  Remember that?

 8    A    That is correct.

 9    Q    And he stood here and, according to the transcript, and

10    the jury can remember, he said you did that after you filed

11    this lawsuit in 2019.  Remember him saying that to you?

12    A    I do.

13    Q    The fact of the matter is -- and I actually have the

14    date here -- it was May 6th of 2022.  You didn't become a

15    class representative until May 6th of 2022, correct?

16    A    That is correct.

17    Q    So if there was any attempt to create an impression with

18    this jury that you had had this lawsuit on file in 2019 and

19    then went out to South Carolina and became a part of this

20    system that you're challenging, that wouldn't be accurate,

21    would it?

22    A    It was not accurate.

23    Q    Now, I'm not going to get into all the details, but is

24    your -- your husband -- or I'm sorry.  Your son is an

25    attorney, correct?
```

276

```
1   A    He is.

2   Q    And did you learn about what was happening in this

3   lawsuit through conversations with your son?

4   A    I did, because I had expressed to him -- well, we

5   expressed our frustration after the sale in 2016 on Piper

6   Road, that it stung, the amount of money paid to someone we

7   never even met, the buyer's agent who we never met.

8           And then he also had -- we had conversations

9   regarding our difficulty with the transaction in South

10  Carolina and our disgruntledness of having to pay that agent

11  and the difficulty, even though they caused so much

12  difficulty.  So he knew that I had a fairly strong opinion

13  about how I felt this was pretty unfair.

14  Q    And it sounds like it would have been better maybe if I

15  had sat down with you at a place in new Republic, but I came

16  down to Springfield and met at one of those Mexican

17  restaurants down there?

18  A    Yeah.

19  Q    Remember the name of that one?

20  A    I think it was Mexican Villa, yeah.

21          THE COURT:  Which one?  It's real important for you

22  to explain that.

23          THE WITNESS:  Yeah, yeah.  That's true.  It was the

24  original on National.

25  Q    (BY MR. KETCHMARK)  And grand burrito was not the
                              277
```

```
 1   suggestion.

 2   A     Yeah.

 3   Q     But I did it anyway.

 4   A     Uh-huh.

 5   Q     Now, the -- well, you got the benefit of not having to

 6   pay $7,800 when you didn't have to pay a buyer's commission.

 7   Remember when the attorney from HomeServices was saying that

 8   to you?

 9   A     I do.

10   Q     And not taking anything against Mr. Bex, but if you were

11   the one paying for the services that you got, would it have

12   been worth $7,800 to you?

13   A     Again, not -- nothing against Joe, but I don't know that

14   I would have felt that that would have been an accurate

15   compensation for the amount of work that was done.

16   Q     Do you know, from your own life experiences down in

17   Springfield and your work as a teacher and all the things, how

18   hard it is to work for $7,800?

19   A     That's -- yeah.  That's -- that is a -- it's a blow to

20   our pocket at that amount, especially on a public teacher

21   fund.

22   Q     So what I'm saying is that for $7,800, to earn that

23   much, is that -- that's a lot of money?

24   A     It is a lot of money, lot of time, yep.

25   Q     And if you were the one in a free market, a fair market,
```
                                278

```
 1   if you were saying you were going to pay your own buyer's
 2   agent, would -- any circumstance in the world would you have
 3   ever paid anywhere close to $7,800?
 4   A    I would have not.  I would have made different choices.
 5   Q    Now, one of the things that I want to ask you about --
 6   and he asked you over and over again.  I wrote it down.  I
 7   think I wrote it down five times before I stopped keeping
 8   track.
 9        He said you and your husband yielded -- and he kept
10   saying "yielded" -- $18,000.  Remember him continuing to say
11   that?
12   A    I do.
13   Q    Now, look, this is the exhibit that I showed you when I
14   told you that.  We actually did this when I said I was doing
15   math, and I said that's how much was left after you paid your
16   mortgage, right?
17   A    Uh-huh.
18   Q    Yes?  I'm sorry.  It's for the record.
19   A    Yes.  I'm sorry.  Yes, that's correct.
20   Q    So when he kept saying you netted this -- you netted
21   this, you netted this, you netted this, you netted this -- he
22   said that over and over again.  You remember that?
23   A    I do.
24   Q    But the fact of the matter is what he didn't talk to you
25   about is what you actually did is you paid two sets of
```
279

```
 1   commission, one to Keller Williams, the buyer's agent,
 2   correct?
 3    A    That is correct.
 4    Q    20 percent of your equity, correct?
 5    A    That is correct.
 6    Q    And 20 percent of the equity to the Anywhere person from
 7   Coldwell Banker, correct?
 8    A    That is correct.
 9    Q    So you didn't net $18,000, did you?
10    A    Not at all.
11    Q    40 percent of the equity in your home was put into what
12   you've called the standard practice of 6 percent, correct?
13    A    That is correct.
14    Q    Is that why you're here?
15    A    Exactly why I'm here.
16    Q    Thank you.
17         MR. KETCHMARK:  I have no further questions for you.
18         MR. MacGILL:  Just one quick follow-up.
19         THE COURT:  Counsel, come up here real quick since
20   this is our first witness we're doing this with.
21         (Counsel approached the bench and the following
22   proceedings were had:)
23         THE COURT:  So recross is not normally allowed.  If
24   you've got something new and it's --
25         MR. MacGILL:  That's fine.
```

                                280

```
 1              THE COURT:  I just don't want to -- if we get going
 2    that route, guess what?  He's going to do that with everybody.
 3    And so --
 4              MR. MacGILL:  That's fine.
 5              THE COURT:  If you need to, I want to give you some
 6    grace, but --
 7              MR. MacGILL:  Thank you for the opportunity.  No,
 8    don't need to.
 9              THE COURT:  Okay.  Thank you.
10         (The proceedings returned to open court.)
11              THE COURT:  May this witness be dismissed?
12              MR. KETCHMARK:  Yes, Your Honor.
13              THE COURT:  Thank you.
14              THE WITNESS:  Thank you, sir.
15              THE COURT:  Enjoy your burrito enchilada style.
16              My plan is to take a break at three o'clock for 15
17    minutes, give or take.  If anybody needs to go to the
18    restroom, we're going to take care of you.  So that's the
19    plan.
20              Got your next witness?
21              MR. KETCHMARK:  We are.
22              The plaintiffs call to the stand Michael Gorman by
23    way of his sworn video deposition dated August 22nd, 2022.
24    Counsel for all of the defendants, corporate defendants, as
25    well as Anywhere and RE/MAX, were present.
```
281

```
 1              (Video played.)

 2              THE COURT:  Ladies and gentlemen of the jury, we are

 3   going to go ahead and take our afternoon break until 3:15.

 4   We'll see you back.  Please do not discuss this case.

 5              (The following proceedings were had out of the

 6   presence of the jury:)

 7              THE COURT:  So No. 44's IEP got moved from noon to

 8   three; so we're going to try to give her a little bit of time

 9   to sit in on that with her child.

10              MR. KETCHMARK:  Okay.

11              THE COURT:  So that's why I magically chose three

12   o'clock.

13              THE COURTROOM DEPUTY:  It got moved again.  She just

14   told me.

15              THE COURT:  It got moved again.  Welcome to that

16   system.

17              Since I gave them 15 minutes, is there anything

18   anybody needs real quick?

19              MR. KETCHMARK:  No.  Whatever we need, Your Honor.

20   We'll do whatever.

21              THE COURT:  Okay.

22                   (A recess was taken.)

23              (The following proceedings were had in the presence

24   of the jury:)

25              THE COURT:  Mr. Ketchmark.
                              282
```

```
 1           MR. KETCHMARK:  Plaintiffs call Rhonda Burnett to
 2   the stand.
 3           THE COURT:  Ma'am, right before you're seated, we'll
 4   have you raise your right hand, and we'll swear you in.
 5   RHONDA BURNETT, being duly sworn by the courtroom deputy,
 6   testified:
 7   DIRECT EXAMINATION BY MR. KETCHMARK:
 8   Q    Can you please state your name and introduce yourself to
 9   the jury.
10   A    My name is Rhonda Burnett.
11   Q    And, Rhonda, what's your husband's name?
12   A    Scott Burnett.
13   Q    And how long have you and Scott been married?
14   A    42 years.
15   Q    Where are you originally from?
16   A    I was raised in Georgia in, like, a suburb of Atlanta,
17   but I was born in Florida.
18   Q    And what did your mom and dad do when you were growing
19   up?
20   A    My mom was a stay-at-home mom, and she took care of my
21   sisters and I.  She sold Tupperware.  And my father worked for
22   the government.  He worked at the federal penitentiary doing
23   rotational jobs.  He had a side hustle too.  He worked at
24   Sears in the sporting goods department, and we were never out
25   of skate keys.
```

283

```
1   Q    Where did you go to high school?

2   A    I went to Columbia High School in Decatur.

3   Q    And where did you go to college?

4   A    I went to Georgia State University, transferred to the

5   University of Georgia.

6        When I graduated there, I went back to Georgia State

7   University and took a master's.

8   Q    What was your undergraduate master's degree in?

9   A    Education.  I wanted to be a school psychologist because

10  they get the summers off.

11  Q    And did you wind up in Kansas City?

12  A    I've been -- I've lived in Kansas City since 1990, but

13  we moved to Kansas right after we were married in '81.

14  Q    And do you and your husband, Scott, have children?

15  A    We have three children.

16  Q    Tell the jury about who they are.

17  A    My oldest son, Sam, will be 38 in a couple weeks, and

18  his brother is 36, and our daughter is 33.

19  Q    And I'm going to show you what's been marked as Exhibit

20  No. 2205.  It's just some photographs.

21       MR. KETCHMARK:  Does defense counsel have some

22  objection to me using some photographs?

23       I'd move 2205 into evidence, Your Honor.

24       THE COURT:  No objections.  2205 is admitted.

25  Q    (BY MR. KETCHMARK)  Is this a picture of you and Scott?
```
                                284

```
 1   A     It is.

 2   Q     Tell me who we see in this photograph here, this next

 3   part of 2205.

 4   A     We see my baby.  That's -- the nearest in the picture is

 5   my son Sam and his wife, Kate, their daughter Bridget.  Scott

 6   is at the back, and Jake is sitting next to him.

 7   Q     And when we see here the house we've been kind of

 8   visiting about in this case with the jury a little bit about,

 9   is this -- do you recognize this as a picture of a home that's

10   over on 36th and Holmes?

11   A     3630 Holmes.  We bought that house when my oldest son,

12   Sam, was in law school to give him a place to live and maybe

13   get him some equity, build up his credit, let him rent out a

14   room.

15   Q     What year was that?

16   A     2008.

17   Q     And did there come a time where you decided to sell that

18   house?

19   A     Yes.  When he finished -- he finished law school, and

20   homeownership just didn't sit with him.

21   Q     Did you first try to sell the house on your own?  Do you

22   remember?

23   A     We went in to clean it up and prepare it for sale, and

24   while we were doing that, we just put a sign in the yard.  It

25   was really pitiful.  I mean, it wasn't like we made fliers and
```
285

```
 1   put them up or anything.  It was just we stuck a sign in the
 2   yard saying "Coming soon."
 3   Q    Did you end up hiring a real estate agent?
 4   A    I did.
 5   Q    And who did you guys hire?
 6   A    I hired Pam Gard.  I have been friends with Pam since,
 7   like, the early '90s.  We knew each other through advocacy for
 8   the public schools.
 9   Q    And what is advocacy for the public schools?
10   A    We were parents of children in the public school that
11   would advocate on behalf of our schools and advocate to the
12   public that it was a viable consideration for their -- for
13   their families.
14   Q    And is that something that you were active in the Kansas
15   City area doing that?
16   A    Very much.
17   Q    And what real estate agency was Pam Gard associated
18   with; do you recall?
19   A    I think she is still associated with ReeceNichols.
20   Q    Is your understanding now that that's a part of -- that
21   has an affiliation with HomeServices?
22   A    Yes.
23   Q    Were you happy with her?
24   A    Yeah.
25   Q    Now, one of the things that I'd like to show you is
```
                                286

```
 1   Exhibit No. 4588, the ReeceNichols franchise disclosure form.

 2           MR. MacGILL:  One moment, Your Honor.

 3           MR. KETCHMARK:  It's your franchise.

 4           MR. MacGILL:  Your Honor, lack of foundation with

 5   this witness on this document, 4588.  For that reason, we

 6   would object.

 7           THE COURT:  Lay a little foundation, would you?

 8           MR. KETCHMARK:  If we have to.

 9   Q    (BY MR. KETCHMARK) I'm going to approach and show you

10   Exhibit No. 4508 [sic].  Do you recognize your signature on

11   this franchise disclosure document for ReeceNichols?

12   A    It's electronic.

13   Q    And it's your name as the electronic signature?

14   A    Yes.

15   Q    Is that the franchise disclosure document you had as

16   part of the sale of this home, ma'am?

17   A    Yes.

18           THE COURT:  4588 is admitted.

19   Q    (BY MR. KETCHMARK)  I want to talk to you about this

20   exhibit, No. 4588.

21           Do you see here across the top of this where first

22   thing we see across the top is it says ReeceNichols.  You see

23   that?

24   A    Yes.

25   Q    And it's kind of strange, but when I'm asking questions,
```
287

```
 1    I should have explained this to you before.  This is kind of
 2    new to you.
 3              When I ask questions, it's important that you answer
 4    audibly so the court reporter can take it down.  Fair?
 5    A    Yes.
 6    Q    And you're doing a good job.  We can't talk at the same
 7    time.  Okay?
 8    A    (Witness nodded head.)
 9    Q    Okay?
10    A    Okay.
11    Q    And do you see here where it says -- it says Harry Scott
12    Burnett and Rhonda Burnett.  It says Harry is his legal first
13    name, but he goes by Scott?
14    A    He goes by either because it's so -- he never knows
15    who's going to need him.
16    Q    Okay.  And then we see it lists who it's from, and we
17    see a couple of different entities, but one of the ones we see
18    is ReeceNichols, correct?
19    A    That's right.
20    Q    Across the very top of it, we see Affiliated Business
21    Arrangement Disclosure.  Do you see that?
22    A    Yes.
23    Q    And contained in here, it states that -- well, maybe I
24    should use it down here.  At the bottom of this for electronic
25    signature, that's where we see the electric signature for a
                                  288
```

1   Docusign that was electronically signed by both you, Rhonda

2   Burnett, and Scott Burnett.  You see that?

3   A    Yes.

4   Q    And contained within this disclosure agreement, it

5   states that -- we see ReeceNichols Realtors doing business as

6   ReeceNichols, and it lists a variety of different companies

7   there, correct?

8   A    Yes.

9   Q    And it says, Each are wholly owned by HomeServices of

10  America.  Do you see that?

11  A    Yes.

12  Q    Either directly or through one or more subsidiaries.  Do

13  you see that?

14  A    Yes.

15  Q    And then you get down to here where it talks about

16  services provided, and there's a section for a broker's

17  commission.  Do you see that?

18  A    Yes.

19  Q    And for the broker's commission for the sale of that

20  home, we see ReeceNichols, correct?

21  A    That's right.

22  Q    And it says "broker's commission," correct?

23  A    Yes.

24  Q    And there's a fee of $298, correct?

25  A    Right.

                              289

```
 1    Q    It says, Plus 6 to 10 percent of the sales price,
 2  correct?
 3    A    Right.
 4    Q    It doesn't have a number less than 6 percent, does it?
 5    A    No.
 6    Q    And then when we look at the -- when we look at Exhibit
 7  No. -- I'm going to use Exhibit No. 2200, the sales contract.
 8              MR. KETCHMARK:  Any objection to that?  You want me
 9  to lay the foundation for that with her or can I just --
10              MR. MacGILL:  Let me take a look.
11              No objection to Exhibit 2200.
12              MR. KETCHMARK:  I'm introducing 2200, Bates pages
13  239 through 243 and Bates No. 245 into evidence, Your Honor.
14              THE COURT:  2200 is admitted.
15    Q    (BY MR. KETCHMARK)  I'm going to show you the front page
16  of that where we see "exclusive right to sale," correct?  Do
17  you see that?
18    A    That's right.
19    Q    And on the last page of that -- and I'm sorry.  That's
20  where we see you and your husband's name, correct?
21    A    Yes.
22    Q    Up there with the contract between you, and then we see
23  between you and the ReeceNichols' broker, correct?
24    A    That's right.
25    Q    And it's for this property at 3630 Holmes, correct?
```
290

```
1    A    That's right.
2    Q    And the last page of this, we see that there's this
3    electronic signature page, correct?
4    A    That's right.
5    Q    And on this there's a compensation section here,
6    correct?
7    A    That's right.
8    Q    And on this compensation section it says "seller."  And
9    that would be you and your husband, correct?
10   A    That's right.
11   Q    And it says you agree to pay the commission.  Remember
12   before in the disclosure that they gave you when they were
13   saying that they're wholly owned by HomeServices, where they
14   said 6 to 10 percent.  Do you remember that last exhibit we
15   looked at?
16   A    Yes.
17   Q    And there were some boxes they have that says "circle
18   one," and they start at 7 percent, 8 percent, 9 percent, 10
19   percent, or a blank.  Do you see that?
20   A    Yes.
21   Q    Contained in that blank, it says 6 percent, correct?
22   A    Lower than the rest.
23   Q    Did you think you were getting a deal when you saw
24   this --
25   A    No.  I didn't think I was getting a deal, but they might
```
291

```
 1   want you to think that.
 2   Q    When you got this contract to be electronically signed,
 3   was that a number that was already in there?
 4   A    It was already in there.
 5   Q    So when you got this contract from this company that's
 6   wholly owned by -- related with HomeServices, they had already
 7   written 6 percent on the contract?
 8   A    Yes.
 9   Q    You signed it electronically, correct?
10   A    Yes.
11   Q    So it wasn't as if you -- do it this way.  Did you sit
12   down with Pam Gard over coffee and have some discussion about
13   negotiating that rate?
14   A    We had had discussions prior to her sending the document
15   to us, but I was told that nothing was negotiable.
16   Q    She told you that?
17   A    Yes.
18   Q    Now, look, I want to be clear in this case.  You're not
19   here to -- or I'll ask this way.
20        You're not here complaining about Pam Gard or issues
21   that you have with Pam Gard, correct?
22   A    No.
23   Q    You're not here complaining about the local
24   ReeceNichols' agents that you're dealing with, correct?
25   A    No.  She was doing her job.
```
                              292

```
 1    Q    Now, in this contract when we look down, it says that

 2    the 6-percent commission, that will be split; 3 percent to the

 3    agent working for you on the listing side, the HomeServices'

 4    person, and 3 percent to the buyer's agent.  Do you see that?

 5    A    Yes.

 6    Q    And it says that that was to be already for a blank to

 7    be filled in.  When they received this contract from these

 8    folks with -- associated with HomeServices, was that already

 9    filled out, the 3 and 3?

10    A    Yes, it was.

11    Q    If it hadn't already been filled out --

12    A    You couldn't sign it.

13    Q    What's that?

14    A    You couldn't sign it if it was -- had blanks.

15    Q    But it actually says here even if it happened to be

16    signed if it was blank, if it was blank, it would be 50/50 if

17    left blank, correct?

18    A    That's right.

19    Q    Now, did the house end up selling?

20    A    It did.

21    Q    And I'm going to show you --

22         MR. KETCHMARK:  Like to move 2201 into evidence, the

23    settlement statement.

24         Any objections?

25         We move 2201 into evidence, Your Honor.
```
                              293

```
 1              THE COURT:  2201 is admitted.
 2   Q    (BY MR. KETCHMARK)  I'm not going to spend too much time
 3   on this because there's been some time on this already, but
 4   I'm going to talk a little bit about it.
 5              There's a settlement statement that you have here
 6   for this home.  Do you see that?
 7   A    Yes.
 8   Q    And that's for you -- the home that you and Scott sold,
 9   correct?
10   A    That's right.
11   Q    And in the settlement statement, it shows the -- there's
12   a section here on the sale price of the house, the contract
13   price was $250,000.  Do you see that?
14   A    Yes.
15   Q    And then contained in this, when we look to the next
16   page, it talks about the -- number one on the settlement
17   charges, it lists commissions.  Do you see that?
18   A    Yes.
19   Q    And it says the settlement charges.  Does it say who's
20   paying the settlement commissions over here where I've
21   highlighted that?  Do you see that?
22   A    It's on my side.
23   Q    As the seller of the home, correct?
24   A    Yes.
25   Q    And the amount is -- can you tell the jury the amount
```

```
 1   just for the record?  I know everyone can see it, but for the
 2   record, can you read into that amount?
 3   A     15,298.
 4   Q     And that's the $298 fee, correct?
 5   A     For the brokerage.
 6   Q     And then plus the 3 percent, the 3 percent you paid to
 7   your seller's agent and the 3 percent that paid for the
 8   buyer's agent, correct?
 9   A     That's right.
10   Q     And the buyer's agent, would that be the agent who was
11   working for the buyer of the home?
12   A     She definitely was working for the buyer of the home.
13   Q     And you said that with maybe -- what makes you say it
14   that way?
15   A     Well, she wasn't working for me.
16   Q     Yeah.  Okay.  I got you now.
17          And who -- and that person was associated with
18   RE/MAX, correct?
19   A     That's right.
20   Q     And the -- that's something that happened as part of the
21   sale of your home, correct?
22   A     Yes.
23   Q     And then -- now, do you understand that you're here in
24   this case as a class representative on behalf of the classes
25   of people all across the state of Missouri?
                                  295
```

```
 1   A    I do.

 2   Q    And can you tell the jury why you would -- you decided

 3   to do this as a class representative?

 4   A    Well, just reviewing that last document is what you need

 5   to know because I paid the buyer's broker to negotiate against

 6   me and my husband, which resulted in a lower sales price and

 7   about $10,000 in additional repairs that they said that was

 8   contingent on the buy that -- she did a good job in

 9   representing him, but I had to pay her commission.

10   Q    So one of the things -- let's look at -- I'd like to

11   show Exhibit No. 2204, which is the listing -- the picture

12   listing.

13          MR. KETCHMARK:  Any objection?

14          MR. RAY:  None.

15          MR. KETCHMARK:  I move 2204 into evidence.

16          THE COURT:  Admitted.

17   Q    (BY MR. KETCHMARK)  This is the flier that Pam Gard at

18   ReeceNichols put together.  We see Pam down here, your friend

19   from that advocacy group.  We see her down there, correct?

20   A    Yes.

21   Q    And it's the flier that --

22   A    She looks happy.

23   Q    -- she put together for your home there on -- that you

24   were selling, right?

25   A    Right.
```

296

```
 1    Q    And you listed it for $275,000, right?

 2    A    That's right.

 3    Q    And then ended up selling it for $250,000, right?

 4    A    That's right.

 5    Q    And you said the buyer's agent did a good job working

 6   for the buyer, right?

 7    A    She did.  Excellent job.

 8    Q    And then, in addition to getting $25,000 less off the

 9   house, you also ended up paying for her services, correct?

10    A    Paid for her services and additional repairs.

11    Q    And you understand, as part of this class action

12   lawsuit, that you're here not just as yourself but as a voice

13   for all of the people that you know that I've been appointed

14   to represent across the state of Missouri; is that true?

15    A    That's true.

16              MR. KETCHMARK:  Thank you.  And I don't have any

17   further questions, but I know that these attorneys -- and they

18   have an absolute right to -- they have questions for you.

19   Okay?

20              THE WITNESS:  Thank you.

21              MR. KETCHMARK:  You're welcome.

22   CROSS-EXAMINATION BY MR. MacGILL:

23    Q    Good afternoon, Mrs. Burnett.  My name is Rob MacGill.

24   I'm one of the lawyers representing HomeServices, BHH, and

25   HSF.  What I'd like to do is just start out with a little bit
```

297

```
 1   of context, if I may.
 2           The jury has seen this previously, but this is a
 3   little bit of a -- a chart of different companies that are
 4   involved in this lawsuit, at least from our perspective,
 5   HomeServices of America.
 6           So if I may, I'm going to show you a couple of
 7   things, and I have a question.
 8           HomeServices of America is shown here as a holding
 9   company, HSF and BHH.  Do you see that's at least what's on
10   the chart here?
11    A    Yes.
12    Q    Okay.  The question I have, the company that you dealt
13   with and that you signed a contract with is ReeceNichols; is
14   that right?
15    A    That's right.
16    Q    And your agent, ma'am, was from ReeceNichols; is that
17   also correct?
18    A    Yes.
19    Q    Okay.  So I'm sorry I was a little slow in reacting to
20   one of the exhibits that Mr. Ketchmark had referenced,
21   Exhibit 4508.  And I want to ask you about that.
22           He asked you twice whether this was a franchise
23   disclosure agreement, all right?
24           I'm going to put it up on the screen, if I can.
25           MR. KETCHMARK:  Not what I said, Counselor.
                             298
```

```
 1              THE COURT:  Is it 4588?

 2              MR. MacGILL:  I wrote down 4508.  I must be

 3   mistaken.

 4              MR. KETCHMARK:  4588.

 5              MR. MacGILL:  Okay.  Thank you.

 6              MR. KETCHMARK:  You're welcome.

 7              MR. MacGILL:  4588.  I stand corrected.

 8   Q    (BY MR. MacGILL)  So do you see this document that

 9   Mr. Ketchmark had asked you about before?

10   A    Yes.

11   Q    And this -- its title says "Affiliated Business

12   Arrangement Disclosure Statement."  Do you see that?

13   A    Yes.

14   Q    And that's what you were describing in your testimony

15   previously.  This was a disclosure to you and to your husband

16   once you signed the listing agreement, right?

17   A    That's right.

18   Q    All right.  Could we read together a couple more parts,

19   ma'am.

20              If you go down, you'll see in bold it says, There

21   are frequently other settlement service providers available

22   with similar services.  You are free to shop around and to

23   determine that you are receiving the best services and best

24   rate for these services.

25              Do you see that?
                          299
```

```
 1   A    Yes.

 2   Q    And did you understand at the time you received this and

 3   you signed this that this was the disclosure; that there were

 4   other service providers that were, in fact, affiliated with

 5   ReeceNichols?

 6   A    I thought that was a description of what followed and of

 7   where you could get a credit report or an appraisal or

 8   originate a loan and the services provided as they list as

 9   associated with their brokerage.

10   Q    Okay.  And so you understood.  And so what ReeceNichols

11   was telling you -- let me read the top paragraph.

12         ReeceNichols was telling you that they have certain

13   affiliated businesses specifically as listed here,

14   HomeServices of America, et cetera, and they were describing

15   to you that there were other service providers that were also

16   available; is that right?

17   A    Right.

18   Q    Okay.

19         MR. MacGILL:  If you'll scroll down just a little

20   bit on the document, please.

21   Q    (BY MR. MacGILL) You'll see that ReeceNichols was

22   described to you here, as was HomeServices Lending, a company

23   called Kansas City Title, ReeceNichols Insurance, and A.B. May

24   Company.  Do you see that?

25   A    Yes.
```

300

```
 1   Q    Okay.  And I think that's it, but let's take a look if
 2  there's -- okay.
 3          And then you executed this along with your husband
 4  electronically, right?
 5   A    Yes.
 6   Q    All right.  Now, I want to ask you about something else
 7  that Mr. Ketchmark asked you about on this affiliated business
 8  disclosure.  He asked you about what is shown on broker's
 9  commission, charge or range of charges.  Do you see that?
10   A    Yes.
11   Q    He asked you about the range that was given as to
12  ReeceNichols, $298 plus 6 percent to 10 percent of the sales
13  price.  Do you recall those questions?
14   A    Yes.
15   Q    All right.  Now, separate from this disclosure document,
16  you entered into a contract, did you not, with ReeceNichols?
17  You recall that Mr. Ketchmark asked you about that contract?
18   A    Yes.
19   Q    All right.
20          MR. MacGILL:  Can we can pull up that contract,
21  2200.
22   Q    (BY MR. MacGILL) Okay.  Just to get oriented here, this
23  is the exclusive right to sell, and, ma'am, just to tie this
24  up, this is an arrangement, a contract that you entered into
25  with this company, ReeceNichols; is that right?
```

301

```
 1   A    Yes.

 2   Q    So just to ask you about your educational background,

 3  ma'am.  I just -- I think I heard you say this, but you have

 4  not only a college degree but a master's degree in education;

 5  is that right?

 6   A    That's right.

 7   Q    Okay.  And in terms of your employment, your history is

 8  that you're not currently employed; is that right?

 9   A    No.

10   Q    But you had years of employment in the workforce in

11  different places, correct?

12   A    Yes.

13   Q    Okay.  For one example, you had worked as a consultant

14  for different political campaigns; is that right?

15   A    Yes.

16   Q    And in addition, before working as a consultant, you

17  also worked as a franchisee for ShowBiz Pizza; is that right?

18   A    I worked for a franchisee for ShowBiz.

19   Q    For a franchisee.  Okay.  Thank you for that correction.

20          So I want to visit with you about a few of the

21  details on the sale of 3630 Holmes Street.  You were asked

22  about that on your direct examination.  You recall that?

23   A    Yes.

24   Q    And that's the contract that we have in front of us,

25  this Exhibit 2200?
```
302

1    A    Yes.

2    Q    I'll -- I'll tell you this is Exhibit 2200.  You'll see

3    that at the bottom.

4             Okay.  So what I want to do -- just to set up the

5    context for this, you were selling this because your son no

6    longer needed the residence; is that right?

7    A    That's right.

8    Q    Okay.  And he had finished his law school years and now

9    was ready to move on?

10   A    Yes.

11   Q    Okay.  So mom and dad were done supporting him in this

12   respect; is that right?

13   A    Yes.

14   Q    All right.  So I want to talk to you about choices, if

15   you don't mind, the choices that you and your husband made at

16   the time you decided to sell this house.  Fair enough?

17   A    Okay.

18   Q    Okay.  So, first, did you consider that you could have

19   sold this house as a for-sale-by-owner transaction?

20   A    Yes.

21   Q    And specifically, before you hired an agent, did you, in

22   fact -- did you and your husband try to sell this house for

23   sale by owner?

24   A    We didn't work very hard trying to sell that house.

25   Q    Okay.

                          303

```
 1   A    We just put a sign in the yard while we were there

 2   cleaning it up.

 3   Q    Okay.  And that didn't work out?

 4   A    Well, we knew that that was not going to be the end of

 5   this -- of our process of selling the house.

 6   Q    Okay.

 7   A    You have to -- you have to be on MLS to sell a house.

 8   Q    Okay.  Now, with respect to the decision -- you put the

 9   sign in the yard.  That didn't work out.

10        The next choice was were you going to use a

11   full-service broker or a discount broker; is that fair?

12   A    I was going to use somebody I knew.

13   Q    Okay.  Did you investigate, you and your husband, to

14   look into specifically whether you should hire a discount

15   broker?

16   A    I interviewed a company called Your Next Address or

17   something like that because my son had a connection with them

18   and asked me to meet with them.

19   Q    All right.  Do you remember a company called Your Future

20   Address?  Was that the company?

21   A    That's the one I'm referring to, yes, sir.

22   Q    Okay.  Fair enough.  Did you understand that that was a

23   discount broker of some sort?

24   A    I knew that they weren't usual.

25   Q    Okay.
```

304

```
 1   A    I mean, they were cheaper, but you still had to pay the

 2   buyer's broker 3 percent, so --

 3   Q    All right.  Well, but in terms of this -- your --

 4   A    They took less.  I don't know what kind of presence they

 5   had on MLS and didn't know anything about their expertise in

 6   marketing.

 7   Q    Did you interview an agent from Your Future Address to

 8   determine whether she or their company could assist you?

 9   A    Yes.

10   Q    And did they propose to you that they could be your

11   brokerage in using a flat fee approach?

12   A    I don't remember exactly what they told me then.  I

13   wasn't paying much attention to them because I really wasn't

14   considering them.

15   Q    Okay.  Let me pull up the web page, see if I can refresh

16   your memory.

17            MR. MacGILL:  Pull up Defendant's Exhibit 4086.

18            MR. KETCHMARK:  Is that in evidence?

19            MR. MacGILL:  Let me -- 4086.  We would ask you

20   to --

21            MR. KETCHMARK:  Let's not pull anything up until you

22   show us.

23            MR. MacGILL:  Agreed.  4086 is the exhibit.

24            MR. KETCHMARK:  This is her web page?

25            MR. MacGILL:  This is the web page for Your Future.
                                  305
```

```
 1            MR. KETCHMARK:  There's been no foundation laid for

 2   this.  No.

 3            MR. MacGILL:  Okay.  We won't display it to the

 4   jury, Your Honor.  May I display it to the witness only at

 5   this point?

 6            THE COURT:  You bet.

 7            MR. MacGILL:  And then ask some foundational

 8   questions?

 9            THE COURT:  You bet.

10            MR. MacGILL:  Thank you.

11            So what I'd ask is to display 4806 to the witness

12   only, please.

13            MR. KETCHMARK:  You know what, Mr. MacGill, if this

14   is important to HomeServices, I won't object to it.  Just use

15   it.  Just put it into evidence.

16            MR. MacGILL:  Okay.

17            THE COURT:  Admitted.

18   Q    (BY MR. MacGILL) Ma'am, I'm going to put 4086 in front

19   of you and now the jury.  Do you recognize this as a website

20   for the entity Your Future Address?

21   A    Well, it says it is.  I'm not familiar with their

22   company or their website.

23   Q    Okay.  But you do -- we do have the right company.  Your

24   Future Address is the entity that you considered at the same

25   time you were considering for sale by owner and at the same
```

1    time you were considering full service; is that fair?

2    A    Yes.

3    Q    All right.  Let's look at page 2 together, if we could.

4           On page 2, if you look at page 2, what's in front of

5    you, I'd like you to take a look at the second full sentence

6    beginning "Your Future Address."

7           Mr. Gilmore is going to highlight that for us.

8           It says here:  Your Future Address provides the

9    quality service you would expect from a 6-percent listing

10   agent.  We just chose to charge less.  It's that simple.

11          Do you see that?

12   A    Yes.

13   Q    And it continues:  Our team of real estate professionals

14   leverage the technology available to list and promote a

15   property for sale to maximize its exposure and attract

16   potential buyers.

17          Do you see that, ma'am?

18   A    I do.

19   Q    Now, with respect to what we just read to this court and

20   to this jury, is this part of the sales pitch, so to speak,

21   that you were given at the time you considered Your Future

22   Address as a company to market your home?

23   A    I considered that it was -- they said that they were

24   cheaper.

25   Q    Okay.  Now, if you turn to one last thing here on page

                              307

1   2, there's an indicator about the range of flat fees.  And did

2   you understand, at least generally, that there was a range of

3   flat fees depending on the property price?  Did you understand

4   that if we go to the top of the web page?

5   A     Yes.

6   Q     You see that variation there across that banner

7   headline?

8   A     Yes.

9   Q     So as you progressed on this, did you engage in some

10  email correspondence where you and your husband were

11  evaluating whether it was, in fact, a good idea to make this

12  choice to use this particular brokerage approach?

13  A     I recall only being dismissive of them.

14  Q     Okay.  Ma'am, I'm going to show you an exhibit.  I'm

15  going to hand you a paper exhibit, Defendant's Trial Exhibit

16  3675.

17          MR. MacGILL:  If I may approach, Your Honor?

18  Q     (BY MR. MacGILL) Ma'am, do you have in front of you

19  3675?

20  A     Yes.

21  Q     And do you recognize this as a series of emails between

22  you and a woman by the name of Katie Yaeger at

23  yourfutureaddress.com?

24  A     Yes.

25  Q     And is -- are these emails that you exchanged during the

                              308

```
 1    September 2015 period of time?

 2     A    Yes.

 3            MR. MacGILL:  We would offer into evidence, Your

 4    Honor, Defendant's 3675.

 5            MR. KETCHMARK:  No objection, Your Honor.

 6            THE COURT:  Admitted.

 7     Q    (BY MR. MacGILL) I'd like you to turn to the second page

 8    of this, and if you -- it's -- you'll notice, ma'am, on the

 9    bottom right-hand corner, there's a Bates number that says

10    Burnett 00003, and I'm referring to the email at the top on

11    September --

12            MR. MacGILL:  If we go to the next page, please, on

13    the display.

14     Q    (BY MR. MacGILL) At the top, there's an email that reads

15    as follows:  This is Monday, September 7th, 2015, at 5:41 p.m.

16    Do you see that reference, ma'am?

17     A    Yes.

18     Q    And is this an email where you were written, and the

19    following was said:  Rhonda, Katie and I would like to thank

20    you very much for allowing us to view your home.  We would

21    love the opportunity to list it and feel that buyers will

22    really appreciate the upgrades you've made so far.

23            Do you see that?

24     A    Yes.

25     Q    And is that -- that's part of what she wrote to you on
```
309

```
 1   September 7, 2015, in her effort to convince you to use her
 2   brokerage approach; is that right?
 3    A    I understand that, yes.
 4    Q    Now, ma'am, I want to refer to your decisions and the
 5   choice you made in terms of how to market your home.
 6              I now go to the first page of Exhibit 3675.  Would
 7   you please turn back to the first page.
 8              Would you look -- there's an email, September 9,
 9   2015, at 8:15 a.m. from you; is there not?
10    A    Yes.
11    Q    Did you write Aaron and Katie on that day?
12    A    Yes.
13    Q    These were the two representatives that you had been
14   working with specifically at this brokerage; is that right?
15    A    Right.
16    Q    Now, did you write the following on September 9th of
17   2015:  I certainly enjoyed meeting you and learning about your
18   business.
19              That's part of what you wrote; is that correct?
20    A    Yes.
21    Q    And did you further say:  We decided our house needs
22   specific expertise offered by professionals marketing to the
23   area; is that right?
24    A    That's right.
25    Q    And that's what you wrote?
```
310

```
 1   A    I didn't --

 2   Q    Now, looking back to your decision on how you were going

 3   to market specifically your house specifically at 3630 Holmes

 4   Street, this was part of the analysis that you made for your

 5   part is you wanted a brokerage with specific expertise offered

 6   by professionals; is that right?

 7   A    Yes.

 8   Q    And specifically, to be even more detailed, you wanted a

 9   full-service broker to market this house at 3630 Holmes

10   Street; is that fair?

11   A    I wanted someone who knew that neighborhood and could

12   market the neighborhood as well as the house.

13   Q    Okay.

14   A    And I felt this other group didn't know that, and they

15   weren't even familiar with midtown neighborhoods at all.

16   Q    And to be -- were you finished?

17   A    Yes.

18   Q    To be even more specific, it's fair to say that in terms

19   of your belief, specifically your belief at the time, that you

20   believed specifically that you would need to compensate that

21   agent for the expertise that they brought to marketing a house

22   in that neighborhood, right?

23   A    I always expected to compensate the agent.

24   Q    And specifically for the expertise that that agent

25   brought to marketing a house in that neighborhood, right?
```

311

1    A    Yes.

2    Q    Okay.  And did you understand that by taking that

3    approach, by making this choice, did you understand that

4    compensating a professional agent might be more expensive

5    than, for example, going with an entity like Your Future

6    Address?

7    A    Yes.  We were aware of that.

8    Q    Okay.  Now, being comfortable with your choice and being

9    comfortable with spending more rather than less, is this

10   something that you were comfortable with as well as your

11   husband?

12   A    We had no problem paying for an agent to sell our house.

13   Our problem is paying for a buyer's agent to work against us.

14   Q    You told us in your earlier testimony that you did

15   choose an agent, a listing agent named Pam Gard; is that

16   correct?

17   A    Yes.  And we knew we would be paying her a commission.

18   We knew that we were going to have to pay the buyer's agent a

19   commission too.  We -- I'm just telling you right now we

20   weren't happy about that.

21   Q    Okay.  Now, just to get a little more detail about

22   Ms. Gard and in terms of the process that you and your husband

23   went through specifically in making the choices that you did,

24   did you believe that Ms. Gard was a longtime resident of that

25   specific neighborhood and was known to be the go-to realtor to

                              312

1  market homes there?

2   A    Yes.

3   Q    Okay.  And you specifically, to be even more detailed

4  about it, wanted the broker to market the property and the

5  neighborhood, right?

6   A    That's right.

7   Q    And this, you know, fairly stated, these were goals that

8  you and your husband had set for marketing this house; is that

9  correct?

10  A    Yes.

11  Q    And what part of your desires were -- as you made this

12  choice about how you were to market this, part of what you

13  wanted to make sure of is that the most number of people could

14  know that the house was for sale; is that fair?

15  A    That's fair.

16  Q    And you wanted to be sure that the most number of people

17  would know about this house being for sale because for your

18  part, you wanted to be sure that you could sell this

19  particular house faster; is that also fair?

20  A    We wanted to sell the house quickly, yes.

21  Q    Now, with that background, ma'am, you've now confirmed

22  how this came about, what your choices were, and why you made

23  the different choices.

24        I'd now like to turn back to the listing agreement

25  and some of the details there.

                    313

```
 1            MR. MacGILL:  If we could go back to the Exhibit

 2    2200.

 3    Q    (BY MR. MacGILL) So with respect to this exclusive right

 4    to sell, as you've already confirmed, this was your contract

 5    that you made with ReeceNichols, and the date of this was

 6    when, ma'am, do you recall?  Was it in September of 2015?

 7    A    Yes.

 8    Q    And that was shortly after you had finished your

 9    communications with the other enterprise; is that right?

10    A    That's right.

11    Q    And the -- as matters went forward then, you made

12    some -- you agreed to some terms and conditions, is that fair,

13    in this exclusive right to sell contract?

14    A    Yes.

15            MR. MacGILL:  And can we look at Section 1A.

16    Q    (BY MR. MacGILL) In terms of listing services -- let me

17    back up to the -- let me ask you first about the commission

18    amount -- the overall commission amount of 6 percent.  You

19    testified to that on direct examination; do you recall that?

20    A    Yes.

21    Q    And specifically what you agreed to was a 6-percent

22    overall compensation rate based on this choice that you and

23    your husband made; fair statement?

24    A    Yes.

25    Q    All right.  Now, in addition to the choice that you made
```

314

1    about the 6 percent, you and your husband also authorized

2    specifically the broker to cooperate and to share the

3    commission payable under the contract with other brokers; is

4    that right?

5    A    That's right.

6    Q    And you understood that this would be a collaborative or

7    a cooperative effort in the sense that there would be somebody

8    working for you on one side of the transaction and somebody

9    working for them on the other side of the transaction, right?

10   A    I knew that there would be an agent representing the

11   buyer, but that she wouldn't necessarily be working on my

12   behalf.

13   Q    Okay.  But in any event, you had authorized the broker

14   to cooperate and share the commission payable under this

15   contract with other brokers; fair statement?

16   A    Yes.

17   Q    And that was part of this contract that you agreed to

18   and executed?

19   A    Yeah.

20   Q    Okay.  So looking further at this, in terms of your

21   general understanding, if we step away from the actual term of

22   the contract for a moment and focus on what you understood at

23   the time you made this contract, you for your part understood

24   that to mean that your -- that ReeceNichols and Ms. Gard would

25   share -- or I should say -- let me restate the question.

                              315

1           You understood, based on this contract, that you had

         2    authorized Ms. Gard to share her commission; is that right?

         3     A     That's right.

         4     Q     Okay.  And with respect to your general understanding of

         5    this contract that you executed, isn't it also fair to say

         6    that you agreed that under this section that we just

         7    displayed, that it had been fully disclosed to you that there

         8    would be a sharing of the commission?

         9     A     Yes.

        10     Q     Okay.  It was always clear to you, ma'am, wasn't it,

        11    that Ms. Gard was going to share her commission with another

        12    agent, whether it was at ReeceNichols or some other brokerage;

        13    fair statement?

        14     A     Yes.

        15     Q     If we look at page 2, paragraph 2, and I'd like to take

        16    a look at subparagraph A with you.  I have a couple of

        17    questions about that.

        18           Can you see what's being highlighted here, or will

        19    be highlighted?

        20     A     Yes.

        21     Q     To look at the compensation term, it says that seller

        22    agrees to pay ReeceNichols realtors a commission consisting of

        23    $298 and circle one:  7, 8, 9, 10, or 6 percent of the selling

        24    price.  You see that?

        25     A     Yes.

                                        316

```
 1   Q    And 6 percent is what was in the contract that was
 2   executed; is that right?
 3   A    That's right.
 4   Q    And if you look at paragraph -- that same paragraph,
 5   subpart B, if we go -- B as in boy, please.
 6        Ma'am, to be specific, this confirms this very
 7   specifically what you've already explained to the jury in
 8   terms of the contract, doesn't it, in that you said -- in that
 9   it says, Broker will offer a commission split of 3 percent
10   listing side and 3 percent of selling side, excluding the $298
11   amount left blank.  Agreed?
12   A    Yes.
13   Q    Okay.  So no confusion on your part.  You explained it
14   as you understood it, and you explained it as you can see it
15   with your own eyes here in the courtroom.  Fair statement?
16   A    Yes.
17   Q    Now, when you -- before you decided to hire ReeceNichols
18   and Ms. Gard specifically, did you understand there were
19   alternatives that -- other choices that you could have made
20   other than Ms. Gard and choosing her?
21   A    Yes.
22   Q    So I take it you understood, based on your own
23   background that you had and based on conversations that you
24   had with Ms. Gard, that ReeceNichols would offer a commission
25   split to the buyer's agent as shown here, right?
```

317

```
 1    A    Yes.

 2    Q    Now, I want to ask about one of the things that Ms. Gard

 3   explained to you specifically at the time that you were

 4   involved in the transaction with ReeceNichols.  Ms. Gard

 5   explained to you specifically that her broker would be sharing

 6   the commission, right?

 7    A    I'm not sure I understand what you're asking me.

 8    Q    Let me be -- may I restate it one more time?

 9    A    Sure.

10    Q    Okay.  Do you agree that your agent explained that your

11   broker would be sharing the commission?

12    A    I knew that the commission would be split.

13    Q    Okay.  And had that been explained to you by Ms. Gard?

14    A    Yes.

15    Q    All right.  Now, just in terms of a few details of how

16   you went about the price.  When you -- on direct examination,

17   you were asked by Mr. Ketchmark questions about the price

18   initially going from 275 to, I think, ultimately $250,000; is

19   that correct?

20    A    That's right.

21    Q    In terms of the priorities that you had and your husband

22   had in terms of moving forward and selling your home, price,

23   of course, was important to you; is that right?

24    A    That's right.

25    Q    But also expediency was important to you as well, as you
                                   318
```

```
 1   previously testified?

 2   A    Yes.

 3   Q    And finding a buyer, of course, was important to you, as

 4   you confirmed previously?

 5   A    Yes.

 6   Q    Prior to coming to the courtroom today, is it fair to

 7   say and to explain to the jury that, prior to coming here

 8   today, you never expressed any dissatisfaction with the

 9   services given to you by Ms. Gard; is that fair?

10   A    That is very fair.

11   Q    And just one more question on that in terms of

12   expressing dissatisfaction.  Is it also fair that you,

13   yourself, never told Ms. Gard that you were displeased with

14   any of the services that she provided?  Is that also fair?

15   A    No.

16   Q    Okay.  I want to go back to -- a little bit in time and

17   ask you just some general questions about when you and your

18   husband purchased this home at 3630 Holmes Street.  You used

19   Judy Johnson, a buyer agent, to assist you in that?

20   A    I really wasn't a part of the purchase of this home.  My

21   son did the negotiations.  He was the one looking at

22   properties.  He was the one who chose this home.  I was -- my

23   role in it was signing -- cosigning a loan for him so he could

24   actually do it.

25   Q    So did you say it was your -- I didn't hear you.  It was
```

```
1    your son that did primarily the work?

2    A    Yes.

3    Q    Okay.  And but did -- but this was something that you

4    and your husband paid for to facilitate his education; is that

5    right?

6    A    We facilitated him buying this house.

7    Q    And with respect to the purchase of the house, I take it

8    you did not pay a buyer's commission; that was paid by the

9    seller?

10   A    Yes.

11   Q    All right.  With respect to buy -- the buyer's -- let me

12   ask it this way.

13        With respect to buying 3620 Holmes Street, did you

14   feel that your husband or you or both of you got good service

15   from your buyer agent in connection with bringing that

16   transaction to closing?

17   A    Yeah.  She was just doing her job.

18        MR. MacGILL:  So I'm going to ask to put up

19   Exhibit 216.

20        And, Counsel, this is policy statement 7.23.

21        MR. KETCHMARK:  What policy statement?

22        MR. MacGILL:  The cooperative compensation model

23   offer.

24        But before we do that, make sure Mr. Ketchmark and

25   the court agree with this.
```
                                320

```
 1            MR. KETCHMARK:  You want to put up the NAR policy

 2   for this witness?

 3            MR. MacGILL:  Yes.

 4            MR. KETCHMARK:  I guess go ahead.

 5            THE COURT:  216 is admitted then.

 6   Q    (BY MR. MacGILL) Last question or two on this, ma'am.

 7            We put up Exhibit 216, and first question:  You're a

 8   plaintiff in this lawsuit; is that right?

 9   A    I am.

10   Q    All right.  And prior to the time that you became a

11   plaintiff in this lawsuit, did you at any time read this

12   handbook?

13   A    No.

14   Q    Okay.  Let me ask you one more question on this, if I

15   may.  If we could turn specifically to policy statement 7.23.

16            MR. MacGILL:  If we could enlarge that section,

17   please.

18   Q    (BY MR. MacGILL) Section G at the bottom -- final

19   question, ma'am:  Prior to becoming a plaintiff in this --

20   well, let me back up.

21            Prior to becoming one of the plaintiffs in this

22   lawsuit, had you at any time read this particular commission

23   and cooperative compensation offers language?

24   A    No.

25   Q    Okay.
```

                              321

```
 1              MR. MacGILL:  No further questions, Your Honor.

 2              May I ask one other question?

 3              THE COURT:  Yes.

 4    Q     (BY MR. MacGILL) So, ma'am, just one -- my colleague Mr.

 5    Varon has asked me to follow up with one item.

 6              So prior to the time that you listed, had you been

 7    advised by the prior brokerage that 275 was too high and it

 8    should be a $250,000 price?

 9    A     Advised by whom?

10    Q     By the prior broker that you interviewed.

11    A     Yeah.  I think that was in the emails that you produced.

12    Q     Okay.

13              MR. MacGILL:  Thank you.

14              MS. TOPOL:  No questions from NAR, Your Honor.

15              THE COURT:  Any other questions from any defense?

16              MR. RAY:  No, Your Honor.

17              THE COURT:  Short redirect?

18              MR. KETCHMARK:  Sure.

19    REDIRECT EXAMINATION BY MR. KETCHMARK:

20    Q     See if I can draw some -- I want to talk about Pam Gard

21    and all this conversation about Pam Gard, the HomeServices'

22    person.  She was the seller's agent, the lister's agent,

23    correct?

24    A     She was.  She was my agent.

25    Q     Your agent.
```

```
 1            And all of this back-and-forth that we had and all

 2    the time we spent with this jury on this issue with this Your

 3    Future Address, do you remember all that back-and-forth that

 4    you had --

 5    A    Yeah.

 6    Q    -- that he asked you those questions about it?

 7    A    Yeah, I do.

 8    Q    That was about your decision to whether or not to use

 9    that discount broker to represent you as the seller, correct?

10    A    That's right.

11    Q    And they were going to charge you as the seller

12    1 percent, correct?

13    A    Yes.

14    Q    And Ms. Gard, you knew when you hired her, she was going

15    to charge you 3 percent to represent you, correct?

16    A    That's right.  She was going to earn 3 percent.  She was

17    going to give 3 percent away.

18    Q    And you had no problem with that, right?

19    A    I didn't like having to pay for someone to work against

20    me, but --

21    Q    I'm not talking about the buyer's agent now.  I don't

22    want to confuse the two.  Ms. Gard, were you willing to pay

23    her 3 percent to represent your interest?

24    A    Yes, I was.

25    Q    Now, one of the things I want to show you here, a
```

323

|     | portion of this web page he did not show you; that Mr. MacGill |
| --- | --- |
| 1 | portion of this web page he did not show you; that Mr. MacGill |
| 2 | and HomeServices for whatever reason did not show you, I'm |
| 3 | going to show you. |
| 4 | MR. KETCHMARK:  I'm going to mark this as 4086A. |
| 5 | Do you have any objection to me using that? |
| 6 | MR. MacGILL:  No objection. |
| 7 | MR. KETCHMARK:  4086A as in apple. |
| 8 | Q    (BY MR. KETCHMARK)  One of the things he did not show |
| 9 | you -- now this deals with what -- this Your Future Address. |
| 10 | Do you see that? |
| 11 | A    Yes. |
| 12 | Q    It says, How can I save money?  Do you see that? |
| 13 | A    I do. |
| 14 | Q    And what they were saying is, this flat fee broker, the |
| 15 | industry standard for selling a property is at least |
| 16 | 6 percent.  Do you see that? |
| 17 | A    Yes. |
| 18 | Q    And it says, Our average seller pays around 4 percent, |
| 19 | including a 3 percent to the buyer's agent.  That's what it |
| 20 | says, correct? |
| 21 | A    Right. |
| 22 | Q    And that's something the HomeServices' lawyer was not |
| 23 | asking you about.  I mean, even if you went to what he kept |
| 24 | calling this discount broker and these choices you made, you |
| 25 | still would have had to pay the 3 percent buyer's -- |

324

1   portion of this web page he did not show you; that Mr. MacGill

2   and HomeServices for whatever reason did not show you, I'm

3   going to show you.

4           MR. KETCHMARK:  I'm going to mark this as 4086A.

5           Do you have any objection to me using that?

6           MR. MacGILL:  No objection.

7           MR. KETCHMARK:  4086A as in apple.

8    Q    (BY MR. KETCHMARK)  One of the things he did not show

9   you -- now this deals with what -- this Your Future Address.

10  Do you see that?

11   A    Yes.

12   Q    It says, How can I save money?  Do you see that?

13   A    I do.

14   Q    And what they were saying is, this flat fee broker, the

15  industry standard for selling a property is at least

16  6 percent.  Do you see that?

17   A    Yes.

18   Q    And it says, Our average seller pays around 4 percent,

19  including a 3 percent to the buyer's agent.  That's what it

20  says, correct?

21   A    Right.

22   Q    And that's something the HomeServices' lawyer was not

23  asking you about.  I mean, even if you went to what he kept

24  calling this discount broker and these choices you made, you

25  still would have had to pay the 3 percent buyer's --

324

```
 1   A    To the buyer's agent.

 2   Q    You need to let me finish.  I'm sorry.  I know you're

 3   frustrated.

 4   A    I'm just excited.

 5   Q    I get it.

 6        You would have had to pay the 3 percent to the

 7   RE/MAX agent even if you went with them, correct?

 8   A    That's right.

 9   Q    And one of the things that we see in here in this --

10        THE COURT:  For what it's worth, that exhibit is

11   admitted.

12        MR. KETCHMARK:  Excuse me, Your Honor?

13        THE COURT:  It's admitted.  I never said the magic

14   words.

15        MR. KETCHMARK:  Oh, I'm sorry.

16        THE COURT:  My bad.

17   Q    (BY MR. KETCHMARK)  4086, one of the things that the

18   HomeServices' lawyer didn't talk to you about is this discount

19   broker, Your Future Address.  See that?

20   A    I do.

21   Q    The reason they were paying that 3 percent to the

22   buyer's agent, because they were telling you that if you were

23   using them, they were going to list it in this MLS, which is

24   they're a member of the MLS, which is at the core of this

25   lawsuit.  You see that?
```

325

```
 1   A    I do.

 2   Q    And so all of this stuff about your future agent, that's

 3   got nothing to do with the issues in this case about whether

 4   you should have been forced to pay a buyer's agent; fair

 5   statement?

 6   A    That is very fair.  Because I would still have to pay

 7   them.

 8   Q    You'd pay them 1 percent, but you said no, because in

 9   the free market, the fair market, you said, I'm willing to pay

10   Pam Gard for her work.  But either way you were going to have

11   to pay this buyer's agent, right?

12   A    That's right.

13   Q    Because of this rule from the National Association of

14   Realtors that you saw for the first time when they showed it

15   to you in this litigation, right?

16   A    I had not read that handbook.

17        MR. KETCHMARK:  Thank you very much for your time.

18        THE WITNESS:  Thank you.

19        MR. KETCHMARK:  You are finished.

20        THE COURT:  You may step down.  Thank you, ma'am.

21        THE WITNESS:  Thank you.

22        THE COURT:  Who you got next, Mr. Ketchmark?

23        MR. KETCHMARK:  We are calling Jeremy Keel to the

24   stand.

25        THE COURT:  Sir, come on up here.  Right before
                              326
```

```
 1  you're seated, we'll have you raise your right hand and swear
 2  you in.
 3  JEREMY KEEL, being duly sworn by the courtroom deputy,
 4  testified:
 5          THE COURT:  Mr. Ketchmark, if we can keep this to
 6  about 20 minutes and they can keep it to about 20 minutes,
 7  then I can get the jury on the road at five.
 8          MR. KETCHMARK:  I will absolutely do that, Your
 9  Honor.
10  DIRECT EXAMINATION BY MR. KETCHMARK:
11  Q    Can you please introduce yourself to the jury.
12  A    My name is Jeremy Keel.
13  Q    Where are you from?
14  A    I grew up around Springfield.  I went to a high school
15  in Republic, and then I moved up here around law school.  So
16  I've been here for like eight years.
17  Q    And where did you go to law school?
18  A    UMKC is where I graduated.
19  Q    And what year did you graduate from law school?
20  A    2018.
21  Q    Now, as part of this lawsuit, you know you're here as a
22  class representative; fair statement?
23  A    Correct, yes.
24  Q    And before being involved in this lawsuit, had we ever
25  even met before you became in this as a class representative?
```
327

```
 1    A    No.
 2    Q    Now, tell the jury what type of law -- lawyers do all
 3    different types of things, right?
 4    A    Yes.
 5    Q    What type of law do you practice?
 6    A    So I do, I would say, elder law generally.  We do estate
 7    planning, Medicaid planning, some post-death administration,
 8    stuff like that.  Dead, dying, mentally ill.
 9    Q    Now, how about antitrust law, you got background or
10    experience in antitrust law?
11    A    No.
12    Q    How about trial work, the kind of stuff I'm doing now?
13    A    No.
14    Q    Now, in fairness, you've been in a courtroom before,
15    haven't you?
16    A    Yes, I have.
17    Q    And explain to the jury what your background is about
18    being in a courtroom.
19    A    So before I did elder law stuff, for about two years I
20    did family law, and so I would have hearings and stuff.  I --
21    the closest thing I got to a trial was order of protections,
22    which are much more muted, much, much more muted than this.
23    But just kind of a proceeding, I would say.  But, yeah, I've
24    had some courtroom experience.
25    Q    Without getting too much into the law clerks, you worked
```

328

```
 1    as a law clerk for a judge over in the state system, correct?
 2    A    Yes.  I did a summer internship for Judge Mason in
 3    Johnson County.
 4    Q    Now, you owned a house at 4522 Tracy Street; is that
 5    right?
 6    A    Yes.
 7    Q    I'm going to show you what's been marked as Exhibit No.
 8    228.
 9         MR. KETCHMARK:  I'd like to move this into evidence,
10    the photograph.
11         MR. ECHOLS:  No objection.
12         MR. KETCHMARK:  228 into evidence, Your Honor.
13         THE COURT:  228, no objections, is admitted.  228?
14    222 --
15         MR. KETCHMARK:  I'm sorry.  2228.  I apologize.  I
16    misspoke.
17         Zoom in.
18    Q    (BY MR. KETCHMARK)  Give a little bit of a shout-out to
19    that -- who is that a picture of there?
20    A    That was my dog Josie.  She was the reason for the house
21    because we needed a yard.
22    Q    And second picture, a little bit --
23    A    Again, Josie.  That was her birthday, which was Monday
24    this week actually.  So October 16th.  I don't remember what
25    year that was, a year or two ago.
```

329

```
 1   Q    And how long did you live in that house?

 2   A    I lived there a little over a year and a half.

 3   Q    And the address is 45th and Tracy here?

 4   A    It was 4522 Tracy, yeah.

 5   Q    And did you sell the house?

 6   A    I did.

 7   Q    And did you end up hiring a real estate agent to help

 8   you in the sale of the house?

 9   A    I did.

10   Q    And who was it that you hired?

11   A    I used -- my friend was the agent that I worked with the

12   most, but I think Brandy Murphy is who it was, was the kind of

13   boss of the office.

14   Q    And what office was it?

15   A    It was Keller Williams something.  I can't remember.

16   Key Partners maybe or --

17   Q    And were they the -- your listing agent?

18   A    Yes.

19   Q    Now, the listing agent means being the agents who would

20   have represented you as the seller of the house, correct?

21   A    Yes.

22   Q    See if we can't maybe shorten some of the examination

23   here today on both sides.

24             Do you have any complaints at all in this lawsuit or

25   with this -- that you want to express to this jury about the
                              330
```

```
 1    work that Keller Williams did for you as a seller's agent of
 2    the home?
 3    A    No.
 4    Q    Happy with the agent that you worked with there for
 5    Keller Williams as far as what they did for you as the seller
 6    of the home?
 7    A    Yeah, yeah.  They were fine.
 8    Q    I want to show you what's been marked as Exhibit No.
 9    225.
10         MR. KETCHMARK:  I'd like to move that into evidence.
11    I'm sorry.  2225.
12         Exhibit 2225, move it into evidence, Your Honor.
13         THE COURT:  Admitted.
14    Q    (BY MR. KETCHMARK)  That's a copy of the exclusive right
15    to sale contract.  Do you see that?
16    A    Yes.
17    Q    In fact, it looks like across the top here that we see
18    where it's actually a form from this local association of
19    realtors with this trademark from the NAR, from the NAR forms.
20    Do you see that?
21    A    Yes.
22    Q    And in this particular contract, this is the sales
23    contract that you would have entered into when you were
24    selling this home, correct?
25    A    Yes.
```
                                331

```
 1    Q    And there's a section here in this form contract, this
 2   NAR form, where we look under Section 11, paragraph 11.
 3              It says:  Compensation.  Seller agrees to pay broker
 4   a commission, and it shall be -- and it says 6 percent.  Do
 5   you see that?
 6    A    Yes.
 7    Q    Plus a brokerage fee, correct?
 8    A    I didn't know what that fee was; but, yes, yeah.
 9    Q    The commission shall be split, and it says to the
10   listing side, 3 percent; and then 3 percent to the buying
11   side.  Do you see that?
12    A    Yes.
13    Q    And there's a spot on the last page of this where you
14   electronically signed this.  Do you see that?
15    A    Yes.
16    Q    Now, when you received this contract, this NAR form
17   contract, was it -- was the 6 percent already put in there and
18   the 3 percent to the seller side or the 3 percent to the buyer
19   side already put in there?
20    A    Yes.
21    Q    You know what it means to be involved in contract
22   negotiations?  As an attorney, you know what that means; do
23   you not?
24    A    I know the idea of it, yes.
25    Q    Did you sit down and have some type of negotiation about
```
                                 332

```
 1    what the percentage was going to be and how the split was

 2    going to be and how you were going to be paid?

 3    A     No.

 4    Q     Now, did the house end up selling?

 5    A     Yes.

 6    Q     And I'm going to show you --

 7          MR. KETCHMARK:  With the defendant's permission, I'd

 8    like to move 226 -- 2226 into evidence.  It's the settlement

 9    statement.  Counsel?

10          MR. ECHOLS:  No objection.

11          MR. KETCHMARK:  Move 2226 into evidence.

12          THE COURT:  Admitted.

13    Q     (BY MR. KETCHMARK)  Do you see here this is the

14    settlement statement for the sale of this home?  Do you see

15    that?

16    A     Yes.

17    Q     And in the settlement statement for the sale of this

18    home, this is the sale that took place in 2020 for this

19    property on 45 Tracy.  Do you see that?

20    A     Yes.

21    Q     And it shows the sales price of this home is $205,000.

22    Do you see that?

23    A     Yes.

24    Q     And it lists that at the time you sold it, that you

25    still owed -- even after the deposit, you owed $194,000 to the
                                333
```

1    bank on the property, correct?

2    A    I think that's the buyer's mortgage.

3    Q    I'm sorry.  That's the buyer's mortgage.  Thank you for

4    correcting me on that.

5              Now, when we look at this, let's flip to this next

6    page.  When we go to the second page of this, there's a

7    section of this, Mr. Keel, that lists commission.  Do you see

8    that?

9    A    Yes.

10   Q    And on the commission, you paid a commission here to

11   your seller's agent, the person who was working on your behalf

12   at Keller Williams, correct?

13   A    Yes.

14   Q    And that's the one you've already told the jury you have

15   no complaint about, correct?

16   A    Yes.

17   Q    And then you were -- also paid this commission to the

18   ReeceNichols' agent there.  Do you see that?

19   A    Yes.

20   Q    And that's the buyer's agent, correct?

21   A    Yes.

22   Q    And you have -- were -- after this lawsuit was filed in

23   2019, at some point in time later, and it was in 2022 that you

24   were named as a plaintiff that is the representative of some

25   folks as part of this class; is that true?

334

```
 1   A    Yes.

 2   Q    Have you ever served as a representative of some class

 3   of people?

 4   A    No.

 5   Q    Tell the jury why you're doing it.

 6   A    I mean, after going through this process, I kind of

 7   learned how it works, and I don't think that the system is set

 8   up correctly.  I think it's kind of unfair, and so I think

 9   that it should change.

10   Q    My partner, Mr. Fadler, corrected me.  And thank you,

11   Mr. Fadler.

12        I misspoke.  It was on June 30th of 2021 that you

13   came in as a class representative, correct?

14   A    Okay.  That sounds good, yeah.

15        MR. KETCHMARK:  Thank you.  I don't have any further

16   questions for you.  I tried to keep it within that 20 minutes.

17   Thank you.

18        MR. ECHOLS:  If we could have a moment to get set

19   up, Your Honor.

20        THE COURT:  You bet.

21        MR. ECHOLS:  In the interest of efficiency, Your

22   Honor, I'm going to hand to Mr. Ketchmark now the exhibits

23   that we have so that we can fly through this.

24        MR. KETCHMARK:  In the interest of efficiency, I

25   won't have any objection to any of these because you've been
```

335

```
 1   honorable.

 2           MR. ECHOLS:  Thank you.

 3           You wonder how useful glasses are when you have to

 4   take them off to read.

 5           THE COURT:  You look smarter taking them on and off.

 6           MR. ECHOLS:  I don't know about that.

 7   CROSS-EXAMINATION BY MR. ECHOLS:

 8    Q   Good afternoon, Mr. Keel.  My name is Barack Echols, and

 9   I'm one of the attorneys for Keller Williams Realty.  How are

10   you doing this afternoon?

11    A   Good.

12    Q   We'll try to be as efficient and breeze through this.

13           Now, Mr. Keel, what I'd like to ask you is we talked

14   about the Tracy property that you sold with KW Key Partners'

15   help, but I have gotten from the information you provided

16   throughout this suit that there was another property or two

17   that you had then purchased, and I wanted to see if I could

18   confirm if these are correct or not.

19    A   Okay.

20           MR. ECHOLS:  If I could please pull up the Dem 01.

21    Q   (BY MR. ECHOLS) Please do correct me if any of this is

22   wrong.

23           MR. KETCHMARK:  You just need to move it into

24   evidence.

25           MR. ECHOLS:  It's a demonstrative.
                              336
```

MR. KETCHMARK:  If you want to move it into
1

2    evidence, I don't have any objection.

3                    MR. ECHOLS:  Yeah.  Let him confirm so we have the

4    provenance of it.

5    Q    (BY MR. ECHOLS) What we did is took this from your

6    answers to written questions, the interrogatories, and the

7    documents, and you'll see we've got the 4522 Tracy Avenue

8    property that we discussed and saw a picture of, and we have

9    you buying that in December of 2018.

10   A    Correct.

11   Q    And then the sale, we just discussed briefly in

12   September, October 2020, correct?

13   A    Correct.

14   Q    And then I have seen documents, I think I'll show you

15   some here, about a purchase of a property on Troostwood Road?

16   A    Correct.

17   Q    And do you still own that property, or has it been sold?

18   A    I still own it.

19   Q    Okay.  And then this last property more recently

20   purchased on 63rd Terrace, is that, sir -- it appeared to

21   me -- is that for rental purposes?

22   A    Correct.

23   Q    Okay.  So it's an investment property?

24   A    Correct.

25   Q    Got it.  Okay.

                                337

```
 1              Now, it's been a little schizophrenic, I have to
 2    say, from what I've seen over the past couple of days as to
 3    whether buyer's agents are a good thing or a bad thing, but at
 4    least in your instance, whenever you bought a property, you
 5    used a buyer agent, correct?
 6    A    Correct.
 7    Q    And one of the reasons you did that is because there is
 8    a general convenience to having a buyer's agent?
 9    A    I would say I did it because I thought that that was how
10    you were supposed to do it.
11    Q    Okay.  With respect to the Tracy Avenue property,
12    there's a Mr. Kevin Bryant, who was your buyer agent?
13    A    Correct.
14    Q    And Mr. Bryant facilitated the exchange of documents
15    back and forth for you?
16    A    Correct.
17    Q    He also kind of told you where you needed to be in terms
18    of a price for you to buy the place, right?
19    A    Yes.
20    Q    And he helped you get to the $172,000 that you
21    eventually paid in buying it, correct?
22    A    Yes.
23    Q    I'd like to take a brief look at the contract for the
24    purchase of the Tracy property, which is Exhibit D-3767, if we
25    could.
```

338

```
 1              Okay.  Do you recognize this, sir, as being a copy
 2   of the sale contract under which you bought the Tracy
 3   property?
 4    A    Yes.
 5    Q    If we could flip to the second page, please.
 6              Now, one of the things Mr. Ketchmark mentioned here,
 7   which we know as lawyers, you and I, is that with contracts,
 8   you can add or subtract terms as -- during the course of the
 9   negotiation, correct?
10    A    Say that again.
11    Q    Yes.  With a contract negotiation, you can propose, you
12   know, and accept or reject new terms between the parties?
13    A    Yes.
14    Q    And you knew that in this purchase contract here in the
15   C section -- you know, maybe you look at it as little things,
16   but the sellers needed to install the washer and dryer
17   hookups, right?
18    A    Yes.
19    Q    They had to remove the debris from the back of the yard,
20   correct?
21    A    Yes.
22    Q    And you also -- you checked a box.  On these contracts,
23   you have options.  You have blanks.  You have check boxes.
24   And you checked the box that said that the seller would
25   provide $650 towards the purchase of a home warranty, right?
```

339

```
1   A    No.  The box was checked for me when I got this form.

2   Q    Oh, for the -- automatically the seller was offering the

3   home warranty?

4   A    When the form was sent to me, the box was checked.

5   Q    Okay.  But you -- this was a benefit to you, was it not,

6   to have the seller pay for the home warranty?

7   A    Yes.

8   Q    And if you go two more pages in, please, I assume -- you

9   know, and correct me if I'm wrong -- there had to be some

10  amount of discussion in this Section F where you got the

11  seller to agree or maybe your agent got the seller to agree to

12  pay $4,000 towards closing costs?

13  A    I asked them to pay $4,000 in closing costs, yes.

14  Q    As part of your negotiation to buy the property, you

15  said, This is what I want in order to buy the property, and

16  they agreed?

17  A    Correct.

18  Q    Now, because this was your purchase of the property,

19  you, yourself, didn't have to pay Mr. Bryant directly his

20  commission cost, right?

21  A    Correct.

22  Q    The seller instead paid that commission cost?

23  A    Correct.

24  Q    And it was helpful to you to have the seller pay

25  Mr. Bryant's commission so that you didn't have to come out of
```
340

1  pocket with that money?

2  A    I did not have to come out of pocket with the money,

3  that's correct.

4  Q    And that's a good thing, not having to come out of

5  pocket with extra money?

6  A    Sure.

7  Q    And when you were looking for a home, it's correct you

8  knew that your agent had access to the MLS and properties that

9  were listed for sale there, right?

10  A    I don't think that at the time I really understood what

11  the MLS was, but that's my understanding, is that he had

12  access to that.

13  Q    Right.  And that's useful at least in making sure you've

14  got the universe of potential houses you might be interested

15  in?

16  A    Say that again.

17  Q    It was useful to have the ability to have this catalog

18  of houses from which you could choose so you've got a large

19  amount of choice?

20  A    Yes.

21  Q    In this Tracy Avenue transaction, you benefited from the

22  sellers paying your broker's commission, correct?

23  A    Yes.

24  Q    And you would agree, would you not, sir, that them

25  paying for Mr. Bryant's services or paying his commissions,

                                341

```
 1   that helped you tremendously?

 2   A    I would say it was a help, yeah.

 3   Q    Would you also say "tremendously"?

 4   A    No.

 5   Q    Okay.  All right.  I'm not going to quibble, but, you

 6   know, it was a help.

 7           Let's move ahead to the sale of the Tracy property,

 8   and I don't have to take much time on this because

 9   Mr. Ketchmark already -- oh, I'm sorry.  I did have a little

10   bit of math to do on this purchase, I believe.

11           MR. ECHOLS:  Yeah.  If we could please pull up

12   D-3772.

13   Q    (BY MR. ECHOLS) Do you recognize this, sir, as the

14   closing disclosure for your purchase of the Tracy Avenue

15   property?

16   A    Yes.

17   Q    And this is dated December 2018.  It shows you there as

18   the borrower and the sales price of $174,000, correct?

19   A    Yes.

20   Q    If we could go to the next page, please, towards the

21   bottom.

22           THE COURT:  3772 is admitted.

23           MR. ECHOLS:  Thank you, Your Honor.

24   Q    (BY MR. ECHOLS) Towards the bottom of the next page,

25   you'll see in the Section H of "other," a couple of line
```

                                  342

```
 1    items.
 2              So we've got ReeceNichols, who is -- who was
 3    involved -- in this case there were different offices on both
 4    sides of the transaction, right?
 5    A    Yes.
 6    Q    And there's a fixed commission you see there for $315,
 7    and then the real estate commission of $8,700.  Do you see
 8    that?
 9    A    Yes.
10    Q    Now, I have a calculator I can get to show you, if you
11    need, but what I'd like to do -- have my exhibits here.
12              MR. ECHOLS:  Did the math here, Mike.
13              THE COURT:  Any objection, Mr. Ketchmark?
14              MR. KETCHMARK:  Any objection to --
15              THE COURT:  Whatever he showed you.
16              MR. KETCHMARK:  Well, he just showed me some math.
17              MR. ECHOLS:  Yeah, just like you did, some simple
18    math.
19              MR. KETCHMARK:  Sure, sure.  No objections.
20    Q    (BY MR. ECHOLS) Just very briefly, then.
21              MR. ECHOLS:  If we could please pull up DX-DEM003.
22    Q    (BY MR. ECHOLS) Yeah, so what we've done here is very
23    basic math, and, again, feel free, if we want to use a
24    calculator, is you've taken the commission of $8,700, divided
25    the purchase price of $174,000, and you see that that comes
```
                                   343

1  out to a 5-percent commission?  You see that, sir?

2   A    I mean, I don't know that math, but I'll assume that

3  that's correct.

4   Q    Okay.  And then we're going to ask them to confirm that

5  I'm doing the math correctly.

6          And, you know, there's that $315.  If you want to

7  add that in, it takes it to a 5.18 percent commission, I will

8  warrant to you.

9          So here your very first purchase out of law school,

10  first homeownership, and it's a sales -- purchase of sale

11  transaction in Missouri with a 5-percent commission, correct?

12   A    I don't know what the math is with both of those fixed

13  commission fees that were on there, but sure.

14   Q    Okay.  And now, did you negotiate this to 5 percent?

15   A    No.  I didn't know you could negotiate them.

16   Q    Do you have any contact with the seller -- the seller

17  obviously -- somebody negotiated this to be a 5 percent, not a

18  6 percent, 7 percent, 10 percent, a 5-percent commission?

19   A    No one ever mentioned negotiating commission to me; so I

20  don't know if the buyer did it either.

21   Q    Okay.  Let's please go to the sale of the Tracy

22  property, Exhibit 3859.

23          MR. ECHOLS:  Your Honor, this is D3859.  It's

24  actually I see the same document as P2225 that Mr. Ketchmark

25  moved in earlier.

                           344

THE COURT:  3859 is admitted as well.

MR. KETCHMARK:  All right.

3   Q    (BY MR. ECHOLS) Let me skip all the way to the portion

4   Mr. Ketchmark was asking you about, Section 11 in the back on

5   compensation.

6   A    Okay.

7   Q    Paragraph 11.  Okay.  Now, here this is the transaction

8   for the sale of the Tracy property where you had Mr. Blake

9   Dankert, your friend, serving as your seller agent, right?

10  A    I think Blake was just an associated agent or something,

11  maybe a buyer's agent, but Brandy Murphy was the agent that

12  listed the house.  I think --

13  Q    Blake and Brandy worked together, right?

14  A    Yeah.  I think Brandy is Blake's boss.

15  Q    Right.  And Mr. Ketchmark said and asked you, Now, you

16  didn't sit down and have a conversation about this contract

17  and the commission rate, correct?

18  A    Correct.

19  Q    Nothing stopped you, sir, from sitting down and having

20  that conversation, did it?

21  A    The only time I ever saw these numbers was on here when

22  they were already filled in; so I just assumed that it could

23  not be discussed.

24  Q    Sir, as an attorney, seeing blanks that have amounts

25  filled into them, you are testifying that you thought you had

                                345

1  no ability to negotiate such terms?

2   A    Correct.

3   Q    I just want to make sure that's clear, that you're

4  testifying before the jury that you thought that any standard

5  terms in the contract that you were provided, you had no

6  ability to negotiate those?

7   A    Correct.

8   Q    All right.  I'll come back to that.

9          It's correct, is it not, that you did not ask

10  Mr. Dankert or Ms. Murphy to lower the commission rate of the

11  6 percent?

12   A    Correct.  There was never a discussion of changing

13  commission rates.

14   Q    Similarly, you didn't question about the provision that

15  allowed for the split 50/50 of the commission between a buyer

16  broker and a seller broker, right?

17   A    Correct.  I just assumed this is what had to be done.

18          MR. ECHOLS:  If we could move to Exhibit D-3858.

19          THE COURT:  3858 is admitted.

20   Q    (BY MR. ECHOLS) And now you -- briefly on this, we see

21  this change form.  You were in a hot market and were having

22  success in selling your property, and so this shows we were

23  increasing the price from 192,000 up to 200,000 at this point,

24  correct?

25   A    Correct.

346

```
 1    Q    If you'll go a couple of pages in, this is probably a
 2   form you've seen other times to this Missouri broker
 3   disclosure form.  This is a document you -- yeah, there we go
 4   -- signed off on.
 5            You've seen this before, have you not, sir, that the
 6   information provided by the law, it says that -- if you go
 7   down to the second to last paragraph:  Missouri laws require
 8   if you want representation, you must enter into a written
 9   agreement.  This may or may not require you to pay a
10   commission.
11            Do you see that?
12   A    Yes.
13   Q    And you were aware of that when you went to add and
14   signed on with Mr. Dankert, your friend, and Ms. Murphy for
15   the sale of the property?
16   A    Correct.
17   Q    Now, there was another property that you purchased.  Is
18   it the Troostwood house?
19   A    I purchased the house on Troostwood, yeah.
20   Q    If we could take a look at Exhibits D-3857.
21            THE COURT:  3857 is admitted.
22   Q    (BY MR. ECHOLS) You'll see, sir, your name there.
23   Again, you used Mr. Dankert for this purchase, correct?
24   A    Yes.
25   Q    And the -- you see on -- further down on the first page
                                347
```

1   there, there's a broker's obligations.  There's what he's

 2   committing to do in assisting you in identifying and assisting

 3   with the purchase of the property?

 4   A    Yes.

 5   Q    And then if you turn to the next page, there's a

 6   compensation term, which, again, you agreed to that -- even in

 7   his situation as being your buyer's broker, if he weren't to

 8   receive compensation from the seller, that you would pay his 3

 9   percent; is that right?

10   A    Again, yeah, this was sent to me filled out; but, yeah,

11   I see that.

12   Q    Right.  But you had the opportunity to talk to

13   Mr. Dankert, request any information that you needed about it

14   to be comfortable with signing it, correct?

15   A    I believe the conversation was:  Hey, I sent you an

16   email.  Can you log in and sign?

17   Q    And you read and signed, right?

18   A    I did.

19   Q    Now, there's one other property that I want to ask you

20   about, the investment property on 63rd Terrace.

21   A    Okay.

22   Q    If we could take a look, please, at D-3944.

23        So here we've got as buyers, and you said this was

24   an investment property for rent, of Ethan Adkisson and Jeremy

25   Keel.  Who is Mr. Adkisson?

                              348

```
 1    A    That's my partner.

 2    Q    The property is 724 East 63rd Terrace, and you're

 3    engaging ReeceNichols here to provide you services in

 4    connection with buying this property; is that right?

 5    A    Correct.

 6    Q    If you go down, please, to the compensation section.

 7    And this was very confusing to me because here it states that

 8    the compensation will be MLS, and then 3.5 percent is left

 9    blank, and it goes on from there.

10         Now, was this a term that you negotiated with the

11    ReeceNichols' agents?

12    A    I don't remember having a conversation about the MLS.

13         MR. KETCHMARK:  Can you move 3944 in just for the

14    record?

15         MR. ECHOLS:  Yes.  Sorry.  We move 3944, Judge.

16         THE COURT:  Admitted.

17    Q    (BY MR. ECHOLS)  And there's the note above there in

18    this compensation that says:  Laura and Aaron will pay the

19    $475 buyer agency fee, and buy pays the $335 ReeceNichols'

20    fee.

21         Do you see that?

22    A    Yes.

23    Q    Was that a particular provision that you negotiated?

24    A    I don't remember.

25    Q    You don't recall?
```

349

MR. ECHOLS:  All right.  Well, let's go to Section

 8, if we can, in this buyer agency agreement, a few pages in.

  Q    (BY MR. ECHOLS) Now, here we have -- you've got the

 ReeceNichols' standard form that's been provided to you with

 this various information.  This is something I've never seen

 in my 24 years of practice.

          But you had a standard arbitration agreement in the

 standard form, and then there's a handwritten interlineation

 striking it out with an X.  Do you see that?

  A    Yes.

  Q    And then there's initials there.  That's a JK on the

 left; is that right?

  A    Yes.

  Q    And then EA.  That's your partner, Mr. Adkisson, right?

  A    Yes.

  Q    And so you got this standard form with this standard

 term and decided that you didn't like it, and you were going

 to strike it, and that's what you did, right?

  A    Yes.

  Q    And this is arbitration agreement; meaning, if you had a

 dispute, you would have had to go to arbitration.  And you

 were saying, no, I'm not going to be stuck with arbitration.

 I want to go to court if I want to.

  A    Correct.

  Q    Okay.  And if we go down to the next paragraph as well,

                          350

```
 1    again, something novel to see.  You've got the jury trial and
 2    class action waiver that you see in just about every standard
 3    form these days, I would say, but --
 4              MR. KETCHMARK:  Objection, Your Honor.
 5              THE COURT:  Just ask a question.  Sustained.
 6              MR. ECHOLS:  Sure.  Sorry.
 7    Q     (BY MR. ECHOLS) But here, again, you've stricken this
 8    provision out, correct?
 9    A     Correct.
10    Q     You did not want to waive the jury trial class action
11    availability when you signed this contract?
12    A     Correct.
13    Q     If we could go to the next page, you will see there, if
14    you could confirm, sir, these are your signatures and your
15    partner's signatures on this contract?
16    A     Correct.
17    Q     Now, last thing I want to ask you about with this
18    purchase, this purchase went through?  Although you had
19    stricken these provisions, ReeceNichols agreed, and you were
20    able to buy the property, right?
21    A     Correct.
22    Q     And when you bought this property, is it not the case,
23    sir, that -- as we do the math, actually take it from what
24    you've provided to us, this was done at a 4-percent commission
25    price?
```

351

```
 1    A    Correct.
 2    Q    And this was 2 percent to the buyer agent and 2 percent
 3    to the listing agent, right?
 4    A    I don't remember the split, but I do remember that it
 5    was about 4 percent.
 6    Q    Right.  I have here your written interrogatories.  Would
 7    you like me to provide them to you so you can refresh your
 8    recollection?
 9    A    Sure.
10         THE COURT:  Did he agree with you, though, that it's
11    4 percent?
12         MR. ECHOLS:  Yes, sir.
13         THE COURT:  I don't think there's anything to
14    impeach him on.
15         MR. ECHOLS:  I beg your pardon?
16         THE COURT:  There's nothing to impeach him on.  He
17    agreed with you.
18         MR. ECHOLS:  Okay.  If you agree it was 4 percent.
19    Q    (BY MR. ECHOLS)  And it was a 2-percent split.  And,
20    sir, it is the case, is it not, that this commission was
21    negotiated?
22    A    Correct.
23    Q    Okay.  And this is in the state of Missouri after you
24    are a participant in this lawsuit and a purchase or sale
25    transaction with a 4-percent commission and a 2 percent,
```
352

```
 1   2-percent split?

 2   A    Correct.

 3            MR. ECHOLS:  Okay.  Thank you.

 4            No further questions.

 5            THE COURT:  Any other questions by any other defense

 6   counsel?

 7            MR. MacGILL:  Not HomeServices, Your Honor.

 8            MS. TOPOL:  Not NAR, Your Honor.

 9            THE COURT:  Thank you.

10   REDIRECT EXAMINATION BY MR. KETCHMARK:

11   Q    Before I get to the striking of these provisions, that 4

12   percent, that's not a part of this lawsuit.  Can you explain

13   to the jury what that involved, this whole 4-percent

14   situation?

15   A    Yeah.  So we randomly went to an open house one day.

16   The listing agent was at the open house, and we were just

17   casually talking to her.  We liked the house.  It was a good

18   deal, yada, yada, yada.  And we were like, well, if we buy

19   another house, I don't think we're going to use a realtor,

20   because I knew the process and I was thinking, you know, I can

21   fill out a PDF.  I don't need a realtor.

22            And she was like, Well, you do need someone because

23   it's very intricate.  You need someone on your side.  So we

24   were like okay.  She said, Let me have my partner do it for

25   you.  So Laura was the listing agent.  Aaron is her partner.
```
                                 353

1    Aaron is the one that represented us.  They said that they

2    would take a reduced commission in order for us to agree to

3    let them do both sides.

4    Q    To sell you the house?

5    A    Correct, to sell us the house.

6    Q    So that was the seller of the house who ended up paying

7    that when you said you actually didn't need somebody; is that

8    right?

9    A    Correct.

10   Q    Now, I want to talk about when you became involved --

11   and that has nothing to do with this lawsuit.  What you just

12   described there is not a part of this lawsuit, right?

13   A    Correct.  That was just a purchase.

14   Q    Now, I want to talk to you.  You became a class

15   representative in this case on June 30th of 2021; is that

16   correct?

17   A    Yes, I believe so.

18   Q    And one of the contracts that was entered into by you

19   that, again, doesn't -- all this stuff -- this Exhibit 3944,

20   this HomeServices ReeceNichols' contract, that the attorney

21   for Keller Williams was just talking to you about, that's not

22   the one that's at issue in this case; is that a fair

23   statement?

24   A    Correct.  That's a different house.

25   Q    But one of the things that we do see here, and I believe

354

```
1    he actually referred to it as a standard portion of all of

2    these contracts now.  You remember when he said that to you?

3    A    Yes.

4    Q    One of the things that you struck out, and you said,

5    Boy, this is weird, I haven't seen it before.  The attorney

6    for Keller Williams said he had not seen it before?  Do you

7    remember that?

8    A    Yes.

9    Q    So this is after you have now become a member of this

10   lawsuit and you've had an opportunity to learn about what's

11   been happening in the real estate industry, correct?

12   A    Correct.

13   Q    And one of the things you saw here in this contract when

14   you bought this home, and this is as a buyer, not as a seller,

15   correct?

16   A    Correct.

17   Q    That HomeServices had put in here an arbitration clause

18   to say now if you're doing it, you're going to be stuck in

19   arbitration and you can't go to trial.  That's what they said,

20   correct?

21   A    Correct.

22   Q    And you struck that out, correct?

23   A    I did.

24   Q    And then the next thing he said in there was I guess

25   there was a big surprise with the Keller Williams' company,
```
355

that they had also put in here in HomeServices where they were

trying to get you to waive your right to a jury trial and to

waive the right to be a part of a class action lawsuit.  And

what they're saying here in this ReeceNichols and

HomeServices, hey, sign this form and waive your right to have

a jury be able to hold their company accountable or to be a

class representative as a class of people.  That's what it

said, right?

A    Correct.

Q    But because you had -- now at this point in time, this

is after this lawsuit's been filed, after you now understand

what's happening in this industry, what did you do to that?

A    I thought now that I know better, I'll do better, and I

didn't want to agree to that.

Q    And you crossed it off because you said if they do

something that's wrong under the law, you want a jury to be

able to hold them accountable and not be stuck in some

arbitration, correct?

A    Correct.

Q    And you said that what you want to be able to do with

HomeServices is to be able to not just be there by yourself

over a couple thousand dollars, but to be able to be a

representative of other people because that's what's called a

class action.  You were saying they need to waive this in

their standard contract, correct?

```
 1    A    Correct.

 2    Q    Now, just in fairness, to be clear, that has nothing to

 3    do with this lawsuit because this is when you were a buyer,

 4    correct?

 5    A    Correct.

 6              MR. KETCHMARK:  Thank you very much for your time,

 7    and I have no further questions for you.

 8              THE WITNESS:  Thank you.

 9              THE COURT:  Sir, you may step down, and you're the

10    third Republic Tiger in the courtroom today.

11              THE WITNESS:  I've heard that.  Thank you.

12              THE COURT:  Ladies and gentlemen of the jury, we're

13    going to go ahead and recess for the evening.  We'll pick it

14    back up at 8:30 tomorrow morning.  I'll just remind you of the

15    earlier instruction.  Don't talk about it, don't research it,

16    don't read about it.  We'll be in recess.

17              We're starting tomorrow at 10:30.

18    (The following proceedings were had out of the presence of the

19    jury:)

20              THE COURT:  Do we have some we need to move into --

21              MR. FADLER:  Your Honor, thank you for asking.

22    Mr. Glass and I are going to confer tonight, and we'll be

23    ready to go tomorrow morning.  Thank you for asking.

24              THE COURT:  You're welcome.

25              MR. RAY:  Mr. Ketchmark had been pretty good up to
```
                                 357

1  this point.  If we are going to like just lead our own

2  witnesses if that's going to be the case, that's fine.  I

3  didn't want to object the last time.  I think there was an

4  excessive amount of leading on redirect.  So I didn't know how

5  Your Honor felt about that.  We didn't want to object.

6          MR. KETCHMARK:  If you want to object, we can take

7  an objection up at that point is what I would say.

8          THE COURT:  It's reasonable to help him get it done.

9  He's obviously not supposed to just leave, and he'll do better

10  in the future.

11          MR. RAY:  Thank you.

12          MR. ECHOLS:  We had --

13          THE COURT:  You've got a radio or a TV voice.

14          MR. KETCHMARK:  I actually wrote a note to Fadler

15  that said, I love this man's voice.

16          MR. ECHOLS:  The problem is, Judge, I also have a

17  face for radio.

18          Exhibit 3767, there was no objection, but I think we

19  failed to move it in.

20          MR. KETCHMARK:  No objection, Your Honor.

21          THE COURT:  3767.  Sara, 3767 is admitted.

22          MR. MacGILL:  Your Honor, may we have an agreement

23  in order to exchange all parties' demonstrative exhibits using

24  the courtroom like today and opening statements, we --

25          THE COURT:  As long as it's both ways, do -- you
                            358

```
 1    don't need my agreement to rubber stamp this.  It would sure
 2    be nice if you traded exhibits.
 3            MR. KETCHMARK:  He's talking about trading exhibits,
 4    but he slipped in opening statements.  He's asking for a copy
 5    of my whole PowerPoint opening statement.  I said that's not
 6    what I do, I'm not going to do that.  I think he tried to slip
 7    that in.  I have no problem with demonstrative exhibits, but
 8    I'm not going to give you my opening statement.
 9            MR. MacGILL:  That's what we were asking.  As you
10    know, before we gave our opening statement, we think it's
11    reasonably customary to hand them over before we give them.
12    We've done that.  We think Mr. Ketchmark ought to do that.
13    The demonstrative exhibits today, the same thing.
14            MR. KETCHMARK:  I didn't ask for it.  I'll give it
15    back if you want.  That's not what I do.
16            THE COURT:  I'm not going to retroactively make him
17    give you his opening statement.
18            MR. MacGILL:  Understood.
19            THE COURT:  See you tomorrow at 10:30.
20                    ***********************
21
22
23
24
25
                              359
```

```
 1                REPORTER'S CERTIFICATE

 2

 3           I certify that the foregoing pages are a correct

 4   transcript from the record of proceedings in the

 5   above-entitled matter.

 6

 7   _____        _____

         Date               /s/Gayle M. Wambolt
 8                          GAYLE M. WAMBOLT, CRR, RMR
                            United States Court Reporter
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```